UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**       'O'

| Case No. | 2:15-cv-06633-CAS(AJWx) | Date | September 29, 2015 |
|---|---|---|---|
| Title | THE WIMBLEDON FUND, SPC (CLASS TT) V. GRAYBOX, L.L.C., ET AL. | | |

| Present: The Honorable | CHRISTINA A. SNYDER | | |
|---|---|---|---|
| Catherine Jeang | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**   (IN CHAMBERS) - PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## I.   INTRODUCTION

Plaintiff, The Wimbledon Fund, SPC (Class TT) ("Wimbledon"), filed this action on August 28, 2015 against defendants Graybox, L.L.C. ("Graybox"), Integrated Administration, Eugene Scher, as trustee of the Bergstein Trust, and Cascade Technologies, Corp. (collectively, "defendants"). Dkt. 1. In brief, the complaint alleges that Wimbledon was the victim of a fraudulent investment scheme involving an investment advisory company named Swartz IP Services Group ("SIP"). See generally Id. Wimbledon asserts that in November and December 2011, it invested $17.7 million dollars with SIP pursuant to a note purchase agreement, but that subsequently SIP caused this investment to be transferred to various third parties, including defendants. Id. at 4-6. Wimbledon asserts that these transfers violated its agreement with SIP and constituted fraudulent transfers in violation of the California Uniform Fraudulent Transfer Act ("CUFTA"). See id. Accordingly, Wimbledon asserts claims against defendants for recovery of fraudulent transfers pursuant to California Civil Code §§ 3439.04, 3439.05, and 3439.07. Id. at 7-12.

In the instant motion, Wimbledon requests a preliminary injunction freezing the assets of defendant Graybox in order to prevent Graybox from dissipating a $2.9 million wire transfer it is expected to receive in the coming weeks. Mot., at 1. Wimbledon believes that these funds are the only assets likely to satisfy its fraudulent transfer claim against Graybox. Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**     'O'

| Case No. | 2:15-cv-06633-CAS(AJWx) | Date | September 29, 2015 |
|---|---|---|---|
| Title | THE WIMBLEDON FUND, SPC (CLASS TT) V. GRAYBOX, L.L.C., ET AL. | | |

On September 9, 2015, Wimbledon filed the instant motion for a preliminary injunction against Graybox. Dkt. 16. On September 25, 2015, Graybox filed an opposition, Dkt. 50, and on September 28, 2015, Wimbledon filed a reply, Dkt. 52.

## II. BACKGROUND

### A. SIP, Graybox, and the Note Purchase Agreement

According to Graybox, SIP was formed on December 10, 2010 for the purpose of providing advisory services and making investments. Dkt. 50-2, Decl. of David Bergstein ("Bergstein Decl."), ¶ 3. During the period relevant to this suit, the president and secretary of SIP was David Bergstein ("Bergstein"). Dkt. 16, Ex. E, SIP Resolution. Bergstein was also the founder of Graybox and, since its founding, has always been the primary manager of Graybox. See Bergstein Decl., ¶¶ 2-3. Shortly after SIP was formed it entered into a consulting agreement with Graybox whereby Graybox would provide consulting services to SIP in exchange for a quarterly fee of at least $50,000. Opp'n., at 4. In accordance with this and other agreements, SIP and Graybox engaged in a number of collaborate investment activities during the period relevant to this action. See Opp'n., at 4-7.

On or about November 14, 2011, Wimbledon and SIP entered into a Note Purchase Agreement (the "NPA"). Dkt. 16, Ex. A, NPA. Pursuant to this agreement, Wimbledon had the right to purchase up to $25 million worth of reference notes issued by SIP (the "SIP Notes"). Id. at 1. The NPA stated that the value of the SIP notes would be tied to the performance of the Tewksbury Investment Fund. Id. at 9. Wimbledon states that the Tewksbury Investment Fund is a multi-billion dollar hedge fund, well-known in financial circles for its stability and successful annual returns. Dkt. 16, Ex. B, Decl. of Vincent King ("King Decl.").

