PATRICIA L. GLASER - State Bar No. 55668
pglaser@glaserweil.com
G. JILL BASINGER - State Bar No. 195739
jbasinger@glaserweil.com
RICHARD W. BUCKNER - State Bar No. 102545
rbuckner@glaserweil.com
CAMILLA Y. CHAN - State Bar No. 241674
cchan@glaserweil.com
GLASER WEIL FINK HOWARD
   AVCHEN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone:  (310) 553-3000
Facsimile:  (310) 556-2920

Attorneys for Defendants
David Bergstein and Graybox, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| THE WIMBLEDON FUND, SPC (CLASS TT), <br><br> Plaintiff, <br><br> v. <br><br> GRAYBOX, LLC; INTEGRATED ADMINISTRATION; EUGENE SCHER, AS TRUSTEE OF BERGSTEIN TRUST; AND CASCADE TECHNOLOGIES CORP., <br><br> Defendants. | CASE NO.: 2:15-CV-6633-CAS-AJWx <br><br> **DISCOVERY MATTER** <br><br> Hon. Andrew J. Wistrich <br><br> **EX PARTE APPLICATION TO FOR A PROTECTIVE ORDER STAY PRODUCTION OF DOCUMENTS BY BANK OF AMERICA PENDING RESOLUTION OF MOTION TO QUASH SUBPOENA OR FOR PROTECTIVE ORDER, OR, ALTERNATIVELY, TO QUASH SUBPOENA; MEMORANDUM OF POINTS AND AUTHORITIES** |
| AND RELATED CONSOLIDATED ACTION AND THIRD PARTY COMPLAINT. | (Filed Concurrently with: (1) Declaration of David Bergstein; (2) Declaration of Richard W. Buckner; (3) [Proposed] Order <br><br> DATE: NA <br> COURTROOM:     Courtroom 690 (Roybal) <br> Date Filed:         August 28, 2015 <br> Discovery Cutoff:   March 31, 2017 <br> Final Pretrial Conf.: October 2, 2017 <br> Trial Date:          October 24, 2017 |

Glaser Weil

1238406

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Defendants David Bergstein and Graybox, LLC (collectively, the "Moving Parties") hereby apply *ex parte* for a protective order staying production by Bank of America of certain documents related to Graybox pending this Court's ruling on a motion to quash the subpoena issued by Wimbledon seeking those documents or, alternatively, a protective order.  The particular document requests at issue are as follows:

3.      Any and all account statements, records, wire transfers, and documents concerning any account from November 11 2011 through the present date in the name of Graybox.

. . . .

6.      All documents and communications concerning any account from November 2011 through the present date in the name of Graybox.

. . . .

9.      All documents and communications between You and Bergstein concerning any account from November 2011 through the present date in the name of Graybox.

. . . .

13.     All documents and communications evidencing the identity of the individual(s) who made and/or authorized any withdrawals from any account in the name of Graybox from any of Your branch locations.

Declaration of Richard W. Buckner, Ex. A.  As can be seen, these requests seek essentially every scrap of financial information and all banking records related to Graybox in Bank of America's possession for a period of nearly five years up to and including the present.  No effort was made to limit the requests to the relevant time period (which ended in 2012) or to limit the requests by subject matter or party so as to avoid production of irrelevant materials and confidential or private matters such as payments to lawyers, charitable donations, tax payments, political contributions,

Glaser Weil

medical payments, or other payments having nothing to do with this litigation.  Most if not all of the materials sought are irrelevant to this litigation.  Moreover, this information falls within the scope of Graybox's privacy rights and, because Bergstein is the sole manager and owner of Graybox who participates in investments through that entity, it also falls within the scope of Bergstein's privacy rights.  Revealing such materials to the public would be unfairly and needlessly damaging to Graybox and Bergstein.  See Declaration of David R. Bergstein at ¶¶ 2-4.  Those privacy rights outweigh any relevance for such massive and broad requests.

There is an additional reason to protect Graybox's and Bergstein's rights regarding the bank records being sought.  As detailed in the accompanying deposition testimony of Bergstein's former counsel, Alex Weingarten, Wimbledon's counsel has engaged in improper efforts to obtain Bergstein's privileged and confidential information.  Buckner Decl. ¶¶ 6-8 and Exs. D, E.  Moreover, Wimbledon has shown a penchant for suing attorneys who have represented Bergstein and related entities (Aaron Grunfeld and the Law Offices of Henry Jannol are attorneys who have represented Bergstein or related entities in the past and have been named as defendants by Wimbledon in these consolidated actions).  Allowing Wimbledon and its counsel access to Graybox's and Bergstein's private information would risk misuse of that information.

