# EXHIBIT D

Swartz IP Services Group Inc.

$25,000,000

Reference Notes due November 14, 2016

NOTE PURCHASE AGREEMENT

Dated November 14, 2011

TABLE OF CONTENTS

**SECTION 1  AUTHORIZATION OF NOTES**

**SECTION 2  SALE AND ACCEPTANCE OF NOTES**

**SECTION 3  CLOSINGS**
Section 3.1     Tranche A Note Closing ...........................................................................2
Section 3.2     Tranche B Note Closings .........................................................................2

**SECTION 4  CONDITIONS TO CLOSING**
Section 4.1     Conditions to Purchaser's Obligations.................................................3
Section 4.2     Conditions to Company's Obligations...................................................3

**SECTION 5  REPRESENTATIONS AND WARRANTIES OF THE COMPANY**
Section 5.1     Organization; Power and Authority.......................................................4
Section 5.2     Authorization, Etc. ..................................................................................4

**SECTION 6  REPRESENTATIONS AND AGREEMENTS OF THE PURCHASER**
Section 6.1     Organization; Power and Authority .......................................................5
Section 6.2     Authorization, Etc. ..................................................................................5
Section 6.3     Acknowledgements..................................................................................5
Section 6.4     Regulatory Matters.............................................**Error! Bookmark not defined.**

**SECTION 7  FINANCIAL INFORMATION; AFFIRMATIVE COVENANTS; NEGATIVE COVENANTS**
Section 7.1     Financial Statements and Other Reports...............................................6
Section 7.2     Affirmative Covenants.............................................................................7
Section 7.3     Negative Covenants.................................................................................8

**SECTION 8  PRINCIPAL RESET AND MATURITY**
Section 8.1     Principal Reset .........................................................................................9
Section 8.2     Maturity.....................................................................................................9

**SECTION 9  OPTIONAL PREPAYMENT OF THE NOTES**
Section 10.1   Prepayments at the Option of the Company .........................................10
Section 10.2   Notice of Optional Prepayments...........................................................10
Section 10.3   Maturity; Surrender, Etc. ......................................................................10

**SECTION 10 MANDATORY PREPAYMENT OF THE NOTES**
Section 11.1   Prepayment upon Redemptions .............................................................11

**SECTION 11 EVENTS OF DEFAULT**

**SECTION 12 REMEDIES ON DEFAULT, ETC.**
Section 13.1   Acceleration...........................................................................................12
Section 13.2   Rescission ...............................................................................................12
Section 13.3   No Waivers or Election of Remedies, Expenses, Etc. ..........................12

i

### SECTION 13 REGISTRATION; EXCHANGE; SUBSTITUTION OF NOTES

Section 14.1    Registration of Notes ...................................................................13
Section 14.2    Transfer and Exchange of Notes.................................................13
Section 14.3    Replacement of Notes ..................................................................13

### SECTION 14 PAYMENTS ON NOTES

### SECTION 15 AMENDMENT AND WAIVER

Section 16.1    Requirements .................................................................................14
Section 16.2    Binding Effect, Etc........................................................................14

### SECTION 16 NOTICES

### SECTION 17 MISCELLANEOUS

Section 18.1    Guarantee...............................................................Error! Bookmark not defined.
Section 18.2    Severability ...................................................................................15
Section 18.3    Counterparts ..................................................................................15
Section 18.4    Governing Law; Venue.................................................................15
Section 18.5    Construction ..................................................................................16
Section 18.6    Payment Of Collection, Enforcement And Other Costs ........................................16

Reference Notes due 2016

November 14, 2011

TO THE PURCHASER:

Swartz IP Services Group Inc., a Texas Corporation (the "**Company**"), agrees with Wimbledon Fund (Class TT), a class of a Cayman Islands Segregated Portfolio Company (the "**Purchaser**") as follows:

## Section 1

### Authorization of Notes.

The Company will authorize the issue and delivery of up to $25,000,000 aggregate principal amount of its Reference Notes due 2016 (the "Notes", such term to include any such notes issued in substitution therefor pursuant to this Agreement) in accordance with the terms set forth herein. The Notes shall be substantially in the form set out in Exhibit 1. Certain capitalized and other terms used in this Note Purchase Agreement (this "**Agreement**") are defined in Schedule B.

## Section 2

### Sale and Acceptance of Notes.

Subject to the terms and conditions of this Agreement, the Company will issue to the Purchaser and the Purchaser will accept from the Company, at the Closing provided for in Section 3, Notes in the principal amount of $12,500,000 (such Notes, 'Tranche A Notes") upon delivery by the Purchaser to the Company by wire transfer immediately available funds in an amount equal to 100% of such principal amount (the "Purchase Price"). In connection therewith, immediately following the issuance of the Tranche A Notes, the Company shall simultaneously cause to be delivered to the Purchaser warrants to purchase an aggregate of 3% of the fully diluted capital stock of Pineboard Holdings, Inc. ("Pineboard") as of November 14, 2011, substantially in the form set forth on Exhibit II hereto (the "**Warrants**") (which Warrants shall be a portion of like warrants issued to the Company by Pineboard Holdings Inc. substantially simultaneously with the Closing provided for in Section 3). After the Closing, subject to the terms and conditions of this Agreement, the Company will issue to the Purchaser and the Purchaser will accept from the Company, from time to time, one or more additional Notes (such Notes, "Tranche B Notes") in the additional aggregate principal amount of $12,500,000, or such lesser principal amounts as Purchaser shall purchase pursuant to the terms of this Agreement, upon delivery by the Purchaser to the Company by wire transfer immediately available funds in an amount equal to 100% of the principal amount of such Tranche B Notes purchased. Purchaser shall not be obligated to purchase Tranche B Notes.

