# EXHIBIT T

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4            v.                            16 Cr. 0746(PKC)

 5   DAVID BERGSTEIN,

 6            Defendant.

 7   ------------------------------x
                                            February 7, 2018
 8                                          10:11 a.m.
     Before:
 9
                       HON. P. KEVIN CASTEL,
10
                                            District Judge
11
                            APPEARANCES
12
     GEOFFREY S. BERMAN
13        Interim United States Attorney for the
          Southern District of New York
14   BY:  EDWARD IMPERATORE
          ROBERT ALLEN
15        ELISHA KOBRE
            Assistant United States Attorneys
16
     BIENERT, MILLER & KATZMAN, PLC
17        Attorneys for Defendant
     BY:  THOMAS H. BIENERT, JR.
18        ANTHONY R. BISCONTI

19   SATTERLEE STEPHENS LLP
          Attorneys for Defendant
20   BY:  ANDREW L. FISH

21            - also present -

22   Ellie Sheinwald, U.S. Paralegal Specialist
     Sarah Emmerick, U.S. Paralegal Specialist
23   Caroline Howland, Defense Paralegal Specialist

24   SA Shannon Bieniek, FBI

25
```

I27dber1  Wellner - direct

1  the note purchase agreement that we had just looked at were
2  fine and that we wanted to get it signed by Jerry Swartz at
3  this point, as I stated earlier.
4  Q.  Why?
5  A.  Because we wanted Jerry to -- we wanted Jerry's signature
6  on it, and we wanted to make sure that Jerry was aware of this
7  transaction.
8  Q.  What did Mr. Bergstein say in response?
9  A.  He said that he would indeed get it signed by Jerry Swartz.
10 Q.  Did you ever receive Jerry Swartz's signature?
11 A.  I did not.
12         MR. IMPERATORE:  We could take that down.  Thank you.
13 Q.  Mr. Wellner, did you plead guilty to committing crimes in
14 connection with this TT transaction with Swartz IP?
15 A.  I did.
16 Q.  Was the TT agreement with Swartz IP in the best interest of
17 the TT investors?
18 A.  It was not.
19 Q.  Why not?
20 A.  Because the TT offering memorandum provided that it would
21 invest directly or notionally through a transaction with a bank
22 or similar such that it would get the Tewksbury returns or in
23 short be invested with Tewksbury.  This was not an investment
24 with Tewksbury.
25 Q.  Was this transaction within the scope of what was permitted

```
 1  by the offering memorandum?
 2  A.  It was not.
 3  Q.  Do you believe it was wrong to enter into this deal?
 4  A.  I do.
 5  Q.  Now, I believe you testified that as part of this deal,
 6  some money was transferred to another Weston fund, is that
 7  right?
 8  A.  That's correct.
 9  Q.  All right.  Let's look at Government Exhibit 173, in
10  evidence.
11          So this is an email from Mr. Bergstein to you and the
12  Hallacs, November 29, 2011, and Mr. Bergstein writes:  "A wire
13  in the amount of roughly 1.7 million was sent to Partners Fund.
14  I will explain the math when we speak.  I will follow up with a
15  confirmation number shortly.  Balance goes out on Thursday."
16          What was Mr. Bergstein referring to here?
17  A.  This is the -- Mr. Bergstein paid the $3 million that went
18  from Swartz IP to P2 in two pieces and this was the first piece
19  of $1.7 million.
20  Q.  What, if anything, did you tell Mr. Bergstein about why it
21  was necessary to pay Partners 2?
22  A.  Partners 2 had to be repaid because it was at this point,
23  at the end of November and it was 30 days out from the maturity
24  date of P2, and it became more and more likely that Deutsche
25  Bank was not going to come in in time, or certainly not in time
```

|  |  |
|---|---|
| 1 | to meet the December 30th redemption -- I mean |
| 2 | December 30th maturity, and as a result it was important that |
| 3 | Partners got repaid, because Mr. Hallac had promised the |
| 4 | Partners' investors that in January he was going to make a cash |
| 5 | distribution to them and he wanted to make sure that he had the |
| 6 | ability to make even if it wasn't all of the money -- I mean, |
| 7 | obviously that was the ideal goal, but at least be able to pay |
| 8 | some of the money to Partners 2. |
| 9 | THE COURT: Now, in your answer, you referred to "P2," |
| 10 | "Partners 2" and "Partners." What, if anything, is the |
| 11 | difference between those three terms as used in your last |
| 12 | answer? |
| 13 | THE WITNESS: I apologize if I did that. It was all |
| 14 | meant to be one and the same, the Partners 2 Fund. |
| 15 | THE COURT: Thank you. Next question. |
| 16 | BY MR. IMPERATORE: |
| 17 | Q. So you mentioned a December 30th maturity date. What was |
| 18 | the concern there specifically? If the money was not repaid to |
| 19 | P2 as of December 30th, what effect might that have? |
| 20 | A. Well, in short, the January 15th timeframe that Mr. Hallac |
| 21 | had promised to pay the P2 investors would not be met, and they |
| 22 | would more than likely ask questions as to why that would |
| 23 | happen and it would require -- or likely require the disclosure |
| 24 | of the fact that P2 had lent money to Arius Libra/WFF. |
| 25 | Q. What, if anything, did you tell Mr. Bergstein about that? |

WF0017148

