# EXHIBIT DD

ORIGINAL

JUDGE BERMAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x
                                 :    INFORMATION
UNITED STATES OF AMERICA         :
                                 :
        - v. -                   :    15 CRIM 512
                                 :
ALBERT HALLAC,                   :
                                 :
        Defendant.               :
                                 :
- - - - - - - - - - - - - - - - x

**COUNT ONE**
(Conspiracy to Commit Investment Advisor Fraud
and Securities Fraud)

The United States Attorney charges:

**Relevant Individuals and Entities**

1.    From at least in or about 2009 to at least in or about
2013, Weston Capital Asset Management ("Weston" or "WCAM") was a
registered investment adviser with the U.S. Securities and
Exchange Commission (the "SEC"), providing discretionary
investment management and advisory services to domestic and
foreign private investment funds, as well as domestic and
foreign institutions and high net worth individuals.  At all
times relevant to this Information, Weston had places of
business in both New York, New York and West Palm Beach,
Florida.

2.    ALBERT HALLAC, the defendant, was Weston's founder.
At all times relevant to this Information, HALLAC was the firm's

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____

president and, for certain periods of time relevant to this Information, exercised control over Weston.

3.  Weston managed over a dozen hedge funds for its investors. Each of Weston's funds had a particular investing strategy, primarily focused on investments in other hedge funds. One of the funds Weston managed was Wimbledon Fund SPC ("Wimbledon"), which was segregated into classes of investment portfolios. One of the investment portfolios in Wimbledon was the Class TT Portfolio (the "TT Portfolio"), which invested all of its investor monies either directly or notionally in the Tewksbury Investment Fund Ltd. ("Tewksbury"), a multi-billion dollar hedge fund invested predominantly in securities and U.S. Treasury bills. Another Wimbledon-related fund was the Wimbledon Financing Fund ("WFF"), which focused on asset-backed lending investments.

4.  Weston also managed a series of "Partners" funds. The Partners 2 Fund (the "P2 Fund") invested in funds managed by other hedge fund managers, some of whom focused their investment strategy on the buying and selling of securities. The Partners 3 Fund (the "P3 Fund") was planned, but never finalized or funded with investor monies.

5.  At all times relevant to this Information, Fund.com was a publicly-traded company that focused on financial services information publishing for the fund management industry.

Beginning in or about January 2008, an individual ("Associate-1") exercised substantial control over Fund.com. In or about April 2007, as a result of an action commenced by the SEC, Associate-1 was judicially barred from serving as an officer or director of a publicly-traded company for a period of five years.

6.    At all times relevant to this Information, Gerova Financial Corporation ("Gerova") was an international reinsurance company based in Bermuda. Until 2011, Gerova traded publicly on the American Stock Exchange, or Amex, operated by the New York Stock Exchange. From at least 2009, Associate-1 exercised substantial control over Gerova.

7.    At all times relevant to this Information, a co-conspirator of ALBERT HALLAC, the defendant, not named as a defendant herein ("CC-1") owned, operated or otherwise involved himself in a number of companies, focusing partly on private equity investments and partly on the film industry. Among others, CC-1 exercised substantial control over Arius Libra, which invested in companies in the medical billing industry (including a company called Pineboard), and Swartz IP, a private equity firm that invested in a variety of companies, including some in the medical billing industry.

3

## The Scheme to Defraud

8.   From at least in or about 2009 through at least in or about 2013, ALBERT HALLAC, the defendant, and others known and unknown participated in a multi-faceted scheme to defraud Weston investors.  In general, the scheme included: (i) HALLAC's failure to disclose material information about financial transactions involving investor monies, as he was legally and contractually obligated to do; (ii) HALLAC's failure to disclose the transfer of funds from one pool of Weston's investors to make payments to, or otherwise benefit, another pool of Weston's investors, as he was similarly obligated to do; and (iii) HALLAC's conversion of at least a portion of funds transferred from investor accounts for his, and other Weston officers', benefit.

