# EXHIBIT II

I2K5ber1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                New York, N.Y.

          v.                             16 Cr. 0746(PKC)

DAVID BERGSTEIN,

          Defendant.

------------------------------x
                                         February 20, 2018
                                         10:15 a.m.
Before:

               HON. P. KEVIN CASTEL,

                                         District Judge

                    APPEARANCES

GEOFFREY S. BERMAN
     Interim United States Attorney for the
     Southern District of New York
BY:  EDWARD IMPERATORE
     ROBERT ALLEN
     ELISHA KOBRE
          Assistant United States Attorneys

BIENERT, MILLER & KATZMAN, PLC
     Attorneys for Defendant
BY:  THOMAS H. BIENERT, JR.
     ANTHONY R. BISCONTI

SATTERLEE STEPHENS LLP
     Attorneys for Defendant
BY:  ANDREW L. FISH

          - also present -

Ellie Sheinwald, U.S. Paralegal Specialist
Sarah Emmerick, U.S. Paralegal Specialist
Caroline Howland, Defense Paralegal Specialist

SA Shannon Bieniek, FBI
```

1  A. Zero.
2  Q. Is Weston still in business today?
3  A. No, sir.
4  Q. Mr. Hallac, did you commit any crimes when you were working
5  at Weston?
6  A. Yes, I did.
7  Q. We will talk about this in more detail later but, generally
8  speaking, what did you do?
9  A. Well, I kept my investors from knowing the truth about some
10 of the investments we were making.  It started with my making a
11 transaction with a Fund.com who actually purchased part of
12 Weston Capital.  It was basically being run by a fellow called
13 Jason Galanis.  Jason Galanis was involved with the SEC and was
14 not supposed to manage any public companies.  I did not tell my
15 investors that he was the main partner of Fund.com, I just told
16 them that we made the transaction.  That was one of the first
17 things that happened.
18         Another thing that happened was we made a deal with
19 Mr. Galanis and Gerova.  My clients knew about it but they
20 never knew about Mr. Galanis's existence in Gerova.
21         Another instance is we actually made a loan to one of
22 Mr. Bergstein's companies called Arius Libra which was made
23 from P2 without the knowledge of our investors.
24         Also, there was a company through TT that I controlled
25 and some monies were transferred to that company for my

WF0018290

1405

1  personal use.
2           The last thing that I'm aware of is the fact that we
3  got involved with a public company, Mr. Bergstein wanted to be
4  financed/guaranteed.  We were not in a position to have a large
5  enough balance sheet at the time.  He created a balance sheet,
6  sent it over by e-mail, told me to send it to the attorney
7  representing him and the transactions.
8  Q.  Let's break some of that down.
9           So, Mr. Hallac, did you cause the P2 fund to do things
10 that were prohibited by its offering memorandum?
11 A.  Yes, sir.
12 Q.  Did you then take steps to hide those actions from the P2
13 funds investors?
14 A.  Yes, we did.
15 Q.  Did you also cause the TT Fund to do things that were
16 prohibited by its offering memorandum?
17 A.  Yes, sir.
18 Q.  And, did you take steps to hide those actions from the TT
19 funds' investors as well?
20 A.  Yes, sir.  We did.
21 Q.  Did you take money from the Weston fund that you should not
22 have taken?
23 A.  Yes, sir.
24 Q.  And, did you commit any crimes with respect to a fund
25 called Partners III?

WF0018291

1  updated request?
2  A. Yes, sir.
3  Q. Okay. Ms. Sheinwald, we can take this down.
4      Now, did Mr. Wellner tell you that he was going to
5  travel to California around the time of this e-mail which,
6  again, was dated April 24th, 2012?
7  A. Yes. He told me he was going to be doing that.
8  Q. Did Mr. Wellner tell you the purpose of this trip to
9  California?
10 A. Yes. He told me he wanted to speak with Mr. Bergstein
11 alone.
12 Q. And did you meet with Mr. Wellner after he returned from
13 California?
14 A. Yes, I did. He came to the New York office.
15 Q. And, again, where in New York is your office or was your
16 office?
17 A. It was on Third Avenue and 48th Street.
18 Q. Approximately when did that meeting take place?
19 A. Somewhere around May 17th, 18th. Around that time.
20 Q. And what, if anything, did Mr. Wellner give you during that
21 meeting?
22 A. He gave me two documents; one was a note for $8 million
23 between Swartz IP and Arius Libra, and upon looking at it I
24 asked Keith what is this. He said, well, ask Bergstein and
25 walked away.

