# EXHIBIT KK

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

THE WIMBLEDON FUND, SPC (CLASS    )
TT),                              )
                                  )
                 PLAINTIFFS,      )
                                  )
        VS.                       ) CASE NO.
                                  ) 2:15-CV-6633-CAS-ASJWX
                                  )
GRAYBOX LLC; INTEGRATED           )
ADMINISTRATION; EUGENE SCHER, AS  )
TRUSTEE OF BERGSTEIN TRUST; AND   )
CASCADE TECHNOLOGIES CORP.,       )
                                  )
                 DEFENDANTS.      )
_____  )

VIDEOTAPED DEPOSITION OF FRYMI BIEDAK

TAKEN ON

MONDAY, MARCH 25, 2019

Sandra Mitchell
C.S.R. 12553

## Page 2

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4    THE WIMBLEDON FUND, SPC (CLASS    )
      TT),                             )
 5                                     )
              PLAINTIFFS,   )
 6                                     )
      VS.            ) CASE NO.
 7                   ) 2:15-CV-6633-CAS-ASJWX
                     )
 8    GRAYBOX LLC; INTEGRATED          )
      ADMINISTRATION; EUGENE SCHER, AS )
 9    TRUSTEE OF BERGSTEIN TRUST; AND  )
      CASCADE TECHNOLOGIES CORP.,      )
10                                     )
              DEFENDANTS.   )
11    _____ )
12
13
14
15
16         VIDEOTAPED DEPOSITION OF FRYMI BIEDAK, taken on
17    behalf of the Plaintiff, at 10100 Santa Monica Boulevard,
18    13th Floor, Los Angeles, California, commencing at
19    10:05 a.m., Monday, March 25, 2019, before Sandra Mitchell,
20    C.S.R. 12553, pursuant to Notice.
21
22
23
24
25
```

## Page 3

```
 1    APPEARANCES:
 2    For the Plaintiffs, THE WIMBLEDON FUND, SPC (CLASS TT):
 3         COLE SCHOTZ
           BY:  JAMES W. WALKER, ESQ.
 4         901 MAIN STREET, SUITE 4120
           DALLAS, TEXAS 75202
 5         (469) 557-9391
           E-MAIL: JWALKER@COLESCHOTZ
 6
 7    For the Plaintiffs, THE WIMBLEDON FUND, SPC (CLASS TT):
 8         COLE SCHOTZ
           BY:  ERIC S. LATZER, ESQ.
 9         COURT PLAZA NORTH
           25 MAIN STREET
10         HACKENSAK, NEW JERSEY 07601
           E-MAIL: ELATZER@COLESCHOTZ.COM
11
      For the Defendants, KIARASH JAM:
12
           DAVID WIECHERT
13         BY:  27136 PASEO ESPADA, SUITE B1123, ESQ.
           SAN JUAN CAPISTRANO, CALIFORNIA 92675
14         (949) 361-2822
           E-MAIL: DWEICHERT@AOL.COM
15
      For the WITNESS, FRYMI BIEDAK:
16
           LAW OFFICES OF TIMOTHY D. MCGONIGLE
17         BY:  TIMOTHY D. MCGONIGLE, ESQ.
           1880 CENTURY PARK EAST, SUITE 516
18         LOS ANGELES, CALIFORNIA 90067
           (310) 478-7110
19         E-MAIL: TIM@MCGONIGLE
20
      Also Present:
21
           MICHELLE BARTFAY, VIDEOGRAPHER
22
23
24
25
```

## Page 4

```
 1                    I-N-D-E-X
 2    WITNESS
 3    FRYMI BIEDAK
 4                         PAGE
 5    EXAMINATION BY MR. WALKER      8,225
 6    EXAMINATION BY MR. WIECHERT   178,251
 7
 8         E X H I B I T S
 9
10    NUMBER         DESCRIPTION          PAGE
11    EXHIBIT 1 - NOTICE OF DEPOSITION OF FRYMI BIEDAK   10
12    EXHIBIT 2 - 2004 DEPOSITION OF FRYMI BIEDAK        13
13    EXHIBIT 3 - VOL. 2 OF 2004 DEPOSITION OF FRYMI     31
            BIEDAK
14
      EXHIBIT 4 - VOL. 3 OF 2004 DEPOSITION OF FRYMI     46
15         BIEDAK
16    EXHIBIT 5 - SERIES OF CHARTS          49
17    EXHIBIT 6 - TEXAS NOTICE OF DELINQUENT FRANCHISE   59
            TAX - 7/22/2011
18
      EXHIBIT 7 - LIST OF RELATED ENTITIES'      61
19         INFORMATION
20    EXHIBIT 8 - E-MAIL - EFFIE STERN 11/2/2011      71
21    EXHIBIT 9 - E-MAIL - FRYMI BIEDAK - 11/9/2011   80
22    EXHIBIT 10 - E-MAIL - SWARTZ IP SERVICES - EFILE  86
            CONFIRMATION AN EFILED FORMS
23         ATTACHED
24    EXHIBIT 11 - SWARTZ IP CANCELED CHECKS      93
25
```

## Page 5

```
 1         I N D E X (Continued)
 2         E X H I B I T S
 3
 4    NUMBER       DESCRIPTION         PAGE
 5    EXHIBIT 12 - E-MAIL - SWARTZ IP SERVICE - TEXAS   101
            TAXES - 1/19/2012
 6
      EXHIBIT 13 - KELLER WILLIAMS REALTY LETTER -      105
 7         4/1/2012
 8    EXHIBIT 14 - E-MAIL - KIA JAM - 4/16/2012      107
 9    EXHIBIT 15 - E-MAIL - FRYMI BIEDAK - 4/19/2012   108
10    EXHIBIT 16 - E-MAIL - MAJID ZARRINKELK -       121
            4/19/2012
11
      EXHIBIT 17 - E-MAIL - KEITH WELNER - 4/26/2012    122
12
      EXHIBIT 18 - E-MAIL - KIA JAM - 4/27/2012      124
13
      EXHIBIT 19 - E-MAIL - KIA JAM - 1/2/2013      126
14
      EXHIBIT 20 - E-MAIL - KIA JAM - 1/2/2013      129
15
      EXHIBIT 21 - IA EMPLOYEE LIST - 8/2011 TO 12/2013  140
16
      EXHIBIT 22 - SUMMARY OF ENTITIES      145
17
      EXHIBIT 23 - LIST OF EMPLOYEES      164
18
      EXHIBIT 24 - E-MAIL - FRYMI BIEDAK - 3/17/2016   169
19
      EXHIBIT 25 - SWARTZ IP SERVICES- DESCRIPTION OF   200
20         BUSINESS
21    EXHIBIT 26 - E-MAIL - SEAN EDRINGTON - 11/10/2011 203
22    EXHIBIT 27 - E-MAIL - SEAN EDRINGTON - 11/17/2011 213
23    EXHIBIT 28 - E-MAIL - SEAN EDRINGTON - 11/17/2011 216
24    EXHIBIT 29 - E-MAIL - SEAN EDRINGTON - 11/23/2011 217
25
```

Frymi Biedak                                                03-25-19

## Page 6

1          I N D E X (Continued)
2          E X H I B I T S
3
4    NUMBER      DESCRIPTION       PAGE
5    EXHIBIT 30 - E-MAIL - ALISA LILEY - 12/22/2011   218
6    EXHIBIT 31 - E-MAIL - JUSTIN MILLIGAN - 3/2/2012   219
7    EXHIBIT 32 - E-MAIL - DAVID BERGSTEIN - MALIBU   222
         PROPERTY - 3/13/2012
8
9
10   QUESTIONS INSTRUCTED NOT TO ANSWER
11          PAGE   LINE
12          12   19
13          28   14
14          29   1
15          30   18
16          172   24
17          173   18
18          174   4
19
20   INFORMATION REQUESTED
21          (NONE)
22
23
24
25

## Page 7

00:00:01    1       LOS ANGELES, CALIFORNIA, MONDAY, MARCH 25, 2019
            2              AT 10:05 A.M.
            3
            4       THE VIDEOGRAPHER:  Good morning.  We are now on
10:05:14    5   the record.  My name is Michelle Bartfay.  I'm a
            6   certified legal video specialist working with
            7   eLitigation Services, Inc.  I'm neither a relative nor
            8   employee of any of the parties and have no financial
            9   interest in the outcome of this action.
10:05:31   10       Today's date is March 25, 2019.  The current
           11   time is 10:05 a.m.  Today's deposition is taking place
           12   at 10100 Santa Monica Boulevard, Los Angeles,
           13   California.
           14       This is the videotaped deposition of Frymi
10:05:51   15   Biedak.  The consolidated case number is 2:15-CV-6633
           16   CAS-AJWx.  The entitled case matter is The Wimbledon
           17   Fund versus Graybox LLC, et al.
           18       The court reporter today is Sandra Mitchell.
           19       Counsel, will you please introduce yourself and
10:06:17   20   state whom you represent.
           21       MR. WALKER:  Jim Walker for the plaintiff,
           22   Class TT.
           23       MR. LATZER:  Good morning.  Eric Latzer of Cole
           24   Schotz also for the plaintiff.
10:06:27   25       MR. WIECHERT:  David Wiechert on behalf of

## Page 8

10:06:27    1   defendants Kia Jam and Integrated Administration.
            2       MR. MCGONIGLE:  And Timothy McGonigle for
            3   Graybox, as well as for the witness.
            4       THE VIDEOGRAPHER:  Would the court reporter
10:06:36    5   please swear in the witness.
            6       THE REPORTER:  Please raise your right hand.
            7       Do you solemnly swear in the cause
            8       now pending to tell the truth, the
            9       whole truth, and nothing but the
10:06:37   10       truth so help you God?
           11   THE WITNESS:  I do.
           12          FRYMI BIEDAK,
           13       having been duly sworn,
           14       was examined and testified as follows:
10:06:45   15
           16          EXAMINATION
           17   BY MR. WALKER:
           18       Q   Please state your full name for the record,
           19   ma'am.
10:06:48   20       A   It's Frymi Biedak.  It's F as in Frank, R, Y as
           21   in yellow, M as in Mary, I as in India.  B as in boy,
           22   I-E, D as in dog, A as in apple, K as in kite.
           23       Q   How are you currently employed?
           24       A   I currently work for Corporate Administrative
10:07:11   25   Services.

## Page 9

10:07:11    1       Q   And who owns that company?
            2       A   I don't know.
            3       Q   When you called me last week, the caller ID
            4   showed it was from Graybox LLC.
10:07:19    5       Are you still working with Graybox LLC?
            6       A   No.
            7       Q   Do you know why the caller ID would reflect
            8   that?
            9       A   It's on my cell phone.
10:07:28   10       Q   What is the name of the entity that's on your
           11   paycheck?
           12       A   Corporate Administrative Services.
           13       Q   And could please spell that?  It's Corporate?
           14       A   Corporate Administrative Services.
10:07:40   15       Q   Okay.  And you don't know who owns that
           16   company?
           17       A   No.
           18       Q   When was the last time that you spoke to David
           19   Bergstein?
10:07:49   20       A   Yesterday.  I went that visit him at Taft.
           21       Q   And how often do you contact him week to week?
           22       A   It depends.
           23       Q   Are you in regular contact with him?
           24       A   I visit him, like, once a week.
10:08:04   25       Q   And during your visit, I take it you're

eLitigation Services, Inc. - els@els-team.com

Frymi Biedak                                                    03-25-19

| | Page 10 |
|---|---|

| 10:08:06 | 1 | discussing matters that relate to his business affairs? |
|---|---|---|
| | 2 | A   I am helping him with his legal items presently |
| | 3 | because he's not available.  So I'm helping him with his |
| | 4 | legal stuff and his communication to his attorneys. |
| 10:08:22 | 5 | Q   Why is he not able to communicate with his |
| | 6 | attorneys directly? |
| | 7 | A   Because it's only three days a week that you |
| | 8 | can see him. |
| | 9 | Q   Are you also communicating with him with |
| 10:08:33 | 10 | respect to any business affairs? |
| | 11 | A   No. |
| | 12 | Q   I've handed you what's been marked as |
| | 13 | Exhibit 1. |
| | 14 | (Exhibit 1 was marked for |
| 14:15:30 | 15 | identification by the Court Reporter |
| | 16 | and is attached hereto.) |
| | 17 | BY MR. WALKER: |
| | 18 | Q   And you understand this is a deposition notice |
| | 19 | that accompanied the subpoena that asked that you be |
| 10:08:48 | 20 | here today; correct? |
| | 21 | A   Correct. |
| | 22 | Q   How many depositions have you provided prior to |
| | 23 | today's proceeding? |
| | 24 | A   Either six or seven. |
| 10:08:58 | 25 | Q   When was the first one that you gave? |

| | Page 11 |
|---|---|

| 10:09:02 | 1 | A   In -- it was Leonard Gumport, and it was I want |
|---|---|---|
| | 2 | to say 2010.  It could also be 2011.  I'm not sure. |
| | 3 | Q   And you gave three depositions for Mr. Gumport? |
| | 4 | A   Uh-huh. |
| 10:09:19 | 5 | Q   And he was representing a bankrupt -- |
| | 6 | bankruptcy trustee in a matter pertaining to a couple of |
| | 7 | Mr. Bergstein's companies; is that correct? |
| | 8 | A   As far as I recall, yes. |
| | 9 | Q   What were the other three or four depositions |
| 10:09:30 | 10 | that you provided? |
| | 11 | A   One was with -- in the law offices of -- it |
| | 12 | was -- the person was Earl Levine, I think it was.  I |
| | 13 | don't -- I don't recall the law firm.  It was also in |
| | 14 | connection with the bankruptcy.  I'm not sure. |
| 10:09:45 | 15 | Then there was one with Sidley and Austin. |
| | 16 | I don't know -- I don't remember what that was about. |
| | 17 | And there was one, I think, in Beverly Hills.  I |
| | 18 | think the attorneys were Early Sullivan.  I don't |
| | 19 | remember what that was about. |
| 10:10:02 | 20 | And then there was another one recently and |
| | 21 | with regards to some sort of an insurance claim. |
| | 22 | Q   Now, were all of the depositions you provided |
| | 23 | relating in one way or the other to Mr. Bergstein's |
| | 24 | business affairs? |
| 10:10:16 | 25 | A   I don't know.  I can't tell. |

| | Page 12 |
|---|---|

| 10:10:18 | 1 | Q   Well, did they relate to a particular personal |
|---|---|---|
| | 2 | interest of yours, like an auto accident? |
| | 3 | A   No, no. |
| | 4 | Q   Okay.  Did they relate to any personal business |
| 10:10:26 | 5 | that you conduct? |
| | 6 | A   No. |
| | 7 | Q   Was there any other reason for you to have been |
| | 8 | at those depositions outside of your employment with or |
| | 9 | for Mr. Bergstein? |
| 10:10:38 | 10 | A   Can you explain the question?  Sorry. |
| | 11 | Q   Yes.  Is it fair to say that there was no other |
| | 12 | reason for you to provide six or seven depositions |
| | 13 | out -- other than the fact that you were there for |
| | 14 | something relating to Mr. Bergstein's business affairs? |
| 10:10:53 | 15 | A   To his entities. |
| | 16 | Q   Okay.  You mean his companies? |
| | 17 | A   Yes.  Entities related -- companies related one |
| | 18 | way or the other. |
| | 19 | Q   What business entities does Mr. Bergstein |
| 10:11:09 | 20 | continue to operate? |
| | 21 | A   None as far -- |
| | 22 | MR. MCGONIGLE:  Well, I'm going to object to |
| | 23 | that.  I think it's irrelevant to this case.  I'm not |
| | 24 | sure what -- what the relevancy would be to this matter. |
| 10:11:20 | 25 | So any business activities that Mr. Bergstein's |

| | Page 13 |
|---|---|

| 10:11:23 | 1 | currently running I think is irrelevant and I instruct |
|---|---|---|
| | 2 | her not to answer. |
| | 3 | MR. WALKER:  I would ask counsel to conform his |
| | 4 | objections to the rules and not provide guidance to the |
| 10:11:33 | 5 | witness. |
| | 6 | MR. MCGONIGLE:  I don't think I did.  I'm |
| | 7 | not -- didn't coach the witness, Counsel. |
| | 8 | BY MR. WALKER: |
| | 9 | Q   And you -- are you going to follow Counsel's |
| 10:11:42 | 10 | advice and not respond to that question, ma'am? |
| | 11 | A   Can you repeat the question? |
| | 12 | Q   Are you going to follow your lawyer's advice |
| | 13 | and not answer the question that I just asked you?  The |
| | 14 | one that he objected to? |
| 10:11:54 | 15 | A   Yes, of course. |
| | 16 | Q   I'd like to hand you what has been marked as |
| | 17 | Plaintiff's Exhibit 2. |
| | 18 | (Exhibit 2 was marked for |
| | 19 | identification by the Court Reporter |
| 14:15:30 | 20 | and is attached hereto.) |
| | 21 | BY MR. WALKER: |
| | 22 | Q   You had mentioned earlier that you provided a |
| | 23 | deposition requested by Leonard Gumport in a bankruptcy |
| | 24 | matter.  And I'll represent to you that this was the |
| 10:12:26 | 25 | 2004 examination that you provided.  This is the first |

Frymi Biedak                                                    03-25-19

---

Page 14

| 10:12:29 | 1 | volume of the transcript of that deposition. |
| | 2 | A   Uh-huh. |
| | 3 | Q   Does it appear to -- if you -- you're free to |
| | 4 | look at it as you wish.  Does it appear to be copy of |
| 10:12:37 | 5 | that transcript of Volume 1 of your deposition? |
| | 6 | A   I can only assume yes. |
| | 7 | MR. MCGONIGLE:  Well, just for the record, it |
| | 8 | doesn't look complete.  I see it goes from Page 119 to |
| | 9 | 160. |
| 10:12:56 | 10 | BY MR. WALKER: |
| | 11 | Q   Okay.  Ma'am, if you look at the top, you'll |
| | 12 | see it says Exhibit 46, Page 1 of 48 on the first page |
| | 13 | there.  It's on the very first page. |
| | 14 | A   Yes. |
| 10:13:07 | 15 | Q   Do you see where it says Page 1 of 48? |
| | 16 | A   I see that. |
| | 17 | Q   Okay.  I'm going to refer to those review so |
| | 18 | page numbers as we walk through this. |
| | 19 | A   Okay. |
| 10:13:14 | 20 | Q   If that's okay? |
| | 21 | A   Fine with me. |
| | 22 | Q   All right.  If you could turn to Page 5 of 48, |
| | 23 | please. |
| | 24 | A   Yes. |
| 10:13:26 | 25 | Q   You were asked at time that what company was on |

Page 15

| 10:13:30 | 1 | your paycheck at that time, and you responded that it |
| | 2 | was Managed Media Services, Inc.; correct? |
| | 3 | A   Yes. |
| | 4 | Q   When did that change? |
| 10:13:40 | 5 | A   I don't remember.  I'm sorry. |
| | 6 | Q   How many companies have appeared on your |
| | 7 | paychecks say over the last five years? |
| | 8 | A   I'm going to have to think for a second.  So |
| | 9 | now we are now in 2019.  So '14 -- at some point it was |
| 10:14:08 | 10 | Integrated Administrative Services.  And then -- and |
| | 11 | then it -- oh, wait.  There was one in between.  It was |
| | 12 | something with financial, and then it was CAS. |
| | 13 | Q   Okay.  So how many companies have appeared on |
| | 14 | to your paycheck over the last ten years? |
| 10:14:25 | 15 | A   That, I cannot.  I don't remember. |
| | 16 | Q   More than ten? |
| | 17 | A   I would have to look. |
| | 18 | Q   Would it be between five and ten? |
| | 19 | A   I can't say either way.  Sorry. |
| 10:14:35 | 20 | Q   What is the reason that you change employers -- |
| | 21 | well, let me ask it this way.  During the period of the |
| | 22 | ten-year -- going back ten years, to the extent that the |
| | 23 | name of the company on your paycheck changed, you -- |
| | 24 | your job did not change; correct? |
| 10:14:54 | 25 | MR. MCGONIGLE:  I object.  The question's |

Page 16

| 10:14:55 | 1 | overbroad and it's vague.  You can answer. |
| | 2 | THE WITNESS:  Can you repeat the question? |
| | 3 | BY MR. WALKER: |
| | 4 | Q   Yes.  To the -- over the past ten years, to the |
| 10:15:03 | 5 | extent that the name of the company on your paycheck |
| | 6 | changed, your job did not change; correct? |
| | 7 | MR. MCGONIGLE:  Same objections. |
| | 8 | THE WITNESS:  Until Mr. Bergstein's |
| | 9 | incarceration, I worked for him.  For David Bergstein. |
| 10:15:22 | 10 | And then now I'm working for an entity named Corporate |
| | 11 | Administrative Services. |
| | 12 | BY MR. WALKER: |
| | 13 | Q   Is that involved or affiliated with |
| | 14 | Mr. Bergstein in any way? |
| 10:15:32 | 15 | A   I wouldn't know. |
| | 16 | Q   Were you doing any work for Mr. Bergstein or |
| | 17 | any of his interests? |
| | 18 | MR. MCGONIGLE:  During what period of time? |
| | 19 | BY MR. WALKER: |
| 10:15:41 | 20 | Q   Currently? |
| | 21 | A   Currently, no.  I help him with his legal |
| | 22 | battles, as I said before. |
| | 23 | Q   So is it your testimony that your current |
| | 24 | position and employment has absolutely nothing to do |
| 10:15:52 | 25 | with Mr. Bergstein or any of his entities or corporate |

Page 17

| 10:15:55 | 1 | interests? |
| | 2 | MR. MCGONIGLE:  Well, I'm going to object to |
| | 3 | that to the extent if she's assisting Mr. Bergstein with |
| | 4 | his legal affairs, then that would be protected by the |
| 10:16:04 | 5 | attorney-client privilege. |
| | 6 | So anything you're doing for Mr. Bergstein |
| | 7 | would be protected by the privilege. |
| | 8 | THE WITNESS:  Okay. |
| | 9 | MR. WALKER:  Well, actually, no.  You can |
| 10:16:13 | 10 | instruct her that to the extent that's the case, she can |
| | 11 | conform her answer.  But you can't instruct her how to |
| | 12 | answer the question. |
| | 13 | MR. MCGONIGLE:  I'm not doing that. |
| | 14 | MR. WALKER:  I would again urge Counsel to |
| 10:16:23 | 15 | comply with the rules governing objections and not |
| | 16 | provide guidance to the witness. |
| | 17 | BY MR. WALKER: |
| | 18 | Q   Ma'am, my question is, quite simply, are you |
| | 19 | still working for Mr. Bergstein or any of his entities |
| | 20 | or commercial interests? |
| 10:16:38 | 21 | A   To the best of my knowledge, no. |
| | 22 | Q   When was the last time that you started working |
| | 23 | for Mr. Bergstein or any of his corporate interests? |
| | 24 | A   Well, he got incarcerated back in -- in -- in |
| 10:16:56 | 25 | March of last year.  So that's when it pretty much |

Frymi Biedak                                                    03-25-19

---

**Page 18**

| | | |
|---|---|---|
| 10:17:00 | 1 | ended. |
| | 2 | Q   How many entities did Mr. Bergstein have at the |
| | 3 | time of his incarceration that were active companies? |
| | 4 | A   I wouldn't know.  I would have to look. |
| 10:17:12 | 5 | Q   What was the last -- what was the last name of |
| | 6 | the company that was on your paycheck that was |
| | 7 | affiliated with Mr. Bergstein? |
| | 8 | A   When you say affiliated, what do you mean by |
| | 9 | that? |
| 10:17:26 | 10 | Q   Had any involvement whatsoever to do with |
| | 11 | Mr. Bergstein or any of his companies or commercial |
| | 12 | interests? |
| | 13 | A   I can't -- I don't know how to answer those |
| | 14 | questions.  I really don't he know. |
| 10:17:39 | 15 | Q   You don't know what the last company that -- |
| | 16 | A   It's Corporate Administrative Services. |
| | 17 | Q   The current company that's on your paycheck? |
| | 18 | A   It's Corporate Administrative Services.  That's |
| | 19 | what it's been for the last, I want to say maybe 2015. |
| 10:17:55 | 20 | Q   Okay.  Going back before Mr. Bergstein's |
| | 21 | incarceration? |
| | 22 | A   Yes. |
| | 23 | Q   Okay.  And so the current company on your |
| | 24 | paycheck is, in fact, affiliated in some way with |
| 10:18:07 | 25 | Mr. Bergstein; correct? |

**Page 19**

| | | |
|---|---|---|
| 10:18:08 | 1 | A   Well, I don't know how it is affiliated. |
| | 2 | Q   Okay.  Going to Page 8 of 48. |
| | 3 | A   Page? |
| | 4 | Q   There on Line 20, you see the line numbers that |
| 10:18:36 | 5 | are on the left side? |
| | 6 | A   Yes. |
| | 7 | Q   Okay.  Beginning on Line 19 you were asked |
| | 8 | about when you first started working with David |
| | 9 | Bergstein. |
| 10:18:46 | 10 | Is it fair say that you began working for David |
| | 11 | Bergstein in January of 1995? |
| | 12 | A   Yes. |
| | 13 | Q   And you consistently worked for him all the way |
| | 14 | up until the time his -- his incarceration? |
| 10:18:59 | 15 | MR. WIECHERT:  Object.  The question is vague. |
| | 16 | It lacks foundation. |
| | 17 | THE WITNESS:  I -- I don't -- I worked for -- I |
| | 18 | worked for a lot of people, I mean, in my time.  So I -- |
| | 19 | you're talking 25 years. |
| 10:19:12 | 20 | BY MR. WALKER: |
| | 21 | Q   I'm talking about from 1995 when you began |
| | 22 | working with David Bergstein until the time of his |
| | 23 | incarceration.  Were you always working and reporting to |
| | 24 | Mr. Bergstein during that time period? |
| 10:19:24 | 25 | MR. WIECHERT:  Objection.  The question lacks |

**Page 20**

| | | |
|---|---|---|
| 10:19:25 | 1 | foundation.  It's vague. |
| | 2 | You can answer. |
| | 3 | THE WITNESS:  I -- I would say that I, in one |
| | 4 | way or the other, always worked for David Bergstein. |
| | 5 | That's the way I would say, yes.  Since '95. |
| 10:19:33 | 5 | |
| | 6 | BY MR. WALKER: |
| | 7 | Q   Now, during that same period of time you were |
| | 8 | also working closely with Kia Jam; correct? |
| | 9 | A   No. |
| 10:19:44 | 10 | Q   Okay.  He was not involved on any |
| | 11 | communications that you had with Mr. Bergstein? |
| | 12 | A   At the time, I think it -- when we moved to the |
| | 13 | offices on -- on -- in Santa Monica.  And I'm not sure. |
| | 14 | As far as I recollect, Mr. Jam signed -- I think he was |
| 10:20:09 | 15 | the one who signed the lease, as far as I recollect. |
| | 16 | And the employer of record was Integrated Administrative |
| | 17 | Services, and he -- he did not really involve me in the |
| | 18 | day-to-day operations. |
| | 19 | Q   Of what? |
| 10:20:36 | 20 | A   Hmm? |
| | 21 | Q   Of what? |
| | 22 | A   Of the company. |
| | 23 | Q   Which company? |
| | 24 | A   Integrated Administrative Services. |
| 10:20:43 | 25 | Q   What was the address that you moved into at |

**Page 21**

| | | |
|---|---|---|
| 10:20:46 | 1 | that time? |
| | 2 | A   The one Colorado Boulevard, I want to say. |
| | 3 | Q   And what year was that? |
| | 4 | A   I want to say beginning of 2011. |
| 10:20:59 | 5 | Q   Going to Page 9 of 48. |
| | 6 | A   Yeah. |
| | 7 | Q   There on the top four lines you said that |
| | 8 | Mr. Bergstein was somehow a business associate of the |
| | 9 | person that you worked for.  Who was that person? |
| 10:21:17 | 10 | MR. WIECHERT:  And you're referring to in 1995, |
| | 11 | Counsel? |
| | 12 | MR. WALKER:  Referring to her testimony on |
| | 13 | Line 1 through 4. |
| | 14 | MR. WIECHERT:  I think that testimony relates |
| 10:21:34 | 15 | back to the earlier page. |
| | 16 | MR. MCGONIGLE:  You might want to read the |
| | 17 | earlier pages to put it in context. |
| | 18 | THE WITNESS:  Okay.  Uh-huh.  Oh, the people -- |
| | 19 | are you talking about the people to -- that -- who |
| 10:21:55 | 20 | introduced me to David Bergstein? |
| | 21 | BY MR. WALKER: |
| | 22 | Q   Yes. |
| | 23 | A   It was Scott Fine. |
| | 24 | Q   And how do you spell that name? |
| 10:22:04 | 25 | A   Fine, F-I-N-E, Scott. |

eLitigation Services, Inc. - els@els-team.com

Frymi Biedak                                                      03-25-19

Page 22

10:22:07  1    Q  His name was Fine Scott?
          2    A  No, his name was Scott Fine.
          3    Q  Scott Fine.  Thank you.
          4       Going to Page 15 of 48, if you could, please,
10:22:21  5  ma'am.
          6    A  Yes.
          7    Q  Okay.  Now, there towards the bottom you were
          8  asked:  "When did you first have anything to do with
          9  spreadsheets as you've referred to it?"
10:22:38 10       And your answer was:  "I want to say 2007, but
         11  I'm not 100 percent sure."
         12       Do you see that?
         13    A  Yes.
         14    Q  What spreadsheets are you discussing there?
10:22:50 15       MR. WIECHERT:  I'm going to object on grounds
         16  of relevance.
         17  BY MR. WALKER:
         18    Q  You can answer the question.
         19    A  Okay.  I would say reconciliations of bank
10:23:03 20  accounts, I'd say.
         21    Q  Okay.  So was this something that you started
         22  to do for Mr. Bergstein?
         23    A  I always kept records of everything, like I
         24  keep of my personal life.  I just like to write things
10:23:21 25  down.  That's all.

Page 23

10:23:22  1    Q  But specifically what did the spreadsheets
          2  reflect?
          3    A  I would say it's like a checkbook that you keep
          4  to write down the checks that you are coming in and
10:23:32  5  going out.
          6    Q  For which companies?
          7    A  Oh, my god.  I don't remember.
          8    Q  Multiple companies; correct?
          9    A  I am sure, yes.
10:23:38 10    Q  Okay.  Did you keep a separate spreadsheet for
         11  each of Mr. Bergstein's entities?
         12       MR. WIECHERT:  Objection.  That question's
         13  vague as to time.  It lacks foundation.
         14       THE WITNESS:  I don't remember.
10:23:48 15  BY MR. WALKER:
         16    Q  Starting in 2007, were you maintaining a
         17  spreadsheet for each of Mr. Bergstein's entities?
         18    A  I don't remember.  I really don't remember.  I
         19  would have to look at the records.
10:24:00 20    Q  Do you -- were you keeping spreadsheets for
         21  multiple companies?
         22       MR. WIECHERT:  Objection to the question.  Are
         23  you talking about as of 2007?
         24       MR. WALKER:  Sure.
10:24:08 25       THE WITNESS:  I'm -- I would -- I'm fairly

Page 24

10:24:10  1  sure, yes.
          2  BY MR. WALKER:
          3    Q  And for how long did you maintain these
          4  spreadsheets?  Over what period of years?
10:24:17  5    A  I wouldn't know.
          6    Q  Well, when was the last time that you provided
          7  Mr. Bergstein a copy of those spreadsheets?
          8    A  For which company?
          9    Q  Any of his companies?
10:24:26 10    A  I'm just trying to think.
         11       Well, it would have been definitely before his
         12  incarceration.
         13    Q  Okay.  How soon before?
         14    A  That, I don't remember.  I would have to look
10:24:42 15  at my records.
         16    Q  Now, going to the preceding page, 14 of 48.
         17  There at the top you were asked:  "When you say the
         18  spreadsheet, what are you referring to?"
         19       You said:  "The tracking of banking transfers."
10:25:05 20       Do you see that?
         21    A  Uh-huh.
         22    Q  Is that a fair characterization of what the
         23  spreadsheets reflected?
         24       MR. WIECHERT:  Objection.  Vague and ambiguous.
10:25:14 25       MR. MCGONIGLE:  I'll join in that.  You can

Page 25

10:25:16  1  answer.
          2       THE WITNESS:  I say it's a -- it's a keeping of
          3  a -- okay.  Let me just rephrase.  It's keeping track of
          4  anything that happens in a bank account.  Like a check
10:25:32  5  balancing -- checkbook balancing.  Sorry.
          6  BY MR. WALKER:
          7    Q  Okay.  Going to Page 17 of 48.  There on Line 9
          8  you were asked if you were an accountant, and your
          9  answer was no.  Was that accurate at the time?
10:25:49 10    A  It's still accurate.
         11    Q  Okay.  Have you ever been an accountant?
         12    A  No.
         13    Q  Have you ever been trained or educated as an
         14  accountant?
10:25:56 15    A  No.
         16    Q  Have you ever held a certified public
         17  accountancy?
         18    A  No.
         19    Q  Have you ever been licensed in any respect as
10:26:02 20  an accountant?
         21    A  No.
         22    Q  Now, at the time that you were giving this
         23  examination that's reflected in Exhibit 2, did you
         24  understand that you were under oath?
10:26:14 25    A  Yes.

Frymi Biedak                                           03-25-19

| | Page 26 |
|---|---|

10:26:14   1    Q   Just as you're under oath today?
           2    A   Yes.
           3    Q   Was the first time that you and Mr. Bergstein
           4    began working with Mr. Jam when you moved to the
10:26:38   5    Colorado Boulevard office?
           6    A   I don't think so.
           7    Q   When did you first start working with Mr. Jam?
           8        MR. WIECHERT:  The question's vague and
           9    ambiguous as to working with.
10:26:51  10    BY MR. WALKER:
          11    Q   You can answer the question.
          12    A   I think we were actually in this building, and
          13    I think we moved here, I want to say either 2006 or
          14    2007.  I think that's when Mr. Jam and his assistant
10:27:09  15    moved in with us, I think.
          16    Q   And what was the name of his assistant?
          17    A   I think at the time it was Amy.
          18    Q   And what was her last name?
          19    A   I don't remember.  I think it was Amy.
10:27:23  20    Q   And then when you moved from this building, did
          21    you then move to the Colorado Boulevard address?
          22    A   No, I don't think so.
          23    Q   What was the next address that you occupied as
          24    an office?
10:27:38  25    A   I think we moved to Fox Plaza.

| | Page 27 |
|---|---|

10:27:43   1    Q   And what year was that?
           2    A   I don't remember, but it was not much --  I
           3    don't think we stayed long on -- in this building.
           4    Q   Okay.  And did Mr. Jam and his assistant move
10:28:04   5    with you and Mr. Bergstein to Fox Plaza?
           6    A   I don't know if it was the same assistant.  I
           7    don't remember.
           8    Q   But Mr. Jam did move with you?
           9    A   As far as -- I thought he did, yes.
10:28:21  10    Q   What was the -- you're familiar with the
          11    Graybox LLC, I take it?
          12    Q   When you say familiar, what do you mean?
          13    Q   You understand it was one of Mr. Bergstein's
          14    companies?
10:28:43  15    A   It -- he was the manager.
          16    Q   What was purpose of Graybox?
          17    A   I don't know.
          18    Q   Are you familiar with the company called
          19    Pineboard Holdings?
10:28:54  20    A   I heard the name, yes.
          21    Q   What was the purpose of Pineboard Holdings?
          22    A   That, I don't know.
          23    Q   Are you familiar with the entity called --
          24    initially called Swartz IP?
10:29:07  25    A   I heard the name, yes.

| | Page 28 |
|---|---|

10:29:09   1    Q   And that was also an entity that Mr. Jam and
           2    Mr. Bergstein were involved with; correct?
           3        MR. WIECHERT:  Objection.  No foundation.
           4        THE WITNESS:  I wouldn't know.
10:29:19   5    BY MR. WALKER:
           6    Q   What was the purpose of Swartz IP?
           7    A   I don't know that either.
           8    Q   As we sit here today, is it your testimony that
           9    you're no longer maintaining spreadsheets for any of
10:29:38  10    Mr. Bergstein's entities reflecting any banking
          11    transfers?
          12    A   I keep spreadsheets on entities that I have
          13    access to.
          14    Q   What are the names of those entities?
10:30:05  15        MR. MCGONIGLE:  I'm going to instruct -- I
          16    think that's an irrelevant -- to this case and it's an
          17    invasion of the privacy of the particular people
          18    involved.  I'm going to instruct her not to answer that.
          19    BY MR. WALKER:
10:30:17  20    Q   Are you going to follow your counsel's advice
          21    and not respond to that?
          22    A   Yes.
          23    Q   Do you still possess David Bergstein's
          24    signature stamp?
10:30:33  25    A   Yes.

| | Page 29 |
|---|---|

10:30:34   1    Q   When was last time you used it?
           2        MR. MCGONIGLE:  I'm going to instruct her not
           3    to answer.  That's irrelevant.
           4    BY MR. WALKER:
10:30:40   5    Q   Are you going to follow your counsel's advice,
           6    ma'am?
           7    A   I don't think I've used it in a long time.
           8        MR. MCGONIGLE:  That's -- there's your answer.
           9    BY MR. WALKER:
10:30:48  10    Q   When was the last time you used it?
          11    A   I don't remember.
          12    Q   Did you ever maintain a -- or possess a
          13    signature stamp for Kia Jam?
          14    A   I did not, but there was one.  But he never
10:31:04  15    gave it to me.
          16    Q   Okay.
          17    A   I mean, no.  He may have given it to me when he
          18    was traveling.  It's very possible.  But, yes, there was
          19    definitely one.
10:31:12  20    Q   So from time to time you would have possessed
          21    Mr. Jam's signature stamp?
          22    A   When he was traveling and he knew that his
          23    signature would be required and the office manager
          24    wasn't there, then he would give it to me, yes.
10:31:35  25    Q   If you could go to Page 44 of 48, please.

8  (Pages 26 to 29)

Frymi Biedak                                                    03-25-19

|  | Page 30 |
|---|---|

10:31:41   1   A   Page 44 we are now?
2   Q   Yes, ma'am.
3       Do you see your answer starting on Line 9?
4   A   On line 9? Yes.
10:32:00   5   Q   Could you read that answer, that first
6   paragraph out loud for us, please?
7   A   From A, my answer?
8   Q   Yes.
9   A   "Whenever I felt it was necessary that he --
10:32:11  10   that it -- well, look, I'm not accountant.  I'm not a
11   bookkeeper.  I'm making the entries.  I'm keeping track.
12   I'm making sure every penny is accounted for.  Okay."
13   Q   Are you still doing that for any of
14   Mr. Bergstein's entities?
10:32:29  15   A   I wouldn't even know which entities he has, so.
16   I'm keeping spreadsheets on any account that I have
17   access to.
18   Q   Okay.  And what would the name of those
19   accounts or entities be?
10:32:41  20       MR. MCGONIGLE:  Well, I'm going to instruct her
21   not to answer.  It's irrelevant and it's an invasion of
22   privacy.
23       MR. WALKER:  Whose privacy?
24       MR. MCGONIGLE:  Well, it's invasion of the
10:32:49  25   witness' privacy and whoever she's working for, so I'm

|  | Page 31 |
|---|---|

10:32:54   1   going to instruct her not to answer.
2   BY MR. WALKER:
3   Q   I take it you're going to follow your counsel's
4   advice and not respond to that question?
10:33:01   5   A   I wouldn't even know what to answer, so yes.
6   Q   Can you reach that, ma'am?
7   A   Yes, yes.
8   Q   Okay.
9       (Exhibit 3 was marked for
10:33:27  10       identification by the Court Reporter
11       and is attached hereto.)
12   BY MR. WALKER:
13   Q   Ma'am, I've handed you what is now marked as
14   Exhibit 3.
10:33:38  15   A   Yes.
16   Q   And it is Volume 2 that continues your 2004
17   examination under oath in the Thinkfilm bankruptcy;
18   correct?
19   A   Correct.
10:33:54  20   Q   Now, I'd like to turn your attention, ma'am,
21   to -- we'll use the same page number format that we used
22   for the last volume, okay?
23   A   Very well.
24   Q   If you could go to page 46 of 51, please.
10:34:08  25   A   Forty-six?

|  | Page 32 |
|---|---|

10:34:10   1   Q   Yes, ma'am.
2       Now, is the spreadsheet that we see on Page 46
3   of 51 in Exhibit 3 --
4   A   Is Exhibit 47.
10:34:43   5   Q   Yes.  That's the way it's marked on the bottom
6   of the page.  Thank you, ma'am.
7       And it's -- appears at page 46 of 51 of this
8   transcript; correct?
9   A   Okay.  Yes.
10:34:54  10   Q   Okay.  Is this an example of the spreadsheet
11   that you maintained for a particular entity, in this
12   case CT1 Holdings, LLC?
13   A   That looks like something I may have created,
14   yes.
10:35:07  15   Q   Okay.  So when we talk about your spreadsheets
16   that you're maintaining for each entity, this particular
17   page, 46 of 51 in Exhibit 3, is how those spreadsheets
18   would appear; correct?
19       MR. MCGONIGLE:  And I'll object that it
10:35:19  20   mischaracterizes the witness' testimony and lacks
21   foundation.
22       You can answer.
23       THE WITNESS:  I think I've changed the format
24   over time drastically.
10:35:29  25   BY MR. WALKER:

|  | Page 33 |
|---|---|

10:35:29   1   Q   Okay.  But, certainly, this is how it appeared
2   at the time that you were keeping this spreadsheet?
3   Q   In -- in 2010?
4   Q   Yes.
10:35:40   5   A   Yes, I think, yeah, that's how they look like,
6   yes.
7   Q   And who decided what columns to create with
8   respect to this spreadsheet?
9   A   I don't remember.
10:35:52  10   Q   Did you make that decision?
11   A   I don't remember.  It's been so long.  I don't
12   remember.
13   Q   Going about halfway down the page, a
14   transaction check No. 1004 on May 30, 2008, there was a
10:36:08  15   payment to K.Jam Productions; correct?
16   A   Yes.
17   Q   Okay.  And that was for a little bit more than
18   $11,000; correct?
19   A   Yes.
10:36:19  20   Q   And the stated purpose was consulting services;
21   correct?
22   A   That's what it says.
23   Q   What consulting services was K.Jam Productions
24   providing?
10:36:31  25       MR. WIECHERT:  You mean at the time that this

Frymi Biedak                                                                03-25-19

| | |
|---|---|

Page 34

```
10:36:32   1    spreadsheet was created?
           2         MR. WALKER:  Yes.
           3         MR. WIECHERT:  So is there actually a date on
           4    this?
10:36:37   5         MR. WALKER:  May 30, 2008, shows the date of
           6    the transaction.
           7         MR. WIECHERT:  And I'll object on relevance
           8    grounds just to a 2008 transaction.
           9    BY MR. WALKER:
10:36:46  10         Q   My question, ma'am, is what consulting services
          11    was K.Jam Productions providing that resulted in an
          12    $11,076.93 payment?
          13         A   I don't -- I don't know.
          14         Q   Which company or person was the recipient or
10:37:03  15    the beneficiary of those consulting services?
          16         A   Of K.Jam Productions?
          17         Q   Yes.
          18         A   Well, I will have to assume -- and I know that
          19    I'm not supposed to do that -- but I can only say I
10:37:19  20    would assume it's Kia Jam.
          21         MR. WIECHERT:  Let me move to strike the answer
          22    as speculation.  And the witness was actually correct in
          23    her legal assessment.
          24         MR. WALKER:  Again, I would ask that Counsel
10:37:32  25    conform their objections to the rules.
```

Page 35

```
10:37:35   1    BY MR. WALKER:
           2         Q   Ma'am, if you could look at page 48 of 51.
           3         A   Forty-eight?
           4         Q   Yes, ma'am.
10:37:47   5         A   Forty-eight.  Okay.
           6         Q   Okay.  There on the third line we see a
           7    February 8, 2009, payment to K.Jam Productions, LLC;
           8    correct?
           9         A   Correct.
10:38:03  10         Q   And again, there was an $11,076.93 payment made
          11    to K.Jam Productions LLC that your spreadsheet tracked;
          12    correct?
          13         MR. WIECHERT:  Objection.  Relevance.
          14         MR. WIECHERT:  Please allow me to finish my
10:38:17  15    question before you interpose your objection.
          16         MR. WIECHERT:  Sorry.  I though you were
          17    paused, Counsel.
          18    BY MR. WALKER:
          19         Q   I'll re-ask the question, ma'am.
10:38:25  20         What was the purpose of the $11,076.93 payment
          21    to K.Jam Productions LLC?
          22         MR. WIECHERT:  Objection.  No foundation.
          23    Calls for speculation.
          24         THE WITNESS:  I have no idea.
          25    ///
```

Page 36

```
10:38:37   1    BY MR. WALKER:
           2         Q   It states "consulting services production."  Do
           3    you see that?
           4         A   Yes.
10:38:43   5         Q   And who was the beneficiary or the recipient of
           6    the consulting service for which K.Jam Productions LLC
           7    was paid?
           8         MR. WIECHERT:  Objection.  No foundation.
           9    Speculation.
10:39:00  10         THE WITNESS:  I'm sorry.  Can you repeat the
          11    question?
          12    BY MR. WALKER:
          13         Q   Who was the beneficiary or the recipient of the
          14    consulting services for which K.Jam Productions was paid
10:39:11  15    on February 8, 2009?
          16         A   Well, the check was made out of CT1 --
          17    whatever -- whatever it was -- of CT1 Holdings LLC.
          18         So would this be the beneficiary?
          19         Q   I'm asking you, ma'am.
10:39:28  20         A   Well, I wouldn't know one way or the other.
          21         Q   What was the nature of the consulting services
          22    that were provided by K.Jam Productions LLC at this
          23    time?
          24         MR. WIECHERT:  Objection.  No foundation.
10:39:49  25         THE WITNESS:  I'm sorry.  You're going to have
```

Page 37

```
10:39:49   1    to -- I am going to ask you to repeat the question
           2    because I'm a little bit lost.
           3    BY MR. WALKER:
           4         Q   What was the nature of the consulting services
10:39:56   5    being provided by K.Jam Productions LLC as of
           6    February 8, 2009?
           7         MR. WIECHERT:  Same objection.
           8         THE WITNESS:  I can only, as far as I
           9    recollect, K.Jam Productions was a product -- they did
10:40:18  10    something with movies.  That's all I can say.
          11    BY MR. WALKER:
          12         Q   Going down a few lines on the same date, do you
          13    see --
          14         A   On same date?
10:40:27  15         A   Yes.  On February 8, 2009, do you see the
          16    payment to Kia Jam?
          17         A   Yes.
          18         Q   And you see that payment was for $2,201.80;
          19    correct?
10:40:42  20         A   Correct.
          21         Q   And the description was for reimbursement of
          22    expenses; correct?
          23         A   That's what it says.
          24         Q   When you created this spreadsheet for CT1
10:40:55  25    Holdings, LLC, was that -- was this entry signifying
```

10  (Pages 34 to 37)

Frymi Biedak                                                                    03-25-19

| Page 38 | Page 40 |

**Page 38**

10:41:01  1   that Mr. Jam had incurred expenses on behalf of that
          2   company?
          3       A  I don't --
          4           MR. MCGONIGLE:  Objection.  Relevance.
10:41:09  5           THE WITNESS:  I don't remember.
          6   BY MR. WALKER:
          7       Q   When you recorded a payment to Kia Jam in this
          8   instance on February 8, 2009, utilizing check No. 1878
          9   in the amount of $2,201.80, were you careful to ensure
10:41:28 10   that that entry was accurate?
         11       A  I don't remember.  I really don't remember.
         12       Q   Well, do you not remember whether or not you
         13   made an effort to ensure that the transactions and the
         14   payments that you recorded in these spreadsheets were
10:41:42 15   accurate?
         16       A  Well, I can only say what I'm doing now and
         17   what I've been doing over the years.  When somebody gave
         18   me receipts of monies that he had fronted and I would
         19   write a check or would ask accounting to write a check.
10:41:58 20   I would make sure that it's for the exact amount of they
         21   claim that they advanced funds.  For example, somebody
         22   claims mileage, I making sure that he gives me the
         23   receipt.
         24       Q   So --
10:42:10 25       A  That's all I can say.

**Page 39**

10:42:11  1       Q   -- when you entered a payment to Kia Jam on a
          2   specific date and noted it in one your spreadsheets, is
          3   it fair to say that that payment was actually made?
          4       A  Well, if you look at the cleared items -- I
10:42:32  5   would have see the -- but you look at the cleared items
          6   and it says here one, the way I remember it, and then it
          7   reduced the actual balance, I would assume the payment
          8   was made.
          9       Q   Okay.  And did you take care to ensure that the
10:42:44 10   entries that you made on these spreadsheet were
         11   accurate?
         12       A  Will you -- I'm sorry.  Can you explain the
         13   question?
         14       Q   Yes, ma'am.  On the -- on the spreadsheet such
10:42:56 15   as the kind that we see here on page 48 of 51 --
         16       A  Yes.
         17       Q   -- of Exhibit 3, we see a series of payments, a
         18   series of payees, a series of amounts; correct?
         19       A  Uh-huh.
10:43:08 20       Q   Did you ensure that when you entered any
         21   particular transaction or payment on your spreadsheets
         22   that the information that was provided was accurate?
         23           MR. WIECHERT:  The question's vague and
         24   ambiguous as to which spreadsheets Counsel is referring.
10:43:27 25           THE WITNESS:  I -- looked -- I would say I

**Page 40**

10:43:29  1   looked -- took the check numbers -- that's what I would
          2   do today -- and I wrote down whom they were written to
          3   and then the amount and then I would balance.  And if
          4   the account balanced, then I would assume that it was
10:43:39  5   right.
          6   BY MR. WALKER:
          7       Q   And did you make an effort to ensure that it
          8   was right?
          9       A  That, I don't remember.  I really don't recall
10:43:47 10   what I did then.
         11       Q   Okay.  With respect to the spreadsheets that
         12   you've maintained in the recent years, did you ensure
         13   that the information regarding who was being paid and
         14   the amount they were being paid was accurately reflected
10:44:01 15   in your spreadsheets?
         16           MR. MCGONIGLE:  Object.  The question is vague
         17   and it lacks foundation.
         18           You can answer it.
         19           THE WITNESS:  I'm trying the best I can to do
10:44:09 20   everything right.  If I make mistakes, you know, it's
         21   human.
         22   BY MR. WALKER:
         23       Q   And that's my point, ma'am.  You were making
         24   every effort -- every reasonable effort to ensure that
10:44:17 25   the information that you recorded in your spreadsheets

**Page 41**

10:44:20  1   was accurate; correct?
          2       A  We are all trying to do the right thing and do
          3   a good job.
          4       Q   So your answer to that would be yes?
10:44:28  5       A  I would -- I definitely tried with my best
          6   efforts to do it right.
          7       Q   Okay.  And by doing right, you mean to ensure
          8   that the information that you were putting into the
          9   spreadsheet was accurate?
10:44:41 10       A  Yes.  I will go with that.
         11       Q   Going to the final page, 51 of 51, of this same
         12   exhibit.
         13       A  Fifty-one?  Fifty-one.
         14       Q   There towards the kind bottom third, at the top
10:45:00 15   we see a December 11, 2008, entry?
         16       A  December 11, 2008.  I'm sorry, give me one.
         17       Q   It's a payment K.Jam Productions LLC?
         18       A  Yes.
         19       Q   Okay.  And that was replaced with a cashier's
10:45:13 20   check; correct?
         21       A  On 1/8 it says here.
         22       Q   Why would it have been necessary to replace the
         23   payment with a cashier's check?
         24           MR. WIECHERT:  Objection.  Relevance.
10:45:26 25           THE WITNESS:  I don't know.  I really don't

11  (Pages 38 to 41)

Frymi Biedak                                              03-25-19

Page 42

```
10:45:28   1    know.
           2    BY MR. WALKER:
           3       Q   Going down a little bit further.  You see on
           4    December 11, 2008, a payment to Kia Jam; correct?
10:45:36   5       A   Yes.
           6       Q   And that was for $1,148.31; correct?
           7       A   Correct.
           8       MR. WIECHERT:  Objection.  Relevance.
           9    BY MR. WALKER:
10:45:44  10       Q   And that was for reimbursement of expenses?
          11       A   That's what it says.
          12       Q   Does that reflect that Mr. Jam was incurring
          13    expenses on behalf of CAPCO Group, LLC, the entity for
          14    which this spreadsheet was created?
10:46:01  15       MR. WIECHERT:  Objection.  Relevance.
          16       THE WITNESS:  I can only say what it says here,
          17    so I don't -- I really don't know.  I mean, again,
          18    somebody has -- wants to be reimbursed for his expenses,
          19    he gives me an expense -- that's what I'm doing in
10:46:17  20    general:  An expense report, receipts, and then a check
          21    is being generated.
          22    BY MR. WALKER:
          23       Q   So if Mr. -- if Mr. Jam presented you with
          24    receipts for expenses and said to charge those expense
10:46:32  25    to a particular entity, then you would go to the
```

Page 43

```
10:46:36   1    spreadsheet for that entity and record the reimbursement
           2    of those expenses in that spreadsheet; correct?
           3       MR. WIECHERT:  Objection.  Lacks foundation.
           4    No time frame.
10:46:48   5       THE WITNESS:  Back then or now?
           6    BY MR. WALKER:
           7       Q   Over the course of the time that you maintained
           8    these spreadsheets?
           9       A   I don't think I would put something in a
10:46:59  10    spreadsheet when I didn't have some sort of a backup
          11    for.
          12       Q   Right.  So the backup might be expense for a
          13    dinner; correct?  It might be expense for the purchase
          14    of a particular item.  And when Mr. Jam brought you
10:47:15  15    those receipts, would he tell you which company to
          16    charge them to?
          17       MR. WIECHERT:  The question's compound.
          18       THE WITNESS:  I --
          19       MR. MCGONIGLE:  Yeah, why don't we -- can we
10:47:32  20    break that down?  It is compound.
          21       THE WITNESS:  I'm -- I don't remember -- that
          22    was in 2000 -- when was -- in 2000 -- in 2008.  So that
          23    was 11 years ago.  I don't remember what people gave me
          24    back then, how it was record.  I -- I really don't
10:47:53  25    remember.
```

Page 44

```
10:47:53   1    BY MR. WALKER:
           2       Q   Okay.
           3       A   I'm really sorry, but I don't.
           4       Q   Let's go to the -- let's go to the last few
10:47:56   5    years.
           6       A   Okay.
           7       Q   When -- when someone presented you with
           8    expenses, would you record it on the spreadsheet for the
           9    company that they told you the expenses were incurred
10:48:07  10    for?
          11       A   Well, I normally would write a check -- if it's
          12    a reimbursement of expenses and it's related to a
          13    certain entity, then I would try to write it out of that
          14    particular entity, if I have receipts.
10:48:35  15       Q   And how would you know that the expenses were
          16    related to a particular entity?
          17       A   Well, I guess the person would say work related
          18    to X, Y, Z.
          19       Q   In other words, that came in the form of
10:48:50  20    direction to you from whoever was requesting the
          21    payment; correct?
          22       A   You're talking now or then?
          23       Q   Throughout the entire time that you were
          24    recording expenses incurred for any particular entity,
10:49:03  25    is the way that you knew which entity to charge the
```

Page 45

```
10:49:07   1    expenses to based upon what you were told by the person
           2    submitting the expenses for reimbursement?
           3       A   That's how it is now.
           4       Q   Okay.
10:49:20   5       A   Back then, I don't remember how it was.
           6       Q   Is it likely that it was the same way back
           7    then?
           8       A   I wouldn't know one way or the other.
           9       MR. WIECHERT:  Calls for speculation.  No
10:49:29  10    foundation.
          11    BY MR. WALKER:
          12       Q   Are you suggesting that in 2007, in that time
          13    frame, that if you didn't receive instructions from
          14    someone as to which company the expenses were incurred
10:49:39  15    for, that you would just randomly assign them to a
          16    particular entity?
          17       A   I don't think I ever did that because I was not
          18    a signer on any of the accounts.  I guess somebody must
          19    have told me out of which company to write any
10:49:53  20    particular check to.
          21       Q   Yes, ma'am.
          22       MR. WALKER:  Why don't we take a break for a
          23    few minutes.
          24       MR. WIECHERT:  Sure.
10:49:59  25       THE VIDEOGRAPHER:  The time is 10:49 a.m.  We
```

12  (Pages 42 to 45)

Frymi Biedak                                                    03-25-19

Page 46

10:50:00  1   are now off the record.
          2        (A recess was taken.)
          3        THE VIDEOGRAPHER:  We are back on the record.
          4   The time is 11:05 a.m.
11:05:33  5   BY MR. WALKER:
          6        Q   Ms. Biedak, I've handed you what's been marked
          7   as Exhibit 4, and would represent to you that it is
          8   Volume 3 of your prior 2004 examination under oath.
          9        Does that appear to be correct to you?
11:05:51 10        A   It says it here.
         11        (Exhibit 4 was marked for
         12        identification by the Court Reporter
         13        and is attached hereto.)
         14        MR. WALKER:  Thank you, ma'am.
11:05:55 15   BY MR. WALKER:
         16        Q   Using the same page numbering, if you could
         17   turn to page 37 of 38, please.
         18        A   Thirty-seven?  Yeah, I see that.
         19        Q   Okay.  Is this a spreadsheet that you prepared
11:06:28 20   for Production Management Services, LLC?
         21        A   I don't recollect that format.  It may be, but
         22   it's just not -- it's not complete.
         23        Q   Why do you say that?
         24        A   Because if you looked at the other spreadsheet,
11:06:52 25   I always had, like -- put the actual balances and the

Page 47

11:06:55  1   bank balances and whatever cleared.  So this is not
          2   something that -- it looks more like a -- a fragment of
          3   something that I may have created.
          4        Q   Okay.  So this appears to be a portion of a
11:07:14  5   spreadsheet that you created for Production Management
          6   Services, LLC; correct?
          7        A   It could be.
          8        Q   Okay.
          9        A   It could be.
11:07:21 10        Q   Going approximately two-thirds of the way down,
         11   on March 13, 2008, there's notation "deposit."
         12        Do you see that?
         13        A   It's "deposit cc."
         14        Q   Excuse me.
11:07:44 15        What does the cc designate?
         16        A   What I would use it now, I would say cashier's
         17   check.
         18        Q   And that -- was that reflecting a payment to
         19   Kia Jam?  I'm looking at the one for March 13, 2008, a
11:08:03 20   deposit by cashier's check, and the vendor or deposit
         21   from is Kia Jam for $200,000.
         22        MR. WIECHERT:  Objection.  Relevance.
         23   BY MR. WALKER:
         24        Q   Do you see that entry?
11:08:17 25        A   I see an entry here and it says deposit, Kia

Page 48

11:08:21  1   Jam, and then it says credit.  So I -- the way I see it,
          2   this was a cashier's check or a deposit that came from
          3   Kia Jam to Production Management Services, if I
          4   understand this correctly.
11:08:41  5        Q   Do you recall why Mr. Jam would have been
          6   paying $200,000 to Production Management Services at
          7   that time?
          8        A   No idea.
          9        MR. WIECHERT:  Objection.  Relevance.
11:08:49 10   BY MR. WALKER:
         11        Q   Going down two line items.  On March 20, 2008,
         12   there was a wire transfer of $2 million to Jerome
         13   Swartz.
         14        Do you see that?
11:08:59 15        A   If you look at the spreadsheet, it would be a
         16   credit from him.  So it would have come from him,
         17   because this is in the credit column.
         18        Q   So that was Production Management Services,
         19   LLC, receiving $2 million from Mr. Swartz?
11:09:17 20        A   That's the way I see it now, yes.
         21        Q   If you'd go to the next page, ma'am, Page 38 of
         22   Exhibit 4.
         23        A   Thirty-eight of 38.  Yeah, I'm on the page now,
         24   yes.
11:09:40 25        Q   And is this another portion of a spreadsheet

Page 49

11:09:42  1   that you created for Production Management Services,
          2   LLC?
          3        A   I would think so, yes.  It looks definitely --
          4   the upper part is something, but it's -- it's just I
11:09:58  5   would not presented it this way.  Maybe it was printed
          6   out differently.
          7        Q   Going to the second -- to the last item.  On
          8   December 20, 2007, check No. 2112 was issued to K.Jam
          9   Productions; correct?
11:10:16 10        MR. WIECHERT:  Objection.  Relevance.
         11        THE WITNESS:  That's what it says.
         12   BY MR. WALKER:
         13        Q   And the check was issued in the amount of
         14   $11,076.93; correct?
11:10:25 15        MR. WIECHERT:  Same objection.
         16        THE WITNESS:  That's what it says.
         17   BY MR. WALKER:
         18        Q   Do you know the purpose for that payment to
         19   K.Jam Productions at that time?
11:10:34 20        MR. WIECHERT:  Same objection.
         21        THE WITNESS:  If it's not here, I don't
         22   remember.
         23        (Exhibit 5 was marked for
         24        identification by the Court Reporter
11:10:38 25        and is attached hereto.)

                                    13  (Pages 46 to 49)

Frymi Biedak                                                      03-25-19

Page 50

```
11:11:01   1    BY MR. WALKER:
           2       Q   Ma'am, I've handed you what's been marked as
           3    Plaintiff's Exhibit 5.  And I think you'll see that it's
           4    a series of charts; correct?
11:11:18   5       A   Yes.
           6       Q   Okay.  And these charts were created by the
           7    federal government in its trial against Mr. Bergstein;
           8    correct?
           9       A   I've never seen them before.
11:11:28  10       Q   Well, if you look to the right corner you'll
          11    see it says Government Exhibit 50; correct?
          12       A   That's what it says, yes.
          13       Q   Okay.  Now, the first page of Exhibit 5 looks
          14    at transfers from Swartz IP Services Group to Pacific
11:11:45  15    Life, the Bergstein Trust, Integrated Administration,
          16    and Graybox; correct?
          17       A   That's what it says, yes.
          18       Q   Do you know on February 12 -- I'm sorry -- do
          19    you know on February 2nd, 2012, why Swartz IP Services
11:12:02  20    Group would have paid $29,000 to Pacific Life?
          21       MR. WIECHERT:  Assumes facts not in evidence.
          22       MR. MCGONIGLE:  I'm going to object to the
          23    extent there's no foundation.
          24       But you can answer it.
11:12:12  25       THE WITNESS:  Where do you see that -- the
```

Page 51

```
11:12:14   1    date?  On the top?  Okay.  On that day?
           2       I have no idea.  I don't even know who Pacific
           3    Life is, quite frankly.
           4    BY MR. WALKER:
11:12:27   5       Q   The next item reflects a $50,000 transfer from
           6    Swartz IP to Bergstein trust; correct?
           7       A   Yes, that's what it says.
           8       Q   As of 2012, what -- what was the total value of
           9    the assets held by the Bergstein trust?
11:12:46  10       A   I have no idea.
          11       Q   Do you know -- could you identify any assets
          12    individually that were held in that trust?
          13       A   I never saw that -- any -- any kind information
          14    on that trust.
11:12:58  15       Q   Who was handling or managing those items and
          16    assets for Mr. Bergstein?
          17       A   I don't --
          18       MR. MCGONIGLE:  You mean the ones in the trust?
          19       MR. WALKER:  Yes.
11:13:08  20       THE WITNESS:  I have no idea.
          21    BY MR. WALKER:
          22       Q   Okay.  Going down a bit, we see Swartz IP
          23    Service Group transferred $50,000 to Integrated
          24    Administration; correct?
11:13:18  25       MR. WIECHERT:  Objection.  Assumes facts not in
```

Page 52

```
11:13:18   1    evidence.  No foundation.
           2       THE WITNESS:  Oh, that's what it says on the
           3    spreadsheet, yes.
           4    BY MR. WALKER:
11:13:25   5       Q   And do you understand Integrated
           6    Administration, at that time, to have been Mr. Jam's
           7    company?  Kia Jam's company?
           8       MR. WIECHERT:  Calls for a legal conclusion.
           9       THE WITNESS:  Can you repeat that question?
11:13:36  10    I'm sorry.
          11       MR. WALKER:  Yes, ma'am.
          12    BY MR. WALKER:
          13       Q   As of February 2nd, 2012, did you understand
          14    Integrated Administration to be Kia Jam's company?
11:13:46  15       MR. WIECHERT:  No foundation.  Calls for a
          16    conclusion.
          17       THE WITNESS:  You want me to say something?
          18    BY MR. WALKER:
          19       Q   I'd like you to answer the question, yes,
11:13:54  20    ma'am.  I'm asking for your understanding as of
          21    February 2nd, 2012, as to whether or not Integrated
          22    Administration was Kia Jam's company?
          23       A   Well, when you say Kia Jam's company, what do
          24    you mean by that?  Did he own it?  I don't -- ownership,
11:14:10  25    I don't know.  I just can say that he was one way or the
```

Page 53

```
11:14:13   1    other connected with this entity.  I think he had an
           2    office.  That's all I can say.
           3       Q   Okay.  If you could turn to the third page of
           4    this exhibit, ma'am.  And I apologize they're not
11:14:37   5    numbered.
           6       A   That's okay.
           7       Q   You'll just have to thumb through it.
           8       A   Yes.
           9       Q   Okay.  Now we see a chart that's entitled
11:14:45  10    G.X.715, February 2nd, 2012, transfers from Swartz IP
          11    Services Group to Incident Administration; correct?
          12       A   That's what it says.
          13       Q   Okay.  And it shows a transfer from Swartz IP
          14    Services Group to Integrated Administration of $50,000;
11:15:01  15    correct?
          16       A   That's what it says.
          17       Q   Now, were you maintaining a spreadsheet for
          18    Swartz IP Services Group as of February 2nd, 2012?
          19       A   No.  Never had one.
11:15:15  20       Q   You never a maintained spreadsheet for Swartz
          21    IP?
          22       A   No.
          23       Q   Why not?
          24       A   Because I didn't know even -- I didn't know
11:15:21  25    who -- I didn't know which bank there was an account
```

14  (Pages 50 to 53)

Frymi Biedak                                                        03-25-19

---

Page 54

| | |
|---|---|
| 11:15:26 | 1   with at the time. |
| | 2      Q   Was that an oversight on your part? |
| | 3         MR. MCGONIGLE:  Objection. |
| | 4         THE WITNESS:  I was not involved. |
| 11:15:33 | 5         MR. MCGONIGLE:  Excuse me, ma'am. |
| | 6         THE WITNESS:  I'm sorry. |
| | 7         MR. MCGONIGLE:  I just wanted to take a moment |
| | 8   to object. |
| | 9         THE WITNESS:  Sorry about that. |
| 11:15:39 | 10        MR. MCGONIGLE:  The question is vague and |
| | 11  ambiguous. |
| | 12  BY MR. WALKER: |
| | 13     Q   Was there a specific reason that you understood |
| | 14  as to why you were not asked to create a spreadsheet for |
| 11:15:47 | 15  Swartz IP? |
| | 16     A   I don't know if there was a reason I was not |
| | 17  asked, so I didn't maintain one. |
| | 18     Q   Now, going on in this chart, it shows the |
| | 19  transfer from Swartz IP to Integrated Administration. |
| 11:16:04 | 20  Did you maintain a spreadsheet for Integrated |
| | 21  Administration? |
| | 22     A   I did not. |
| | 23     Q   And why was that? |
| | 24        MR. WIECHERT:  Calls for a conclusion.  No |
| 11:16:15 | 25  foundation. |

Page 55

| | |
|---|---|
| 11:16:15 | 1         THE WITNESS:  So do you want me not to answer? |
| | 2   BY MR. WALKER: |
| | 3      Q   Yes, ma'am, you can answer the question. |
| | 4         MR. MCGONIGLE:  You can -- you can answer. |
| 11:16:21 | 5         THE WITNESS:  Okay.  Because I never know |
| | 6   how -- how exact -- |
| | 7         Repeat the question, please.  Sorry. |
| | 8   BY MR. WALKER: |
| | 9      Q   Yes, ma'am.  Did you maintain a spreadsheet at |
| 11:16:28 | 10  any time for Integrated Administration? |
| | 11     A   I did not. |
| | 12     Q   And do you know why you did not? |
| | 13     A   I did not have access to that account online. |
| | 14     Q   Now, this shows a transfer from Integrated |
| 11:16:39 | 15  Administration to K.Jam Productions of $18,000 and K.Jam |
| | 16  Media of $33,000; correct? |
| | 17     A   That's what it says. |
| | 18        MR. WIECHERT:  Objection.  No foundation. |
| | 19  There's no foundation as to whether you know whether |
| 11:16:55 | 20  transfers occurred or not. |
| | 21        MR. WALKER:  I would -- I would ask Counsel |
| | 22  again to please conform his objections to the rules. |
| | 23        MR. WIECHERT:  I am, Counsel.  She didn't |
| | 24  create this document.  You haven't laid a foundation as |
| 11:17:07 | 25  to whether she has any personal knowledge about any of |

Page 56

| | |
|---|---|
| 11:17:07 | 1   those transfers. |
| | 2   BY MR. WALKER: |
| | 3      Q   Ma'am, my question was, did you maintain a |
| | 4   spreadsheet for K.Jam Productions or K.Jam Media? |
| 11:17:15 | 5      A   I have no. |
| | 6      Q   And do you know why you did not? |
| | 7      A   Because nobody ever told me to.  Or because I |
| | 8   never had access to anything.  I cannot create something |
| | 9   that I don't have access to. |
| 11:17:30 | 10     Q   So to the extent that Swartz IP Services Group |
| | 11  transferred $50,000 to Integrated Administration, you |
| | 12  would not have maintained a spreadsheet to show how that |
| | 13  money went from Integrated to either K.Jam Productions |
| | 14  or K.Jam Media? |
| 11:17:50 | 15     A   No. |
| | 16        MR. WIECHERT:  Assumes facts not in evidence. |
| | 17  BY MR. WALKER: |
| | 18     Q   And I take it that's largely because Kia Jam |
| | 19  did not ask you to create a spreadsheet for his |
| 11:17:58 | 20  companies; correct? |
| | 21        MR. MCGONIGLE:  Object to that.  It's -- |
| | 22  there's no foundation.  It's argumentative. |
| | 23        You can answer it. |
| | 24        THE WITNESS:  I'm sorry.  I forget the |
| 11:18:06 | 25  questions.  I really apologize. |

Page 57

| | |
|---|---|
| 11:18:09 | 1   BY MR. WALKER: |
| | 2      Q   I take it that the reason that you didn't have |
| | 3   a spreadsheet for either Integrated Administration, |
| | 4   K.Jam Productions, or K.Jam Media was because Kia Jam |
| 11:18:19 | 5   did not ask you to prepare a spreadsheet or maintain a |
| | 6   spreadsheet for those companies? |
| | 7         MR. MCGONIGLE:  Same objection. |
| | 8   BY MR. WALKER: |
| | 9      Q   Is that correct? |
| 11:18:27 | 10     A   I would assume so, yes. |
| | 11     Q   And I take it that you also did not have access |
| | 12  to the bank accounts for Integrated Administration, |
| | 13  K.Jam Productions, or K.Jam Media? |
| | 14     A   I have not, no. |
| 11:18:42 | 15     Q   Is that true at all times, that you never had |
| | 16  access to the bank accounts of Integrated |
| | 17  Administration, K.Jam Productions, or K.Jam Media? |
| | 18        MR. MCGONIGLE:  I'll object to that as |
| | 19  compound. |
| 11:18:53 | 20        MR. WALKER:  Well, let me -- I'll go ahead and |
| | 21  break up to address the objection. |
| | 22  BY MR. WALKER: |
| | 23     Q   Have you, at any time, ever had access to the |
| | 24  bank accounts of Integrated Administration? |
| 11:19:02 | 25     A   Not as far as I recall. |

15  (Pages 54 to 57)

Frymi Biedak                                           03-25-19

---

Page 58

| | |
|---|---|
| 11:19:04 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:19:14 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 11:19:32 | 10 |

1    Q   Have you, at any time, had access to the bank
2  accounts of K.Jam Productions?
3    A   Definitely not.
4    Q   Have you, at any time, had access to the bank
5  records for K.Jam Media?
6    A   Definitely not.
7    Q   Now, going on to the next page, we see the
8  chart reflects that of the $18,000 that went to K.Jam
9  Productions, that that was transferred to Zarrinkelk
10  Kashefipour?
11    A   That's what it says.
12    Q   Okay.  And are you familiar with the entity --
13  the Zarrinkelk?
14    A   To the best of my knowledge, they were an
15  accounting firm.
16    Q   Okay.  And did the Zarrinkelk accounting firm
17  provide accounting services for both Mr. Jam's
18  companies, as well as Mr. Bergstein's companies?
19    A   I don't think they provided services to
20  Mr. Bergstein.  But I'm not sure.  I'm real -- I really
21  don't know.
22    Q   Did you understand that Mr. Zarrinkelk was only
23  Kia Jam's accountant?
24    A   I wouldn't know one way or the other.
25    Q   Going down there towards the bottom of that

---

Page 59

1  chart, from K.Jam Media, we see it reflects that $13,000
2  was transferred to K.Jam House.
3         Is that just Mr. Jam's home?
4    MR. WIECHERT:  Objection.  No foundation.
5    THE WITNESS:  I have no idea.
6  BY MR. WALKER:
7    Q   Do you --
8    A   I have no idea.
9    Q   Ma'am, I'm going to hand you what's been marked
10  as Exhibit 6.
11    A   Are we done with this now?
12    Q   Yes, ma'am.  We are.  Thank you.
13         (Exhibit 6 was marked for
14         identification by the Court Reporter
15         and is attached hereto.)
16  BY MR. WALKER:
17    Q   Now, can you identify Exhibit 6 as the Texas
18  notice of delinquent franchise tax that was issued for
19  Swartz IP Services Group, Inc.?
20    A   That's what it says, yes.
21    Q   And it says that the date of delinquency up in
22  the upper right corner was May 17, 2011; correct?
23    A   That's what it says.
24    Q   And it states the reason for the delinquency
25  was that the original franchise tax report was not

---

Page 60

1  filed; correct?
2    A   That's what it -- that's what it says on the --
3  on the document, yes.
4    Q   And, likewise, it states that a complete signed
5  public information report, form 05-102 was also not
6  filed; correct?
7    A   That's what it says, yes.
8    Q   Okay.  Were those forms and tax reports ever
9  filed with the state of Texas, to your knowledge?
10    A   I am -- I vaguely remember -- and that is
11  really vaguely -- that something was filed.  But I think
12  for a prior year for this Swartz IP Services with the
13  franchise tax.  But I think was -- and I actually think
14  Scott Woodward did a filing.  I -- I vaguely remember
15  that one.  But this is the only one, because I think
16  something needed to be done and he was -- he is a CPA,
17  Scott Woodward.  And I think he did the filing with
18  Texas.
19    Q   For the 2010 year?
20    A   That's the way -- I think so.  It was -- it
21  was -- I think this one -- I think it was for the
22  previous year.  It was filed for one year, but I don't
23  remember for which year.
24    Q   Okay.  And was Swartz IP Services Group, Inc.,
25  to your knowledge, allowed to forfeit its charter in

---

Page 61

1  Texas?
2    A   I have no idea.  I don't know.
3    Q   Going to the bottom left of Exhibit 6, Swartz
4  IP Services Group, Inc., listed a 10101 Fondren Road,
5  Suite 515 address in Houston, Texas.
6         Do you know why that address was used?
7    A   I have no idea.
8    Q   Do you know what was located at that address?
9    A   I have no idea.
10    Q   I'm going to hand you what's been marked as
11  Exhibit 7, ma'am.
12         (Exhibit 7 was marked for
13         identification by the Court Reporter
14         and is attached hereto.)
15  BY MR. WALKER:
16    Q   Now, Plaintiff's Exhibit 7 that I've handed you
17  is two pages, and it has a list of entities with related
18  information; correct?
19    A   Yes.
20    Q   Okay.  Was this a list that you created?
21    A   It looks like something that I may have
22  created, yes.
23    Q   Okay.  And --
24    A   I think I did it with the office manager at the
25  time.

Timestamps for Page 60: 11:21:29, 11:21:38, 11:21:58, 11:22:18, 11:22:32, 11:22:49

Timestamps for Page 61: 11:22:53, 11:23:02, 11:23:23, 11:23:27, 11:23:48, 11:23:55

Timestamps for Page 59: 11:20:19, 11:20:31, 11:20:54, 11:20:58, 11:21:15, 11:21:25

Additional timestamps for Page 58: 11:19:46, 11:20:04, 11:20:17

Frymi Biedak                                                03-25-19

Page 62

| | |
|---|---|
| 11:23:55 | 1 | Q  Who would have been whom? |
| | 2 | A  That would have been Steven Piskula. |
| | 3 | THE COURT REPORTER:  Steven who? |
| | 4 | THE WITNESS:  Steven Piskula.  P as in papa, I, |
| 11:24:02 | 5 | S as in Sam, K as in kite, U as in unicorn, L as in |
| | 6 | Larry, A as in apple.  First name is Steven. |
| | 7 | BY MR. WALKER: |
| | 8 | Q  Okay.  And what was the purpose of creating |
| | 9 | this form? |
| 11:24:23 | 10 | A  I can only assume that I was instructed by |
| | 11 | somebody to put together a form of entities and their |
| | 12 | EIN numbers. |
| | 13 | Q  Now, by my count -- well, let me ask you this: |
| | 14 | When you look at the second page, is it -- is the second |
| 11:24:41 | 15 | page, was it intended to be a second page or is that |
| | 16 | simply another column that should appear on the right of |
| | 17 | what the first page is? |
| | 18 | A  I don't know why this is not the same format as |
| | 19 | this one.  I have no idea. |
| 11:25:10 | 20 | Q  Do you recognize the -- the chart with the name |
| | 21 | of entity and the EIN number on the second page of |
| | 22 | Exhibit 7? |
| | 23 | A  When you say recognize, what do -- |
| | 24 | Q  Yes, ma'am.  Is that a separate document or |
| 11:25:25 | 25 | chart that you created? |

Page 63

| | |
|---|---|
| 11:25:26 | 1 | A  I would not know one way or the other.  I don't |
| | 2 | think that I would create something with -- like, I -- I |
| | 3 | think I probably would have followed this.  I'm very |
| | 4 | consistent.  I probably would have done the same format. |
| 11:25:36 | 5 | Why this is chopped up, I don't know. |
| | 6 | Q  Do you recall the purpose for creating this? |
| | 7 | Just that someone instructed you to do it? |
| | 8 | A  I would assume so. |
| | 9 | Q  And why were these 17 entities selected to be |
| 11:25:50 | 10 | included within this chart? |
| | 11 | A  I have no way knowing of one or the other. |
| | 12 | Q  Okay.  Now, this reflects -- and you're welcome |
| | 13 | to check my accounting if you like -- but this reflects |
| | 14 | that 10 entities were formed in 2011; is that correct? |
| 11:26:07 | 15 | A  If that's what it says here. |
| | 16 | Q  And those entities would include Integrated |
| | 17 | Administration; correct? |
| | 18 | A  That's what it says here, yes. |
| | 19 | Q  It shows that six entities were formed in 2010, |
| 11:26:27 | 20 | including Swartz IP Services here, yes.  Inc.; correct? |
| | 21 | A  That was it says here, yes.  No, wait.  Okay. |
| | 22 | Q  And it shows one entity, K.Jam Media, Inc., was |
| | 23 | created in 2007; correct? |
| | 24 | A  That's what it says, yes. |
| 11:26:49 | 25 | Q  Does that refresh your recollection as to why |

Page 64

| | |
|---|---|
| 11:26:51 | 1 | these 17 entities appeared in this particular chart? |
| | 2 | A  No. |
| | 3 | Q  And what was your understanding of the purpose |
| | 4 | for forming all of those 16 entities over the course of |
| 11:27:06 | 5 | the 2010 and 2011 years? |
| | 6 | MR. WIECHERT:  The question is compound.  Also |
| | 7 | no foundation. |
| | 8 | THE WITNESS:  I did not form all of -- I formed |
| | 9 | only a few, as far as I recollect. |
| 11:27:19 | 10 | BY MR. WALKER: |
| | 11 | Q  Okay.  And do you recall -- or could you point |
| | 12 | us to those few that you formed? |
| | 13 | A  I try.  I think -- and I'm not sure.  I think I |
| | 14 | formed -- I may have formed CAC Group maybe. |
| 11:27:56 | 15 | Q  Okay.  What else? |
| | 16 | A  Cyrano Group. |
| | 17 | Q  All righty. |
| | 18 | A  Maybe Tristate Lighting Inc. |
| | 19 | Well, these are the same.  These are -- these |
| 11:28:34 | 20 | are the same as these one, no? |
| | 21 | Q  It appears that they are, yes, ma'am. |
| | 22 | A  I think -- that's from what I recall.  That's |
| | 23 | what I think I may have formed. |
| | 24 | Q  Now, some of the companies on the first page of |
| 11:28:50 | 25 | Exhibit 7 were incorporated in Delaware; correct? |

Page 65

| | |
|---|---|
| 11:28:55 | 1 | A  Yes. |
| | 2 | Q  And some were incorporated in California; |
| | 3 | correct? |
| | 4 | A  Yes. |
| 11:29:00 | 5 | Q  And one, Swartz IP Services Group, Inc., was |
| | 6 | incorporated in Texas; correct? |
| | 7 | A  That's what it says, yes. |
| | 8 | Q  Who made the decision as to which state each |
| | 9 | entity would be incorporated in? |
| 11:29:14 | 10 | MR. WIECHERT:  It's compound. |
| | 11 | THE WITNESS:  I can only speak of the -- of the |
| | 12 | entities that I think I may have formed. |
| | 13 | BY MR. WALKER: |
| | 14 | Q  All right, ma'am.  Who made the decision as to |
| 11:29:26 | 15 | which states the entities that you named as -- that you |
| | 16 | were possibly involved in forming, who made the decision |
| | 17 | as to which state those entities would be incorporated |
| | 18 | in? |
| | 19 | A  I would say that at that time, I would have |
| 11:29:42 | 20 | received instructions from David Bergstein. |
| | 21 | Q  Now, K.Jam Media is included in this list; |
| | 22 | correct? |
| | 23 | A  It is, yes. |
| | 24 | Q  And you understood that to be Kia Jam's |
| 11:29:55 | 25 | company? |

17  (Pages 62 to 65)

Frymi Biedak                                    03-25-19

Page 66

11:29:56   1    A   An entity connected with Kia Jam, one way or
2    the other.
3    Q   And Integrated Administration is also listed on
4    this particular list; correct?
11:30:07   5    A   Correct.
6    Q   And you understood that Integrated
7    Administration was a Kia Jam company?
8        MR. WIECHERT:  Objection.  Call for a
9    conclusion.  No foundation.
11:30:16  10        MR. MCGONIGLE:  And I'll object to it.  No
11   foundation.  It's vague.
12       THE WITNESS:  So do I need to answer this now?
13       MR. MCGONIGLE:  You can answer it.
14       THE WITNESS:  Oh.  The way I see it, Integrated
11:30:26  15   Administration was connected with Kia Jam.
16   BY MR. WALKER:
17   Q   Were there any other companies on this list
18   that you understood were connected, as you say, with
19   Kia Jam?
11:30:47  20   A   I -- most of these entities I don't even -- I
21   don't -- if I haven't formed them, I couldn't tell you.
22   Q   Okay.
23   A   I wouldn't -- I wouldn't know.
24   Q   What does the column signify when it says that
11:31:06  25   those entities are responsible parties?

Page 67

11:31:09   1    A   A responsible party is when you file for an EIN
2    number online, it asks you for a responsible party.  And
3    that would be the responsible party.
4    Q   Who determined which company would be listed as
11:31:26   5   the responsible party for any of the entities on the
6    left side of this chart?
7    A   I most likely must have asked either -- I guess
8    in this case I would have probably asked David Bergstein
9    whoever the attorney was at the time there.  The
11:31:47  10   in-house counsel, maybe.
11   Q   With respect to Integrated Administration or
12   K.Jam Media or CAC Group, would you have asked Mr. Jam
13   for that information?
14   A   Those ones I did not apply for an EIN number,
11:32:06  15   so I don't know.  Because if there is a question mark --
16   and there is two question mark, so I did not apply for
17   this.
18   Q   Okay.  So I take it that with respect to CAC
19   Group, Inc., Integrated Administration, and K.Jam Media,
11:32:28  20   Inc., that you did secure that information from
21   Mr. Bergstein; is that correct?
22   A   Well, here it is question mark, so I don't -- I
23   probably didn't know at the time.  Wherever there is
24   question marks, I wouldn't know.
11:32:49  25   Q   All right.  Well, let's look at CAC Group,

Page 68

11:32:51   1   Inc., then.  The responsible party is listed as K.Jam
2    Media, Inc.  Did you secure that information as to whom
3    to designate as a responsible party from Mr. Jam?
4    A   I need to think about this for a second.
11:33:15   5       The way it goes with EIN numbers -- and I'm
6    going to have to explain this -- when you have applied
7    online for an EIN number and you want to list this same
8    entity as applying for another -- for another EIN, you
9    cannot do it online.  You need to do it via facsimile.
11:33:40  10   So I don't remember applying for this EIN number.  If --
11   Q   Which one, ma'am, that you're pointing to?
12   A   We are talking the CAC Group, Inc.
13   Q   Yes, ma'am.  Thank you.
14   A   And if it says K.Jam Media, Inc., I don't think
11:34:02  15   that I have applied for this online.
16   Q   So when you listed K.Jam Media, Inc., as the
17   responsible party for CAC Group Inc., who gave you that
18   information?  Was it Kia Jam?
19   A   I don't think I -- I -- I don't think I would
11:34:26  20   have taken instructions from David Bergstein to -- to --
21   to put K.Jam Media, Inc., on an -- as a responsible
22   party.  I don't think so.
23   Q   So is it likely then that you took those
24   instructions from Kia Jam?
11:34:38  25   A   I don't know one way or the other.

Page 69

11:34:42   1    Q   Okay.  Where did you secure the employer
2    identification number that's listed on this chart for
3    CAC Group, Inc., K.Jam Media, Inc., and Integrated
4    Administration?  Would that have come from Mr. Jam?
11:35:08   5    A   I don't want to really assume, so I don't -- I
6    mean, it def-- it didn't have it.
7    Q   But you did have it at the time you created
8    this chart; correct?
9    A   Yeah, I put it there.  It could have come also
11:35:24  10   from his accountant.
11   Q   Okay.  Fair enough.
12       So you were working with Mr. Jam's accountant,
13   for example, on this type of project?
14   A   Well, working with is not really a -- I
11:35:40  15   couldn't really say working with his -- no.
16   Q   If you went to Mr. Jam's accountant and
17   requested information regarding his companies, the
18   accountant would provide it to you; correct?
19       MR. WIECHERT:  Objection.  Calls for
11:35:53  20   speculation.  No foundation.
21       THE WITNESS:  I would not call him on my own
22   unless Mr. -- unless Kia Jam would have said to me, "You
23   can call  Majid and find out."
24   BY MR. WALKER:
11:36:09  25   Q   Okay.  So you believe that it's likely that

18  (Pages 66 to 69)

Frymi Biedak                                                                03-25-19

Page 70

11:36:11   1    Mr. Jam approved your contacting his accountant to get
           2    the information about from Mr. Jam's companies --
           3        MR. WIECHERT:  Assumes --
           4    BY MR. WALKER:
11:36:17   5        Q    -- that we see on that particular chart?
           6        MR. WIECHERT:  Assumes facts not in evidence.
           7        THE WITNESS:  I'm sorry.  Can you repeat?
           8    BY MR. WALKER:
           9        Q    Yes.  Do you believe then that Mr. Jam
11:36:28  10    authorized you to contact his accountant to secure the
          11    information regarding his three companies, CAC Group,
          12    Integrated, and K.Jam Media, that appears on the chart
          13    that we've marked as Exhibit 7?
          14        A    I would have not contacted somebody who is not
11:36:44  15    belonging to -- who is not directly connected with David
          16    Bergstein based on just -- like, I wouldn't contact your
          17    assistant without you giving me assist -- permission.
          18        Does this answer your question?
          19        Q    Do you believe then that, given your normal
11:37:01  20    practices, that Mr. Jam would have authorized you
          21    contact his accountant to secure the information
          22    regarding his three companies that appears in the chart
          23    we've marked as Exhibit 7?
          24        A    That's how I do.  That's how I normally react.
11:37:17  25    That I'm not -- if it's -- if something is -- it doesn't

Page 71

11:37:21   1    really matter who it is I need to get permission to --
           2    to contact the other person.
           3        Q    So do you believe then that you secured
           4    permission from Mr. Jam to contact his accountant to
11:37:31   5    secure the information regarding his three companies
           6    that appears in the chart that we've marked as
           7    Exhibit 7?
           8        MR. WIECHERT:  Calls for speculation.
           9        THE WITNESS:  Unless he had given me the
11:37:42  10    information himself.
          11    BY MR. WALKER:
          12        Q    Okay.  Thank you, ma'am.
          13        Let me hand you what's been marked as
          14    Exhibit 8.
11:37:51  15        (Exhibit 8 was marked for
          16         identification by the Court Reporter
          17         and is attached hereto.)
          18    BY MR. WALKER:
          19        Q    Now, there are on the bottom two-thirds of
11:38:06  20    Exhibit 8, is that an e-mail from you to Effie Stern on
          21    November 2, 2011?
          22        A    That's what it says, yes.
          23        Q    And was frymi@grayboxllc.com the e-mail address
          24    that you were using on that date?
11:38:22  25        A    At that time, yes.

Page 72

11:38:24   1        Q    As of November 2, 2011, did you have more than
           2    one e-mail address?
           3        A    I may have had -- can you hear me -- I may have
           4    had an e-mail address -- and I'm not sure.  Maybe
11:38:51   5    fbiedak@kjammedia.com.  It's possible.
           6        Q    Okay.  So you believe that it's possible that
           7    you had a kjammedia.com e-mail address and a
           8    grayboxllc.com e-mail address as of --
           9        A    That's very possible, yes.
11:39:07  10        Q    Okay.  And that was as of November 2, 2011,
          11    that time frame?
          12        A    I don't know which time frame, but it's -- I
          13    don't remember the time frame.
          14        Q    Okay.  But you believe that you had both e-mail
11:39:18  15    addresses at one time?
          16        A    I think so.
          17        Q    Now, looking at your e-mail here to Mr. Stern,
          18    who was Mr. Stern?
          19        A    Effie Stern, he worked for VCorp Services.  He
11:39:36  20    was a representative, then.
          21        Q    Now, you list yourself at the bottom of your
          22    e-mail as assistant to David Bergstein; correct?
          23        A    Yes.
          24        Q    And you say:  "Hi Effie, it was nice meeting
11:39:55  25    you over the phone."

Page 73

11:39:56   1        As of November 2, 2011, had you not previously
           2    worked with Mr. Stern?
           3        A    No.
           4        Q    You go on to state:  "As discussed, following
11:40:07   5    is a list of entities that VCorp has formed end of last
           6    year per request of Aaron Grunfeld, Esquire."
           7        Did I read that correctly?
           8        A    Yes, you did.
           9        Q    Okay.
11:40:20  10        A    Excuse me for one second.
          11        Q    Of course, ma'am.  And we can take a break if
          12    you need to take a break.
          13        A    That's okay.  I have very bad allergies.
          14        So I'm good now.
11:40:47  15        Q    Okay.  Are you -- are you okay to --
          16        A    Yes.
          17        Q    -- continue?
          18        A    Yeah.
          19        Q    Okay.  Thank you very much.
11:40:54  20        All right.  So there were six entities formed
          21    that are referenced in your e-mail; correct?
          22        A    Yes.
          23        Q    And what was the purpose of your e-mail to
          24    Mr. Stern?
11:41:14  25        A    I think the way I understand it now is that

19  (Pages 70 to 73)

Frymi Biedak                                                                  03-25-19

Page 74

| | | |
|---|---|---|
| 11:41:24 | 1 | when I form an entity, I always form it with Parasec. |
| | 2 | That's the only service I use because I've been -- I -- |
| | 3 | I like them more.  And I think -- and they always send |
| | 4 | me notifications that you need to do this, you need to |
| 11:41:37 | 5 | file it, whatever. |
| | 6 | And I -- I did not have any -- any documents on |
| | 7 | these entities.  So when I would have -- the way -- I |
| | 8 | can only vaguely remember that I assume that I asked |
| | 9 | Mr. Grunfeld how to get information of this.  And then I |
| 11:41:53 | 10 | called Effie Stern, or sent him an e-mail asking about |
| | 11 | what was due, what needed to be done on these entities |
| | 12 | in order not to miss any filings or whatever. |
| | 13 | But that's just the way I see it from reading |
| | 14 | it. |
| 11:42:06 | 15 | Q   Now, you copied on your e-mail a |
| | 16 | jeffreymsolomon@me.com; correct? |
| | 17 | A   Yes. |
| | 18 | Q   And what was that gentleman's role in the |
| | 19 | context of this communication? |
| 11:42:18 | 20 | A   I think -- I think he was hired to -- to deal |
| | 21 | with the -- to put together the corporate records of |
| | 22 | these entities.  I think he was an attorney, actually. |
| | 23 | Q   And david@abcxyz.cc was David Bergstein's |
| | 24 | address? |
| 11:42:41 | 25 | A   Yes. |

Page 75

| | | |
|---|---|---|
| 11:42:42 | 1 | Q   Okay.  Do you know why he would use an e-mail |
| | 2 | address with a Chinese domain? |
| | 3 | A   I didn't even know it was Chinese. |
| | 4 | Q   The dot cc? |
| 11:42:54 | 5 | A   I would not know that. |
| | 6 | Q   Do you know why he would use an e-mail with a |
| | 7 | Chinese domain that would delete automatically after 30 |
| | 8 | days? |
| | 9 | MR. WIECHERT:  Objection.  Assumes facts not in |
| 11:43:04 | 10 | evidence. |
| | 11 | THE WITNESS:  That's the first -- |
| | 12 | MR. MCGONIGLE:  Same objection.  There's no |
| | 13 | foundation for it. |
| | 14 | THE WITNESS:  I don't have the slightest idea. |
| 11:43:14 | 15 | I didn't even know anything about that. |
| | 16 | BY MR. WALKER: |
| | 17 | Q   When did Mr. Bergstein start using the |
| | 18 | abcxyz.cc domain for his e-mail? |
| | 19 | A   I have no idea. |
| 11:43:26 | 20 | Q   Did he have other e-mail addresses that he used |
| | 21 | at this same time? |
| | 22 | A   I thought he always used |
| | 23 | dbergstein@grayboxllc.com. |
| | 24 | Q   So you were aware of at least one other e-mail |
| 11:43:40 | 25 | address that he had? |

Page 76

| | | |
|---|---|---|
| 11:43:41 | 1 | A   That's the one that I used when I -- when I ... |
| | 2 | Q   Except, of course, in this instance, you -- you |
| | 3 | provided him a courtesy copy -- |
| | 4 | A   Apparently. |
| 11:43:52 | 5 | Q   Okay.  So you were -- you were also using the |
| | 6 | abcxyz.cc domain as well in your communications with |
| | 7 | Mr. Bergstein; correct? |
| | 8 | A   Well, I -- here is -- I will just try to look |
| | 9 | at this one.  What -- what's -- what's weird here, |
| 11:44:16 | 10 | because apparently I sent the e-mail at 5:40 p.m.  And |
| | 11 | then he responds at 5:24 p.m.:  "Thanks.  We will look |
| | 12 | into this." |
| | 13 | Q   Uh-huh. |
| | 14 | A   Which seems a little bit odd to me. |
| 11:44:29 | 15 | Q   Well, the clock on either his computer or yours |
| | 16 | was off. |
| | 17 | A   Apparently, yes. |
| | 18 | Q   Okay.  But going back to the courtesy copy of |
| | 19 | the e-mail that you drafted, clearly you were aware of |
| 11:44:43 | 20 | and utilized David Bergstein's abcxyz.cc domain? |
| | 21 | A   Would I assume, yes. |
| | 22 | Q   And then, of course, you copied |
| | 23 | kiajam@kjammedia.com; correct? |
| | 24 | A   Yes.  Yeah. |
| 11:44:57 | 25 | Q   Was it common when you were discussing matters |

Page 77

| | | |
|---|---|---|
| 11:45:01 | 1 | regarding entities such as the six that we see on |
| | 2 | Exhibit 8 for you to copy both Mr. Bergstein and |
| | 3 | Mr. Jam? |
| | 4 | MR. WIECHERT:  The question is vague and |
| 11:45:10 | 5 | ambiguous. |
| | 6 | THE WITNESS:  I don't -- I don't even know why |
| | 7 | I -- why I copied Jeffrey Solomon on this e-mail.  I |
| | 8 | have no idea how -- what -- what made me copy these |
| | 9 | three -- well, I don't know why I copied these people. |
| 11:45:39 | 10 | I couldn't tell you. |
| | 11 | BY MR. WALKER: |
| | 12 | Q   Yes, ma'am.  But my question, with all respect, |
| | 13 | was, was it relatively common for you to include Mr. Jam |
| | 14 | and Mr. Bergstein on your e-mails? |
| 11:45:49 | 15 | MR. WIECHERT:  The question is vague and |
| | 16 | ambiguous. |
| | 17 | BY MR. WALKER: |
| | 18 | Q   During this same time frame? |
| | 19 | MR. MCGONIGLE:  Relating to these entities? |
| 11:45:55 | 20 | BY MR. WALKER: |
| | 21 | Q   I would like to take a half a step back to your |
| | 22 | normal business practices -- |
| | 23 | A   Okay. |
| | 24 | Q   -- around the 2010, 2011 time frame.  Was it a |
| 11:46:05 | 25 | customary practice for you to copy both Mr. Bergstein |

Frymi Biedak                                                      03-25-19

---

Page 78

```
11:46:09    1    and Mr. Jam on your communications regarding their
            2    companies?
            3         MR. WIECHERT:  Same objections.
            4         THE WITNESS:  If I copied either of -- if I
11:46:16    5    copied any of three people, they must have given me
            6    instructions:  Get the information and copy X, Y, Z.
            7    That's the way I can only understand it.  But somebody
            8    must have given me instruction because I usually -- I
            9    don't -- there must have had some sort of a relationship
11:46:41   10    was what was going on in this e-mail.  So somebody must
           11    have given me instructions whom to copy.
           12         MR. WALKER:  Okay.
           13         MR. WIECHERT:  Move to strike the answer as
           14    speculation.  No foundation.
11:46:50   15    BY MR. WALKER:
           16    Q    Now, with respect to the six entities that are
           17    listed in your e-mail, Hojo Capital Partners Corp. is
           18    the first one; correct?
           19    A    Yes.
11:46:59   20    Q    As of November 2, 2011, did Hojo Capital have
           21    any actual employees?
           22    A    Not that I'm aware of.
           23    Q    The second item is Kambe Asset Management
           24    Group, Inc.
11:47:13   25         Do you see that?
```

Page 79

```
11:47:14    1    A    Yes, I see it.
            2    Q    As of November 2011, did Kambe Asset have any
            3    actual employees?
            4    A    Not as far I -- not as far as I know, which
11:47:24    5    doesn't mean anything.
            6    Q    The third company is Owari Opus, Inc.; correct?
            7    A    That's what -- yes.
            8    Q    As of November 2011, did Owari Opus, Inc., have
            9    any actual employees?
11:47:37   10    A    No.
           11    Q    As to the next company --
           12    A    I mean, not to the best of my knowledge.  I'm
           13    sorry.  I really don't.
           14    Q    The next company, Gion Funding Settlements,
11:47:47   15    Inc., did that entity, as of November 2011, have any
           16    actual employees?
           17    A    Not that I am aware of.
           18         And when you say employees, you refer to
           19    payroll, payroll taxes -- yeah, I don't think so.
11:48:07   20    Q    With respect to Swartz IP Services Group, Inc.,
           21    as November 2, 2011, did that company have any actual
           22    employees?
           23    A    Not to the best of my knowledge.
           24    Q    And Nobunaga Unity, LLC, as of November 2,
11:48:22   25    2011, did that company have any actual employees?
```

Page 80

```
11:48:26    1    A    Not to the best of my knowledge, no.
            2    Q    Ma'am, let me hand you what's been marked as
            3    Exhibit 9.
            4         (Exhibit 9 was marked for
11:48:50    5          identification by the Court Reporter
            6          and is attached hereto.)
            7    BY MR. WALKER:
            8    Q    And I would like to direct your attention first
            9    to the e-mail toward the bottom from a
11:49:00   10    jswoodwardcpa@aol.com to you with certain courtesy copy
           11    recipients.
           12         Do you see that?
           13    A    Yes, I do.
           14    Q    And it's dated November 8, 2011?
11:49:13   15    A    Yes.
           16    Q    What was Mr. Woodward's or Ms. Woodward's role?
           17    A    It's Scott Woodward, so it's Mister.
           18    Q    Thank you.  What was Scott Woodward's role in
           19    all of this?
11:49:27   20    A    He is a CPA.
           21    Q    And was he retained for all the various
           22    entities that we've discussed as a CPA for those
           23    entities?
           24    A    I think he was the one who filed that one
11:49:41   25    return with the franchise tax that we talked before.  I
```

Page 81

```
11:49:45    1    think he was one who, I guess, helped with reinstating
            2    the entity.
            3    Q    Okay.
            4    A    I think.
11:49:53    5    Q    Okay.  You think Mr. Woodward filed the 2010
            6    return for the franchise return in Texas for Swartz IP?
            7    A    I think so, yes.
            8    Q    But you don't know that whether or not the 2011
            9    franchise return was ever filed?
11:50:08   10    A    I don't know.
           11    Q    And he was sending this e-mail on November 8,
           12    2011, to you utilizing your grayboxllc.com address;
           13    correct?
           14    A    That's what it says, yes.
11:50:20   15    Q    Okay.  And there we see he was using David
           16    Bergstein's grayboxllc.com address; correct?
           17    A    Yes.
           18    Q    And he was sending it to Kia Jam as well;
           19    correct?
11:50:30   20    A    Correct.
           21    Q    All right.  So the subject of his e-mail is
           22    Swartz IP Services efile confirmation and filed forms
           23    attached.
           24         Did I read that correctly?
11:50:47   25    A    Yes, you did.
```

eLitigation Services, Inc. - els@els-team.com

Frymi Biedak                                                      03-25-19

## Page 82

11:50:48   1    Q   Okay.  And he just notes:  "Hi Frymi, I am
           2   sorry but when we spoke I was on my cell phone and I had
           3   a bad connection.  I have completed everything that you
           4   requested in your e-mail, though."
11:51:00   5        So, and then he describes what he had done;
           6   correct?
           7    A   Yes.
           8    Q   Now, Kia Jam responds with an e-mail to you
           9   approximately two and a half hours later; correct?
11:51:17  10    A   Yes.
          11    Q   And this was on November 8, 2011, at 9:39 p.m.;
          12   correct?
          13    A   Yes.
          14    Q   And he asks you:  "Is this the one that KJM
11:51:28  15   owns?"
          16        Did I read correctly?
          17    A   That's what it says.
          18    Q   And when you received this, did you understand
          19   that KJM was referring to K.Jam Media?
11:51:43  20    A   I -- I have no idea.  I really have no idea.
          21    Q   Okay.  And then the next day, at 11:50 a.m. you
          22   responded to Mr. Jam; correct?
          23    A   Yes.
          24    Q   Okay.  And the courtesy copy recipients include
11:52:01  25   David Bergstein at his abcxyz.cc address; correct?

## Page 83

11:52:07   1    A   Yes.  I wasn't very consistent.
           2    Q   And what does Jeff Solomon forwarder signify?
           3    A   I'm not a technical person, but sometimes
           4   people have, like, different e-mail addresses where it
           5   forwards directly to them.  So I'm -- I'm not very --
           6   that's the way I understand it.
           7    Q   Fair enough.  Now, in your e-mail to Mr. Jam on
           8   November 9, 2011, you respond to his question:  "Is this
           9   the one that KJM owns?" by stating:  "This is owned by
11:52:40  10   K.Jam and Owari, but K.Jam will be named as the
          11   responsible party when we file for an EIN number."
          12        Did I read that correctly?
          13    A   That's what it says.
          14    Q   Okay.  So you're referring there to Swartz IP
11:52:54  15   Services; correct?
          16    A   I -- I thought -- I don't know.  I mean, I --
          17   it doesn't seem -- because I thought that there -- there
          18   was an EIN number for Swartz IP Services at the time
          19   already, but I'm not sure.
11:53:25  20    Q   Okay.  But the first e-mail from Mr. Woodward
          21   references Swartz IP Services and certain filings that
          22   you requested of him; correct?
          23    A   Yes, yes.
          24    Q   And the second e-mail is from Mr. Jam to
11:53:37  25   yourself directly asking:  "Is this the one that KJM

## Page 84

11:53:43   1   owns"; right?
           2    A   That's what it says, yes.
           3    Q   And you understood at that time that he was
           4   referring to Swartz IP Services; correct?
11:53:52   5    A   I could not say one way or the other.  I
           6   really -- I mean, I understand what the e-mail says and
           7   I agree with you 100 percent.  I just -- I -- I don't
           8   think that I would have made -- I don't think that I
           9   would have made any -- and apparently -- because I don't
11:54:15  10   know who owns what.  I never understood that.  So why
          11   have -- I really don't know.
          12    Q   Well, clearly Mr. Jam asked you:  "Is this the
          13   one that KJM owns?" within the context of an e-mail
          14   regarding Swartz IP Services; right?
11:54:35  15    A   That's what the e-mail says.
          16    Q   And clearly your response was:  "This is owned
          17   by K.Jam and Owari, but K.Jam will be named as
          18   responsible party when -- when we file for an EIN
          19   number"; correct?
11:54:51  20    A   Yes, and -- and I don't think I filed for an
          21   EIN number for Swartz IP.  I don't remember myself
          22   filing for that.
          23    Q   So is it possible that as of November 9, 2011,
          24   you were expecting or anticipating that you would file
11:55:05  25   for one, but you had not done so as of that date?  And

## Page 85

11:55:07   1   that's why you're saying K.Jam will be named as
           2   responsible party when we file for an EIN number?
           3    A   That's what the e-mail suggests.
           4    Q   Okay.  And do you recall where you received the
11:55:21   5   information that as of November 9, 2011, that Swartz IP
           6   Services was owned by K.Jam and Owari?
           7    A   I have no idea why I wrote that.  I really
           8   don't.
           9    Q   Is there any reason that you can recall that as
11:55:38  10   of November 9, 2011, when you wrote this e-mail to
          11   Mr. Jam, that you would have been inaccurate or that you
          12   would have been dishonest about your answer?
          13    A   Well, definitely not --
          14        MR. WIECHERT:  Calls for speculation.  I'm
11:55:57  15   sorry.
          16        THE WITNESS:  I'm sorry.  I apologize.
          17        MR. WIECHERT:  Calls for speculation.  No
          18   foundation.
          19   BY MR. WALKER:
11:55:59  20    Q   Let me -- let me rephrase the question, ma'am.
          21   I wasn't trying to be offensive.
          22        When you wrote the e-mail to Mr. Jam on
          23   November 9, 2011, advising him that this is owned by
          24   K.Jam and Owari, but K.Jam will be named as responsible
11:56:11  25   party when we file for an EIN number, you had no reason

Frymi Biedak                                                    03-25-19

Page 86

| 11:56:15 | 1 | to be anything but accurate at that time; correct? |
| | 2 | MR. WIECHERT:  Objection again.  No foundation. |
| | 3 | THE WITNESS:  I -- again, I don't understand. |
| | 4 | That's not something that I would write now. |
| 11:56:31 | 5 | BY MR. WALKER: |
| | 6 | Q   Yes, ma'am.  But at the time that you wrote the |
| | 7 | top of the e-mail on November 9, 2011, to Mr. Jam |
| | 8 | answering his question:  "Is this the one that K.Jam |
| | 9 | owns?" and you advised him:  "This is owned by K.Jam and |
| 11:56:44 | 10 | Owari, but K.Jam will be named as responsible party when |
| | 11 | we file for an EIN number" -- |
| | 12 | A   EIN number. |
| | 13 | Q   -- was it your practice to be accurate and |
| | 14 | truthful in responding to Mr. Jam's questions? |
| 11:56:58 | 15 | A   Well, I would have definitely made an effort. |
| | 16 | Q   Let me hand you what's been marked as |
| | 17 | Exhibit 10.  Why don't we work through this and then we |
| | 18 | can take a lunch break. |
| | 19 | (Exhibit 10 was marked for |
| 11:57:13 | 20 | identification by the Court Reporter |
| | 21 | and is attached hereto.) |
| | 22 | MR. WALKER:  Are you doing okay, ma'am? |
| | 23 | THE WITNESS:  Yes, yes.  I'm fine. |
| | 24 | BY MR. WALKER: |
| 11:57:23 | 25 | Q   Okay, ma'am.  Exhibit 10 -- well, let me ask |

Page 87

| 11:57:25 | 1 | you this:  Could you review the various pages of |
| | 2 | Exhibit 10 and identify this collection of documents for |
| | 3 | me. |
| | 4 | A   Okay. |
| 11:58:48 | 5 | Q   Is Exhibit 10 a collection of records |
| | 6 | pertaining to Swartz IP Services? |
| | 7 | A   Yes. |
| | 8 | Q   On the first page we see an e-mail from you on |
| | 9 | November 9, 2011; correct? |
| 11:59:00 | 10 | A   Uh-huh. |
| | 11 | Q   And it's to mkatz@vcorpservices and |
| | 12 | sonali@vcorpservices; correct? |
| | 13 | A   Yes. |
| | 14 | Q   And you provided a courtesy copy to |
| 11:59:13 | 15 | Mr. Bergstein at his abcxyz.cc address; correct? |
| | 16 | A   Yes. |
| | 17 | Q   And you also provided a courtesy copy to |
| | 18 | Mr. Solomon and Kia Jam; correct? |
| | 19 | A   That's correct, yes. |
| 11:59:28 | 20 | Q   Now going to the second page of Exhibit 10, we |
| | 21 | see the certificate of formation for-profit corporation |
| | 22 | for Swartz IP Services Group Inc.; correct? |
| | 23 | A   Yes. |
| | 24 | Q   And again, with respect to the 10101 Fondren |
| 11:59:46 | 25 | Road, Suite 515, Houston, Texas, address, you have no |

Page 88

| 11:59:52 | 1 | personal knowledge as to what was located at that |
| | 2 | address? |
| | 3 | A   No. |
| | 4 | Q   Do you have any personal knowledge as to why |
| 11:59:58 | 5 | that address was selected for Swartz IP Services? |
| | 6 | A   No.  I have never seen -- I don't remember |
| | 7 | ever -- I mean, I must have seen it, but I have not -- |
| | 8 | maybe not noticed it. |
| | 9 | Q   Okay.  Down at the bottom right corner you see |
| 12:00:13 | 10 | a series of numbers.  It's jam, underscore, TT, |
| | 11 | underscore, and then 000 and then -- |
| | 12 | A   499 and -- |
| | 13 | Q   Okay.  Could you turn to 501, please. |
| | 14 | All right.  Now, this is a certificate of |
| 12:00:27 | 15 | filing of Advisory IP Services, Inc., formerly Swartz IP |
| | 16 | Services Group, Inc. |
| | 17 | Did I read that correctly? |
| | 18 | A   Yes. |
| | 19 | Q   Do you know why the name Swartz IP Services |
| 12:00:40 | 20 | Group, Inc., was changed to Advisory IP Services, Inc.? |
| | 21 | A   No.  I don't know. |
| | 22 | Q   You have no recollection or understanding as to |
| | 23 | why that name change was effectuated? |
| | 24 | A   No. |
| 12:00:56 | 25 | Q   Looking at Page 504.  Have you found that page? |

Page 89

| 12:01:03 | 1 | A   Yes. |
| | 2 | Q   Thank you.  That's executed and the printed or |
| | 3 | typed name states David Bergstein; correct? |
| | 4 | A   Yes. |
| 12:01:13 | 5 | Q   Okay.  Is that Mr. Bergstein's signature stamp |
| | 6 | that was used? |
| | 7 | A   Yes. |
| | 8 | Q   Okay.  Would you have affixed that signature |
| | 9 | stamp to this document? |
| 12:01:22 | 10 | A   I think so. |
| | 11 | Q   Was there a reason why Mr. Bergstein didn't |
| | 12 | sign that personally? |
| | 13 | A   Mr. Bergstein was not much in the office, so |
| | 14 | that's why we created the signature stamp in the first |
| 12:01:42 | 15 | place, so that when he was -- he was not in the office |
| | 16 | much. |
| | 17 | Q   Was Mr. Jam regularly in the office at this |
| | 18 | time? |
| | 19 | MR. WIECHERT:  Could we have a specification as |
| 12:01:51 | 20 | to what office, Counsel? |
| | 21 | BY MR. WALKER: |
| | 22 | Q   The office that you were in in November of |
| | 23 | 2011, what was that address? |
| | 24 | A   2425 Colorado. |
| 12:02:02 | 25 | Q   Okay.  Was Mr. Jam regularly in the office day |

23 (Pages 86 to 89)

Frymi Biedak                                                            03-25-19

## Page 90

12:02:05  1  to day as a normal course of business?
          2      A  I think Mr. Jam came -- as far as I recollect,
          3  I think he was there on a fairly regular basis, yes.
          4      Q  Now, going to page 518.  Let know what you find
12:02:25  5  that document.
          6      A  518?
          7      Q  Yes, ma'am.
          8      A  Okay.
          9      Q  All right.  Now, this is an amendment to
12:02:34 10  registration.  The legal name of the filing entity is
         11  Swartz IP Services Group, Inc., and it shows the
         12  registration is amended to change the legal name of the
         13  entity as amended in the entity's jurisdiction of
         14  formation.  The new name is IP Services Group, Inc.
12:02:52 15         Were you familiar with the fact that this name
         16  change was made to Swartz IP?
         17      A  No.  I thought -- I -- no.
         18      Q  Do you know what the purpose for that name
         19  change was?
12:03:09 20      A  I don't think --
         21         MR. WIECHERT:  Assumes facts not in evidence.
         22  No foundation.
         23         THE WITNESS:  I have to look at this one.
         24  BY MR. WALKER:
12:03:18 25      Q  Yes, ma'am.

## Page 91

12:03:20  1      A  I thought it was changed -- somehow I always
          2  thought that it was changed from Swartz IP Services
          3  Group, Inc., to Advisory IP Service.  That's -- that's
          4  the way I remember it.
12:03:34  5      Q  Right.  And that particular name change, as we
          6  saw on Page 501, was done and had an effective date of
          7  June 13, 2012; correct?
          8      A  I have to look at this.  One second.  June 13,
          9  2012; correct, yes.
12:03:54 10      Q  Okay.  So the effective date of the name change
         11  from Swartz IP Services Group, Inc., to Advisory IP
         12  Services, Inc., was June 13, 2012; correct?
         13      A  That's the way that what the document says,
         14  yes.
12:04:06 15      Q  Okay.  And I believe you testified that you
         16  don't have any personal knowledge as to why that name
         17  change was done?
         18      A  No.
         19      Q  Okay.  But if you look back at the other form,
12:04:16 20  the name change, which was Page 518.
         21      A  Yes.
         22      Q  Okay.  Now, that purports to change the name of
         23  Swartz IP Services Group, Inc., to IP Services Group,
         24  Inc.; correct?
12:04:34 25      A  That's what it says.

## Page 92

12:04:35  1      Q  Okay.  And that form was dated June 11, 2012;
          2  correct?  If you go to the next page.
          3      A  June 11, 2012.
          4      Q  Okay.  So that's two days before the name
12:04:54  5  change to Advisory Services Group, Inc.; correct?
          6      A  That's what it says.
          7      Q  Okay.  And on the form changing the name to IP
          8  Services Group, Inc., dated June 11, 2012, again we see
          9  Mr. Bergstein's signature stamp was affixed; correct?
12:05:16 10      A  Apparently, yes.
         11      Q  Okay.  And did you do that?
         12      A  I would assume so, yes.
         13      Q  Okay.  And does looking at this refresh your
         14  recollection as to why Swartz IP Services Group, Inc.,
12:05:28 15  had its name changed twice over a two-day period?
         16      A  I did not remember this one, this IP Services
         17  Group, Inc.
         18      Q  Do you mind if we go through one set -- one
         19  more exhibit?
12:05:45 20      A  Not at all.
         21      Q  Okay.  Then we'll take a lunch break.
         22         MR. WALKER:  What time is it?
         23         MR. MCGONIGLE:  It is 12:09.
         24         MR. WALKER:  Okay.
12:05:54 25         MR. WIECHERT:  When do you want to return?

## Page 93

12:05:58  1         MR. WALKER:  Sir?
          2         MR. WIECHERT:  An hour or you want to do less?
          3         MR. WALKER:  I was going to go through one more
          4  exhibit.  She said she'd go through one more.
12:06:02  5         MR. WIECHERT:  Oh, I'm sorry.  Okay.
          6  BY MR. WALKER:
          7      Q  Ma'am, let me hand you what's been marked as
          8  Exhibit 11.
          9         (Exhibit 11 was marked for
12:06:14 10          identification by the Court Reporter
         11          and is attached hereto.)
         12  BY MR. WALKER:
         13      Q  Does Exhibit 11 appear to be checks drawn on
         14  the Swartz IP Services Group, Inc., account?
12:06:33 15      A  Yes.
         16      Q  Okay.  Now, the first check is dated
         17  December 9, 2011; correct?  On the first page of
         18  Exhibit 11?
         19      A  Yes.
12:06:44 20      Q  Okay.  And that check was payable to cash?
         21      A  Yes.
         22      Q  For $6,000?
         23      A  Yes.
         24      Q  And I take it that was a counter check?
12:06:58 25      A  When you say co--- what other checks are

Frymi Biedak                                      03-25-19

---

Page 94

| | | |
|---|---|---|
| 12:07:00 | 1 | there? |
| | 2 | Q   Well, in other words, the check that we see for |
| | 3 | $6,000 payable to cash dated December 9, 2011, was not |
| | 4 | on a check that had the Swartz IP name or address |
| 12:07:16 | 5 | printed on it? |
| | 6 | A   It must have been maybe a temporary check. |
| | 7 | Q   Okay.  So was this one of the first checks that |
| | 8 | was cashed on the Swartz IP account? |
| | 9 | A   It's didn't have access to the Swartz.  I |
| 12:07:26 | 10 | didn't keep a spreadsheet on the Swartz IP account, as I |
| | 11 | said before. |
| | 12 | Q   Okay.  Who had access to the Swartz IP bank |
| | 13 | account at this time? |
| | 14 | A   I -- not me. |
| 12:07:39 | 15 | Q   Okay.  Was there a reason that you were not |
| | 16 | provided access to the Swartz IP bank account? |
| | 17 | A   I -- I don't know why, but -- and I never |
| | 18 | asked. |
| | 19 | Q   And is that signature one that you recognize of |
| 12:07:54 | 20 | David Bergstein? |
| | 21 | A   Yes. |
| | 22 | Q   Okay. |
| | 23 | A   But that's his signature. |
| | 24 | Q   That's his actual signature? |
| 12:08:00 | 25 | A   Yes. |

---

Page 95

| | | |
|---|---|---|
| 12:08:01 | 1 | Q   Okay.  Going to the next page, is that also -- |
| | 2 | now we see it's a printed check, 1026, dated July 2, |
| | 3 | 2012; correct? |
| | 4 | A   July 2.  Yes. |
| 12:08:14 | 5 | Q   And now we see it's a printed check for Swartz |
| | 6 | IP Services Group, Inc., at the 2425 Colorado Avenue, |
| | 7 | Suite B205, address in Santa Monica, California; |
| | 8 | correct? |
| | 9 | A   Yes. |
| 12:08:28 | 10 | Q   And who is Che Sheng? |
| | 11 | A   I don't know. |
| | 12 | Q   Have -- had you ever heard of that name in the |
| | 13 | context of Mr. Bergstein or Mr. Jam? |
| | 14 | A   No. |
| 12:08:40 | 15 | Q   And you recognize that as being Mr. Bergstein's |
| | 16 | signature? |
| | 17 | A   Yes.  Not the stamp. |
| | 18 | Q   Going to the next page, there is check 1027 |
| | 19 | dated August 22, 2012, in the amount of $4,960 to Robert |
| 12:09:00 | 20 | Pressler.  Do you see that? |
| | 21 | A   Yes. |
| | 22 | Q   And this is also on the same Swartz IP Services |
| | 23 | Grouping, Inc., account; correct? |
| | 24 | A   With Wells Fargo Bank. |
| 12:09:10 | 25 | Q   Okay.  And you recognize that as David |

---

Page 96

| | | |
|---|---|---|
| 12:09:12 | 1 | Bergstein's actual signature? |
| | 2 | A   Yes. |
| | 3 | Q   Who was Robert Pressler? |
| | 4 | A   I have no idea. |
| 12:09:19 | 5 | Q   That's not a name that you had run into in any |
| | 6 | of your dealings with Mr. Bergstein or Mr. Jam? |
| | 7 | A   No. |
| | 8 | Q   Looking at the endorsement, it says RPP |
| | 9 | Enterprises.  Does that refresh your recollection as to |
| 12:09:33 | 10 | who Mr. Pressler might have been? |
| | 11 | A   No. |
| | 12 | Q   Going to the next check, it's a check dated |
| | 13 | July 23, 2012, in the amount of $12,000 made payable to |
| | 14 | Graybox LLC; correct? |
| 12:09:49 | 15 | A   That's correct, yes. |
| | 16 | Q   And you recognize that as being Mr. Bergstein's |
| | 17 | actual signature? |
| | 18 | A   Yes. |
| | 19 | Q   Do you know what the purpose of this particular |
| 12:10:00 | 20 | payment to Graybox LLC was that Mr. Bergstein made out |
| | 21 | of this Swartz IP account? |
| | 22 | A   I don't know. |
| | 23 | Q   Going to the next check, we see a check on |
| | 24 | December 18, 2013, in the amount of $10,000 drawn on the |
| 12:10:22 | 25 | Swartz IP Services Group account and payable to |

---

Page 97

| | | |
|---|---|---|
| 12:10:24 | 1 | Integrated Administration; correct? |
| | 2 | A   That's correct. |
| | 3 | Q   And it was, apparently, deposited to Integrated |
| | 4 | Administration's account? |
| 12:10:33 | 5 | A   That's the way it looks like, yes. |
| | 6 | Q   Do you know why this payment was being made by |
| | 7 | Swartz IP Services Group to Integrated Administration |
| | 8 | for $10,000? |
| | 9 | A   I don't know. |
| 12:10:45 | 10 | Q   Do you know why it was made as late as |
| | 11 | December 18, 2013? |
| | 12 | A   Well -- can you repeat the question? |
| | 13 | Q   Yes.  Do you know why, on December 18, 2013, |
| | 14 | this checking account was used to pay Integrated |
| 12:11:06 | 15 | Administration $10,000? |
| | 16 | A   I don't know.  I have no idea. |
| | 17 | Q   Is it your understanding that as of |
| | 18 | December 18, 2013, Swartz IP as a company had been |
| | 19 | dissolved? |
| 12:11:22 | 20 | A   I did not know that.  I -- |
| | 21 | Q   Let me ask it a different way.  Was it your |
| | 22 | understanding that as of December 18, 2013, that Swartz |
| | 23 | IP Services Group, Inc., had forfeit its charter in the |
| | 24 | state of Texas? |
| 12:11:36 | 25 |      MR. WIECHERT:  No foundation.  Assumes facts |

25  (Pages 94 to 97)

Frymi Biedak                                                        03-25-19

---

Page 98

12:11:37  1    not in evidence.
          2         THE WITNESS:  Can you tell me what -- what --
          3    can you repeat the question?  I'm sorry.
          4    BY MR. WALKER:
12:11:51  5     Q    Yes, ma'am.
          6     A    I'm very confused.
          7     Q    Do you know whether or not, as of December 18,
          8    2013, that Swartz IP Services Group, Inc., had forfeit
          9    its charter with the state of Texas?
12:12:03 10     A    When you say forwarded its charter with the
         11    state of Texas, do you mean it was not in compliance?
         12     Q    Yes.  It was no longer a recognized
         13    corporation?
         14     A    That, I didn't know.  I just know that that
12:12:16 15    thing with the taxes wasn't done correctly.
         16     Q    And going to the next page in this exhibit, we
         17    see another payment to Integrated Administration, and
         18    this time in the amount of $12,000; correct?
         19     A    That was done on 12/17/2019.
12:12:39 20     Q    Yes.  Do you know what the purpose of this
         21    payment might have been?
         22     A    In 2019?
         23     Q    Yes.
         24     A    But we are now in March.
12:12:50 25         MR. WIECHERT:  I think her point is we haven't

---

Page 99

12:12:52  1    gotten to December 17, 2019, yet.
          2    BY MR. WALKER:
          3     Q    Right.  So do you know why that date would be
          4    used on this check?
12:12:59  5     A    I think it was an error.  Something is --
          6    that's weird.
          7     Q    Okay.  Do you know the purpose of the $12,000
          8    payment to Integrated Administration regardless of date?
          9     A    I have no idea.  I don't know what -- I don't
12:13:16 10    know who would have written this.
         11     Q    Is -- is that Mr. Bergstein's signature or is
         12    that someone just signing his name to look like his
         13    signature?
         14         MR. MCGONIGLE:  That calls for speculation.
12:13:35 15         You can answer it.
         16         THE WITNESS:  If you ask me, I would not say
         17    that this is Mr. Berg-- I could not say one way or the
         18    other.
         19    BY MR. WALKER:
12:13:44 20     Q    Okay.  Did Mr. Jam ever, for whatever reason --
         21    convenience, haste -- did Mr. Jam ever sign
         22    Mr. Bergstein's name with Mr. Bergstein's permission on
         23    any particular documents or checks to your knowledge?
         24     A    I would not know one way or other.
12:14:04 25     Q    But as you look at it, based upon your

---

Page 100

12:14:06  1    familiarity with Mr. Bergstein's signature, you don't
          2    believe that Mr. Bergstein signed this check; is that
          3    correct?
          4     A    I wouldn't know one way or the other.  I
12:14:14  5    couldn't -- I couldn't tell.  This one I could say this
          6    is Mr. Bergstein's signature.  This one.
          7     Q    So the second-to-last page?
          8     A    The second to -- the second-to-last page.
          9     Q    The $10,000 check dated December 18, 2013, to
12:14:31 10    Integrated Administration, you believe that's was
         11    Mr. Bergstein's signature?
         12         Is that your testimony?
         13     A    I -- now I'm not sure.  When I'm looking at
         14    this and I'm looking at this, I'm not sure.  This one --
12:15:08 15    this one I think was his because --
         16     Q    The first page of the exhibit?
         17     A    The first page I think -- I'm pretty sure was
         18    his.
         19     Q    Okay.  Is it possible that Mr. Jam simply
12:15:20 20    completed these checks and signed Mr. Bergstein's name
         21    for the two checks that constitute the last two pages of
         22    Exhibit 11?
         23         MR. WIECHERT:  Objection.  Calls for
         24    speculation.
12:15:31 25         THE WITNESS:  I mean, I have a big issue with

---

Page 101

12:15:33  1    the -- with the 2019 date.  So I can't really comment on
          2    this one.  I don't understand this at all.
          3    BY MR. WALKER:
          4     Q    Okay.  And as we sit here today, with respect
12:15:43  5    to the last two checks to Integrated Administration, one
          6    for 10,000 and one for 12,000, one in 2013, and one in
          7    2019 -- albeit in the future -- I take it you were not
          8    aware that these two checks had been issued?
          9     A    I was not aware of any of these checks that
12:16:03 10    were issued.
         11         MR. WALKER:  Okay.  We can take a break for
         12    lunch, ma'am.
         13         THE VIDEOGRAPHER:  The time is 12:15 p.m.  We
         14    are now off the record.
12:30:07 15         (A recess was taken.)
         16         THE VIDEOGRAPHER:  We're back on the record.
         17    Here marks the beginning of Disk 2.  The time is
         18    1:30 p.m.
         19    BY MR. WALKER:
13:30:29 20     Q    Ma'am, I'll hand you what's been marked as
         21    Exhibit 12.
         22         (Exhibit 12 was marked for
         23         identification by the Court Reporter
         24         and is attached hereto.)
         25    ///

---

26  (Pages 98 to 101)

Frymi Biedak                                                    03-25-19

---

Page 102

13:30:33  1    BY MR. WALKER:
          2    Q   I'll take it this was a series of e-mails that
          3    you were involved in?
          4    A   Yes.
13:31:01  5    Q   So there at the bottom, you sent an e-mail to
          6    Mr. Woodard, the CPA, with a copy to Mr. Bergstein and
          7    Mr. Jam regarding Swartz IP Services Texas taxes on
          8    November 8th, 2011; correct?
          9    A   That's what it says, yes.
13:31:19  10   Q   And you're providing Mr. Woodard the requested
          11   information regarding Swartz IP; correct?
          12   A   I'm just reading the other e-mail, too.
          13   Q   Of course.  Take your time.
          14   A   Okay.
13:31:41  15   Q   So at the very bottom there on the
          16   November 8th, 2011 at 6:45 p.m., you're sending
          17   Mr. Woodard the requested information; correct?
          18   A   I don't know what I sent him here.
          19   Q   Well, whatever it was, it was apparently what
13:31:54  20   he requested of you; correct?
          21   A   Okay.
          22   Q   I'm looking at the very, very bottom --
          23   A   Yeah.  Yeah.  I -- I -- I just don't know
          24   what I sent because normally --
13:32:04  25   Q   It doesn't note in the attachment, does it?

---

Page 103

13:32:07  1    A   It doesn't show anything.
          2    Q   Okay.  Fair enough.
          3        Then going up to the middle e-mail, this on
          4    January 19, 2012, short time later, you sent an e-mail
13:32:21  5    to Mr. Woodard with a copy to Mr. Jam, Mr. Bergstein,
          6    and Steve Piskula; correct?
          7    A   Yes.
          8    Q   And Mr. Piskula was also with K.Jam Media;
          9    correct?
13:32:32  10   A   He was the officer manager.
          11   Q   Thank you.
          12       And you advised Mr. Woodard that you were going
          13   through your filings for the new year and you note that
          14   he was able help you out with the franchise filing for
13:32:47  15   Swartz IP in Texas last November.
          16       So I take it that would have been on or about
          17   the time of the e-mail that you have at the bottom of
          18   this string?
          19   A   I think I was -- we talked about that earlier.
13:33:04  20   I think I was referring to the information that he had
          21   provided, to bring it back in good standing, which I
          22   think was for 2010.  I think now, wanted the same -- we
          23   wanted the same thing for 2011.  That's the way I
          24   understand it now.
13:33:16  25   Q   Okay.  Thank you.

---

Page 104

13:33:17  1        And going to the top of the first page of
          2    plaintiff's Exhibit 12, there is an e-mail from
          3    Mr. Woodard back to you on January 19, 2012 at
          4    4:46 p.m.; correct?
13:33:29  5    A   Yes.
          6    Q   And again, we see courtesy copy recipients of
          7    Mr. Jam, Mr. Bergstein, and Mr. Piskula; correct?
          8    A   Correct.  Yes.
          9    Q   Okay.  And Mr. Woodard was asking you to
13:33:43  10   provide him with certain documents related to Swartz IP;
          11   correct?
          12   A   That's what it says, yes.
          13   Q   And there in the paragraph, the full paragraph,
          14   after he asked you for the balance sheet, the general
13:33:55  15   ledger, and the profit and loss statement, effectively
          16   for the 2011 year, he tells you that he would need to
          17   file the federal corporate income tax return and the
          18   related Texas franchise tax return.
          19       Did I read that correctly?
13:34:11  20   A   You read it correctly, yes.
          21   Q   Were any of those tax returns filed on behalf
          22   of Swartz IP Services?
          23   A   I don't know.
          24   Q   He goes on to state, "If the Texas corporation
13:34:23  25   is doing business in California or additional states, I

---

Page 105

13:34:26  1    would have to file return to those states as well
          2    apportioning income among the respective states."
          3        Do you know if any -- if you were asked to
          4    provide any information along those lines to
13:34:37  5    Mr. Woodard?
          6    A   You mean if it was qualified to do business in
          7    California?
          8    Q   Yes, or any other states.
          9    A   Not to the best of my knowledge, but I'm not
13:34:49  10   sure.  Somebody else may have done it.
          11   Q   And do you recall providing any of this
          12   information to Mr. Woodard that he was requesting?
          13   A   I would have not had it.
          14   Q   And why is that?
13:35:06  15   A   Because I didn't keep the record for Swartz IP
          16   Services.
          17   Q   And who did, do you know?
          18   A   No.  I really don't.
          19   Q   Let me hand you what's been marked as
13:35:20  20   plaintiff's Exhibit 13.
          21       (Exhibit 13 was marked for
          22       identification by the Court Reporter
          23       and is attached hereto.)
          24   BY MR. WALKER:
13:35:34  25   Q   Does this appear to be a copy of a letter of

---

27 (Pages 102 to 105)

Frymi Biedak                                          03-25-19

---

Page 106

13:35:37  1    intent to purchase certain real estate dated April 1st,
       2    2012?
       3        A   That's what it looks like.
       4        Q   And it looks like it was a letter of intent for
13:35:53  5    Swartz IP Services to purchase the real estate that's
       6    referenced?
       7        A   That's what it says.
       8        Q   Did this sale ever go forward, to your
       9    knowledge?
13:36:04 10       A   I -- I have no idea.  This is the first time
      11    I've seen this document.
      12        Q   There is no signature on the last page;
      13    correct?
      14        A   I don't see it.  I don't see a signature.
13:36:22 15        Q   If you could look at the second-to-last page.
      16        A   The second-to-last page, yes.
      17        Q   There, the signature line for Swartz IP
      18    Services, Inc., it has Kia Jam listed as the proposed
      19    signatory; correct?
13:36:37 20        A   That's what it says, yes.
      21        Q   Do you know whether or not Mr. Jam ever signed
      22    this contract?
      23        A   I would not one way or the other.
      24        Q   Thank you.  I'll hand you what's been marked as
13:36:52 25    Exhibit 14.

---

Page 107

13:36:53  1            (Exhibit 14 was marked for
       2             identification by the Court Reporter
       3             and is attached hereto.)
       4    BY MR. WALKER:
13:37:00  5        Q   Now, this is an e-mail from David Bergstein to
       6    you and Kia Jam; correct?
       7        A   Correct.
       8        Q   And it's dated April 16, 2012; correct?
       9        A   That's correct, yes.
13:37:12 10        Q   So Mr. Bergstein was instructing you to wire
      11    $20,000 from Integrated Administration to Jerry Swartz;
      12    correct?
      13        A   That's what it says, yes.
      14        Q   So I take it you had access to Integrated
13:37:23 15    Administrations's account --
      16        A   No.
      17        Q   -- that would allow you to wire the money?
      18        A   No.  I have not.
      19        Q   Okay.  How were you -- let me ask you this.
13:37:34 20    Did you comply with Mr. Bergstein's instruction to wire
      21    $20,000 from Integrated Administration to Jerry Swartz?
      22        A   Well, the e-mail goes from -- from David
      23    Bergstein to myself and to Kia.  So -- to Kia Jam, I'm
      24    sorry.  So if anybody would have instructed -- I mean,
13:37:51 25    Mr. Bergstein usually included me in his e-mails, so --

---

Page 108

13:37:54  1    maybe to follow up, I don't know.  But I did not do this
       2    wire.  I did not do any wires related with Wells Fargo
       3    and I know that I had an account with Wells Fargo.
       4        Q   How do you know that?
13:38:07  5        A   Because that's where the checks were from.
       6        Q   Fair enough.
       7            There is a separate note to Kia that -- well,
       8    the e-mail goes on, "Kia, money for Amex being wired in
       9    separately."
13:38:21 10            I take it Kia Jam had an America Express
      11    account that was being used by Mr. Bergstein at times?
      12        A   I don't know one way or the other.
      13        Q   Did you ever see any of the American Express
      14    account statements?
13:38:36 15        A   No, I have not.
      16        Q   Were there times when you were asked to pay one
      17    of the America Express bills from funds from one of the
      18    accounts to which you had access?
      19        A   I don't remember.  It's possible.  I don't
13:38:57 20    remember.
      21        Q   Let me hand you what's been marked as Exhibit
      22    15, ma'am.
      23            (Exhibit 15 was marked for
      24             identification by the Court Reporter
13:39:10 25             and is attached hereto.)

---

Page 109

13:39:10  1    BY MR. WALKER:
       2        Q   Okay.  This is a series of e-mails.  I would
       3    like to ask you about certain of them, if we could.
       4        A   Okay.
13:39:26  5        Q   Okay.  If you go to the page that's numbered
       6    there in the bottom right, 481, then -- actually, and
       7    you may want to look at the preceding page at the very
       8    bottom to see the -- the names on the e-mail.  It's the
       9    preceding page, ma'am, the one --
13:39:56 10        A   The one before?
      11        Q   Yes, ma'am.
      12            Do you see that e-mail that starts at the very
      13    bottom from you to Majid Zarrinkelk, Kia Jam, and David
      14    Bergstein?
13:40:07 15        A   With a courtesy copy to Steve.
      16        Q   To Mr. Piskula?
      17        A   Yes.
      18        Q   Yes, ma'am.
      19            And you were sending this on April 19, 2012 at
13:40:16 20    10:09 a.m., correct?
      21        A   That's correct, yes.
      22        Q   Okay.  So we go to the next page.
      23            And that is the e-mail that you were sending on
      24    that date and time; correct?
13:40:24 25        A   That is correct.

---

28  (Pages 106 to 109)

Frymi Biedak                                                    03-25-19

---

Page 110

```
13:40:25   1        Q   And so you're saying that Steve asked that you
           2   e-mail to Mr. Zarrinkelk the following summary of
           3   today's wire transfers out of Pineboard Holdings LLC.
           4        So I take it you had access to the account for
13:40:38   5   Pineboard Holdings LLC?
           6        MR. MCGONIGLE:  Objection.  The question is
           7   vague.
           8        You can answer.
           9        THE WITNESS:  I had not.  I don't remember
13:40:48  10   having access to this account.  And I don't remember
          11   myself sending wires out of Wells Fargo.
          12   BY MR. WALKER:
          13        Q   And how did you know that Pineboard Holdings
          14   had a Wells Fargo account?
13:41:01  15        A   Because Kia asked them on various -- Mr. Jam
          16   asked me on various occasions and -- and that -- that
          17   the balance was low and put some money in.
          18        Q   Okay.  So Mr. Jam was managing the Pineboard
          19   Holdings account?
13:41:17  20        MR. WEICHERT:  Objection.  Calls for a
          21   conclusion.  No foundation.
          22        THE WITNESS:  It was -- I -- I -- I know that I
          23   had not access to it.
          24   BY MR. WALKER:
13:41:29  25        Q   But there were times when Mr. Jam pointed out
```

Page 111

```
13:41:32   1   that the balance in the Pineboard Holdings account was
           2   low and asked for you to move some money into it?
           3        A   Not move some money.  We -- I mean -- as far --
           4   and I -- this is just very vaguely.  I think I put some,
13:41:43   5   like -- like 50 or $100 cash in there.
           6        Q   Now, looking --
           7        A   As far as I recollect.
           8        Q   Looking at the wire transfers that are
           9   mentioned in your e-mails having come out of Pineboard
13:41:57  10   Holdings LLC, one is for $500,000 from Citizens -- to
          11   Citizens Bank; correct?
          12        A   That's what is says, yes.
          13        Q   And it was a credit to General Health
          14   Technologies LLC?
13:42:09  15        A   Correct.
          16        Q   Okay.  What was the purpose of that payment?
          17        A   I don't know.
          18        Q   Did you effectuate that wire transfer?
          19        A   If it was from Wells Fargo, no.
13:42:20  20        Q   Okay.  How is it that you were able to have
          21   that information and to convey it to Mr. Zarrinkelk if
          22   you were not the person that arranged for the wire
          23   transfer?
          24        A   Those are wire transfer instructions.
13:42:35  25        Q   Yes, ma'am.
```

Page 112

```
13:42:37   1        A   I must have had them, maybe.  I -- I must have
           2   asked somebody.  Somebody must have given them to me.
           3        Q   Who would have had them, if not you?
           4        MR. WEICHERT:  Calls for speculation.
13:42:51   5        THE WITNESS:  I don't know.
           6   BY MR. WALKER:
           7        Q   What about the 450,000-dollar wire transfer to
           8   Integrated Administration?
           9        A   This came from Pineboard?  Oh, yeah, from
13:43:02  10   Pineboard.
          11        Q   That's what your e-mail suggests; correct?
          12        A   Yes.
          13        Q   What was the purpose of the 450,000-dollar wire
          14   transfer from Pineboard Holdings to Integrated
13:43:15  15   Administration?
          16        MR. WEICHERT:  Objection.  No foundation.
          17        THE WITNESS:  I have no idea.
          18   BY MR. WALKER:
          19        Q   Who is Donald Carroll?
13:43:26  20        A   Donald Carroll is a -- a very good friend of
          21   David Bergstein.  They go back like 40 years.
          22        Q   Was Mr. Carroll at or affiliated in some way
          23   with Integrated Administration?
          24        A   I think he worked there at the time.
13:43:47  25        Q   How did Mr. Bergstein first meet Mr. Carroll?
```

Page 113

```
13:43:52   1        A   They go back to New Jersey.  They're all Jersey
           2   boys.  I think they are like -- when they were like 16
           3   or 17.
           4        Q   Did Mr. Carroll also work out of the same
13:44:03   5   office with you and Mr. Jam and Mr. Bergstein at this
           6   time?
           7        A   I -- I don't -- I really don't remember because
           8   he lived far away.  So I don't know if he came there
           9   every day.
13:44:20  10        Q   But he lived here in California?
          11        A   In -- I think, at the time, in Hermosa Beach.
          12   I think.
          13        Q   That's quite a drive, isn't it?
          14        A   I wouldn't drive.
13:44:34  15        Q   And then going to the next page, let's go to --
          16   I guess it would be the second page of this exhibit.
          17        Mr. Zarrinkelk asks you to provide him the
          18   address for the bank and the recipient on the third
          19   wire; correct?
13:44:57  20        A   Wh-- where?  This one?
          21        Q   Yeah.  The second page of 480 of the exhibit
          22   itself.
          23        A   Right.  I'm -- I'm reading the e-mail.
          24        Q   Yes, ma'am.
13:45:14  25        A   12/24?
```

Frymi Biedak                                                    03-25-19

---

Page 114

| | | |
|---|---|---|
| 13:45:16 | 1 | Q   Yes, ma'am. |
| | 2 | A   And what -- what -- what am I supposed to |
| | 3 | answer?  I'm sorry. |
| | 4 | Q   Okay.  No, it's okay. |
| 13:45:36 | 5 | Have you had the opportunity to review that |
| | 6 | e-mail, ma'am? |
| | 7 | A   Yes, I have. |
| | 8 | Q   Okay.  Now, Mr. Zarrinkelk is asking you to |
| | 9 | provide him the address for the bank and recipient on |
| 13:45:44 | 10 | the third wire transfer; correct? |
| | 11 | A   That's what it says, yes. |
| | 12 | Q   Okay.  If you go back to the last few pages of |
| | 13 | this exhibit, there is three wire confirmations; |
| | 14 | correct? |
| 13:45:59 | 15 | A   That's correct, yes. |
| | 16 | Q   Okay.  So you provided them the information |
| | 17 | about the first wire transfer confirmation on page 483 |
| | 18 | involving General Health Technologies; correct? |
| | 19 | A   Correct. |
| 13:46:13 | 20 | Q   Okay.  You provided them the equivalent |
| | 21 | information to the wire that went to Integrated |
| | 22 | Administration with the beneficiary of Donald Carroll |
| | 23 | that appears on Page 484; correct? |
| | 24 | A   On -- on -- on the one to Integrated |
| 13:46:33 | 25 | Administration, I didn't put the address of the bank. |

---

Page 115

| | | |
|---|---|---|
| 13:46:35 | 1 | Doesn't appear here. |
| | 2 | Q   Well, okay, ma'am. |
| | 3 | But the third wire that he's talking about is |
| | 4 | the last page of Exhibit 12; correct? |
| 13:46:43 | 5 | A   That's Bank of America, yes. |
| | 6 | Q   Okay.  And that would be for Swartz IP Services |
| | 7 | group; correct? |
| | 8 | A   This one, the 33 is to bank -- to Donald |
| | 9 | Carroll, you said. |
| 13:46:55 | 10 | Q   Yes, ma'am.  I'm -- I'm looking at the -- the |
| | 11 | wire confirmations -- |
| | 12 | A   Okay.  Okay. |
| | 13 | Q   -- at the very end of the exhibit.  So let's |
| | 14 | just start over.  Okay? |
| 13:47:01 | 15 | A   Okay. |
| | 16 | Q   Okay.  Do you see three wire confirmations that |
| | 17 | Mr. Zarrinkelk is referencing?  They're the last three |
| | 18 | pages -- |
| | 19 | A   I see it.  I see it.  Yes. |
| 13:47:09 | 20 | Q   Okay.  On page 483 down at the bottom, do you |
| | 21 | see that? |
| | 22 | A   Yes. |
| | 23 | Q   Okay.  That is the wire that you had referenced |
| | 24 | in your e-mail to Mr. Zarrinkelk referencing General |
| 13:47:19 | 25 | Health Technologies; correct? |

---

Page 116

| | | |
|---|---|---|
| 13:47:21 | 1 | A   Correct.  Yes. |
| | 2 | Q   Okay.  And then on the next page, 484, we see |
| | 3 | the wire confirmation that you referenced as going to |
| | 4 | Donald Carroll at Integrated Administration; correct? |
| 13:47:36 | 5 | A   Yes. |
| | 6 | Q   Okay.  But what your e-mail to Mr. Zarrinkelk |
| | 7 | did not indicate was any information about this third |
| | 8 | wire which is the last page of the exhibit which sent a |
| | 9 | million dollars to Swartz IP Services Group; correct? |
| 13:47:52 | 10 | MR. WEICHERT:  I'm sorry -- sorry, but there |
| | 11 | are multiple e-mails in this exhibit and there seems to |
| | 12 | be at least one e-mail that refers to this wire. |
| | 13 | THE WITNESS:  But I think there is another |
| | 14 | e-mail here with just I spoke with David and asked that he |
| 13:48:06 | 15 | arrange for one additional wire out of Pineboard.  I |
| | 16 | think this is the one that you're referring to. |
| | 17 | BY MR. WALKER: |
| | 18 | Q   Yes, ma'am.  We'll get to that. |
| | 19 | A   Okay.  All right. |
| 13:48:11 | 20 | Q   But with respect to Mr. Zarrinkelk's e-mail |
| | 21 | saying, "Could you please send me the information about |
| | 22 | the third wire" -- |
| | 23 | A   Okay. |
| | 24 | Q   -- the third wire he's referencing is the wire |
| 13:48:21 | 25 | that's reflected on the last page of Exhibit 12 that was |

---

Page 117

| | | |
|---|---|---|
| 13:48:24 | 1 | the 1-million-dollar wire confirmation to Swartz IP |
| | 2 | Services; correct? |
| | 3 | A   That's correct, yes. |
| | 4 | Q   Okay.  Very good. |
| 13:48:32 | 5 | So he also tells you on his April 19 -- going |
| | 6 | back now to the second page of the exhibit.  He also |
| | 7 | tells you in his e-mail to you of April 19, 2012 that |
| | 8 | for future reference, Mr. Zarrinkelk had access to all |
| | 9 | the accounts, thus transfer between what he |
| 13:48:53 | 10 | characterizes as "our own accounts, i.e., Integrated |
| | 11 | Administration and Pineboard, can be done online without |
| | 12 | the need for wiring." |
| | 13 | Did I read that correctly? |
| | 14 | A   That's what it says, yes. |
| 13:49:05 | 15 | Q   So when he says "transfer between our own |
| | 16 | accounts," i.e., Integrated Administration and |
| | 17 | Pineboard, who did you understand the "our" to |
| | 18 | reference? |
| | 19 | MR. WEICHERT:  Calls for speculation. |
| 13:49:25 | 20 | THE WITNESS:  What I thought back then? |
| | 21 | BY MR. WALKER: |
| | 22 | Q   Yes, ma'am. |
| | 23 | What was your understanding as to who the "our" |
| | 24 | was, as Mr. Zar- -- Mr. Zarrinkelk is referring to it |
| 13:49:35 | 25 | there?  He's saying, "Thus, transfer between our own |

---

30 (Pages 114 to 117)

Frymi Biedak                                                03-25-19

---

| Page 118 |
| --- |

```
13:49:39   1    accounts, i.e., Integrated Administration and Pineboard
           2    can be done online without the need for wiring."
           3          When you received this at the time, who did you
           4    understand the word "our" to be referring to?
13:49:50   5    A   I don't know what I was thinking at the time.
           6    I know what I was think-- now I would think that they
           7    are on the same portfolio and that you can transfer in
           8    between accounts without paying for the wire transfers.
           9    But I don't know what I was thinking then.
13:50:04  10    Q   Okay.
          11          MR. WEICHERT:  Move to strike.  The answer is
          12    speculation.  No foundation.
          13    BY MR. WALKER:
          14    Q   And Mr. Zarrinkelk is sending this e-mail to
13:50:11  15    you on Thursday, April 19, 2012 along with not only you,
          16    but Mr. Jam; correct?
          17    A   And David Bergstein.
          18    Q   And David Bergstein, with a courtesy copy to
          19    Mr. Piskula; correct?
13:50:23  20    A   Yes.
          21    Q   And there we see Mr. Piskula is using another
          22    e-mail address, correct, 14spiskula@capitalfilms.us;
          23    correct?
          24    A   That's correct.
13:50:38  25    Q   Now, going to the next e-mail in the thread
```

| Page 119 |
| --- |

```
13:50:42   1    which starts at the bottom of the first page, do you see
           2    the e-mail from you to Mr. Zarrinkelk, Mr. Jam, and
           3    Mr. Bergstein on April 19, 2012 at 12:48 p.m.?
           4    A   Yes.
13:51:00   5    Q   And you say, "Dear Majid, just spoke with David
           6    and he asked that you arrange for one additional wire
           7    out of Pineboard Holdings LLC"; correct?
           8    A   That's correct, yes.
           9    Q   And that was a million-dollar wire transfer to
13:51:13  10    Swartz IP Group Services, Inc.; correct?
          11    A   That's correct.
          12    Q   And the address listed for Swartz IP was the
          13    very same office address where you were working at the
          14    time; correct?
13:51:25  15    A   That's what it says, yes.
          16    Q   That was also the same office address where
          17    Mr. Jam was working at the time; correct?
          18    A   We all worked from this office at the time.
          19    Q   So Mr. Jam worked there at this date and time;
13:51:37  20    correct?
          21    A   Well, he was there.
          22    Q   That's where he worked, wasn't it, ma'am?  That
          23    was his office address?
          24    A   That's where his office was, yes.
13:51:48  25    Q   And likewise, that was also Mr. Bergstein's
```

| Page 120 |
| --- |

```
13:51:51   1    office address at this time?
           2    A   I don't think Graybox used that office address.
           3    I m-- may be totally wrong, but I don't remember --
           4    but -- I don't recall.
13:52:07   5    Q   And then you come back and you say in your next
           6    e-mail just a short time later -- although it appeared
           7    to be a short time earlier, that -- 10:52 a.m., "Sorry.
           8    The name is Swartz IP Services Group, Inc.  My
           9    apologies."
13:52:26  10          Did I read that correctly?
          11    A   Yes.
          12    Q   So you were just correcting the name of Swartz
          13    IP Group Services, Inc. in your previous e-mail to
          14    Mr. Zarrinkelk; correct?
13:52:39  15    A   That's what it appears to be, yes.
          16    Q   Do you know why the time stamp on that e-mail
          17    would show that it was earlier than the e-mail you had
          18    sent that you were correcting?
          19    A   I vaguely remember that there was an issue
13:52:58  20    with -- with -- there was a time issue with the Graybox.
          21    I -- I'm not sure, but I think there was something
          22    and -- because I asked people to correct it, but I
          23    think -- I think it was a computer problem with an -- an
          24    hour delay, summertime, wintertime, I really --  but I
13:53:13  25    vaguely remember something but I couldn't confirm it.
```

| Page 121 |
| --- |

```
13:53:17   1    Q   Was that on the Graybox server?
           2    A   It was on the Graybox e-mail.
           3    Q   Okay.  Did you run your grayboxllc.com e-mail
           4    through the Graybox server?
13:53:31   5    A   I don't have a clue.  I'm sorry.
           6    Q   And then Mr. Zarrinkelk responds to you, "All
           7    the wire's gone here, confirmations"; correct?
           8    A   Correct.  And I think -- right.  That's what he
           9    says.
13:53:47  10    Q   And again his, e-mail also has a time stamp
          11    that would suggest it was earlier than the e-mail at the
          12    bottom of the first page of Exhibit 15 that preceded
          13    both of them; correct?
          14    A   That's correct.
13:54:01  15    Q   And -- and it's just -- there was some issue
          16    with the time stamp on your --
          17    A   I vaguely remember something like that.
          18    Q   Okay.  And this is the very -- Exhibit 16, this
          19    reflect your communication back to Mr. Zarrinkelk
13:54:24  20    thanking him; correct?
          21    A   Yes.
          22          (Exhibit 16 was marked for
          23          identification by the Court Reporter
          24          and is attached hereto.)
          25    ///
```

eLitigation Services, Inc. - els@els-team.com

Frymi Biedak                                              03-25-19

---

Page 122

13:54:33   1   BY MR. WALKER:
           2      Q   Going to hand you, ma'am, what has been marked
           3   as Exhibit 17.
           4          (Exhibit 17 was marked for
13:54:41   5          identification by the Court Reporter
           6          and is attached hereto.)
           7   BY MR. WALKER:
           8      Q   And ask you if the first page of Exhibit 17
           9   begins with an e-mail from you to Keith Welner at
13:54:59  10   westoncapital.com?
          11      A   Yes.
          12      Q   It shows a courtesy copy to David Bergstein;
          13   correct?
          14      A   Yes.
13:55:05  15      Q   And the subject is "Swartz IP Services Group,
          16   Inc."?
          17      A   That's correct.
          18      Q   Who was Keith Welner, as you understood it?
          19      A   At the time, I didn't understand it at all.
13:55:18  20   Later on I found out that he was working for Weston
          21   Capital.
          22      Q   What was Weston Capital's relationship to any
          23   of Mr. Bergstein's or Mr. Jam's companies?
          24      A   I have no idea.
13:55:31  25          MR. WEICHERT:  Compound.

---

Page 123

13:55:32   1   BY MR. WALKER:
           2      Q   What was -- what was Mr. Wellner's
           3   relationship -- well, let me ask you this.  What was the
           4   relationship of Weston Capital to any of Mr. Jam's
13:55:43   5   companies?
           6      A   I wouldn't have any idea.
           7      Q   What about with respect to Mr. Bergstein's
           8   companies?
           9      A   I wouldn't know.
13:55:54  10      Q   Were you aware that Mr. Wellner had admitted in
          11   federal court that Swartz IP Services was a fraud?
          12      A   I did not know that.
          13      Q   Were you aware that Mr. Bergstein was recently
          14   convicted and is sentenced to eight years in federal
13:56:12  15   prison in part for the transactions involving Swartz IP
          16   Services Group?
          17      A   All I know is that he was convicted and that
          18   he's now in Taft.
          19      Q   Now, with respect to Exhibit 17, you're
13:56:26  20   forwarding Mr. Welner bylaws for Swartz IP Services
          21   Group; correct?
          22      A   Yes.
          23      Q   Where did you get that document?
          24      A   I have to see.  I'm not sure.  I'm really not
13:56:54  25   sure.  I don't know who would have prepared them.

---

Page 124

13:57:02   1      Q   Looking at the last page of Exhibit 17, did you
           2   affix Mr. Bergstein's signature stamp?
           3      A   That's his signature stamp.
           4      Q   Yes, ma'am.
13:57:10   5          Did you put that on there?
           6      A   I'm pretty sure, yes.
           7      Q   But you don't know who actually drafted that
           8   document?
           9      A   No.
13:57:20  10      Q   You don't know the source of the document at
          11   all?
          12      A   No.
          13      Q   Did you ever see those bylaws amended?
          14      A   I don't even remember that there were -- this
13:57:32  15   is the first time that -- I mean, I -- I looked at them.
          16      Q   I'm going to hand you what's been marked as
          17   Exhibit 18, ma'am.
          18          (Exhibit 18 was marked for
          19          identification by the Court Reporter
13:57:40  20          and is attached hereto.)
          21   BY MR. WALKER:
          22      Q   Now, this is an e-mail dated April 27, 2012
          23   from you to Kia Jam; correct?
          24      A   Correct.
13:57:52  25      Q   And you've provided a courtesy copy to David

---

Page 125

13:57:55   1   Bergstein and Steve Piskula; correct?
           2      A   Correct.
           3      Q   And the subject is "Wire Transfer Out of IA";
           4   correct?
13:58:03   5      A   That's it says.
           6      Q   And that would be Integrated Administration?
           7      A   I would assume so, yes.
           8      Q   And you say, "Hi, Kia.  Per David's request, a
           9   wire needs to be sent to Phoenix Life Insurance in the
13:58:15  10   amount of $12,000.  I gave Steve the instructions."
          11          And then you have your initial F; correct?
          12      A   Uh-huh.
          13      Q   Okay.  What was the purpose of that wire of
          14   $12,000 to Phoenix Life Insurance?
13:58:26  15      A   I have no idea.
          16      Q   Do you know who was insured by that particular
          17   life insurance product?
          18      A   No.
          19      Q   And as I understand it, you were conveying
13:58:41  20   Mr. Bergstein's request that Kia Jam wire $12,000 out of
          21   Integrated Administration's account to Phoenix Life
          22   Insurance?
          23          MR. WEICHERT:  Objection.  Assumes facts not in
          24   evidence.
13:58:57  25          THE WITNESS:  That's my assumption, yes.

---

eLitigation Services, Inc. - els@els-team.com

Frymi Biedak                                                03-25-19

Page 126

13:58:59  1    BY MR. WALKER:
        2         Q   That's effectively what it says, does it not?
        3         A   That's what it says, yes.
        4         Q   Was that -- was that money actually sent, to
13:59:09  5    your knowledge?
        6         A   I don't know.
        7         Q   Let me hand you what's been marked as
        8    Exhibit 19, ma'am.
        9              (Exhibit 19 was marked for
13:59:16 10              identification by the Court Reporter
       11              and is attached hereto.)
       12    BY MR. WALKER:
       13         Q   Okay.  Now, we go to the very bottom of the
       14    first page of Exhibit 19.
13:59:36 15              We see the top of an e-mail from you to Kia Jam
       16    and David Bergstein dated January 2, 2013; correct?
       17         A   Yes.
       18         Q   Okay.  Looking at the second page, your e-mail
       19    actually references as the subject "Delaware Entities
13:59:54 20    Annual Franchise Taxes"; correct?
       21         A   That's correct.
       22         Q   And you say, "Kia and David, please be aware
       23    that the annual franchise tax bills are coming up.  The
       24    basic fee is $250 per entity as long as we pay prior to
14:00:08 25    March 1, 2013 (we have about 30 entities)."

Page 127

14:00:12  1              Did read that correctly?
        2         A   Yes.
        3         Q   And Kia Jam responds to you there toward the
        4    bottom of the first page on January 2, 2013 and asks you
14:00:27  5    to send a list of the entities; correct?
        6         A   That's what it says.
        7         Q   And he notes there that his title is CEO and
        8    producer of K.Jam Media; correct?
        9         A   That's what it says.
14:00:39 10         Q   And it also shows the same 2425 Colorado,
       11    Suite B-205, Santa Monica, California address?
       12         A   That's what the address in -- in -- in Santa
       13    Monica.
       14         Q   Yes, ma'am.
14:00:50 15              And that was the same address were you worked?
       16         A   That's where I was at the time, yes.
       17         Q   And you responded to Mr. Jam and to
       18    Mr. Bergstein, with a courtesy copy to Steve Piskula, on
       19    January 2, 2013 at 3:45 p.m.; correct?
14:01:07 20         A   Correct.
       21         Q   And you state, "So far, we have received
       22    notices for," and then you provide a list of entities;
       23    correct?
       24         A   Yes.
14:01:16 25         Q   And these were all companies that you all had

Page 128

14:01:22  1    formed in Delaware?
        2              MR. WEICHERT:  Objection.  A fact -- assumes
        3    facts not in evidence.  Calls for a conclusion.
        4    BY MR. WALKER:
14:01:30  5         Q   Let me -- let me restate the question, ma'am.
        6              This list of entities are all companies that
        7    have been incorporated in the State of Delaware;
        8    correct?
        9              MR. WEICHERT:  Same objections.
14:01:39 10              THE WITNESS:  Can I answer?
       11    BY MR. WALKER:
       12         Q   Yes, ma'am.
       13         A   I think -- I think so.  I'm not quite sure
       14    about Sovrin Health Systems.  I'm not sure about that
14:01:55 15    one.
       16         Q   Okay.  And you note that there were more
       17    notices to come shortly; correct?
       18         A   Yes, because this is the time when you have to
       19    do the filings for the incs.
14:02:08 20         Q   Yes, ma'am.
       21              For the -- for the corporations?
       22         A   For the corporations, yes.  The LLCs, I think,
       23    in June, something like that.  June.
       24         Q   Now, what was the nature of the business as you
14:02:19 25    understood it for Swartz Technology Group, Inc.?

Page 129

14:02:23  1         A   I don't know.
        2         Q   Was that a company that was separate and apart
        3    from Swartz IP Services, Inc.?
        4              MR. WEICHERT:  Objection.  No foundation.
14:02:32  5              THE WITNESS:  I don't know.
        6    BY MR. WALKER:
        7         Q   And why are you unsure about Sovrin Health
        8    Systems, Inc.?  What do you mean by that?
        9         A   I somehow thought that it was formed in
14:02:45 10    California.  I don't know why.  But I'm -- I -- I really
       11    don't know.  But I thought it was a California entity.
       12         Q   Let me hand you what has been marked as
       13    Exhibit 20.
       14              (Exhibit 20 was marked for
13:59:16 15              identification by the Court Reporter
       16              and is attached hereto.)
       17    BY MR. WALKER:
       18         Q   Now, as we saw in Exhibit 19, Kia Jam asked you
       19    for a list of the entities and you provided that list
14:03:24 20    under the subject of "Delaware Entities Annual Franchise
       21    Taxes."
       22              But here in Exhibit 20, you're providing an
       23    e-mail to Mr. Jam along with a copy to Dave Bergstein
       24    and the subject matter is "List of Corporations";
14:03:45 25    correct?

33  (Pages 126 to 129)

Frymi Biedak                                                03-25-19

---

Page 130

```
14:03:50   1        A   Uh-huh.
           2        Q   And say, "Kia, here is the requested list of
           3   corporations," and that's your initial that follows;
           4   correct?
14:03:56   5        A   Yes.
           6        Q   So what specific list of corporations did
           7   Mr. Jam request of you?
           8        A   I was asked by so many times to -- to -- to
           9   give lists of -- I wouldn't -- I really don't remember.
14:04:19  10   People ask for something and then I'm -- I really don't
          11   remember this one.
          12        Q   And I take it that as we see in Exhibit 20, if
          13   Mr. Jam asked you for a list of certain corporations,
          14   you complied with that request?
14:04:36  15        MR. WEICHERT:  Objection.  The question -- the
          16   question is argumentative.  Overbroad.
          17        THE WITNESS:  Well, if somebody asks me to do
          18   something, I'll do it.
          19   BY MR. WALKER:
14:04:46  20        Q   Right.
          21        A   If I can, if I know how to do it.
          22        Q   Yes, ma'am.
          23        And here we see an instance where Mr. Jam asked
          24   you for information about the various entities and you
14:04:56  25   complied with that request; correct?
```

Page 131

```
14:04:57   1        A   Yes.  I just don't know which entities -- why
           2   I'd listed these entities.
           3        Q   Fair enough.
           4        Now, this is another spreadsheet of sorts that
14:05:07   5   you created, I presume, to comply with his request?
           6        A   I would assume so, yes.
           7        Q   And at the very top we see "Advisory IP
           8   Services, Inc., formerly Swartz IP Services Group,
           9   Inc."; correct?
14:05:20  10        A   That's correct, yes.
          11        Q   And it shows an address in Santa Monica,
          12   California?
          13        A   Correct.
          14        Q   And the responsible party in this list shows it
14:05:30  15   to be Graybox LLC?
          16        A   And that's correct too, yes.
          17        Q   Okay.  Working down the list, we see "CAC
          18   Group, Inc."; correct?
          19        A   That's correct.
14:05:45  20        Q   And the responsible party there is K.Jam Media,
          21   Inc.; correct?
          22        A   Yes.
          23        Q   And that's Mr. Jam's company?
          24        A   I don't know if it's his company, I just know
14:05:56  25   it's connected with Kia Jam.
```

Page 132

```
14:05:59   1        Q   Thank you, ma'am.
           2        And then we go to Integrated Administration
           3   farther down the list, and there is a question mark
           4   there as to the responsible party; correct?
14:06:08   5        A   Yes.
           6        Q   But Integrated Administration was one of
           7   Mr. Jam's companies; correct?
           8        A   When I --
           9        MR. WEICHERT:  Calls for a conclusion.  No
14:06:16  10   foundation.
          11        THE WITNESS:  Sorry.
          12        When I refer to a responsible party, I was
          13   kind -- I -- the way I see it, I usually refer to the
          14   EIN numbers.
14:06:26  15   BY MR. WALKER:
          16        Q   Yes, ma'am.
          17        A   So I -- and since I don't think that I have
          18   applied for an EIN number for Integrated Administration,
          19   that's why I put a question mark on it.
14:06:35  20        Q   So you just didn't have that information?
          21        A   I did not apply for the EIN number online.
          22        Q   Was that done through someone else by someone
          23   else at Mr. Jam's request?
          24        MR. WEICHERT:  Objection.  Calls for
14:06:46  25   speculation.
```

Page 133

```
14:06:49   1        THE WITNESS:  I -- I would not know.
           2   BY MR. WALKER:
           3        Q   You just know that you didn't do it?
           4        A   I know that I didn't do it, yes.
14:06:54   5        Q   And Integrated Administration was a company
           6   that you did not have access to the bank account?
           7        A   Not to the bank account, not to anything, no.
           8        Q   Okay.
           9        A   At the time.
14:07:05  10        Q   When did that change with respect to Integrated
          11   Administration?
          12        A   I want to say when discovery was done for
          13   the -- when -- when the -- when the lawsuit was filed
          14   against -- when the lawsuit was filed in -- in --
14:07:19  15   whenever it was filed.  I would say 2000.  And then
          16   we -- we made lists of -- of -- I -- I remember myself
          17   making lists of, for example, who was employed by IA,
          18   who was on the -- on the -- on the payroll.  And I think
          19   that's when I may have seen something.
14:07:43  20        Q   And when was -- what lawsuit are you
          21   referencing?
          22        A   One of the -- the -- there was so many at that
          23   time.  One -- one of the Wimbledon.  I can only assume.
          24        Q   One of the what, ma'am?
14:07:55  25        A   The Wimbledon lawsuit.
```

34  (Pages 130 to 133)

Frymi Biedak                                              03-25-19

---

Page 134

```
14:07:56    1      Q   Wimbledon?
            2      A   Yes, it was.  It was always at Wimbledon.
            3      Q   Okay.  Okay.  And -- and what year was that,
            4   roughly, do you recall?
14:08:14    5      A   Maybe 2014, but I'm not sure.  I'm really not
            6   sure.  I don't want to -- this is just very vague.
            7      Q   Yes, ma'am.
            8          Now, going up a couple of companies, there is a
            9   Global Services Group.
14:08:27   10          Do you see that?
           11      A   I do.
           12      Q   Was Freddie Wilson, the person designated as a
           13   responsible party, was he working in one of Mr. Jam's
           14   companies?
14:08:36   15      A   Freddie Wilson was -- this company did security
           16   pu- -- services.  They provided se- -- security.
           17      Q   Okay.  So did Mr. Bergstein or Mr. Jam have
           18   some ownership interest in that company?
           19      A   I wouldn't know.
14:08:58   20      Q   Going back down, below Integrated
           21   Administration, do you see Iskra Enterprises, LLC?
           22      A   Yes.
           23      Q   And there, Don Carroll, the individual you
           24   identified as being affiliated with Integrated
14:09:12   25   Administration, he's listed as a responsible party.
```

---

Page 135

```
14:09:14    1          Do you see that?
            2      A   Well -- I'm sorry.  Can you repeat the
            3   question?
            4      Q   Yes, ma'am.
14:09:20    5          Do you see where Don Carroll is listed as a
            6   responsible party for the company known as Iskra
            7   Enterprises, LLC?
            8      A   Yes.
            9      Q   Okay.  Was that also a company affiliated with
14:09:31   10   Kia Jam?
           11      A   I don't think so.
           12      Q   How was it that Mr. Carroll was listed as a
           13   responsible party?
           14      A   I can only assume that we applied for the EIN
14:09:43   15   number with his Social Security, but I'm not sure.
           16      Q   Okay.
           17      A   I'm really not sure.
           18      Q   Also, the next company down, IT Workz, Inc.?
           19      A   Yes.
14:09:54   20      Q   Also lists Don Carroll as the responsible
           21   party.
           22          Was that a company that was affiliated in some
           23   fashion with Kia Jam?
           24      A   Not as far as I know.
14:10:05   25      Q   What was the nature of the business for IT
```

---

Page 136

```
14:10:08    1   Workz, Inc.?
            2      A   They did IT services and phone services and --
            3   and I would say various consulting regarding tech--
            4   technical computer.
14:10:21    5      Q   Okay.  And was that a company that Don Carroll
            6   was affiliated with, obviously?
            7      A   I think IT Workz, Inc., I'm pretty sure that
            8   was his company.
            9      Q   Okay.  And then K.Jam Aviation, Inc. is the
14:10:36   10   next company down and the responsible party listed there
           11   is Kia Jim; correct?
           12      A   Correct, yes.
           13      Q   And likewise, M2 Aircraft Group Inc., a Nevada
           14   corporation, also lists Kia Jam as a responsible party;
14:10:52   15   correct?
           16      A   That's what it says, yes.
           17      Q   And then the next company down, it's K.Jam
           18   Media, Inc., certainly one affiliated with Kia Jam;
           19   correct?
14:11:02   20      A   Well, when you see a responsible party, it's
           21   the entity under which we would have applied for an EIN
           22   number.
           23      Q   Yes, ma'am.
           24          But K.Jam Media, certainly, you understood to
14:11:14   25   be affiliated with Kia Jam, though?
```

---

Page 137

```
14:11:14    1      A   That's the way I understood it, yes.
            2      Q   And then Pineboard Holdings, Inc. is a few
            3   companies down from that; correct?
            4      A   Yes.
14:11:30    5      Q   And then we see Swartz Technology Group, Inc.;
            6   correct?
            7      A   Swartz Technology Group, Inc., yes, I see that.
            8      Q   Okay.  And there is no responsible party listed
            9   for Swartz Technology Group, Inc., is there?
14:11:44   10      A   I guess then we didn't apply for an EIN number.
           11      Q   Okay.  Do you know why, under Sovrin Health
           12   Systems, Inc., K.Jam Media, Inc. is listed as the
           13   responsible party?
           14      A   No.
14:11:58   15      Q   So this would appear to be a group of companies
           16   that both Mr. Bergstein and Mr. Jam and Mr. Carroll were
           17   all involved with one way or the other; correct?
           18          MR. WEICHERT:  Question is vague and ambiguous.
           19   Overbroad.  Calls for a conclusion.  No foundation.
14:12:13   20          THE WITNESS:  I don't understand the question.
           21   Can you rephrase?
           22          BY MR. WALKER:
           23      Q   This list of companies that you put together
           24   reflect various companies that Mr. Jam and Mr. Bergstein
14:12:25   25   had some interest in.
```

---

35 (Pages 134 to 137)

Frymi Biedak                                                          03-25-19

Page 138

14:12:27   1          Is that a fair statement?
           2              MR. WEICHERT:  Same objections.  Same
           3      objections.
           4              THE WITNESS:  I don't know if I would say
14:12:33   5      "interest."  I would say "connected with."
           6      BY MR. WALKER:
           7      Q    And you had access to certain corporate
           8      information about each of these companies like their
           9      employer identification number, for example?
14:12:45  10      A    Yes.
          11      Q    You had information for certain of the
          12      companies regarding the responsible party that was
          13      listed as part of the EIN number filing?
          14      A    When I filed it, yes.  Or when it was given to
14:13:00  15      me and asked for something.
          16      Q    So we can -- I -- I take it, then, from your
          17      testimony that every company on this list for which a
          18      responsible party is listed is a company that you filed
          19      for the employer identification number for?
14:13:18  20      A    I have to see this one.  Or we did it -- as I
          21      said before, if -- if -- let's just say -- okay.  I'm --
          22      I'm going to have to take an example here.  Let's just
          23      say K.Jam Media, Inc. filed online for a -- a -- a -- an
          24      EIN number.  Let's just say like this.
14:13:42  25      Q    Uh-huh.

Page 139

14:13:42   1      A    You could not use the same entity and file
           2      online for another entity.  The IRS would not allow it.
           3      Then you would -- the only way to do it was would send a
           4      fax, a facsimile --
14:13:51   5      Q    Yes, ma'am.
           6      A    -- to the IRS and then within eight to ten
           7      days, they would reply via fax with the EIN number.
           8      Q    Okay.
           9      A    So when it says here "responsible party," I
14:14:03  10      would say this is the part you applied for the EIN
          11      number.
          12      Q    Okay.  Well, you testified earlier that on some
          13      of the companies like Integrated Administration where
          14      you didn't have a responsible party to list, that that
14:14:19  15      was because you didn't apply for that EIN number;
          16      correct?
          17      A    That's the way I see it, yes.
          18      Q    Okay.  So then can we take from your testimony
          19      that every entity for which you listed a responsible
14:14:34  20      party is one for which you did apply for the EIN number?
          21      A    No, I cannot say that.
          22      Q    How were you able to secure the information,
          23      then?
          24      A    Well, Don Carroll must have asked.
14:14:47  25      Q    And he was officing with you at the same

Page 140

14:14:50   1      address on Colorado Boulevard?
           2      A    I don't -- Carroll and I also go back 30 years,
           3      so, I mean -- it's like, I would -- would have just
           4      asked him whatever I needed.  So I met -- I met David
14:15:05   5      Bergstein and Don Carroll at the same time so this was
           6      more like a -- I need something, I called him.  If I
           7      needed IT services, I called him.
           8              So -- so he may have giv- -- I cannot say with
           9      secure thing that whenever you see "a responsible
14:15:18  10      party," that I have applied for it.  For example, I -- I
          11      don't remember applying for Iskra Enterprises.  I don't
          12      remember it.  But since he was the manager, I would --
          13      I'd probably put that down.  Does this --
          14      Q    And -- and as we sit here today, looking at
14:15:36  15      this chart doesn't reflect -- doesn't refresh your
          16      recollection as to what all these companies were doing
          17      in the same chart together?
          18      A    No.
          19      Q    And it doesn't refresh your recollection as to
14:15:48  20      why Mr. Jam asked you to prepare that list?
          21      A    No.
          22      Q    Let me hand you what's been marked as
          23      Exhibit 21, ma'am.
          24              (Exhibit 21 was marked for
13:57:40  25              identification by the Court Reporter

Page 141

13:57:40   1              and is attached hereto.)
           2      BY MR. WALKER:
           3      Q    And ask you if you can identify that document.
           4      A    I'm ready.
14:16:34   5      Q    Does this -- well, could you please identify
           6      this document we've marked as Exhibit 21 for us?
           7      A    It says, "Integrated Administration employee
           8      list, 8/11 to 12/2013."
           9      Q    Okay.  And is this a list that you created?
14:16:50  10      A    I -- I don't think that I would use capital
          11      letters for everything.  That's not my style.  So, I
          12      mean, I -- I -- I don't -- I wouldn't do it.  So
          13      it -- it -- it -- I could have created it but I don't --
          14      it -- I would usually not use everything capital
          15      letters.
14:17:14  16      Q    Let me ask you this:  You've referenced earlier
          17      in your testimony that in response to one of the
          18      Wimbledon lawsuits that you had compiled a list of
          19      Integrated Administration employees, is this that list?
14:17:32  20      A    I don't think so.  I think mine was more -- I
          21      would have done an Excel spreadsheet.
          22      Q    Okay.  Does this appear to be all the -- the
          23      same number of names, for example, you put -- you had
          24      40 -- let me -- let me ask you this way.
14:17:46  25              Does Exhibit 21 reflect the same number of

eLitigation Services, Inc. - els@els-team.com

Frymi Biedak                                              03-25-19

---

Page 142

| | |
|---|---|
| 14:17:51 | 1 Integrated Administration employees that you had on your |
| | 2 list? |
| | 3      A   I would have to look at the list -- at the |
| | 4 other list, the one that I created. |
| 14:18:01 | 5      Q   Do you know why David Bergstein is listed as an |
| | 6 employee of Integrated Administration for that time |
| | 7 period of August 2011 to December 2013? |
| | 8          MR. WIECHERT:  Calls for speculation.  No |
| | 9 foundation. |
| 14:18:17 | 10          THE WITNESS:  He may have been on -- on IA's |
| | 11 payroll at a certain time.  He may have been.  It's |
| | 12 possible. |
| | 13      Q   Is that also true with respect to Donald |
| | 14 Carroll -- he is listed as No. 12 -- was he also an |
| 14:18:32 | 15 employee of Integrated Administration during this time |
| | 16 period? |
| | 17      A   I think so. |
| | 18      Q   Were you also listed -- there is No. 16.  Let |
| | 19 me ask you this way.  It reflects that you were an |
| 14:18:45 | 20 employee of Integrated Administration for the same time |
| | 21 frame, there on No. 16, where you're listed. |
| | 22          Was that also true? |
| | 23      A   Yes, I was an employee. |
| | 24      Q   Now, was Integrated Administration actually the |
| 14:18:58 | 25 company that appeared on your paycheck during this time |

---

Page 143

| | |
|---|---|
| 14:19:01 | 1 period? |
| | 2      A   I think so. |
| | 3      Q   And then, of course, No. 25, Kiarash Jam is |
| | 4 listed as an employee of Integrated Administration; |
| 14:19:13 | 5 correct? |
| | 6      A   Correct, yes. |
| | 7      Q   And was he the president and CEO of Integrated |
| | 8 Administration? |
| | 9      A   I think so, but I don't remember filing a |
| 14:19:36 | 10 statement of information for this entity. |
| | 11          MR. WIECHERT:  Move to strike the answer as |
| | 12 speculation. |
| | 13 BY MR. WALKER: |
| | 14      Q   And then No. 38, Steven Piskula is also listed |
| 14:19:45 | 15 as an employee of Integrated Administration for the same |
| | 16 time frame; correct? |
| | 17      A   Yes.  We worked together a lot. |
| | 18      Q   Looking at this list of people, do you see any |
| | 19 names of people that at one time worked for any of |
| 14:20:05 | 20 Mr. Bergstein's companies? |
| | 21      A   I'm trying to think. |
| | 22          When you say "Mr. Bergstein's companies," |
| | 23 what -- what -- what -- |
| | 24      Q   Any of the companies that were on the list that |
| 14:20:31 | 25 we just looked at, for example, which is -- |

---

Page 144

| | |
|---|---|
| 14:20:37 | 1      A   Of this list? |
| | 2      Q   -- marked -- yes -- which was marked as |
| | 3 Exhibit 20. |
| | 4          MR. WIECHERT:  Objection. |
| 14:20:50 | 5          MR. MCGONIGLE:  I think the problem is we |
| | 6 didn't really lay a foundation, which was Bergstein's |
| | 7 companies or something else. |
| | 8          But you can answer if -- you just want to look |
| | 9 at the list and -- |
| 14:21:01 | 10          THE WITNESS:  I don't think any of these |
| | 11 entities had a payroll. |
| | 12 BY MR. WALKER: |
| | 13      Q   Okay.  Okay.  So let's -- let's go back to |
| | 14 Exhibit 20. |
| 14:21:11 | 15          So it's your testimony that -- it was your |
| | 16 understanding that the list of companies on the second |
| | 17 page of Exhibit 20 did not have a payroll and therefore |
| | 18 had no actual employees. |
| | 19          Is that a fair statement? |
| 14:21:34 | 20      A   Integrated Administration had a payroll.  This |
| | 21 is -- this is what we are talking here? |
| | 22      Q   Yes, ma'am. |
| | 23      A   I vaguely remember that Global Services Group |
| | 24 had a -- had a separate payroll. |
| 14:21:51 | 25      Q   Okay.  Anything else? |

---

Page 145

| | |
|---|---|
| 14:21:57 | 1      A   And I want to say that Sovrin Health Systems -- |
| | 2 or Sovrin -- I don't remember the name.  I think, but |
| | 3 I'm not sure, that Sovrin Health Systems, the people who |
| | 4 worked for Sovrin -- |
| 14:22:14 | 5      Q   Uh-huh. |
| | 6      A   -- that they were on IA's payroll.  I |
| | 7 vaguely -- I think, but I'm not sure. |
| | 8      Q   Okay.  So you believe that -- that Sovrin's -- |
| | 9 anyone working at Sovrin were actually employed by |
| 14:22:27 | 10 Integrated? |
| | 11      A   I think so. |
| | 12          MR. WIECHERT:  Objection.  No foundation. |
| | 13 BY MR. WALKER: |
| | 14      Q   I'm sorry, ma'am.  Go ahead and restate your |
| 14:22:36 | 15 answer. |
| | 16      A   I think so. |
| | 17      Q   Thank you. |
| | 18          Let me hand you what's been marked as |
| | 19 Exhibit 22. |
| 14:22:49 | 20          (Exhibit 22 was marked for |
| | 21           identification by the Court Reporter |
| | 22           and is attached hereto.) |
| | 23          MR. WALKER:  Sorry, I only have one courtesy |
| | 24 copy. |
| | 25 /// |

---

Frymi Biedak                                          03-25-19

---

Page 146

```
14:23:12   1    BY MR. WALKER:
           2        Q   Okay.  So this document is entitled "Summary of
           3    Entities"; correct?
           4        A   Correct.
14:23:26   5        Q   Do you know who prepared this document?
           6        A   No.  Wasn't me.
           7        Q   Now, looking at the first entity mentioned,
           8    Gion Funding Settlements, Inc.
           9            Do you see that?
14:23:40  10        A   Yes.
          11        Q   Okay.  It has the date of incorporation on
          12    December 29, 2010; correct?
          13        A   That's what it says, yes.
          14        Q   It says, "The type of entity is a Delaware C
14:23:50  15    corporation"; correct?
          16        A   That's what it says, yes.
          17        Q   Okay.  It says, "The secretary is likely
          18    Aaron Grunfeld or Howard Apple"; correct?
          19        A   Correct.
14:24:04  20        Q   Who was Mr. Apple?
          21        A   I have no idea.
          22        Q   And there -- there is a list of next steps;
          23    correct?
          24        A   Yes.
14:24:16  25        Q   And under item 3, it says, "Frymi to obtain EIN
```

---

Page 147

```
14:24:21   1    and make sure taxes and payments to VCorp (register
           2    agent) are paid," and then notes that was done; correct?
           3        A   Yes.  I'm impressed.
           4        Q   Okay.  And then there at the bottom, it says,
14:24:36   5    "Jeff, Kia, and David to discuss taxes of Majid on
           6    Thursday, November 10th."
           7            Did I read that correctly?
           8        A   Yes.  It doesn't say the year, though.
           9        Q   Fair enough.
14:24:49  10            And who would you understand are being
          11    mentioned there?  Who is Jeff?
          12        A   Well, I would have to know what November 10th
          13    of which year.
          14        Q   Okay.  Who did you understand Kia is being
14:25:10  15    referenced there?
          16        A   Kia Jam.
          17        Q   And who do you unders- -- who did you
          18    understand the David?
          19        A   David Bergstein.
14:25:17  20        Q   Okay.  And Majid, of course, is Mr. Zarrinkelk?
          21        A   Yes.
          22        Q   And it states on the note, "Graybox owns Gion";
          23    correct?  It's the note right below item 5.
          24        A   Below item 5.  Yes.
14:25:36  25            Yes, that's it.  Yes.
```

---

Page 148

```
14:25:46   1        Q   Okay.  If you could turn to the third page,
           2    ma'am.  The bottom number there is 000534.
           3        A   Yeah.
           4        Q   Now, up at the top, we have Swartz IP
14:25:58   5    Services Group, Inc.; correct?
           6        A   Yes.
           7        Q   It shows the type of entity as a Texas C
           8    corporation; correct?
           9        A   That's what it says.
14:26:05  10        Q   It shows the date of incorporation was
          11    December 2, 2010; correct?
          12        A   Yes.
          13        Q   Okay.  And it shows the secretary was likely
          14    Aaron Grunfeld or Howard Apple; correct?
14:26:16  15        A   Yes.
          16        Q   And there at the bottom -- well, on Item No. 3,
          17    it says -- let me back up just a little bit more.
          18            If you're looking at "next steps" -- do you see
          19    that section?
14:26:34  20        A   Next steps, yes.
          21        Q   Okay.
          22        A   What -- what subpoena are we talking now?
          23        Q   Yes.  Swartz IP Services Group, Inc.
          24        A   Okay.
14:26:40  25        Q   Under the "next steps," it says, "No. 2, Jeff
```

---

Page 149

```
14:26:43   1    to issue 1100 shares to K.Jam Media and 1,000 shares to
           2    Owari Opus and appoint Kia president and David secretary
           3    and take any other required actions, resolutions, annual
           4    meetings, et cetera."
14:26:59   5            Did I read that correctly?
           6        A   Yes.
           7        Q   And is it your understanding that Kia is
           8    referencing Kia Jam?
           9            MR. WIECHERT:  Objection.  No foundation.
14:27:07  10    Calls for speculation.
          11            The witness did not prepare this document.  She
          12    doesn't even indicate she knows who prepared this
          13    document.
          14            MR. WALKER:  And I would -- I would again ask
14:27:16  15    that counsel conform his objections to the rules.
          16            MR. WIECHERT:  That's the truth.
          17            BY MR. WALKER:
          18        Q   When it says that "Jeff to issue 1100 shares to
          19    K.Jam Media," you understood that was Mr. Jam's company,
14:27:32  20    correct, K.Jam Media?
          21            MR. WIECHERT:  Objection.  No foundation.
          22            This is the first day I understand she's seen
          23    this document.  So when you say "understood," that
          24    misstates the testimony.
14:27:43  25            THE WITNESS:  Am I supposed to say something
```

Frymi Biedak                                                     03-25-19

---

Page 150

```
14:27:46   1    now?
           2    BY MR. WALKER:
           3        Q   Yeah.
           4        A   I'm sorry.
14:27:47   5        Q   That's okay.
           6        A   I'm a li-- I'm a little bit confused.
           7        Q   No, I understand.  I understand why, too.
           8           Okay.  Let me -- let me just walk you through
           9    this Item No. 2, okay, under "next steps."
14:27:57  10        A   Yeah.
          11        Q   Who did you understand Jeff to reference?
          12        A   Well, that --
          13           MR. WIECHERT:  Calls for -- excuse me, ma'am.
          14           THE WITNESS:  Sorry.
14:28:02  15           MR. WIECHERT:  Calls for speculation.  No
          16    foundation.
          17    BY MR. WALKER:
          18        Q   Who did you understand Jeff to reference there?
          19           MR. WIECHERT:  Same objections.
14:28:16  20           THE WITNESS:  That's what I asked, which year
          21    we are referring to, because there were two Jeffs.  One
          22    was Jeff Solomon and one is Jeff Kranzton.
          23    BY MR. WALKER:
          24        Q   Okay.  Fair enough.  Thank you.
14:28:28  25           And so whichever those two Jeffs it might have
```

---

Page 151

```
14:28:32   1    been, he was going to issue 1100 shares to K.Jam Media;
           2    correct?
           3           MR. WIECHERT:  Calls for speculation.  No
           4    foundation.
14:28:39   5           THE WITNESS:  That's what it says.
           6    BY MR. WALKER:
           7        Q   And 1,000 shares to Owari Opus; correct?
           8           MR. WIECHERT:  Calls for speculation.  No
           9    foundation.
14:28:50  10           THE WITNESS:  That's what the document says.
          11    BY MR. WALKER:
          12        Q   Okay.  And Kia was to be appointed president;
          13    correct?
          14           MR. WIECHERT:  Objection.  Speculation.  No
14:29:01  15    foundation.
          16           Counsel, you're just reading the document to
          17    her that she didn't prepare.
          18           THE WITNESS:  Am I supposed to say something
          19    now?
14:29:10  20    BY MR. WALKER:
          21        Q   Yes, ma'am.
          22           That's what -- this envisioned appointing Kia
          23    Jam president of Swartz IP Services Group --
          24           MR. WIECHERT:  Objection.  No
14:29:19  25    foundation as to what she understands was envisioned by
```

---

Page 152

```
14:29:22   1    the author of a document she doesn't even know.
           2    BY MR. WALKER:
           3        Q   -- is that correct, ma'am?
           4        A   Can you repeat the question?
14:29:31   5        Q   Yes, ma'am.
           6           This document indicates that it was envisioned
           7    that Kia Jam would be appointed president of Swartz --
           8    Swartz IP Services Group, Inc.; correct?
           9           MR. WIECHERT:  Objection.  No foundation.
14:29:45  10    Calls for speculation.
          11           THE WITNESS:  You want me to answer?
          12           MR. MCGONIGLE:  You can answer.  He's just
          13    making --
          14           THE WITNESS:  Okay.  All right.
14:29:53  15           MR. MCGONIGLE:  -- those objections.
          16           THE WITNESS:  That's what the document says,
          17    yes.
          18    BY MR. WALKER:
          19        Q   Okay.  And then on Item No. 3, that next step
14:30:03  20    involved you obtaining the employer ID number and just
          21    to make sure taxes and payments to VCorp, the registered
          22    agents were paid; correct?
          23        A   That's what it says.
          24           MR. WIECHERT:  Objection.
          25    ///
```

---

Page 153

```
14:30:15   1    BY MR. WALKER:
           2        Q   Okay.
           3           MR. WIECHERT:  Again, her interpretation of
           4    this document is speculation.
14:30:19   5    BY MR. WALKER:
           6        Q   And under the note there at the bottom of this
           7    section, it says, "K.Jam Media and Owari Opus own
           8    Swartz."
           9           Did I read that correctly?
14:30:31  10           MR. WIECHERT:  The document speaks for itself.
          11           THE WITNESS:  That's what it says on the
          12    document.
          13    BY MR. WALKER:
          14        Q   And that's actually consistent with another
14:30:39  15    document we looked at earlier, isn't it?
          16           MR. WIECHERT:  Misstates the testimony and the
          17    evidence.
          18    BY MR. WALKER:
          19        Q   If you recall?
14:30:45  20        A   I -- you would have to tell me which document
          21    it was.
          22        Q   Fair enough.
          23           THE VIDEOGRAPHER:  Scoot back this way.
          24           THE WITNESS:  Oh, I'm sorry.  I'm sorry.
14:30:57  25           Good?
```

---

39 (Pages 150 to 153)

Frymi Biedak                                        03-25-19

---

Page 154

| | |
|---|---|
| 14:30:57 | 1   THE VIDEOGRAPHER: Yes. |
| | 2   BY MR. WALKER: |
| | 3   Q   Now, going down to the next item, we see a |
| | 4   similar section for Owari Opus, Inc.; correct? |
| 14:31:05 | 5   A   Yes. |
| | 6   Q   And again, on item 2, we see the same |
| | 7   statement, "Jeff to issue 100 shares to K.Jam Media and |
| | 8   appoint Kia president and David secretary and take any |
| | 9   other required actions, resolutions, annual meetings, |
| 14:31:20 | 10  et cetera"; correct? |
| | 11   MR. WIECHERT: The document speaks for itself. |
| | 12   THE WITNESS: That's what it -- |
| | 13   MR. WIECHERT: No foundation. |
| | 14   THE WITNESS: That's what the document says. |
| 14:31:25 | 15   BY MR. WALKER: |
| | 16   Q   And there on the bottom, the note states that |
| | 17   K.Jam Media owns Owari; correct? |
| | 18   MR. WIECHERT: Document speaks for itself. No |
| | 19   foundation. |
| 14:31:39 | 20   THE WITNESS: That's what it says. |
| | 21   BY MR. WALKER: |
| | 22   Q   Now, were you ever privy to do any meetings or |
| | 23   discussions or conferences of -- of any kind when any of |
| | 24   these items were discussed? |
| 14:31:51 | 25   MR. MCGONIGLE: Are you talking about Owari or |

---

Page 155

| | |
|---|---|
| 14:31:53 | 1   Swartz or both? |
| | 2   MR. WALKER: Both. |
| | 3   THE WITNESS: I was never included in that. |
| | 4   BY MR. WALKER: |
| 14:31:59 | 5   Q   Were you asked to secure the employer ID number |
| | 6   and to make sure taxes and payments to VCorp as a |
| | 7   registered agent were paid for Swartz IP Services Group, |
| | 8   Inc.? |
| | 9   A   That's what it says in the -- oh, what I |
| 14:32:12 | 10  remember what I was asked? Possible. Possible. |
| | 11   Q   Likewise, were you asked to obtain an employer |
| | 12   ID number and to make sure taxes and payments to VCorp |
| | 13   as a registered agent were paid for Owari Opus, Inc.? |
| | 14   A   I don't think Owari Opus, Inc. -- I may have |
| 14:32:33 | 15   been asked, but I don't think it ever applied to an EIN |
| | 16   number. |
| | 17   Q   Okay. Was it ever actually a legal corporation |
| | 18   then? |
| | 19   A   Yes. Beca-- |
| 14:32:44 | 20   MR. WIECHERT: Objection. Calls for |
| | 21   conclusion. No foundation. |
| | 22   THE WITNESS: When we reinstated it at some |
| | 23   point in Delaware. |
| | 24   BY MR. WALKER: |
| 14:32:51 | 25   Q   Oh, had it lost its charter at some point? |

---

Page 156

| | |
|---|---|
| 14:32:53 | 1   A   I vaguely re- -- I -- I vaguely recollect |
| | 2   something. I may be mixing up -- it was something -- |
| | 3   but I think at some point, it was not in good standing. |
| | 4   And I think we reinstated it, but I'm not 100 percent |
| | 5   sure. |
| 14:33:05 | 6   Q   And then going to the last page of this |
| | 7   exhibit, "There were additional action items for Jeff |
| | 8   and Frymi." |
| | 9   Do you see that? |
| 14:33:22 | 10   MR. WIECHERT: The document speaks for itself. |
| | 11   THE WITNESS: Additional documents, yes. |
| | 12   BY MR. WALKER: |
| | 13   Q   And it says, "Additional action items for Jeff |
| | 14   and Frymi." |
| 14:33:31 | 15   A   Uh-huh. |
| | 16   Q   Do you see that? |
| | 17   A   Yes. |
| | 18   Q   Okay. The first one was formed, Tri-State |
| | 19   Lighting, Inc., in Delaware. |
| 14:33:36 | 20   A   Yes. |
| | 21   Q   Were you involved in the formation of that |
| | 22   company? |
| | 23   A   I'm pretty sure I was. |
| | 24   Q   The second one is formed Cyrano Group, Inc. in |
| 14:33:44 | 25   Delaware. |

---

Page 157

| | |
|---|---|
| 14:33:46 | 1   Do you see that? |
| | 2   A   Yes. |
| | 3   Q   Were you involved in the formation of Cyrano |
| | 4   Group, Inc.? |
| 14:33:51 | 5   A   I think so, yes. I think I formed those with |
| | 6   Parasec, as far as I recollect. |
| | 7   Q   So there are things that are mentioned in |
| | 8   Exhibit 22 that you recall -- that, at least, as far as |
| | 9   it pertains to what you were supposed to do, you recall |
| 14:34:10 | 10  actually doing? |
| | 11   A   Cyrano and Tri-State, I'm fairly sure that I |
| | 12   formed it with Parasec who gave them the instructions. |
| | 13   Q   And with respect to the different companies |
| | 14   that are mentioned in this memo, that note that you |
| 14:34:26 | 15   were -- you were to obtain, an EIN, an employer ID |
| | 16   number, and make sure the taxes and payments to VCorp as |
| | 17   a registered agent were paid, were those the kinds of |
| | 18   things that you normally did? |
| | 19   MR. WIECHERT: Question is compound. It's |
| 14:34:39 | 20   vague and ambiguous. |
| | 21   THE WITNESS: If you ask me now, yes. Ask me |
| | 22   then, I don't remember. |
| | 23   BY MR. WALKER: |
| | 24   Q   Okay. On the first item where it says "done," |
| 14:35:02 | 25   after "Frymi to obtain EIN and make sure taxes and |

---

40 (Pages 154 to 157)

Page 158

| | |
|---|---|
| 14:35:06 | 1  payments to VCorp registered agent are paid for Gion |
| | 2  Funding Settlements, Inc.," do you have any recollection |
| | 3  of actually doing that? |
| | 4      A   No.  I'm sorry. |
| 14:35:17 | 5      Q   Do you have any specific recollection of |
| | 6  doing -- securing any of the employee ID numbers for any |
| | 7  of the companies listed in this memo? |
| | 8          MR. MCGONIGLE:  You might want to start with |
| | 9  the first one and flip through right. |
| 14:35:36 | 10         THE WITNESS:  Okay. |
| | 11         MR. MCGONIGLE:  It would be easier. |
| | 12         THE WITNESS:  Do you mean if I have a |
| | 13  recollection of going on the EIN website and then apply |
| | 14  for an employee IM-- -- EIN number?  If I have |
| 14:35:46 | 15  recollections of that? |
| | 16  BY MR. WALKER: |
| | 17     Q   Or doing it by facsimile.  Either one. |
| | 18         Let's start with the first one.  And I don't |
| | 19  know if I've already asked you this.  I apologize.  But |
| 14:35:53 | 20  just to go through all of them. |
| | 21         Do you recall actually obtaining the employer |
| | 22  ID number and making sure the taxes and payments to |
| | 23  VCorp as a registered agent were paid for Gion Funding? |
| | 24     A   I would have to see whom it lists as |
| 14:36:07 | 25  responsible party for Gion.  I would have to look at |

Page 159

| | |
|---|---|
| 14:36:11 | 1  this one, and I have to look at the records.  Because |
| | 2  when I applied, I would really have to go back to the -- |
| | 3  go and find somewhere. |
| | 4      Q   Well, go ahead and pull Exhibit 20. |
| 14:36:26 | 5      A   Yes. |
| | 6      Q   Okay.  Put that on one side there with the |
| | 7  chart that you created. |
| | 8      A   Sorry. |
| | 9      Q   No, that's fine, ma'am.  Take your time. |
| 14:36:49 | 10         Okay.  So Exhibit 20, you've -- you've got the |
| | 11  second page of that, which is the chart that you've |
| | 12  created with all these different entities -- |
| | 13     A   Yes. |
| | 14     Q   -- correct? |
| 14:36:55 | 15     A   Yes. |
| | 16     Q   So let's start at the top of Exhibit 22 |
| | 17  on Gion Funding Settlements. |
| | 18     A   Yes. |
| | 19     Q   Did you obtain the employer ID number and |
| 14:37:04 | 20  attend to the taxes and payments to VCorp as a |
| | 21  registered agent for that company? |
| | 22     A   I think I probably set up the EIN number |
| | 23  online, I think.  Would I pay the -- the -- the taxes |
| | 24  to -- to VCorp, I'm not sure. |
| 14:37:27 | 25     Q   Okay. |

Page 160

| | |
|---|---|
| 14:37:27 | 1      A   That, I'm not sure. |
| | 2      Q   Okay.  What about the second company on |
| | 3  Exhibit 22, Hojo Capital Partners Corp, does looking at |
| | 4  Exhibit 20, that chart, refresh your recollection as to |
| 14:37:39 | 5  whether or not you secured the -- secured the EIN number |
| | 6  and attended to the taxes and payments to VCorp for that |
| | 7  company? |
| | 8      A   The -- I probably applied for the EIN number |
| | 9  online, but I don't remember if I paid.  I don't |
| 14:37:54 | 10  remember. |
| | 11     Q   Okay.  Going to the third company on |
| | 12  Exhibit 22, Boson LLC. |
| | 13         Does looking at the chart in Exhibit 20 refresh |
| | 14  your recollection as to whether you obtained the |
| 14:38:08 | 15  employer ID number for that company and attended to |
| | 16  those taxes? |
| | 17     A   Boson LLC, I definitely did the EIN number.  I |
| | 18  think Boson LLC -- I think at some point I transferred |
| | 19  it to -- to Par-- I transferred agent of process to |
| 14:38:34 | 20  Parasec. |
| | 21     Q   Fair enough. |
| | 22         But looking at the chart that we have in |
| | 23  Exhibit 20, it refreshes your recollection that you did, |
| | 24  in fact, secure the employer ID number for Boson LLC? |
| 14:38:47 | 25     A   I'm fairly sure, yes. |

Page 161

| | |
|---|---|
| 14:38:49 | 1      Q   Okay.  Going to Kambe Asset Management, Inc., |
| | 2  the next company in the line -- in the list of |
| | 3  Exhibit 22. |
| | 4          Does looking at the chart in Exhibit 20 refresh |
| 14:39:01 | 5  your recollection -- |
| | 6      A   I -- |
| | 7      Q   -- as to whether or not -- |
| | 8      A   I -- |
| | 9      Q   -- you obtained that number? |
| 14:39:03 | 10     A   It's not here, Kambe's.  I don't see it on this |
| | 11  list. |
| | 12     Q   Yes, ma'am.  It's about -- |
| | 13     A   Oh -- oh -- oh, yeah.  Yeah.  Yeah.  That -- |
| | 14  that, I don't know, because it says "Gion Funding |
| 14:39:21 | 15  Settlements, Inc."  And I think we just said that this |
| | 16  one was sold.  If -- I -- I -- I would not remember |
| | 17  having done this with the fax.  I don't remember.  I |
| | 18  really don't. |
| | 19     Q   Okay.  Fair enough. |
| 14:39:32 | 20         Going to the next company that's on the list of |
| | 21  Exhibit 22, which is Swartz IP Services Group. |
| | 22         Does looking at the chart in Exhibit 20 refresh |
| | 23  your recollection as to whether you took care of that |
| | 24  employment ID number and attend -- attending to those |
| 14:39:48 | 25  taxes and payments to VCorp took place as this memo |

Frymi Biedak                                                          03-25-19

---

Page 162

```
14:39:52   1    suggests?
           2        MR. WIECHERT:  Counsel, is Swartz IP Group
           3    mentioned on Exhibit 20?
           4        MR. WALKER:  Yes.
14:40:00   5        MR. WIECHERT:  And so I see Swartz Technology
           6    Group.
           7        THE WITNESS:  I think you're referring to --
           8    BY MR. WALKER:
           9    Q    Yes, ma'am.  Yes.
14:40:09  10    A    I probably have applied for -- you see, I don't
          11    remember applying for this EIN number.  I don't know
          12    why, but I did not apply for it.  I don't remember
          13    myself applying for it.  And the taxes were apparently
          14    not paid.  Because we talked about that.
14:40:29  15    Q    Yes, ma'am.
          16    A    And I don't have much -- I mean, ask me
          17    Delaware, I'm familiar with what needs to be filed.
          18    Nevada, maybe, and California.  Texas, this is, I think,
          19    the only entity that I've ever seen was in Texas.
14:40:46  20    Q    Yes, ma'am.
          21    A    I haven't seen any other.
          22    Q    And do you have any -- based upon your
          23    familiarity with Mr. Bergstein and Mr. Jam, do you have
          24    any understanding as to why Swartz IP was not handled
14:41:00  25    through you?
```

---

Page 163

```
14:41:06   1    A    No.
           2    Q    Thank you, ma'am.
           3        And then looking at Owari Opus, Inc. in
           4    Exhibit 22.
14:41:14   5        Does looking at the chart in Exhibit 20 refresh
           6    your recollection as to whether you obtained that
           7    employer ID number?
           8    A    I don't think this ever had an employer ID
           9    number, Owari Opus, Inc.
14:41:28  10    Q    You had said that earlier.  Thank you.
          11        And in filing Nobunaga Unity LLC, did you have
          12    anything to do with that?
          13    A    No.
          14        MR. MCGONIGLE:  You might have a note on here
          15    if you want to switch it.
14:41:43  16        MR. WALKER:  Oh, I gave you the wrong one?  No
          17    wonder you didn't get a copy.
          18        MR. MCGONIGLE:  No, you -- that one doesn't
          19    look like it -- well, if you want to just do a clean
14:41:43  20    one, I think.
          21        MR. WALKER:  Here, you can have that one.
          22        MR. MCGONIGLE:  Yeah.  There you go.
          23        MR. WALKER:  Well, that one's got a note on it.
          24        MR. MCGONIGLE:  Yes.  I -- I don't need it.
14:42:09  25        MR. WALKER:  You don't want it?
```

---

Page 164

```
14:42:09   1        MR. MCGONIGLE:  Yeah.  Here you go.
           2        MR. WALKER:  Okay.  Fair enough.
           3    BY MR. WALKER:
           4    Q    Let me hand you what's been marked as
14:42:40   5    Exhibit 23, ma'am.
           6        (Exhibit 23 was marked for
           7         identification by the Court Reporter
           8         and is attached hereto.)
           9    BY MR. WALKER:
14:42:47  10    Q    I'm going to ask you if you can identify this
          11    document.
          12    A    This one -- I think this one lists -- and I
          13    think, I'm not sure.  I think it lists the employees on
          14    the payroll of IA, I think, but I think this one also
14:43:17  15    says that the titles --
          16    Q    Okay.
          17    A    -- or the -- or the occupations, I'm sorry.
          18    Q    As I recall your testimony, you didn't believe
          19    that you created -- that you personally drafted or
14:43:27  20    created that last list that we saw marked as --
          21    A    The one with the capital letters?
          22    Q    Yes, ma'am.
          23    A    I don't recall doing this.  But I also don't
          24    recall doing this one.
14:43:40  25    Q    Okay.  Fair enough.
```

---

Page 165

```
14:43:42   1        And do you know what the purpose of creating
           2    Exhibit 23, this particular list, might have been?
           3    A    I think it was also part of maybe the discovery
           4    when we -- when -- when -- when -- when -- when --
14:43:58   5    when -- when Wimbledon filed a -- a -- a lawsuit.  And I
           6    think this was part of the discovery.  But again, I'm
           7    not really sure.
           8    Q    Okay.  Okay.  If you could pull Exhibit 21 as
           9    well, ma'am, in addition to 23, please.
14:44:39  10    A    Yes.
          11    Q    Okay.  So these -- Exhibit 21 and Exhibit 23
          12    are the two lists that we've discussed; correct?
          13    A    That's correct, yes.
          14    Q    Okay.  And you believe that Exhibit 23 is also
14:44:53  15    a list of Integrated Administration employees that was
          16    prepared for the purpose of discovery in a lawsuit?
          17    A    I think so, but I'm not sure.  I think so.
          18    Q    Now, in Exhibit 21, it actually states
          19    "Integrated Administration employee list" and provides a
14:45:11  20    time frame; correct?
          21    A    That's what it says, yes.
          22    Q    But we don't see either an identification of
          23    Integrated Administration employee list in Exhibit 23
          24    nor do we have a time frame; correct?
14:45:24  25    A    On this one?
```

---

42 (Pages 162 to 165)

Frymi Biedak                                                                03-25-19

---

Page 166

```
14:45:25   1      Q   On Exhibit 23, yes, ma'am.
           2      A   Correct, yes.  You're correct.
           3      Q   Okay.  But the one difference that you point
           4   out is that for each of the individuals listed in
14:45:33   5   Exhibit 23, we have titles; correct?
           6      A   And on the other one, we have addresses.
           7      Q   Okay.  Now, for example, on Exhibit 23,
           8   Employee No. 13, Edmond Defrank.  His title is Sovrin
           9   cohead.
14:45:53  10          Did I read that correctly?
          11      A   That's what it says.
          12      Q   Okay.  And 15, Freddie Wilson, for his title,
          13   it says, Global Services Group-security/car company;
          14   correct?
14:46:05  15      A   Yes.
          16      Q   Okay.  Here we see No. 10 on -- on Exhibit 23,
          17   David Bergstein is listed as the CEO of Cyrano Group;
          18   correct?
          19      A   Yes.
14:46:22  20      Q   And on 25 of Exhibit 23, we see Kiarash Jam is
          21   listed as IA director and officer; correct?
          22      A   Yes.
          23      Q   Okay.  But from what I can tell, other than
          24   Mr. Wienskoski, who is listed as Kia Jam's assistant,
14:46:46  25   all these other people are listed in Exhibit 23 as being
```

---

Page 167

```
14:46:50   1   associated or employed by another company altogether,
           2   another -- a company different from Integrated
           3   Administration, I should say.
           4          Do you know why that is?
14:47:00   5      A   I have --
           6          MR. WIECHERT:  Calls for speculation.
           7          THE WITNESS:  No, I have no idea.
           8   BY MR. WALKER:
           9      Q   When it says, "No. 1, Anna Maria Predovich,
14:47:10  10   receptionist," do you know who she is a receptionist
          11   for?
          12      A   She was receptionist in the office on -- on
          13   Colorado Boulevard -- on 2425 Colorado Boulevard.
          14   That's where she was receptionist.
14:47:26  15      Q   Okay.  That was the same location where you had
          16   an office -- or Mr. Bergstein had an office --
          17      A   Well, but he didn't -- didn't come very much.
          18      Q   Right.
          19          And where Kia Jam had an office?
14:47:34  20      A   Yes.
          21      Q   Okay.  Okay.  So she was generally the
          22   receptionist for all of you?
          23      A   Correct.
          24      Q   But do you know why certain of the people on
14:47:45  25   Exhibit 23 are indicating that they are actually with
```

---

Page 168

```
14:47:47   1   Sovrin?  For example, looking at Exhibit 21, the second
           2   on the list is Andrea Potenciano --
           3      A   Potenciano.
           4      Q   -- correct?
14:47:58   5      A   Yes.
           6      Q   Okay.  And she's on Exhibit 21 under a list of
           7   Integrated Administration employees; correct?
           8      A   On -- yes, on the -- on 21.  Yes.  Yes.
           9      Q   Okay.  And then on Exhibit 23, it says that she
14:48:13  10   was Sovrin, dash, office admin medical biller?
          11      A   Yes.
          12      Q   So do you know whether she was an employee of
          13   Sovrin or an employee of Integrated Administration?
          14          MR. WIECHERT:  Calls for speculation.  No
14:48:26  15   foundation.
          16          THE WITNESS:  Can --
          17   BY MR. WALKER:
          18      Q   You can answer --
          19      A   Can I answer?
14:48:30  20      Q   Yes, you can answer.
          21      A   Okay.  The way I see it is that Sovrin General
          22   Health, whatever, was an entity that was not located in
          23   Santa Monica.  I think they were -- I want to say
          24   Glendale, but I'm really not sure.  They did medical
14:48:55  25   billing there.  But I think that the employee -- that --
```

---

Page 169

```
14:49:01   1   well, employees is -- maybe are the people who were
           2   working for Sovrin, did the medical billing, did the
           3   duties.  I think they were on IA's payroll -- on
           4   Integrated Administration's payroll.
14:49:13   5      Q   Did you ever have an understanding as to why
           6   that was done that way?
           7      A   No.
           8      Q   Let me hand you what's been marked as 24,
           9   ma'am.
14:49:23  10          (Exhibit 24 was marked for
          11           identification by the Court Reporter
          12           and is attached hereto.)
          13   BY MR. WALKER:
          14      Q   Now, this is an e-mail to you from Milton Vong;
14:49:42  15   correct?
          16      A   Yes.  Yes.
          17      Q   And it's marked 17/2016 at 12:11 p.m.; correct?
          18      A   Yes.
          19      Q   Okay.  And I think earlier you had said that
14:49:51  20   you preferred Pericorp [sic] as a company that would
          21   register companies or corporations?
          22      A   As an agent of process, I preferred Parasec.
          23      Q   Okay.  Thank you.
          24      A   And I know -- I know they know me there so --
14:50:06  25      Q   Yes, ma'am.
```

43 (Pages 166 to 169)

Frymi Biedak                                                    03-25-19

Page 170

14:50:06   1         Okay.  And Mr. Vong provided a courtesy copy to
           2   Steve Piskula; correct?
           3      A   To me and he cc'd Steve Piskula.
           4      Q   Thank you.
14:50:16   5         Now, he advises -- Mr. Vong advises you that
           6   this entity is currently forfeited and needs to be
           7   reinstated before the change of agent filing would be
           8   accepted?
           9      A   Correct.
14:50:27  10      Q   And, of course, the entity that he is
          11   referencing as having forfeited its charter is Swartz IP
          12   now known as Advisory IP services; correct?
          13      A   Correct.
          14      Q   Okay.  A couple of questions.
14:50:39  15         Why was Advisory IP Services, Inc. being
          16   considered for reinstatement as of March 17, 2016?
          17      A   I mean, I need to think about this.
          18         The way I understand it -- or understood it, I
          19   guess, at the time, the entity was involved in
14:51:11  20   litigation.  And when an entity is involved in
          21   litigation, you need to, first of all, make sure that
          22   it's in -- in good standing.  And I think it was
          23   forfeited.  I did not know that there was no agent of
          24   process.  I thought it was just -- there wasn't a tax
14:51:32  25   issue and so I really didn't know.  So at some point, I

Page 171

14:51:37   1   contacted -- and I didn't even know.  I didn't think
           2   that -- I didn't know if they had an agent or not.  At
           3   some point, I had contacted Parasec and I asked him,
           4   "Can you please be agent of process for this entity?"
14:51:48   5   And then he wrote that back.  And I think that was
           6   pretty much the end of it.
           7      Q   Okay.  So that's why he's telling you that
           8   the -- that the Advisory IP Services, Inc. was currently
           9   forfeited and that that would have to be reinstated
14:52:03  10   before he could do the change of agent filing that you
          11   requested of him?
          12      A   Yes.  And that's -- that's what they explained
          13   to me at some point, that if taxes -- like, even in
          14   Delaware, if taxes are not paid currently, they --
14:52:14  15   they -- they are obligated by -- by -- by law to resign
          16   as agents.
          17      Q   And it's your understanding that Swartz --
          18   Swartz IP, which was now known at this time in 2016 as
          19   Advisory IP Services, that it was never reinstated?
14:52:36  20      A   To the best of my knowledge, it was not
          21   reinstated.
          22         MR. WALKER:  Why don't we take a break for a
          23   few minutes, ma'am?
          24         THE VIDEOGRAPHER:  The time is 2:52 p.m.  We
14:52:45  25   are now off the record.

Page 172

14:52:46   1         (A recess was taken.)
           2         THE VIDEOGRAPHER:  We are back on the record.
           3   The time is 3:07 p.m.
           4   BY MR. WALKER:
15:07:28   5      Q   Ms. Biedak, just a couple of kind of follow-up
           6   questions and I'll -- I'll close out.
           7         You testified earlier that you're seeing
           8   Mr. Bergstein approximately once a month -- or once a
           9   week rather -- in -- in jail?
15:07:40  10      A   Once a week.
          11      Q   Once a week?
          12         Is there a set day that you visit him?
          13      A   No.  It's either Friday or Sunday, usually.
          14      Q   And is that roughly about an hour and a half
15:07:54  15   drive one way for you?
          16      A   I don't -- I don't drive by myself.  I'm
          17   driving with one of the attorneys.
          18      Q   Okay.  Which attorney are you driving with?
          19      A   Jeff Kranzton or Ed Defrank or I'm retaining
15:08:09  20   somebody to drive me out there.
          21      Q   And again, if the attorneys are going with you,
          22   what is the purpose of your visit?
          23      A   Helping gathering the documents, et cetera.
          24      Q   For the appeal?
15:08:26  25         MR. MCGONIGLE:  Well, I'm going to object.  And

Page 173

15:08:27   1   I think that's an invasion of -- of the attorney-client
           2   privilege.
           3         I'll instruct her not to answer that.
           4   BY MR. WALKER:
15:08:34   5      Q   And I'll take it you'll follow your counsel's
           6   advice, ma'am?
           7      A   Yes.
           8      Q   And during the time that you're visiting with
           9   Mr. Bergstein once a week at his jail, how long are you
15:08:47  10   staying up there?
          11      A   That depends.
          12      Q   What's the range of time spent then?
          13      A   Any possible time.  I mean, on Sunday, I was
          14   there from 9:00 till 3:00.
15:09:04  15      Q   9:00 in the morning until 3:00 in the
          16   afternoon?
          17      A   Yes.
          18      Q   And it's your testimony that you're not
          19   discussing anything having to do with Mr. Bergstein's
15:09:14  20   business affairs?
          21      A   I --
          22         MR. MCGONIGLE:  Well, can I -- and during the
          23   entire time period, she's present with counsel.
          24         And Mr. Bergstein, I would instruct her not to
15:09:24  25   answer anything of what's discussed during those

44  (Pages 170 to 173)

Frymi Biedak                                                                              03-25-19

| Page 174 |
|---|

15:09:26   1    meetings. I also think it's irrelevant to this
          2    proceeding.
          3    BY MR. WALKER:
          4        Q   During your visits with Mr. Bergstein, is there
15:09:35   5    anything that you're discussing with him that does not
          6    relate to his criminal trial or appeal?
          7        MR. MCGONIGLE: Well, I'm going to instruct
          8    her -- her not to answer that as well.
          9    BY MR. WALKER:
15:09:48  10        Q   And I'll take it you'll follow your counsel's
         11    advice on that, ma'am?
         12        A   Yes.
         13        Q   During the period of time that you were
         14    officing at the Colorado Boulevard address, what was
15:10:01  15    your understanding that Integrated Administration did as
         16    a business?
         17        A   I think they provided administrative services
         18    and payroll services.
         19        Q   So what type of administrative services would
15:10:18  20    that be, do you know?
         21        A   Any kind of administrative services.
         22        Q   For different types of businesses, particular
         23    types of businesses, do you know?
         24        A   No.
15:10:44  25        Q   What type of payroll services did it provide?

| Page 175 |
|---|

15:10:50   1        A   Did -- the payroll for Integrated
          2    Administrative Services employees? They were on the
          3    payroll.
          4        Q   Okay. Okay. So how did it make money?
15:11:01   5        A   I don't know.
          6        Q   Where did the money come from that allowed
          7    Integrated Administration to pay for the payroll of
          8    certain employees for Sovrin Health and for the other
          9    companies we saw on that list?
15:11:19  10        MR. WIECHERT: No foundation. Calls for
         11    speculation.
         12        THE WITNESS: I wouldn't know one way or the
         13    other.
         14    BY MR. WALKER:
15:11:27  15        Q   Now, you said that you've known Mr. Carroll and
         16    Mr. Bergstein for, I guess --
         17        A   Thirty years.
         18        Q   Thirty years?
         19        And they had a very good relationship?
15:11:39  20        A   Yes.
         21        Q   Okay. How long have you known Mr. Jam?
         22        A   I think -- I'm trying to think.
         23        I think I spoke to him before we moved to Santa
         24    Monica Boulevard. Before we were there, we went Culver
15:12:12  25    City, and I vaguely remember talking to him back then.

| Page 176 |
|---|

15:12:18   1        Q   What time frame would that have been when you
          2    made the move?
          3        A   The move to Santa Monica, I want to say
          4    September 2006, but I'm not 100 percent sure. I'm
15:12:29   5    really not sure anymore.
          6        Q   And did Mr. Bergstein, to your knowledge, have
          7    a relationship with Mr. Jam before 2007 that you just
          8    were not aware of?
          9        A   I have no idea.
15:12:41  10        MR. WIECHERT: Calls for speculation.
         11    BY MR. WALKER:
         12        Q   During the period of time that you were sharing
         13    an office with Mr. Bergstein, Mr. Jam, did you observe
         14    that -- what did you observe about their relationship?
15:12:54  15    What kind of relationship did they have?
         16        A   I think they had a good relationship.
         17        Q   How would you characterize it? Were they
         18    friends? Were they business partners?
         19        A   I -- in all honesty, David Bergstein wasn't
15:13:19  20    that much in the office, so I didn't really see them
         21    that much.
         22        Q   Okay.
         23        A   I couldn't tell you.
         24        Q   Okay. Was Mr. Jam involved in other business
15:13:32  25    matters outside of Mr. Bergstein that were independent

| Page 177 |
|---|

15:13:36   1    of any of Mr. Bergstein's business affairs, to your
          2    knowledge?
          3        A   I wouldn't know.
          4        Q   But from what you observed, Mr. Jam and
15:13:47   5    Mr. Bergstein had a good relationship?
          6        A   Well, I hardly -- I mean, again, I didn't
          7    really see them together. So from -- from the little
          8    bit I saw and I heard -- I mean, people talk. So I
          9    think they had a decent relationship, a friendly --
15:14:16  10        Q   In connection with Swartz IP and the matters
         11    that we've discussed today, have you ever been
         12    interviewed by anyone with the Federal Bureau of
         13    Investigation or the Department of Justice?
         14        A   I have not.
15:14:34  15        Q   Have you ever been interviewed by anyone at the
         16    Federal Bureau of Investigation or the Department of
         17    Justice for any purpose?
         18        A   Not that I recall.
         19        Q   Have you ever been interviewed by anyone with
15:14:52  20    the Securities and Exchange Commission?
         21        A   Not as far as I recall.
         22        Q   Have you ever received a subpoena for any
         23    information, testimony, or documents from either the
         24    SEC, the FBI, or the Department of Justice?
15:15:10  25        A   I have not -- not -- not as far as I recollect.

eLitigation Services, Inc. - els@els-team.com

Frymi Biedak                                        03-25-19

---

Page 178

| 15:15:14 | 1 | And I think that would remember. |
| | 2 | Q   Yes, ma'am. |
| | 3 | MR. WALKER: I'll pass the witness at this |
| | 4 | time. |
| 15:15:21 | 5 | MR. WIECHERT: Thank you. |
| | 6 | MR. WALKER: We can go and -- let's take a |
| | 7 | break. |
| | 8 | MR. WIECHERT: Don't go off the record for a |
| | 9 | while. |
| 15:15:25 | 10 | THE VIDEOGRAPHER: The time is 3:15 p.m. We |
| | 11 | are now off the record. |
| | 12 | (A recess was taken.) |
| | 13 | THE VIDEOGRAPHER: We are back on the record. |
| | 14 | The time is 3:17 p.m. |
| 15:17:27 | 15 | |
| | 16 | EXAMINATION |
| | 17 | BY MR. WIECHERT: |
| | 18 | Q   Ms. Biedak, I'm going to try to be brief. |
| | 19 | My name is David Wiechert.  I represent Kia Jam |
| 15:17:34 | 20 | and Integrated Administration in this case. |
| | 21 | Have we ever talked? |
| | 22 | A   It's possible. |
| | 23 | Q   Well, then I'll -- I will shame myself for not |
| | 24 | remembering it. |
| 15:17:46 | 25 | But do you recall any substantive discussions |

Page 179

| 15:17:50 | 1 | with me? |
| | 2 | A   Not from the top of my head. |
| | 3 | Q   Have you ever talked to Kia Jam about this |
| | 4 | lawsuit? |
| 15:18:03 | 5 | A   This one now?  Well, when we were to get in the |
| | 6 | offices on -- in -- |
| | 7 | Q   This one now. |
| | 8 | A   I'm sure we have talked about it at the time |
| | 9 | when we were in the same office. |
| 15:18:15 | 10 | Q   All right. |
| | 11 | A   On Wilshire Boulevard. |
| | 12 | Q   When was the last time you spoke to Kia Jam? |
| | 13 | A   Spoke to him, I think in the summer we were -- |
| | 14 | there was a discussion about a desk that was supposed to |
| 15:18:28 | 15 | be moved.  I sent him e-mails a couple of months ago.  I |
| | 16 | think this was two entities that he -- that were -- that |
| | 17 | were his.  And I asked him if he wanted to keep them |
| | 18 | with Parasec so there -- there is an e-mail exchange. |
| | 19 | Q   Have you ever been to his home? |
| 15:18:46 | 20 | A   To Kia Jam's home? |
| | 21 | Q   Yes. |
| | 22 | A   No.  Never. |
| | 23 | Q   Have you been to Mr. Bergstein's home? |
| | 24 | A   Occa -- well, on se- -- on -- on a few |
| 15:18:55 | 25 | occasions, yes.  When it was -- yeah.  But, yeah, I was |

Page 180

| 15:18:59 | 1 | at his house, yes. |
| | 2 | Q   How many times have you been to Mr. Bergstein's |
| | 3 | home? |
| | 4 | A   I want to say maybe two or three times when |
| 15:19:13 | 5 | other -- when it was like a social -- like -- and when |
| | 6 | other people from the office were there.  Like, I think |
| | 7 | there was a fund-raiser at some point. |
| | 8 | Q   And is that the house in the Calabasas area? |
| | 9 | A   Yes.  And then I was -- lately, a couple of -- |
| 15:19:26 | 10 | after his incarceration when I went to his house, too. |
| | 11 | Q   Okay.  You were shown some deposition |
| | 12 | transcripts when Mr. Gumport was asking you questions |
| | 13 | during some bankruptcy proceedings in 2010. |
| | 14 | Do you recall that? |
| 15:19:44 | 15 | A   Do I recall it now when we talked about it? |
| | 16 | Q   Yes.  That you were shown those today. |
| | 17 | A   Yes.  I remember those. |
| | 18 | Q   Do you remember that Mr. Bergstein was involved |
| | 19 | in bankruptcy proceedings in the 2010 time frame? |
| 15:20:03 | 20 | A   Can you repeat it?  I'm sorry.  I don't |
| | 21 | understand the question. |
| | 22 | Q   Sure. |
| | 23 | Do you recall that Mr. Bergstein or some of |
| | 24 | these entities were involved in bankruptcy proceedings |
| 15:20:11 | 25 | in the 2010 time frame? |

Page 181

| 15:20:13 | 1 | A   Was five entities that -- four or five entities |
| | 2 | that were in involuntary bankruptcy. |
| | 3 | Q   And they were involuntary bankruptcies that |
| | 4 | were filed against those entities; correct? |
| 15:20:24 | 5 | A   That's the way I see it, yes. |
| | 6 | Q   And Mr. Bergstein had a connection to each of |
| | 7 | those five entities? |
| | 8 | A   That's the way I saw it back then, yes. |
| | 9 | Q   Did you ever talk to Mr. Bergstein about the |
| 15:20:36 | 10 | implications of those bankruptcies on his ongoing |
| | 11 | business? |
| | 12 | A   No. |
| | 13 | Q   Did you ever read any negative articles about |
| | 14 | Mr. Bergstein in the 2010 time frame? |
| 15:20:47 | 15 | A   Yes.  The Hollywood Reporter. |
| | 16 | Q   There were a number of articles in The |
| | 17 | Hollywood Reporter that were negative towards |
| | 18 | Mr. Bergstein; is that right? |
| | 19 | A   They were very bad, yes. |
| 15:20:55 | 20 | Q   And if you Google Mr. Bergstein's name, those |
| | 21 | articles would come up? |
| | 22 | A   Yeah.  Probably, yeah. |
| | 23 | Q   So on the 2011 time frame, if a company was |
| | 24 | doing diligence with regard to Mr. Bergstein, they most |
| 15:21:18 | 25 | likely would be able to see those Hollywood Reporter |

Frymi Biedak                                                          03-25-19

---

Page 182

15:21:20  1   articles?
         2         MR. WALKER:  Objection.  Speculation.
         3         THE WITNESS:  I don't know what they would see,
         4   you know.
15:21:27  5   BY MR. WIECHERT:
         6   Q   Okay.  At some point in time, did you learn
         7   that Mr. Bergstein was using Mr. Jam's American Express
         8   account?
         9   A   I'm trying to think.  I don't remember.
15:22:04 10   Q   All right.  Now, since 1995, when you first met
        11   Mr. Bergstein --
        12   A   I met him in '89.
        13   Q   I'm sorry.  '89.
        14       You started working for him in '95; is that
15:22:20 15   correct?
        16   A   January 1st of '95.
        17   Q   So would it be fair to say that Mr. Bergstein
        18   has been your supervisor since approximately 1995?
        19   A   I worked -- I worked for him and I reported to
15:22:35 20   him, yes.
        21   Q   And was there a point in time where you
        22   reported and worked for Kia Jam?
        23   A   Well, I was in his office.  I wasn't the
        24   office -- David Bergstein was not there, so when Kia Jam
15:22:51 25   gave me instructions -- when he gave them to me.  But I

---

Page 183

15:22:54  1   would have probably done what he told me or asked
         2   whatever -- asked me to do.
         3   Q   The e-mail address you had was a Graybox LLC
         4   e-mail address; correct?
15:23:07  5   A   As I said, I had two.
         6   Q   Yes.
         7       One of them was a Graybox LLC e-mail address?
         8   A   Yes.  Uh-huh.
         9   Q   Were you ever employed by Graybox LLC?
15:23:16 10   A   No.  Never.
        11   Q   Do you know who owns Graybox?
        12   A   David Bergstein is a manager.
        13   Q   He's the manager of the limited liability
        14   corporation?
15:23:28 15   A   Graybox LLC is a Nevada limited liability, not
        16   a corporation.  A company.
        17   Q   A company.
        18   A   And David Bergstein is the manager.
        19   Q   All right.  And do you know if there are any
15:23:37 20   other managers of Graybox?
        21   A   I -- not that I'm aware of.  But I'm not --
        22   Q   In terms of Swartz IP, at any point in time,
        23   did you learn who is the owner of Swartz IP?
        24   A   No.
15:24:03 25   Q   Did you ever see a book of share certificates

---

Page 184

15:24:06  1   for Swartz IP?
         2   A   I don't think so.
         3   Q   Did you ever see any minutes of board of
         4   directors meetings of Swartz IP?
15:24:24  5   A   I'm pretty sure when we put together corporate
         6   documents during discovery, I may have probably seen
         7   something, yes.
         8   Q   Do you recall that David Bergstein was the only
         9   director of Swartz IP?
15:24:35 10   A   No.  I don't remember that.
        11   Q   Okay.  And I may be able to help your
        12   recollection.
        13       Would you ever use David Bergstein's signature
        14   stamp without his permission?
15:25:01 15   A   No.
        16   Q   Would you ever do anything contrary to
        17   Mr. Bergstein's direction?
        18   A   I don't think so.
        19   Q   So if there were a situation where Mr. Jam
15:25:16 20   asked you to do something and Mr. Bergstein said, "I
        21   don't want you to do it," would you have followed
        22   Mr. Bergstein's direction?
        23   A   I would --
        24       MR. MCGONIGLE:  I don't think there's any
15:25:22 25   foundation for that.

---

Page 185

15:25:22  1       But you can answer.
         2       THE WITNESS:  I probably would say to David
         3   Bergstein to -- to settle it with Kia Jam and leave me
         4   out of it.
15:25:35  5   BY MR. WIECHERT:
         6   Q   All right.  Fair enough.
         7       Could you please turn to Exhibit 7.
         8   A   Yes.  I looked at it.
         9   Q   And if you turn to the second to the last row
15:26:04 10   which is Swartz IP Services Group, Inc.
        11   A   Yes.
        12   Q   And I've been referring to that as Swartz IP,
        13   Inc.
        14       So can I use that as just kind of a shortcut
15:26:13 15   for Swartz IP Services Group, Inc.?
        16   A   That's fine.
        17   Q   All right.  It indicates on Exhibit 7 that the
        18   responsible party is Graybox LLC.
        19       Do you see that?
15:26:27 20   A   Yes.
        21   Q   Graybox LLC, David Bergstein was the managing
        22   person for that entity; correct?
        23   A   That's what we -- it was a manager.
        24   Q   A manager.
15:26:38 25       Did Kia Jam have any role in Graybox at all?

---

Frymi Biedak                                                    03-25-19

Page 186

| 15:26:46 | 1 | A  I don't think so. |
| | 2 | Q  If you could now turn to Exhibit 8. |
| | 3 | A  Yeah. |
| | 4 | Q  In the middle of the exhibit, in an e-mail |
| 15:27:35 | 5 | dated November 2nd, 2011, there is a reference to a |
| | 6 | request of Aaron Grunfeld, esquire. |
| | 7 | Do you know who Aaron Grunfeld is? |
| | 8 | A  Aaron Grunfeld, he's an attorney. |
| | 9 | Q  He's an attorney. |
| 15:27:47 | 10 | Aaron Grunfeld does work for David Bergstein; |
| | 11 | correct? |
| | 12 | A  Among -- I guess he has other clients, but yes. |
| | 13 | Q  David Bergstein is one of his clients? |
| | 14 | A  I would say so, yes. |
| 15:28:15 | 15 | Q  Could you now turn to Exhibit 9? |
| | 16 | A  (Witness complies.) |
| | 17 | Q  On November 8, 2011 at 9:30 p.m., Kia Jam sent |
| | 18 | you an e-mail referring to Swartz IP Services.  And an |
| | 19 | e-mail -- he inquires, "Is this the one that KG" -- "KJM |
| 15:28:46 | 20 | owns?" |
| | 21 | Do you see that? |
| | 22 | A  I see that. |
| | 23 | Q  And then you respond, "This is owned by K.Jam |
| | 24 | Owari but K.Jam will be named as responsible party when |
| 15:28:57 | 25 | we file for an EIN number." |

Page 187

| 15:29:00 | 1 | You saw your response? |
| | 2 | A  Uh-huh. |
| | 3 | Q  Now, this information you were conveying to |
| | 4 | Mr. Jam, where did that come from? |
| 15:29:12 | 5 | A  I have no idea. |
| | 6 | Q  You didn't personally know that information; |
| | 7 | correct?  Someone told it to you? |
| | 8 | A  I would not know one way or the other.  I |
| | 9 | really don't. |
| 15:29:25 | 10 | Q  So at this point, you have no information about |
| | 11 | what the source was that caused you to say, "This is |
| | 12 | owned by K.Jam and Owari, but K.Jam will be named as |
| | 13 | responsible party"? |
| | 14 | A  When we filed for an EIN number. |
| 15:29:39 | 15 | Q  Yes. |
| | 16 | A  Then we never filed for an EIN number for |
| | 17 | Owari. |
| | 18 | Q  Yes. |
| | 19 | You -- you have no idea where that information |
| 15:29:47 | 20 | came from? |
| | 21 | A  No. |
| | 22 | Q  And it doesn't strike you as odd that Mr. Jam |
| | 23 | wouldn't know that information and would have to ask you |
| | 24 | about what his company owned? |
| 15:29:58 | 25 | A  No.  It didn't strike me as odd at all because |

Page 188

| 15:30:01 | 1 | he many times asked me -- gave me a list of the entities |
| | 2 | that I'm -- that I'm -- I'm -- I'm -- and the managers |
| | 3 | and directors. |
| | 4 | Q  Please look at Exhibit 10. |
| 15:30:23 | 5 | A  Exhibit 10 now? |
| | 6 | Q  Yes, please. |
| | 7 | A  Uh-huh. |
| | 8 | Q  In Exhibit 10, it's an e-mail that you sent to |
| | 9 | mkatz@vcorpservices? |
| 15:30:39 | 10 | A  Yes. |
| | 11 | Q  And someone else at VCorp Services. |
| | 12 | And I take it they are both ladies attaching a |
| | 13 | confirmation of filing with the State of Texas? |
| | 14 | A  Yes.  Yes. |
| 15:30:54 | 15 | Q  Who prepared the filing for the State of Texas? |
| | 16 | A  I think Aaron Grunfeld incorporated this |
| | 17 | entity, I think. |
| | 18 | Q  Now, if you turn to the second page, about |
| | 19 | two-thirds of the way down, it identifies the director |
| 15:31:12 | 20 | of Swartz IP Services group. |
| | 21 | Do you see that? |
| | 22 | A  Yes. |
| | 23 | Q  And who was the director identified there? |
| | 24 | A  Apparently, according to this document, it was |
| 15:31:22 | 25 | Aaron Grunfeld, the attorney. |

Page 189

| 15:31:26 | 1 | Q  Yes.  And now, if you turn to page 508, at the |
| | 2 | bottom you'll see there's some Bates stamps. |
| | 3 | And Exhibit 508 was part of the package that |
| | 4 | was submitted to the State of Texas; correct? |
| 15:31:54 | 5 | A  That -- hold on one second. |
| | 6 | No.  It just says "confirmation of filing with |
| | 7 | the State of Texas."  That's all that was submitted to |
| | 8 | the ladies.  It doesn't say anything about anything |
| | 9 | else. |
| 15:32:08 | 10 | Q  Well, if you go to Exhibit -- page 507, the |
| | 11 | page before, there is a certificate of filing of Swartz |
| | 12 | IP Services grouping. |
| | 13 | Do you see that? |
| | 14 | A  I see here attached -- I'm sorry.  I -- I -- |
| 15:32:40 | 15 | I'm a little bit confused.  You say here, "Attached |
| | 16 | please find con-" -- "confirmation of filing with the |
| | 17 | State of Texas.  Please let us know how soon you can |
| | 18 | get a" -- "a" -- "a good standing." |
| | 19 | So I sent this to them.  And I think that's all |
| 15:32:50 | 20 | that was sent to them.  We can look how many attachments |
| | 21 | attached. |
| | 22 | Q  There are a number of attachments to this |
| | 23 | e-mail. |
| | 24 | A  I -- I -- I think it has only this attachment. |
| 15:33:09 | 25 | Q  Now, let's then direct you to a couple of |

48  (Pages 186 to 189)

Frymi Biedak                                           03-25-19

---

Page 190

| | |
|---|---|
| 15:33:12 | 1   pages. And the first page is exhibit -- of this exhibit |
| | 2   is on the page Bates-stamped 508. |
| | 3       A   This one? |
| | 4       Q   Of that exhibit. |
| 15:33:31 | 5       But if you'd go to 508 to the bottom. |
| | 6       MR. MCGONIGLE:  To the bottom right corner. |
| | 7       THE WITNESS:  Okay. |
| | 8   BY MR. WIECHERT: |
| | 9       Q   Thank you. |
| 15:33:44 | 10      A   Okay. |
| | 11      Q   Do you see at the bottom of the page there is a |
| | 12  signature line for David Bergstein, director? |
| | 13      A   Yes. |
| | 14      Q   And above that, is that the David Bergstein |
| 15:33:55 | 15  signature stamp? |
| | 16      A   Yes. |
| | 17      Q   Would David Bergstein sometimes use his |
| | 18  signature stamp himself? |
| | 19      A   I don't think so. |
| 15:34:03 | 20      Q   So if a signature stamp appears, it's typically |
| | 21  because you've stamped at -- at his direction? |
| | 22      A   Yes. |
| | 23      Q   Would you ever use his signature stamp without |
| | 24  his permission? |
| 15:34:14 | 25      A   No. |

Page 191

| | |
|---|---|
| 15:34:15 | 1       Q   So if we see David Bergstein's signature stamp |
| | 2   on a document, it means that at some point in time, he |
| | 3   asked you to place that signature stamp there? |
| | 4       A   Or I asked him, "May I stamp" -- "may I use |
| 15:34:27 | 5   your signature stamp to put it on this one?" |
| | 6       Q   Have you seen this document before, this |
| | 7   resolution adapted by a sole director of Swartz IP |
| | 8   Services grouping? |
| | 9       A   It's very possible. |
| 15:34:41 | 10      Q   Your recollection based on your practice would |
| | 11  be that since his signature stamp is on this document, |
| | 12  that you would have seen it at the time you placed his |
| | 13  signature stamp there? |
| | 14      A   Yes. |
| 15:34:57 | 15      Q   And you see also that based on this resolution, |
| | 16  David Bergstein is identified as the president of Swartz |
| | 17  IP; correct? |
| | 18      A   And the secretary. |
| | 19      Q   And the secretary. |
| 15:35:09 | 20      And the sole director; correct? |
| | 21      A   That's what it says, yes. |
| | 22      Q   And do you have any information that any of |
| | 23  that was untrue? |
| | 24      A   I have no information of it whatsoever. |
| 15:35:27 | 25      Q   And you see that that was at least certified to |

Page 192

| | |
|---|---|
| 15:35:31 | 1   by Mr. Bergstein as of December 2nd, 2010? |
| | 2       A   That's what -- yes. |
| | 3       Q   And then on the next page, there is a |
| | 4   certif- -- certificate of secretary indicating that that |
| 15:35:57 | 5   was -- the previous page was a resolution adapted by the |
| | 6   board of directors. |
| | 7       A   Okay. |
| | 8       Q   And do you see the signature line for David |
| | 9   Bergstein as secretary there? |
| 15:36:08 | 10      A   Yes. |
| | 11      Q   And that's his signature stamp? |
| | 12      A   Yes. |
| | 13      Q   Thank you. |
| | 14      If you'd now please turn to Exhibit 11. |
| 15:36:35 | 15      A   Okay. |
| | 16      Q   These are a series of checks that were shown to |
| | 17  you by Mr. Walker? |
| | 18      A   Yes. |
| | 19      Q   All these checks are on a Wells Fargo account; |
| 15:36:47 | 20  correct? |
| | 21      A   Correct. |
| | 22      Q   Do you know how many accounts Swartz IP had? |
| | 23      A   No. |
| | 24      Q   Do you recall that they had an account at |
| 15:36:57 | 25  Deutsche Bank? |

Page 193

| | |
|---|---|
| 15:36:59 | 1       A   I heard of this later on, yes. |
| | 2       Q   You heard of it later on? |
| | 3       A   Yes. |
| | 4       Q   Do you recall having any involvement and helped |
| 15:37:05 | 5   setting up the Deutsche Bank account? |
| | 6       A   It's very possible that I -- because, I mean, |
| | 7   when documents needed to be signed, it's very possible |
| | 8   that I helped facilitate them.  That's very possible, |
| | 9   yes. |
| 15:37:17 | 10      Q   And I will help you out there, I promise. |
| | 11      A   Okay. |
| | 12      Q   Do you also recall Swartz IP had an account at |
| | 13  Wells Fargo? |
| | 14      A   Yes, that's -- I did about this before. |
| 15:37:29 | 15      Q   Do you recall who the signatory was on the |
| | 16  Wells Fargo account? |
| | 17      A   That, I think -- well, according to this, it |
| | 18  was David Bergstein. |
| | 19      Q   Do you recall that he was the sole signatory on |
| 15:37:40 | 20  the Wells Fargo account? |
| | 21      A   I didn't set this account up and I didn't keep |
| | 22  records of it, so I wouldn't know.  So -- |
| | 23      Q   Okay.  Do you know of any other signatories on |
| | 24  the Wells Fargo account other than David Bergstein? |
| 15:37:49 | 25      A   I wouldn't know either way. |

49  (Pages 190 to 193)

Frymi Biedak                                                            03-25-19

Page 194

```
15:37:51   1        Q   And in -- in terms of the Deutsche Bank
           2    account, did you know of any other signatories other
           3    than David Bergstein on the Deutsche Bank account?
           4        A   I didn't even know that David Bergstein was a
15:38:00   5    signatory on the -- on the Deutsche Bank account.
           6        Q   All right.
           7        A   At the time I'm talking now.  I mean, now,
           8    it's --
           9        Q   If you turn to Exhibit 14.
15:38:42  10        A   Yes.
          11        Q   This is a direction from David Bergstein dated
          12    April 16, 2012 to you and Kia Jam saying, "Please wire
          13    20,000 from IA to Jerry Swartz."
          14        A   Correct.
15:39:06  15        Q   I believe you testified that you did not
          16    control the IA bank account; correct?
          17        A   Correct.
          18        Q   So this was a direction by David Bergstein to
          19    Kia Jam to wire money from IA to Jerry Swartz?
15:39:19  20        A   And he probably included me in order to make
          21    sure it was done into follow-up.
          22        Q   So David Bergstein was directing Kia Jam to do
          23    something; correct?
          24        A   That's the way it looks here, yes.
15:39:31  25        Q   And -- and it wasn't unusual for David to give
```

Page 195

```
15:39:34   1    directions to Kia, was it?
           2        A   Well, I see it here so I don't know.
           3        Q   Do you know what -- who Jerry Swartz was?
           4        A   Jerry Swartz -- I mean, it's very hard for me
15:39:53   5    to describe who he was.  He was a -- I think a scientist
           6    of some kind.  And I think he had some sort -- I mean,
           7    again, this is just from the top of my head.  He had
           8    some -- he worked at the university.  He was in some
           9    research and then he got very sick.
15:40:14  10        Q   Did you learn that from David Bergstein?
          11        A   No.  I -- I met Jerry Swartz a few times.
          12        Q   Do you know whether Jerry Swartz had any
          13    ownership interest in Swartz IP?
          14        A   I have no idea.
15:40:28  15        Q   Do you know whether Swartz IP was named in part
          16    because of David Bergstein's relationship with Jerry
          17    Swartz?
          18        A   I would not know.
          19        Q   All right.  If you turn to Exhibit 15.
15:41:03  20        A   (Witness complies.)
          21        Q   At the bottom of the first page, 479, there's
          22    an e-mail from you to Majid, Mr. Jam, and David
          23    Bergstein copied to Steve Piskula indicating that there
          24    was a wire transfer out of Pineboard Holding LLC in the
15:41:33  25    amount of $1 million.
```

Page 196

```
15:41:34   1        Do you see that?
           2        A   Yes.
           3        Q   Who owned Pineboard Holding LLC?
           4        A   I have no idea.
15:41:41   5        Q   Do you know what this million dollars was for?
           6        A   No.
           7        Q   Since -- I'm sorry.  Withdraw the sentence.
           8        The e-mail says you just spoke with David.
           9        Is that David Bergstein?
15:41:58  10        A   Yes.
          11        Q   And he asked you, you being Majid, to arrange
          12    for one additional wire out of Pineboard Holdings in the
          13    amount of $1 million.
          14        Do you see that?
15:42:13  15        A   Yes.
          16        Q   So in this case, David Bergstein is directing
          17    the movement of $1 million out of Pineboard; correct?
          18        A   Well, I -- I don't know what he was directing.
          19    I can only read the e-mail.  So I spoke with David and
15:42:27  20    he asked that "You arrange for one."
          21        Q   All right.  Please turn to Exhibit 17.
          22        A   I'm sorry.  I'm --
          23        MR. MCGONIGLE:  I think that's it.
          24        THE WITNESS:  Huh?
15:43:05  25        MR. MCGONIGLE:  I think that's it.
```

Page 197

```
15:43:05   1        THE WITNESS:  This is 9.
           2        MR. MCGONIGLE:  Oh, it's 9?  It says, "Kia Jam"
           3    in the upper right-hand corner.
           4        THE WITNESS:  17?
15:43:11   5    BY MR. WIECHERT:
           6        Q   17.
           7        It's an e-mail from you to Keith Wellner at
           8    Weston Capital.
           9        A   Oh, yes, I -- I have it here.
15:43:36  10        Q   Did you ever meet Keith Welner?
          11        A   Yes.
          12        Q   He was in Santa Monica?
          13        A   Yes.
          14        Q   Did you know he worked for a company called
15:43:43  15    Weston Capital?
          16        A   I don't think so.
          17        Q   Do you know whether or not Weston Capital
          18    provided any services to the plaintiff in this case?
          19        A   I have no idea.
15:43:55  20        Q   Now, in this e-mail, you say, "Hi, Keith" --
          21    that being Keith Welner -- "attached please find the
          22    bylaws for Swartz IP Services Group.  Please let me know
          23    if you need anything further.  @Frymi."
          24        A   Yes.
15:44:11  25        Q   You copied David Bergstein on this e-mail;
```

50 (Pages 194 to 197)

Frymi Biedak                                                03-25-19

Page 198

```
15:44:13   1        correct?
           2        A   Yes.  Uh-huh.
           3        Q   You did not copy Kia Jam, did you?
           4        A   Apparently not, no.
15:44:23   5        Q   Do you know who owns Owari Opus?
           6        A   I have no idea.
           7        Q   If you could now turn to Exhibit 20.
           8        A   Okay.  Uh-huh, yes.
           9        Q   And on Exhibit 20, we saw earlier the request
15:45:03  10   by David Bergstein for the million-dollar transfer out
          11   of Pineboard Holdings?
          12        A   Uh-huh.
          13        Q   If you look at the responsible party for
          14   Pineboard, do you see that it's Graybox that's listed on
15:45:18  15   this document?
          16        A   Yes.
          17        Q   And that's the company David managed?
          18        A   As I said before, when it says "responsible
          19   party," this was the entity we used to apply for an EIN
15:45:31  20   number.
          21        Q   Right.
          22            Graybox was a company that David managed;
          23   correct?
          24        A   Yes.
15:45:40  25        Q   Now, please look at Exhibit 22.
```

Page 199

```
15:45:58   1        A   Yes.
           2        Q   Did you prepare this document?
           3        A   No, as I said before.
           4        Q   Do you have any idea where the information came
15:46:02   5   from that was placed on this document?
           6        A   The only person I can think of -- and I'm not
           7   sure, and I'm really not sure -- would be in 2010,
           8   maybe, and I can only say maybe, Jeffrey Solomon.
           9        Q   You're speculating; correct?
15:46:30  10        A   Yes, I'm speculating.
          11        Q   Other than this speculation, you have no
          12   knowledge?
          13        A   No.  No idea.
          14        Q   All right.
15:46:35  15        A   Never seen this document.
          16        Q   If you turn to page 3.  And it's a description
          17   of Swartz IP.  On line 4, it says, "David to provide
          18   date and description of all transactions, including
          19   transactions with approximately 40 theaters conducted by
15:46:59  20   Swartz to date."
          21            Do you know of any theater transactions that
          22   Swartz had?
          23        A   No.
          24        Q   It also indicates that on line 2 that Keith was
15:47:20  25   to be appointed president.
```

Page 200

```
15:47:21   1        Do you see that?
           2        A   I see that, yes.  Number 2, yes.
           3        Q   But have we -- have you seen any documents ever
           4   appointing Kia Jam president of Swartz IP?
15:47:38   5        A   I don't think so.  I mean, I -- again, I
           6   don't -- I don't remember.
           7        Q   Have you ever seen Kia Jam sign as president of
           8   Swartz IP?
           9        A   I don't remember either way.
15:47:53  10        Q   So let's start with a new exhibit.  And this
          11   will be Exhibit No. 25.
          12            (Exhibit 25 was marked for
          13            identification by the Court Reporter
          14            and is attached hereto.)
15:48:14  15        MR. WIECHERT:  And, Jim, can I ask you just to
          16   pass my pen over?
          17        MR. WALKER:  Oh, of course.
          18        MR. WIECHERT:  Thank you.
          19   BY MR. WIECHERT:
15:48:35  20        Q   Ms. Biedak, have you ever seen Exhibit 25
          21   before?
          22        A   It looks -- I -- I think so.
          23        Q   Did you prepare it?
          24        A   It's very possible, yes, because that's how I
15:48:55  25   would prepare a document.
```

Page 201

```
15:48:57   1        Q   All right.  Do you recall where the information
           2   came from that you placed on this document?
           3        A   Well, I probably would have looked at the
           4   articles of -- the -- certificate, information or
15:49:18   5   whatever at -- maybe at the -- maybe at the EIN number.
           6        Q   This is interesting.
           7            Do you recall speaking with anyone to obtain
           8   information concerning Swartz IP other than looking at
           9   legal documents?
15:49:44  10        A   Possibly, yes.  I would assume so because I
          11   don't know how to answer any of -- when it says your
          12   name, I would not answer all these questions.  I
          13   wouldn't know how to answer them.
          14        Q   And is this a document -- if you were preparing
15:49:57  15   it, you would be preparing it in the course of your
          16   regular course of business working for Mr. Bergstein?
          17   Would you prepare this as part of your job for
          18   Mr. Bergstein?
          19        A   I don't even know what this document was for,
15:50:13  20   quite frankly.
          21        Q   All right.
          22        A   For which purpose.
          23        Q   There is certain information on this document.
          24        A   Uh-huh.
15:50:18  25        Q   And I want to focus -- first of all, there's a
```

                                    51  (Pages 198 to 201)

Frymi Biedak                                                          03-25-19

Page 202

| 15:50:21 | 1 | question about names of individuals with ten or more |
| | 2 | ownership -- 10 percent or more ownership or control of |
| | 3 | the company.  And first is listed Owari Opus on some |
| | 4 | majority of interest, 87.5 percent. |
| 15:50:38 | 5 | Do you see that? |
| | 6 | A   Yes, I do. |
| | 7 | Q   You've indicated earlier you don't know who |
| | 8 | owns Owari Opus; correct? |
| | 9 | A   That's correct. |
| 15:50:46 | 10 | Q   It then says, "David Bergstein is the president |
| | 11 | of Owari Opus." |
| | 12 | Do you see that? |
| | 13 | A   I see that, yes. |
| | 14 | Q   Do you have any information as to whether or |
| 15:50:55 | 15 | not David Bergstein was the president of Owari Opus? |
| | 16 | A   I -- I don't.  And I don't know -- I did not |
| | 17 | think that he was, actually. |
| | 18 | Q   And Jerry Swartz owning 12.5 percent of Swartz |
| | 19 | IP. |
| 15:51:12 | 20 | Do you know whether he ever became a |
| | 21 | shareholder of Swartz IP? |
| | 22 | A   I wouldn't know either way. |
| | 23 | Q   Then there is -- at the bottom, there are |
| | 24 | financial questions.  And the first relates to total |
| 15:51:27 | 25 | annual income and it says "2 million to $5 million for |

Page 203

| 15:51:31 | 1 | total annually" -- "annual income." |
| | 2 | Do you see that? |
| | 3 | A   Yes. |
| | 4 | Q   Do you know whether or not Swartz IP ever |
| 15:51:36 | 5 | generated 2 to $5 million in annual income? |
| | 6 | A   I have no idea. |
| | 7 | Q   And in terms of liquid net worth, over |
| | 8 | $5 million, do you have any information about that line? |
| | 9 | A   I have no idea. |
| 15:51:48 | 10 | Q   And do you have any information about the total |
| | 11 | net worth over $5 million? |
| | 12 | A   No. |
| | 13 | Q   Thank you. |
| | 14 | This will be Exhibit 26. |
| 15:52:21 | 15 | (Exhibit 26 was marked for |
| | 16 | identification by the Court Reporter |
| | 17 | and is attached hereto.) |
| | 18 | THE WITNESS:  You want me to look at this? |
| | 19 | BY MR. WIECHERT: |
| 15:53:12 | 20 | Q   Yes, please. |
| | 21 | Ms. Biedak, it's a multipage document.  And |
| | 22 | just take a look through.  Take as much time as you need |
| | 23 | to determine what it relates to. |
| | 24 | A   Okay. |
| 15:54:16 | 25 | Q   All right.  Do you recognize this e-mail and |

Page 204

| 15:54:18 | 1 | the attachments? |
| | 2 | A   When you say "recognize" -- when was it sent? |
| | 3 | Q   Well, let's walk through -- |
| | 4 | A   Eight years ago. |
| 15:54:29 | 5 | Q   Let's walk through it. |
| | 6 | A   Sure. |
| | 7 | Q   The from line is from you; correct? |
| | 8 | A   Yes. |
| | 9 | Q   And it's sent on November 10th, 2011 at 4:56 to |
| 15:54:38 | 10 | a seanedr-- seanedrington@db.com. |
| | 11 | Do you see that? |
| | 12 | A   Yes. |
| | 13 | Q   And a Alisa Liley is also a recipient? |
| | 14 | A   Yes. |
| 15:54:49 | 15 | Q   And do you recall that Sean Ed- -- Edrington |
| | 16 | was a representative of Deutsche Bank? |
| | 17 | A   Yes. |
| | 18 | Q   As was Alisa Liley? |
| | 19 | A   She was the assistant, I think. |
| 15:54:58 | 20 | Q   She was his assistant? |
| | 21 | A   Well, I don't think she, like -- I think she |
| | 22 | was more like an associate. |
| | 23 | Q   A coequal?  They both did work at the bank? |
| | 24 | A   Yes. |
| 15:55:10 | 25 | Q   And the subject matter was "Swartz IP Group, |

Page 205

| 15:55:14 | 1 | Inc., New Account with Deutsche Bank." |
| | 2 | Do you see that? |
| | 3 | A   Yes, I do. |
| | 4 | Q   The importance on e-mail was high. |
| 15:55:21 | 5 | Now, is that because you designated it as high? |
| | 6 | A   I pretty much put everything as high. |
| | 7 | Q   There was a sense of urgency in everything? |
| | 8 | A   It was always. |
| | 9 | A   Always a sense of urgency.  I get it. |
| 15:55:31 | 10 | The purpose of the e-mail was to provide |
| | 11 | Deutsche Bank information needed to set up a new account |
| | 12 | for Swartz IP group; correct? |
| | 13 | A   Yes. |
| | 14 | Q   And so you gathered the information and then |
| 15:55:49 | 15 | you transmitted it by e-mail; correct? |
| | 16 | A   Yes. |
| | 17 | Q   Going through this document -- well, let's |
| | 18 | start with basically the last two pages. |
| | 19 | Do you recognize the last page as |
| 15:56:20 | 20 | Mr. Bergstein's driver's license? |
| | 21 | A   Yes. |
| | 22 | Q   Do you recognize what appears to be on the |
| | 23 | second to the last page a photocopy of the passport of |
| | 24 | Mr. Bergstein? |
| 15:56:33 | 25 | A   Yes. |

Page 206

15:56:38  1       Q   You'll also notice that -- one, two, three --
          2   four pages earlier, there is a certificate of secretary
          3   of Swartz IP Group, Inc. that was bearing the signature
          4   of David Bergstein; correct?
15:56:59  5       A   Yes.
          6       Q   Mr. Bergstein was designated the president of
          7   Swartz IP on the corporate account authorization.  And
          8   if you go to page -- let me count them.  One, two,
          9   three, four, five, six, seven, eight.
15:57:38 10       A   Yes.  I looked at it.
         11       Q   All right.  Nine and ten.  Six, seven, eight
         12   nine, and ten.  Well, let's do this.  All right.  I
         13   don't want to -- if you can go to the page that states
         14   "corporate and other organized entities."
15:58:03 15       A   Which page is this?
         16       Q   I'll make it easier.  I'm sorry.  And then
         17   we'll walk through it.
         18          There you go.
         19       A   Thank you.
15:58:23 20       Q   And it appears that the information on the page
         21   entitled "Corporate and Other Organized Entities" was
         22   inputted on a computer rather than handwritten?
         23       A   Yes.
         24       Q   Did you input this information?
15:58:47 25       A   It's possible.  It could have been also put in

Page 207

15:58:50  1   by the bank, by Alisa Liley.
          2       Q   If the bank put it in, would it have been based
          3   on information that was provided by someone outside the
          4   bank; correct?
15:58:58  5       A   That's the way I see it, yes.
          6       Q   Do you recall providing the bank information
          7   about Swartz IP's financials?
          8       A   I don't -- I don't remember.
          9       Q   You did, though, ultimately send them the
15:59:11 10   package to open this new account pursuant to the e-mail?
         11       A   Pursuant to the e-mail, yes.
         12       Q   Now, you'll notice on the "Corporate and Other
         13   Organized Entities" page, there is a box checked for
         14   entities' annual income and it shows 1 to $5 million.
15:59:30 15          Do you see that?
         16       A   One to $5 million.  I'm sorry.  Wh- -- where is
         17   this?
         18       Q   It's about two-thirds of the way down.
         19          MR. MCGONIGLE:  What page are you looking at?
15:59:47 20          MR. WIECHERT:  "Corporate and other organized
         21   entities."
         22          MR. MCGONIGLE:  That is the page before that.
         23          THE WITNESS:  This one?
         24   BY MR. WIECHERT:
15:59:59 25       Q   Yes.

Page 208

16:00:00  1       A   All right.
          2       Q   Two-thirds of the way down, there is a box
          3   checked for entities' annual income.
          4          Do you see that?
16:00:06  5       A   Yes.
          6       Q   And it shows 1 million to $5 million?
          7       A   That's what it says.
          8       Q   Yes.
          9          Do you know where that information came from?
16:00:12 10       A   No.
         11       Q   Okay.  But you do know it was submitted to the
         12   bank?
         13       A   If this is the do- -- if -- if this is the
         14   e-mail and it lists the documents here, because it says,
16:00:22 15   "completed and signed corporate account authorization"
         16   or whatever those -- the -- the three first forms then
         17   yes, it was probably submitted to the bank.
         18       Q   All right.
         19       A   Most likely.
16:00:32 20       Q   And there is also a checked box for
         21   entity's net worth excluding principal residence and it
         22   shows $5 million or more.
         23          Do you see that?
         24       A   I see that, yes.
16:00:43 25       Q   And it indicates that approximately 80 percent

Page 209

16:00:46  1   of the net worth is in investable asset stocks bonds, et
          2   cetera.
          3          Do you see that?
          4       A   Where is this?
16:00:57  5       Q   That's about -- that's in the --
          6          MR. MCGONIGLE:  Right this one here.
          7   BY MR. WIECHERT:
          8       Q   Right under the annual income and net worth.
          9       A   Yes.
16:01:05 10       Q   Yes.
         11       A   I can see it, yeah.
         12       Q   Do you know whether Swartz IP at the time that
         13   this information was submitted to the bank had
         14   investable assets of approximately $4 million or more?
16:01:25 15       A   I wouldn't know one way or the other.
         16       Q   If you go to the next page, it says "Authorized
         17   Parties Details."
         18          Do you see that?
         19       A   Appro- -- yes, I do.  I do.
16:01:41 20       Q   All right.  And there is only one authorized
         21   party there; correct?
         22       A   That's David Bergstein.
         23       Q   And was that his legal address, 6433 Topanga
         24   Canyon Boulevard, Suite 154, Canoga Park as of
16:01:57 25   November 10th, 2011?

53 (Pages 206 to 209)

Frymi Biedak                                      03-25-19

---

Page 210

16:02:01   1      A   I -- I would have not put this address in.
           2      Q   Why not?
           3      A   Because I was not -- I never used his address
           4   for -- for -- for anything.  I would have put in
16:02:15   5   probably the -- the Colorado address.
           6      Q   What was his address?  What was there at 6433
           7   Topanga Canyon --
           8      A   It was a mailing address.  I think it was a
           9   mailing address for David Bergstein.
16:02:25  10      Q   It was David Bergstein's mailing address?
          11      A   I think so, yes.
          12      Q   Is there actually a suite there or is it just a
          13   mailbox?
          14      A   I think it's a mailing -- I think it's a
16:02:35  15   mailbox.
          16      Q   If you go farther down, it shows a business
          17   phone of (310)828-1515.
          18      A   That is my direct line.  Still is.
          19      Q   That's your direct line, not Mr. Bergstein's
16:03:01  20   direct line?
          21      A   My direct line.
          22      Q   And there is a cell phone number of
          23   (213)618-3036.
          24      Whose number is that?
16:03:09  25      A   That used to be David Bergstein's.

---

Page 211

16:03:16   1      Q   All right.  If you go to the next page.
           2      A   (Witness complies.)
           3      Q   For account contact, they identify you as the
           4   assistant to David Bergstein.
16:03:30   5      Do you see that?
           6      A   Yes.
           7      Q   So when this was submitted, you were identified
           8   to the bank as the account contact for the Swartz
           9   account?
16:03:42  10      A   No.  Not really.  I was assistant to David
          11   Bergstein who basically gave the paperwork.
          12      Q   So who was the bank's account contact for this?
          13      A   For the accounting, I have no idea.
          14      Q   Not for an accounting standpoint.
16:04:01  15      But if the bank had a question about the Swartz
          16   IP account based on this paperwork that you submitted,
          17   who would the question go to?
          18      A   Well, they would probably call David Bergstein.
          19   If he didn't answer the phone, they probably would call
16:04:14  20   me and ask me to go to -- get in touch with
          21   Mr. Bergstein.
          22      Q   And you can look through the document to -- or
          23   take my representation, but Mr. Jam was nowhere
          24   mentioned in any of these papers; correct?
16:04:28  25      A   I didn't see his name, no.

---

Page 212

16:04:35   1      Q   Now, if you go two pages over, there is a
           2   corporate account authorization and terms and conditions
           3   officer certificate.
           4      Do you see that?
16:04:50   5      A   Yes.
           6      Q   And it identifies David Bergstein as having
           7   what title with Swartz IP?
           8      A   It says here "president."
           9      Q   And then does he sign as president on this
16:05:14  10   document?
          11      A   It's a signature stamp.
          12      Q   Yes.
          13      And on the next page, does he also have a
          14   signature stamp appear as president of Swartz IP?
16:05:27  15      A   Yes.
          16      Q   And does it also appear as secretary of Swartz
          17   IP?
          18      A   Yes.
          19      Q   Mr. Bergstein was the sole signatory on the
16:05:43  20   Swartz IP account; correct?
          21      A   Well, that, I don't know.
          22      Q   Do you know of anyone else who was?
          23      A   I wouldn't know either way.
          24      Q   Do you recall that once this account was
16:06:26  25   opened?

---

Page 213

16:06:30   1      A   Are you talking about the account with Deutsche
           2   Bank?
           3      Q   Yes.
           4      A   Uh-huh.
16:06:34   5      Q   Once the Deutsche Bank account was opened that
           6   there were a number of transactions that took place
           7   through the Deutsche Bank account?
           8      A   I found out later about that.
           9      Q   You found out later about that?
16:06:46  10      A   At the time of discovery.
          11      Q   Okay.  Let's mark as Exhibit 27 an e-mail from
          12   David Bergstein to Sean Edrington as well as the related
          13   e-mail that copied you.
          14      (Exhibit 27 was marked for
13:30:33  15      identification by the Court Reporter
          16      and is attached hereto.)
          17   BY MR. WEICHERT:
          18      Q   And if you look at the e-mail on the bottom of
          19   Exhibit 27, that's the one that's earlier in time.
16:07:26  20      It was sent from David Bergstein to Sean
          21   Edrington, copied to Alisa, who's at the bank and you;
          22   correct?
          23      A   Yes.
          24      Q   It's a 10:09 a.m. Pacific Standard Time;
16:07:44  25   correct?

---

Frymi Biedak                                          03-25-19

Page 214

| | | |
|---|---|---|
| 16:07:45 | 1 | A  Yes. |
| | 2 | Q  And it states, "Sean, Frymi will be sending one |
| | 3 | last wire for about 1.2 million.  This will be the last |
| | 4 | one that goes out from this deposit.  I need all three |
| 16:07:57 | 5 | out this morning.  I will get back to you in a few |
| | 6 | minutes regarding the e-mail from Eric." |
| | 7 |     Do you recall being involved in sending out a |
| | 8 | wire of $1.2 million out of the Deutsche Bank account on |
| | 9 | or about November of 17, 2011? |
| 16:08:13 | 10 | A  I didn't have access to this account. |
| | 11 | Q  I'm sorry? |
| | 12 | A  I didn't have access to this account.  Not |
| | 13 | online, not offline.  I didn't even know what the |
| | 14 | account number was. |
| 16:08:22 | 15 | Q  So when David says, "Frymi will be sending one |
| | 16 | last wire for about 1.2 million" -- |
| | 17 | A  I -- |
| | 18 | Q  -- that's not true? |
| | 19 | A  I think he was more referring to instructions |
| | 20 | for a wire transfer. |
| 16:08:33 | 21 | Q  And those would be instructions that he would |
| | 22 | have started with and given to you? |
| | 23 | A  That's the way I see it, yes. |
| | 24 | Q  Okay.  So when it says, "Frymi will be sending |
| 16:08:43 | 25 | out one last wire for about $1.2 million," Frymi -- |

Page 215

| | | |
|---|---|---|
| 16:08:47 | 1 | Ms. Biedak -- Biedak, you're not making the decision to |
| | 2 | send out that wire to David Bergstein? |
| | 3 | A  I would -- yes.  Yes. |
| | 4 | Q  Okay.  And you will notice on this e-mail that |
| 16:08:59 | 5 | Kia Jam is not copied; correct? |
| | 6 | A  He's not copied, no. |
| | 7 | Q  He didn't give you that direction to transfer |
| | 8 | the $1.2 million; correct? |
| | 9 | A  That's correct, yes. |
| 16:09:10 | 10 | Q  All right.  And then David Bergstein follows up |
| | 11 | at 1:19 p.m. on the same day in an e-mail to Sean |
| | 12 | Edrington and states, "Okay.  But the wires need to get |
| | 13 | out today no matter what.  Remember, Paul has you on |
| | 14 | speed dial." |
| 16:09:30 | 15 |     Who is Paul? |
| | 16 | A  I have no idea.  I'm sorry. |
| | 17 | MR. MCGONIGLE:  How long do you think we're |
| | 18 | going to be?  I thought we're going to -- |
| | 19 | MR. WEICHERT:  Another half hour and we'll be |
| 16:09:55 | 20 | done. |
| | 21 | MR. MCGONIGLE:  Okay. |
| | 22 | MR. WEICHERT:  Do you want to take a break? |
| | 23 | MR. MCGONIGLE:  No.  I planned on being done. |
| | 24 | I thought we were going to be done by 4:00.  But all |
| 16:09:59 | 25 | right.  I've just got to move a meeting. |

Page 216

| | | |
|---|---|---|
| 16:10:03 | 1 | BY MR. WEICHERT: |
| | 2 | Q  Here is 28. |
| | 3 |     (Exhibit 28 was marked for |
| | 4 |     identification by the Court Reporter |
| 16:10:19 | 5 |     and is attached hereto.) |
| | 6 | BY MR. WEICHERT: |
| | 7 | Q  Do you recognize Exhibit 28? |
| | 8 | A  It's an e-mail from me to Sean Edrington and -- |
| | 9 | yeah, to Sean Edrington. |
| 16:10:50 | 10 | Q  It is just the same days you -- earlier e-mail |
| | 11 | that we saw which is Exhibit 27? |
| | 12 | A  Yes. |
| | 13 | Q  In it you state, "Hi, Sean and Alisa, we faxed |
| | 14 | you instructions for another wire transfer.  See |
| 16:11:02 | 15 | attached." |
| | 16 | A  Yes. |
| | 17 | Q  And looking at the attachment, do you |
| | 18 | understand that this what you sent to Mr. Edrington and |
| | 19 | Ms. Liley on November 17? |
| 16:11:12 | 20 | A  I would assume so, yes. |
| | 21 | Q  Is that David's -- Bergstein's signature stamp |
| | 22 | at the bottom of page 2 of this exhibit? |
| | 23 | A  It is, yes. |
| | 24 | Q  And he is authorizing a wire out of the above |
| 16:11:26 | 25 | referenced account that's being the Swartz IP Services |

Page 217

| | | |
|---|---|---|
| 16:11:29 | 1 | Group account at Deutsche Bank in the amount of |
| | 2 | $1,274,325; correct? |
| | 3 | A  That's what it says, yes. |
| | 4 | Q  All right.  So in November 17th, 2011, David |
| 16:11:42 | 5 | Bergstein authorized a movement out of the Swartz IP |
| | 6 | account of over $1,200,000 to Henry Jannol? |
| | 7 | A  That's what it says, yes. |
| | 8 | Q  Who was Henry Jannol? |
| | 9 | A  He's an attorney. |
| 16:11:57 | 10 | Q  He's an attorney; correct? |
| | 11 | A  Yes.  He's an attorney. |
| | 12 | Q  And he's an attorney that David Bergstein used |
| | 13 | in the 2011 time frame? |
| | 14 | A  That, I don't know.  But I know he's an |
| 16:12:05 | 15 | attorney.  I've known Henry for a long time. |
| | 16 | Q  Kia Jam was not mentioned on the e-mail when |
| | 17 | you sent it to the bank? |
| | 18 | A  I don't see it here, no. |
| | 19 | Q  And Kia Jam is not mentioned on the |
| 16:12:16 | 20 | instruction; correct? |
| | 21 | A  No, didn't copy him. |
| | 22 |     (Exhibit 29 was marked for |
| | 23 |     identification by the Court Reporter |
| | 24 |     and is attached hereto.) |
| | 25 | /// |

55  (Pages 214 to 217)

Frymi Biedak                                                      03-25-19

---

Page 218

16:12:19  1    BY MR. WIECHERT:
          2      Q   Exhibit 29.  This is an e-mail you were copied
          3    on November 23rd, 2011 from David Bergstein to the
          4    Deutsche Bank representatives; correct?
16:13:13  5      A   Yes.
          6      Q   And attached to the e-mail was David
          7    Bergstein's authorization for more wire transfers out of
          8    the Deutsche Bank account; correct?
          9      A   Yes.
16:13:26 10      Q   If you look at the third page, you'll see that
         11    there is a signature line for David Bergstein; correct?
         12      A   Yes.
         13      Q   Do you see any involvement of Kia Jam in this
         14    e-mail or these authorizations?
16:13:42 15      A   No.  I don't see him -- or I don't see him even
         16    mentioned in the e-mail.  But for the record, this is
         17    Mr. Bergstein's signature.  This is not the stamp.  Just
         18    so we're clear.
         19      Q   That's his actual signature?
16:14:02 20      A   That is his signature, yes.
         21      Q   So he personally signed that one?
         22      A   I would assume so, yes.
         23      Q   All right.  Thank you for the clarification.
         24    Exhibit 30.
16:14:29 25          (Exhibit 30 was marked for

---

Page 219

16:14:29  1          identification by the Court Reporter
          2          and is attached hereto.)
          3    BY MR. WIECHERT:
          4      Q   Were you aware of whether or not Mr. Bergstein
16:14:37  5    had a debit card that was associated with the Deutsche
          6    Bank Swartz IP account?
          7      A   I have no idea.
          8      Q   And looking at Exhibit 30, does that refresh
          9    your recollection in any way?
16:14:57 10      A   Is this Exhibit 30?
         11      Q   Yes.
         12      A   I have never seen a debit card.  I've never
         13    seen -- I've never seen anything connected with this
         14    account until such time as discovery was done, other
16:15:18 15    than those you -- I -- I must have seen those few
         16    e-mails.
         17      Q   This is Exhibit 31.
         18          (Exhibit 31 was marked for
         19          identification by the Court Reporter
16:15:35 20          and is attached hereto.)
         21    BY MR. WIECHERT:
         22      Q   And this, like the Deutsche Bank packages, has
         23    a few documents.  So if you could just take a look at
         24    it, that will be great.
16:15:49 25      A   This was open in bank accounts with Wells

---

Page 220

16:15:51  1    Fargo.
          2      Q   All right.  So the first page of Exhibit 31 is
          3    an e-mail from you to Justin Milligan.
          4          Justin Milligan is a representative of Wells
16:16:04  5    Fargo Bank; correct?
          6      A   Yes.  Correct.
          7      Q   David Bergstein is copied on the e-mail; is
          8    that right?
          9      A   Uh-huh.  Yes.  Correct.
16:16:12 10      Q   The purpose of the e-mail was to send documents
         11    to Just-- or Mr. Milligan at Wells Fargo Bank to open the
         12    account; correct?
         13      A   Yes.
         14      Q   Kia Jam is not on this -- copied on this --
16:16:24 15      A   No.
         16      Q   -- e-mail; correct?
         17      A   He's not.  No.
         18      Q   No is he's not --
         19      A   He's not copied.  No.  He's not copied.  No.
16:16:33 20      Q   All right.  Do you recall who asked you to open
         21    up an account or assist in opening up an account at
         22    Wells Fargo on behalf of Swartz IP?
         23      A   I -- I don't remember.
         24      Q   We saw a series of checks that were identified
16:16:59 25    by the plaintiff on the Wells Fargo account, and they

---

Page 221

16:17:02  1    were all signed by Mr. Bergstein; correct?
          2      A   Yes.  Yes.
          3      Q   So looking -- having looked at those checks and
          4    looking at Exhibit 31, does that refresh your
16:17:12  5    recollection that it was Mr. Bergstein that asked you to
          6    assist him in the opening up of the Wells Fargo account?
          7      A   The way I see it, he probably -- he may have
          8    told me.  And this is just the way opening account was,
          9    "Please send this and this person documents related to
16:17:33 10    Swartz IP."
         11      Q   Well, would you have opened up an account at a
         12    bank on behalf of Swartz IP without Mr. Bergstein's
         13    permission?
         14      A   I didn't open the account.  I didn't open the
16:17:46 15    account.  I just sent --
         16      Q   Would you have assist--
         17      A   -- documents.  I just sent documents.  I sent
         18    documents to -- what's his name? -- Justin Milligan.
         19      Q   Yes.
16:17:51 20          You assisted in opening the account; correct?
         21      A   Upon his instructions, yes.
         22      Q   And would you have assisted in opening up a
         23    bank account on behalf of the Swartz IP without the
         24    permission of Mr. Bergstein?
16:18:06 25      A   No.  I was not a signer in any of his accounts

---

56 (Pages 218 to 221)

Frymi Biedak                                                    03-25-19

---

Page 222

16:18:10  1  ever.
          2      Q   As far as you know, Mr. Bergstein was the sole
          3  signer on the Wells Fargo account; correct?
          4      A   I think so, yes.
16:18:21  5      Q   And, in fact, as far as you know, Mr. Bergstein
          6  was the sole signer on any account related to Swartz IP?
          7      A   Wells Fargo, I'm fairly sure.  Again, Deutsche
          8  Bank, I've never seen anything, so I really don't know.
          9      Q   Are you aware of whether or not Mr. Bergstein
16:18:56 10  ever purchased any property in Malibu?
         11      A   I'm sorry?
         12      Q   Did Mr. Bergstein or his trust or anyone
         13  related to Mr. Bergstein ever purchase any property in
         14  Malibu?
16:19:15 15      A   If he did, then I was not involved.
         16      Q   This will be Exhibit 32.
         17          (Exhibit 32 was marked for
         18          identification by the Court Reporter
         19          and is attached hereto.)
16:19:45 20  BY MR. WEICHERT:
         21      Q   It says -- starting with the e-mail at the
         22  bottom, March 13, 2012, 11:33?
         23      A   Yes.
         24      Q   The first e-mail is from -- I'm sorry, let's
16:20:19 25  deal the 11:19 a.m. e-mail.  "There is a

---

Page 223

16:20:22  1  malibuproperty@aol.com to David Bergstein's e-mail
          2  address."
          3          Do you see that?
          4      A   Yes.
16:20:28  5      Q   And you're copied on it; correct?
          6      A   Yes.
          7      Q   And do you know who Chris Cortazzo is?
          8      A   I think he -- he was -- something with real
          9  estate.
16:20:41 10      Q   Something --
         11      A   I think, yes.  I think he was a real estate
         12  person.  But I'm not -- I -- but I think so, yes.
         13      Q   And whoever was at malibuproperty@aol.com
         14  inquires, "David, please see the attached notice to
16:20:54 15  perform from the seller.  The 3 percent deposit needs to
         16  be put into escrow immediately.  Please advise.  Thank
         17  you.  Carol Casey."
         18          Do you see that?
         19      A   Yes.
16:21:04 20      Q   And then his response was, "Money was wired
         21  from Deutsche Bank."
         22          Do you see that?
         23      A   Yes.
         24      Q   Approximately 14 minutes later?
16:21:16 25      A   Okay.

---

Page 224

16:21:17  1      Q   Now, other than the Swartz IP account at
          2  Deutsche Bank, do you know of any other accounts at
          3  Deutsche Bank that David Bergstein had access to?
          4      A   I wouldn't know either way.  I didn't know what
16:21:31  5  he had access to at Deutsche Bank.
          6      Q   Well, you knew he had --
          7          THE REPORTER:  I'm sorry, what was that?
          8  BY MR. WEICHERT:
          9      Q   -- access to the Swartz Deutsche Bank account;
16:21:35 10  correct?
         11      A   Yes.  But you asked about other accounts.
         12      Q   Yes.
         13      A   And so I would not know.
         14      Q   All right.  Do you know why you were copied on
16:21:44 15  this e-mail?
         16      A   No.  I have no idea.
         17      Q   Do you know what Malibu property is being
         18  referenced here, if it was in Malibu?
         19      A   When it says on -- on the top something about
16:21:56 20  Birdview -- 7307 Birdview, isn't this the property?
         21      Q   I don't know.  I was asking you.
         22          Do you know about a property at 7307 Birdview?
         23          MR. MCGONIGLE:  This -- you can answer the
         24  question, if you know.
16:22:11 25          THE WITNESS:  I have no idea.

---

Page 225

16:22:13  1  BY MR. WEICHERT:
          2      Q   Okay.  Okay.  Anyway, the top e-mail indicates,
          3  "I have checked with Deutsche Bank."  This is from David
          4  Bergstein.  "They confirmed the wire was sent in the
16:22:23  5  amount of $186,000."
          6          Do you see that?
          7      A   Yes.  Yeah.
          8      Q   Okay.  And -- and Kia Jam is not referenced
          9  anywhere on these e-mails?
16:22:32 10      A   No, he's not.
         11      Q   Is it correct?
         12      A   No.
         13          MR. WEICHERT:  I have nothing else.
         14          Thank you, Ms. Biedak.
16:22:58 15          MR. WALKER:  I just have a few questions
         16  pending on the side because I'll just get back to what
         17  he just asked you about.
         18          THE WITNESS:  Okay.
         19          MR. WALKER:  I can probably do it from here.
16:23:06 20
         21          FURTHER EXAMINATION
         22  BY MR. WALKER:
         23      Q   Now, you were asked by Mr. Weichert to look at
         24  Exhibit 22 and then his Exhibit 25.
16:23:28 25      A   Now they are not marked.

---

Frymi Biedak                                                03-25-19

Page 226

16:23:44   1    Q   Yeah.  Here's what I marked.
           2        MR. WALKER:  Maybe you can give her the ones
           3    that were marked by the reporter.  And we'll compare
           4    that to 22.
16:24:02   5        THE WITNESS:  This is 25.
           6    BY MR. WALKER:
           7    Q   That's 25.
           8    A   Thirty-two?
           9        MR. WEICHERT:  22.
16:24:02  10    BY MR. WALKER:
          11    Q   22.
          12    A   I need 22.
          13        (Off the record.)
          14        MR. WALKER:  Back on the record.
16:24:02  15    BY MR. WALKER:
          16    Q   And you were asked about the information
          17    regarding Swartz IP; correct?
          18    A   Yes.
          19    Q   And who the officers and directors might be?
16:24:15  20    A   You mean this gentleman asked me about that?
          21    A   Yes.
          22    A   Yes.
          23    Q   Okay.  And looking at Exhibits 22 and 25, do
          24    you agree that -- if you could turn to the page in 22
16:24:26  25    that deals with Swartz IP at the top.  I think it's the

Page 227

16:24:35   1    last page, ma'am.
           2    A   Oh.
           3    Q   Is that the one that deals with Swartz IP?
           4        MR. WEICHERT:  No.  Second to the last page.
16:24:41   5    BY MR. WALKER:
           6    Q   Second to the last page.
           7    A   Okay.
           8    Q   Okay.  So you've got two documents in front of
           9    you, one marked Exhibit 22 and one marked Exhibit 25,
16:24:45  10    and they both referenced to Swartz IP; correct?
          11    A   Yes.
          12    Q   And I think your response to Mr. Weichert's
          13    questions, he was pointing out that there's a difference
          14    in some of the information that's provided about the
          15    same company in each document; correct?
          16    A   He just said?
          17    Q   Yeah.
          18        In looking at those two exhibits, do you see
          19    that they provide different information in some respects
          20    about the same company?
          21    A   I would have to go for -- I would have to
          22    compare them.
          23    Q   Go ahead, ma'am.
          24    A   Well, this document --
16:25:47  25

Page 228

16:25:50   1    Q   Exhibit 22?
           2    A   This document says, "Jeff to issue 1,100 shares
           3    to KJ Media and a thousand shares to Owari Opus and
           4    appoint Kia president and David secretary.  And take any
           5    other required actions, resolution, annual meetings, et
16:26:06   6    cetera."
           7    Q   And you just read from Exhibit 22; correct?
           8    A   I read this from Exhibit 22.
           9    Q   Okay.  And how is that different in Exhibit 25?
16:26:19  10    A   And in Exhi- -- Exhibit 25, it says -- what
          11    does it say here -- well, it says here, "Owari Opus."
          12    It talks about Owari Opus owns them -- was the --
          13    what -- who owns what the majority.  And it says David
          14    Bergstein is the president of Owari Opus.  And then it
16:26:50  15    talks about Jerry Swartz, and then it says Jerry Swartz
          16    is a stockholder of Swartz IP Services Group, Inc.
          17    Q   Okay.  So with respect to Exhibit 21 and
          18    Exhibit 25, you have two different descriptions of the
          19    ownership of Swartz IP; correct?
16:27:13  20    A   Well, 22 doesn't talk about the ownership of
          21    Swartz IP.
          22    Q   And it talks about the officers?
          23    A   It talks about -- what does it say.  It talks
          24    about shares being issued from Swartz IP Services.  And
16:27:40  25    it talks about who is getting appointment as -- as --

Page 229

16:27:45   1    as -- as officers.
           2    Q   Okay.  And does the Exhibit 25 also talk about
           3    who is going to have the percentages of ownership?
           4    A   It says it here.
16:27:57   5    Q   And is that different in terms of the parties
           6    and the amounts of ownership than what is depicted in
           7    Exhibit 22?
           8    A   Well, I wouldn't know how to calculate it
           9    because this one says -- specifically says 1,100 shares,
16:28:10  10    and this one talks in percentages, so I would have to
          11    calculate to some.
          12    Q   Fair enough.
          13        But you have two different documents describing
          14    the ownership of the same company in two different ways,
16:28:22  15    is that fair?
          16    A   I'm sorry.  I must be getting really tired
          17    because I can't really -- I don't quite understand
          18    what -- this -- this document talks --
          19    Q   22?  Exhibit 22?
16:28:47  20    A   22 --
          21    A   Yes, ma'am.
          22    A   -- talks about documents to be issued shares to
          23    K.Jam Media and to Owari Opus and to appoint whom as the
          24    president.  Now -- and then it talks it here that Owari
16:28:58  25    Opus, Inc. owns 87.5 percent in Swartz IP Services.

58  (Pages 226 to 229)

Frymi Biedak                                                        03-25-19

Page 230

| 16:29:06 | 1 | Q   Okay.  Fair enough. |
| | 2 | If you could look at Exhibit 26.  Well, very |
| | 3 | quick on Exhibit 22.  Do -- we referenced the Bates |
| | 4 | number at the bottom.  And you were asked about where |
| 16:29:22 | 5 | that document came from, and you said that you didn't |
| | 6 | know. |
| | 7 | Is that a fair statement? |
| | 8 | A   That's a fair statement.  And then later on I |
| | 9 | said that I -- the only person I could think that may |
| 16:29:32 | 10 | have -- may have -- may have prepared it, with that |
| | 11 | being Jeffrey Solomon. |
| | 12 | Q   Okay.  And what is the Bates number at the |
| | 13 | bottom of that first page? |
| | 14 | A   This one? |
| 16:29:42 | 15 | Q   Yes, ma'am. |
| | 16 | Could you just read that literally as it reads? |
| | 17 | A   JAM_TT_000532. |
| | 18 | Q   Okay.  So regardless of who drafted or prepared |
| | 19 | that document, did you understand that Mr. Jam produced |
| 16:29:58 | 20 | it as one of his records in this case? |
| | 21 | A   I know that I did not prepare it. |
| | 22 | Q   Yes, ma'am. |
| | 23 | But that Bates number with the Jam designation |
| | 24 | indicates that it was produced in this lawsuit by |
| 16:30:13 | 25 | Mr. Jam? |

Page 231

| 16:30:13 | 1 | A   Oh. |
| | 2 | MR. WEICHERT:  We'll stipulate that it was |
| | 3 | produced by us.  The witness doesn't have any idea of |
| | 4 | what was produced by us. |
| 16:30:23 | 5 | BY MR. WALKER: |
| | 6 | Q   Do you know how Mr. Jam would have secured the |
| | 7 | information that appears in Exhibit 22? |
| | 8 | MR. WEICHERT:  Objection.  It's vague and |
| | 9 | ambiguous. |
| 16:30:35 | 10 | THE WITNESS:  If he -- if he prepared it. |
| | 11 | MR. WEICHERT:  And assumes facts -- |
| | 12 | MR. WALKER:  Fair enough. |
| | 13 | MR. WEICHERT:  -- not in evidence.  Thank you. |
| | 14 | BY MR. WALKER: |
| 16:30:40 | 15 | Q   Fair enough. |
| | 16 | Let me ask you this:  Do you know -- how would |
| | 17 | you guess that -- or how would you -- how would you |
| | 18 | estimate that Mr. Jam came to possess that document so |
| | 19 | that he could then produce it in this lawsuit? |
| 16:30:54 | 20 | MR. WEICHERT:  Objection.  Speculation. |
| | 21 | BY MR. WALKER: |
| | 22 | Q   Regardless of who prepared it? |
| | 23 | MR. WEICHERT:  Calls for speculation. |
| | 24 | THE WITNESS:  Can you repeat the question? |
| | 25 | /// |

Page 232

| 16:31:03 | 1 | BY MR. WALKER: |
| | 2 | Q   Yes, ma'am. |
| | 3 | Seeing this on Mr. Jam as the party that |
| | 4 | produced that record, Exhibit 22 in this lawsuit, do you |
| 16:31:09 | 5 | know how he would have acquired possession of it? |
| | 6 | MR. WEICHERT:  Calls for speculation. |
| | 7 | THE WITNESS:  He must have looked at the |
| | 8 | records. |
| | 9 | BY MR. WALKER: |
| 16:31:25 | 10 | Q   And where would those records have been |
| | 11 | located? |
| | 12 | MR. WEICHERT:  Calls for speculation. |
| | 13 | THE WITNESS:  Do you want -- you want me to -- |
| | 14 | to -- to -- to -- to say what I think? |
| 16:31:38 | 15 | BY MR. WALKER: |
| | 16 | Q   Yes, ma'am. |
| | 17 | A   It would have been in the corporate books. |
| | 18 | Q   And where were those located? |
| | 19 | A   I think there was a lot of corporate books on |
| 16:31:58 | 20 | the -- the Wil-- on the -- on the -- on the |
| | 21 | Wilshire offices. |
| | 22 | Q   Okay. |
| | 23 | A   Those big binders. |
| | 24 | Q   And do you know whether or not Mr. Jam ever had |
| 16:32:08 | 25 | occasion to be aware of that fact, to know that the |

Page 233

| 16:32:11 | 1 | binders were there? |
| | 2 | A   I don't know what he knew. |
| | 3 | Q   Did you ever have occasion to know whether or |
| | 4 | not Mr. Jam actually accessed any of those corporate |
| 16:32:28 | 5 | binders? |
| | 6 | A   I would have no way of knowing what he did. |
| | 7 | Q   Okay.  Looking at the Exhibit 26, ma'am. |
| | 8 | That's the application to Deutsche Bank account from -- |
| | 9 | from -- |
| 16:32:52 | 10 | A   I'm going to look right now. |
| | 11 | Q   Now, that particular document doesn't have a |
| | 12 | Bates number, does is it, ma'am? |
| | 13 | A   When you -- you mean this one on the -- |
| | 14 | Q   Yes, ma'am. |
| 16:33:20 | 15 | A   No, it doesn't have one.  No. |
| | 16 | Q   Okay.  And I will represent to you that that |
| | 17 | document was also produced by Kia Jam in this lawsuit. |
| | 18 | Okay? |
| | 19 | A   Okay. |
| 16:33:30 | 20 | Q   Knowing that Mr. Jam had possession of that |
| | 21 | document that allowed him to produce in this lawsuit, do |
| | 22 | you know how he came to possess the document? |
| | 23 | MR. WEICHERT:  And let me just object for a |
| | 24 | moment. |
| 16:33:41 | 25 | THE WITNESS:  But -- |

59  (Pages 230 to 233)

Frymi Biedak                                                    03-25-19

| Page 234 | Page 236 |
|---|---|

**Page 234**

16:33:41 1    MR. WEICHERT:  Because counsel is creating a
2    false impression with the witness.  He knows that this
3    was an exhibit from the government's case that we
4    provided at counsel's request.  So the intonation that
16:33:55 5    this is something that Mr. Jam had in his possession as
6    a business record or something is just a false --
7        MR. WALKER:  Okay, well --
8        MR. WEICHERT:  It's a false implication and --
9    and counsel knows that.  So I'll object on the grounds
16:34:08 10   that the counsel was totally misleading the witness
11   about the source of this document.
12       MR. WALKER:  Okay.  We'll, I'll address that.
13       You see, the records that government used as an
14   exhibit that they gave us had a government exhibit
16:34:19 15   sticker number on it.  It was actually marked as a
16   government exhibit.  That document doesn't have any
17   government stick- -- sticker on --
18       MR. WEICHERT:  And we deleted the government
19   exhibit number on all of these exhibits because we don't
16:34:30 20   believe that the government's prosecution is going to be
21   a matter that's going to be considered by the jury.
22       MR. WALKER:  And there -- there was also a
23   Bates number for Mr. Jam that was on the document he
24   produced in the case, and yet that document doesn't have
16:34:43 25   this Bates number on it either, suggesting that what

**Page 235**

16:34:48 1    Mr. Weichert has used as an exhibit in this case today
2    is not the government's exhibit, or even the document
3    they produced with the Bates number, but the actual
4    record that was in Mr. Jam's possession.
16:35:01 5        So based upon the fact that there is no
6    government exhibit sticker on it, and based upon the
7    fact that the actual exhibit you used in your deposition
8    has no Bates number on it, I think my question is a fair
9    one.
16:35:12 10       I'm not trying to mislead you.
11       MR. WEICHERT:  You are, actually, Counsel.
12   This came from the government's exhibit because I pulled
13   it from the government's exhibit.
14       MR. WALKER:  I'm asking my question.  So if you
16:35:20 15   have an objection --
16       MR. WEICHERT:  Okay.  Yeah.  The objection is
17   it's total speculation.  So if you want to deal with
18   this later on, we can, but this witness doesn't know
19   where this document came from other than I showed it to
16:35:31 20   her.
21       MR. WALKER:  Okay.  Fair enough.
22       BY MR. WALKER:
23       Q   So my question to you, ma'am, is:  Seeing as
24   that -- that record doesn't have a government exhibit
16:35:40 25   sticker and it doesn't have a Bates number on it, do you

**Page 236**

16:35:42 1    know how Mr. Jam would have come to possess those
2    records?
3        MR. WEICHERT:  Calls for speculation.
4    Misleading the witness.
16:35:54 5        THE WITNESS:  May I ask something?
6        BY MR. WALKER:
7        Q   Sure.
8        Q   Which one is the government's Bates number?  Is
9    it this one?
16:36:01 10       Q   The government sticker?  It's actually a
11   sticker like that yellow one.  It's a square sticker.
12   It says "Government EX" and it has a number on it.
13       A   And this one is from whom is this?
14       Q   That shows that that's the prefix.  The JAM_TT
16:36:12 15   is the prefix that they used to mark the documents that
16   they have produced in this lawsuit.
17       A   Okay.  I just was wondering.
18       A   Yes, ma'am.
19       A   And these ones we just put right now?
16:36:25 20       Q   Yes.
21       Okay.  Got it.
22       Q   Those are the ones that the court reporter put
23   on so that the exhibit would have a sticker on it.
24       Okay.  I get it.
16:36:32 25       Q   So my question to you, ma'am, is:  Do you know

**Page 237**

16:36:35 1    how Mr. Jam would have had access to the record that's
2    marked as Exhibit 26?
3        MR. WEICHERT:  Calls for speculation.
4        MR. MCGONIGLE:  Do you have 26 in front of you?
16:36:50 5        THE WITNESS:  Yes.  That he was not copied on.
6    You want -- you want -- you want to ask --
7        BY MR. WALKER:
8        Q   Yes, ma'am.
9        A   -- me when he was not copied --
16:36:51 10       Q   Yes.
11       A   -- how he would have gotten the document?
12       Q   Yes.
13       A   Is this the question?
14       Q   Yes.
16:36:56 15       Was that record -- would that record have been
16   available at the Colorado Boulevard office?
17       A   Well, he was not copied on the e-mail, so I
18   don't know how he would have gotten it.
19       Q   Okay.  Fair enough.
16:37:12 20       Now, going to --
21       A   I'm sorry, could I just step out for one
22   second?
23       Q   Of course.
24       A   Can I go to the restroom?
16:37:23 25       Q   Absolutely.

eLitigation Services, Inc. - els@els-team.com

Frymi Biedak                                                    03-25-19

---

Page 238

```
16:37:23   1        Watch your microphone, ma'am.
           2     A  Oh, yes.  Thank you.
           3        THE VIDEOGRAPHER:  The time is 4:37 p.m.  We
           4   are now off the record.
16:37:26   5        (A recess was taken.)
           6        THE VIDEOGRAPHER:  We are back on the record.
           7   The time is 4:42 p.m.
           8        BY MR. WALKER:
           9     Q  All right.  Ma'am, do you have Exhibit 26
16:43:08  10   before you?
          11     A  I do.
          12     Q  All right.  Now, there were a couple of
          13   instances on that document were you know that the --
          14   Mr. Bergstein's signature stamp was used?
16:43:16  15     A  Yes.
          16     Q  Okay.  And is it correct that Mr. Bergstein
          17   never used his own signature stamp, that he would sign a
          18   document if he was signing it?
          19     A  I don't think he used the signature stamp.
16:43:32  20     Q  So how do we know that Mr. Bergstein actually
          21   completed that application?
          22     A  Can you repeat the question?  I don't quite
          23   understand the connection.
          24     Q  He was asking you about that submission to
16:43:57  25   Deutsche Bank?
```

Page 239

```
16:43:59   1     A  Yes.
           2     Q  Presuming that Mr. Bergstein completed that and
           3   sent it into the bank.
           4        And he kept pointing out that Kia Jam was not
16:44:06   5   on the e-mail and was not mentioned in the document;
           6   right?
           7     A  Yes.
           8     Q  Okay.  And you remember his earlier questions
           9   about how Mr. Bergstein was directing Kia Jam in certain
16:44:19  10   requests, he would direct him to do things?
          11     A  Correct.
          12     Q  Okay.  Their theory is that Mr. Jam is not
          13   responsible for any of this because it was all
          14   Mr. Bergstein, that he's solely responsible for all of
16:44:32  15   this and that he was controlling Mr. Jam so thoroughly
          16   that Mr. Jam has no liability or fault --
          17        MR. WEICHERT:  Do you want to make your opening
          18   statement now or is there going to be a question?
          19        BY MR. WALKER:
16:44:46  20     Q  My question, ma'am, is that if Mr. Bergstein,
          21   at least according to your knowledge, would sign a
          22   document, would not use a signature stamp for his own
          23   signature, how do we know that Mr. Bergstein even sent
          24   that into Deutsche Bank?
16:45:04  25     A  I don't know.
```

Page 240

```
16:45:22   1     Q  Now, with respect to the fact that Mr. Jam is
           2   not copied on the e-mail, do you know whether or not
           3   Mr. Jam and Mr. Bergstein discussed that loan or the
           4   opening of that account, rather?
16:45:37   5     A  I wouldn't know either way.
           6     Q  And just because Mr. Jam doesn't get copied on
           7   the e-mail to Deutsche Bank doesn't mean that he wasn't
           8   aware that this was being done; right?
           9        MR. WEICHERT:  The question is argumentative.
16:45:53  10        BY MR. WALKER:
          11     Q  You can answer the question.
          12        THE WITNESS:  Can you repeat?
          13        BY MR. WALKER:
          14     Q  Yes, ma'am.  I'd be glad to.
16:45:59  15        The fact that Mr. Jam is not copied on that one
          16   e-mail doesn't suggest that he didn't know anything
          17   about it, does it?
          18     A  Doesn't suggest anything.
          19     Q  I mean, it's entirely possible that
16:46:14  20   Mr. Bergstein and Mr. Jam discussed this account
          21   opening, is it not?
          22     A  Anything is possible.
          23        MR. WEICHERT:  Calls for speculation.
          24        BY MR. WALKER:
16:46:24  25     Q  I mean, they were sharing an office.  They were
```

Page 241

```
16:46:27   1   friends.  They were both involved in Swartz IP.  Mr. Jam
           2   signed a purchase agreement in this case as vice
           3   president of Swartz IP.
           4        MR. WEICHERT:  Counsel is testifying.
16:46:39   5        Do you want to testify or ask questions --
           6        BY MR. WALKER:
           7     Q  Do you think that --
           8        MR. WEICHERT:  -- Counsel?
           9        BY MR. WALKER:
16:46:42  10     Q  Do you think that it's possible that Mr. Jam
          11   was aware of the submission of this account?
          12        MR. WEICHERT:  Calls for speculation.
          13        THE WITNESS:  Am I supposed to say something
          14   now?  I'm sorry.
16:46:56  15     Q  Yes, ma'am.  I'll reask the question.
          16        Given what you know about the relationship
          17   between Mr. Jam and Mr. Bergstein, and the number of
          18   business matters that they worked on together, do you
          19   think it's likely that Mr. Bergstein discussed this
16:47:07  20   account opening with Mr. Jam?
          21        MR. WEICHERT:  Calls for speculation.
          22        THE WITNESS:  I don't know what they discussed.
          23        BY MR. WALKER:
16:47:22  24     Q  Fair enough.
```

Frymi Biedak                                                                      03-25-19

Page 242

```
16:47:23   1        A  I was not privy to their meeting so --
           2        Q  And the simple fact that Mr. Jam is not copied
           3   on that e-mail doesn't mean that he didn't know about
           4   it?
16:47:31   5        MR. WEICHERT:  It's argumentative.
           6        THE WITNESS:  Oh, it doesn't mean anything.
           7   BY MR. WALKER:
           8        Q  Thank you, ma'am.
           9        Do you think it's possible that Kia Jam
16:47:44  10   actually filled that out and used Mr. Bergstein's
          11   signature stamp?
          12        A  I think --
          13        MR. WEICHERT:  Calls for speculation.
          14        MR. MCGONIGLE:  You can answer.
16:47:57  15        THE WITNESS:  I -- I don't think -- I don't
          16   think so.  I -- I -- I -- I personally think that this
          17   document was filled out by Deutsche Bank.
          18   BY MR. WALKER:
          19        Q  But they wouldn't have had Mr. Bergstein's
16:48:07  20   signature stamp?
          21        A  No.  They wouldn't have the signature stamp.
          22        Q  Okay.  Do you think it's possible that Mr. Jam,
          23   in assisting Mr. Bergstein, used the signature stamp to
          24   submit those documents?
16:48:20  25        MR. WEICHERT:  Calls for speculation.
```

Page 243

```
16:48:21   1        THE WITNESS:  Do -- you think that -- you --
           2   you -- do -- I'm -- I'm sorry.  Again, if I was not
           3   there at that time, I was not in the office, the office
           4   manager was there, Steven Piskula, he had access to the
16:48:44   5   stamp.
           6   BY MR. WALKER:
           7        Q  Did Mr. Jam also have access to the stamp?
           8        A  Not that -- I don't -- he, himself, I don't
           9   think so.
16:48:54  10        Q  From time to time, he did possess the stamp,
          11   didn't he?
          12        A  I don't know about that.
          13        Q  Okay.  Thank you.
          14        Looking at Exhibit 27, that is the November 17,
16:49:10  15   2011 e-mail?
          16        A  Hold on one second.  I'm sorry.
          17        Q  Yes, ma'am.  Take your time.
          18        A  I need -- I need to arrange this.
          19        Oh, where is 27?
16:49:28  20        MR. MCGONIGLE:  It was -- it was right behind
          21   26.  It should be right here.  Hold on a second.
          22        THE WITNESS:  It's not here.
          23        MR. MCGONIGLE:  Here it is.  It's stuck on this
          24   one.
16:50:02  25        THE WITNESS:  27.  Okay.  I'm not going to
```

Page 244

```
16:50:03   1   touch anything.  27.
           2   BY MR. WALKER:
           3        Q  Now, again, you were asked about the fact that
           4   Mr. Jam was not copied on that e-mail.
16:50:18   5        But you -- do you know if whether or not
           6   Mr. Jam discussed the substance of that e-mail with
           7   Mr. Bergstein?
           8        MR. WEICHERT:  Calls for speculation.
           9        THE WITNESS:  I wouldn't know one way or the
16:50:30  10   other.
          11   BY MR. WALKER:
          12        Q  Looking at this e-mail -- Exhibit 29, ma'am.
          13        A  29.
          14        Q  Again, I'll wait until you find it.  I'm sorry.
16:50:49  15        A  Yeah.
          16        Q  And you got it.  Okay.
          17        Again, much was made of the fact that Mr. Jam
          18   did not receive a copy of that e-mail.
          19        But again, do you know whether or not Mr. Jam
16:51:00  20   would have discussed any aspect of the substance of that
          21   e-mail with Mr. Bergstein at any time?
          22        A  I would not know one way or the other.
          23        Q  The fact that Mr. Jam is not on these e-mails
          24   doesn't necessarily signify that he didn't know about
16:51:13  25   the substance of the e-mails; is that correct?
```

Page 245

```
16:51:17   1        MR. WEICHERT:  It's argumentative.
           2        THE WITNESS:  I don't know what he knew.
           3   BY MR. WALKER:
           4        Q  Well, I guess my point is the fact that he
16:51:23   5   wasn't copied on the e-mails doesn't mean that
           6   Mr. Bergstein didn't discuss the substance of those
           7   e-mails with Mr. Jam --
           8        MR. WEICHERT:  Speculation.  Argumentative.
           9   BY MR. WALKER:
16:51:35  10        Q  -- is that correct?
          11        A  It doesn't say anything about whether he knew
          12   or whether he didn't know.  He was just not copied on
          13   the e-mail.  And I don't know what their conversations
          14   was about.
16:51:46  15        Q  Thank you, ma'am.
          16        If you could look at Exhibit 31, ma'am.
          17        A  Yes.  31.
          18        Q  Now, you were asked about those five Wells
          19   Fargo checks that we looked at, the first one being made
16:52:25  20   payable to cash on the counter check, and the last two
          21   were made payable to Integrated Administration.
          22        Do you recall those?
          23        A  Yes.
          24        Q  And do you recall that the signature on the
16:52:35  25   last two that were paid to Integrated Administration --
```

62 (Pages 242 to 245)

Frymi Biedak                                                03-25-19

## Page 246

16:52:37  1    correct me if I'm wrong, because I believe you testified
          2    that you weren't sure whether or not those were actually
          3    Mr. Bergstein's signature.
          4       A   I said that I -- yes.  I was not sure that
16:52:49  5    those were.  I -- I could not -- I would not say for
          6    100 percent that those were his signatures.  Yes, I said
          7    that.
          8       Q   And going to Exhibit 32.
          9       A   Yes.  Exhibit 32.
16:53:25 10       Q   You were asked about this particular real
         11    estate transaction?
         12       A   Yes.
         13       Q   In the normal course of your business, did you
         14    have occasion to have any information or knowledge about
16:53:34 15    this transaction?
         16       A   Can you explain, please?
         17       A   Yes, ma'am.
         18          As of March 13, 2012, when this e-mail was sent
         19    by Mr. Bergstein, is the normal part of your duties
16:53:49 20    working at the Colorado Boulevard address, did you have
         21    occasion to know anything about this transaction?
         22       A   Not -- not really.  I mean, it was -- it -- it
         23    was -- he wasn't doing real estate back then.
         24       Q   Did you have anything to do with anything
16:54:11 25    mentioned in Exhibit 32 at the time that this e-mail was

## Page 247

16:54:17  1    sent?
          2       A   You mean --
          3       Q   Did you know about it?  Did you facilitate it?
          4    Did you have anything at all to -- to do with this
16:54:32  5    particular real estate transaction at the time that this
          6    e-mail was sent?
          7       A   I don't -- I don't re- -- recall.  I really
          8    don't recall.  It's possible that I did.  I did
          9    something with it.  Maybe -- maybe documents were sent.
16:54:47 10    I don't know.  I really don't remember.
         11       Q   Do you agree that the best indication of where
         12    the money went and to whom it was directed that was
         13    contained in the Deutsche bank account and the Wells
         14    Fargo account that Swartz IP had, that the best
16:55:09 15    indication of where that money went in those two
         16    accounts would be in the bank records themselves?
         17          MR. WEICHERT:  It's vague and ambiguous.  Also
         18    argumentative.
         19          THE WITNESS:  I don't understand the questions.
16:55:17 20    I'm sorry.
         21    BY MR. WALKER:
         22       Q   With res- -- with respect to the Swartz IP
         23    Deutsche bank account and the Swartz IP Wells Fargo
         24    account --
16:55:26 25       A   Yes.

## Page 248

16:55:27  1       Q   -- do you agree that the best indication of
          2    what happened to the money in those two accounts, where
          3    the money was directed, who it was paid out to, that
          4    sort of thing, that the best indication of that would be
16:55:39  5    the actual bank records for those two accounts?
          6          MR. WEICHERT:  It's argumentative.
          7          THE WITNESS:  I wouldn't know wherever else to
          8    get it from.
          9    BY MR. WALKER:
16:55:49 10       Q   The bank records would be an accurate
         11    reflection of checks that were issued, for example;
         12    correct?
         13       A   Yes, and the statements.
         14       Q   The -- the bank statements and the bank records
16:56:01 15    would be an accurate reflection of wire transfers that
         16    were sent out from those two accounts; correct?
         17       A   Yes.
         18       Q   The bank records and bank statements for both
         19    the Swartz IP, Wells Fargo account, and the Swartz IP
16:56:16 20    Deutsche bank account would be the best -- most accurate
         21    record of the amount of each payment and the recipient
         22    of each payment; correct?
         23       A   Can I ask a question?
         24          What would the another option?
16:56:31 25       Q   I -- I'm -- I'm not aware of one, but I'm just

## Page 249

16:56:32  1    trying to -- do you agree with the -- the bank records
          2    are the best evidence of --
          3       A   That's -- that's where I would look first --
          4       Q   Okay.
16:56:39  5       A   -- if I was going to try to reconcile an
          6    account.
          7       Q   Okay.
          8       A   If I was.
          9       Q   Have you ever looked at the bank records for
16:56:46 10    Wells Fargo and Deutsche Bank to see how much money was
         11    paid out to Integrated Administration from those two
         12    accounts?
         13       A   Maybe -- maybe when discovery was done.  It's
         14    very possible.  But I really don't remember.
16:57:06 15       Q   Did you ever analyze the Swartz IP Deutsche
         16    bank account to determine how much, if any, of that
         17    money went to Kia Jam directly?
         18       A   If it was done during discovery, then the
         19    account was reconciled.  Maybe I looked at it.  It's
16:57:26 20    possible.  But I don't -- I don't really remember.
         21       Q   But whatever the records reflect, you agree
         22    that the bank records themselves would be the most
         23    accurate records of what happened to the funds held in
         24    each of those two accounts; correct?
16:57:42 25          MR. WEICHERT:  Asked and answered multiple

Frymi Biedak                                                      03-25-19

---

Page 250

```
16:57:43   1    times.  Argumentative multiple times.
           2           THE WITNESS:  So I'm not saying anything?
           3           MR. WEICHERT:  No.  You can answer.
           4    BY MR. WALKER:
16:57:50   5       Q   You can answer.
           6           MR. MCGONIGLE:  You can answer again.
           7           Coun--- Counsel, you should know this by now,
           8    anyway.
           9           MR. WEICHERT:  Making his point.
16:57:56  10           MR. MCGONIGLE:  You can go ahead and answer.
          11           THE WITNESS:  Okay.  Okay.
          12           MR. WEICHERT:  Maybe you want to come back
          13    tomorrow.
          14           THE WITNESS:  Can you repeat the question?
16:58:03  15    BY MR. WALKER:
          16       Q   Yes, ma'am.
          17           You agree that the bank records for the Swartz
          18    IP Wells Fargo account and the Deutsche Bank account are
          19    the best record of how the funds in those two accounts
16:58:15  20    were paid out and to whom they were paid?
          21       A   I think the bank records are the only records
          22    that I would look at and trust if it came to any kind of
          23    transactions that I was trying to reconcile.
          24           MR. WALKER:  Thank you, ma'am.
16:58:30  25           We'll pass the witness.
```

Page 251

```
16:58:31   1              EXAMINATION
           2    BY MR. WEICHERT:
           3       Q   So with regard to the bank records, I'm just
           4    following up really briefly.
16:58:37   5           If there was a wire transfer out of the
           6    account, the person who actually originated that wire
           7    transfer necessarily wouldn't show up in the bank
           8    records; correct?
           9       A   I don't know -- do you mean who initiated the
16:58:53  10    wire transfer?
          11       Q   So if you are on an account and David Bergstein
          12    gives you a direction to initiate a wire transfer, the
          13    bank records would show that you initiated it even
          14    though it was David Bergstein's instruction to you;
16:59:05  15    correct?
          16       A   I am not -- I'm not assigned on any of the
          17    accounts.
          18       Q   Okay.  So if you look at the bank records and
          19    you're the sole signer of the account, that will show --
16:59:17  20    withdraw that question.
          21       A   Okay.
          22       Q   Let's go to -- back to Exhibit 26.
          23       A   Go ahead.
          24       Q   I believe you testified that Kia Jam did not
16:59:54  25    have access to David Bergstein's signature stamp;
```

Page 252

```
16:59:57   1    correct?
           2       A   To the best of my knowledge, yes.  I don't
           3    think so.
           4       Q   You never saw Kia Jam use David Bergstein's
17:00:04   5    signature stamp; correct?
           6       A   I did not see anybody.  I mean, I -- I -- I saw
           7    myself using it.  The office manager, Steven Piskula.
           8       Q   Is there any indication in Exhibit 26 that Kia
           9    Jam had any involvement in the preparation of any of
17:00:20  10    these documents?
          11       A   Well, his name is not mentioned on it.
          12       Q   The last two pages of the documents, the last
          13    page is David Bergstein's driver's license.
          14           Did Kia Jam, at any point in time, did you
17:00:41  15    know, have any possession of David Bergstein's driver's
          16    license?
          17       A   That's actually very possible as much as I
          18    am -- am -- because they were traveling together.  So
          19    it's very possible that I gave him a copy of the
17:00:56  20    driver's license.
          21       Q   All right.  And with regard to the passport,
          22    did David give Kia a copy of his passport?
          23       A   I may have given it.
          24       Q   A copy of his passport?
17:01:07  25       A   When they were -- because they were traveling
```

Page 253

```
17:01:09   1    together.
           2       Q   When they were traveling --
           3       A   So it's very correct.  When they were
           4    traveling.  Because they did.
17:01:12   5       Q   The document -- the first page of Exhibit 26
           6    indicates that you were sending a number of documents to
           7    Deutsche Bank including David Bergstein's passport and
           8    driver's license.
           9           Do you see that?
17:01:29  10       A   Yes.
          11       Q   And --
          12       A   Yes.  Yes.
          13       Q   Would you have gotten David Bergstein's
          14    passport and driver's license from Kia Jam?
17:01:38  15       A   I think we had a copy of his driver's license
          16    and his passport in -- in the records.
          17       Q   And which records are those?
          18       A   I think I -- in my records.
          19       Q   Your records?
17:01:49  20       A   Yes.
          21       Q   And that's where you obtained the copies at the
          22    back of Exhibit 26?
          23       A   You mean this particular record, they could
          24    have been also e-mailed to somebody and I would have
17:02:01  25    taken a copy of that e-mail.
```

64  (Pages 250 to 253)

Frymi Biedak                                                          03-25-19

---

Page 254

| | | |
|---|---|---|
| 17:02:02 | 1 | Q   All right.  But it was you who provided the |
| | 2 | picture? |
| | 3 | A   According to this e-mail?  Yes.  It listed |
| | 4 | here. |
| 17:02:10 | 5 | Q   So you provided the passport page as well as |
| | 6 | the driver's license page? |
| | 7 | A   Yes.  According to this e-mail, absolutely, |
| | 8 | yes. |
| | 9 | Q   And Kia Jam did not; correct? |
| 17:02:20 | 10 | A   I don't think so. |
| | 11 | MR. WEICHERT:  Nothing else. |
| | 12 | MR. WALKER:  I have nothing else. |
| | 13 | MR. WEICHERT:  So should we enter into a |
| | 14 | stipulation about -- |
| 17:02:34 | 15 | MR. MCGONIGLE:  Want to just send it -- |
| | 16 | MR. WEICHERT:  -- the transcript? |
| | 17 | MR. MCGONIGLE:  It would be easier to send -- |
| | 18 | MR. WEICHERT:  What do you want to do? |
| | 19 | MR. MCGONIGLE:  -- the transcript to her and |
| 17:02:38 | 20 | she'll review it and sign under oath. |
| | 21 | I guess you originally want it to go back to |
| | 22 | you? |
| | 23 | MR. WALKER:  Yeah. |
| | 24 | MR. MCGONIGLE:  Or let the witness hold it |
| 17:02:42 | 25 | or -- |

---

Page 255

| | | |
|---|---|---|
| 17:02:44 | 1 | MR. WALKER:  No.  No.  We want it to go back to |
| | 2 | us. |
| | 3 | MR. MCGONIGLE:  Okay. |
| | 4 | MR. WEICHERT:  How long do you want to give the |
| 17:02:48 | 5 | witness to review and sign? |
| | 6 | MR. MCGONIGLE:  Well, will it be okay is just |
| | 7 | relieve the court reporter of her duties under the |
| | 8 | California code -- |
| | 9 | MR. WEICHERT:  Yes. |
| 17:02:56 | 10 | MR. MCGONIGLE:  -- with respect to having the |
| | 11 | witness sign the original under oath, and also her duty |
| | 12 | to retain the original signed transcript. |
| | 13 | You can send the certified -- or the original |
| | 14 | transcript to me, and I'll have the witness review it, |
| 17:03:06 | 15 | make any changes she deems appropriate and sign it under |
| | 16 | oath. |
| | 17 | And if you could do that in 30 days from |
| | 18 | receipt? |
| | 19 | MR. WALKER:  Well, we'd like to have it |
| 17:03:15 | 20 | quicker, obviously.  But we'll reserve the right to use |
| | 21 | an unsigned copy -- |
| | 22 | MR. MCGONIGLE:  Okay. |
| | 23 | MR. WALKER:  -- in lieu of the signed copy. |
| | 24 | THE WITNESS:  Can I have 30 days, please? |
| 17:03:22 | 25 | MR. WALKER:  Yes, ma'am. |

---

Page 256

| | | |
|---|---|---|
| 17:03:22 | 1 | THE WITNESS:  Thank you. |
| | 2 | MR. MCGONIGLE:  Okay.  But -- but I'll give |
| | 3 | you -- after that -- once she gets it, once we receive |
| | 4 | it after 30 days, I'll give you a prompt notice of all |
| 17:03:29 | 5 | the changes, if any, she's made, and also the fact that |
| | 6 | she signed it under oath.  And I'll send the original to |
| | 7 | Mr. Walker.  He can retain custody of it. |
| | 8 | MR. WALKER:  Okay.  Yeah.  And we will reserve |
| | 9 | the right to use an unsigned copy for any purpose with |
| 17:03:42 | 10 | the court. |
| | 11 | THE WITNESS:  If I'm not signing this in |
| | 12 | 30 days; is this correct? |
| | 13 | MR. WALKER:  Well, you -- you -- you have the |
| | 14 | 30 days to review it and sign it. |
| 17:03:51 | 15 | THE WITNESS:  Okay.  From the time we |
| | 16 | receive -- |
| | 17 | MR. WALKER:  Regardless of what I do with it. |
| | 18 | THE WITNESS:  Okay.  From the time you receive |
| | 19 | it? |
| 17:03:57 | 20 | MR. WALKER:  Sure.  That will be fine.  We just |
| | 21 | need to get it back, you know, at some point. |
| | 22 | MR. MCGONIGLE:  Okay.  Okay. |
| | 23 | THE WITNESS:  All right. |
| | 24 | MR. MCGONIGLE:  All right. |
| 17:04:06 | 25 | MR. WALKER:  Thank you. |

---

Page 257

| | | |
|---|---|---|
| 17:04:09 | 1 | THE VIDEOGRAPHER:  This concludes today's |
| | 2 | proceeding in the deposition of Frymi Biedak.  Four DVDs |
| | 3 | were used.  The time is 5:04 p.m.  We're now off the |
| | 4 | record. |
| 17:04:27 | 5 | (The proceedings were concluded |
| | 6 | at 5:04 p.m.) |
| | 7 | ---o0o--- |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

---

65 (Pages 254 to 257)

Frymi Biedak                                                    03-25-19

Page 258

17:04:27  1    STATE OF CALIFORNIA )
                                    ) ss.
          2    COUNTY OF _____ )

          3

          4

17:04:27  5         I, FRYMI BIEDAK, say I have read the

          6    foregoing deposition and declare under penalty of perjury

          7    that my answers as indicated are true and correct.

          8

          9

17:04:27 10

         11    _____

                   (Date)

         12

         13         _____

                            (Signature)

         14

17:04:27 15

         16

         17

         18

         19

17:04:27 20

         21

         22

         23

         24

17:04:27 25

Page 259

          1         I, Sandra Mitchell CSR No. 12553, Certified Shorthand

          2    Reporter, hereby certify that:

          3         I am authorized to administer oaths or affirmations.

          4    (Cal. Code of Civ. P. Sec. 2093 (b) and Fed. R. Civ. P. 28(a)).

          5         The foregoing proceedings were taken before me at the

          6    time and place therein set forth, at which time the witness

          7    was duly sworn by me. (Cal. Code Civ. Proc. 2025.330(a),

          8    2025.540(a) and Fed. R. Civ. P. 30(f)(1)).

          9         The foregoing pages contain a full, true and accurate

         10    record of all proceedings and testimony. (Cal. Code Civ.

         11    Proc. 2025.540(a) and Fed. R. Civ. P. 30(f)(1)).

         12         I am not a relative or employee of the parties,

         13    nor financially interested in the action. (Cal. Code Civ.

         14    Proc. 2025.320(a)).

         15         Before completion of the proceedings, review of the

         16    transcript [ x ] was [   ] was not requested.  If requested,

         17    any changes made by the witness (and provided to the reporter)

         18    during the period allowed, are appended hereto.

         19    (Fed. R. Civ. P. 30(e)).

         20         I declare under penalty of perjury under the laws of

         21    California that the foregoing is true and correct.

         22         Dated this 29th day of March, 2019.

         23    _____

         24    Sandra Mitchell

         25    C.S.R. No. 12553

66 (Pages 258 to 259)

**A**

**a.m** 2:19 7:2,11
45:25 46:4 82:21
109:20 120:7
213:24 222:25
**Aaron** 73:6 146:18
148:14 186:6,7,8
186:10 188:16,25
**abcxyz.cc** 75:18
76:6,20 82:25
87:15
**able** 10:5 103:14
111:20 139:22
181:25 184:11
**absolutely** 16:24
237:25 254:7
**accepted** 170:8
**access** 28:13 30:17
55:13 56:8,9
57:11,16,23 58:1
58:4 94:9,12,16
107:14 108:18
110:4,10,23 117:8
133:6 138:7
214:10,12 224:3,5
224:9 237:1 243:4
243:7 251:25
**accessed** 233:4
**accident** 12:2
**accompanied** 10:19
**account** 25:4 30:16
40:4 53:25 55:13
93:14 94:8,10,13
94:16 95:23 96:21
96:25 97:4,14
107:15 108:3,11
108:14 110:4,10
110:14,19 111:1
125:21 133:6,7
182:8 192:19,24
193:5,12,16,20,21
193:24 194:2,3,5
194:16 205:1,11
206:7 207:10
208:15 211:3,8,9
211:12,16 212:2

212:20,24 213:1,5
213:7 214:8,10,12
214:14 216:25
217:1,6 218:8
219:6,14 220:12
220:21,21,25
221:6,8,11,14,15
221:20,23 222:3,6
224:1,9 233:8
240:4,20 241:11
241:21 247:13,14
247:23,24 248:19
248:20 249:6,16
249:19 250:18,18
251:6,11,19
**accountancy** 25:17
**accountant** 25:8,11
25:14,20 30:10
58:23 69:10,12,16
69:18 70:1,10,21
71:4
**accounted** 30:12
**accounting** 38:19
58:15,16,17 63:13
211:13,14
**accounts** 22:20
30:19 45:18 57:12
57:16,24 58:2
108:18 117:9,10
117:16 118:1,8
192:22 219:25
221:25 224:2,11
247:16 248:2,5,16
249:12,24 250:19
251:17
**accurate** 25:9,10
38:10,15 39:11,22
41:1,9 86:1,13
248:10,15,20
249:23 259:9
**accurately** 40:14
**acquired** 232:5
**action** 7:9 156:7,13
259:13
**actions** 149:3 154:9
228:5
**active** 18:3

**activities** 12:25
**actual** 39:7 46:25
78:21 79:3,9,16
79:21,25 94:24
96:1,17 144:18
218:19 235:3,7
248:5
**adapted** 191:7
192:5
**addition** 165:9
**additional** 104:25
116:15 119:6
156:7,11,13
196:12
**address** 20:25
26:21,23 57:21
61:5,6,8 71:23
72:2,4,7,8 74:24
75:2,25 81:12,16
82:25 87:15,25
88:2,5 89:23 94:4
95:7 113:18 114:9
114:25 118:22
119:12,13,16,23
120:1,2 127:11,12
127:15 131:11
140:1 174:14
183:3,4,7 209:23
210:1,3,5,6,8,9,10
223:2 234:12
246:20
**addresses** 72:15
75:20 83:4 166:6
**admin** 168:10
**administer** 259:3
**Administration** 1:8
2:8 8:1 50:15
51:24 52:6,14,22
53:11,14 54:19,21
55:10,15 56:11
57:3,12,17,24
63:17 66:3,7,15
67:11,19 69:4
97:1,7,15 98:17
99:8 100:10 101:5
107:11,21 112:8
112:15,23 114:22

114:25 116:4
117:11,16 118:1
125:6 132:2,6,18
133:5,11 134:21
134:25 139:13
141:7,19 142:1,6
142:15,20,24
143:4,8,15 144:20
165:15,19,23
167:3 168:7,13
174:15 175:7
178:20 245:21,25
249:11
**Administration's**
97:4 125:21 169:4
**Administrations's**
107:15
**administrative**
8:24 9:12,14
15:10 16:11 18:16
18:18 20:16,24
174:17,19,21
175:2
**admitted** 123:10
**advanced** 38:21
**advice** 13:10,12
28:20 29:5 31:4
173:6 174:11
**advise** 223:16
**advised** 86:9
103:12
**advises** 170:5,5
**advising** 85:23
**Advisory** 88:15,20
91:3,11 92:5
131:7 170:12,15
171:8,19
**affairs** 10:1,10
11:24 12:14 17:4
173:20 177:1
**affiliated** 16:13
18:7,8,24 19:1
112:22 134:24
135:9,22 136:6,18
136:25
**affirmations** 259:3
**affix** 124:2

**affixed** 89:8 92:9
**afternoon** 173:16
**agent** 147:2 155:7
155:13 157:17
158:1,23 159:21
160:19 169:22
170:7,23 171:2,4
171:10
**agents** 152:22
171:16
**ago** 43:23 179:15
204:4
**agree** 84:7 226:24
247:11 248:1
249:1,21 250:17
**agreement** 241:2
**ahead** 57:20 145:14
159:4 227:24
250:10 251:23
**Aircraft** 136:13
**al** 7:17
**albeit** 101:7
**Alisa** 6:5 204:13,18
207:1 213:21
216:13
**allergies** 73:13
**allow** 35:14 107:17
139:2
**allowed** 60:25
175:6 233:21
259:18
**altogether** 167:1
**ambiguous** 24:24
26:9 39:24 54:11
77:5,16 137:18
157:20 231:9
247:17
**amended** 90:12,13
124:13
**amendment** 90:9
**America** 108:10,17
115:5
**American** 108:13
182:7
**Amex** 108:8
**amount** 38:9,20
40:3,14 49:13

Frymi Biedak                                                     03-25-19

Page 261

95:19 96:13,24
98:18 125:10
195:25 196:13
217:1 225:5
248:21
**amounts** 39:18
229:6
**Amy** 26:17,19
**analyze** 249:15
**Andrea** 168:2
**Angeles** 2:18 3:18
7:1,12
**Anna** 167:9
**annual** 126:20,23
129:20 149:3
154:9 202:25
203:1,5 207:14
208:3 209:8 228:5
**annually** 203:1
**answer** 6:10 13:2
13:13 16:1 17:11
17:12 18:13 20:2
22:10,18 25:1,9
26:11 28:18 29:3
29:8 30:3,5,7,21
31:1,5 32:22
34:21 40:18 41:4
50:24 52:19 55:1
55:3,4 56:23
66:12,13 70:18
78:13 85:12 99:15
110:8 114:3
118:11 128:10
143:11 144:8
145:15 152:11,12
168:18,19,20
173:3,25 174:8
185:1 201:11,12
201:13 211:19
224:23 240:11
242:14 250:3,5,6
250:10
**answered** 249:25
**answering** 86:8
**answers** 258:7
**anticipating** 84:24
**anybody** 107:24

252:6
**anymore** 176:5
**anyway** 225:2
250:8
**apart** 129:2
**apologies** 120:9
**apologize** 53:4
56:25 85:16
158:19
**apparently** 76:4,10
76:17 84:9 92:10
97:3 102:19
162:13 188:24
198:4
**appeal** 172:24
174:6
**appear** 14:3,4
32:18 46:9 62:16
93:13 105:25
115:1 137:15
141:22 212:14,16
**APPEARANCES**
3:1
**appeared** 15:6,13
33:1 64:1 120:6
142:25
**appears** 32:7 47:4
64:21 70:12,22
71:6 114:23
120:15 190:20
205:22 206:20
231:7
**appended** 259:18
**apple** 8:22 62:6
146:18,20 148:14
**application** 233:8
238:21
**applied** 68:6,15
132:18 135:14
136:21 139:10
140:10 155:15
159:2 160:8
162:10
**apply** 67:14,16
132:21 137:10
139:15,20 158:13
162:12 198:19

**applying** 68:8,10
140:11 162:11,13
**appoint** 149:2
154:8 228:4
229:23
**appointed** 151:12
152:7 199:25
**appointing** 151:22
200:4
**appointment**
228:25
**apportioning** 105:2
**Appro-** 209:19
**appropriate** 255:15
**approved** 70:1
**approximately**
47:10 82:9 172:8
182:18 199:19
208:25 209:14
223:24
**April** 106:1 107:8
109:19 117:5,7
118:15 119:3
124:22 194:12
**area** 180:8
**argumentative**
56:22 130:16
240:9 242:5 245:1
245:8 247:18
248:6 250:1
**arrange** 116:15
119:6 196:11,20
243:18
**arranged** 111:22
**articles** 181:13,16
181:21 182:1
201:4
**asked** 10:19 13:13
14:25 19:7 22:8
24:17 25:8 54:14
54:17 67:7,8,12
74:8 84:12 94:18
104:14 105:3
108:16 110:1,15
110:16 111:2
112:2 116:14
119:6 120:22

129:18 130:8,13
130:23 138:15
139:24 140:4,20
150:20 155:5,10
155:11,15 158:19
171:3 179:17
183:1,2 184:20
188:1 191:3,4
196:11,20 220:20
221:5 224:11
225:17,23 226:16
226:20 230:4
244:3 245:18
246:10 249:25
**asking** 36:19 52:20
74:10 83:25 104:9
114:8 180:12
224:21 235:14
238:24
**asks** 67:2 82:14
113:17 127:4
130:17
**aspect** 244:20
**assessment** 34:23
**asset** 78:23 79:2
161:1 209:1
**assets** 51:9,11,16
209:14
**assign** 45:15
**assigned** 251:16
**assist** 70:17 220:21
221:6
**assist-** 221:16
**assistant** 26:14,16
27:4,6 70:17
72:22 166:24
204:19,20 211:4
211:10
**assisted** 221:20,22
**assisting** 17:3
242:23
**associate** 21:8
204:22
**associated** 167:1
219:5
**assume** 14:6 34:18
34:20 39:7 40:4

57:10 62:10 63:8
69:5 74:8 76:21
92:12 125:7 131:6
133:23 135:14
201:10 216:20
218:22
**assumes** 50:21
51:25 56:16 70:3
70:6 75:9 90:21
97:25 125:23
128:2 231:11
**assumption** 125:25
**attached** 4:23
10:16 13:20 31:11
46:13 49:25 59:15
61:14 71:17 80:6
81:23 86:21 93:11
101:24 105:23
107:3 108:25
121:24 122:6
124:20 126:11
129:16 141:1
145:22 164:8
169:12 189:14,15
189:21 197:21
200:14 203:17
213:16 216:5,15
217:24 218:6
219:2,20 222:19
223:14
**attaching** 188:12
**attachment** 102:25
189:24 216:17
**attachments**
189:20,22 204:1
**attend** 159:20
161:24
**attended** 160:6,15
**attending** 161:24
**attention** 31:20
80:8
**attorney** 67:9
74:22 172:18
186:8,9 188:25
217:9,10,11,12,15
**attorney-client**
17:5 173:1

Frymi Biedak                                                      03-25-19

**attorneys** 10:4,6
  11:18 172:17,21
**August** 95:19 142:7
**Austin** 11:15
**author** 152:1
**authorization**
  206:7 208:15
  212:2 218:7
**authorizations**
  218:14
**authorized** 70:10
  70:20 209:16,20
  217:5 259:3
**authorizing** 216:24
**auto** 12:2
**automatically** 75:7
**available** 10:3
  237:16
**Avenue** 95:6
**Aviation** 13:9
**aware** 75:24 76:19
  78:22 79:17 101:8
  101:9 123:10,13
  126:22 176:8
  183:21 219:4
  222:9 232:25
  240:8 241:11
  248:25

**B**

**b** 4:8 5:2 6:2 8:21
  259:4
**B-205** 127:11
**B1123** 3:13
**B205** 95:7
**back** 15:22 17:24
  18:20 21:15 43:5
  43:24 45:5,6 46:3
  76:18 77:21 91:19
  101:16 103:21
  104:3 112:21
  113:1 114:12
  117:6,20 120:5
  121:19 134:20
  140:2 144:13
  148:17 153:23
  159:2 171:5 172:2

175:25 178:13
181:8 214:5
225:16 226:14
238:6 246:23
250:12 251:22
253:22 254:21
255:1 256:21
**backup** 43:10,12
**bad** 73:13 82:3
  181:19
**balance** 39:7 40:3
  104:14 110:17
  111:1
**balanced** 40:4
**balances** 46:25
  47:1
**balancing** 25:5,5
**bank** 22:19 25:4
  47:1 53:25 57:12
  57:16,24 58:1,4
  94:12,16 95:24
  111:11 113:18
  114:9,25 115:5,8
  133:6,7 192:25
  193:5 194:1,3,5
  194:16 204:16,23
  205:1,11 207:1,2
  207:4,6 208:12,17
  209:13 211:8,15
  213:2,5,7,21
  214:8 217:1,17
  218:4,8 219:6,22
  219:25 220:5,11
  221:12,23 222:8
  223:21 224:2,3,5
  224:9 225:3 233:8
  238:25 239:3,24
  240:7 242:17
  247:13,16,23
  248:5,10,14,14,18
  248:18,20 249:1,9
  249:10,16,22
  250:17,18,21
  251:3,7,13,18
  253:7
**bank's** 211:12
**banking** 24:19

28:10
**bankrupt** 11:5
**bankruptcies** 181:3
  181:10
**bankruptcy** 11:6
  11:14 13:23 31:17
  180:13,19,24
  181:2
**Bartfay** 3:21 7:5
**based** 45:1 70:16
  99:25 162:22
  191:10,15 207:2
  211:16 235:5,6
**basic** 126:24
**basically** 205:18
  211:11
**basis** 90:3
**Bates** 189:2 230:3
  230:12,23 233:12
  234:23,25 235:3,8
  235:25 236:8
**Bates-stamped**
  190:2
**battles** 16:22
**Beach** 113:11
**bearing** 206:3
**Beca-** 155:19
**began** 19:10,21
  26:4
**beginning** 19:7
  21:4 101:17
**begins** 122:9
**behalf** 2:17 7:25
  38:1 42:13 104:21
  220:22 221:12,23
**believe** 69:25 70:9
  70:19 71:3 72:6
  72:14 91:15 100:2
  100:10 145:8
  164:18 165:14
  194:15 234:20
  246:1 251:24
**belonging** 70:15
**beneficiary** 34:15
  36:5,13,18 114:22
**Berg-** 99:17
**Bergstein** 1:9 2:9

6:7 9:19 12:9,19
16:9,14,16,25
17:3,6,19,23 18:2
18:7,11,25 19:9
19:11,22,24 20:4
20:11 21:8,20
22:22 24:7 26:3
27:5 28:2 50:7,15
51:6,9,16 58:20
65:20 67:8,21
68:20 70:16 72:22
75:17 76:7 77:2
77:14,25 82:25
87:15 89:3,11,13
94:20 95:13 96:6
96:20 100:2 102:6
103:5 104:7 107:5
107:10,23,25
108:11 109:14
112:21,25 113:5
118:17,18 119:3
122:12 123:13
125:1 126:16
127:18 129:23
134:17 137:16,24
140:5 142:5
147:19 162:23
166:17 167:16
172:8 173:9,24
174:4 175:16
176:6,13,19,25
177:5 180:18,23
181:6,9,14,18,24
182:7,11,17,24
183:12,18 184:8
184:20 185:3,21
186:10,13 190:12
190:14,17 191:16
192:1,9 193:18,24
194:3,4,11,18,22
195:10,23 196:9
196:16 197:25
198:10 201:16,18
202:10,15 205:24
206:4,6 209:22
210:9 211:4,11,18
211:21 212:6,19

213:12,20 215:2
215:10 217:5,12
218:3,11 219:4
220:7 221:1,5,24
222:2,5,9,12,13
224:3 225:4
228:14 238:16,20
239:2,9,14,20,23
240:3,20 241:18
241:20 242:23
244:7,21 245:6
246:19 251:11
**Bergstein's** 11:7,23
  12:14,25 16:8
  18:20 23:11,17
  27:13 28:10,23
  30:14 58:18 74:23
  76:20 81:16 89:5
  92:9 95:15 96:1
  96:16 99:11,22,22
  100:1,6,11,20
  107:20 119:25
  122:23 123:7
  124:2 125:20
  143:20,22 144:6
  173:19 177:1
  179:23 180:2
  181:20 184:13,17
  184:22 191:1
  195:16 205:20
  210:10,19,25
  216:21 218:7,17
  221:12 223:1
  238:14 242:10,19
  246:3 251:14,25
  252:4,13,15 253:7
  253:13
**best** 17:21 40:19
  41:5 58:14 79:12
  79:23 80:1 105:9
  171:20 247:11,14
  248:1,4,20 249:2
  250:19 252:2
**Beverly** 11:17
**Biedak** 1:16 2:16
  3:15 4:3,11,12,13
  4:15,21 5:9,18

eLitigation Services, Inc. - els@els-team.com

7:15 8:12,20 46:6
172:5 178:18
200:20 203:21
215:1,1 225:14
257:2 258:5
**big** 100:25 232:23
**biller** 168:10
**billing** 168:25
169:2
**bills** 108:17 126:23
**binders** 232:23
233:1,5
**Birdview** 224:20,20
224:22
**bit** 33:17 37:2 42:3
51:22 76:14
148:17 150:6
177:8 189:15
**board** 184:3 192:6
**bonds** 209:1
**book** 183:25
**bookkeeper** 30:11
**books** 232:17,19
**Boson** 160:12,17,18
160:24
**bottom** 22:7 32:5
41:14 58:25 61:3
71:19 72:21 80:9
88:9 102:5,15,22
103:17 109:6,8,13
115:20 119:1
121:12 126:13
127:4 147:4 148:2
148:16 153:6
154:16 189:2
190:5,6,11 195:21
202:23 213:18
216:22 222:22
230:4,13
**Boulevard** 2:17
7:12 21:2 26:5,21
140:1 167:13,13
174:14 175:24
179:11 209:24
237:16 246:20
**box** 207:13 208:2
208:20

**boy** 8:21
**boys** 113:2
**break** 43:20 45:22
57:21 73:11,12
86:18 92:21
101:11 171:22
178:7 215:22
**brief** 178:18
**briefly** 251:4
**bring** 103:21
**brought** 43:14
**building** 26:12,20
27:3
**Bureau** 177:12,16
**business** 5:20 10:1
10:10 11:24 12:4
12:14,19,25 21:8
77:22 90:1 104:25
105:6 128:24
135:25 173:20
174:16 176:18,24
177:1 181:11
201:16 210:16
234:6 241:19
246:13
**businesses** 174:22
174:23
**bylaws** 123:20
124:13 197:22

--- 

**C**

**C** 146:14 148:7
**C.S.R** 1:22 2:20
259:25
**CAC** 64:14 67:12
67:18,25 68:12,17
69:3 70:11 131:17
**Cal** 259:4,7,10,13
**Calabasas** 180:8
**calculate** 229:8,11
**California** 1:2 2:2
2:18 3:13,18 7:1
7:13 65:2 95:7
104:25 105:7
113:10 127:11
129:10,11 131:12
162:18 255:8

258:1 259:21
**call** 66:8 69:21,23
211:18,19
**called** 9:3 27:18,23
27:24 74:10 140:6
140:7 197:14
**caller** 9:3,7
**calls** 35:23 45:9
52:8,15 54:24
69:19 71:8 85:14
85:17 99:14
100:23 110:20
112:4 117:19
128:3 132:9,24
137:19 142:8
149:10 150:13,15
151:3,8 152:10
155:20 167:6
168:14 175:10
176:10 231:23
232:6,12 236:3
237:3 240:23
241:12,22 242:13
242:25 244:8
**CANCELED** 4:24
**Canoga** 209:24
**Canyon** 209:24
210:7
**CAPCO** 42:13
**CAPISTRANO**
3:13
**capital** 78:17,20
122:21 123:4
141:10,14 160:3
164:21 197:8,15
197:17
**Capital's** 122:22
**card** 219:5,12
**care** 39:9 161:23
**careful** 38:9
**Carol** 223:17
**Carroll** 112:19,20
112:22,25 113:4
114:22 115:9
116:4 134:23
135:5,12,20 136:5
137:16 139:24

140:2,5 142:14
175:15
**CAS** 15:12
**CAS-AJWx** 7:16
**CASCADE** 1:9 2:9
**case** 1:6 2:6 7:15,16
12:23 17:10 28:16
32:12 67:8 178:20
196:16 197:18
230:20 234:3,24
235:1 241:2
**Casey** 223:17
**cash** 93:20 94:3
111:5 245:20
**cashed** 94:8
**cashier's** 41:19,23
47:16,20 48:2
**cause** 8:7
**caused** 187:11
**cc** 47:13,15 75:4
**cc'd** 170:3
**cell** 9:9 82:2 210:22
**CENTRAL** 1:2 2:2
**CENTURY** 3:17
**CEO** 127:7 143:7
166:17
**certain** 44:13 80:10
83:21 104:10
106:1 109:3
130:13 138:7,11
142:11 167:24
175:8 201:23
239:9
**certainly** 33:1
136:18,24
**certif-** 192:4
**certificate** 87:21
88:14 189:11
192:4 201:4 206:2
212:3
**certificates** 183:25
**certified** 7:6 25:16
191:25 255:13
259:1
**certify** 259:2
**cetera** 149:4
154:10 172:23

209:2 228:6
**change** 15:4,20,24
16:6 88:23 90:12
90:16,19 91:5,10
91:17,20,22 92:5
133:10 170:7
171:10
**changed** 15:23 16:6
32:23 88:20 91:1
91:2 92:15
**changes** 255:15
256:5 259:17
**changing** 92:7
**characterization**
24:22
**characterize**
176:17
**characterizes**
117:10
**charge** 42:24 43:16
44:25
**chart** 53:9 54:18
58:8 59:1 62:20
62:25 63:10 64:1
67:6 69:2,8 70:5
70:12,22 71:6
140:15,17 159:7
159:11 160:4,13
160:22 161:4,22
163:5
**charter** 60:25
97:23 98:9,10
155:25 170:11
**charts** 4:16 50:4,6
**Che** 95:10
**check** 25:4 33:14
36:16 38:8,19,19
40:1 41:20,23
42:20 44:11 45:20
47:17,20 48:2
49:8,13 63:13
93:16,20,24 94:2
94:4,6 95:2,5,18
96:12,12,23,23
99:4 100:2,9
245:20
**checkbook** 23:3

Frymi Biedak                                          03-25-19

25:5
**checked** 207:13
 208:3,20 225:3
**checking** 97:14
**checks** 4:24 23:4
 93:13,25 94:7
 99:23 100:20,21
 101:5,8,9 108:5
 192:16,19 220:24
 221:3 245:19
 248:11
**Chinese** 75:2,3,7
**chopped** 63:5
**Chris** 223:7
**Citizens** 111:10,11
**City** 175:25
**Civ** 259:4,4,7,8,10
 259:11,13,19
**claim** 11:21 38:21
**claims** 38:22
**clarification**
 218:23
**Class** 1:4 2:4 3:2,7
 7:22
**clean** 163:19
**clear** 218:18
**cleared** 39:4,5 47:1
**clearly** 76:19 84:12
 84:16
**clients** 186:12,13
**clock** 76:15
**close** 172:6
**closely** 20:8
**clue** 121:5
**co-** 93:25
**coach** 13:7
**code** 255:8 259:4,7
 259:10,13
**coequal** 204:23
**cohead** 166:9
**Cole** 3:3,8 7:23
**collection** 87:2,5
**Colorado** 21:2 26:5
 26:21 89:24 95:6
 127:10 140:1
 167:13,13 174:14
 210:5 237:16

246:20
**column** 48:17
 62:16 66:24
**columns** 33:7
**come** 48:16 69:4,9
 111:9 120:5
 128:17 167:17
 175:6 181:21
 187:4 236:1
 250:12
**coming** 23:4
 126:23
**commencing** 2:18
**comment** 101:1
**commercial** 17:20
 18:11
**Commission**
 177:20
**common** 76:25
 77:13
**communicate** 10:5
**communicating**
 10:9
**communication**
 10:4 74:19 121:19
**communications**
 20:11 76:6 78:1
**companies** 11:7
 12:16,17 15:6,13
 18:3,11 23:6,8,21
 24:9 27:14 56:20
 57:6 58:18,18
 64:24 66:17 69:17
 70:2,11,22 71:5
 78:2 122:23 123:5
 123:8 127:25
 128:6 132:7 134:8
 134:14 137:3,15
 137:23,24 138:8
 138:12 139:13
 140:16 143:20,22
 143:24 144:7,16
 157:13 158:7
 169:21 175:9
**company** 9:1,16
 14:25 15:23 16:5
 18:6,15,17,23

20:22,23 24:8
 27:18 34:14 38:2
 43:15 44:9 45:14
 45:19 52:7,7,14
 52:22,23 65:25
 66:7 67:4 79:6,11
 79:14,21,25 97:18
 129:2 131:23,24
 133:5 134:15,18
 135:6,9,18,22
 136:5,8,10,17
 138:17,18 142:25
 149:19 156:22
 159:21 160:2,7,11
 160:15 161:2,20
 166:13 167:1,2
 169:20 181:23
 183:16,17 187:24
 197:14 198:17,22
 202:3 227:16,21
 229:14
**compare** 226:3
 227:23
**compiled** 141:18
**complete** 14:8
 46:22 60:4
**completed** 82:3
 100:20 208:15
 238:21 239:2
**completion** 259:15
**compliance** 98:11
**complied** 130:14
 130:25
**complies** 186:16
 195:20 211:2
**comply** 17:15
 107:20 131:5
**compound** 43:17
 43:20 57:19 64:6
 65:10 122:25
 157:19
**computer** 76:15
 120:23 136:4
 206:22
**con-** 189:16
**concerning** 201:8
**concluded** 257:5

**concludes** 257:1
**conclusion** 52:8,16
 54:24 66:9 110:21
 128:3 132:9
 137:19 155:21
**conditions** 212:2
**conduct** 12:5
**conducted** 199:19
**conferences** 154:23
**confirm** 120:25
**confirmation** 4:22
 81:22 114:17
 116:3 117:1
 188:13 189:6,16
**confirmations**
 114:13 115:11,16
 121:7
**confirmed** 225:4
**conform** 13:3
 17:11 34:25 55:22
 149:15
**confused** 98:6
 150:6 189:15
**connected** 53:1
 66:1,15,18 70:15
 131:25 138:5
 219:13
**connection** 11:14
 82:3 177:10 181:6
 238:23
**considered** 170:16
 234:21
**consistent** 63:4
 83:1 153:14
**consistently** 19:13
**consolidated** 7:15
**constitute** 100:21
**consulting** 33:20
 33:23 34:10,15
 36:2,6,14,21 37:4
 136:3
**contact** 9:21,23
 70:10,16,21 71:2
 71:4 211:3,8,12
**contacted** 70:14
 171:1,3
**contacting** 70:1

**contain** 259:9
**contained** 247:13
**context** 21:17
 74:19 84:13 95:13
**continue** 12:20
 73:17
**Continued** 5:1 6:1
**continues** 31:16
**contract** 106:22
**contrary** 184:16
**control** 194:16
 202:2
**controlling** 239:15
**convenience** 99:21
**conversations**
 245:13
**convey** 111:21
**conveying** 125:19
 187:3
**convicted** 123:14
 123:17
**copied** 74:15 76:22
 77:7,9 78:4,5
 195:23 197:25
 213:13,21 215:5,6
 218:2 220:7,14,19
 220:19 223:5
 224:14 237:5,9,17
 240:2,6,15 242:2
 244:4 245:5,12
**copies** 253:21
**copy** 14:4 24:7 76:3
 76:18 77:2,8,25
 78:6,11 80:10
 82:24 87:14,17
 102:6 103:5 104:6
 105:25 109:15
 118:18 122:12
 124:25 127:18
 129:23 145:24
 163:17 170:1
 198:3 217:21
 244:18 252:19,22
 252:24 253:15,25
 255:21,23 256:9
**corner** 50:10 59:22
 88:9 190:6 197:3

**Corp** 1:9 2:9 78:17
  160:3
**corporate** 8:24
  9:12,13,14 16:10
  16:25 17:23 18:16
  18:18 74:21
  104:17 138:7
  184:5 206:7,14,21
  207:12,20 208:15
  212:2 232:17,19
  233:4
**corporation** 87:21
  98:13 104:24
  136:14 146:15
  148:8 155:17
  183:14,16
**corporations**
  128:21,22 129:24
  130:3,6,13 169:21
**correct** 10:20,21
  11:7 15:2,24 16:6
  18:25 20:8 23:8
  28:2 31:18,19
  32:8,18 33:15,18
  33:21 34:22 35:8
  35:9,12 37:19,20
  37:22 39:18 41:1
  41:20 42:4,6,7
  43:2,13 44:21
  46:9 47:6 49:9,14
  50:4,8,11,16 51:6
  51:24 53:11,15
  55:16 56:20 57:9
  59:22 60:1,6
  61:18 63:14,17,20
  63:23 64:25 65:3
  65:6,22 66:4,5
  67:21 69:8,18
  72:22 73:21 74:16
  76:7,23 78:18
  79:6 81:13,16,19
  81:20 82:6,9,12
  82:22,25 83:15,22
  84:4,19 86:1 87:9
  87:12,15,18,19,22
  89:3 91:7,9,12,24
  92:2,5,9 93:17

95:3,8,23 96:14
  96:15 97:1,2
  98:18 100:3 102:8
  102:11,17,20
  103:6,9 104:4,7,8
  104:11 106:13,19
  107:6,7,8,9,12
  109:20,21,24,25
  111:11,15 112:11
  113:19 114:10,14
  114:15,18,19,23
  115:4,7,25 116:1
  116:4,9 117:2,3
  118:16,19,22,23
  118:24 119:7,8,10
  119:11,14,17,20
  120:14,22 121:7,8
  121:13,14,20
  122:13,17 123:21
  124:23,24 125:1,2
  125:4,11 126:16
  126:20,21 127:5,8
  127:19,20,23
  128:8,17 129:25
  130:4,25 131:9,10
  131:13,16,18,19
  131:21 132:4,7
  136:11,12,15,19
  137:3,6,17 139:16
  143:5,6,16 146:3
  146:4,12,15,18,19
  146:23 147:2,23
  148:5,8,11,14
  149:20 151:2,7,13
  152:3,8,22 154:4
  154:10,17 159:14
  165:12,13,20,24
  166:2,2,5,14,18
  166:21 167:23
  168:4,7 169:15,17
  170:2,9,12,13
  181:4 182:15
  183:4 185:22
  186:11 187:7
  189:4 191:17,20
  192:20,21 194:14
  194:16,17,23

196:17 198:1,23
  199:9 202:8,9
  204:7 205:12,15
  206:4 207:4
  209:21 211:24
  212:20 213:22,25
  215:5,8,9 217:2
  217:10,20 218:4,8
  218:11 220:5,6,9
  220:12,16 221:1
  221:20 222:3
  223:5 224:10
  225:11 226:17
  227:11,16 228:7
  228:19 238:16
  239:11 244:25
  245:10 246:1
  248:12,16,22
  249:24 251:8,15
  252:1,5 254:9
  256:12 258:7
  259:21
**correcting** 120:12
  120:18
**correctly** 48:4 73:7
  81:24 82:16 83:12
  88:17 98:15
  104:19,20 117:13
  120:10 127:1
  147:7 149:5 153:9
  166:10
**Cortazzo** 223:7
**Coun-** 250:7
**counsel** 7:19 13:3,7
  17:14 21:11 34:24
  35:17 39:24 55:21
  55:23 67:10 89:20
  149:15 151:16
  162:2 173:23
  234:1,9,10 235:11
  241:4,8 250:7
**counsel's** 13:9
  28:20 29:5 31:3
  173:5 174:10
  234:4
**count** 62:13 206:8
**counter** 93:24

245:20
**COUNTY** 258:2
**couple** 11:6 134:8
  170:14 172:5
  179:15 180:9
  189:25 238:12
**course** 13:15 43:7
  64:4 73:11 76:2
  76:22 90:1 102:13
  143:3 147:20
  170:10 200:17
  201:15,16 237:23
  246:13
**court** 1:1 2:1 3:9
  7:18 8:4 10:15
  13:19 31:10 46:12
  49:24 59:14 61:13
  62:3 71:16 80:5
  86:20 93:10
  101:23 105:22
  107:2 108:24
  121:23 122:5
  123:11 124:19
  126:10 129:15
  140:25 145:21
  164:7 169:11
  200:13 203:16
  213:15 216:4
  217:23 219:1,19
  222:18 236:22
  255:7 256:10
**courtesy** 76:3,18
  80:10 82:24 87:14
  87:17 104:6
  109:15 118:18
  122:12 124:25
  127:18 145:23
  170:1
**CPA** 60:16 80:20
  80:22 102:6
**create** 33:7 54:14
  55:24 56:8,19
  63:2
**created** 32:13 34:1
  37:24 42:14 47:3
  47:5 49:1 50:6
  61:20,22 62:25

63:23 69:7 89:14
  131:5 141:9,13
  142:4 159:7,12
  164:19,20
**creating** 62:8 63:6
  165:1 234:1
**credit** 48:1,16,17
  111:13
**criminal** 174:6
**CSR** 259:1
**CT1** 32:12 36:16
  36:17 37:24
**Culver** 175:24
**current** 7:10 16:23
  18:17,23
**currently** 8:23,24
  13:1 16:20,21
  170:6 171:8,14
**custody** 256:7
**customary** 77:25
**Cyrano** 64:16
  156:24 157:3,11
  166:17

---

**D**

**D** 3:16,17 5:1 6:1
  8:22
**DALLAS** 3:4
**dash** 168:10
**date** 7:10 34:3,5
  37:12,14 39:2
  51:1 59:21 71:24
  84:25 91:6,10
  99:3,8 101:1
  109:24 119:19
  146:11 148:10
  199:18,20 258:11
**dated** 80:14 92:1,8
  93:16 94:3 95:2
  95:19 96:12 100:9
  106:1 107:8
  124:22 126:16
  186:5 194:11
  259:22
**Dave** 129:23
**David** 3:12 6:7 7:25
  9:18 16:9 19:8,10

19:22 20:4 21:20
28:23 65:20 67:8
68:20 70:15 72:22
74:23 76:20 81:15
82:25 89:3 94:20
95:25 107:5,22
109:13 112:21
116:14 118:17,18
119:5 122:12
124:25 126:16,22
140:4 142:5 147:5
147:18,19 149:2
154:8 166:17
176:19 178:19
182:24 183:12,18
184:8,13 185:2,21
186:10,13 190:12
190:14,17 191:1
191:16 192:8
193:18,24 194:3,4
194:11,18,22,25
195:10,16,22
196:8,9,16,19
197:25 198:10,17
198:22 199:17
202:10,15 206:4
209:22 210:9,10
210:25 211:4,10
211:18 212:6
213:12,20 214:15
215:2,10 217:4,12
218:3,6,11 220:7
223:1,14 224:3
225:3 228:4,13
251:11,14,25
252:4,13,15,22
253:7,13
**David's** 125:8
216:21
**david@abcxyz.cc**
74:23
**day** 51:1 82:21
89:25 90:1 113:9
149:22 172:12
215:11 259:22
**day-to-day** 20:18
**days** 10:7 75:8 92:4

139:7 216:10
255:17,24 256:4
256:12,14
**dbergstein@gra...**
75:23
**deal** 74:20 222:25
235:17
**dealings** 96:6
**deals** 226:25 227:3
**Dear** 119:5
**debit** 219:5,12
**December** 41:15,16
42:4 49:8 93:17
94:3 96:24 97:11
97:13,18,22 98:7
99:1 100:9 142:7
146:12 148:11
192:1
**decent** 177:9
**decided** 33:7
**decision** 33:10 65:8
65:14,16 215:1
**declare** 258:6
259:20
**deems** 255:15
**def-** 69:6
**defendants** 1:10
2:10 3:11 8:1
**definitely** 24:11
29:19 41:5 49:3
58:3,6 85:13
86:15 160:17
**Defrank** 166:8
172:19
**Delaware** 64:25
126:19 128:1,7
129:20 146:14
155:23 156:19,25
162:17 171:14
**delay** 120:24
**delete** 75:7
**deleted** 234:18
**delinquency** 59:21
59:24
**delinquent** 4:17
59:18
**Department**

177:13,16,24
**depends** 9:22
173:11
**depicted** 229:6
**deposit** 47:11,13,20
47:20,25 48:2
214:4 223:15
**deposited** 97:3
**deposition** 1:16
2:16 4:11,12,13
4:14 7:11,14
10:18 13:23 14:1
14:5 180:11 235:7
257:2 258:6
**depositions** 10:22
11:3,9,22 12:8,12
**describe** 195:5
**describes** 82:5
**describing** 229:13
**description** 44:20
5:4,19 6:4 37:21
199:16,18
**descriptions**
228:18
**designate** 47:15
68:3
**designated** 134:12
205:5 206:6
**designation** 230:23
**desk** 179:14
**Details** 209:17
**determine** 203:23
249:16
**determined** 67:4
**Deutsche** 192:25
193:5 194:1,3,5
204:16 205:1,11
213:1,5,7 214:8
217:1 218:4,8
219:5,22 222:7
223:21 224:2,3,5
224:9 225:3 233:8
238:25 239:24
240:7 242:17
247:13,23 248:20
249:10,15 250:18
253:7

**dial** 215:14
**difference** 166:3
227:14
**different** 83:4
97:21 157:13
159:12 167:2
174:22 227:20
228:9,18 229:5,13
229:14
**differently** 49:6
**diligence** 181:24
**dinner** 43:13
**direct** 80:8 189:25
210:18,19,20,21
239:10
**directed** 247:12
248:3
**directing** 194:22
196:16,18 239:9
**direction** 4:10
184:17,22 190:21
194:11,18 215:7
251:12
**directions** 195:1
**directly** 10:6 70:15
83:5,25 249:17
**director** 166:21
184:9 188:19,23
190:12 191:7,20
**directors** 184:4
188:3 192:6
226:19
**discovery** 133:12
165:3,6,16 184:6
213:10 219:14
249:13,18
**discuss** 147:5 245:6
**discussed** 73:4
80:22 154:24
165:12 173:25
177:11 240:3,20
241:20,23 244:6
244:20
**discussing** 10:1
22:14 76:25
173:19 174:5
**discussion** 179:14

**discussions** 154:23
178:25
**dishonest** 85:12
**Disk** 101:17
**dissolved** 97:19
**DISTRICT** 1:1,2
2:1,2
**do-** 208:13
**document** 55:24
60:3 62:24 89:9
90:5 91:13 106:11
123:23 124:8,10
141:3,6 146:2,5
149:11,13,23
151:10,16 152:1,6
152:16 153:4,10
153:12,15,20
154:11,14,18
156:10 164:11
188:24 191:2,6,11
198:15 199:2,5,15
200:25 201:2,14
201:19,23 203:21
205:17 211:22
212:10 227:16,25
228:2 229:18
230:5,19 231:18
233:11,17,21,22
234:11,16,23,24
235:2,19 237:11
238:13,18 239:5
239:22 242:17
253:5
**documents** 74:6
87:2 99:23 104:10
156:11 172:23
177:23 184:6
193:7 200:3 201:9
208:14 219:23
220:10 221:9,17
221:17,18 227:9
229:13,22 236:15
242:24 247:9
252:10,12 253:6
**dog** 8:22
**doing** 16:16 17:6
17:13 30:13 38:16

38:17 41:7 42:19
86:22 104:25
140:16 157:10
158:3,6,17 164:23
164:24 181:24
246:23
**dollars** 116:9 196:5
**domain** 75:2,7,18
76:6,20
**Don** 134:23 135:5
135:20 136:5
139:24 140:5
**Donald** 112:19,20
114:22 115:8
116:4 142:13
**dot** 75:4
**drafted** 76:19
124:7 164:19
230:18
**drastically** 32:24
**drawn** 93:13 96:24
**drive** 113:13,14
172:15,16,20
**driver's** 205:20
252:13,15,20
253:8,14,15 254:6
**driving** 172:17,18
**due** 74:11
**duly** 8:13 259:7
**duties** 169:3 246:19
255:7
**duty** 255:11
**DVDs** 257:2
**DWEICHERT@...**
3:14

**E**
**E** 4:8 5:1,2 6:1,2
**e-mail** 3:5,10,14,19
4:20,21,22 5:5,8,9
5:10,11,12,13,14
5:18,21,22,23,24
6:5,6,7 71:20,23
72:2,4,7,8,14,17
72:22 73:21,23
74:10,15 75:1,6
75:18,20,24 76:10

76:19 77:7 78:10
78:17 80:9 81:11
81:21 82:4,8 83:4
83:7,20,24 84:6
84:13,15 85:3,10
85:22 86:7 87:8
102:5,12 103:3,4
103:17 104:2
107:5,22 108:8
109:8,12,23 110:2
112:11 113:23
114:6 115:24
116:6,12,14,20
117:7 118:14,22
118:25 119:2
120:6,13,16,17
121:2,3,10,11
122:9 124:22
126:15,18 129:23
169:14 179:18
183:3,4,7 186:4
186:18,19 188:8
189:23 195:22
196:8,19 197:7,20
197:25 203:25
205:4,10,15
207:10,11 208:14
213:11,13,18
214:6 215:4,11
216:8,10 217:16
218:2,6,14,16
220:3,7,10,16
222:21,24,25
223:1 224:15
225:2 237:17
239:5 240:2,7,16
242:3 243:15
244:4,6,12,18,21
245:13 246:18,25
247:6 253:25
254:3,7
**e-mailed** 253:24
**e-mails** 77:14 102:2
107:25 109:2
111:9 116:11
179:15 219:16
225:9 244:23,25

245:5,7
**Earl** 11:12
**earlier** 13:22 21:15
21:17 103:19
120:7,17 121:11
139:12 141:16
153:15 163:10
169:19 172:7
198:9 202:7 206:2
213:19 216:10
239:8
**Early** 11:18
**easier** 158:11
206:16 254:17
**EAST** 3:17
**Ed** 172:19
**Ed-** 204:15
**Edmond** 166:8
**Edrington** 5:21,22
5:23,24 204:15
213:12,21 215:12
216:8,9,18
**educated** 25:13
**effective** 91:6,10
**effectively** 104:15
126:2
**effectuate** 111:18
**effectuated** 88:23
**Effie** 4:20 71:20
72:19,24 74:10
**effort** 38:13 40:7
40:24,24 86:15
**efforts** 41:6
**efile** 4:22 81:22
**EFILED** 4:22
**eight** 123:14 139:6
204:4 206:9,11
**EIN** 62:12,21 67:1
67:14 68:5,7,8,10
83:11,18 84:18,21
85:2,25 86:11,12
132:14,18,21
135:14 136:21
137:10 138:13,24
139:7,10,15,20
146:25 155:15
157:15,25 158:13

158:14 159:22
160:5,8,17 162:11
186:25 187:14,16
198:19 201:5
**either** 10:24 15:19
26:13 28:7 56:13
57:3 67:7 76:15
78:4 158:17
165:22 172:13
177:23 193:25
200:9 202:22
212:23 224:4
234:25 240:5
**ELATZER@CO...**
3:10
**eLitigation** 7:7
**employed** 8:23
133:17 145:9
167:1 183:9
**employee** 5:15 7:8
141:7 142:6,15,20
142:23 143:4,15
158:6,14 165:19
165:23 166:8
168:12,13,25
259:12
**employees** 5:17
78:21 79:3,9,16
79:18,22,25
141:19 142:1
144:18 164:13
165:15 168:7
169:1 175:2,8
**employer** 20:16
69:1 138:9,19
152:20 155:5,11
157:15 158:21
159:19 160:15,24
163:7,8
**employers** 15:20
**employment** 12:8
16:24 161:24
**ended** 18:1
**endorsement** 96:8
**ensure** 38:9,13 39:9
39:20 40:7,12,24
41:7

**enter** 254:13
**entered** 39:1,20
**Enterprises** 96:9
134:21 135:7
140:11
**entire** 44:23 173:23
**entirely** 240:19
**entities** 5:16 12:15
12:17,19 16:25
17:19 18:2 23:11
23:17 28:10,12,14
30:14,15,19 61:17
62:11 63:9,14,16
63:19 64:1,4
65:12,15,17 66:20
66:25 67:5 73:5
73:20 74:7,11,22
77:1,19 78:16
80:22,23 126:19
126:25 127:5,22
128:6 129:19,20
130:24 131:1,2
144:11 146:3
159:12 179:16
180:24 181:1,1,4
181:7 188:1
206:14,21 207:13
207:21
**entities'** 4:18
207:14 208:3
**entitled** 7:16 53:9
146:2 206:21
**entity** 9:10 16:10
27:23 28:1 32:11
32:16 42:13,25
43:1 44:13,14,16
44:24,25 45:16
53:1 58:12 62:21
63:22 65:9 66:1
68:8 74:1 79:15
81:2 90:10,13
126:24 129:11
136:21 139:1,2,19
143:10 146:7,14
148:7 162:19
168:22 170:6,10
170:19,20 171:4

185:22 188:17 198:19
**entity's** 90:13 208:21
**entries** 30:11 39:10
**entry** 37:25 38:10 41:15 47:24,25
**envisioned** 151:22 151:25 152:6
**equivalent** 114:20
**Eric** 3:8 7:23 214:6
**error** 99:5
**escrow** 223:16
**ESPADA** 3:13
**ESQ** 3:3,8,13,17
**esquire** 73:6 186:6
**estate** 106:1,5 223:9,11 246:11 246:23 247:5
**estimate** 231:18
**et** 7:17 149:4 154:10 172:23 209:1 228:5
**EUGENE** 1:8 2:8
**evidence** 50:21 52:1 56:16 70:6 75:10 90:21 98:1 125:24 128:3 153:17 231:13 249:2
**EX** 236:12
**exact** 38:20 55:6
**examination** 4:5,6 8:16 13:25 25:23 31:17 46:8 178:16 225:21 251:1
**examined** 8:14
**example** 32:10 38:21 69:13 133:17 138:9,22 140:10 141:23 143:25 166:7 168:1 248:11
**Excel** 141:21
**exchange** 177:20 179:18
**excluding** 208:21

**excuse** 47:14 54:5 73:10 150:13
**executed** 89:2
**Exhi-** 228:10
**exhibit** 4:11,12,13 4:14,16,17,18,20 4:21,22,24 5:5,6,8 5:9,10,11,12,13 5:14,15,16,17,18 5:19,21,22,23,24 6:5,6,7 10:13,14 13:17,18 14:12 25:23 31:9,14 32:3,4,17 39:17 41:12 46:7,11 48:22 49:23 50:3 50:11,13 53:4 59:10,13,17 61:3 61:11,12,16 62:22 64:25 70:13,23 71:7,14,15,20 77:2 80:3,4 86:17 86:19,25 87:2,5 87:20 92:19 93:4 93:8,9,13,18 98:16 100:16,22 101:21,22 104:2 105:20,21 106:25 107:1 108:21,23 113:16,21 114:13 115:4,13 116:8,11 116:25 117:6 121:12,18,22 122:3,4,8 123:19 124:1,17,18 126:8 126:9,14 129:13 129:14,18,22 130:12 140:23,24 141:6,25 144:3,14 144:17 145:19,20 156:7 157:8 159:4 159:10,16 160:3,4 160:12,13,23 161:3,4,21,22 162:3 163:4,5 164:5,6 165:2,8 165:11,11,14,18

165:23 166:1,5,7 166:16,20,25 167:25 168:1,6,9 169:10 185:7,17 186:2,4,15 188:4 188:5,8 189:3,10 190:1,1,4 192:14 194:9 195:19 196:21 198:7,9,25 200:10,11,12,20 203:14,15 213:11 213:14,19 216:3,7 216:11,22 217:22 218:2,24,25 219:8 219:10,17,18 220:2 221:4 222:16,17 225:24 225:24 227:10,10 228:1,7,8,9,10,17 228:18 229:2,7,19 230:2,3 231:7 232:4 233:7 234:3 234:14,14,16,19 235:1,2,6,7,12,13 235:24 236:23 237:2 238:9 243:14 244:12 245:16 246:8,9,25 251:22 252:8 253:5,22
**exhibits** 226:23 227:19 234:19
**expecting** 84:24
**expense** 42:19,20 42:24 43:12,13
**expenses** 37:22 38:1 42:10,13,18 42:24 43:2 44:8,9 44:12,15,24 45:1 45:2,14
**explain** 12:10 39:12 68:6 246:16
**explained** 171:12
**Express** 108:10,13 108:17 182:7
**extent** 15:22 16:5 17:3,10 50:23

56:10

---
**F**
---
**F** 8:20 125:11
**F-I-N-E** 21:25
**facilitate** 193:8 247:3
**facsimile** 68:9 139:4 158:17
**fact** 12:13 18:24 90:15 128:2 160:24 222:5 232:25 235:5,7 240:1,15 242:2 244:3,17,23 245:4 256:5
**facts** 50:21 51:25 56:16 70:6 75:9 90:21 97:25 125:23 128:3 231:11
**fair** 12:11 19:10 24:22 39:3 69:11 83:7 103:2 108:6 131:3 138:1 144:19 147:9 150:24 153:22 160:21 161:19 164:2,25 182:17 185:6 229:12,15 230:1,7,8 231:12 231:15 235:8,21 237:19 241:25
**fairly** 23:25 90:3 157:11 160:25 222:7
**false** 234:2,6,8
**familiar** 27:10,12 27:18,23 58:12 90:15 162:17
**familiarity** 100:1 162:23
**far** 11:8 12:21 20:14,15 27:9 37:8 57:25 64:9 79:4,4 90:2 111:3 111:7 113:8

127:21 135:24 157:6,8 177:21,25 222:2,5
**Fargo** 95:24 108:2 108:3 110:11,14 111:19 192:19 193:13,16,20,24 220:1,5,11,22,25 221:6 222:3,7 245:19 247:14,23 248:19 249:10 250:18
**farther** 132:3 210:16
**fashion** 135:23
**fault** 239:16
**fax** 139:4,7 161:17
**faxed** 216:13
**FBI** 177:24
**fbiedak@kjamm...** 72:5
**February** 35:7 36:15 37:6,15 38:8 50:18,19 52:13,21 53:10,18
**Fed** 259:4,8,11,19
**federal** 50:7 104:17 123:11,14 177:12 177:16
**fee** 126:24
**felt** 30:9
**Fifty-one** 41:13,13
**file** 67:1 74:5 83:11 84:18,24 85:2,25 86:11 104:17 105:1 139:1 186:25
**filed** 60:1,6,9,11,22 80:24 81:5,9,22 84:20 104:21 133:13,14,15 138:14,18,23 162:17 165:5 181:4 187:14,16
**filing** 60:14,17 84:22 88:15 90:10 103:14 138:13

Frymi Biedak                                                03-25-19

143:9 163:11
170:7 171:10
188:13,15 189:6
189:11,16
**filings** 74:12 83:21
103:13 128:19
**filled** 242:10,17
**final** 41:11
**financial** 7:8 15:12
202:24
**financially** 259:13
**financials** 207:7
**find** 69:23 90:4
159:3 189:16
197:21 244:14
**fine** 14:21 21:23,25
22:1,2,3 86:23
159:9 185:16
256:20
**finish** 35:14
**firm** 11:13 58:15
58:16
**first** 10:25 13:25
14:12,13 19:8
22:8 26:3,7 30:5
50:13 62:6,17
64:24 75:11 78:18
80:8 83:20 87:8
89:14 93:16,17
94:7 100:16,17
104:1 106:10
112:25 114:17
119:1 121:12
122:8 124:15
126:14 127:4
146:7 149:22
156:18 157:24
158:9,18 170:21
182:10 190:1
195:21 201:25
202:3,24 208:16
220:2 222:24
230:13 245:19
249:3 253:5
**five** 15:7,18 181:1,1
181:7 206:9
245:18

**flip** 158:9
**Floor** 2:18
**focus** 201:25
**follow** 13:9,12
28:20 29:5 31:3
108:1 173:5
174:10
**follow-up** 172:5
194:21
**followed** 63:3
184:21
**following** 73:4
110:2 251:4
**follows** 8:14 130:3
215:10
**Fondren** 61:4
87:24
**for-profit** 87:21
**foregoing** 258:6
259:5,9,21
**forfeit** 60:25 97:23
98:8
**forfeited** 170:6,11
170:23 171:9
**forget** 56:24
**form** 44:19 60:5
62:9,11 64:8 74:1
74:1 91:19 92:1,7
**format** 31:21 32:23
46:21 62:18 63:4
**formation** 87:21
90:14 156:21
157:3
**formed** 63:14,19
64:8,12,14,14,23
65:12 66:21 73:5
73:20 128:1 129:9
156:18,24 157:5
157:12
**formerly** 88:15
131:8
**forming** 64:4 65:16
**forms** 4:22 60:8
81:22 208:16
**forth** 259:6
**Forty-eight** 35:3,5
**Forty-six** 31:25

**forward** 106:8
**forwarded** 98:10
**forwarder** 83:2
**forwarding** 123:20
**forwards** 83:5
**found** 88:25 122:20
213:8,9
**foundation** 19:16
20:1 23:13 28:3
32:21 35:22 36:8
36:24 40:17 43:3
45:10 50:23 52:1
52:15 54:25 55:18
55:19,24 56:22
59:4 64:7 66:9,11
69:20 75:13 78:14
85:18 86:2 90:22
97:25 110:21
112:16 118:12
129:4 132:10
137:19 142:9
144:6 145:12
149:9,21 150:16
151:4,9,15,25
152:9 154:13,19
155:21 168:15
175:10 184:25
**four** 11:9 21:7
181:1 206:2,9
257:2
**Fox** 26:25 27:5
**fragment** 47:2
**frame** 43:4 45:13
72:11,12,13 77:18
77:24 142:21
143:16 165:20,24
176:1 180:19,25
181:14,23 217:13
**franchise** 4:17
59:18,25 60:13
80:25 81:6,9
103:14 104:18
126:20,23 129:20
**Frank** 8:20
**frankly** 51:3
201:20
**fraud** 123:11

**Freddie** 134:12,15
166:12
**free** 14:3
**Friday** 172:13
**friend** 112:20
**friendly** 177:9
**friends** 176:18
241:1
**front** 227:9 237:4
**fronted** 38:18
**Frymi** 1:16 2:16
3:15 4:3,11,12,13
4:14,21 5:9,18
7:14 8:12,20 82:1
146:25 156:8,14
157:25 197:23
214:2,15,24,25
257:2 258:5
**frymi@grayboxl...**
71:23
**full** 8:18 104:13
259:9
**Fund** 1:4 2:4 3:2,7
7:17
**fund-raiser** 180:7
**Funding** 79:14
146:8 158:2,23
159:17 161:14
**funds** 38:21 108:17
249:23 250:19
**further** 42:3
197:23 225:21
**future** 101:7 117:8

————————

**G**

**G.X.715** 53:10
**gathered** 205:14
**gathering** 172:23
**general** 42:20
104:14 111:13
114:18 115:24
168:21
**generally** 167:21
**generated** 42:21
203:5
**gentleman** 226:20
**gentleman's** 74:18

**getting** 228:25
229:16
**Gion** 79:14 146:8
147:22 158:1,23
158:25 159:17
161:14
**giv-** 140:8
**give** 29:24 41:16
130:9 194:25
215:7 226:2
252:22 255:4
256:2,4
**given** 29:17 70:19
71:9 78:5,8,11
112:2 138:14
214:22 241:17
252:23
**gives** 38:22 42:19
251:12
**giving** 25:22 70:17
**glad** 240:14
**Glendale** 168:24
**Global** 134:9
144:23 166:13
**go** 29:25 31:24
41:10 42:25 44:4
44:4 48:21 57:20
73:4 92:2,18 93:3
93:4 106:8 109:5
109:22 112:21
113:1,15 114:12
126:13 132:2
140:2 144:13
145:14 158:20
159:2,3,4 163:22
164:1 178:6,8
189:10 190:5
206:8,13,18
209:16 210:16
211:1,17,20 212:1
227:22,24 237:24
250:10 251:22,23
254:21 255:1
**god** 8:10 23:7
**goes** 14:8 68:5
104:24 107:22
108:8 214:4

**going** 12:22 13:9,12
  14:17 15:8,22
  17:2 18:20 19:2
  21:5 22:4,15 23:5
  24:16 25:7 28:15
  28:18,20 29:2,5
  30:20 31:1,3
  33:13 36:25 37:1
  37:12 41:11 42:3
  47:10 48:11 49:7
  50:22 51:22 54:18
  58:7,25 59:9 61:3
  61:10 68:6 76:18
  78:10 87:20 90:4
  93:3 95:1,18
  96:12,23 98:16
  103:3,12 104:1
  113:15 116:3
  117:5 118:25
  122:2 124:16
  134:8,20 138:22
  151:1 154:3 156:6
  158:13 160:11
  161:1,20 164:10
  172:21,25 174:7
  178:18 205:17
  215:18,18,24
  229:3 233:10
  234:20,21 237:20
  239:18 243:25
  246:8 249:5
**good** 7:4,23 41:3
  73:14 103:21
  112:20 117:4
  153:25 156:3
  170:22 175:19
  176:16 177:5
  189:18
**Google** 181:20
**gotten** 99:1 237:11
  237:18 253:13
**governing** 17:15
**government** 50:7
  50:11 234:13,14
  234:16,17,18
  235:6,24 236:10
  236:12

**government's**
  234:3,20 235:2,12
  235:13 236:8
**Graybox** 1:8 2:8
  7:17 8:3 9:4,5
  27:11,16 50:16
  96:14,20 120:2,20
  121:1,2,4 131:15
  147:22 183:3,7,9
  183:11,15,20
  185:18,21,25
  198:14,22
**grayboxllc.com**
  72:8 81:12,16
  121:3
**great** 219:24
**grounds** 22:15 34:8
  234:9
**group** 42:13 50:14
  50:20 51:23 53:11
  53:14,18 56:10
  59:19 60:24 61:4
  63:20 64:14,16
  65:5 67:12,19,25
  68:12,17 69:3
  70:11 78:24 79:20
  87:22 88:16,20
  90:11,14 91:3,11
  91:23,23 92:5,8
  92:14,17 93:14
  95:6 96:25 97:7
  97:23 98:8 115:7
  116:9 119:10
  120:8,13 122:15
  123:16,21 128:25
  131:8,18 134:9
  136:13 137:5,7,9
  137:15 144:23
  148:5,23 151:23
  152:8 155:7
  156:24 157:4
  161:21 162:2,6
  166:17 185:10,15
  188:20 197:22
  204:25 205:12
  206:3 217:1
  228:16

**Group-security/c...**
  166:13
**grouping** 95:23
  189:12 191:8
**Grunfeld** 73:6 74:9
  146:18 148:14
  186:6,7,8,10
  188:16,25
**guess** 44:17 45:18
  67:7 81:1 113:16
  137:10 170:19
  175:16 186:12
  231:17 245:4
  254:21
**guidance** 13:4
  17:16
**Gumport** 11:1,3
  13:23 180:12

---

## H

**H** 4:8 5:2 6:2
**HACKENSAK**
  3:10
**half** 77:21 82:9
  172:14 215:19
**halfway** 33:13
**hand** 8:6 13:16
  59:9 61:10 71:13
  80:2 86:16 93:7
  101:20 105:19
  106:24 108:21
  122:2 124:16
  126:7 129:12
  140:22 145:18
  164:4 169:8
**handed** 10:12
  31:13 46:6 50:2
  61:16
**handled** 162:24
**handling** 51:15
**handwritten**
  206:22
**happened** 248:2
  249:23
**happens** 25:4
**hard** 195:4
**haste** 99:21

**head** 179:2 195:7
**Health** 111:13
  114:18 115:25
  128:14 129:7
  137:11 145:1,3
  168:22 175:8
**hear** 72:3
**heard** 27:20,25
  95:12 177:8 193:1
  193:2
**held** 25:16 51:9,12
  249:23
**help** 8:10 16:21
  103:14 184:11
  193:10
**helped** 81:1 193:4,8
**helping** 10:2,3
  172:23
**Henry** 217:6,8,15
**hereto** 10:16 13:20
  31:11 46:13 49:25
  59:15 61:14 71:17
  80:6 86:21 93:11
  101:24 105:23
  107:3 108:25
  121:24 122:6
  124:20 126:11
  129:16 141:1
  145:22 164:8
  169:12 200:14
  203:17 213:16
  216:5 217:24
  219:2,20 222:19
  259:18
**Hermosa** 113:11
**Hi** 72:24 82:1 125:8
  197:20 216:13
**high** 205:4,5,6
**Hills** 11:17
**hired** 74:20
**Hmm** 20:20
**Hojo** 78:17,20
  160:3
**hold** 189:5 243:16
  243:21 254:24
**Holding** 195:24
  196:3

**Holdings** 27:19,21
  32:12 36:17 37:25
  110:3,5,13,19
  111:1,10 112:14
  119:7 137:2
  196:12 198:11
**Hollywood** 181:15
  181:17,25
**home** 59:3 179:19
  179:20,23 180:3
**honesty** 176:19
**hour** 93:2 120:24
  172:14 215:19
**hours** 82:9
**house** 59:2 180:1,8
  180:10
**Houston** 61:5
  87:25
**Howard** 146:18
  148:14
**Huh** 196:24
**human** 40:21

---

## I

**I-E** 8:22
**I-N-D-E-X** 4:1
**i.e** 117:10,16 118:1
**IA** 5:15 125:3
  133:17 164:14
  166:21 194:13,16
  194:19
**IA's** 142:10 145:6
  169:3
**ID** 9:3,7 152:20
  155:5,12 157:15
  158:6,22 159:19
  160:15,24 161:24
  163:7,8
**idea** 35:24 48:8
  51:2,10,20 59:5,8
  61:2,7,9 62:19
  75:14,19 77:8
  82:20,20 85:7
  96:4 97:16 99:9
  106:10 112:17
  122:24 123:6
  125:15 146:21

167:7 176:9 187:5
187:19 195:14
196:4 197:19
198:6 199:4,13
203:6,9 211:13
215:16 219:7
224:16,25 231:3
**identification**
10:15 13:19 31:10
46:12 49:24 59:14
61:13 69:2 71:16
80:5 86:20 93:10
101:23 105:22
107:2 108:24
121:23 122:5
124:19 126:10
129:15 138:9,19
140:25 145:21
164:7 165:22
169:11 200:13
203:16 213:15
216:4 217:23
219:1,19 222:18
**identified** 134:24
188:23 191:16
211:7 220:24
**identifies** 188:19
212:6
**identify** 51:11
59:17 87:2 141:3
141:5 164:10
211:3
**IM-** 158:14
**immediately**
223:16
**implication** 234:8
**implications**
181:10
**importance** 205:4
**important** 253:3
**impressed** 147:3
**impression** 234:2
**in-house** 67:10
**inaccurate** 85:11
**incarcerated** 17:24
**incarceration** 16:9
18:3,21 19:14,23

24:12 180:10
**Incident** 53:11
**include** 63:16
77:13 82:24
**included** 63:10
65:21 107:25
155:3 194:20
**including** 63:20
199:18 253:7
**income** 104:17
105:2 202:25
203:1,5 207:14
208:3 209:8
**incorporated** 64:25
65:2,6,9,17 128:7
188:16
**incorporation**
146:11 148:10
**incs** 128:19
**incurred** 38:1 44:9
44:24 45:14
**incurring** 42:12
**independent**
176:25
**India** 8:21
**indicate** 116:7
149:12
**indicated** 202:7
258:7
**indicates** 152:6
185:17 199:24
208:25 225:2
230:24 253:6
**indicating** 167:25
192:4 195:23
**indication** 247:11
247:15 248:1,4
252:8
**individual** 134:23
**individually** 51:12
**individuals** 166:4
202:1
**information** 4:19
6:20 39:22 40:13
40:25 41:8 51:13
60:5 61:18 67:13
67:20 68:2,18

69:17 70:2,11,21
71:5,10 74:9 78:6
85:5 102:11,17
103:20 105:4,12
111:21 114:16,21
116:7,21 130:24
132:20 138:8,11
139:22 143:10
177:23 187:3,6,10
187:19,23 191:22
191:24 199:4
201:1,4,8,23
202:14 203:8,10
205:11,14 206:20
206:24 207:3,6
208:9 209:13
226:16 227:15,20
231:7 246:14
**initial** 125:11 130:3
**initially** 27:24
**initiate** 251:12
**initiated** 251:9,13
**input** 206:24
**inputted** 206:22
**inquires** 186:19
223:14
**instance** 38:8 76:2
130:23
**instances** 238:13
**instruct** 13:1 17:10
17:11 28:15,18
29:2 30:20 31:1
173:3,24 174:7
**instructed** 6:10
62:10 63:7 107:24
**instructing** 107:10
**instruction** 78:8
107:20 217:20
251:14
**instructions** 45:13
65:20 68:20,24
78:6,11 111:24
125:10 157:12
182:25 214:19,21
216:14 221:21
**insurance** 11:21
125:9,14,17,22

**insured** 125:16
**Integrated** 1:8 2:8
8:1 15:10 20:16
20:24 50:15 51:23
52:5,14,21 53:14
54:19,20 55:10,14
56:11,13 57:3,12
57:16,24 63:16
66:3,6,14 67:11
67:19 69:3 70:12
97:1,3,7,14 98:17
99:8 100:10 101:5
107:11,14,21
112:8,14,23
114:21,24 116:4
117:10,16 118:1
125:6,21 132:2,6
132:18 133:5,10
134:20,24 139:13
141:7,19 142:1,6
142:15,20,24
143:4,7,15 144:20
145:10 165:15,19
165:23 167:2
168:7,13 169:4
174:15 175:1,7
178:20 245:21,25
249:11
**intended** 62:15
**intent** 106:1,4
**interest** 7:9 12:2
134:18 137:25
138:5 195:13
202:4
**interested** 259:13
**interesting** 201:6
**interests** 16:17
17:1,20,23 18:12
**interpose** 35:15
**interpretation**
153:3
**interviewed** 177:12
177:15,19
**intonation** 234:4
**introduce** 7:19
**introduced** 21:20
**invasion** 28:17

30:21,24 173:1
**investable** 209:1,14
**Investigation**
177:13,16
**involuntary** 181:2
181:3
**involve** 20:17
**involved** 16:13
20:10 28:2,18
54:4 65:16 102:3
137:17 152:20
156:21 157:3
170:19,20 176:24
180:18,24 214:7
222:15 241:1
**involvement** 18:10
193:4 218:13
252:9
**involving** 114:18
123:15
**IP** 4:22,24 5:5,19
27:24 28:6 50:14
50:19 51:6,22
53:10,13,18,21
54:15,19 56:10
59:19 60:12,24
61:4 63:20 65:5
79:20 81:6,22
83:14,18,21 84:4
84:14,21 85:5
87:6,22 88:5,15
88:15,19,20 90:11
90:14,16 91:2,3
91:11,11,23,23
92:7,14,16 93:14
94:4,8,10,12,16
95:6,2 96:21,25
97:7,18,23 98:8
102:7,11 103:15
104:10,22 105:15
106:5,17 115:6
116:9 117:1
119:10,12 120:8
120:13 122:15
123:11,15,20
129:3 131:7,8
148:4,23 151:23

152:8 155:7
161:21 162:2,24
170:11,12,15
171:8,18,19
177:10 183:22,23
184:1,4,9 185:10
185:12,15 186:18
188:20 189:12
191:7,17 192:22
193:12 195:13,15
197:22 199:17
200:4,8 201:8
202:19,21 203:4
204:25 205:12
206:3,7 209:12
211:16 212:7,14
212:17,20 216:25
217:5 219:6
220:22 221:10,12
221:23 222:6
224:1 226:17,25
227:3,11 228:16
228:19,21,24
229:25 241:1,3
247:14,22,23
248:19,19 249:15
250:18
**IP's** 207:7
**irrelevant** 12:23
13:1 28:16 29:3
30:21 174:1
**IRS** 139:2,6
**Iskra** 134:21 135:6
140:11
**issue** 100:25 120:19
120:20 121:15
149:1,18 151:1
154:7 170:25
228:2
**issued** 49:8,13
59:18 101:8,10
228:24 229:22
248:11
**item** 43:14 49:7
51:5 78:23 146:25
147:23,24 148:16
150:9 152:19

154:3,6 157:24
**items** 10:2 39:4,5
48:11 51:15
154:24 156:7,13

**J**

**jail** 172:9 173:9
**jam** 3:11 5:8,12,13
5:14 8:1 20:8,14
26:4,7,14 27:4,8
28:1 29:13 34:20
37:16 38:1,7 39:1
42:4,12,23 43:14
47:19,21 48:1,3,5
56:18 57:4 66:1,7
66:15,19 67:12
68:3,18,24 69:4
69:22 70:1,9,20
71:4 77:3,13 78:1
81:18 82:8,22
83:7,24 84:12
85:11,22 86:7
87:18 88:10 89:17
89:25 90:2 95:13
96:6 99:20,21
100:19 102:7
103:5 104:7
106:18,21 107:6
107:23 108:10
109:13 110:15,18
110:25 113:5
118:16 119:2,17
119:19 124:23
125:20 126:15
127:3,17 129:18
129:23 130:7,13
130:23 131:25
134:17 135:10,23
136:14,18,25
137:16,24 140:20
143:3 147:16
149:8 151:23
152:7 162:23
166:20 167:19
175:21 176:7,13
176:24 177:4
178:19 179:3,12

182:22,24 184:19
185:3,25 186:17
187:4,22 194:12
194:19,22 195:22
197:2 198:3 200:4
200:7 211:23
215:5 217:16,19
218:13 220:14
225:8 230:19,23
230:25 231:6,18
232:3,24 233:4,17
233:20 234:5,23
236:1 237:1 239:4
239:9,12,15,16
240:1,3,6,15,20
241:1,10,18,21
242:2,9,22 243:7
244:4,6,17,19,23
245:7 249:17
251:24 252:4,9,14
253:14 254:9
**Jam's** 29:21 52:6,7
52:14,22,23 58:17
58:23 59:3 65:24
69:12,16 70:2
86:14 122:23
123:4 131:23
132:7,23 134:13
149:19 166:24
179:20 182:7
235:4
**JAM_TT** 236:14
**JAM_TT_000532**
230:17
**JAMES** 3:3
**Jannol** 217:6,8
**January** 19:11
103:4 104:3
126:16 127:4,19
182:16
**Jeff** 83:2 147:5,11
148:25 149:18
150:11,18,22,22
154:7 156:7,13
172:19 228:2
**Jeffrey** 77:7 199:8
230:11

**jeffreymsolomon...**
74:16
**Jeffs** 150:21,25
**Jerome** 48:12
**Jerry** 107:11,21
194:13,19 195:3,4
195:11,12,16
202:18 228:15,15
**Jersey** 3:10 113:1,1
**Jim** 7:21 136:11
200:15
**job** 15:24 16:6 41:3
201:17
**join** 24:25
**jswoodwardcpa...**
80:10
**JUAN** 3:13
**July** 95:2,4 96:13
**June** 91:7,8,12 92:1
92:3,8 128:23,23
**jurisdiction** 90:13
**jury** 234:21
**Just-** 220:11
**Justice** 177:13,17
177:24
**Justin** 6:6 220:3,4
221:18
**JWALKER@C...**
3:5

**K**

**K** 8:22 62:5
**K.Jam** 33:15,23
34:11,16 35:7,11
35:21 36:6,14,22
37:5,9 41:17 49:8
49:19 55:15,15
56:4,4,13,14 57:4
57:4,13,13,17,17
58:2,5,8 59:1,2
63:22 65:21 67:12
67:19 68:1,14,16
68:21 69:3 70:12
82:19 83:10,10
84:17,17 85:1,6
85:24,24 86:8,9
86:10 103:8 127:8

131:20 136:9,17
136:24 137:12
138:23 149:1,19
149:20 151:1
153:7 154:7,17
186:23,24 187:12
187:12 229:23
**Kambe** 78:23 79:2
161:1
**Kambe's** 161:10
**Kashefipour** 58:10
**keep** 22:24 23:3,10
28:12 94:10
105:15 179:17
193:21
**keeping** 23:20 25:2
25:3 30:11,16
33:2
**Keith** 5:11 122:9
122:18 197:7,10
197:20,21 199:24
**KELLER** 5:6
**kept** 22:23 239:4
**KG** 186:19
**Kia** 5:8,12,13,14
8:1 20:8 29:13
34:20 37:16 38:7
39:1 42:4 47:19
47:21,25 48:3
52:7,14,22,23
56:18 57:4 58:23
65:24 66:1,7,15
66:19 68:18,24
69:22 81:18 82:8
87:18 106:18
107:6,23,23 108:7
108:8,10 109:13
110:15 124:23
125:8,20 126:15
126:22 127:3
129:18 130:2
131:25 135:10,23
136:11,14,18,25
147:5,14,16 149:2
149:7,8 151:12,22
152:7 154:8
166:24 167:19

Frymi Biedak

178:19 179:3,12
179:20 182:22,24
185:3,25 186:17
194:12,19,22
195:1 197:2 198:3
200:4,7 215:5
217:16,19 218:13
220:14 225:8
228:4 233:17
239:4,9 242:9
249:17 251:24
252:4,8,14,22
253:14 254:9
**kiajam@kjamm...**
76:23
**Kiarash** 3:11 143:3
166:20
**kind** 39:15 41:14
51:13 132:13
154:23 172:5
174:21 176:15
185:14 195:6
250:22
**kinds** 157:17
**kite** 8:22 62:5
**KJ** 228:3
**kjammedia.com**
72:7
**KJM** 82:14,19 83:9
83:25 84:13
186:19
**knew** 29:22 44:25
224:6 233:2 245:2
245:11
**know** 9:2,7,15
11:16,25 16:15
18:4,13,14,15
19:1 24:5 27:6,17
27:22 28:4,7
30:15 31:5 34:13
34:18 36:20 40:20
41:25 42:1,17
44:15 45:8 49:18
50:18,19 51:2,11
52:25 53:24,24,25
54:16 55:5,12,19
56:6 58:21,24

61:2,6,8 62:18
63:1,5 66:23
67:15,23,24 68:25
72:12 75:1,3,5,6
75:15 77:6,9 79:4
81:8,10 83:16
84:10,11 88:19,21
90:4,18 94:17
95:11 96:19,22
97:6,9,10,13,16
97:20 98:7,14,14
98:20 99:3,7,9,10
99:24 100:4
102:18,23 104:23
105:3,17 106:21
108:1,3,4,12
110:13,22 111:17
112:5 113:8 118:5
118:6,9 120:16
123:9,12,17,25
124:7,10 125:16
126:6 129:1,5,10
129:11 130:21
131:1,24,24 133:1
133:3,4 134:19
135:24 137:11
138:4 142:5 146:5
147:12 152:1
158:19 161:14
162:11 165:1
167:4,10,24
168:12 169:24,24
169:24 170:23,25
171:1,2 174:20,23
175:5,12 177:3
182:3,4 183:11,19
186:7 187:6,8,23
189:17 192:22
193:22,23,25
194:2,4 195:2,3
195:12,15,18
196:5,18 197:14
197:17,22 198:5
199:21 201:11,13
201:19 202:7,16
202:20,22 203:4
208:9,11 209:12

209:15 212:21,22
212:23 214:13
217:14,14 222:2,5
222:8 223:7 224:2
224:4,4,13,14,17
224:21,22,24
229:8 230:6,21
231:6,16 232:5,24
232:25 233:2,3,22
235:18 236:1,25
237:18 238:13,20
239:23,25 240:2,5
240:16 241:17,23
242:3 243:12
244:5,9,19,22,24
245:2,12,13
246:21 247:3,10
248:7 250:7 251:9
252:15 256:21
**knowing** 63:11
233:6,20
**knowledge** 17:21
55:25 58:14 60:9
60:25 79:12,23
80:1 88:1,4 91:16
99:23 105:9 106:9
126:5 171:20
176:6 177:2
199:12 239:21
246:14 252:2
**known** 135:6
170:12 171:18
175:15,21 217:15
**knows** 149:12
234:2,9
**Kranzton** 150:22
172:19

———————
**L**
**L** 62:5
**lacks** 19:16,25
23:13 32:20 40:17
43:3
**ladies** 188:12 189:8
**laid** 55:24
**largely** 56:18
**Larry** 62:6

**late** 97:10
**lately** 180:9
**Latzer** 3:8 7:23,23
**law** 3:16 11:11,13
171:15
**laws** 259:20
**lawsuit** 133:13,14
133:20,25 165:5
165:16 179:4
230:24 231:19
232:4 233:17,21
236:16
**lawsuits** 141:18
**lawyer's** 13:12
**lay** 144:6
**learn** 182:6 183:23
195:10
**lease** 20:15
**leave** 185:3
**ledger** 104:15
**left** 19:5 61:3 67:6
**legal** 7:6 10:2,4
16:21 17:4 34:23
52:8 90:10,12
155:17 201:9
209:23
**Leonard** 11:1
13:23
**let's** 44:4,4 67:25
113:15 115:13
138:21,22,24
144:13,13 158:18
159:16 178:6
189:25 200:10
204:3,5 205:17
206:12 213:11
222:24 251:22
**letter** 5:6 105:25
106:4
**letters** 141:11,15
164:21
**Levine** 11:12
**li-** 150:6
**liability** 183:13,15
239:16
**license** 205:20
252:13,16,20

253:8,14,15 254:6
**licensed** 25:19
**lieu** 255:23
**life** 22:24 50:15,20
51:3 125:9,14,17
125:21
**Lighting** 64:18
156:19
**likewise** 60:4
119:25 136:13
155:11
**Liley** 6:5 204:13,18
207:1 216:19
**limited** 183:13,15
**line** 6:11 19:4,4,7
21:13 25:7 30:3,4
35:6 48:11 106:17
161:2 190:12
192:8 199:17,24
203:8 204:7
210:18,19,20,21
218:11
**lines** 21:7 37:12
105:4
**liquid** 203:7
**list** 4:18 5:15,17
61:17,20 65:21
66:4,17 68:7
72:21 73:5 127:5
127:22 128:6
129:19,19,24
130:2,6,13 131:14
131:17 132:3
137:23 138:17
139:14 140:20
141:8,9,18,19
142:2,3,4 143:18
143:24 144:1,9,16
146:22 161:2,11
161:20 164:20
165:2,15,19,23
168:2,6 175:9
188:1
**listed** 61:4 66:3
67:4 68:1,16 69:2
78:17 106:18
119:12 131:2

Frymi Biedak

03-25-19

134:25 135:5,12
136:10 137:8,12
138:13,18 139:19
142:5,14,18,21
143:4,14 158:7
166:4,17,21,24,25
198:14 202:3
254:3
**lists** 130:9 133:16
133:17 135:20
136:14 158:24
164:12,13 165:12
208:14
**literally** 230:16
**litigation** 170:20,21
**little** 33:17 37:2
42:3 76:14 148:17
150:6 177:7
189:15
**lived** 113:8,10
**LLC** 1:8 2:8 7:17
9:4,5 27:11 32:12
35:7,11,21 36:6
36:17,22 37:5,25
41:17 42:13 46:20
47:6 48:19 49:2
79:24 96:14,20
110:3,5 111:10,14
119:7 131:15
134:21 135:7
160:12,17,18,24
163:11 183:3,7,9
183:15 185:18,21
195:24 196:3
**LLCs** 128:22
**loan** 240:3
**located** 61:8 88:1
168:22 232:11,18
**location** 167:15
**long** 24:3 27:3 29:7
33:11 126:24
173:9 175:21
215:17 217:15
255:4
**longer** 28:9 98:12
**look** 14:4,8,11
15:17 18:4 23:19

24:14 30:10 33:5
35:2 39:4,5 48:15
50:10 62:14 67:25
76:8,11 90:23
91:8,19 99:12,25
106:15 109:7
142:3 144:8
158:25 159:1
163:19 188:4
189:20 198:13,25
203:18,22 211:22
213:18 218:10
219:23 225:23
230:2 233:10
245:16 249:3
250:22 251:18
**looked** 39:25 40:1
46:24 124:15
143:25 153:15
185:8 201:3
206:10 221:3
232:7 245:19
249:9,19
**looking** 47:19
72:17 88:25 92:13
96:8 100:13,14
102:22 111:6,8
115:10 124:1
126:18 140:14
143:18 146:7
148:18 160:3,13
160:22 161:4,22
163:3,5 168:1
201:8 207:19
216:17 219:8
221:3,4 226:23
227:19 233:7
243:14 244:12
**looks** 32:13 47:2
49:3 50:13 61:21
97:5 106:3,4
194:24 200:22
**Los** 2:18 3:18 7:1
7:12
**loss** 104:15
**lost** 37:2 155:25
**lot** 19:18 143:17

232:19
**loud** 30:6
**low** 110:17 111:2
**lunch** 86:18 92:21
101:12

_____

**M**

**M** 8:21
**m-** 120:3
**M2** 136:13
**ma'am** 8:19 13:10
14:11 17:18 22:5
29:6 30:2 31:6,13
31:20 32:1,6
34:10 35:2,4,19
36:19 39:14 40:23
45:21 46:14 48:21
50:2 52:11,20
53:4 54:5 55:3,9
56:3 59:9,12
61:11 62:24 64:21
65:14 68:11,13
71:12 73:11 77:12
80:2 85:20 86:6
86:22,25 90:7,25
93:7 98:5 101:12
101:20 108:22
109:9,11,18
111:25 113:24
114:1,6 115:2,10
116:18 117:22
119:22 122:2
124:4,17 126:8
127:14 128:5,12
128:20 130:22
132:1,16 133:24
134:7 135:4
136:23 139:5
140:23 144:22
145:14 148:2
150:13 151:21
152:3,5 159:9
161:12 162:9,15
162:20 163:2
164:5,22 165:9
166:1 169:9,25
171:23 173:6

174:11 178:2
227:1,24 229:21
230:15,22 232:2
232:16 233:7,12
233:14 235:23
236:18,25 237:8
238:1,9 239:20
240:14 241:16
242:8 243:17
244:12 245:15,16
246:17 250:16,24
255:25
**mailbox** 210:13,15
**mailing** 210:8,9,10
210:14
**MAIN** 3:4,9
**maintain** 24:3
29:12 54:17,20
55:9 56:3 57:5
**maintained** 32:11
40:12 43:7 53:20
56:12
**maintaining** 23:16
28:9 32:16 53:17
**Majid** 5:10 69:23
109:13 119:5
147:5,20 195:22
196:11
**majority** 202:4
228:13
**making** 30:11,12
38:22 40:23
133:17 152:13
158:22 215:1
250:9
**Malibu** 6:7 222:10
222:14 224:17,18
**malibuproperty...**
223:1,13
**managed** 15:2
198:17,22
**Management** 46:20
47:5 48:3,6,18
49:1 78:23 161:1
**manager** 27:15
29:23 61:24
103:10 140:12

183:12,13,18
185:23,24 243:4
252:7
**managers** 183:20
188:2
**managing** 51:15
110:18 185:21
**March** 1:18 2:19
7:1,10 17:25
47:11,19 48:11
98:24 126:25
170:16 222:22
246:18 259:22
**Maria** 167:9
**mark** 67:15,16,22
132:3,19 213:11
236:15
**marked** 10:12,14
13:16,18 31:9,13
32:5 46:6,11
49:23 50:2 59:9
59:13 61:10,12
70:13,23 71:6,13
71:15 80:2,4
86:16,19 93:7,9
101:10,22 105:19
105:21 106:24
107:1 108:21,23
121:22 122:2,4
124:16,18 126:7,9
129:12,14 140:22
140:24 141:6
144:2,2 145:18,20
164:4,6,20 169:8
169:10,17 200:12
203:15 213:14
216:3 217:22
218:25 219:18
222:17 225:25
226:1,3 227:10,10
234:15 237:2
**marks** 67:24
101:17
**Mary** 8:21
**matter** 7:16 11:6
12:24 13:24 71:1
129:24 204:25

215:13 234:21
**matters** 10:1 76:25
176:25 177:10
241:19
**McGonigle** 3:16,17
8:2,2 12:22 13:6
14:7 15:25 16:7
16:18 17:2,13
21:16 24:25 28:15
29:2,8 30:20,24
32:19 38:4 40:16
43:19 50:22 51:18
54:3,5,7,10 55:4
56:21 57:7,18
66:10,13 75:12
77:19 92:23 99:14
110:6 144:5
152:12,15 154:25
158:8,11 163:14
163:18,22,24
164:1 172:25
173:22 174:7
184:24 190:6
196:23,25 197:2
207:19,22 209:6
215:17,21,23
224:23 237:4
242:14 243:20,23
250:6,10 254:15
254:17,19,24
255:3,6,10,22
256:2,22,24
**mean** 12:16 18:8
19:18 27:12 29:17
33:25 41:7 42:17
51:18 52:24 69:6
79:5,12 83:16
84:6 88:7 98:11
100:25 105:6
107:24 111:3
124:15 129:8
140:3 141:12
158:12 162:16
170:17 173:13
177:6,8 193:6
194:7 195:4,6
200:5 226:20

233:13 240:7,19
240:25 242:3,6
245:5 246:22
247:2 251:9 252:6
253:23
**means** 191:2
**Media** 15:2 55:16
56:4,14 57:4,13
57:17 58:5 59:1
63:22 65:21 67:12
67:19 68:2,14,16
68:21 69:3 70:12
82:19 103:8 127:8
131:20 136:18,24
137:12 138:23
149:1,19,20 151:1
153:7 154:7,17
228:3 229:23
**medical** 168:10,24
169:2
**meet** 112:25 197:10
**meeting** 72:24
215:25 242:1
**meetings** 149:4
154:9,22 174:1
184:4 228:5
**memo** 157:14
158:7 161:25
**mentioned** 13:22
111:9 146:7
147:11 157:7,14
162:3 211:24
217:16,19 218:16
239:5 246:25
252:11
**met** 140:4,4 182:10
182:12 195:11
**Michelle** 3:21 7:5
**microphone** 238:1
**middle** 103:3 186:4
**mileage** 38:22
**Milligan** 6:6 220:3
220:4,11 221:18
**million** 48:12,19
116:9 195:25
196:5,13,17
202:25,25 203:5,8

203:11 207:14,16
208:6,6,22 209:14
214:3,8,16,25
215:8
**million-dollar**
119:9 198:10
**Milton** 169:14
**mind** 92:18
**mine** 141:20
**minutes** 45:23
171:23 184:3
214:6 223:24
**mischaracterizes**
32:20
**mislead** 235:10
**misleading** 234:10
236:4
**misstates** 149:24
153:16
**mistakes** 40:20
**Mister** 80:17
**Mitchell** 1:22 2:19
7:18 259:1,24
**mixing** 156:2
**mkatz@vcorpser...**
87:11 188:9
**moment** 54:7
233:24
**Monday** 1:18 2:19
7:1
**money** 56:13
107:17 108:8
110:17 111:2,3
126:4 175:4,6
194:19 223:20
247:12,15 248:2,3
249:10,17
**Monica** 2:17 7:12
20:13 95:7 127:11
127:13 131:11
168:23 175:24
176:3 197:12
**monies** 38:18
**month** 172:8
**months** 179:15
**morning** 7:4,23
173:15 214:5

**move** 26:21 27:4,8
34:21 78:13 111:2
111:3 118:11
143:11 176:2,3
215:25
**moved** 20:12,25
26:4,13,15,20,25
175:23 179:15
**movement** 196:17
217:5
**movies** 37:10
**multipage** 203:21
**multiple** 23:8,21
116:11 249:25
250:1

---

**N**

**N** 5:1 6:1
**name** 7:5 8:18 9:10
15:23 16:5 18:5
21:24 22:1,2
26:16,18 27:20,25
30:18 62:6,20
88:19,23 89:3
90:10,12,14,15,18
91:5,10,16,20,22
92:4,7,15 94:4
95:12 96:5 99:12
99:22 100:20
120:8,12 145:2
178:19 181:20
201:12 211:25
221:18 252:11
**named** 16:10 65:15
83:10 84:17 85:1
85:24 86:10
186:24 187:12
195:15
**names** 28:14 109:8
141:23 143:19
202:1
**nature** 36:21 37:4
128:24 135:25
**necessarily** 244:24
251:7
**necessary** 30:9
41:22

**need** 66:12 68:4,9
71:1 73:12 74:4,4
104:16 117:12
118:2 140:6
163:24 170:17,21
197:23 203:22
214:4 215:12
226:12 243:18,18
256:21
**needed** 60:16 74:11
140:4,7 193:7
205:11
**needs** 125:9 162:17
170:6 223:15
**negative** 181:13,17
**neither** 7:7
**net** 203:7,11 208:21
209:1,8
**Nevada** 136:13
162:18 183:15
**never** 29:14 50:9
51:13 53:19,20
55:5 56:8 57:15
84:10 88:6 94:17
155:3 171:19
179:22 183:10
187:16 199:15
210:3 219:12,12
219:13 222:8
238:17 252:4
**new** 3:10 90:14
103:13 113:1
200:10 205:1,11
207:10
**nice** 72:24
**nine** 206:11,12
**Nobunaga** 79:24
163:11
**normal** 70:19
77:22 90:1 246:13
246:19
**normally** 44:11
70:24 102:24
157:18
**NORTH** 3:9
**notation** 47:11
**note** 102:25 103:13

Frymi Biedak                                                      03-25-19

108:7 128:16
147:22,23 153:6
154:16 157:14
163:14,23
**noted** 39:2
**notes** 82:1 127:7
147:2
**notice** 2:20 4:11,17
10:18 59:18 206:1
207:12 215:4
223:14 256:4
**noticed** 88:8
**notices** 127:22
128:17
**notifications** 74:4
**November** 71:21
72:1,10 73:1
78:20 79:2,8,15
79:21,24 80:14
81:11 82:11 83:8
84:23 85:5,10,23
86:7 87:9 89:22
102:8,16 103:15
147:6,12 186:5,17
204:9 209:25
214:9 216:19
217:4 218:3
243:14
**number** 4:10 5:4
6:4 7:15 31:21
62:21 67:2,14
68:7,10 69:2
83:11,18 84:19,21
85:2,25 86:11,12
132:18,21 135:15
136:22 137:10
138:9,13,19,24
139:7,11,15,20
141:23,25 148:2
152:20 155:5,12
155:16 157:16
158:14,22 159:19
159:22 160:5,8,15
160:17,24 161:9
161:24 162:11
163:7,9 181:16
186:25 187:14,16

189:22 198:20
200:2 201:5
210:22,24 213:6
214:14 230:4,12
230:23 233:12
234:15,19,23,25
235:3,8,25 236:8
236:12 241:18
253:6
**numbered** 53:5
109:5
**numbering** 46:16
**numbers** 14:18
19:4 40:1 62:12
68:5 88:10 132:14
158:6

___

# O

**o0o---** 257:7
**oath** 25:24 26:1
31:17 46:8 254:20
255:11,16 256:6
**oaths** 259:3
**object** 12:22 15:25
17:2 19:15 22:15
32:19 34:7 40:16
50:22 54:8 56:21
57:18 66:10
172:25 233:23
234:9
**objected** 13:14
**objection** 19:25
23:12,22 24:24
28:3 35:13,15,22
36:8,24 37:7 38:4
41:24 42:8,15
43:3 47:22 48:9
49:10,15,20 51:25
54:3 55:18 57:7
57:21 59:4 66:8
69:19 75:9,12
86:2 100:23 110:6
110:20 112:16
125:23 128:2
129:4 130:15
132:24 144:4
145:12 149:9,21

151:14,24 152:9
152:24 155:20
182:2 231:8,20
235:15,16
**objections** 13:4
16:7 17:15 34:25
55:22 78:3 128:9
138:2,3 149:15
150:19 152:15
**obligated** 171:15
**observe** 176:13,14
**observed** 177:4
**obtain** 146:25
155:11 157:15,25
159:19 201:7
**obtained** 160:14
161:9 163:6
253:21
**obtaining** 152:20
158:21
**obviously** 136:6
255:20
**Occa-** 179:24
**occasion** 232:25
233:3 246:14,21
**occasions** 110:16
179:25
**occupations** 164:17
**occupied** 26:23
**occurred** 55:20
**odd** 76:14 187:22
187:25
**offensive** 85:21
**office** 26:5,24 29:23
53:2 61:24 89:13
89:15,17,20,22,25
113:5 119:13,16
119:18,23,24
120:1,2 167:12,16
167:16,19 168:10
176:13,20 179:9
180:6 182:23,24
237:16 240:25
243:3,3 252:7
**officer** 103:10
166:21 212:3
**officers** 226:19

228:22 229:1
**offices** 3:16 11:11
20:13 179:6
232:21
**officing** 139:25
174:14
**offline** 214:13
**oh** 15:11 21:18 23:7
52:2 66:14 93:5
112:9 153:24
155:9,25 161:13
161:13,13 163:16
197:2,9 200:17
227:2 231:1 238:2
242:6 243:19
**okay** 9:15 12:4,16
14:11,17,19,20
15:13 17:8 18:20
18:23 19:2,7
20:10 21:18 22:7
22:19,21 23:10
24:13 25:3,7,11
27:4 29:16 30:12
30:18 31:8,22
32:9,10,15 33:1
33:17 35:5,6 39:9
40:11 41:7,19
44:2,6 45:4 46:19
47:4,8 50:6,13
51:1,22 53:3,6,9
53:13 55:5 58:12
58:16 60:8,24
61:20,23 62:8
63:12,21 64:11,15
66:22 67:18 69:1
69:11,25 71:12
72:6,10,14 73:9
73:13,15,15,19
75:1 76:5,18
77:23 78:12 81:3
81:5,15 82:1,21
82:24 83:14,20
85:4 86:22,25
87:4 88:9,13 89:5
89:8,25 90:8
91:10,15,19,22
92:1,4,7,11,13,21

92:24 93:5,16,20
94:7,12,15,22
95:1,25 99:7,20
100:19 101:4,11
102:14,21 103:2
103:25 104:9
107:19 109:2,4,5
109:22 110:18
111:16,20 114:4,4
114:8,12,16,20
115:2,6,12,12,14
115:15,16,20,23
116:2,6,19,23
117:4 118:10
121:3,18 125:13
126:13,18 128:16
131:17 133:8
134:3,3,17 135:9
135:16 136:5,9
137:8,11 138:21
139:8,12,18 141:9
141:22 144:13,13
144:25 145:8
146:2,1,17 147:4
147:14,20 148:1,4
148:13,21,24
150:5,8,9,24
151:12 152:14,19
153:2 155:17
156:18 157:24
158:10 159:6,10
159:16,25 160:2
160:11 161:1,19
164:2,16,25 165:8
165:8,11,14 166:3
166:7,12,16,23
167:15,21,21
168:6,9,21 169:19
169:23 170:1,14
171:7 172:18
175:4,4,21 176:22
176:24 180:11
182:6 184:11
190:7,10 192:7,15
193:11,23 198:8
203:24 208:11
213:11 214:24

215:4,12,21
223:25 225:2,2,8
225:18 226:23
227:7,9 228:9,17
229:2 230:1,12,18
232:22 233:7,16
233:18,19 234:7
234:12 235:16,21
236:17,21,24
237:19 238:16
239:8,12 242:22
243:13,25 244:16
249:4,7 250:11,11
251:18,21 255:3,6
255:22 256:2,8,15
256:18,22,22
**once** 9:24 172:8,8
172:10,11 173:9
212:24 213:5
256:3,3
**one's** 163:23
**ones** 51:18 67:14
226:2 236:19,22
**ongoing** 181:10
**online** 55:13 67:2
68:7,9,15 117:11
118:2 132:21
138:23 139:2
159:23 160:9
214:13
**open** 207:10 219:25
220:11,20 221:14
221:14
**opened** 212:25
213:5 221:11
**opening** 220:21
221:6,8,20,22
239:17 240:4,21
241:21
**operate** 12:20
**operations** 20:18
**opportunity** 114:5
**option** 248:24
**Opus** 79:6,8 149:2
151:7 153:7 154:4
155:13,14 163:3,9
198:5 202:3,8,11

202:15 228:3,11
228:12,14 229:23
229:25
**order** 74:12 194:20
**organized** 206:14
206:21 207:13,20
**original** 59:25
255:11,12,13
256:6
**originally** 254:21
**originated** 251:6
**outcome** 7:9
**outside** 12:8 176:25
207:3
**overbroad** 16:1
130:16 137:19
**oversight** 54:2
**Owari** 79:6,8 83:10
84:17 85:6,24
86:10 149:2 151:7
153:7 154:4,17,25
155:13,14 163:3,9
186:24 187:12,17
198:5 202:3,8,11
202:15 228:3,11
228:12,14 229:23
229:24
**owned** 83:9 84:16
85:6,23 86:9
186:23 187:12,24
196:3
**owner** 183:23
**ownership** 52:24
134:18 195:13
202:2,2 228:19,20
229:3,6,14
**owning** 202:18
**owns** 9:1,15 82:15
83:9 84:1,10,13
86:9 147:22
154:17 183:11
186:20 198:5
202:8 228:12,13
229:25

---
**P**
---
**P** 62:4 259:4,4,8,11

259:19
**p.m** 76:10,11 82:11
101:13,18 102:16
104:4 119:3
127:19 169:17
171:24 172:3
178:10,14 186:17
215:11 238:3,7
257:3,6
**Pacific** 50:14,20
51:2 213:24
**package** 189:3
207:10
**packages** 219:22
**page** 4:4,10 5:4 6:4
6:11 14:8,12,12
14:13,15,18,22
19:2,3 21:5,15
22:4 24:16 25:7
29:25 30:1 31:21
31:24 32:2,6,7,17
33:13 35:2 39:15
41:11 46:16,17
48:21,21,23 50:13
53:3 58:7 62:14
62:15,15,17,21
64:24 87:8,20
88:25,25 90:4
91:6,20 92:2
93:17 95:1,18
98:16 100:7,8,16
100:17 104:1
106:12,15,16
109:5,7,9,22
113:15,16,21
114:17,23 115:4
115:20 116:2,8,25
117:6 119:1
121:12 122:8
124:1 126:14,18
127:4 144:17
148:1 156:6
159:11 188:18
189:1,10,11 190:1
190:2,11 192:3,5
195:21 199:16
205:19,23 206:8

206:13,15,20
207:13,19,22
209:16 211:1
212:13 216:22
218:10 220:2
226:24 227:1,4,6
230:13 252:13
253:5 254:5,6
**pages** 21:17 61:17
87:1 100:21
114:12 115:18
190:1 205:18
206:2 212:1
252:12 259:9
**paid** 36:7,14 40:13
40:14 50:20 147:2
152:22 155:7,13
157:17 158:1,23
160:9 162:14
171:14 245:25
248:3 249:11
250:20,20
**papa** 62:4
**papers** 211:24
**paperwork** 211:11
211:16
**Par-** 160:19
**paragraph** 30:6
104:13,13
**Parasec** 74:1 157:6
157:12 160:20
169:22 171:3
179:18
**Park** 3:17 209:24
**part** 49:4 54:2
123:15 138:13
139:10 165:3,6
189:3 195:15
201:17 246:19
**particular** 12:1
28:17 32:11,16
39:21 42:25 43:14
44:14,16,24 45:16
45:20 64:1 66:4
70:5 91:5 96:19
99:23 125:16
165:2 174:22

233:11 246:10
247:5 253:23
**parties** 7:8 66:25
209:17 229:5
259:12
**partners** 78:17
160:3 176:18
**party** 67:1,2,3,5
68:1,3,17,22
83:11 84:18 85:2
85:25 86:10
131:14,20 132:4
132:12 134:13,25
135:6,13,21
136:10,14,20
137:8,13 138:12
138:18 139:9,14
139:20 140:10
158:25 185:18
186:24 187:13
198:13,19 209:21
232:3
**PASEO** 3:13
**pass** 178:3 200:16
250:25
**passport** 205:23
252:21,22,24
253:7,14,16 254:5
**Paul** 215:13,15
**paused** 35:17
**pay** 97:14 108:16
126:24 159:23
175:7
**payable** 93:20 94:3
96:13,25 245:20
245:21
**paycheck** 9:11 15:1
15:14,23 16:5
18:6,17,24 142:25
**paychecks** 15:7
**payees** 39:18
**paying** 48:6 118:8
**payment** 33:15
34:12 35:7,10,20
37:16,18 38:7
39:1,3,7,21 41:17
41:23 42:4 44:21

47:18 49:18 96:20
97:6 98:17,21
99:8 111:16
248:21,22
**payments** 38:14
39:17 147:1
152:21 155:6,12
157:16 158:1,22
159:20 160:6
161:25
**payroll** 79:19,19
133:18 142:11
144:11,17,20,24
145:6 164:14
169:3,4 174:18,25
175:1,3,7
**pen** 200:16
**penalty** 258:6
259:20
**pending** 8:8 225:16
**penny** 30:12
**people** 19:18 21:18
21:19 28:17 43:23
77:9 78:5 83:4
120:22 130:10
143:18,19 145:3
166:25 167:24
169:1 177:8 180:6
**percent** 22:11 84:7
156:4 176:4 202:2
202:4,18 208:25
223:15 229:25
246:6
**percentages** 229:3
229:10
**perform** 223:15
**Pericorp** 169:20
**period** 15:21 16:18
19:24 20:7 24:4
92:15 142:7,16
143:1 173:23
174:13 176:12
259:18
**perjury** 258:6
259:20
**permission** 70:17
71:1,4 99:22

184:14 190:24
221:13,24
**person** 11:12 21:9
21:9 34:14 44:17
45:1 71:2 83:3
111:22 134:12
185:22 199:6
221:9 223:12
230:9 251:6
**personal** 12:1,4
22:24 55:25 88:1
88:4 91:16
**personally** 89:12
164:19 187:6
218:21 242:16
**pertaining** 11:6
87:6
**pertains** 157:9
**Phoenix** 125:9,14
125:21
**phone** 9:9 72:25
82:2 136:2 210:17
210:22 211:19
**photocopy** 205:23
**picture** 254:2
**Pineboard** 27:19
27:21 110:3,5,13
110:18 111:1,9
112:9,10,14
116:15 117:11,17
118:1 119:7 137:2
195:24 196:3,12
196:17 198:11,14
**Piskula** 62:2,4
103:6,8 104:7
109:16 118:19,21
125:1 127:18
143:14 170:2,3
195:23 243:4
252:7
**place** 7:11 89:15
161:25 191:3
213:6 259:6
**placed** 191:12
199:5 201:2
**plaintiff** 2:17 7:21
7:24 197:18

220:25
**plaintiff's** 13:17
50:3 61:16 104:2
105:20
**Plaintiffs** 1:5 2:5
3:2,7
**planned** 215:23
**Plaza** 3:9 26:25
27:5
**please** 7:19 8:5,6
8:18 9:13 14:23
22:4 29:25 30:6
31:24 35:14 46:17
55:7,22 88:13
116:21 126:22
141:5 165:9 171:4
185:7 188:4,6
189:16,17 192:14
194:12 196:21
197:21,22 198:25
203:20 221:9
223:14,16 246:16
255:24
**point** 15:9 40:23
64:11 98:25
155:23,25 156:3
160:18 166:3
170:25 171:3,13
180:7 182:6,21
183:22 187:10
191:2 245:4 250:9
252:14 256:21
**pointed** 110:25
**pointing** 68:11
227:14 239:4
**portfolio** 118:7
**portion** 47:4 48:25
**position** 16:24
**possess** 28:23 29:12
231:18 233:22
236:1 243:10
**possessed** 29:20
**possession** 232:5
233:20 234:5
235:4 252:15
**possible** 29:18 72:5
72:6,9 84:23

100:19 108:19
142:12 155:10,10
173:13 178:22
191:9 193:6,7,8
200:24 206:25
240:19,22 241:10
242:9,22 247:8
249:14,20 252:17
252:19
**possibly** 65:16
201:10
**Potenciano** 168:2,3
**practice** 77:25
86:13 191:10
**practices** 70:20
77:22
**preceded** 121:12
**preceding** 24:16
109:7,9
**Predovich** 167:9
**preferred** 169:20
169:22
**prefix** 236:14,15
**preparation** 252:9
**prepare** 57:5
140:20 149:11
151:17 199:2
200:23,25 201:17
230:21
**prepared** 46:19
123:25 146:5
149:12 165:16
188:15 230:10,18
231:10,22
**preparing** 201:14
201:15
**present** 3:20
173:23
**presented** 42:23
44:7 49:5
**presently** 10:2
**president** 143:7
149:2 151:12,23
152:7 154:8
191:16 199:25
200:4,7 202:10,15
206:6 212:8,9,14

228:4,14 229:24
241:3
**Pressler** 95:20 96:3
96:10
**presume** 131:5
**Presuming** 239:2
**pretty** 17:25
100:17 124:6
136:7 156:23
171:6 184:5 205:6
**previous** 60:22
120:13 192:5
**previously** 73:1
**principal** 208:21
**printed** 49:5 89:2
94:5 95:2,5
**prior** 10:22 46:8
60:12 126:24
**prison** 123:15
**privacy** 28:17
30:22,23,25
**privilege** 17:5,7
173:2
**privy** 154:22 242:1
**probably** 63:3,4
67:8,23 140:13
159:22 160:8
162:10 181:22
183:1 184:6 185:2
194:20 201:3
208:17 210:5
211:18,19 221:7
225:19
**problem** 120:23
144:5
**Proc** 259:7,11,14
**proceeding** 10:23
174:2 257:2
**proceedings** 180:13
180:19,24 257:5
259:5,10,15
**process** 160:19
169:22 170:24
171:4
**produce** 231:19
233:21
**produced** 230:19

Frymi Biedak

03-25-19

230:24 231:3,4
232:4 233:17
234:24 235:3
236:16
**producer** 127:8
**product** 37:9
125:17
**production** 36:2
46:20 47:5 48:3,6
48:18 49:1
**Productions** 33:15
33:23 34:11,16
35:7,11,21 36:6
36:14,22 37:5,9
41:17 49:9,19
55:15 56:4,13
57:4,13,17 58:2,9
**profit** 104:15
**project** 69:13
**promise** 193:10
**prompt** 256:4
**property** 6:7
222:10,13 224:17
224:20,22
**proposed** 106:18
**prosecution** 234:20
**protected** 17:4,7
**provide** 12:12 13:4
17:16 58:17 69:18
104:10 105:4
113:17 114:9
127:22 174:25
199:17 205:10
227:20
**provided** 10:22
11:10,22 13:22,25
24:6 36:22 37:5
39:22 58:19 76:3
87:14,17 94:16
103:21 114:16,20
124:25 129:19
134:16 170:1
174:17 197:18
207:3 227:15
234:4 254:1,5
259:17
**provides** 165:19

**providing** 33:24
34:11 102:10
105:11 129:22
207:6
**pu-** 134:16
**public** 25:16 60:5
**pull** 159:4 165:8
**pulled** 235:12
**purchase** 43:13
106:1,5 222:13
241:2
**purchased** 222:10
**purports** 91:22
**purpose** 27:16,21
28:6 33:20 35:20
49:18 62:8 63:6
64:3 73:23 90:18
96:19 98:20 99:7
111:16 112:13
125:13 165:1,16
172:22 177:17
201:22 205:10
220:10 256:9
**pursuant** 2:20
207:10,11
**put** 21:17 43:9
46:25 62:11 68:21
69:9 74:21 110:17
111:4 114:25
124:5 132:19
137:23 140:13
141:23 159:6
184:5 191:5 205:6
206:25 207:2
210:1,4 223:16
236:19,22
**putting** 41:8

**Q**

**qualified** 105:6
**question** 12:10
13:10,11,13 16:2
17:12,18 19:15,25
22:18 23:22 26:11
31:4 34:10 35:15
35:19 36:11 37:1
39:13 40:16 52:9

52:19 54:10 55:3
55:7 56:3 64:6
67:15,16,22,24
70:18 77:4,12,15
83:8 85:20 86:8
97:12 98:3 110:6
128:5 130:15,16
132:3,19 135:3
137:18,20 152:4
157:19 180:21
202:1 211:15,17
224:24 231:24
235:8,14,23
236:25 237:13
238:22 239:18,20
240:9,11 241:16
248:23 250:14
251:20
**question's** 15:25
23:12 26:8 39:23
43:17
**questions** 6:10
18:14 56:25 86:14
170:14 172:6
180:12 201:12
202:24 225:15
227:14 239:8
241:5 247:19
**quick** 230:3
**quicker** 255:20
**quite** 17:18 51:3
113:13 128:13
201:20 229:17
238:22

**R**

**R** 8:20 259:4,8,11
259:19
**raise** 8:6
**randomly** 45:15
**range** 173:12
**re-** 156:1 247:7
**re-ask** 35:19
**reach** 31:6
**react** 70:24
**read** 21:16 30:5
73:7 81:24 82:16

83:12 88:17
104:19,20 117:13
120:10 127:1
147:7 149:5 153:9
166:10 181:13
196:19 228:7,8
230:16 258:5
**reading** 74:13
102:12 113:23
151:16
**reads** 230:16
**ready** 141:4
**real** 58:20 106:1,5
223:8,11 246:10
246:23 247:5
**really** 18:14 20:17
23:18 38:11 40:9
41:25 42:17 43:24
44:3 56:25 58:20
60:11 69:5,14,15
71:1 79:13 82:20
84:6,11 85:7
101:1 105:18
113:7 120:24
123:24 129:10
130:9,10 134:5
135:17 144:6
159:2 161:18
165:7 168:24
170:25 176:5,20
177:7 187:9 199:7
211:10 222:8
229:16,17 246:22
247:7,10 249:14
249:20 251:4
**REALTY** 5:6
**reask** 241:16
**reason** 12:7,12
15:20 54:13,16
57:2 59:24 85:9
85:25 89:11 94:15
99:20
**reasonable** 40:24
**recall** 11:8,13 40:9
48:5 57:25 63:6
64:11,22 85:4,9
105:11 120:4

134:4 153:19
157:8,9 158:21
164:18,23,24
177:18,21 178:25
180:14,15,23
184:8 192:24
193:4,12,15,19
201:1,7 204:15
207:6 212:24
214:7 220:20
245:22,24 247:7,8
**receipt** 38:23
255:18
**receipts** 38:18
42:20,24 43:15
44:14
**receive** 45:13
244:18 256:3,16
256:18
**received** 65:20
82:18 85:4 118:3
127:21 177:22
**receiving** 48:19
**receptionist** 167:10
167:10,12,14,22
**recess** 46:2 101:15
172:1 178:12
238:5
**recipient** 34:14
36:5,13 113:18
114:9 204:13
248:21
**recipients** 80:11
82:24 104:6
**recognize** 62:20,23
94:19 95:15,25
96:16 203:25
204:2 205:19,22
216:7
**recognized** 98:12
**recollect** 20:14,15
37:9 46:21 64:9
90:2 111:7 156:1
157:6 177:25
**recollection** 63:25
88:22 92:14 96:9
140:16,19 158:2,5

158:13 160:4,14
160:23 161:5,23
163:6 184:12
191:10 219:9
221:5
**recollections**
158:15
**reconcile** 249:5
250:23
**reconciled** 249:19
**reconciliations**
22:19
**record** 7:5 8:18
14:7 20:16 43:1
43:24 44:8 46:1,3
101:14,16 105:15
171:25 172:2
178:8,11,13
218:16 226:13,14
232:4 234:6 235:4
235:24 237:1,15
237:15 238:4,6
248:21 250:19
253:23 257:4
259:10
**recorded** 38:7,14
40:25
**recording** 44:24
**records** 22:23
23:19 24:15 58:5
74:21 87:5 159:1
193:22 230:20
232:8,10 234:13
236:2 247:16
248:5,10,14,18
249:1,9,21,22,23
250:17,21,21
251:3,8,13,18
253:16,17,18,19
**reduced** 39:7
**refer** 14:17 79:18
132:12,13
**reference** 117:8,18
150:11,18 186:5
**referenced** 73:21
106:6 115:23
116:3 141:16

147:15 216:25
224:18 225:8
227:11 230:3
**references** 83:21
126:19
**referencing** 115:17
115:24 116:24
133:21 149:8
170:11
**referred** 22:9
**referring** 21:10,12
24:18 39:24 82:19
83:14 84:4 103:20
116:16 117:24
118:4 150:21
162:7 185:12
186:18 214:19
**refers** 116:12
**reflect** 9:7 23:2
42:12 121:19
137:24 140:15
141:25 249:21
**reflected** 24:23
25:23 40:14
116:25
**reflecting** 28:10
47:18
**reflection** 248:11
248:15
**reflects** 51:5 58:8
59:1 63:12,13
142:19
**refresh** 63:25 92:13
96:9 140:15,19
160:4,13 161:4,22
163:5 219:8 221:4
**refreshes** 160:23
**regard** 181:24
251:3 252:21
**regarding** 40:13
69:17 70:11,22
71:5 77:1 78:1
84:14 102:7,11
136:3 138:12
214:6 226:17
**regardless** 99:8
230:18 231:22

256:17
**regards** 11:21
**register** 147:1
169:21
**registered** 152:21
155:7,13 157:17
158:1,23 159:21
**registration** 90:10
90:12
**regular** 9:23 90:3
201:16
**regularly** 89:17,25
**reimbursed** 42:18
**reimbursement**
37:21 42:10 43:1
44:12 45:2
**reinstated** 155:22
156:4 170:7 171:9
171:19,21
**reinstatement**
170:16
**reinstating** 81:1
**relate** 10:1 12:1,4
174:6
**related** 4:18 12:17
12:17 44:12,16,17
61:17 104:10,18
108:2 213:12
221:9 222:6,13
**relates** 21:14
202:24 203:23
**relating** 11:23
12:14 77:19
**relationship** 78:9
122:22 123:3,4
175:19 176:7,14
176:15,16 177:5,9
195:16 241:17
**relative** 7:7 259:12
**relatively** 77:13
**relevance** 22:16
34:7 35:13 38:4
41:24 42:8,15
47:22 48:9 49:10
**relevancy** 12:24
**relieve** 255:7
**remember** 11:16

11:19 15:5,15
23:7,14,18,18
24:14 26:19 27:2
27:7 29:11 33:9
33:11,12 38:5,11
38:11,12 39:6
40:9 43:21,23,25
45:5 49:22 60:10
60:14,23 68:10
72:13 74:8 84:21
88:6 91:4 92:16
108:19,20 110:9
110:10 113:7
120:3,19,25
121:17 124:14
130:9,11 133:16
140:11,12 143:9
144:23 145:2
155:10 157:22
160:9,10 161:16
161:17 162:11,12
175:25 178:1
180:17,18 182:9
184:10 200:6,9
207:8 215:13
220:23 239:8
247:10 249:14,20
**remembering**
178:24
**repeat** 13:11 16:2
36:10 37:1 52:9
55:7 70:7 97:12
98:3 135:2 152:4
180:20 231:24
238:22 240:12
250:14
**rephrase** 25:3
85:20 137:21
**replace** 41:22
**replaced** 41:19
**reply** 139:7
**report** 42:20 59:25
60:5
**reported** 182:19,22
**reporter** 7:18 8:4,6
10:15 13:19 31:10
46:12 49:24 59:14

61:13 62:3 71:16
80:5 86:20 93:10
101:23 105:22
107:2 108:24
121:23 122:5
124:19 126:10
129:15 140:25
145:21 164:7
169:11 181:15,17
181:25 200:13
203:16 213:15
216:4 217:23
219:1,19 222:18
224:7 226:3
236:22 255:7
259:2,17
**reporting** 19:23
**reports** 60:8
**represent** 7:20
13:24 46:7 178:19
233:16
**representation**
211:23
**representative**
72:20 204:16
220:4
**representatives**
218:4
**representing** 11:5
**request** 73:6 125:8
125:20 130:7,14
130:25 131:5
132:23 186:6
198:9 234:4
**requested** 6:20
13:23 69:17 82:4
83:22 102:10,17
102:20 130:2
171:11 259:16,16
**requesting** 44:20
105:12
**requests** 239:10
**required** 29:23
149:3 154:9 228:5
**res-** 247:22
**research** 195:9
**reserve** 255:20

Frymi Biedak
03-25-19

256:8
**residence** 208:21
**resign** 171:15
**resolution** 191:7,15
  192:5 228:5
**resolutions** 149:3
  154:9
**respect** 10:10 25:19
  33:8 40:11 67:11
  67:18 77:12 78:16
  79:20 87:24 101:4
  116:20 123:7,19
  133:10 142:13
  157:13 228:17
  240:1 247:22
  255:10
**respective** 105:2
**respects** 227:20
**respond** 13:10
  28:21 31:4 83:8
  186:23
**responded** 15:1
  82:22 127:17
**responding** 86:14
**responds** 76:11
  82:8 121:6 127:3
**response** 84:16
  141:17 187:1
  223:20 227:13
**responsible** 66:25
  67:1,2,3,5 68:1,3
  68:17,21 83:11
  84:18 85:2,24
  86:10 131:14,20
  132:4,12 134:13
  134:25 135:6,13
  135:20 136:10,14
  136:20 137:8,13
  138:12,18 139:9
  139:14,19 140:9
  158:25 185:18
  186:24 187:13
  198:13,18 239:13
  239:14
**restate** 128:5
  145:14
**restroom** 237:24

**resulted** 34:11
**retain** 255:12 256:7
**retained** 80:21
**retaining** 172:19
**return** 80:25 81:6,6
  81:9 92:25 104:17
  104:18 105:1
**returns** 104:21
**review** 14:17 87:1
  114:5 254:20
  255:5,14 256:14
  259:15
**right** 8:6 14:22
  40:5,8,20 41:2,6,7
  43:12 50:10 59:22
  62:16 65:14 67:25
  73:20 81:21 84:1
  84:14 88:9,14
  90:9 91:5 99:3
  109:6 113:23
  116:19 121:8
  130:20 147:23
  152:14 158:9
  167:18 179:10
  181:18 182:10
  183:19 185:6,17
  190:6 194:6
  195:19 196:21
  198:21 199:14
  201:1,21 203:25
  206:11,12 208:1
  208:18 209:6,8,20
  211:1 215:10,25
  217:4 218:23
  220:2,8,20 224:14
  233:10 236:19
  238:9,12 239:6
  240:8 243:20,21
  252:21 254:1
  255:20 256:9,23
  256:24
**right-hand** 197:3
**righty** 64:17
**Road** 61:4 87:25
**Robert** 95:19 96:3
**role** 74:18 80:16,18
  185:25

**roughly** 134:4
  172:14
**row** 185:9
**RPP** 96:8
**rules** 13:4 17:15
  34:25 55:22
  149:15
**run** 96:5 121:3
**running** 13:1

_____
### S
**S** 3:8 4:8 5:2 6:2
  62:5
**sale** 106:8
**Sam** 62:5
**SAN** 3:13
**Sandra** 1:22 2:19
  7:18 259:1,24
**Santa** 2:17 7:12
  20:13 95:7 127:11
  127:12 131:11
  168:23 175:23
  176:3 197:12
**saw** 51:13 91:6
  129:18 164:20
  175:9 177:8 181:8
  187:1 198:9
  216:11 220:24
  252:4,6
**saying** 85:1 110:1
  116:21 117:25
  194:12 250:2
**says** 14:12,15 33:22
  37:23 39:6 41:21
  42:11,16 46:10
  47:25 48:1 49:11
  49:16 50:11,12,17
  51:7 52:2 53:12
  53:16 55:17 58:11
  59:20,21,23 60:2
  60:7 63:15,18,21
  63:24 65:7 66:24
  68:14 71:22 81:14
  82:17 83:13 84:2
  84:6,15 91:13,25
  92:6 96:8 102:9
  104:12 106:7,20

107:13 111:12
  114:11 117:14,15
  119:15 121:9
  125:5 126:2,3
  127:6,9 136:16
  139:9 141:7
  146:13,14,16,17
  146:25 147:4
  148:9,17,25
  149:18 151:5,10
  152:16,23 153:7
  153:11 154:14,20
  155:9 156:13
  157:24 161:14
  164:15 165:21
  166:11,13 167:9
  168:9 189:6
  191:21 196:8
  197:2 198:18
  199:17 201:11
  202:10,25 208:7
  208:14 209:16
  212:8 214:15,24
  217:3,7 222:21
  224:19 228:2,10
  228:11,13,15
  229:4,9,9 236:12
**SCHER** 1:8 2:8
**Schotz** 3:3,8 7:24
**scientist** 195:5
**Scoot** 153:23
**Scott** 21:23,25 22:1
  22:2,3 60:14,17
  80:17,18
**se-** 134:16 179:24
**Sean** 5:21,22,23,24
  204:15 213:12,20
  214:2 215:11
  216:8,9,13
**seanedr-** 204:10
**seanedrington@...**
  204:10
**Sec** 177:24 259:4
**second** 15:8 49:7
  62:14,14,15,21
  68:4 73:10 78:23
  83:24 87:20 91:8

100:8 113:16,21
  117:6 126:18
  144:16 156:24
  159:11 160:2
  168:1 185:9
  188:18 189:5
  205:23 227:4,6
  237:22 243:16,21
**second-to-last**
  100:7,8 106:15,16
**secretary** 146:17
  148:13 149:2
  154:8 191:18,19
  192:4,9 206:2
  212:16 228:4
**section** 148:19
  153:7 154:4
**secure** 67:20 68:2
  69:1 70:10,21
  71:5 139:22 140:9
  155:5 160:24
**secured** 71:3 160:5
  160:5 231:6
**securing** 158:6
**Securities** 177:20
**security** 134:15,16
  135:15
**see** 10:8 14:8,12,15
  14:16 19:4 22:12
  24:20 30:3 32:2
  35:6 36:3 37:13
  37:15,18 39:5,15
  39:17 41:15 42:3
  46:18 47:12,24,25
  48:1,14,20 50:3
  50:11,25 51:22
  53:9 58:7 59:1
  66:14 70:5 74:13
  77:1 78:25 79:1
  80:12 81:15 87:8
  87:21 88:9 92:8
  94:2 95:2,5,20
  96:23 98:17 104:6
  106:14,14 108:13
  109:8,12 115:16
  115:19,19,21
  116:2 118:21

Frymi Biedak

03-25-19

119:1 123:24
124:13 126:15
130:12,23 131:7
131:17 132:13
134:10,21 135:1,5
136:20 137:5,7
138:20 139:17
140:9 143:18
146:9 148:18
154:3,6 156:9,16
157:1 158:24
161:10 162:5,10
165:22 166:16,20
168:21 176:20
177:7 181:5,25
182:3 183:25
184:3 185:19
186:21,22 188:21
189:2,13,14
190:11 191:1,15
191:25 192:8
195:2 196:1,14
198:14 200:1,2
202:5,12,13 203:2
204:11 205:2
207:5,15 208:4,23
208:24 209:3,11
209:18 211:5,25
212:4 214:23
216:14 217:18
218:10,13,15,15
221:7 223:3,14,18
223:22 225:6
227:19 234:13
249:10 252:6
253:9
**seeing** 172:7 232:3
235:23
**seen** 50:9 88:6,7
106:11 133:19
149:22 162:19,21
184:6 191:6,12
199:15 200:3,7,20
219:12,13,13,15
222:8
**selected** 63:9 88:5
**seller** 223:15

**send** 74:3 116:21
127:5 139:3 207:9
215:2 220:10
221:9 254:15,17
255:13 256:6
**sending** 81:11,18
102:16 109:19,23
110:11 118:14
214:2,7,15,24
253:6
**sense** 205:7,9
**sent** 74:10 76:10
102:5,18,24 103:4
116:8 120:18
125:9 126:4
179:15 186:17
188:8 189:19,20
204:2,9 213:20
216:18 217:17
221:15,17,17
225:4 239:3,23
246:18 247:1,6,9
248:16
**sentence** 196:7
**sentenced** 123:14
**separate** 23:10
62:24 108:7 129:2
144:24
**separately** 108:9
**September** 176:4
**series** 4:16 39:17
39:18,18 50:4
88:10 102:2 109:2
192:16 220:24
**server** 121:1,4
**service** 5:5 36:6
51:23 74:2 91:3
**services** 4:22 7:7
8:25 9:12,14 15:2
15:10 16:11 18:16
18:18 20:17,24
33:20,23 34:10,15
36:2,14,21 37:4
46:20 47:6 48:3,6
48:18 49:1 50:14
50:19 53:11,14,18
56:10 58:17,19

59:19 60:12,24
61:4 63:20 65:5
72:19 79:20 81:22
83:15,18,21 84:4
84:14 85:6 87:6
87:22 88:5,15,16
88:19,20 90:11,14
91:2,11,12,23,23
92:5,8,14,16
93:14 95:6,22
96:25 97:7,23
98:8 102:7 104:22
105:16 106:5,18
115:6 116:9 117:2
119:10 120:8,13
122:15 123:11,16
123:20 129:3
131:8,8 134:9,16
136:2,2 140:7
144:23 148:5,23
151:23 152:8
155:7 161:21
166:13 170:12,15
171:8,19 174:17
174:18,19,21,25
175:2 185:10,15
186:18 188:11,20
189:12 191:8
197:18,22 216:25
228:16,24 229:25
**SERVICES-** 5:19
**set** 92:18 159:22
172:12 193:21
205:11 259:6
**setting** 193:5
**settle** 185:3
**Settlements** 79:14
146:8 158:2
159:17 161:15
**seven** 10:24 12:12
206:9,11
**shame** 178:23
**share** 183:25
**shareholder** 202:21
**shares** 149:1,1,18
151:1,7 154:7
228:2,3,24 229:9

229:22
**sharing** 176:12
240:25
**she'd** 93:4
**she'll** 254:20
**sheet** 104:14
**Sheng** 95:10
**short** 103:4 120:6,7
**shortcut** 185:14
**Shorthand** 259:1
**shortly** 128:17
**show** 56:12 103:1
120:17 251:7,13
251:19
**showed** 9:4 235:19
**shown** 180:11,16
192:16
**shows** 34:5 53:13
54:18 55:14 63:19
63:22 90:11
122:12 127:10
131:11,14 148:7
148:10,13 207:14
208:6,22 210:16
236:14
**sic** 169:20
**sick** 195:9
**side** 19:5 67:6
159:6 225:16
**Sidley** 11:15
**sign** 89:12 99:21
200:7 212:9
238:17 239:21
254:20 255:5,11
255:15 256:14
**signatories** 193:23
194:2
**signatory** 106:19
193:15,19 194:5
212:19
**signature** 28:24
29:13,21,23 89:5
89:8,14 92:9
94:19,23,24 95:16
96:1,17 99:11,13
100:1,6,11 106:12
106:14,17 124:2,3

184:13 190:12,15
190:18,20,23
191:1,3,5,11,13
192:8,11 206:3
212:11,14 216:21
218:11,17,19,20
238:14,17,19
239:22,23 242:11
242:20,21,23
245:24 246:3
251:25 252:5
258:13
**signatures** 246:6
**signed** 20:14,15
60:4 100:2,20
106:21 193:7
208:15 218:21
221:1 241:2
255:12,23 256:6
**signer** 45:18
221:25 222:3,6
251:19
**signify** 66:24 83:2
244:24
**signifying** 37:25
**signing** 99:12
238:18 256:11
**similar** 154:4
**simple** 242:2
**simply** 17:18 62:16
100:19
**Sir** 93:1
**sit** 28:8 101:4
140:14
**situation** 184:19
**six** 10:24 12:12
63:19 73:20 77:1
78:16 206:9,11
**slightest** 75:14
**social** 135:15 180:5
**sold** 161:16
**sole** 191:7,20
193:19 212:19
222:2,6 251:19
**solely** 239:14
**solemnly** 8:7
**Solomon** 77:7 83:2

87:18 150:22
199:8 230:11
**somebody** 38:17,21
42:18 45:18 62:11
70:14 78:7,10
105:10 112:2,2
130:17 172:20
253:24
**sonali@vcorpser...**
87:12
**soon** 24:13 189:17
**sorry** 12:10 15:5,19
25:5 35:16 36:10
36:25 39:12 41:16
44:3 50:18 52:10
54:6,9 55:7 56:24
70:7 79:13 82:2
85:15,16 93:5
98:3 107:24 114:3
116:10,10 120:7
121:5 132:11
135:2 145:14,23
150:4,14 153:24
153:24 158:4
159:8 164:17
180:20 182:13
189:14 196:7,22
206:16 207:16
214:11 215:16
222:11,24 224:7
229:16 237:21
241:14 243:2,16
244:14 247:20
**sort** 11:21 43:10
78:9 195:6 248:4
**sorts** 131:4
**source** 124:10
187:11 234:11
**Sovrin** 128:14
129:7 137:11
145:1,2,3,4,9
166:8 168:1,10,13
168:21 169:2
175:8
**Sovrin's** 145:8
**SPC** 1:4 2:4 3:2,7
**speak** 65:11

**speaking** 201:7
**speaks** 153:10
154:11,18 156:10
**specialist** 7:6
**specific** 39:2 54:13
130:6 158:5
**specifically** 23:1
229:9
**specification** 89:19
**speculating** 199:9
199:10
**speculation** 34:22
35:23 36:9 45:9
69:20 71:8 78:14
85:14,17 99:14
100:24 112:4
117:19 118:12
132:25 142:8
143:12 149:10
150:15 151:3,8,14
151:24 152:10
153:4 167:6
168:14 175:11
176:10 182:2
199:11 231:20,23
232:6,12 235:17
236:3 237:3
240:23 241:12,22
242:13,25 244:8
245:8
**speed** 215:14
**spell** 9:13 21:24
**spent** 173:12
**spoke** 9:18 82:2
116:14 119:5
175:23 179:12,13
196:8,19
**spreadsheet** 23:10
23:17 24:18 32:2
32:10 33:2,8 34:1
35:11 37:24 39:10
39:14 41:9 42:14
43:1,2,10 44:8
46:19,24 47:5
48:15,25 52:3
53:17,20 54:14,20
55:9 56:4,12,19

57:3,5,6 94:10
131:4 141:21
**spreadsheets** 22:9
22:14 23:1,20
24:4,7,23 28:9,12
30:16 32:15,17
38:14 39:2,21,24
40:11,15,25 43:8
**square** 236:11
**ss** 258:1
**stamp** 28:24 29:13
29:21 89:5,9,14
92:9 95:17 120:16
121:10,16 124:2,3
184:14 190:15,18
190:20,23 191:1,3
191:4,5,11,13
192:11 212:11,14
216:21 218:17
238:14,17,19
239:22 242:11,20
242:21,23 243:5,7
243:10 251:25
252:5
**stamped** 190:21
**stamps** 189:2
**Standard** 213:24
**standing** 103:21
156:3 170:22
189:18
**standpoint** 211:14
**start** 26:7 75:17
115:14 158:8,18
159:16 200:10
205:18
**started** 17:22 19:8
22:21 182:14
214:22
**starting** 23:16 30:3
222:21
**starts** 109:12 119:1
**state** 7:20 8:18 60:9
65:8,17 73:4
97:24 98:9,11
104:24 127:21
128:7 188:13,15
189:4,7,17 216:13

258:1
**stated** 33:20
**statement** 104:15
138:1 143:10
144:19 154:7
230:7,8 239:18
**statements** 108:14
248:13,14,18
**states** 1:1 2:1 36:2
59:24 60:4 65:15
89:3 104:25 105:1
105:2,8 147:22
154:16 165:18
206:13 214:2
215:12
**stating** 83:9
**stayed** 27:3
**staying** 173:10
**step** 77:21 152:19
237:21
**steps** 146:22
148:18,20,25
150:9
**Stern** 4:20 71:20
72:17,18,19 73:2
73:24 74:10
**Steve** 103:6 109:15
110:1 125:1,10
127:18 170:2,3
195:23
**Steven** 62:2,3,4,6
143:14 243:4
252:7
**stick-** 234:17
**sticker** 234:15,17
235:6,25 236:10
236:11,11,23
**stipulate** 231:2
**stipulation** 254:14
**stockholder** 228:16
**stocks** 209:1
**STREET** 3:4,9
**strike** 34:21 78:13
118:11 143:11
187:22,25
**string** 103:18
**stuck** 243:23

**stuff** 10:4
**style** 141:11
**subject** 81:21
122:15 125:3
126:19 129:20,24
204:25
**submission** 238:24
241:11
**submit** 242:24
**submitted** 189:4,7
208:11,17 209:13
211:7,16
**submitting** 45:2
**subpoena** 10:19
148:22 177:22
**substance** 244:6,20
244:25 245:6
**substantive** 178:25
**suggest** 121:11
240:16,18
**suggesting** 45:12
234:25
**suggests** 85:3
112:11 162:1
**suite** 3:4,13,17 61:5
87:25 95:7 127:11
209:24 210:12
**Sullivan** 11:18
**summary** 5:16
110:2 146:2
**summer** 179:13
**summertime**
120:24
**Sunday** 172:13
173:13
**supervisor** 182:18
**supposed** 34:19
114:2 149:25
151:18 157:9
179:14 241:13
**sure** 11:2,14 12:24
20:13 22:11 23:9
23:24 24:1 30:12
38:20,22 45:24
58:20 64:13 72:4
83:19 100:13,14
100:17 105:10

120:21 123:24,25
124:6 128:13,14
134:5,6 135:15,17
136:7 145:3,7
147:1 152:21
155:6,12 156:5,23
157:11,16,25
158:22 159:24
160:1,25 164:13
165:7,17 168:24
170:21 176:4,5
179:8 180:22
184:5 194:21
199:7,7 204:6
222:7 236:7 246:2
246:4 256:20
**Swartz** 4:22,24 5:5
5:19 27:24 28:6
48:13,19 50:14,19
51:6,22 53:10,13
53:18,20 54:15,19
56:10 59:19 60:12
60:24 61:3 63:20
65:5 79:20 81:6
81:22 83:14,18,21
84:4,14,21 85:5
87:6,22 88:5,15
88:19 90:11,16
91:2,11,23 92:14
93:14 94:4,8,9,10
94:12,16 95:5,22
96:21,25 97:7,18
97:22 98:8 102:7
102:11 103:15
104:10,22 105:15
106:5,17 107:11
107:21 115:6
116:9 117:1
119:10,12 120:8
120:12 122:15
123:11,15,20
128:25 129:3
131:8 137:5,7,9
148:4,23 151:23
152:7,8 153:8
155:1,7 161:21
162:2,5,24 170:11

171:17,18 177:10
183:22,23 184:1,4
184:9 185:10,12
185:15 186:18
188:20 189:11
191:7,16 192:22
193:12 194:13,19
195:3,4,11,12,13
195:15,17 197:22
199:17,20,22
200:4,8 201:8
202:18,18,21
203:4 204:25
205:12 206:3,7
207:7 209:12
211:8,15 212:7,14
212:16,20 216:25
217:5 219:6
220:22 221:10,12
221:23 222:6
224:1,9 226:17,25
227:3,11 228:15
228:15,16,19,21
228:24 229:25
241:1,3 247:14,22
247:23 248:19,19
249:15 250:17
**swear** 8:5,7
**switch** 163:15
**sworn** 8:13 259:7
**Systems** 128:14
129:8 137:12
145:1,3

---

**T**

**T** 4:8 5:2 6:2
**Taft** 9:20 123:18
**take** 9:25 27:11
31:3 39:9 45:22
54:7 56:18 57:2
57:11 67:18 73:11
73:12 77:21 86:18
92:21 93:24 101:7
101:11 102:2,13
103:16 107:14
108:10 110:4
130:12 138:16,22

139:18 149:3
154:8 159:9
171:22 173:5
174:10 178:6
188:12 203:22,22
211:23 215:22
219:23 228:4
243:17
**taken** 1:17 2:16
46:2 68:20 101:15
172:1 178:12
238:5 253:25
259:5
**talk** 32:15 177:8
181:9 228:20
229:2
**talked** 80:25
103:19 162:14
178:21 179:3,8
180:15
**talking** 19:19,21
21:19 23:23 44:22
68:12 115:3
144:21 148:22
154:25 175:25
194:7 213:1
**talks** 228:12,15,22
228:23,23,25
229:10,18,22,24
**tax** 4:17 59:18,25
60:8,13 80:25
104:17,18,21
126:23 170:24
**taxes** 5:5 79:19
98:15 102:7
126:20 129:21
147:1,5 152:21
155:6,12 157:16
157:25 158:22
159:20,23 160:6
160:16 161:25
162:13 171:13,14
**tech-** 136:3
**technical** 83:3
136:4
**Technologies** 1:9
2:9 111:14 114:18

115:25
**Technology** 128:25
137:5,7,9 162:5
**tell** 8:8 11:25 43:15
66:21 77:10 98:2
100:5 153:20
166:23 176:23
**telling** 171:7
**tells** 104:16 117:5,7
**temporary** 94:6
**ten** 15:14,16,18,22
16:4 139:6 202:1
206:11,12
**ten-year** 15:22
**terms** 183:22 194:1
203:7 212:2 229:5
**testified** 8:14 91:15
139:12 172:7
194:15 246:1
251:24
**testify** 241:5
**testifying** 241:4
**testimony** 16:23
21:12,14 28:8
32:20 100:12
138:17 139:18
141:17 144:15
149:24 153:16
164:18 173:18
177:23 259:10
**Texas** 3:4 4:17 5:5
59:17 60:9,18
61:1,5 65:6 81:6
87:25 97:24 98:9
98:11 102:7
103:15 104:18,24
148:7 162:18,19
188:13,15 189:4,7
189:17
**Thank** 22:3 32:6
46:14 59:12 68:13
71:12 73:19 80:18
89:2 103:11,25
106:24 132:1
145:17 150:24
163:2,10 169:23
170:4 178:5 190:9

192:13 200:18
203:13 206:19
218:23 223:16
225:14 231:13
238:2 242:8
243:13 245:15
250:24 256:1,25
**thanking** 121:20
**Thanks** 76:11
**theater** 199:21
**theaters** 199:19
**theory** 239:12
**thing** 41:2 98:15
103:23 140:9
248:4
**things** 22:24 157:7
157:18 239:10
**think** 11:12,17,18
12:23 13:1,6 15:8
20:12,14 21:14
24:10 26:6,12,13
26:14,15,17,19,22
26:25 27:3 28:16
29:7 32:23 33:5
43:9 45:17 49:3
50:3 53:1 58:19
60:11,13,13,15,17
60:20,21,21 61:24
63:2,3 64:13,13
64:22,23 65:12
68:4,14,19,19,22
72:16 73:25 74:3
74:20,20,22 79:19
80:24 81:1,4,5,7
84:8,8,20 89:10
90:2,3,20 98:25
99:5 100:15,17
103:19,20,22,23
111:4 112:24
113:2,11,12
116:13,16 118:6
120:2,21,23,23
121:8 128:13,13
128:22 132:17
133:18 135:11
136:7 141:10,20
141:20 142:17

143:2,9,21 144:5 144:10 145:2,7,11 145:16 155:14,15 156:3,4 157:5,5 159:22,23 160:18 160:18 161:15 162:7,18 163:8,20 164:12,13,13,14 164:14 165:3,6,17 165:17 168:23,25 169:3,19 170:17 170:22 171:1,5 173:1 174:1,17 175:22,22,23 176:16 177:9 178:1 179:13,16 180:6 182:9 184:2 184:18,24 186:1 188:16,17 189:19 189:24 190:19 193:17 195:5,6 196:23,25 197:16 199:6 200:5,22 202:17 204:19,21 204:21 210:8,11 210:14,14 214:19 215:17 222:4 223:8,11,11,12 226:25 227:13 230:9 232:14,19 235:8 238:19 241:7,10,20 242:9 242:12,15,16,16 242:22 243:1,9 250:21 252:3 253:15,18 254:10
**think-** 118:6
**Thinkfilm** 31:17
**thinking** 118:5,9
**third** 35:6 41:14 53:3 79:6 113:18 114:10 115:3 116:7,22,24 148:1 160:11 218:10
**Thirty** 175:17,18
**Thirty-eight** 48:23
**Thirty-seven** 46:18
**Thirty-two** 226:8
**thoroughly** 239:15
**thought** 27:9 75:22 83:16,17 90:17 91:1,2 117:20 129:9,11 170:24 215:18,24
**thousand** 228:3
**thread** 118:25
**three** 10:7 11:3,9 70:11,22 71:5 77:9 78:5 114:13 115:16,17 180:4 206:1,9 208:16 214:4
**thumb** 53:7
**Thursday** 118:15 147:6
**till** 173:14
**TIM@MCGONI...** 3:19
**time** 7:11 9:18 14:25 15:1 16:18 17:22 18:3 19:14 19:18,22,24 20:7 20:12 21:1 23:13 24:6 25:9,22 26:3 26:17 29:1,7,10 29:20,20 32:24 33:2,25 36:23 43:4,7 44:23 45:12,25 46:4 48:7 49:19 52:6 54:1 55:10 57:23 58:1,4 61:25 65:19 67:9,23 69:7 71:25 72:11 72:12,13,15 75:21 77:18,24 83:18 84:3 86:1,6 89:18 92:22 94:13 98:18 101:13,17 102:13 103:4,17 106:10 109:24 112:24 113:6,11 118:3,5 119:14,17,18,19 120:1,6,7,16,20 121:10,16 122:19 124:15 127:16 128:18 133:9,23 140:5 142:6,11,15 142:20,25 143:16 143:19 159:9 165:20,24 170:19 171:18,24 172:3 173:8,12,13,23 174:13 176:1,12 178:4,10,14 179:8 179:12 180:19,25 181:14,23 182:6 182:21 183:22 191:2,12 194:7 203:22 209:12 213:10,19,24 217:13,15 219:14 238:3,7 243:3,10 243:10,17 244:21 246:25 247:5 252:14 256:15,18 257:3 259:6,6
**times** 57:15 108:11 108:16 110:25 130:8 180:2,4 188:1 195:11 250:1,1
**Timothy** 3:16,17 8:2
**tired** 229:16
**title** 127:7 166:8,12 212:7
**titles** 164:15 166:5
**today** 7:18 10:20 26:1 28:8 40:2 101:4 140:14 177:11 180:16 215:13 235:1
**today's** 7:10,11 10:23 110:3 257:1
**told** 44:9 45:1,19 56:7 183:1 187:7 221:8
**tomorrow** 250:13
**top** 14:11 21:7 24:17 41:14 51:1 86:7 104:1 126:15 131:7 148:4 159:16 179:2 195:7 224:19 225:2 226:25
**Topanga** 209:23 210:7
**total** 51:8 202:24 203:1,10 235:17
**totally** 120:3 234:10
**touch** 211:20 244:1
**track** 25:3 30:11
**tracked** 35:11
**tracking** 24:19
**trained** 25:13
**transaction** 33:14 34:6,8 39:21 246:11,15,21 247:5
**transactions** 38:13 123:15 199:18,19 199:21 213:6 250:23
**transcript** 14:1,5 32:8 254:16,19 255:12,14 259:16
**transcripts** 180:12
**transfer** 48:12 51:5 53:13 54:19 55:14 111:18,23,24 112:7,14 114:10 114:17 117:9,15 117:25 118:7 119:9 125:3 195:24 198:10 214:20 215:7 216:14 251:5,7,10 251:12
**transferred** 51:23 56:11 58:9 59:2 160:18,19
**transfers** 24:19 28:11 50:14 53:10 55:20 56:1 110:3 111:8 118:8 218:7 248:15
**transmitted** 205:15
**traveling** 29:18,22 252:18,25 253:2,4
**Tri-State** 156:18 157:11
**trial** 50:7 174:6
**tried** 41:5
**Tristate** 64:18
**true** 57:15 142:13 142:22 214:18 258:7 259:9,21
**trust** 1:9 2:9 50:15 51:6,9,12,14,18 222:12 250:22
**trustee** 1:9 2:9 11:6
**truth** 8:8,9,10 149:16
**truthful** 86:14
**try** 44:13 64:13 76:8 178:18 249:5
**trying** 24:10 40:19 41:2 85:21 143:21 175:22 182:9 235:10 249:1 250:23
**TT** 1:4 2:4 3:2,7 7:22 88:10
**turn** 14:22 31:20 46:17 53:3 88:13 148:1 185:7,9 186:2,15 188:18 189:1 192:14 194:9 195:19 196:21 198:7 199:16 226:24
**twice** 92:15
**two** 48:11 61:17 67:16 82:9 92:4 100:21,21 101:5,8 150:21,25 165:12 179:16 180:4 183:5 205:18 206:1,8 212:1 227:9,19 228:18 229:13,14 245:20 245:25 247:15 248:2,5,16 249:11

Frymi Biedak
03-25-19

249:24 250:19
252:12
**two-day** 92:15
**two-thirds** 47:10
71:19 188:19
207:18 208:2
**type** 69:13 146:14
148:7 174:19,25
**typed** 89:3
**types** 174:22,23
**typically** 190:20

**U**

**U** 62:5
**Uh-huh** 11:4 14:2
21:18 24:21 39:19
76:13 87:10
125:12 130:1
138:25 145:5
156:15 183:8
187:2 188:7 198:2
198:8,12 201:24
213:4 220:9
**ultimately** 207:9
**unders-** 147:17
**underscore** 88:10
88:11
**understand** 10:18
25:24 27:13 48:4
52:5,13 58:22
73:25 78:7 82:18
83:6 84:6 86:3
101:2 103:24
117:17 118:4
122:19 125:19
137:20 147:10,14
147:18 149:22
150:7,7,11,18
170:18 180:21
216:18 229:17
230:19 238:23
247:19
**understanding**
52:20 64:3 88:22
97:17,22 117:23
144:16 149:7
162:24 169:5

171:17 174:15
**understands**
151:25
**understood** 54:13
65:24 66:6,18
84:3,10 122:18
128:25 136:24
137:1 149:19,23
170:18
**unicorn** 62:5
**UNITED** 1:1 2:1
**Unity** 79:24 163:11
**university** 195:8
**unsigned** 255:21
256:9
**unsure** 129:7
**untrue** 191:23
**unusual** 194:25
**upper** 49:4 59:22
197:3
**urge** 17:14
**urgency** 205:7,9
**use** 31:21 47:16
74:2 75:1,6 139:1
141:10,14 184:13
185:14 190:17,23
191:4 239:22
252:4 255:20
256:9
**usually** 78:8 107:25
132:13 141:14
172:13
**utilized** 76:20
**utilizing** 38:8 81:12

**V**

**vague** 16:1 19:15
20:1 23:13 24:24
26:8 39:23 40:16
54:10 66:11 77:4
77:15 110:7 134:6
137:18 157:20
231:8 247:17
**vaguely** 60:10,11
60:14 74:8 111:4
120:19,25 121:17
144:23 145:7

156:1,1 175:25
**value** 51:8
**various** 80:21 87:1
110:15,16 130:24
136:3 137:24
**VCorp** 72:19 73:5
147:1 152:21
155:6,12 157:16
158:1,23 159:20
159:24 160:6
161:25 188:11
**vendor** 47:20
**versus** 7:17
**vice** 241:2
**video** 7:6
**VIDEOGRAPH...**
3:21 7:4 8:4
45:25 46:3 101:13
101:16 153:23
154:1 171:24
172:2 178:10,13
238:3,6 257:1
**videotaped** 1:16
2:16 7:14
**visit** 9:20,24,25
172:12,22
**visiting** 173:8
**visits** 174:4
**VOL** 4:13,14
**volume** 14:1,5
31:16,22 46:8
**Vong** 169:14 170:1
170:5
**VS** 1:6 2:6

**W**

**W** 3:3
**wait** 15:11 63:21
244:14
**walk** 14:18 150:8
204:3,5 206:17
**Walker** 3:3 4:5
7:21,21 8:17
10:17 13:3,8,21
14:10 16:3,12,19
17:9,14,17 19:20
20:6 21:12,21

22:17 23:15,24
24:2 25:6 26:10
28:5,19 29:4,9
30:23 31:2,12
32:25 34:2,5,9,24
35:1,14,18 36:1
36:12 37:3,11
38:6 40:6,22 42:2
42:9,22 43:6 44:1
45:11,22 46:5,14
46:15 47:23 48:10
49:12,17 50:1
51:4,19,21 52:4
52:11,12,18 54:12
55:2,8,21 56:2,17
57:1,8,20,22 59:6
59:16 61:15 62:7
64:10 65:13 66:16
69:24 70:4,8
71:11,18 75:16
77:11,17,20 78:12
78:15 80:7 85:19
86:5,22,24 89:21
90:24 92:22,24
93:1,3,6,12 98:4
99:2,19 101:3,11
101:19 102:1
105:24 107:4
109:1 110:12,24
112:6,18 116:17
117:21 118:13
122:1,7 123:1
124:21 126:1,12
128:4,11 129:6,17
130:19 132:15
133:2 137:22
138:6 141:2
143:13 144:12
145:13,23 146:1
149:14,17 150:2
150:17,23 151:6
151:11,20 152:2
152:18 153:1,5,13
153:18 154:2,15
154:21 155:2,4,24
156:12 157:23
158:16 162:4,8

163:16,21,23,25
164:2,3,9 167:8
168:17 169:13
171:22 172:4
173:4 174:3,9
175:14 176:11
178:3,6 182:2
192:17 200:17
225:15,19,22
226:2,6,10,14,15
227:5,8 231:5,12
231:14,21 232:1,9
232:15 234:7,12
234:22 235:14,21
235:22 236:6
237:7 238:8
239:19 240:10,13
240:24 241:6,9,15
241:24 242:7,18
243:6 244:2,11
245:3,9 247:21
248:9 250:4,15,24
254:12,23 255:1
255:19,23,25
256:7,8,13,17,20
256:25
**want** 11:1 18:19
21:2,4,16 22:10
26:13 52:17 55:1
68:7 69:5 92:25
93:2 109:7 133:12
134:6 144:8 145:1
152:11 158:8
163:15,19,25
168:23 176:3
180:4 184:21
201:25 203:18
206:13 215:22
232:13,13 235:17
237:6,6,6 239:17
241:5 250:12
254:15,18,21
255:1,4
**wanted** 54:7 103:22
103:23 179:17
**wants** 42:18
**wasn't** 29:24 83:1

85:21 98:15
119:22 146:6
170:24 176:19
182:23 194:25
240:7 245:5
246:23
**Watch** 238:1
**way** 11:23 12:18
15:19,21 16:14
18:24 19:13 20:4
20:5 32:5 36:20
39:6 44:25 45:6,8
47:10 48:1,20
49:5 52:25 58:24
60:20 63:1,11
66:1,14 68:5,25
73:25 74:7,13
78:7 83:6 84:5
91:4,13 97:5,21
99:17,24 100:4
103:23 106:23
108:12 112:22
132:13 137:1,17
139:3,17 141:24
142:19 153:23
168:21 169:6
170:18 172:15
175:12 181:5,8
187:8 188:19
193:25 194:24
200:9 202:22
207:5,18 208:2
209:15 212:23
214:23 219:9
221:7,8 224:4
233:6 240:5 244:9
244:22
**ways** 229:14
**we'll** 31:21 92:21
116:18 206:17
215:19 226:3
231:2 234:12
250:25 255:20
**we're** 101:16
215:17,18 218:18
257:3
**we've** 70:13,23

71:6 80:22 141:6
165:12 177:11
**website** 158:13
**week** 9:3,21,21,24
10:7 172:9,10,11
173:9
**Weichert** 110:20
112:4,16 116:10
117:19 118:11
122:25 125:23
128:2,9 129:4
130:15 132:9,24
137:18 138:2
142:8 213:17
215:19,22 216:1,6
219:3,21 222:20
224:8 225:1,13,23
226:9 227:4 231:2
231:8,11,13,20,23
232:6,12 233:23
234:1,8,18 235:1
235:11,16 236:3
237:3 239:17
240:9,23 241:4,8
241:12,22 242:5
242:13,25 244:8
245:1,8 247:17
248:6 249:25
250:3,9,12 251:2
254:11,13,16,18
255:4,9
**Weichert's** 227:13
**weird** 76:9 99:6
**welcome** 63:12
**Wellner** 123:10
197:7
**Wellner's** 123:2
**Wells** 95:24 108:2
108:3 110:11,14
111:19 192:19
193:13,16,20,24
219:25 220:4,11
220:22,25 221:6
222:3,7 245:18
247:13,23 248:19
249:10 250:18
**Welner** 5:11 122:9

122:18 123:20
197:10,21
**went** 9:20 56:13
58:8 69:16 114:21
175:24 180:10
247:12,15 249:17
**weren't** 246:2
**Weston** 122:20,22
123:4 197:8,15,17
**westoncapital.com**
122:10
**Wh-** 113:20 207:16
**whatsoever** 18:10
191:24
**whichever** 150:25
**Wiechert** 3:12 4:6
7:25,25 19:15,25
21:10,14 22:15
23:12,22 24:24
26:8 28:3 33:25
34:3,7,21 35:13
35:16,22 36:8,24
37:7 39:23 41:24
42:8,15 43:3,17
45:9,24 47:22
48:9 49:10,15,20
50:21 51:25 52:8
52:15 54:24 55:18
55:23 56:16 59:4
64:6 65:10 66:8
69:19 70:3,6 71:8
75:9 77:4,15 78:3
78:13 85:14,17
86:2 89:19 90:21
92:25 93:2,5
97:25 98:25
100:23 143:11
144:4 145:12
149:9,16,21
150:13,15,19
151:3,8,14,24
152:9,24 153:3,10
153:16 154:11,13
154:18 155:20
156:10 157:19
162:2,5 167:6
168:14 175:10

176:10 178:5,8,17
178:19 182:5
185:5 190:8 197:5
200:15,18,19
203:19 207:20,24
209:7 218:1
**Wienskoski** 166:24
**Wil-** 232:20
**WILLIAMS** 5:6
**Wilshire** 179:11
232:21
**Wilson** 134:12,15
166:12
**Wimbledon** 1:4 2:4
3:2,7 7:16 133:23
133:25 134:1,2
141:18 165:5
**wintertime** 120:24
**wire** 48:12 107:10
107:17,20 108:2
110:3 111:8,18,22
111:24 112:7,13
113:19 114:10,13
114:17,21 115:3
115:11,16,23
116:3,8,12,15,22
116:24,24 117:1
118:8 119:6,9
125:3,9,13,20
194:12,19 195:24
196:12 214:3,8,16
214:20,25 215:7
216:14,24 218:7
225:4 248:15
251:5,6,10,12
**wire's** 121:7
**wired** 108:8 223:20
**wires** 108:2 110:11
215:12
**wiring** 117:12
118:2
**wish** 14:4
**withdraw** 196:7
251:20
**witness** 3:15 4:2
8:3,5,11 13:5,7
16:2,8 17:8,16

19:17 20:3 21:18
23:14,25 25:2
28:4 32:23 34:22
35:24 36:10,25
37:8 38:5 39:25
40:19 41:25 42:16
43:5,18,21 49:11
49:16,21 50:25
51:20 52:2,9,17
54:4,6,9 55:1,5
56:24 59:5 62:4
64:8 65:11 66:12
66:14 69:21 70:7
71:9 75:11,14
77:6 78:4 85:16
86:3,23 90:23
98:2 99:16 100:25
110:9,22 112:5,17
116:13 117:20
125:25 128:10
129:5 130:17
132:11 133:1
137:20 138:4
142:10 144:10
149:11,25 150:14
150:20 151:5,10
151:18 152:11,14
152:16 153:11,24
154:12,14,20
155:3,22 156:11
157:21 158:10,12
162:7 167:7
168:16 175:12
178:3 182:3 185:2
186:16 190:7
195:20 196:24
197:1,4 203:18
207:23 211:2
224:25 225:18
226:5 231:3,10,24
232:7,13 233:25
234:2,10 235:18
236:4,5 237:5
240:12 241:13,23
242:6,15 243:1,22
243:25 244:9
245:2 247:19

248:7 250:2,11,14
250:25 254:24
255:5,11,14,24
256:1,11,15,18,23
259:6,17
**witness'** 30:25
32:20
**wonder** 163:17
**wondering** 236:17
**Woodard** 102:6,10
102:17 103:5,12
104:3,9 105:5,12
**Woodward** 60:14
60:17 80:17 81:5
83:20
**Woodward's** 80:16
80:16,18
**word** 118:4
**words** 44:19 94:2
**work** 8:24 16:16
44:17 86:17 113:4
186:10 204:23
**worked** 16:9 19:13
19:17,18 20:4
21:9 72:19 73:2
112:24 119:18,19
119:22 127:15
143:17,19 145:4
182:19,19,22
195:8 197:14
241:19
**working** 7:6 9:5
16:10 17:19,22
19:8,10,22,23
20:8 26:4,7,9
30:25 69:12,14,15
119:13,17 122:20
131:17 134:13
145:9 169:2
182:14 201:16
246:20
**Workz** 135:18
136:1,7
**worth** 203:7,11
208:21 209:1,8
**wouldn't** 16:15
18:4 24:5 28:4

30:15 31:5 36:20
45:8 58:24 66:23
66:23 67:24 70:16
100:4 113:14
123:6,9 130:9
134:19 141:12
175:12 177:3
187:23 193:22,25
201:13 202:22
209:15 212:23
224:4 229:8 240:5
242:19,21 244:9
248:7 251:7
**write** 22:24 23:4
38:19,19 44:11,13
45:19 86:4
**written** 40:2 99:10
**wrong** 120:3
163:16 246:1
**wrote** 40:2 85:7,10
85:22 86:6 171:5

― ― ― ― ―
**X**
**x** 4:8 5:1,2 6:1,2
44:18 78:6 259:16

― ― ― ― ―
**Y**
**Y** 8:20 44:18 78:6
**yeah** 21:6 33:5
43:19 46:18 48:23
69:9 73:18 76:24
79:19 102:23,23
112:9 113:21
148:3 150:3,10
161:13,13,13
163:22 164:1
179:25,25 181:22
181:22 186:3
209:11 216:9
225:7 226:1
227:18 235:16
244:15 254:23
256:8
**year** 17:25 21:3
27:1 60:12,19,22
60:22,23 73:6
103:13 104:16

134:3 147:8,13
150:20
**years** 15:7,14,22
16:4 19:19 24:4
38:17 40:12 43:23
44:5 64:5 112:21
123:14 140:2
175:17,18 204:4
**yellow** 8:21 236:11
**Yesterday** 9:20

― ― ― ― ―
**Z**
**Z** 44:18 78:6
**Zar-** 117:24
**Zarrinkelk** 5:10
58:9,13,16,22
109:13 110:2
111:21 113:17
114:8 115:17,24
116:6 117:8,24
118:14 119:2
120:14 121:6,19
147:20
**Zarrinkelk's**
116:20

― ― ― ― ―
**0**
**000** 88:11
**000534** 148:2
**05-102** 60:5
**07601** 3:10

― ― ― ― ―
**1**
**1** 4:11 6:14 10:13
10:14 14:5,12,15
21:13 126:25
167:9 195:25
196:13,17 207:14
208:6
**1-million-dollar**
117:1
**1,000** 149:1 151:7
**1,100** 228:2 229:9
**1,148.31** 42:6
**1,200,000** 217:6
**1,274,325** 217:2
**1.2** 214:3,8,16,25

215:8
**1/19/2012** 5:5
**1/2/2013** 5:13,14
**1/8** 41:21
**1:19** 215:11
**1:30** 101:18
**10** 4:11,22 63:14
86:17,19,25 87:2
87:5,20 166:16
188:4,5,8 202:2
**10,000** 96:24 97:8
97:15 100:9 101:6
**10:05** 2:19 7:2,11
**10:09** 109:20
213:24
**10:49** 45:25
**10:52** 120:7
**100** 22:11 84:7
111:5 154:7 156:4
176:4 246:6
**1004** 33:14
**101** 5:5
**10100** 2:17 7:12
**10101** 61:4 87:24
**1026** 95:2
**1027** 95:18
**105** 5:6
**107** 5:8
**108** 5:9
**10th** 147:6,12
204:9 209:25
**11** 4:24 41:15,16
42:4 43:23 92:1,3
92:8 93:8,9,13,18
100:22 192:14
**11,000** 33:18
**11,076.93** 34:12
35:10,20 49:14
**11/10/2011** 5:21
**11/17/2011** 5:22,23
**11/2/2011** 4:20
**11/23/2011** 5:24
**11/9/2011** 4:21
**11:05** 46:4
**11:19** 222:25
**11:33** 222:22
**11:50** 82:21

**1100** 149:1,18
151:1
**119** 14:8
**12** 5:5 6:12 50:18
101:21,22 104:2
115:4 116:25
142:14
**12,000** 96:13 98:18
99:7 101:6 125:10
125:14,20
**12.5** 202:18
**12/17/2019** 98:19
**12/2013** 5:15 141:8
**12/22/2011** 6:5
**12/24** 113:25
**12:09** 92:23
**12:11** 169:17
**12:15** 101:13
**12:48** 119:3
**121** 5:10
**122** 5:11
**124** 5:12
**12553** 1:22 2:20
259:1,25
**126** 5:13
**129** 5:14
**13** 4:12 5:6 47:11
47:19 91:7,8,12
105:20,21 166:8
222:22 246:18
**13,000** 59:1
**13th** 2:18
**14** 5:8 6:13 15:9
24:16 106:25
107:1 194:9
223:24
**140** 5:15
**145** 5:16
**14spiskula@capi...**
118:22
**15** 5:9 22:4 108:22
108:23 121:12
166:12 195:19
**154** 209:24
**16** 5:10 64:4 107:8
113:2 121:18,22
142:18,21 194:12

Frymi Biedak

03-25-19

| | | | | |
|---|---|---|---|---|
| **160** 14:9 | **2:15-CV-6633-C...** | 186:5,17 204:9 | 159:16 160:3,12 | 192:1 |
| **164** 5:17 | 1:7 2:7 | 209:25 214:9 | 161:3,21 163:4 | **3** |
| **169** 5:18 | **2:52** 171:24 | 217:4,13 218:3 | 198:25 225:24 | **3** 4:13,14 31:9,14 |
| **17** 5:11 25:7 59:22 | **20** 5:14 19:4 48:11 | 243:15 | 226:4,9,11,12,23 | 32:3,17 39:17 |
| 63:9 64:1 99:1 | 49:8 129:13,14,22 | **2012** 50:19 51:8 | 226:24 227:10 | 46:8 146:25 |
| 113:3 122:3,4,8 | 130:12 144:3,14 | 52:13,21 53:10,18 | 228:1,7,8,20 | 148:16 152:19 |
| 123:19 124:1 | 144:17 159:4,10 | 91:7,9,12 92:1,3,8 | 229:7,19,19,20 | 199:16 223:15 |
| 170:16 196:21 | 160:4,13,23 161:4 | 95:3,19 96:13 | 230:3 231:7 232:4 | **3/13/2012** 6:7 |
| 197:4,6 214:9 | 161:22 162:3 | 103:4 104:3 106:2 | **222** 6:7 | **3/17/2016** 5:18 |
| 216:19 243:14 | 163:5 198:7,9 | 107:8 109:19 | **23** 5:17 96:13 164:5 | **3/2/2012** 6:6 |
| **17/2016** 169:17 | **20,000** 107:11,21 | 117:7 118:15 | 164:6 165:2,9,11 | **3:00** 173:14,15 |
| **172** 6:16 | 194:13 | 119:3 124:22 | 165:14,23 166:1,5 | **3:07** 172:3 |
| **173** 6:17 | **200** 5:19 | 194:12 222:22 | 166:7,16,20,25 | **3:15** 178:10 |
| **174** 6:18 | **200,000** 47:21 48:6 | 246:18 | 167:25 168:9 | **3:17** 178:14 |
| **178,251** 4:6 | **2000** 43:22,22 | **2013** 96:24 97:11 | **23rd** 218:3 | **3:45** 127:19 |
| **17th** 217:4 | 133:15 | 97:13,18,22 98:8 | **24** 5:18 6:16 169:8 | **30** 6:5,15 33:14 |
| **18** 5:12 6:15,17 | **2004** 4:12,13,14 | 100:9 101:6 | 169:10 | 34:5 75:7 126:25 |
| 96:24 97:11,13,18 | 13:25 31:16 46:8 | 126:16,25 127:4 | **2425** 89:24 95:6 | 140:2 218:24,25 |
| 97:22 98:7 100:9 | **2006** 26:13 176:4 | 127:19 142:7 | 127:10 167:13 | 219:8,10 255:17 |
| 124:17,18 | **2007** 22:10 23:16 | **2014** 134:5 | **25** 1:18 2:19 3:9 | 255:24 256:4,12 |
| **18,000** 55:15 58:8 | 23:23 26:14 45:12 | **2015** 18:19 | 5:19 7:1,10 19:19 | 256:14 |
| **186,000** 225:5 | 49:8 63:23 176:7 | **2016** 170:16 171:18 | 143:3 166:20 | **30(e))** 259:19 |
| **1878** 38:8 | **2008** 33:14 34:5,8 | **2019** 1:18 2:19 7:1 | 200:11,12,20 | **30(f)(1))** 259:8,11 |
| **1880** 3:17 | 41:15,16 42:4 | 7:10 15:9 98:22 | 225:24 226:5,7,23 | **31** 4:13 6:6 219:17 |
| **19** 5:13 6:12 19:7 | 43:22 47:11,19 | 99:1 101:1,7 | 227:10 228:9,10 | 219:18 220:2 |
| 103:4 104:3 | 48:11 | 259:22 | 228:18 229:2 | 221:4 245:16,17 |
| 109:19 117:5,7 | **2009** 35:7 36:15 | **2025.320(a))** | **250** 126:24 | **310** 3:18 |
| 118:15 119:3 | 37:6,15 38:8 | 259:14 | **26** 5:21 203:14,15 | **310)828-1515** |
| 126:8,9,14 129:18 | **2010** 11:2 33:3 | **2025.330(a)** 259:7 | 230:2 233:7 237:2 | 210:17 |
| **1995** 19:11,21 | 60:19 63:19 64:5 | **2025.540(a)** 259:8 | 237:4 238:9 | **32** 6:7 222:16,17 |
| 21:10 182:10,18 | 77:24 81:5 103:22 | 259:11 | 243:21 251:22 | 246:8,9,25 |
| **1st** 106:1 182:16 | 146:12 148:11 | **203** 5:21 | 252:8 253:5,22 | **33** 115:8 |
| | 180:13,19,25 | **2093** 259:4 | **27** 5:22 124:22 | **33,000** 55:16 |
| **2** | 181:14 192:1 | **21** 5:15 140:23,24 | 213:11,14,19 | **361-2822** 3:14 |
| **2** 4:12,13 13:17,18 | 199:7 | 141:6,25 165:8,11 | 216:11 243:14,19 | **37** 46:17 |
| 25:23 31:16 48:12 | **2011** 11:2 21:4 | 165:18 168:1,6,8 | 243:25 244:1 | **38** 46:17 48:21,23 |
| 48:19 71:21 72:1 | 59:22 63:14 64:5 | 228:17 | **27136** 3:13 | 143:14 |
| 72:10 73:1 78:20 | 71:21 72:1,10 | **2112** 49:8 | **28** 5:23 6:13 216:2 | |
| 79:21,24 95:2,4 | 73:1 77:24 78:20 | **213** 5:22 | 216:3,7 | **4** |
| 101:17 126:16 | 79:2,8,15,21,25 | **213)618-3036** | **28(a))** 259:4 | **4** 4:14 6:18 21:13 |
| 127:4,19 148:11 | 80:14 81:8,12 | 210:23 | **29** 5:24 6:14 146:12 | 46:7,11 48:22 |
| 148:25 150:9 | 82:11 83:8 84:23 | **216** 5:23 | 217:22 218:2 | 199:17 209:14 |
| 154:6 199:24 | 85:5,10,23 86:7 | **217** 5:24 | 244:12,13 | **4,960** 95:19 |
| 200:2 202:25 | 87:9 89:23 93:17 | **218** 6:5 | **29,000** 50:20 | **4/1/2012** 5:7 |
| 203:5 216:22 | 94:3 102:8,16 | **219** 6:6 | **29th** 259:22 | **4/16/2012** 5:8 |
| **2,201.80** 37:18 38:9 | 103:23 104:16 | **22** 5:16 95:19 | **2nd** 50:19 52:13,21 | **4/19/2012** 5:9,10 |
| **2:15-CV-6633** 7:15 | 142:7 181:23 | 145:19,20 157:8 | 53:10,18 186:5 | |

**4/26/2012** 5:11
**4/27/2012** 5:12
**4:00** 215:24
**4:37** 238:3
**4:42** 238:7
**4:46** 104:4
**4:56** 204:9
**40** 112:21 141:24
  199:19
**4120** 3:4
**44** 29:25 30:1
**450,000-dollar**
  112:7,13
**46** 4:14 14:12 31:24
  32:2,7,17
**469** 3:5
**47** 32:4
**478-7110** 3:18
**479** 195:21
**48** 14:12,15,22 19:2
  21:5 22:4 24:16
  25:7 29:25 35:2
  39:15
**480** 113:21
**481** 109:6
**483** 114:17 115:20
**484** 114:23 116:2
**49** 4:16
**499** 88:12

**5**
**5** 4:16 14:22 49:23
  50:3,13 147:23,24
  202:25 203:5,8,11
  207:14,16 208:6
  208:22
**5:04** 257:3,6
**5:24** 76:11
**5:40** 76:10
**50** 50:11 111:5
**50,000** 51:5,23
  53:14 56:11
**500,000** 111:10
**501** 88:13 91:6
**504** 88:25
**507** 189:10
**508** 189:1,3 190:2,5

**51** 31:24 32:3,7,17
  35:2 39:15 41:11
  41:11
**515** 61:5 87:25
**516** 3:17
**518** 90:4,6 91:20
**557-9391** 3:5
**59** 4:17

**6**
**6** 4:17 59:10,13,17
  61:3
**6,000** 93:22 94:3
**6:45** 102:16
**61** 4:18
**6433** 209:23 210:6

**7**
**7** 4:18 61:11,12,16
  62:22 64:25 70:13
  70:23 71:7 185:7
  185:17
**7/22/2011** 4:17
**71** 4:20
**7307** 224:20,22
**75202** 3:4

**8**
**8** 4:20 19:2 35:7
  36:15 37:6,15
  38:8 71:14,15,20
  77:2 80:14 81:11
  82:11 186:2,17
**8,225** 4:5
**8/11** 141:8
**8/2011** 5:15
**80** 4:21 208:25
**86** 4:22
**87.5** 202:4 229:25
**89** 182:12,13
**8th** 102:8,16

**9**
**9** 4:21 21:5 25:7
  30:3,4 80:3,4 83:8
  84:23 85:5,10,23
  86:7 87:9 93:17

**94:3** 186:15 197:1
  197:2
**9:00** 173:14,15
**9:30** 186:17
**9:39** 82:11
**90067** 3:18
**901** 3:4
**92675** 3:13
**93** 4:24
**949** 3:14
**95** 20:5 182:14,16