Pursuant to the NPA, the SIP notes were scheduled to become due and payable in full as of November 14, 2016, although Wimbledon could extend this date to November 14, 2021. Id. Notwithstanding these provisions, the NPA permitted that on or after December 1, 2011 and with thirty days written notice, Wimbledon could make a "redemption request" upon SIP. Id. at 11. Upon receipt of a valid redemption request, SIP was required to pay a portion of the value of the SIP Notes to Wimbledon. Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**      'O'

| Case No. | 2:15-cv-06633-CAS(AJWx) | Date | September 29, 2015 |
|---|---|---|---|
| Title | THE WIMBLEDON FUND, SPC (CLASS TT) V. GRAYBOX, L.L.C., ET AL. | | |

Furthermore, in the event that SIP failed to comply with any of the terms of the NPA, and failed to resume compliance within thirty days, Wimbledon was entitled to declare the SIP Notes immediately due and payable in full. Id.

In November and December 2011, Wimbledon made payments of $12.5 and $5.2 million, respectively, to SIP to purchase SIP Notes. King Decl., ¶ 4. Bank account statements provided by Wimbledon appear to indicate that at or around the time Wimbledon purchased the SIP Notes, SIP opened bank accounts with Wells Fargo and Deutsche Bank and made deposits in the amount of Wimbledon's investment. Dkt. 16, Ex. H, Wells Fargo Acct. Statement; Dkt. 16, Ex. I, Deutsche Bank Acct. Statement. Wimbledon contends that shortly after these funds were deposited, through a series of withdrawals and wire transfers SIP transferred virtually all of these funds to third parties. Mot., at 1. Wimbledon alleges that Bergstein authorized the majority of these transfers and that many of the transfers were made to Bergstein's company, Graybox. Mot., at 3-4. In total, Wimbledon contends that between November 2011 and July 2012 Bergstein directed the transfer of $2,412,000 to Graybox and that these transfers (the "Graybox Transfers") were inconsistent with and violated the NPA. Mot., at 3.[1]

---

[1] In support of these allegations, Wimbledon has produced a number of account statements and summaries purportedly from SIP's accounts with Wells Fargo and Deutsche Bank. The Wells Fargo statement indicates that a deposit of $5.2 million was made on December 8, 2011. Dkt. 16, Ex. H, Wells Fargo Acct. Statement, at 2. Through a series of wire transfers and withdrawals, over the next fifteen days all but $67,875 was removed from this account. Id. The statement indicates that $300,000 was transferred to Graybox via two wire transfers. Id. Similarly, the Deutsche Bank statements indicate that a cash deposit of $12,500,000 was made in late November 2011. Dkt. 16, Ex. I, Deutsche Bank Acct. Statement. Summaries of these accounts indicate that within eight months this account was virtually depleted. Dkt. 16, Exs. O, P. Wimbledon has also produced a series of communications from this period in which Bergstein directed Deutsche Bank to transfer funds from the Deutsche bank accounts to Graybox. See, e.g. Dkt. 16, Ex. R (requesting transfer of $75,000 to Graybox on December 6, 2011); Ex. S (requesting transfer of $200,000 to Graybox on January 4, 2012); Ex. X (requesting transfer of $160,000 to Graybox on March 20, 2012); Ex. BB (requesting transfer of $600,000 to Graybox on June 4, 2012).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES - GENERAL** | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-06633-CAS(AJWx) | Date | September 29, 2015 |
| Title | THE WIMBLEDON FUND, SPC (CLASS TT) V. GRAYBOX, L.L.C., ET AL. | | |