The subpoena to Bank of America has a return date of September 19, 2016 and we have been informed that the Bank will produce the requested documents on that date absent the filing of a motion to stay or quash on or before September 16, 2016 at 4:00 p.m. Eastern.  Buckner Decl. at ¶ 2, 3.  Graybox and Bergstein intend to file a motion to quash the subpoena as to the above-quoted requests or, alternatively, for a protective order but there is not sufficient time to do so before September 19, 2016 while complying with the Joint Stipulation provisions of Local Rule 37.  *Id.*  Counsel for Graybox and Bergstein  and counsel for Wimbledon held the conference required by Local Rule 37 on September 13, 2016 but were unable to resolve the dispute.  *Id.*

1238406

at ¶ 2.  Counsel for Graybox and Bergstein will provide their portion of the Joint Stipulation called for by Local Rule 37 no later than Friday, September 16, 2016 with Wimbledon's portion of the Joint Stipulation due seven days later.  *Id.* at ¶ 2. Counsel for Graybox and Bergstein will then promptly file the motion to quash or for a protective order.

Counsel for Graybox and Bergstein have also requested that Wimbledon agree that Bank of America's production of documents in response to the above-quoted requests be stayed pending the Court's ruling on the motion to quash or for a protective order but it has refused to do so.  *Id.*  Accordingly, Graybox and Bergstein file this *Ex Parte* Application seeking a stay of the production to permit the Court to rule on that motion or for a protective order barring production pending resolution of their motion to quash the subpoena as to the requests quoted above.

Unless the stay sought by this Application is granted, Wimbledon may receive a great deal of information that is both irrelevant and subject to Graybox's and Bergstein's confidentiality and privacy rights.

This Application is made following notice given pursuant to Local Rule 7-19.1. See Buckner Decl. ¶ 2.  Wimbledon's counsel has said it will oppose this application. *Id.*  The names, address, telephone number, and e-mail addresses of Wimbledon's counsel are:

James Walker

Cole Schotz P.C.

2515 McKinney Ave., Suite 1350

Dallas, TX

(469) 557-9391

jwalker@coleschotz.com

Eric S. Latzer

Cole Schotz P.C.

25 Main Street

Hackensack, NJ 07601

(201) 489-3000

elatzer@coleschotz.com


Jeffrey N. Pomerantz

Jeffrey L. Kandel

Pachulski Stang Ziehl & Jones LLP

10100 Santa Monica Boulevard, 13th Floor

Los Angeles, CA 90067

(310) 277-6910

jpomerantz@pszjlaw.com

jkandel@pszjlaw.com

This Application is based on this Application, the attached Memorandum of

Points and Authorities, the accompanying Declarations of David Bergstein and

Richard W. Buckner, and the other papers, records, and files in this case.

DATED:  September 15, 2016        PATRICIA L. GLASER
                                  G. JILL BASINGER
                                  RICHARD W. BUCKNER
                                  CAMILLA Y. CHAN
                                  GLASER WEIL FINK HOWARD AVCHEN &
                                  SHAPIRO LLP


                                  By:      /s/ Richard W. Buckner
                                  _____
                                  Richard W. Buckner
                                  Attorneys for Defendants Graybox, LLC
                                  and David Bergstein

1238406

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PRELIMINARY STATEMENT ................................................................ 1

II.   FACTUAL BACKGROUND ................................................................... 3

    A.   SIP's Investment Activities .......................................................... 3

    B.   Wimbledon's Conduct and Effort to Obtain Confidential and
        Privileged Materials ..................................................................... 5

    C.   The Document Requests at Issue ................................................ 11

III.  ARGUMENT ...................................................................................... 12

    A.   The Materials Sought are Irrelevant .......................................... 13

    B.   The Materials Sought are Subject to Graybox's and Bergstein's
        Privacy Rights and Those Privacy Rights Outweigh any Relevance
        the Materials at Issue Might Have .............................................. 14

IV.   CONCLUSION ................................................................................... 16

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Bollore S.A. v. Import Warehouse, Inc.*,
  448 F.3d 317 (5th Cir. 2006) ................................................................. 14

*Permian Petroleum Co. v. Petroleos Mexicanos*,
  934 F.2d 635 (5th Cir. 1991) ................................................................. 14

*Transcor v. Furney Charters, Inc.*,
  212 F.R.D. 588 (D. Kan. 2003) .............................................................. 15

*Wells Fargo Bank N.A. v. Iny*,
  No. 2:13-cv-01561-MMD-NJK, 2014 WL 1796216 (D. Nev. May 6, 2014) ....... 15

## STATE CASES

*Roberts v. Gulf Oil Corp.*,
  147 Cal. App. 3d 770 (1983) .................................................................. 15

*Sonora Diamond Corp. v. Superior Court*,
  83 Cal. App. 4th 523 (2000) .................................................................. 14

## FEDERAL STATUTES

Fed. R. Civ. Proc. 26(b) ........................................................................... 13

## STATE STATUTES

Cal. Civ. Code § 3439.04(b)(8) ................................................................. 3

## OTHER AUTHORITIES

Cal. Const., art. I, § 1 ............................................................................. 15

1238406

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   PRELIMINARY STATEMENT

3   Plaintiff The Wimbledon Fund, SPC (Class TT) ("Wimbledon") brought these

4   consolidated actions against Graybox and David Bergstein (collectively, the "Moving

5   Parties") and others seeking to hold Bergstein liable for a default judgment

6   Wimbledon obtained against Swartz IP Services Group Inc. ("SIP") and seeking to

7   hold Graybox liable for certain allegedly fraudulent transfers it supposedly received.