## Section 3

### Closings.

Section 3.1     **Tranche A Note Closing.**  The delivery of the Tranche A Notes and the Warrants to be accepted by the Purchaser shall occur at the offices of Company at 9:00 a.m., Los Angeles time, at a closing (the "**Closing**") on the first date upon which the conditions set forth in Section 4 are satisfied or on such other Business Day as may be agreed upon by the Company and the Purchaser.  At the Closing, the Company will deliver to the Purchaser the Tranche A Notes and, immediately thereafter, the Warrants, in each case to be accepted by the Purchaser in the form of a single Note and single Warrant dated the date of the Closing and, in the case of the Notes, registered in the Purchaser's name and, in the case of the Warrants, with appropriate transfer documents evidencing the transfer of the Warrants by the Company to the Purchaser, against delivery by the Purchaser to the Company or its order of immediately available funds in the amount of the principal amount thereof by wire transfer to an account number designated by the Company at least twenty-four (24) hours before the Closing.  For the avoidance of doubt, the Purchaser agrees that it shall deliver to the Company at least twenty-four (24) hours before the Closing immediately available funds in the amount of $12,500,000.

Section 3.2     **Tranche B Note Closings.**  Purchaser shall deliver written notice (each, a "Tranche B Notice") to the Company that it wishes to purchase Tranche B Notes.  Each Tranche B Notice shall set forth (i) the closing date for the purchase of Tranche B Notes set forth therein (each such date, a "Tranche B Closing Date") which Tranche B Closing Date shall not be less than five (5) Business Days after the date of such Tranche B Notice (provided, that, for no more than one Tranche B Notice per calendar month, so long as such Tranche B Notice relates to Tranche B Notes with an aggregate principal amount of no greater than $2,000,000, such Tranche B Closing Date shall not be less than one (1) Business Days after the date of such Tranche B Notice), and (ii) the principal amount of Tranche B Notes to be purchased, which principal amount, when added to the principal amount of all Tranche B Notes purchased prior to such Tranche B Closing Date, shall not exceed $12,500,000.  Each Tranche B Note shall be in a principal amount of not less than $250,000, provided that, if the purchase of a Tranche B Note in a principal amount of $250,000 shall cause the aggregate principal amount of Tranche B Notes purchased pursuant to this Section 3.2 to exceed $12,500,000, the principal amount of such Tranche B Note shall, unless the Company and the Purchaser otherwise agree, be an amount equal to the difference between the aggregate principal amount of all Tranche B Notes purchased prior to such Tranche B Note and $12,500,000.  Each delivery of the Tranche B Notes to be accepted by the Purchaser shall occur at the offices of Barnes Law, Los Angeles, California, at 9:00 a.m., Los Angeles time, at a closing (each, a "Tranche B Closing") on the Tranche B Closing Date set forth in the Tranche B Notice pertaining to the purchase of such Tranche B Note or on such other Business Day as may be agreed upon by the Company and the Purchaser.  At each Tranche B Closing, the Company will deliver to the Purchaser Tranche B Notes to be accepted by the Purchaser in the form of a single Tranche B Note dated the date of such Tranche B Closing and registered in the Purchaser's name, against delivery by the Purchaser to the Company or its order of immediately available funds in the amount of one hundred percent (100%) of the principal amount thereof by wire transfer to an account number designated by the Company.

2

## Section 4

## Conditions to Closing.

Section 4.1   **Conditions to Purchaser's Obligations.**  The Purchaser's obligation to accept the Notes to be delivered to the Purchaser at the Closing and at each Tranche B Closing is subject to the fulfillment (or waiver) prior to or at the Closing or such Tranche B Closing, as the case may be, of the following conditions:

(a)  The Company shall have delivered to the Purchaser such Notes, and, in the case of the Closing, the Company shall substantially simultaneously be delivering to the Purchaser the Warrants, in each case duly authorized and issued, to be accepted by the Purchaser in the form of a single Note and, in the case of the Closing, single Warrant, dated as of the Closing Date or such Tranche B Closing Date, as the case may be, and, in the case of the Notes, registered in the Purchaser's name and, in the case of the Warrants, with appropriate transfer documents evidencing the transfer of the Warrants by the Company to the Purchaser.

(b)  The representations and warranties of the Company in this Agreement shall be true and correct in all material respects (without regard to qualifications or exceptions contained therein as to materiality) when made and at the time of the Closing or such Tranche B Closing, as the case may be, as though made on and as of the Closing or such Tranche B Closing, as the case may be.

(c)  The Company shall have performed and complied in all material respects with all agreements and conditions contained in this Agreement required to be performed or complied with by it prior to or at the Closing or such Tranche B Closing, as the case may be.

(d)  No Governmental Authority having jurisdiction over any party hereto shall have issued any order, decree, ruling, injunction or other action that is in effect (whether temporary, preliminary or permanent) restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, and no law or regulation shall have been adopted that makes consummation of the transaction contemplated by this Agreement illegal or otherwise prohibited.

(e)  In the case of each Tranche B Closing, the closing of the transactions contemplated by the Purchase Agreement shall have occurred (or shall be occurring substantially concurrently with such Tranche B Closing).

Section 4.2   **Conditions to Company's Obligations.**  The Company's obligation to issue the Notes, and, in the case of the Closing, to transfer to the Purchaser the Warrants, to be delivered to the Purchaser at the Closing and at each Tranche B Closing is subject to the fulfillment (or waiver), prior to or at the Closing, or such Tranche B Closing, as the case may be, of the following conditions:

(a)  The Purchaser shall have delivered, or caused to be delivered, to the Company or its order, immediately available funds in the amount of 100% of the principal amount of the Notes to be purchased.

(b)     The representations and warranties of the Purchaser in this Agreement shall be true and correct in all material respects (without regard to qualifications or exceptions contained therein as to materiality) when made and at the time of the Closing or such Tranche B Closing, as the case may be.

(c)     The Purchaser shall have performed and complied in all material respects with all agreements and conditions contained in this Agreement required to be performed or complied with by it prior to or at the Closing or such Tranche B Closing, as the case may be.

(d)     No Governmental Authority having jurisdiction over any party hereto shall have issued any order, decree, ruling, injunction or other action that is in effect (whether temporary, preliminary or permanent) restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, and no law or regulation shall have been adopted that makes consummation of the transaction contemplated by this Agreement illegal or otherwise prohibited.

(e)     In the case of each Tranche B Closing, the closing of the transactions contemplated by the Purchase Agreement shall have occurred (or shall be occurring substantially concurrently with such Tranche B Closing).