```
 1   A.   Mr. Bergstein -- we told Mr. Bergstein that -- that the
 2   money had to be repaid by December 30th because the P2
 3   investors were not aware of the loan to Arius Libra and it had
 4   to be repaid.
 5   Q.   So, in other words, you couldn't keep hiding it if the
 6   maturity date came and you owed this money to P2 investors?
 7   A.   That is correct.  I mean, there was -- it would have been
 8   uncovered -- if by January 15th the money was not repaid so
 9   that Mr. Hallac could then and Weston could repay its
10   investors, it would be -- likely be exposed, the whole loan
11   from P2 to Arius Libra.
12   Q.   How much money ultimately was transferred from Swartz IP to
13   P2 as partial repayment for the P2 loan?
14   A.   The total transfer was slightly over $3 million.
15   Q.   Now, what conflict of interest, if any, was created by
16   transferring $3 million to P2 as partial repayment for its
17   loan?
18   A.   Well, it created a conflict of interest because TT money
19   was being used to pay off P2 and P2 had nothing to do with TT
20   and, likewise, TT had nothing to do with P2.  So they were two
21   separate funds, separate pools of money, and the conflict was
22   favoring -- in essence, by transferring the $3 million,
23   favoring the P2 investors to the tune of $3 million to the
24   detriment of TT investors.
25   Q.   Did you and Mr. Hallac disclose the TT agreement with
```