9.   Prior to the financial crisis of 2008, Weston's funds (including separate funds for which Weston had provided seed capital) had combined total assets, at their peak, of approximately $2.8 billion.  Following the financial crisis, investors in need of liquid assets made a significant number of redemption requests and withdrew their investments from the funds.  As a result, during the time period relevant to this Information, Weston's assets under management declined to a few hundred million dollars.  Weston's revenue also diminished, and the firm was in need of capital.

4

10.   In or about 2009, ALBERT HALLAC, the defendant, agreed to a transaction, negotiated with Associate-1, in which Fund.com would purchase a majority ownership interest in Weston in exchange for approximately $5.8 million.  The deal was signed in March 2010.  While HALLAC disclosed certain details of the transaction to Weston's investors, he intentionally did not disclose, nor did he instruct his staff to disclose, that Fund.com was effectively controlled by Associate-1, a fact that he knew would have been material to investors in view of, among other things, the judicial bar which precluded Associate-1 from serving as an officer or director of a company such as Fund.com.

11.   Similarly, in January 2010, at Associate-1's initiation, ALBERT HALLAC, the defendant, agreed with Associate-1 to a transaction with Gerova (the "Gerova Exchange").  As part of that transaction, HALLAC sent all of the assets from the Wimbledon Financing Fund (comprised of investments in other hedge funds) to Gerova in exchange for restricted shares of Gerova stock, which was valued at approximately $85 million.  Again, while HALLAC disclosed many of the details of the transaction to WFF investors, HALLAC intentionally withheld from WFF investors information about, among other things, Associate-1's substantial control over Gerova, and the fact that companies controlled by Associate-1 (Fund.com and Gerova) were on both sides of the deal.

5

12.   In or about 2011, Gerova's stock price plummeted. Around this time, Associate-1 introduced ALBERT HALLAC, the defendant, to CC-1, who helped orchestrate a transaction to purportedly rescue some of Weston's investment in Gerova.   In or about July 2011, due to contractual defaults by Associate-1 and Gerova, the Gerova Exchange was unwound, WFF returned its shares of Gerova stock, and Gerova released the WFF assets.   At CC-1's direction, HALLAC then caused the WFF assets to be transferred to Arius Libra.   CC-1 asserted control of Arius Libra, which was attempting to grow a number of medical billing businesses.

13.   As part of the transaction to unwind the Gerova Exchange, ALBERT HALLAC, the defendant, caused Weston to agree to pay approximately $5 million to several third-party creditors of Gerova.   CC-1 had represented that he had made efforts to obtain a loan to cover those costs, as well as provide operating capital for Arius Libra.   When that loan was purportedly delayed, HALLAC and CC-1 devised a plan in which Weston would loan Arius Libra money from one of Weston's funds.   In the fall of 2011, HALLAC executed a note loaning Arius Libra approximately $9 million from Weston's P2 Fund.   Those monies were used to, among other things, pay off the Gerova creditors from the WFF investment and fund Arius Libra's medical billing businesses.   HALLAC failed to disclose the details of the loan, or even the existence of the loan, to P2 investors.   In

particular, he failed to disclose to the P2 Fund investors that he was using their money to pay a debt to Gerova which had been incurred by the WFF investors, despite his fiduciary duty, as well as a series of duties set forth in his agreement with P2 Fund investors, to manage the P2 Fund in the best interests of P2 investors. He failed to make this disclosure because he understood that this loan was not in the best interests of the P2 Fund investors.