```
 1   Q.   What was your reaction?
 2   A.   I was pretty upset.
 3   Q.   Why were you upset?
 4   A.   Because all of a sudden there is a new note here floating
 5   around the world that never existed before.
 6   Q.   And what do you mean it never existed before?
 7   A.   That that note was never seen by anyone of Weston Capital.
 8   This was a note that was probably done much later than August
 9   the 3rd.
10   Q.   So let's talk about August the 3rd, 2011.  Did you even
11   know that Swartz IP existed on August 3rd, 2011?
12   A.   No, I did not.
13   Q.   And, by the way, I think you had said the year was -- did
14   you say the year was 2011 or 2012 when you got this document?
15   A.   No, 2012.  I'm sorry if I said '11.
16   Q.   August 3rd, 2011; did you even know that Swartz IP existed
17   at that time?
18   A.   No, I didn't.
19   Q.   And, to be clear, was there a loan from Swartz IP to
20   Arius Libra for $8 million on August 3rd, 2011?
21   A.   No, there was none.
22   Q.   Is this a real or fake document?
23   A.   This is a fake document.
24   Q.   So, the first paragraph says:  For value received,
25   Arius Libra, Inc., promises to pay to the order of Swartz IP
```

| | |
|---|---|
| 1 | Q. And, did you have an understanding of how that $4.4 million |
| 2 | was going to be funded? |
| 3 | A. Well, it was going to be funded temporarily from the money |
| 4 | that was in Swartz IP. |
| 5 | Q. Was that money from Wimbledon TT? |
| 6 | A. And that money was from Wimbledon TT, yes. |
| 7 | Q. You can take that down, Ms. Sheinwald. |
| 8 | Mr. Hallac, was using Wimbledon TT money to pay back |
| 9 | the P2 loan and a fund Pineboard consistent with a notional |
| 10 | investment in the Tewksbury Fund? |
| 11 | A. No, sir. It was not. |
| 12 | Q. Why not? |
| 13 | A. None of our -- first of all, none of our clients knew about |
| 14 | it. As far as being a notional investment, this was not a |
| 15 | notional investment. Giving money though Pineboard was not a |
| 16 | notional investment. The only way you have a notional |
| 17 | investment in Tewksbury is if you have a direct line between |
| 18 | theirself through a bank to the actual assets and the returns. |
| 19 | Q. Mr. Hallac, did you ultimately enter into the transaction |
| 20 | that Mr. Bergstein had proposed with Swartz IP? |
| 21 | A. Yes, sir. |
| 22 | Q. And, did Mr. Bergstein agree to the side letter that we |
| 23 | just saw? |
| 24 | A. Yes, sir. |
| 25 | Q. Ms. Sheinwald, can you please publish Government Exhibit |

WF0018380

```
 1   would get fees of any kind for arranging the Swartz IP
 2   transaction?
 3   A.  No, sir.
 4   Q.  Did Mr. Bergstein ever tell you that he was going to use
 5   any of the TT money for personal purposes?
 6   A.  No, sir.
 7   Q.  Did Mr. Bergstein ever tell you that Kia Jam, or any of Kia
 8   Jam's companies would be receiving any of the TT money?
 9   A.  No, sir.
10   Q.  If Mr. Bergstein or Mr. Jam were to have received -- sorry
11   if Mr. Bergstein were to have told you that he was going to
12   receive some of TT's money himself, would that be something you
13   would have wanted to know?
14   A.  Absolutely.
15   Q.  Why?
16   A.  Because we wouldn't have been able to do the transaction
17   and I -- it was completely and totally illegal.
18   Q.  Is the same thing true with Mr. Jam?
19   A.  Absolutely.
20           MR. ALLEN:  Your Honor, this may be a point to break
21   for lunch.  I am about to change subjects.  Or, I can keep
22   going.
23           THE COURT:  Ladies and gentlemen, I think it's a good
24   time for our lunch break, so let's take our lunch break.
25           Remember, please do not discuss the case and keep an
```

WF0018383