In August and October 2012 and in January 2013, Wimbledon made redemption requests on SIP to return portions of Wimbledon's investment. King Decl. ¶ 5. Wimbledon contends that SIP ignored these requests. Id. In February 2013, Wimbledon declared the notes immediately due and payable. Id. ¶ 6. Wimbledon contends that SIP ignored their request to accelerate payment of the notes. Id. On February 8, 2013, Wimbledon filed suit in New York state court asserting a claim for breach of contract against SIP. Dkt. 16, Ex. C. In the New York action, Wimbledon alleged that SIP's failure to comply with Wimbledon's redemption requests and notice to accelerate payment of the SIP Notes constituted a breach of the NPA. Id. Accordingly, Wimbledon requested damages in the amount of the unpaid balance of the SIP Notes. Id. Wimbledon alleges that on July 14, 2015, the New York state court entered judgment in its favor. Dkt. 16, Ex. C, Decl. James Walker ("Walker Decl.").

Graybox argues that the transfers Wimbledon identifies were in fact legitimate and that they were approved by Wimbledon's managing entity, Weston Capital Management L.L.C and/or Weston Capital Asset Management, L.L.C. (collectively, "Weston"). Opp'n., at 4-6. During the period relevant to this suit, Wimbledon retained Weston to manage its investments. Bisconti Decl, Ex. 29, ¶ 10; Reply, at 1. Beginning around October 2011, SIP and Graybox entered into several agreements with Weston and another entity controlled by Weston, Pineboard Holdings ("Pineboard"). Graybox argues that the Graybox Transfers were made pursuant to these agreements.

Specifically, on October 1, 2011, Graybox and Pineboard entered into a funding and services agreement. Opp'n., at 5. Pursuant to this agreement, Graybox advanced funds for a number of Pineboard's expenses and then submitted requests to Pineboard for reimbursement. Id. On November 18, 2011, SIP and Pineboard arranged for SIP to purchase a $5 million note from Pineboard. Id. SIP and Pineboard agreed that, as partial payment for the note, SIP would assume Pineboard's obligation to reimburse Graybox under the funding and services agreement. Id. Graybox claims that the majority of the Graybox Transfers were made pursuant to this arrangement between SIP and Pineboard. Id. at 5-6.

Additionally, on July 2, 2012, SIP and another company, Glendon Group, Inc. ("Glendon"), entered into a Stock Purchase Agreement (the "Glendon SPA"). Id. at 6.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**       'O'

| Case No. | 2:15-cv-06633-CAS(AJWx) | Date | September 29, 2015 |
|---|---|---|---|
| Title | THE WIMBLEDON FUND, SPC (CLASS TT) V. GRAYBOX, L.L.C., ET AL. | | |

Pursuant to this agreement, SIP agreed to purchase $1 million worth of Glendon's common stock. Id. In order to facilitate this purchase, SIP, Weston, and Graybox agreed that Graybox would cause a loan of $1 million to be made to SIP and that this loan would be financed by advancing up to $900,000 to Graybox. Id. Graybox argues that many of the Graybox Transfers were made in connection with this arrangement to advance funds to Graybox to finance the Glendon SPA. Id. Furthermore, Graybox argues that, because Weston managed Wimbledon during this period, Weston's knowledge and approval of these agreements should be imputed to Wimbledon. Id. [2]

Wimbledon responds that a closer look at these transactions indicates that the entities involved were primarily owned and operated by principals at SIP, including Bergstein. Reply, at 4. For example, Bergstein is the founder and president of Pineboard. Reply, Ex. 1, ¶ 42. Similarly, Glendon is an entity controlled by Kiarash Jam ("Jam"). Reply, at 4. Wimbledon alleges that Jam was one of the founders of SIP. Mot., at 1. And at all times relevant to these agreements, Bergstein was the primary manager of both Graybox and SIP. Reply, at 4. Accordingly, Wimbledon argues that these were not legitimate transactions. Id. With regard to Weston, Wimbledon argues that Weston was a participant in SIP's alleged fraud and accordingly, its actions or knowledge should not be imputed to Wimbledon. Id. In June 2014, the Securities and Exchange Commission ("SEC") filed a complaint against Weston based, in part, on its actions managing Wimbledon. Reply, Ex. 3, SEC Compl. In its complaint, the SEC alleges that:

> [b]eginning in August 2011, Weston . . . and its principal Albert Hallac perpetuated a fraud at a cost of more than $17 million to a hedge fund they manage. Under a purported swap transaction with a consulting and investment firm known as Swartz IP Services Group Inc., they drained the Weston-managed hedge fund Wimbledon Fund."