8   Wimbledon premises its claim against Bergstein on the false theory that Bergstein is

9   the alter ego of SIP and thus liable for its debts. As to Graybox, Wimbledon asserts,

10   wrongly, that Graybox was the recipient of fraudulent transfers from SIP in 2011 and

11   2012 and Wimbledon seeks recovery of those allegedly fraudulent transfers.

12   Declaration of Richard W. Buckner, Exhibits B and C.  Bergstein is the sole manager

13   and owner of Graybox.  Declaration of David R. Bergstein Decl. at ¶ 2.  In truth,

14   Bergstein is not and never was the alter ego of SIP, and neither Graybox nor

15   Bergstein was ever the recipient of any fraudulent transfers from SIP.

16   To be clear, this Application is not about efforts to prevent access to SIP's

17   banking records to explore the allegedly fraudulent transfers it supposedly made or to

18   explore its relationship with Bergstein in connection with Wimbledon's alter ego

19   allegations.  The subpoena to Bank of America seeks SIP's banking records, but the

20   Moving Parties are not resisting that discovery.  Rather, this Application only relates

21   to Graybox banking records which are either entirely irrelevant to Wimbledon's

22   fraudulent transfer and alter ego claims, or, to the extent relevant at all, Wimbledon

23   already possesses because they were used by the parties in prior motion for a

24   preliminary injunction.

25   For example, Wimbledon seeks all of Graybox's banking records from

26   November 2011 to the present.  But all but one of the twenty specific allegedly

27   fraudulent transfers to Graybox by SIP occurred in 2011 and 2012 (Plaintiff's Motion

28   for Preliminary Injunction, etc. (Dkt 16) at 4), and SIP conducted no operations at all

_Glaser Weil_

1238406

1

after February 2013.  Buckner, Ex. B at ¶ 32.  Yet Wimbledon seeks all of Graybox's banking records, not just for 2011 and 2012, but for 2013, 2014, 2015, and 2016 to the present.  Those records can have nothing at all to do with Wimbledon's fraudulent transfer claims.  Moreover, Wimbledon already has the relevant Graybox banking records from 2011 and 2012 related to SIP.  *See, e.g.*, Declaration of David Bergstein dated September 25, 2015 (Dkt 50-2) at ¶¶ 8,9; Exhibits to Declaration of David Bergstein dated September 25, 2015 (Dkt 51-1), Exs. 5, 6).  Wimbledon has no legitimate need for Graybox banking records on the fraudulent conveyance claim; even if had a need for some of the Graybox banking records, it clearly would have a need only for those records associated with the specific 2011 and 2012 transfers from SIP to Graybox.   But Wimbledon has made no effort to limit its requests in that way.

Moreover, and most fundamentally, Wimbledon has no need even for the Graybox banking records related to the specific allegedly  fraudulent transfers from SIP to Graybox, not only because it already has the relevant records, but also because, as detailed in the Factual Background section below, Graybox has already provided the contracts and invoices and banking records showing the allegedly fraudulent transfers to SIP to have been proper.  Wimbledon has failed to refute those backup materials.

Nor are the Graybox banking records in any way relevant to Wimbledon's alter ego claim against Bergstein.  By that claim, Wimbledon asserts that Bergstein is the alter ego of ***SIP*** and so is liable for ***SIP's*** liabilities.  But Graybox's banking records have nothing to do with whether Bergstein is SIP's alter ego.  SIP's banking records conceivably could be relevant to that issue but Graybox and Bergstein are not objecting to the production of SIP's banking records.

In addition, the Graybox banking records contain private, financial information that should be protected from disclosure unless its relevance outweighs privacy concerns.  As we have shown, the Graybox  banking records, to the extent they have not already been provided in connection with the preliminary injunction motion in

2

Glaser Weil

this case, are irrelevant, and privacy interests counsel against production.

## II.   FACTUAL BACKGROUND

### A.   SIP's Investment Activities

Briefly, Wimbledon, working through its agent Weston Capital Management, LLC and/or Weston Capital Asset Management LLC (collectively, "Weston") purchased $17.7 million in notes from SIP as to which SIP ultimately defaulted, leading to the above referenced default judgment.  Notwithstanding Wimbledon's claims, however, SIP was not a mere shell through which Bergstein conducted business but was instead an active company investing the Wimbledon note proceeds in an effort to generate sufficient revenue to repay the Wimbledon notes.  That those investments were not successful is unfortunate but not the result of wrongdoing by Bergstein or Graybox.  In fact, the Graybox transactions challenged by Wimbledon were appropriate and Graybox provided reasonably equivalent value to SIP for the transfers it received.