(f)     In the case of each Tranche B Closing, the Purchaser shall not have exercised its rights under Section 10 of this Agreement for an aggregate amount in excess of $2,500,000.

## Section 5

### Representations and Warranties of the Company.

The Company represents and warrants to the Purchaser that:

Section 5.1     **Organization; Power and Authority.**  It is duly organized, validly existing and in good standing under the laws of the State of Texas.  It has all requisite limited liability company or corporate power, as applicable, to enter into this Agreement and to carry out the transaction contemplated hereby and by the Notes.

Section 5.2     **Authorization, Etc.**  The execution and delivery of this Agreement, and the consummation of the transaction contemplated hereby, have been duly authorized by the appropriate governing body of it, and no other or further corporate or similar action on the part of it is necessary therefor.  This Agreement is, and upon execution and delivery thereof each Note will be, the legal, valid and binding obligation of the Company, and this Agreement is, and upon execution and delivery thereof the Warrant will be, the legal, valid and binding obligation of Pineboard, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors' rights generally, and by general equitable principles.  No other consent, approval or authorization of any Person is required in connection with the execution, delivery or performance by it of this Agreement other than such other consents, approvals or authorizations, as to which the failure to obtain could not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of it to perform its obligations under this Agreement.

4

## Section 6

### Representations and Agreements of the Purchaser.

The Purchaser hereby represents and warrants to and agrees with the Company as follows:

Section 6.1 **Organization; Power and Authority.** The Purchaser is duly organized, validly existing and in good standing under the laws of the state in which it is incorporated or organized, as applicable. The Purchaser has all requisite power to enter into this Agreement and to carry out the transaction contemplated hereby.

Section 6.2 **Authorization, Etc.** The execution and delivery of this Agreement, and the consummation of the transaction contemplated hereby, have been duly authorized by the appropriate governing body of the Purchaser, as applicable, and no other or further corporate or similar action on the part of the Purchaser is necessary therefor. The execution and delivery of this Agreement and the performance by the Purchaser of its obligations hereunder will not violate or constitute a default under the terms of any agreement, indenture or other instrument, license, judgment, decree, order, law, statute, ordinance or other governmental rule or regulation by which the Purchaser is bound. This Agreement is the legal, valid and binding obligation of the Purchaser, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors' rights generally, and by general equitable principles. No other consent, approval or authorization of any Person is required in connection with the execution, delivery or performance by the Purchaser of this Agreement other than such other consents, approvals or authorizations as to which the failure to obtain could not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of the Purchaser to perform its obligations under this Agreement.

Section 6.3 **Acknowledgements.** The Purchaser acknowledges and agrees that:

(a)     The Securities are being acquired by the Purchaser in connection with the consummation of the transactions (the "**Transactions**") contemplated by the Purchase Agreement. The Securities have not been registered under the Securities Act or under any state securities laws and the Purchaser is acquiring the Securities pursuant to an exemption from registration under the Securities Act. The Purchaser understands that it may not sell or otherwise dispose of any of the Securities except in compliance with the registration requirements or exemption provisions of the Securities Act and any other applicable securities laws, and that it may therefore be required to hold such Securities indefinitely.

(b)     It has had access to such information as it has deemed necessary or appropriate for its own independent due diligence investigation and the Company does not make, and neither has made, any representation as to sufficiency or suitability of such information for the Purchaser's purposes. The Company may possess material, nonpublic information about the Company, Pineboard and their respective subsidiaries and conditions (financial and otherwise), financial status, results of operations, businesses, properties, management, plans and prospects (collectively, the "**Information**") and the Purchaser did not request or receive such Information

5

in making the decision to accept the Securities pursuant to this Agreement. The Purchaser agrees that any such additional Information the Company may possess would not have been material to the Purchaser's decision to enter into this Agreement and acquire the Securities because of the overall benefits of the Transactions and this Agreement to the Purchaser and its Affiliates.

(c)     It is an "accredited investor" as that term is defined by Rule 501 of the Securities Act, and has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of the investment in the Securities and of making an informed investment decision, and it is able to bear the economic risk of an investment in the Securities.

## Section 7

### Financial Information; Affirmative Covenants; Negative Covenants.

Section 7.1    **Financial Statements and Other Reports**. Commencing on the Closing Date, the Company shall cause to be prepared and made available to the holders of the Notes:

(a)     Interim Financial Statements.  Upon request, within forty-five (45) days after the end of each quarterly fiscal period (except the last) of each fiscal year, an unaudited consolidated balance sheet of the Company, and its respective subsidiaries as of the close of such quarterly period and unaudited consolidated statements of income, cash flows and stockholders' equity for the quarterly period then ended and that portion of the fiscal year then ended, all in reasonable detail in accordance with GAAP (except for the absence of footnotes and subject to normal year-end adjustments) applicable to quarterly financial statements generally.

(b)     Annual Financial Statements.  Upon request, within ninety (90) days after the end of each fiscal year, an audited consolidated balance sheet of the Company and its respective subsidiaries as of the close of such fiscal year and audited consolidated statements of income, cash flows and stockholders' equity for the fiscal year then ended, including the notes thereto, all in reasonable detail and in comparative form the corresponding figures for the preceding fiscal year, prepared by an independent certified public accounting firm, in accordance with GAAP.

(c)     Regulatory and Rating Filings.  Upon request, the Company shall make available to the holders of the Notes, reasonably promptly, and in any event within ten (10) Business Days after such request, copies of all previously filed or delivered (since the holder's last request) statutory accounting and other financial reports filed with any regulatory Governmental Authorities.