```
1    Swartz IP to TT investors?
2    A.  We did not.
3    Q.  Why not?
4    A.  Because doing so would have angered the TT investors and
5    likely caused them to seek their money back.
6    Q.  Why would they have been angry?
7    A.  Because they wouldn't have known what Schwartz IP was, and
8    the understanding and the offering documents provided that it
9    was to be invested with Tewksbury and this was not an
10   investment in Tewksbury.
11   Q.  Now, did you believe it was wrong not to disclose the TT
12   transaction with Swartz IP to TT investors?
13   A.  I do.
14   Q.  Now, did you or Mr. Hallac tell P2 investors about the fact
15   that $3 million was going over from Swartz IP to repay the P2
16   loan?
17   A.  We did not.
18   Q.  Why?
19   A.  Because in doing so that would have raised more questions
20   and likely led to the uncovering of the fact that P2 had
21   provided the loan in the first place to Arius Libra.  You can't
22   disclose the repayment of a loan if they are not aware of the
23   loan existing in the first place.
24   Q.  Now, walk us through the discussions you had with
25   Mr. Bergstein, if any, about whether to disclose the Swartz IP
```

1   do with the actual purchaser of the claim, yet we represented
2   that we did.
3   Q.  So, did you falsely represent yourself to Stephens to be
4   associated with the buyer of this bankruptcy claim?
5   A.  Yes, and not be affiliated or Mr. Bergstein not having any
6   affiliation with the buyer.
7   Q.  And what did this allow Mr. Bergstein to achieve by your
8   falsely pretending to be associated with the buyer?
9           MR. BIENERT:  Objection.  Speculative, your Honor.
10  Foundation.
11          THE COURT:  Rephrase it, please.
12  BY MR. IMPERATORE:
13  Q.  What, if anything, did Mr. Bergstein tell you about what he
14  would achieve from this?
15  A.  He was going to be able to obtain a bankruptcy claim that
16  he otherwise would not have been able to obtain.
17  Q.  Why would he otherwise not have been able to obtain this
18  claim on his own?
19  A.  Because it's my understanding that the bankruptcy rules do
20  not allow a debtor or someone affiliated with a debtor to
21  purchase, in essence, their own bankruptcy claims.
22  Q.  Describe what you did at Mr. Bergstein's request.
23  A.  I exchanged e-mails with individuals at Stephens and
24  indicated that I was a representative of the buyer which was a
25  subsidiary of Weston.

I275ber2                    Wellner - direct.

1   evidence.
2            And in the middle part of this Jackson Farrow says:
3   Mr. Wellner, attached are the completely signed purchase
4   agreement and the assignment document re the promissory note.
5            What was your understanding Mr. Farrow was sending
6   back to you here?
7   A.  He is sending me the fully-executed agreement.
8   Q.  Let's turn to pdf page 7.  Who signed this agreement?
9   A.  It was signed by the seller, by Jackson Farrow, and the
10  buyer CAC Group, it was signed by Kia Jam.
11  Q.  Let's take a look at the first page of this e-mail again,
12  Ms. Emmerick.
13           Once this e-mail is sent to you, you then forwarded it
14  to Mr. Bergstein.  Why did you do that?
15  A.  Because he was the purchaser and they requested -- they
16  acknowledged that they were going to send certain documents
17  once they received payment.  So, since Mr. Bergstein was going
18  to be providing the payment and -- yes.  So, once they received
19  the payment, I sent it to Mr. Bergstein so that he would
20  understand that he would have to pay the money and then we
21  would receive the documentation back.
22  Q.  Do you believe it was wrong to lie to Stephens and pretend
23  to be the purchaser?
24  A.  I do.
25  Q.  Ms. Emmerick, please show, for identification only,

1  Q. How do you know that?
2  A. Because I have been there.
3  Q. And what are the materials that are being referenced here?
4  A. They are the materials Stephens had sent to me in
5  connection with the purchase of the bankruptcy claim.
6  Q. If you can zoom out, please?
7     And what was your response, Mr. Wellner?
8  A. I said that they were delivered to my office last week and
9  I had my assistant FedEx them to Kia the same day.
10 Q. And we see here your address 767 Third Avenue, 25th floor;
11 is that right?
12 A. That's correct.
13 Q. I want to change topics, Mr. Wellner. Are you familiar
14 with something called Purplebox?
15 A. I am.
16 Q. What is Purplebox?
17 A. Purplebox was something formed by Weston attorneys for the
18 benefit of Mr. Albert Hallac, Mr. Jeffrey Hallac, and myself.
19 Q. When was Purplebox created, roughly?
20 A. The summer of 2011.
21 Q. Did Purplebox have any business operations?
22 A. No, it did not.
23 Q. Did there come a time that Purplebox received any money
24 from Swartz IP?
25 A. Yes, they did.

WF0017179

1   Q.  How much, roughly?
2   A.  $750,000.
3   Q.  And when, approximately, did that happen?
4   A.  It happened in early to mid-December 2011.
5   Q.  Who transferred that money from Swartz IP to Purplebox?
6   A.  Mr. Bergstein.
7   Q.  Was that transfer disclosed to investors?
8   A.  No, it was not.
9   Q.  Why?
10  A.  Because it wasn't disclosed to investors because it was not
11  consistent with the use of funds in any particular fund.
12  Q.  And how was the money divided up once it went from
13  Swartz IP to Purplebox?
14  A.  It was divided up $240,000 Mr. Albert Hallac kept, $120,000
15  went to Jeffrey Hallac, $120,000 went to myself, and $250,000
16  went into Weston Capital, and the balance of $20,000 remained
17  in a bank account in the name of Purplebox.
18  Q.  What did you do with the $120,000 that went from Purplebox
19  to you?
20  A.  I deposited it into my bank account.
21  Q.  When did that happen, roughly?
22  A.  It was paid to me in early January 2012.
23  Q.  What, if anything, did you discuss with Mr. Bergstein about
24  what Purplebox was?
25  A.  Purplebox was created in discussions actually with

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | California.  The meeting in California was sort of an ad hoc         |
| 2  | meeting.  I wound up going just because the WFF investor,            |
| 3  | Mr. Porter, was going to be there, but the general meeting with      |
| 4  | share holders -- the large shareholders of WFF was scheduled         |
| 5  | for that Thursday afternoon and the following day that Friday.       |
| 6  | Q.  Where did the meeting take place?                                |
| 7  | A.  In Weston's New York office.                                     |
| 8  | Q.  Who attended?                                                    |
| 9  | A.  I attended, Albert Hallac attended for part of it, and a         |
| 10 | number of the WFF investors attended.                                |
| 11 | Q.  Describe what took place at that meeting.  Let me just take      |
| 12 | a step back.                                                         |
| 13 |         Was Mr. Bergstein there at this meeting?                     |
| 14 | A.  At this meeting in New York, no, he was not.                     |
| 15 | Q.  OK.  Describe what took place at this meeting with               |
| 16 | investors in New York.                                               |
| 17 | A.  The meeting was, I think, what I would describe as a             |
| 18 | culmination of the frustration of the investors in not               |
| 19 | receiving this whole stock of information that they had been         |
| 20 | requesting for quite some time at this point.  So it was a           |
| 21 | little bit of the discussion on the hedge funds, which I knew        |
| 22 | very well, and a bigger discussion on the medical billing            |
| 23 | business and where things stood, the financial condition, which      |
| 24 | I did not know well at all.                                          |
| 25 | Q.  You testified earlier that you falsely disclosed to              |