14. In or about November 2011, ALBERT HALLAC, the defendant, and CC-1 conducted another transaction involving Weston investors' monies which benefitted HALLAC and CC-1 at the expense of investors. In this transaction, HALLAC executed a swap agreement in which HALLAC agreed to send approximately $17.7 million from the TT Portfolio to Swartz IP, another company controlled by CC-1, in exchange for Swartz IP's agreement to provide notes that would meet the TT Portfolio's previous returns (by mirroring the Tewksbury returns) plus an additional one percent return each year and a promise to meet investor redemptions on a current basis. The transfer of monies was completed in or about December 2011. HALLAC again failed to act in accordance with his fiduciary and contractual duties to TT Portfolio investors, and instead acted for the purpose of deceiving his investors and benefitting his interests. Among other things, HALLAC agreed to transfer TT Portfolio monies to

Swartz IP without disclosing the transaction to TT Portfolio investors and, because he failed to conduct proper due diligence of Swartz IP, without having confirmed Swartz IP's ability to either (a) satisfy the express purpose of the TT Portfolio, which was to make returns consistent with the Tewksbury returns, or (b) satisfy redemption requests from TT Portfolio investors.

15.  Of the money sent to Swartz IP from Weston's TT Portfolio, ALBERT HALLAC, the defendant, directed that approximately $3 million be transferred to the P2 Fund to pay back the P2 Fund's loan to Arius Libra.  This too was done without disclosure to, or the knowledge or consent of, TT Portfolio investors.  Again, HALLAC directed that money from one set of Weston's investors (the TT Portfolio investors) be used to pay back part of a debt owed to another set of Weston's investors (the P2 investors).

16.  In addition to diverting TT Portfolio money for unauthorized and improper investments, ALBERT HALLAC, the defendant, and two other Weston officers received a payment of approximately $750,000 from Swartz IP.  After Swartz IP received the funds from the TT Portfolio, an entity named Purplebox LLC ("Purplebox") was formed by HALLAC and two other Weston officers as the three members, and a bank account was opened in the entity's name.  Swartz IP wired approximately $750,000 of TT Portfolio monies to the Purplebox account, of which HALLAC

8

personally received approximately $240,000 in unauthorized and undisclosed payment.

## Statutory Allegations

17. From at least in or about 2009 through in or about 2013, in the Southern District of New York and elsewhere, ALBERT HALLAC, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, (1) investment advisor fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17, and (2) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5.

18. It was a part and object of the conspiracy that ALBERT HALLAC, the defendant, acting as an investment adviser, and others known and unknown, willfully and knowingly would and did use the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, in

9

violation of Title 15, United States Code, Sections 80b-6 and 80b-17.

19.    It was a further part and object of the conspiracy that ALBERT HALLAC, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, would and did use and employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

Overt Acts

20.    In furtherance of the conspiracy and to effect its illegal objects, ALBERT HALLAC, the defendant, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

10

a. In or about August 2011, HALLAC agreed to loan approximately $9 million from Weston's P2 Fund to another entity, Arius Libra, without disclosing the transaction to the P2 Fund's clients, or investors, and for the purpose of, among other things, paying debts which were not incurred by P2 Fund investors.

b. In or about November 2011, HALLAC transferred approximately $17.7 million from Weston's TT Portfolio to another entity, Swartz IP, without disclosing the transaction to the TT Portfolio's clients, or investors, and for the purpose of, among other things, paying debts owed to P2 investors.

c. In or about January 2012, HALLAC caused approximately $750,000 to be withdrawn from a bank account which was funded from the monies transferred to it as part of the TT Portfolio transaction described in Paragraph 16 above.

(Title 18, United States Code, Section 371.)

## COUNT TWO
(Investment Advisor Fraud)

The United States Attorney further charges:

21. The allegations contained in paragraphs 1 through 16 of this Information are repeated and realleged as if fully set forth herein.

22. From in or about 2009, up to and including in or about 2013, in the Southern District of New York and elsewhere, ALBERT HALLAC, the defendant, acting as an investment adviser,

11

willfully and knowingly used the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, to wit, while acting as an investment advisor to Weston investors, HALLAC schemed to defraud clients, or investors, in certain of Weston's funds and portfolios by, among other things, (i) failing to disclose to investors the control exercised by Associate-1 over Fund.com and Gerova, respectively, in connection with those entities' business dealings with Weston; (ii) causing certain investor funds to be used as payments to or to otherwise benefit other Weston investors; (iii) failing to disclose to investors that he had caused those investors' funds to be loaned or transferred to other entities; and (iv) converting a portion of those transferred funds to his personal use and benefit, without disclosing that transaction to investors.