```
                     A F T E R N O O N   S E S S I O N
                                2:17 P.M.
           (Trial resumed; jury not present)
           THE COURT:  Please remain standing.  I'm almost done
 on the deposition designations.  I have a lot of stickies.
           (Jury present)
           All right.  Please be seated.
           Mr. Allen, you may continue.
 BY MR. ALLEN:
 Q.  All right.  Ms. Sheinwald, would you please publish
 Government Exhibit 3.
           Mr. Hallac, does this exhibit show a basic outline of
 the transaction between Swartz IP and Wimbleton TT?
 A.  Yes, sir, it does.
 Q.  And did you plead guilty to any crimes in connection with
 this transaction?
 A.  Yes, I did.
 Q.  Based on the offering memorandum for Wimbleton TT, how was
 Wimbleton TT's money supposed to be invested?
 A.  Among other things, it was to be invested in a notional
 fashion with the traders.
 Q.  The traders in what?
 A.  In that fund.
 Q.  What fund?
 A.  The Wimbleton TT fund.
```

1   A. Yes.
2   Q. Ms. Sheinwald, can you please go back to Government
3   Exhibit 3.
4       Now, Mr. Hallac, was the agreement with Swartz IP in
5   the best interests of Wimbleton TT's investors?
6   A. No, sir.
7   Q. Why not?
8   A. We redeemed out of an amazing manager that a lot of people
9   wanted to be in, and we put it in with an organization or an
10  entity that we had no understanding whether it had any money or
11  not.
12  Q. Did you believe that it was wrong to enter into the Swartz
13  IP transaction when you did it in November of 2011?
14          MR. BIENERT:  Objection, relevance, your Honor.
15          THE COURT:  Overruled.
16  A. Yes, sir.
17  Q. You did believe it was wrong?
18  A. Absolutely.
19  Q. Okay. And as part of that Swartz IP transaction, was any
20  money transferred to another Weston fund?
21  A. Yes.
22  Q. And how much money was transferred and to what fund?
23  A. Three million and $25 -- $25,000 were transferred from
24  Swartz IP to the Partners fund.
25  Q. Why was that $3 million transferred to the Partners 2 fund?

| | |
|---|---|
| 1 | A. I had asked for it to be done when we did the side letter; |
| 2 | so that P2 could receive some money. |
| 3 | Q. And what was P2 going to do with that money? |
| 4 | A. It was going to go to investors. |
| 5 | Q. Did it have any connection to the P2 loan? |
| 6 | A. It is, in fact, repaying 3 million of that loan. |
| 7 | Q. And was that use of money from Wimbleton TT consistent or |
| 8 | inconsistent with your fiduciary duties as an investment |
| 9 | advisor? |
| 10 | A. No, they were totally inconsistent. I did not do the right |
| 11 | thing. |
| 12 | Q. Did it create a conflict of interest? |
| 13 | A. Yes, it did. |
| 14 | Q. Could you please explain that conflict of interest? |
| 15 | A. I was taking money from one fund with certain types of |
| 16 | shareholders, and transferring it to another fund with |
| 17 | different shareholders. |
| 18 | Q. And did you ever disclose the payment that was made from TT |
| 19 | to Partners 2 to investors in either of those funds? |
| 20 | A. No, I did not. |
| 21 | Q. Did you or Mr. Wellner disclose the agreement with Swartz |
| 22 | IP to investors in the Wimbleton TT fund before or around the |
| 23 | time that you entered into that transaction? |
| 24 | A. No, we did not. |
| 25 | Q. Why didn't you disclose it? |

WF0018391

```
 1   A.  We were just not disclosing it because they would have
 2   turned it all down; so we were not able to do so.
 3   Q.  When you say they would have turned it all down, who are
 4   you referring to?
 5   A.  The investors in P2.
 6   Q.  What about the investors in TT?
 7   A.  Well, the investors in TT were totally -- they were not
 8   told about it; so they were -- you know, they were totally
 9   upset.
10   Q.  And how do you think the investors in TT would have reacted
11   if you had told them about the Swartz IP transaction?
12   A.  Well, they wouldn't have been happy, especially that we
13   were using their money to make payments on other things.
14   Q.  Did you believe it was wrong not to disclose the Swartz IP
15   transaction to your investors?
16           MR. BIENERT:  Objection, relevance, your Honor.
17           THE COURT:  Overruled.
18   A.  Yes, sir; I do.
19   Q.  Did you have any discussions with Mr. Bergstein about
20   whether to disclose the Swartz IP transaction to investors?
21   A.  Yes.
22   Q.  What did you say?
23   A.  That we couldn't disclose it.
24   Q.  What did Mr. Bergstein say in response?
25   A.  Not -- you know, not to worry, not to do it because it
```

1  A.  It was, I think, in early December of 2011.
2  Q.  Who transferred the money from Swartz IP to Purplebox?
3  A.  I'm assuming somebody at Mr. Bergstein's office or himself.
4  Q.  Ms. Sheinwald, could you please publish Government
5  Exhibit 182.
6       Now, Mr. Hallac, this is an e-mail from Dawn Berbes --
7  Berbes or Berbes?
8  A.  Berbes.
9  Q.  This is an e-mail from Dawn Berbes to David Bergstein with
10 you copied, and in the e-mail Ms. Berbes says:  "Hi, David.
11 Please find attached the wire instructions for Purplebox.  Let
12 me know if you need anything else."  And the date of the e-mail
13 is December 7th, 2011.  What do you understand Mrs. Berbes to
14 be doing in this e-mail?
15 A.  She was responding to an e-mail from Mr. Bergstein asking
16 for the wire instructions of Purplebox.
17 Q.  And who is she sending those wire instructions to?
18 A.  Mr. Bergstein.
19 Q.  How much money was ultimately received by Purplebox?
20 A.  Actually, 750,000.
21 Q.  And what did you do with the money when you got it?
22 A.  In early January, 240,000 was transferred to my personal
23 account; 120,000 was transferred to Jeffrey's account; 120,000
24 to Keith Wellner's account; and 250,000 to Weston Capital's
25 account.