---

[2] Graybox also argues that between November 22, 2011 and May 31, 2012 at Weston's direction, at least $7,275,675 was transferred to various Weston-managed entities including Wimbledon. Opp'n. at 7. However, Graybox identifies only $1 million which was actually transferred to Wimbledon. Bergstein Decl. ¶ 16. Wimbledon argues that this money was not actually transferred to Wimbledon, and that Weston directed these transfers for its own benefit. Reply, at 5 n.4.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**  'O'

| Case No. | 2:15-cv-06633-CAS(AJWx) | Date | September 29, 2015 |
|---|---|---|---|
| Title | THE WIMBLEDON FUND, SPC (CLASS TT) V. GRAYBOX, L.L.C., ET AL. | | |

Id. ¶ 1. The complaint also alleged that "Hallac, his son Jeffrey Hallac, and [Weston's counsel] collectively received $750,000 from Swartz IP. This money was investor money . . . which had been transfered to Swartz IP." Id. ¶ 2

### B. Graybox's Corporate Activities

Wimbledon contends that there is substantial evidence that Graybox is a "sham" corporation used primarily as a vehicle for Bergstein to route funds for his personal expenses and business ventures. Mot., at 6. In support of these accusations, Wimbledon relies primarily on a report generated by the trustees in a bankruptcy proceeding to which Graybox was a party. Mot., at 7-8. This report concluded that "Graybox is . . . a shell," "lacked substance," and was "a conduit used to route funds . . . to Bergstein." Dkt. 16, Ex. MM, Trustees' Report, at 354, 371. The trustees based their findings, in part, on evidence that Graybox had transferred funds to Las Vegas casinos to satisfy Bergstein's gambling debts. For example, the trustees identified a payment of $470,000 to the Venetian, two payments of $250,000 to the Wynn Casino, and another payment of $63,000 to the Wynn Casino. Id. at 86, 120, 130, 280. In a declaration submitted in response to the Trustee's report, Bergstein admitted that funds from Graybox were occasionally transferred to Las Vegas casinos to pay for his personal entertainment and gaming activities. Dkt. 16, Ex. D, ¶¶ 6,11. The report also found that Bergstein, and many of the entities he controlled had (1) withheld or deleted numerous computer files during the course of the bankruptcy proceeding, Ex. MM, Trustees' Report, at 6-7, 34-35, 260-63; (2) filed incomplete tax returns, Id. at 284-94; and (3) "likely" backdated documents in an effort to misrepresent when certain assets had been transferred by one of Bergstein's entities, Id. at 295-317.

Graybox responds that many of the allegations contained in this report have never been proven. Opp'n., at 9. Moreover, Graybox notes that subsequent to issuing this report, the Bankruptcy Judge overseeing these proceedings, Judge Russell, determined that the trustees were untrustworthy. Bergstein Decl., Ex. 22, at 13. Among other things, Judge Russell found that the trustees had failed to exercise "due diligence in attending to the administration of the estate," and could not "be trusted to properly manage [the estate]." Nonetheless, Judge Russell's order made no findings with regard to the trustees' report or the evidence on which the trustees relied in creating their report.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**     'O'

| | | | |
|---|---|---|---|
| Case No. | 2:15-cv-06633-CAS(AJWx) | Date | September 29, 2015 |
| Title | THE WIMBLEDON FUND, SPC (CLASS TT) V. GRAYBOX, L.L.C., ET AL. | | |

### C. The Aramid Settlement

Bergstein, Graybox, and a number of other entities connected with Bergstein are parties to an ongoing bankruptcy proceeding, In re Aramid Entertainment Fund Limited, et al., in the Bankruptcy Court for the Southern District of New York. Mot., at 5. On August 18, 2015, a number of the parties to this proceeding, including Graybox, reached a settlement. Id. Pursuant to this settlement Graybox is expected to receive $2.9 million. Id.