More specifically, on December 10, 2010, SIP was formed to provide advisory services and to make investments.  Dkt 50-2 at ¶ 3.  SIP was an active company engaged in various investments at any given time.  See Dkt 50-2, *passim*. Accordingly, SIP and Graybox thereafter entered into a Consulting Agreement under which Graybox would provide advisory and consulting services to SIP in exchange for a quarterly fee of at least $50,000.  Dkt 50-2 at ¶ 4; Dkt 51-1, Ex. 1.  Thus, some of the transfers from SIP to Graybox challenged by Wimbledon were for the services Graybox provided under the Consulting Agreement.  As to those transfers, SIP received reasonably equivalent value and they were thus not fraudulent transfers.  *See* Cal. Civ. Code § 3439.04(b)(8).  The same is true of the other transfers challenged by Wimbledon.

For example, on Wimbledon's behalf, Weston managed a number of investments, including an investment vehicle known as Arius Libra, the majority shareholder in an entity named Pineboard Holdings, Inc.  Dkt 50-2 at ¶ 5; Dkt 51-1,

Glaser Weil

3

1238406

Ex. 2 at 11-16.  On October 1, 2011, Graybox and Pineboard entered into a Funding and Services Agreement (the "Pineboard Agreement").  Dkt 50-2 at ¶ 6; Dkt 51-1, Ex. 3.  Pursuant to the Pineboard Agreement, Graybox provided various services to Pineboard and advanced certain Pineboard expenses.  In exchange, Graybox was paid a monthly fee of $20,000 and reimbursed for its advances.  Dkt 50-2 at ¶¶ 1-7.

On or about November 18, 2011, SIP and Pineboard entered into a Securities Purchase Agreement under which SIP purchased a $5 million note.  That agreement specifically provides that the purchase price be paid with fifty percent up front and the balance payable periodically thereafter.  The agreement also provided that the purchase price "[s]hall be delivered either to  [Pineboard] or as directed by [Pineboard] to third parties for the benefit of [Pineboard]."  Dkt 50-2 at ¶ 7; Dkt 51-1, Ex. 4 at ¶ 4(d).  Thus, the Securities Purchase Agreement expressly contemplated payments by SIP to third parties in satisfaction of SIP's obligation to Pineboard to pay the purchase price.  It is therefore unsurprising that some of SIP's appropriate payments on Pineboard's behalf were made to third parties, including Graybox.

Graybox regularly advanced funds for the benefit of Pineboard and submitted invoices to Pineboard for payment.  Dkt 50-2 at ¶ 8; Dkt 51-1, Ex. 5.  Those invoices were supported by wire-transfer receipts reflecting Graybox's payments on Pineboard's behalf.  Dkt 50-2 ¶ 9; Dkt 51-1, Ex. 6.  In accordance with the Securities Purchase Agreement, Pineboard would direct SIP to pay those invoices as a means of repayment by SIP of the purchase price owed to Pineboard under that agreement.  Dkt 50-2 at ¶ 8.  Thus, the transfers by SIP to Graybox related to Pineboard were in exchange for reasonably equivalent value and thus perfectly appropriate.

Similarly, to further its investment activities and to attempt to yield returns sufficient to repay the Wimbledon notes, on or about July 2, 2012, SIP (now operating under the name Advisory IP Services, Inc.) and Glendon Group, Inc. entered into a Stock Purchase Agreement (the "Glendon SPA").  Dkt 50-2 at ¶ 10; Dkt 51-1, Exs. 7, 8.  Under that agreement, SIP agreed to purchase 1.2 million shares

1238406

**Glaser Weil**

1   of Glendon common stock for $1 million.  *Id.*, Ex. 7 at § 1.2.  To facilitate SIP's

2   investment in Glendon, Graybox, SIP, and Weston (Wimbledon's agent) entered into

3   an agreement dated March 16, 2012 under which Graybox agreed to cause a loan to

4   be made to SIP in the amount of the $1 million purchase price, up to $900,000 of

5   which would be advanced to Graybox.  Dkt 50-2 at ¶ 11; Dkt 51-1, Ex. 9.  On April

6   19, 2012, the $1 million loan to SIP was funded and, after SIP advanced the $900,000

7   to Graybox as agreed, Graybox wired the $1 million purchase price to Glendon.  Dkt

8   50-2 at ¶ 11; Dkt 51-1, Exs. 10, 12.  Again, SIP received reasonably equivalent value

9   for the $900,000 provided to Graybox.

10         As is clear from the discussion above, SIP was an active company with active

11   investments, information that was available to Wimbledon at the time through its

12   agent Weston.  Moreover, in addition to the above investments, the vast bulk of SIP's

13   other transfers were transfers to Wimbledon or Weston totaling at least $7,275,675,

14   including a $1 million redemption payment to Wimbledon on the SIP notes it had

15   purchased.  Dkt 50-2 at ¶ 16; Dkt 51-1, Exs. 13-20.[1]

16         In short, the SIP transfers to Graybox were documented and proper; there is no

17   basis for an subpoena seeking wholesale production of all Graybox bank records, the

18   vast bulk of which have nothing to do with this case.