(d)     Notices.  Upon request, the Company shall make available to the holders of the Notes reasonably promptly (but in no event later than ten (10) Business Days after such request) (a) information relating to the occurrence of any of the following since such holder's last request: (i) the commencement of any proceedings or investigations by or before any Governmental Authority and any actions or proceedings in any court or before any arbitrator against or involving the Company, Pineboard or any of their subsidiaries or any of their

6

respective properties, assets or businesses, in each case involving a claim or liability which would reasonably be expected to have a material adverse effect on the Company, in each case taken as a whole with its subsidiaries, (ii) any attachment, judgment, levy or order assessed against the Company that would reasonably be expected to have a material adverse effect on the Company, taken as a whole with its subsidiaries, (iii) any default or event of default under any Indebtedness of the Company that would reasonably be expected to have a Material Adverse Effect on the Company taken as a whole with its subsidiaries and (b) notice of the time and place of the next scheduled meeting of the Company's board of directors (it being understood that in the event that the holders of the Notes shall reasonably request, one representative of the holders of the Notes reasonably acceptable to the Company shall be permitted to attend such meeting of the Company's board of directors and/or, if such holders provide reasonably acceptable evidence that no such representative is able to so attend, the Company will provide such representative with reasonable access to the minutes of such meeting (when available); provided, that, in either case of attendance or access to the minutes, such representative and such holders execute a customary confidentiality agreement reasonably acceptable to the Company).

Section 7.2    **Affirmative Covenants.**  Unless prior written notice of at least ten (10) Business Days is provided to all of the holders of the Notes it will, and will cause its Significant Subsidiaries to:

(a)    <u>Preservation of Corporate Existence and Related Matters</u>.  Preserve and maintain its separate corporate existence and all material rights, franchises, licenses, permits and privileges sufficient for the conduct of its business, except as would not have a material adverse effect on the Company or Pineboard, as applicable, in each case taken as a whole with its Significant Subsidiaries; and qualify and remain qualified as a foreign corporation authorized to do business in each jurisdiction in which the character of its properties or the nature of its business requires such qualification or authorization, except in each case to the extent that the failure to be or remain so qualified would not have a material adverse effect on the Company or Pineboard, as applicable, in each case taken as a whole with its Significant Subsidiaries.

(b)    <u>Maintenance of Property</u>.  Protect and preserve all material properties necessary to its business, including tangible and intangible assets; maintain in good working order and condition (ordinary wear and tear excepted) all buildings, equipment and other tangible real and personal property necessary and material to its business; and from time to time make or cause to be made all renewals, replacements and additions to such property necessary for the conduct of its business so that the business carried on in connection therewith may be properly conducted at all times, except in each case to the extent that the failure to do so would not have a material adverse effect on the Company, as applicable, in each case taken as a whole with its Significant Subsidiaries.

(c)    <u>Maintenance of Insurance</u>.  Maintain insurance, including directors' and officers' liability insurance, with responsible insurance companies against such risks and in such amounts as are customarily maintained by similar businesses in similar industries, except in each case as would not have material adverse effect on the Company taken as a whole with its Significant Subsidiaries.

7

(d)   <u>Payment of Taxes and Governmental Charges</u>.  Pay all material taxes, assessments and other governmental charges that may be levied or assessed upon it or any of its property (including, without limitation, withholding, social security, payroll and similar employment related taxes on the dates such taxes are due); *provided*, that Company may contest such taxes, assessments and other governmental charges in good faith so long as adequate reserves are maintained with respect thereto in accordance with GAAP, and except in each case as would not have a material adverse effect on the Company taken as a whole with its Significant Subsidiaries.

(e)   <u>Accounting Methods; Financial Records</u>.   Maintain a system of accounting, and keep such books, records and accounts sufficient to permit the preparation of financial statements in accordance with GAAP consistently applied and in compliance with the regulations of any Governmental Authority having jurisdiction over it or any of its properties, except in each case as would not have a material adverse effect on the Company taken as a whole with its Significant Subsidiaries.

(f)   <u>Compliance With Laws</u>.  Observe and remain in compliance with all laws and maintain in full force and effect all approvals of Governmental Authorities (including state insurance regulatory bodies), in each case applicable or necessary to the conduct of its business except where the failure to do so would not result in a material adverse effect on the Company taken as a whole with its Significant Subsidiaries and except that the Company or any such Subsidiary may contest the applicability of any law in good faith so long as adequate reserves are maintained with respect thereto in accordance with GAAP.

(g)   <u>Visits and Inspections</u>.  Permit representatives of the holder of this Note, from time to time, as often as may be reasonably requested, but only during normal business hours and upon reasonable prior notice, to visit and inspect its properties; inspect, audit and make extracts from its books, records and files, including, but not limited to, management letters prepared by independent accountants; and discuss with its principal officers and its independent accountants, its business, assets, liabilities, financial condition, results of operations and business prospects, in each case subject to customary confidentiality agreements and provided that in no event will any such visits, inspections, audits or discussions unreasonably interfere with the business operations of the Company.

Section 7.3   **Negative Covenants.**

(a)   <u>Debt</u>. Unless prior written notice of at least ten (10) Business Days is provided to all of the holders of the Notes and holders of at least 50% in principal amount of the Notes at the time outstanding do not object, or otherwise consent to in writing, the Company hereby covenants and agrees that it will not, and will not permit any of its Significant Subsidiaries to at any time after the date hereof, create, incur, assume or suffer to exist any Indebtedness, other than (i) unsecured Indebtedness that are pari passu with or junior to the Notes, (ii) capital leases entered into in the ordinary course of business, (iii) Permitted Indebtedness or (iv) any other Indebtedness so long as the net cash proceeds of such Indebtedness are used within 45 days of receipt thereof (a) to make an offer of prepayment of the Notes to holders pursuant to Section 9.1(a) (it being understood that in the event that any holders decline to receive such a prepayment, the Company shall be permitted to use the amounts not

required to be used to prepay the Notes pursuant to such offer in any manner that does not violate the terms of this Agreement) or (b) to make an offer of prepayment or to prepay other Indebtedness that is pari passu with the Notes.

(b) <u>Closing of Purchase Agreement</u>. Unless otherwise consented to in writing by the holders of more than 50% in principal amount of the Notes at the time outstanding, Company shall not, at or prior to the consummation of the closing of the transactions contemplated by the Purchase Agreement, waive any of the provisions of the Purchase Agreement, or agree to any amendment of the Purchase Agreement, in each case the effect of which would be materially adverse to the interests of the Purchaser in its capacity as holder of the Tranche A Notes and Tranche B Notes.