```
 1   investors that Arius Libra was indebted to an entity called
 2   Swartz IP.
 3            What requests, if any, did investors have at this
 4   meeting relating to that disclosure?
 5   A.  They were seeking -- one of the requests was that they were
 6   seeking the actual loan documents as it related to the loan
 7   from Swartz IP to Arius Libra.
 8   Q.  To whom did they make that request during this meeting?
 9   A.  To me.
10   Q.  What did you say in response?
11   A.  I told them that I would get them the loan documents.  I
12   told them that I had the note but I didn't have the balance of
13   the loan documents readily available and I would get that to
14   them.
15   Q.  Was that true?
16   A.  No, it was not true.
17   Q.  At that point in time, was there any loan note between
18   Arius Libra and Swartz IP?
19   A.  There were no loan documents at that time.  The only loan
20   documents that existed were between Arius Libra and P2.
21   Q.  OK.  And did you tell anything to investors about the loan
22   between P2 and Arius Libra?
23   A.  No, that was not disclosed.
24   Q.  All right.  So when investors asked you for this loan
25   documentation, what did you do?
```

|     |                                                                          |
| --- | ------------------------------------------------------------------------ |
| 1   | difficult situation, and that they were particularly unhappy             |
| 2   | that I cannot provide them the note and other loan documents             |
| 3   | but particularly the note.                                               |
| 4   | Q.  All right.  And when you say "the note," are you referring           |
| 5   | to this note for a loan that never even happened?                        |
| 6   | A.  That's correct.                                                      |
| 7   | Q.  What was Mr. Bergstein's reaction?                                   |
| 8   | A.  His reaction was don't worry, we're going to take care of            |
| 9   | this, and we'll solve this problem.  I mean, that was his                |
| 10  | reaction to most things.                                                 |
| 11  | Q.  OK.  What did he propose?                                            |
| 12  | A.  He proposed that we create documentation to support the              |
| 13  | statement that was made back in March, that Arius Libra was in           |
| 14  | fact indebted to Swartz IP, when in fact it was not.                     |
| 15  | Q.  How could you create documentation to show that?  You just           |
| 16  | said that there was no such loan.                                        |
| 17  | A.  Right.  The solution was to create documentation to show             |
| 18  | the existence of a loan that didn't exist.                               |
| 19  | Q.  Fake documentation?                                                  |
| 20  | A.  Yes.                                                                 |
| 21  | Q.  And did you agree to do that with Mr. Bergstein?                     |
| 22  | A.  Yes.                                                                 |
| 23  | Q.  Did you believe what you were doing was wrong?                       |
| 24  | A.  Yes.                                                                 |
| 25  | Q.  Now, did you travel back to California later in May of               |