(Title 15, United States Code, Sections 80b-6 and 80b-17; and Title 18, United States Code, Section 2.)

## COUNT THREE
(Securities Fraud)

The United States Attorney further charges:

23. The allegations contained in paragraphs 1 through 16 of this Information are repeated and realleged as if fully set forth herein.

24. From in or about 2009, up to and including in or about 2013, in the Southern District of New York and elsewhere, ALBERT HALLAC, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, HALLAC defrauded investors in certain of Weston's funds and portfolios by, among other things, (i) failing to disclose to investors the control exercised by

13

Associate-1 over Fund.com and Gerova, respectively, in connection with those entities' business dealings with Weston; (ii) causing certain investor funds to be used as payments to or to otherwise benefit other Weston investors, (iii) failing to disclose to investors that he had caused those investors' funds to be loaned or transferred to other entities; and (iv) converting a portion of those transferred funds to his personal use and benefit, without disclosing that transaction to investors.

> (Title 15, United States Code, Sections 78j(b) & 78ff;
> Title 17, Code of Federal Regulations, Section 240.10b-5;
> and Title 18, United States Code, Section 2.)

## COUNT FOUR
(Conspiracy to Commit Wire Fraud)

The United States Attorney further charges:

25. The allegations contained in paragraphs 1 through 7 of this Information are repeated and realleged as if fully set forth herein.

26. In or about 2012, CC-1 was in the process of purchasing another company ("Company-1"), and had represented to Company-1 that Weston had guaranteed the money for CC-1 to buy Company-1. CC-1 thereafter created a fake balance sheet for the P3 Fund that listed a number of assets although, in reality, the P3 Fund had never raised any capital and had zero assets, as CC-1 well knew, for the purpose of inducing Company-1 to enter into

14

the transaction with CC-1. CC-1, who was in California, sent the fake balance sheet to ALBERT HALLAC, the defendant, who was in Florida, via an email server based in Weston's New York office. At CC-1's direction, HALLAC then sent the fraudulent document, knowing it to be false, to representatives of Company-1 in California via email.

### Statutory Allegation

27. In or about 2012, in the Southern District of New York and elsewhere, ALBERT HALLAC, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States of America, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343.

28. It was a part and an object of the conspiracy that ALBERT HALLAC, the defendant, CC-1, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of

15

executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

### COUNT FIVE
(Wire Fraud)

The United States Attorney further charges:

29. The allegations contained in paragraphs 1 through 7 and paragraph 26 of this Information are repeated and realleged as if fully set forth herein.

30. In or about 2012, in the Southern District of New York and elsewhere, ALBERT HALLAC, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, HALLAC, for the purpose of deceiving Company-1 by falsely representing that CC-1's proposed business transaction was secured by Weston funds, at CC-1's direction transmitted by email between Florida and California, via an email server based in Weston's New York office, a fraudulent balance sheet for one

16

of Weston's funds reflecting assets that the fund did not in fact have.

(Title 18, United States Code, Sections 1343 and 2.)

### FORFEITURE ALLEGATION

31.     As a result of committing one or more of the offenses alleged in Counts One through Five of this Information, ALBERT HALLAC, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code Section 2461, any and all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Five of this Information.

### Substitute Assets Provision

32.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty;

17

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

      (Title 18, United States Code, Section 981(a)(1)(C);
          Title 21, United States Code, Section 853(p);
          Title 28, United States Code, Section 2461.)

_Preet Bharara / KRQ_

PREET BHARARA
United States Attorney

18

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

ALBERT HALLAC,

Defendant.

## INFORMATION

15 Cr. ____

(Title 15, United States Code, Sections
78j(b),78ff, 80b-6 and 80b-17;
Title 18, United States Code, Sections
371, 1343, 1349 and 2.)

PREET BHARARA
United States Attorney.

7/30/15 - Filed Information
ae    Filed Waiver of Indictment.
Judg Pitman
USMJ