The Bankruptcy Court approved the settlement on September 16, 2015. Dkt. 32, at 12. Pursuant to Federal Rule of Bankruptcy Procedure 8002, the settlement will become effective fourteen days later on September 30, 2015, at which point the settlement funds will begin to be distributed. Id. Wimbledon believes that the proceeds of this settlement agreement are the only funds from which it will likely be able to satisfy its fraudulent transfer claim against Graybox. Mot., at 1. Accordingly, Wimbledon requests a preliminary injunction freezing the assets of defendant Graybox in order to prevent Graybox from dissipating the funds it will receive in the settlement. Id.

## III. LEGAL STANDARD

A court may issue a preliminary injunction to preserve the status quo pending trial. L.A. Mem'l Coliseum Comm'n. v. Nat'l Football League, 634 F.2d 1197, 1200 (9th Cir. 1980). Nonetheless, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." Winter, 555 U.S. at 20; Am. Trucking Ass'n, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009). Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the Winter test are also met." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1132 (9th Cir. 2011) (interpreting Winter and explaining that the "sliding scale" test for preliminary injunctive relief remains valid). "Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          'O'

| Case No. | 2:15-cv-06633-CAS(AJWx) | Date | September 29, 2015 |
|---|---|---|---|
| Title | THE WIMBLEDON FUND, SPC (CLASS TT) V. GRAYBOX, L.L.C., ET AL. | | |

investigation.'" Repub. of the Phil. v. Marcos, 862 F.2d 1355, 1362 (9th Cir. 1988) (citations omitted).

Due to the exigent nature of a preliminary injunction, "a court may properly consider evidence that would otherwise be inadmissible at trial." Cherokee Inc. v. Wilson Sporting Goods Co., 2015 WL3930041, at *3. The Court has discretion "weigh [this] evidence as required to reflect its reliability." Dr. Seuss Ents. v. Penguin Books USA, Inc., 924 F. Supp. 1559, 1562 (S.D. Cal. 1996).

## IV. ANALYSIS

### A. Authority to Issue an Injunction Freezing Assets

As an initial matter, Graybox argues that the requested injunction is an inappropriate form of relief. Opp'n., at 11. Specifically, Graybox argues that because the settlement proceeds are not the assets which Wimbledon alleges were fraudulently transferred (i.e. the Graybox Transfers), Wimbledon does not possess a lien or equitable interest in these funds. Id. at 12-13. Accordingly, Graybox contends that the Court may not issue an injunction freezing the settlement proceeds. Id.

In support of this contention, Graybox cites Grupo Mexicano de Desarrollo S.A., v. Alliance Bond Fund, Inc., in which the Supreme Court held that a district court lacks authority "to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed." 527 U.S. 308, 310, 333 (1999). However, the Court expressly stated that its holding was limited to cases in which only monetary damages are requested and did not apply where equitable relief is sought. Id. at 324-25. And the Court stated that its ruling did not apply to cases in which a fraudulent transfer is alleged. Id. at 324, n.7 ("Several States have adopted the Uniform Fraudulent Conveyance Act . . . which has been interpreted as conferring on a nonjudgment creditor the right to bring a fraudulent conveyance claim . . . Because this case does not involve a claim of fraudulent conveyance, we express no opinion on the point.").