19   **B.      Wimbledon's Conduct and Effort to Obtain Confidential and**

20   **          Privileged Materials**

21         Before addressing the specific document requests at issue, one more area needs

22   to be discussed.  Wimbledon and its counsel have demonstrated a remarkable

23   penchant for suing Bergstein's and Graybox's lawyers, having named Aaron Grunfeld

24   and the Law Offices of Henry Jannol as defendants in these consolidated actions.

25   Ever more disturbing, however, it that Wimbledon's counsel has engaged in

26

27   _____

28   [1] The Moving Parties acknowledge that the Court has issued a preliminary injunction freezing certain Graybox funds notwithstanding the discussion in text.  See Dkt 56.

EX PARTE APP. RE: MOTION TO QUASH

1238406

remarkable, and improper, conduct in this litigation and so to allow the wholesale turnover of Graybox bank records would be inappropriate.

Bergstein and Graybox were formerly represented by Susan Tregub as general counsel.  Tregub had been Bergstein's long-time attorney but ultimately she and Bergstein had disagreements.  Remarkably, Tregub allowed those disagreements to cause her to depart from her ethical and legal obligations as an attorney to a stunning degree.  Tregub betrayed Bergstein, providing his confidential and privileged information to his "mortal enemy" and litigation adversary in scores of cases, and going so far as to secretly act as counsel against Bergstein and for his litigation adversary – while still formally representing Bergstein and his related entities as counsel – to force certain Bergstein related entities into involuntary bankruptcy. Buckner Decl. Ex. C (Weingarten Deposition at 12:12-13:15).  As a result of her actions against Bergstein and affiliated companies, Tregub suffered a judgment of $50 million for legal malpractice and breach of fiduciary duty.  Declaration of Anthony R. Bisconti (Dkt 50-4 at ¶¶ 4, 11; Dkt 50-5, Exs. 1, 8).

During the course of this litigation, counsel for Graybox and Bergstein received information suggesting that Wimbledon's counsel, James Walker, may have attempted to convince Bergstein's prior counsel, Alex Weingarten, to engage in similar misconduct toward his former clients, Bergstein and related entities.  Rather than rush off with unsubstantiated allegations against opposing counsel, Bergstein's counsel noticed the deposition of Alex Weingarten to determine whether what they had heard was true and to make a record of what actually happened.

Bergstein's counsel noticed the Weingarten deposition for June 30, 2016. Wimbledon's counsel requested that the deposition be delayed but Bergstein's counsel declined.  When Wimbledon's counsel asked why Bergstein's counsel insisted on proceeding with the deposition, they informed him that they had received information that Wimbledon's counsel may have attempted to intimidate Bergstein's former counsel, Weingarten, and that they needed to proceed to determine if there

1238406

were any truth to that. Wimbledon then purported to itself notice the Weingarten

deposition for June 30, 2016. Buckner Decl. at ¶ 6. A few days before the

deposition, Weingarten said a conflict had arisen and the deposition would need to be

rescheduled. Wimbledon's counsel refused to agree to reschedule and announced it

intended to appear at the scheduled time and place, take Weingarten's notice of non-

appearance, and pursue its remedies against him. *Id.* In so doing, Wimbledon's

counsel indicated that Walker, located in Texas, had changed his travel plans and

would not attend but that Wimbledon's local counsel from the Pachulski firm would

appear with a court reporter and videographer to take the notice of non-appearance.

*Id.* In reliance on Wimbledon's counsel's statement that Wimbledon would provide a

court reporter and videographer, Bergstein's counsel cancelled the arrangements he

had made for those services. *Id.* After this, Weingarten informed the parties that he

was able to change his schedule in light of the position taken by Wimbledon's counsel

and appear for deposition on June 30, 2016 as scheduled. Buckner Decl. at ¶ 7.

      Wimbledon's counsel from the Pachulski firm, Jeffrey Kandel, appeared at the

deposition with a court reporter but no videographer. Weingarten appeared as did

counsel for Bergstein and Graybox, Richard Buckner. This is what happened at the

beginning of the deposition:

      MR. KANDEL: We're on the record.

      We are here for the deposition of Alex M. Weingarten.

      And for the record, my name is Jeffrey Kandel, with Pachulski

Stang Ziehl & Jones, co-counsel to Plaintiff, The Wimbledon Fund.

      In the room with us is Mr. Weingarten, Alex M. Weingarten, and

Richard Buckner, of Glaser Weil, attorneys for Defendants David

Bergstein and Aaron Grunfeld.

      MR. BUCKNER: And also Graybox, and Eugene Scher as

Trustee for David Bergstein.

      MR. KANDEL: Thank you for the clarification.

1238406

**Glaser Weil**

1         Mr. Weingarten had previously stated that he would not be

2    available for the deposition this morning.

3         And in reliance on those statements, Jim Walker, from Texas,

4    stated in his e-mail yesterday that he would accordingly be canceling his

5    travel plans, and that we would be here today merely to note Mr.