**Section 8**

**Principal Reset and Maturity.**

Section 8.1    **Principal Reset.**  On the second Business Day immediately following the receipt by the Company of a correct and complete copy of the monthly Net Asset Value report of the Tewksbury Investment Fund Ltd. Series B of Tewksbury Capital Management Bermuda (the "**Fund**"), commencing with the Net Asset Value report received in the month of November 2011, the principal amount of the Notes shall either be increased or decreased as follows: If the Net Asset Value report received in the respective month reflects a decrease, the principal amount of the Notes shall be decreased to reflect the performance of the Fund over the immediately preceding month;  If the Net Asset Value report received in the respective month reflects an increase, the principal amount of the Notes shall be increased to reflect the performance of the Fund over the immediately preceding month.  The amount of the increase or decrease shall be calculated by multiplying the monthly return to investors net of fees for the preceding calendar month (excluding, for the avoidance of doubt, the impact of asset inflows and outflows) by the then-current principal amount of the Notes. For the avoidance of doubt, a positive increase in such monthly return to investors net of fees shall result in a positive increase to the principal amount of the Notes and a negative decrease in such monthly return to investors net of fees shall result in a negative decrease to the principal amount of the Notes.  The then-current principal amount of the Notes will at all times be updated and listed on Exhibit III to this Agreement, and reasonably promptly delivered to the holders of the Notes by the Company upon request.  No separate interest shall be payable on the Notes.  At each one year anniversary of the Notes, the sum of one percent [1%] of the then-current principal amount of the Notes will be added to the principal amount of the Notes and the revised principal balance will be updated and listed on Exhibit III to this Agreement, and reasonably promptly delivered to the holders of the Notes by the Company upon request.

Section 8.2    **Maturity.**  Except as otherwise expressly set forth herein, the Notes shall become due and payable in full on November 14, 2016; provided, that, at the written request of the holders of more than 50% in principal amount of the Notes at the time outstanding delivered to the Company and the other holders of the Notes no later than six month prior to November 14, 2016, the maturity date of the Notes shall be extended to November 14, 2021.

## Section 9

### Optional Prepayment of the Notes.

Section 9.1     Prepayments at the Option of the Company.

(a)     Notwithstanding anything to the contrary contained herein, **Error! Reference source not found.** shall not apply to any transaction so long as, at least thirty (30) days prior to the consummation of such transaction, the Company gives each holder of Notes (i) written notice of such transaction (and a reasonable description of the principal terms thereof), which written notice shall provide each such holder with the option to at, and conditioned upon, the closing of such transaction, have such holder's Notes prepaid, in whole, for cash pursuant to Section 9.3, and shall include the information contemplated to be included in notices delivered pursuant to Section 9.2, and (ii) such other information as the Company determines in good faith is reasonably necessary for a reasonable investor in such holder's position to make an informed investment decision. Such holder may irrevocably exercise its option pursuant to such written notice by communicating to the Company, in writing, its election no later than fifteen (15) days following delivery of such written notice and other information referenced in this Section 9.1(a). If such holder does not timely communicate its election pursuant to the immediately preceding paragraph, it shall be deemed to have validly elected to have such holder's Notes prepaid, in whole, for cash pursuant to Section 9.3.

(b)     The Company shall have the right, at any time, to prepay the Notes in whole, for cash, pursuant to Section 9.3, for a price equal to the sum of (a) 100% of the then remaining principal amount of such Notes plus (b) (1) if the date of such redemption is on or after the fifth anniversary of the date hereof, $0, (2) if the date of such redemption is any date prior to the fifth anniversary of the date hereof and on or after the third anniversary of the date hereof, the product of (x) 10%, (y)(A) the number of days between the redemption date and the fifth anniversary of the date hereof divided by (B) 365 and (z) the remaining principal amount of such Notes, or (3) if the date of such redemption is any date prior to the third anniversary of the date hereof, the product of (x) 50% and (y) the remaining principal amount of such Notes.

Section 9.2     **Notice of Optional Prepayments**. The Company will give each holder of Notes written notice of the exercise of the optional prepayment right under Section 9.1(b) not less than forty-five (45) days prior to the date fixed for such prepayment (it being understood that such notice may provide that the occurrence of such prepayment on the date fixed therefor is conditional upon the closing of any debt facility or securities issuance or other transaction). Such notice shall specify such date, and the principal amount being prepaid (and, in the case of prepayment pursuant to Section 9.1(b), the amount of the premium to be paid) and the place or places at which Notes shall be surrendered for prepayment.

Section 9.3     **Maturity; Surrender, Etc.** In the case of each prepayment of Notes pursuant to this Section 9, the principal amount of each Note to be prepaid shall mature and become due and payable, without premium (except the premium specified Section 9.1(b), as applicable) or penalty in cash on the date fixed for such prepayment (assuming the conditions, if any, relating to such prepayment, as specified in the applicable notice of prepayment have been

satisfied), in each case upon surrender of such Note for prepayment in accordance with the notice described in Section 9.1 or Section 9.2, as applicable.

## Section 10

## Mandatory Prepayment of the Notes.

Section 10.1 **Prepayment upon Redemptions.** On or after December 1, 2011, within thirty (30) days of any written notice from Purchaser of a redemption request from one or more unaffiliated limited partner(s) in Purchaser's fund (each such request, a **"Redemption Event"**), which notice shall state the full amount of funds requested to be redeemed by such unaffiliated limited partner(s) in Purchaser's fund (the **"Redemption Amount"**), the Company shall prepay a principal amount of the Notes equal to fifty percent (50%) of the Redemption Amount set forth in such notice; provided, that any such redemption request must be accompanied by evidence, reasonably satisfactory to the Company, that the purpose and use of proceeds of the Redemption Event is to satisfy such redemption request (and no more than 50% the total amount thereof).