Accordingly, the Ninth Circuit has held that Grupo Mexicano does not prevent a court from issuing a preliminary injunction freezing assets where a fraudulent-transfer claim is asserted. See In re Focus Media, Inc., 387 F.3d 1077, 1085 (9th Cir. 2004)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES - GENERAL** | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-06633-CAS(AJWx) | Date | September 29, 2015 |
| Title | THE WIMBLEDON FUND, SPC (CLASS TT) V. GRAYBOX, L.L.C., ET AL. | | |

("Grupo Mexicano thus exempts from its proscription against preliminary injunctions freezing assets [,] cases involving bankruptcy and fraudulent conveyances, and cases in which equitable relief is sought."). Here, Wimbledon asserts a claim for recovery of fraudulent transfers against Graybox and accordingly Graybox's reliance on Grupo Mexicano is unavailing.

    Moreover, Wimbledon is not specifically targeting the settlement proceeds as the only Graybox asset to be frozen. See Reply, at 9. Rather, it is seeking to freeze any and all assets Graybox may possess to prevent Graybox from dissipating those assets prior to resolution of this action. See id. Significant case law supports that a district court may freeze a defendant's assets where there is "a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not ganted." Johnson v. Couturier, 572 F.3d 1067, 1085 (9th Cir. 2009) (citing Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878, 881 (9th Cir.2003); see also In re Focus Media, Inc., 387 F.3d at 1085 (affirming preliminary injunction freezing assets where there was "substantial evidence that assets were being dissipated"); Kremen v. Cohen, 2011 WL 6113198. At *6 (N.D. Cal Dec. 7, 2011) (freezing assets where "there is an appreciable risk that defendants" will dissipate assets). Accordingly, the Court finds that it has the authority to issue the requested injunction.

    **B.    Likelihood of Success**

    The Court finds that Wimbledon has demonstrated that, at a minimum, there are "serious questions going to the merits" regarding its claim for fraudulent transfers against Graybox. Pursuant to California Civil Code § 3439.04(a)(1), a transfer is fraudulent as to a creditor if it is made "with actual intent to hinder, delay, or defraud any creditor of the debtor." In determining whether the transferor acted with "actual intent" the statute provides that a court may consider, among other factors, "(1) Whether the transfer or obligation was to an insider; (2) Whether the debtor retained possession or control of the property transferred after the transfer; . . . (4) Whether before the transfer was made or obligation was incurred, the debtor has been sued or threatened with suit; (5) Whether the transfer was of substantially all the debtor's assets; . . . (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; . . . (10) Whether the transfer

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**  'O'

| Case No. | 2:15-cv-06633-CAS(AJWx) | Date | September 29, 2015 |
|---|---|---|---|
| Title | THE WIMBLEDON FUND, SPC (CLASS TT) V. GRAYBOX, L.L.C., ET AL. | | |

occurred shortly before or shortly after a substantial debt was incurred." Cal. Civ. Code § 3439.04(b).

Here, each of these factors weighs in favor of finding that SIP transferred assets to Graybox with the intent to "hinder, delay, or defraud" Wimbledon. For example, Bergstein was both the president of SIP and the principal manager of Graybox. Accordingly, it appears that the Graybox Transfers were made not only between insiders, but between the same person. See id. § 3439.04(b)(1). Moreover, through Bergstein, SIP likely retained control over Wimbledon's funds even after they were transferred to Graybox. See id. § 3439.04(b)(2). SIP also made many of these transfers after receiving requests to return funds to Wimbledon and after Wimbledon declared the SIP Notes immediately due and payable in full. See id. § 3439.04(b)(4). Finally, the bank account statements provided by Wimbledon indicate that many of these transfers were made shortly after Wimbledon invested funds with SIP (i.e. shortly after SIP incurred its obligation to repay the SIP Notes by 2016) and that after the transfers SIP's bank accounts were virtually depleted. See id. §§ 3439.04(b)(5), (10).