6    Weingarten's nonappearance for the record, as opposed to going forward

7    with the substantive deposition.

8         As a result, we will – of course, Mr. Weingarten is here, so we're

9    not going to take his Notice of Nonappearance.

10        We're not going to take his nonappearance.  But we will continue

11   this deposition under the current subpoena to a later scheduled time.

12        And with that, we're done and off the record.

13        MR. BUCKNER:  We're not done.

14        MR. KANDEL:  You're not done?

15        MR. BUCKNER:  I have questions.

16        MR. KANDEL:  Well, this is my deposition and my court

17   reporter.

18        MR. BUCKNER:  But you didn't – I also have the subpoena.

19        MR. KANDEL:  That doesn't matter.

20        MR. BUCKNER:  We're here for the deposition.  I'm asking

21   questions.

22        MR. KANDEL:  Thank you very much.

23        We're done.

24   Buckner Decl. Ex. D at 4:5-5:24.  Thereafter, a very lengthy argument ensued

25   with counsel for Bergstein and Graybox insisting that the deposition proceed

26   with questioning and Wimbledon's counsel preventing it from occurring and

27   insisting on going off the record.  Buckner Decl. Ex. D at 5:25-21:15.  When

28   Bergstein's counsel offered to proceed with an express agreement that

8

1238406

Wimbledon would waive no rights by doing so, Wimbledon's counsel refused the offer and would not say why. *Id.* Wimbledon's counsel refused Bergstein's counsel's request to call the Magistrate Judge for guidance. Buckner Decl. at ¶ 7. The court reporter who accompanied Kandel to the deposition was put in an untenable position and ultimately declined to report questioning at the deposition in light of Kandel's instruction. Counsel for Bergstein and Graybox then told Wimbledon's counsel that he would arrange his own court reporter and would proceed with questioning. After being so warned, Wimbledon's counsel left and Bergstein's counsel proceeded with the deposition questioning of Weingarten. Buckner Decl. at ¶¶ 7, 8.

The testimony was stunning. After Weingarten testified that he had represented Bergstein and related entities in dozens of matters and explained that he had telephoned Walker to discuss a possible offer aimed at giving Weingarten access to the settlement funds frozen by this Court's preliminary injunction, Weingarten gave this testimony about his dealings with Wimbledon's counsel, James Walker:

> Q. And what did Mr. Walker say to you in that conversation?
>
> A. I don't remember his exact words, but the effect of his words were that he was not interested in my offer; that if I wanted to intervene, that he would welcome my involvement because it would make it that much easier for him to depose me, conduct discovery, and ultimately sue me.
>
> Q. Did he mention Susan Tregub in that conversation?
>
> A. He did. He told me then that – that he found it odd that I was calling because he had recently had a conversation with Bergstein's lawyers – and he didn't specifically identify who Bergstein's lawyers were – and what he explained to me was that, quote, unquote, Bergstein's lawyers were offering me up. And that was the actual word

9

Glaser Weil

1  that he used: were offering me up.[2]

2      He didn't explain specifically what he meant by that.  And at that

3  point, I was kind of shocked, to be honest with you, so I didn't ask him

4  what he meant by that, but he said that they were offering me up and if I

5  was smart, that I would turn Susan Tregub and give him all the

6  information that they needed to be able to bury Bergstein.

7      Q.  And what did you understand him to mean when he said you

8  should act like Susan Tregub?

9      A.  Susan Tregub was previously an attorney for David Bergstein,

10  and she ended up betraying David Bergstein by taking all of his

11  confidential, privileged information and other aspects of information

12  about his life, and handing it over to his mortal enemy and acting as

13  counsel in actions against him to drag several companies that he was

14  involved with into involuntary bankruptcy.

15      And it was a whole – what she did was a breach of her ethical

16  duties as an attorney, incomprehensible to me, to be honest with you, but

17  she did it.  She admitted she did it.  It ended up resulting in a 50 million

18  dollar judgment against her as a result of her actions.

19      But what I understood him to mean was that he was asking me to

20  turn against David Bergstein, to give whatever information I had about

21  David and his business to them, being the plaintiffs, to assist them in the

22  prosecution of their case.

23      . . . .

24      Q.  In your experience, has anyone else ever suggested to you that

25  you should turn against a client like that?

26      A.  No.

27

28  [2] None of Bergstein's counsel ever "offered up" Weingarten.

1238406

1        Q.  What was your reaction when Mr. Walker made that

2    suggestion?

3        A.  I was shocked and surprised.  He also suggested to me that if I

4    didn't, quote, smarten up, you know, that I was going to be in his

5    crosshairs.

6        So I asked him to clarify if what he was asking me to do was to

7    turn over privileged information about a former client, and then he hung

8    up.