## Section 11

## Events of Default.

An **"Event of Default"** shall exist if any of the following conditions or events shall occur and be continuing:

(a)     the Company defaults in the payment of any principal on any Note when the same becomes due and payable;

(b)     the Company defaults in the performance of or compliance with any other term contained herein and such default is not remedied within thirty (30) days after the Company receives written notice of such default from any holder of a Note (any such written notice to be identified as a "notice of default" and to refer specifically to this Section 11(b));

(c)     the Company, or any of its Significant Subsidiaries (i) breaches a material term of any Indebtedness and (ii) such breach results in Indebtedness in an aggregate amount (with other defaulted indebtedness) in excess of $500,000 becoming due and payable prior to its due date, and with respect to which a demand for payment has been made and not withdrawn within thirty (30) days of such demand being made;

(d)     a final judgment or judgments for the payment of money aggregating in excess of $500,000 are rendered (and not previously cured pursuant to the terms of this Section 11(d)) against the Company or any of its Significant Subsidiaries, and which judgments are not, within sixty (60) days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within sixty (60) days after the expiration of such stay; provided, however, that any judgment which is covered by insurance or an indemnity from a credit-worthy party shall not be included in calculating the amounts set forth above;

(e)     the Company or any of its respective Significant Subsidiaries (i) files, or consents by answer or otherwise to the filing against it of, a petition for relief or reorganization

11

or arrangement or any other petition in bankruptcy, for liquidation or to take advantage of any bankruptcy, insolvency, reorganization, moratorium or other similar law of any jurisdiction, (ii) makes an assignment for the benefit of its creditors, (iii) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, or (iv) is adjudicated as insolvent or to be liquidated; or

(f)     a court or Governmental Authority of competent jurisdiction enters an order appointing, without consent by the Company, or any of its Significant Subsidiaries, a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, or constituting an order for relief or approving a petition for relief or reorganization or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up or liquidation of the Company or any of its Significant Subsidiaries, or any such petition shall be filed against the Company, or any of its respective Significant Subsidiaries and such petition shall not be dismissed within sixty (60) days.

## Section 12

## Remedies on Default, Etc.

Section 12.1  **Acceleration.**  If any Event of Default has occurred and is continuing, holders of more than 50% of the aggregate principal amount of the Notes at the time outstanding may at any time at its or their option, by notice or notices to the Company, declare all the Notes then outstanding to be immediately due and payable.  Upon any Notes becoming due and payable under this Section 12.1, such Notes will forthwith mature and the entire unpaid principal amount of such Notes shall all be immediately due and payable, without presentment, demand, protest or further notice, all of which are hereby waived.  Notwithstanding the foregoing, any such declaration pursuant to this Section 12.1 that the Notes then outstanding are immediately due and payable shall be void retroactively, and the Notes shall not be due and payable, if the Event of Default is cured and/or otherwise no longer continuing within thirty (30) days following such declaration; provided, however, that the foregoing clause shall not apply if Section 11 provides for a cure or remedy period for such Event of Default of not less than thirty (30) days.

Section 12.2  **Rescission.**  At any time after any Notes have been declared due and payable pursuant to Section 12.1, the holders of more than 50% of the aggregate principal amount of the Notes then outstanding, by written notice to the Company, may rescind and annul any such declaration and its consequences if (a) the Company has paid all principal of any Notes that are due and payable and are unpaid other than by reason of such declaration, and (b) no judgment or decree has been entered for the payment of any monies due pursuant hereto or to the Notes which would conflict with such rescission.  No rescission and annulment under this Section 12.2 will extend to or affect any subsequent Event of Default or Default or impair any right consequent thereon.

Section 12.3  **No Waivers or Election of Remedies, Expenses, Etc.**  No course of dealing and no delay on the part of any holder of any Note in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice such holder's rights, powers or remedies.  No right, power or remedy conferred by this Agreement or by any Note upon any

12

holder thereof shall be exclusive of any other right, power or remedy referred to herein or therein or now or hereafter available at law, in equity, by statute or otherwise.

## Section 13

## Registration; Exchange; Substitution of Notes.

Section 13.1 **Registration of Notes.** The Company shall keep at its principal executive office a register for the registration of transfers of Notes. The name and address of each holder of one or more Notes, each transfer thereof and the name and address of each transferee of one or more Notes shall be registered in such register. Prior to due presentment for registration of transfer, the Person in whose name any Note shall be registered shall be deemed and treated as the owner and holder thereof for all purposes hereof, and the Company shall not be affected by any notice or knowledge to the contrary. Notwithstanding anything to the contrary contained herein or in the Notes, other than a transfer to an Affiliate of a holder or any other fund managed or sponsored directly or indirectly by Weston Capital Management LLC or any Affiliate thereof, the Notes shall be non-transferable by holder thereof, unless any transfer, assignment, hypothecation, pledge, sale, divestment or other disposition is preceded by prior written consent of the Company. The holder shall have the right to convey custody of any Note to any financial institution, including, without limitation, Société General or any of its Affiliates.

Section 13.2 **Transfer and Exchange of Notes.** Subject to the prior written consent of the Company pursuant to Section 13.1 and the receipt by the Company of evidence reasonably satisfactory to it (it being understood that the receipt of an opinion of counsel to such effect in form and substance reasonably satisfactory to the Company shall be sufficient evidence) that such transfer is exempt from registration under the Securities Act, upon surrender of any Note to the Company at the address and to the attention of the designated officer for registration of transfer (and in the case of a surrender for registration of transfer accompanied by a written instrument of transfer duly executed by the registered holder of such Note and accompanied by the relevant name, address and other information for notices of each transferee of such Note or part thereof), within ten (10) Business Days thereafter, the Company shall execute and deliver, at the Company's expense (except as provided below), one or more new Notes (as requested by the holder thereof) in exchange therefor, in an aggregate principal amount equal to the unpaid principal amount of the surrendered Note. Each such new Note shall be payable to such Person as such holder may request and shall be substantially in the form of Exhibit 1. Each such new Note shall be dated from the date of the most recent 12 month anniversary of the Closing Date. The Company may require payment of a sum sufficient to cover any stamp tax or governmental charge imposed in respect of any such transfer of Notes. Notes shall not be transferred in denominations of less than $250,000, *provided* that if necessary to enable the registration of transfer by a holder of its entire holding of Notes, one Note may be in a denomination of less than $250,000. Any transferee of a Note shall, by acceptance of such Note, be bound by this Agreement.