Graybox argues that the Graybox Transfers were not fraudulent because they were made pursuant to ongoing agreements with various investment companies and with the approval of Weston, Wimbledon's managing entity. Opp'n., at 16. However, Graybox's attempt to legitimize these transfers does not cure them of the appearance of impropriety. First, even assuming that Graybox's agreements with Pineboard, Glendon, and Weston, were valid, Graybox provides no explanation of how these agreements comported with the provisions of the NPA. Moreover, it appears that these transactions are merely further instances of insider transactions between SIP and companies owned by its members and directors.

Finally, to the extent Weston may have participated in SIP's alleged scheme to defraud Wimbledon, its conduct may not be imputed to Wimbledon. See F.D.I.C. v. O'Melveny & Myers, 969 F.2d 744, 750 (9th Cir. 1992) ("[T]he knowledge acquired by the agent who is acting adversely to his principal will not be attributed to the principal") (rev'd on other grounds by, 512 U.S. 79 (1994)); Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton L.L.P., 133 Cal. App. 4th 658, 679 (2005) ("Nor is a corporation chargeable with the knowledge of an officer who collaborates with outsiders to defraud the corporation."). Furthermore, while the Court does not accept the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES - GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-06633-CAS(AJWx) | Date | September 29, 2015 |
| Title | THE WIMBLEDON FUND, SPC (CLASS TT) V. GRAYBOX, L.L.C., ET AL. | | |

allegations in the SEC's complaint for their truth, at a minimum, the fact that the SEC has filed a complaint against Weston based on its involvement with SIP raises "serious questions" regarding the propriety of the SIP agreements to which Weston was a party and whether Westons' approval of these agreements may be imputed to Wimbledon.

### C. Irreparable Harm

Wimbledon has also demonstrated that irreparable injury is "likely" in the absence of preliminary relief. Winter, 555 U.S. at 22. Generally, monetary injury is not considered to be irreparable. Nelson v. Nat'l Aeronautics & Space Admin., 530 F.3d 865, 881 (9th Cir. 2008). However, where "there [is] substantial danger that the defendants would transfer or conceal its funds, resulting in denying recovery to the plaintiffs," a preliminary injunction may be appropriate. In re Estate of Ferdinand Marco, Human Rights Litig., 25 F.3d at 1480; see also Johnson, 572 F.3d at 1085 ("A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted.").

In determining whether an asset freeze is appropriate, Courts have frequently looked to evidence of the defendants prior conduct. For example, in Johnson v. Couturier, defendant, the CEO of a corporation, had on prior occasions successfully persuaded his fellow directors and trustees to divert funds from an employee stock ownership plan to his personal bank account. 572 F.3d, at 1085. The Ninth Circuit found that "[s]uch an individual is presumably more than capable of placing assets in his personal possession beyond the reach of a judgment. Accordingly, [defendant's] own *prior conduct* establishes a likelihood that in the absence of an asset freeze and accounting, Plaintiffs will not be able to recover the improperly diverted funds and will thus be irreparably harmed." Id. (emphasis added); See also F.T.C. v. Affordable Media, 179 F.3d 1228, 1236 (9th Cir. 1999) (affirming preliminary injunction "[g]iven the [defendants'] history of spiriting their commissions away to a Cook Islands trust").

Here, Wimbledon has presented evidence that Graybox's manager Bergstein has regularly transferred assets between Graybox and various other entities which he controls, such as SIP and Pineboard. Moreover, while the Court has reservations regarding the trustworthiness of the trustee's report that Wimbledon relies upon, the Court notes that it contains serious accusations regarding the corporate integrity of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES - GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-06633-CAS(AJWx) | Date | September 29, 2015 |
| Title | THE WIMBLEDON FUND, SPC (CLASS TT) V. GRAYBOX, L.L.C., ET AL. | | |

Graybox and other entities controlled and/or managed by Bergstein. And it appears that Bergstein admits to using Graybox funds on at least several occasions to pay for his personal gambling expenses. Taken together, this evidence supports an inference that there is a "substantial danger" that Graybox, upon receipt of the settlement proceeds, will transfer or otherwise dissipate those funds, before this action is concluded.