9    Buckner Decl. Ex. E at  5:19-14:12 (footnote added).

10       Given this testimony, great care should be taken before Wimbledon is granted

11   access to private banking information, particularly given that much of what

12   Wimbledon seeks has nothing to do with this litigation.

13   **C.     The Document Requests at Issue**

14       On or about August 18, 2016, Wimbledon served a very broad subpoena on

15   Bank of America seeking, among other things, virtually every document or electronic

16   file imaginable related to any account held by Graybox over a nearly five-year period.

17   Read literally, the subpoena would require production of documents reflecting every

18   single one of Graybox's banking transactions at Bank of America dating back through

19   November 2011.  Absolutely no effort was made to limit the subpoena's reach to the

20   only conceivably relevant information: banking records related the twenty specific

21   allegedly fraudulent transfers from SIP to Graybox in 2011 and 2012.[3]  Instead,

22   Wimbledon demands everything.  As relevant to this Application, Wimbledon's

23   subpoena seeks the following documents from Bank of America:

24       3.     Any and all account statements, records, wire transfers, and

25   documents concerning any account from November 11 2011 through the

26

27   _____

28   [3] Wimbledon does allege a single allegedly fraudulent transfer of $30,000 in
December 2013.  Plaintiff's Motion for Preliminary Injunction, etc. (Dkt 16) at 4.

Glaser Weil

1238406

present date in the name of Graybox.

. . . .

6.      All documents and communications concerning any account from November 2011 through the present date in the name of Graybox.

. . . .

9.      All documents and communications between You and Bergstein concerning any account from November 2011 through the present date in the name of Graybox.

. . . .

13.     All documents and communications evidencing the identity of the individual(s) who made and/or authorized any withdrawals from any account in the name of Graybox from any of Your branch locations.

Buckner Decl. Exhibit A at 4 ¶ 3 and 5 ¶¶ 6, 9, 13.

## III.   **ARGUMENT**

The vast bulk of the documents called for by Wimbledon's subpoena to Bank of America are irrelevant (or, the ones relevant have already been provided in connection with the earlier preliminary injunction motion in this case) but, even to the extent they may have some marginal relevance, it is outweighed by Graybox's and Bergstein's privacy rights.  For those reasons, the Moving Parties intend to file a motion with this Court to quash the subpoena as to the above-quoted requests or, at a minimum, to require that any production be pursuant to a Protective Order limiting dissemination and use of any materials produced to that which is essential to the prosecution of this litigation.  By this Application, the Moving Parties seek only to stay Bank of America's production long enough for the Court to resolve the Moving Parties' motion to quash or for a protective order.  Because the materials sought are irrelevant, or if marginally relevant any relevance is outweighed by Graybox's and Bergstein's privacy interests, the Court should stay Bank of America's production so that documents are not released before the Court can determine whether and to what

1238406

extent they are discoverable and, if so, what controls should be put in place to regulate their use in this case.

### A.  The Materials Sought are Irrelevant

Obviously, irrelevant materials are not discoverable "Parties may obtain discovery regarding any nonprivileged matter that is ***relevant*** to any party's claim or defense and proportional to the needs of the case. . . ." Fed. R. Civ. Proc. 26(b) (emphasis added).  If the Bank were to produce the requested records, the vast bulk, if not all, of the materials produced would be entirely irrelevant to this litigation. Wimbledon would receive records of every single Graybox banking transaction over a nearly five-year period regardless whether it had anything to do with Wimbledon, SIP, or any issues associated with Wimbledon's purported fraudulent transfer claims against Graybox or its purported alter ego claim against Bergstein.  The requested bank records would reveal a great deal about Graybox's and Bergstein's activities that has nothing whatever to do with this case.  Presumably, Wimbledon would receive records of Graybox's payments to its lawyers, its charitable contributions, its political donations (if any), its membership dues to any organization of which it is a member, and much, much more.  But none of that would be relevant here or advance any legitimate interest of Wimbledon.

As to Wimbledon's fraudulent transfer claims, all save one (for $30,000) was alleged to have occurred in 2011 and 2012.  In addition, SIP conducted no operations after February 2013.  Clearly, Graybox banking records from 2013, 2014, 2015, and 2016 have absolutely nothing to do with allegedly fraudulent transfers from SIP to Graybox in 2011 and 2012.  Moreover, the requests are not limited to banking transactions involving SIP but seek records of all of Graybox's banking transactions which would show the identities of everyone from whom Graybox received money or to whom Graybox sent money.  There is no justification for such vastly overbroad requests seeking obviously irrelevant materials.

In truth, Wimbledon already has access to all the banking records it needs to

EX PARTE APP. RE: MOTION TO QUASH

1238406

litigate its fraudulent transfer claims against Graybox.  Wimbledon has subpoenaed SIP's banking records and Graybox and Bergstein have no objection to Wimbledon's discovery directed toward SIP banking records.  Wimbledon thus has the banking records it needs to show transfers from SIP to Graybox.  In addition, Graybox provided relevant Bank of America banking records showing its disposition of funds received from SIP in connection with its opposition to Wimbeldon's prior preliminary injunction motion.  See Dkt 50-1 at ¶ 6; Dkt 51-1, Exs. 5, 6.  It has no need for or right to other Graybox banking records.