Section 13.3 **Replacement of Notes.** Upon receipt by the Company at the address and to the attention of the designated officer of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note, and

(a)   in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it, or

(b)   in the case of mutilation, upon surrender and cancellation thereof,

within ten (10) Business Days thereafter, the Company shall execute and deliver, in lieu thereof, a new Note, dated from the date of the most recent 12 month anniversary of the Closing Date.

## Section 14

### Payments on Notes.

The Company shall at all times maintain an office or agency in the United States at which the Notes may be presented for payment. The Company initially designates its office at 2425 Colorado Blvd, Suite B205, Santa Monica, CA 90404 as such office. Except as provided in the Notes, payment on the Notes shall be made at such office and in such lawful money of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

## Section 15

### Amendment and Waiver.

Section 15.1   **Requirements.**  This Agreement and the Notes may be amended, and the observance of any term hereof or of the Notes may be waived (either retroactively or prospectively), with (and only with) the written consent of the Company and the holders of more than 50% of the aggregate principal amount of the Notes at the time outstanding, except that (a) no amendment or waiver of any of the provisions of Section 1, Section 2, Section 3 or Section 3.2 will be effective as to the Purchaser unless consented to by the Purchaser in writing and (b) no such amendment to or waiver of a provision of the Notes may, without the written consent of the holder of each Note at the time outstanding affected thereby, (i) subject to the provisions of Section 12 relating to acceleration or rescission, change the amount or time of any prepayment or payment of principal of such Note, (ii) change the percentage of the principal amount of the Notes the holders of which are required to consent to an amendment or waiver hereunder, or (iii) adversely affect in any material respect the right of holders of Notes to convert their Notes pursuant to the terms hereof.

Section 15.2   **Binding Effect, Etc.**  Any amendment or waiver consented to as provided in this Section 15 applies equally to all holders of Notes and is binding upon them and upon each future holder of any Note and upon the Company without regard to whether such Note has been marked to indicate such amendment or waiver. No such amendment or waiver will extend to or affect any obligation, covenant, agreement, Default or Event of Default not expressly amended or waived or impair any right consequent thereon. No course of dealing between the Company and the holder of any Note, nor any delay in exercising any rights hereunder or under any Note shall operate as a waiver of any rights of any holder of such Note. As used herein, the term "this

14

Agreement" and references thereto shall mean this Agreement as it may from time to time be amended or supplemented.

## Section 16

## Notices.

Except as otherwise provided in this Agreement, all notices and communications provided for hereunder shall be in writing and sent (a) by facsimile if the sender on the same day sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid), or (b) by registered or certified mail with return receipt requested (postage prepaid), or (c) by a recognized overnight delivery service (with charges prepaid), or (d) if consented to by the recipient, by electronic mail. Any such notice must be sent:

(i)     if to the Purchaser or its nominee, to the Purchaser or nominee at the address specified for such communications in Schedule A, or at such other address as the Purchaser or nominee shall have specified to the Company in writing;

(ii)    if to any other holder of any Note, to such holder at such address as such other holder shall have specified to the Company in writing; or

(iii)   if to the Company, to 2425 Colorado Blvd, Suite B205, Santa Monica, CA 90401 to the attention of Contract Adminstrator, facsimile number: (310) 388-5363, or at such other address as the Company shall have specified to the holder of each Note in writing.

Notices under this Section 16 will be deemed given only when (x) delivered by physical delivery or electronic mail (or if such date is not a Business Day, on the next Business Day), (y) facsimile confirmation is received (or if such receipt is not on a Business Day, on the next Business Day) or (z) if sent by registered or certified mail, three (3) Business Days after the date of mailing.

## Section 17

## Miscellaneous.

Section 17.1   **Severability**.   Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

Section 17.2   **Counterparts**.   This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto.

Section 17.3   **Governing Law; Venue**

15

(a)     .Governing Law.  This Agreement and the Notes may not be modified or
terminated orally, and shall be construed and interpreted according to the internal laws of the
State of New York, excluding any choice of law rules that may direct the application of the laws
of another jurisdiction.

(b)     Venue.  Each party agrees that it will bring any action or proceeding in
respect of any claim arising out of or related to this Agreement or the Notes exclusively in any
federal or state court sitting in the State of New York (the "New York Courts"), and, solely in
connection with claims arising under this Agreement or the Notes, (i) irrevocably submits to the
exclusive jurisdiction of the New York Courts; (ii) waives any objection to laying venue in any
such action or proceeding in the New York Courts; (iii) waives any objection that the New York
Courts are an inconvenient forum or do not have jurisdiction over any party; and (iv) agrees that
service of process upon such party in any such action or proceeding will be effective if notice is
given in accordance with Section 17.

(c)     WAIVER OF JURY TRIAL.  Each party acknowledges and agrees that
any controversy which may arise under this Agreement or the Notes is likely to involve
complicated and difficult issues, and therefore each such party hereby irrevocably and
unconditionally waives any right such party may have to a trial by jury in respect of any
litigation directly or indirectly arising out of or relating to this Agreement or the Notes.  Each
party certifies and acknowledges that: (i) no representative, agent or attorney of any other party
has represented, expressly or otherwise, that such other party would not, in the event of
litigation, seek to enforce the foregoing waiver; (ii) each party understands and has considered
the implications of this waiver; (iii) each party makes this waiver voluntarily; and (iv) each party
has been induced to issue or accept delivery of the Notes, as applicable, by among other things
the mutual waivers and certifications in this Section 17.3.