### D. Balance of the Equities

In balancing the equities, the Court must evaluate the interim harm defendant is likely to sustain if the injunction is granted, and compare it with the harm plaintiff is likely to suffer if an injunction is denied. Winter, 555 U.S. at 24. As stated above, the Court finds that, absent an injunction, Wimbledon will likely have no means of recovering on its fraudulent transfer claim against Graybox. Accordingly, the harm to Graybox from freezing its assets pending resolution of this action is outweighed by the potential harm to Wimbledon if the injunction is not granted. See also Arch Ins. Co., 2012 WL 5897327, at *5 ("[T]he danger that [plaintiff] would not be able to recover on its claims against defendants is greater than the harm to defendants from freezing their assets before trial.").

Nonetheless, Graybox argues that if the Court grants Wimbledon's request for an injunction, multiple non-parties will be adversely affected. Opp'n., at 24. These third parties include twenty-four entities who Graybox asserts have an interest in the settlement proceeds. Id. However, a closer look at the settlement agreement indicates that each of these parties is identified as a "Bergstein Related Party." Bisconti Decl., Ex. 24 § 1.3. Moreover, in the settlement agreement, the signatory for each of these entities was Bergstein. Id. at 16-20. Accordingly, the Court is not persuaded that the alleged harm to these third parties is not simply a harm to Bergstein.

Graybox also argues that various attorneys claim liens on the settlement proceeds based on legal services they have provided to Bergstein and his related entities. Opp'n., at 24. Several of these attorneys have produced declarations asserting that they are presently owed fees for their services and that they are entitled to have those fees paid out of the settlement proceeds. Bisconti Decl., Ex. 37, at ¶ 10; Bisconti Decl., Ex. 38, at ¶ 9. However, other than these declarations, Graybox provides no evidence that these attorneys are entitled to the fees they claim.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          'O'

| Case No. | 2:15-cv-06633-CAS(AJWx) | Date | September 29, 2015 |
|---|---|---|---|
| Title | THE WIMBLEDON FUND, SPC (CLASS TT) V. GRAYBOX, L.L.C., ET AL. | | |

In any event, Graybox does not explain why the hardship these attorneys will suffer outweighs the potential that Wimbledon will have no basis for obtaining adequate relief if an injunction does not issue. Furthermore, Graybox's assertion that it intends to transfer the settlement proceeds to these attorneys and third-parties only serves to bolster Wimbledon's argument that an injunction is necessary to ensure that Wimbledon may recover on its claims. Accordingly, the Court finds that the balance of the equities favors Wimbledon.

### E.     The Public Interest

"When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction.'" Stormans, Inc. v. Selecky, 586 F.3d 1109, 1138–39 (9th Cir. 2009) (quoting Bernhardt v. L.A. County, 339 F.3d 920, 931 (9th Cir.2003)). "If, however, the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." Id. at 1139 (citing Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 965 (9th Cir. 2002)).

Here, Graybox argues that the requested injunction is not in the public interest because it will affect the distribution of the settlement proceeds to non-parties. Opp'n., at 24-25. However, for the reasons stated above, the Court finds that the interests of these parties are outweighed by the potential that Wimbledon will not be able to obtain adequate relief on its claims against Graybox. Accordingly, the public interest is not a significant factor in this case.

### V.    CONCLUSION

In accordance with the foregoing, plaintiff's motion for a preliminary injunction is GRANTED. Plaintiff is directed to submit a proposed order granting the requested

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**     '**O**'

| Case No. | 2:15-cv-06633-CAS(AJWx) | Date | September 29, 2015 |
|---|---|---|---|
| Title | THE WIMBLEDON FUND, SPC (CLASS TT) V. GRAYBOX, L.L.C., ET AL. | | |

injunction. In addition, the parties are instructed to submit additional briefing, not to exceed 10 pages, regarding an appropriate bond, if any.

    IT IS SO ORDERED.

                                                                                               00 : 00

Initials of Preparer          CMJ