Similarly, the Graybox bank records are entirely unrelated to whether or not Bergstein is SIP's alter ego as alleged by Wimbledon.  To establish alter ego liability on Bergstein's part, Wimbledon must prove that (a) there is such a unity of interest and ownership between Bergstein and SIP that the individuality, or separateness, of Bergstein and SIP ceased to exist and (b) holding only SIP, and not Bergstein, liable for the default judgment against SIP would result in injustice.  *See, e.g.*, *Bollore S.A. v. Import Warehouse, Inc.*, 448 F.3d 317, 325 (5th Cir. 2006) (applying Texas law requiring stock ownership for alter ego liability); *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643 (5th Cir. 1991) (same); *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000) (stating unity of interest and injustice elements of alter ego liability).  Graybox's bank records have nothing to do with either issue.[4]

**B.** **The Materials Sought are Subject to Graybox's and Bergstein's Privacy Rights and Those Privacy Rights Outweigh any Relevance the Materials at Issue Might Have**

Document Request No. 3, seeking all account statements, records, wire transfers, and documents concerning all Graybox accounts from November 2011

---

[4] Wimbledon has obtained SIP bank records and has requested additional SIP bank records in the Bank of America subpoena.  The Moving Parties are not opposing that discovery.

Glaser Weil

through the present is vastly overbroad and calls for essentially every document and record related to Graybox's bank accounts.  The same is true of (a) Request No. 6, seeking all documents and communications regarding Graybox accounts from November 2011 to the present, (b) Request No. 9, seeking all documents and communications with Bergstein regarding Graybox accounts during the same period, and, (c) Request No. 13, seeking all documents and communications "evidencing" the identity of persons making or authorizing withdrawals from any Graybox account at any time.  Requiring disclosure of all of these materials would be invasive of the privacy rights of Graybox and its sole manager, Bergstein.  *See, e.g.*, *Roberts v. Gulf Oil Corp.*, 147 Cal. App. 3d 770, 796-97 (1983); Cal. Const., Art. 1, Sec. 1; *see also*, *Wells Fargo Bank N.A. v. Iny*, No. 2:13-cv-01561-MMD-NJK, 2014 WL 1796216 (D. Nev. May 6, 2014) (recognizing a privacy interest in bank records and entering a protective order regulating use of such records).[5]  In determining whether to allow discovery of such materials, the Court must balance relevance against privacy.  *Id.*

Bergstein is now and has always been the sole member and owner of Graybox, an entity that was formed in or around February 2000, long before any of the events at issue in this litigation.  Bergstein Decl. at ¶ 2.  Graybox has a number of business investments and projects that do not relate to any of the events at issue in this litigation.  *Id.*  The bank account records being sought by Wimbledon will reflect numerous business transactions spanning nearly five years from Graybox's bank accounts that have no relationship to any issue in this litigation.  The Graybox Bank of America records will contain thousands of transactions relating to Graybox's and Bergstein's private investment and financial activities unrelated to any issue in this litigation.  *Id.* at ¶ 3.  These will include highly private information of a personal and

---

[5] While the subpoena is addressed to Bank of America, Graybox and Bergstein have standing to move to quash or for a protective order because the subpoena seeks information about them as to which they have a "personal right."  *See, e.g.*, *Transcor v. Furney Charters, Inc.*, 212 F.R.D. 588, 590-91 (D. Kan. 2003).

1238406

business nature, including but not limited to payments to lawyers, investment activities, mortgage payments, rent payments, charitable donations, payments for medical bills, and transfers of investment proceeds.  Moreover, some of Bergstein's personal funds are invested in projects or other investments Graybox administers.

Given that the Moving Parties believe that the vast bulk of the materials sought by these Requests have nothing to do with this litigation and contain confidential and private information, they believe the Court should quash the subpoena to Bank of America as to Request Nos. 3, 6, 9, and 13.  If the Court is unwilling to do so, the Moving Parties nonetheless believe, at a minimum, that the Court should permit production only pursuant to the Protective Order governing use of those materials and barring their dissemination or use beyond that essential to the conduct of this litigation.  By this Application, the Moving Parties seek only to stay production of materials called for by those Requests until the Court has ruled on the Moving Parties' soon to be filed motion to quash or for a protective order.

## IV.   <u>CONCLUSION</u>

For all the foregoing reasons, the Moving Parties respectfully request that the Court stay production by Bank of America of the documents called for by Request Nos. 3, 6, 9, and 13 pending the Court's ruling on the Moving Parties' motion to quash or for a protective order.


DATED:  September 15, 2016          Respectfully submitted,

                                                  GLASER WEIL FINK HOWARD AVCHEN & SHAPIRO LLP


                                                  By:  /s/ Richard W. Buckner
                                                  PATRICIA L. GLASER
                                                  G. JILL BASINGER
                                                RICHARD W. BUCKNER
                                                CAMILLA Y. CHAN
                                                      Attorneys for Defendants
                                                      David Bergstein and Graybox, LLC