Section 17.4  **Construction**.    All references  in  this  Agreement  to  Exhibits,
Schedules, Sections, subsections and other subdivisions refer to the corresponding Exhibits,
Schedules, Sections, subsections and other subdivisions of this Agreement unless expressly
provided otherwise.  Titles appearing at the beginning of any Sections, subsections or other
subdivisions of this Agreement are for convenience only, do not constitute any part of such
Sections, subsections or other subdivisions, and shall be disregarded in construing the language
contained therein.  The words "this Agreement," "herein," "hereby," "hereunder" and "hereof"
and words of similar import, refer to this Agreement as a whole and not to any particular
subdivision unless expressly so limited.  The words "this Section," "this subsection" and words
of similar import, refer only to the Sections or subsections hereof in which such words occur.
The word "including" (in its various forms) means "including, without limitation."  Pronouns in
masculine, feminine or neuter genders shall be construed to state and include any other gender
and words, terms and titles (including terms defined herein) in the singular form shall be
construed to include the plural and vice versa, unless the context otherwise expressly requires.
Unless the context otherwise requires, all defined terms contained herein shall include the
singular and plural and the conjunctive and disjunctive forms of such defined terms.

Section 17.5  **Payment Of Collection, Enforcement And Other Costs**.  If there occurs
any bankruptcy, reorganization, receivership of the Company or other proceedings affecting
Company creditors' rights and involving a claim under this Agreement or the Notes or if the

holders of Notes otherwise take action to collect amounts due under the Notes or to enforce the provisions of this Agreement or the Notes, then the Company shall pay the costs incurred by the holders for such enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, attorneys' fees and disbursements.

\* \* \* \* \*

If you are in agreement with the foregoing, please sign the form of agreement on a counterpart of this Agreement and return it to the Company, whereupon this Agreement shall become a binding agreement between you, the Company and (to the extent set forth below.)

Very truly yours,

Swartz IP Services Group Inc.

By:

Name: KYLE CHARY

Title: VICE PRESIDENT

This Agreement is hereby accepted and agreed to as of the date thereof.

**Wimbledon Fund (Class TT), a class of a
Cayman Islands Segregated Portfolio Company**

By:

Name:

Title:

Benjamin D. Miller
Director

*[Signature page to Note Purchase Agreement]*

Schedule A

INFORMATION RELATING TO PURCHASER

| Name and Address of Purchaser | Principal Amount of Notes to be Purchased |
|---|---|
| Wimbledon Fund (Class TT), a class of a Cayman Islands Segregated Portfolio Company | $ 25,000,000 |

(1)    All payments by wire transfer of immediately available funds to:

| Purchaser | Wire Instructions |
|---|---|
| Wimbledon Fund (Class TT), a class of a Cayman Islands Segregated Portfolio Company | Bank:  The Bank of New Canaan<br>ABA:  021-113-662<br>FBO:  The Wimbledon Fund SPC – Class TT<br>Account #:  Redacted |

with sufficient information to identify the source and application of such funds.

(2)    All communications, including notices of payments and written confirmation of such wire transfers to:

Keith D. Wellner
Chief Operating Officer
Weston Capital Management
767 Third Ave - 25th Floor
New York, New York 10017
Keith.Wellner@westoncapital.com
Tel        212.318.3500
Fax        212.980.4064

Schedule A - 1

Schedule B

### Defined Terms

As used herein, the following terms have the respective meanings set forth below or set forth in the Section hereof following such term:

"**Affiliate**" of any specified Person means any other person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such specified Person. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Agreement**" is defined in Section 1.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which commercial banks in New York, New York are required or authorized to be closed.

"**Closing**" is defined in Section 3.

"**Closing Date**" is defined in the Purchase Agreement.

"**Company**" is defined in the first paragraph of this Agreement.

"**Default**" means an event or condition the occurrence or existence of which would, with the lapse of time or the giving of notice or both, become an Event of Default.

"**Event of Default**" is defined in 11.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**GAAP**" means generally accepted accounting principles as in effect from time to time in the United States of America.

"**Governmental Authority**" means the government of the United States of America or any State or other political subdivision thereof, or any other jurisdiction in which the Company or any subsidiary conducts all or any part of its business, or which asserts jurisdiction over any properties of the Company or any subsidiary, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of, or pertaining to, any such government.

"**holder**" means, with respect to any Note the Person in whose name such Note is registered in the register maintained by the Company pursuant to Section 13.

"**Indebtedness**" means, with respect to any Person, (a) any indebtedness, contingent or otherwise, in respect of borrowed money, including indebtedness in respect of borrowed money evidenced by bonds, notes, debentures or similar instruments, (b) letters of credit or (c)

indebtedness representing the balance deferred and unpaid of the purchase price of any property (including pursuant to financing leases), regardless of whether any of the foregoing indebtedness would appear as a liability upon a balance sheet of such Person prepared on a consolidated basis in accordance with GAAP and regardless of whether or not the recourse of the lender is to the whole of the assets of such Person or only to a portion thereof.

"**Information**" is defined in Section 6.3(b).

"**Material Adverse Effect**" is defined in the Purchase Agreement.

"**Net Asset Value**" is defined in **Error! Reference source not found.**.

"**New York Courts**" is defined in Section 17.3(b).

"**Notes**" is defined in Section 1.

"**Permitted Indebtedness**" shall mean (a) Indebtedness of Company to a wholly-owned subsidiary of Company, so long as the applicable subsidiary remains directly or indirectly wholly-owned by Company; (b) Indebtedness outstanding on the date hereof (including the Notes and any other notes issued pursuant to the Purchase Agreement) and any refinancings, refundings, renewals or extensions thereof (without increasing, or shortening the maturity of, the principal amount thereof); (c) trade accounts payable of the Company arising in the ordinary course of business (such trade accounts payable being pari passu in right of payment to the Notes); or margin debt provided by any institution holding publicly traded securities for Company, which proceeds may be used to make investment in any public or non-public securities, including to affiliates of Company which are not subsidiaries of Company.

"**Person**" means an individual, partnership (limited or general), corporation, joint venture, limited liability company, association, trust, business trust, unincorporated organization or business entity.

"**Purchase Agreement**" means the Purchase Agreement, dated as of November 14, 2011, by and among Company and Purchaser.

"**Purchaser**" is defined in the first paragraph of this Agreement.

"**Securities**" means the Notes, the Warrants of Pineboard that are being delivered to the Holder simultaneously with the Notes and any shares of Common Stock of Pineboard that may be issued upon exercise of any such Warrants.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**Significant Subsidiary**" means any subsidiary of Compnay which has a value in excess of $500,000.

"**Transactions**" is defined in Section 6.3(a).