LAW OFFICE OF DAVID W. WIECHERT
DAVID W. WIECHERT (Cal. Bar No. 94607)
JAHNAVI GOLDSTEIN (Cal. Bar No. 245084)
WILLIAM J. MIGLER (Cal. Bar No. 318518)
27136 Paseo Espada, Suite B1123
San Juan Capistrano, California 92675
Telephone: (949) 361-2822
Facsimile: (949) 361-5722
Email: dwiechert@aol.com
Email: jahnavi@davidwiechertlaw.com
Email: william@davidwiechertlaw.com

Attorneys for Defendants
Kiarash Jam and Integrated Administration, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

THE WIMBLEDON FUND, SPC (CLASS TT),

Plaintiff,

v.

GRAYBOX, LLC; INTEGRATED ADMINISTRATION; EUGENE SCHER, AS TRUSTEE OF BERGSTEIN TRUST; CASCADE TECHNOLOGIES CORP., and THE LAW OFFICES OF HENRY N. JANNOL,

Defendants.

---

THE WIMBLEDON FUND, SPC (CLASS TT),

Plaintiff,

v.

C.D. Cal. Consolidated Case No. 2:15-cv-6633-CAS-AJWx
Honorable Christina A. Snyder

**DEFENDANT KIARASH JAM'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF KIARASH JAM; DECLARATION OF DAVID WIECHERT**

Filed concurrently with:
Proposed Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment

Hearing Date: May 13, 2019
Time: 10:00 a.m.
Courtroom: 8D

DAVID BERGSTEIN; JEROME SWARTZ; AARON GRUNFELD; and KIARASH JAM.,

Defendants.

AND CONSOLIDATED ACTIONS AND RELATED THIRD-PARTY ACTIONS.

PLEASE TAKE NOTICE that on May 13, 2019 at 10:00 a.m. in Courtroom 8D of the above-captioned Court located at 350 West First Street, Los Angeles, California 90012, Defendant Kiarash Jam ("Jam" or "Defendant") will, and hereby does, move the Court pursuant to Federal Rule of Civil Procedure 56 for an order granting him summary judgment on the Plaintiff's singular claim that he is the alter-ego of Advisory IP Services, Inc. f/k/a Swartz IP Services, Group, Inc. ("SIP") and thus personally liable for its obligations to Plaintiff.

This motion is made following the conference of counsel pursuant to C.D. Cal. Local Rule 7-3, which occurred on April 2, 2019 via a telephone call.

Defendant makes the instant motion on three independent grounds: (1) that there is no genuine dispute of material fact that he was never a shareholder of SIP, and thus as a matter of Texas law, he cannot be SIP's alter-ego; (2) that there is no genuine dispute of material fact that Defendant's involvement with SIP does not rise to the level of being SIP's alter-ego under Texas law; and (3) that, even assuming, aruendo that Defendant is SIP's alter-ego, Plaintiff has already settled with SIP and, under Texas law, has released Defendant by virtue of Plaintiff's settlement with SIP.

This motion is based on this notice of motion, the attached memorandum of points and authorities, the Proposed Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment filed concurrently, the Declarations of Defendant and David Wiechert, all pleadings, files, and records in this action, and on any

further argument and evidence as may be presented to the Court at or before the date of the hearing on this motion.

Respectfully submitted,

Dated: April 10, 2019

LAW OFFICE OF DAVID W. WIECHERT

By: _/s/ David W. Wiechert_

David W. Wiechert
Jahnavi Goldstein
William J. Migler
Attorneys for Defendants
Kiarash Jam and Integrated Administration, Inc.

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................ 1

II. STATEMENT OF UNDISPUTED FACT ........................................ 3

III. LEGAL ARGUMENT ..................................................... 6

A. Motion for Summary Judgment Standard ................................... 6

B. Texas Law Governs Wimbledon's Alter-Ego Claims against Jam ............. 7

C. Wimbledon's Claim that Jam is SIP's Alter-ego Fails as a Matter of Law Because Jam was Never a Shareholder in SIP. ........................... 7

D. Alternatively, There Is No Genuine Dispute that Jam Did Not Control and Dominate SIP – Rather, all Indications Point to Bergstein Being SIP's Sole Alter-ego. ............................................. 9

E. Alternatively, Even if, Arguendo, Jam Is SIP's Alter-ego, Wimbledon's Claims against Jam Have Been Settled by Virtue of Wimbledon's Settlement With and Release of SIP via the Settlement Agreement. ............................................................ 11

IV. CONCLUSION ......................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*Amoco Chem. Co. v. Tex Tin Corp.*, 925 F. Supp. 1192 (S.D. Tex. 1996)..........................7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)......................................................6

*Assessment Appeals Services, LLC v. Corolla Centers, Inc.*, No. B169461, 2005 WL 249392 (Cal. Ct. App. Feb. 3, 2005) ..................................................................9

*Bollore S.A. v. Import Warehouse, Inc.*, 448 F.3d 317 (5th Cir. 2006)...........................7, 8

*Castleberry v. Branscum*, 721 S.W.2d 270 (Tex. 1986)....................................................8

*Dassault Falcon Jet Corp. v. Oberflex, Inc.*, 909 F. Supp. 345 (M.D.N.C. 1995)........................................................................................................11

*Endsley Elec., Inc. v. Altech, Inc.*, 378 S.W.3d 15 (Tex. App. – Texarkana 2012)..........................................................................................7, 9

*Ferens v. John Deere Co.*, 494 U.S. 516 (1990) ..............................................................7

*Firstmark Capital Corp. v. Hempel Financial Corp.*, 859 F.2d 92 (9th Cir. 1988) ..................................................................................................................9

*Krainz v. Kodiak Resources, Inc.*, 436 S.W.3d 325 (Tex. App. – Austin 2013) .................8

*Lewis v. Exxon Co., USA*, 786 S.W.2d 724 (Tex. App. – El Paso 1989) ..........................12

*Lisanti v. Dixon*, 147 S.W.3d 638 (Tex. App. – Dallas 2004)............................................9

*Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226 (Tex. 1990) ................................................9

*McMillen v. Klingensmith*, 467 S. W.2d 193 (Tex. 1971)...............................................12

*Nichols v. Tseng Hsiang Lin*, 282 S.W.3d 743 (Tex. App. – Dallas 2009).......................10

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099 (9th Cir. 2000) ..................................................................................................................6

*Peliculas Y Videos Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d 1131 (C.D. Cal. 2004) .................................................6

*Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635 (5th Cir. 1991) ..................................................................................................................8

*Ravelo Monegro v. Rosa*, 211 F.3d 509, 513 n. 3 (9th Cir. 2000) ....................................... 7

*Richard Nugent and CAO, Inc. v. Estate of Ellickson*, 543 S.W.3d 243 (Tex. App. – Houston 2018) ....................................... 12

*Riddle v. Leuschner*, 51 Cal. 2d 574 (1959) ....................................... 9

*Ruiz v. Conoco, Inc.*, 868 S.W.2d 752 (Tex. 1993) ....................................... 12

*Schlumberger Logelco Inc. v. Morgan Equipment Co.*, No. C-94-1776 MHP, 1996 WL 251951 (N.D. Cal. May 3, 1996) ....................................... 11

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626 (9th Cir. 1987) ....................................... 6

*Van Dusen v. Barrack*, 376 U.S. 612 (1964) ....................................... 7

*Wehlage v. EmpRes Healthcare Inc.*, 821 F. Supp. 2d 1122 (N.D. Cal. 2011) ....................................... 11

**Statutes**

28 U.S.C § 1404(a) ....................................... 7

Federal Rule of Civil Procedure 56 ....................................... 6

**Other Authorities**

Restatement (Second) of Conflict of Laws §§ 307 (1971) ....................................... 7

https://en.wikipedia.org/wiki/Kia_Jam ....................................... 11

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

Defendant Kiarash Jam ("Jam") simply should not be a party to this matter. Plaintiff The Wimbledon Fund, SPC (Class TT)'s ("Wimbledon") alter-ego allegations against Jam fail both factually and as a matter of law. The only alter-ego of Advisory Services, Inc. f/k/a Swartz IP Services Group, Inc. ("SIP"), if there ever was one, is prior co-defendant, SIP creator, SIP shareholder, sole director, president and secretary, deal and settlement negotiator, and singular SIP bank account signatory – David Bergstein ("Bergstein"). Furthermore, under the applicable law, any alter-ego of SIP has effectively been released by nature of Wimbledon's November 2017 "Confidential Compromise Settlement and Release Agreement" (the "Settlement Agreement") with SIP.

Jam is embroiled in this matter because of his unfortunate naivety and loyalty to Bergstein, whom he became acquainted with through their mutual involvement in the film industry. Despite Bergstein's negative publicity mainly relating to contentious bankruptcy actions, Jam believed Bergstein to be an astute and reputable businessman, as Jam had first-hand seen Bergstein persevere against his critics and litigation adversaries (in fact Bergstein prevailed in his bankruptcy lawsuits and negotiated the approximately $660 million sale of Miramax, which greatly impressed Jam). Between 2010 and 2014 Jam was drawn into many of Bergstein's business dealings, including related to SIP, wherein Jam relied on Bergstein, and Bergstein's many professional contacts and attorneys.

In December 2010 Bergstein caused the creation of SIP, a Texas corporation. In fall of 2011 Bergstein solely negotiated on behalf of SIP with Wimbledon's representatives in connection with Wimbledon's transfer of over $17,000,000 to SIP. Bergstein was the sole signatory on SIP's three bank accounts and controlled the inflow and outflow of Wimbledon's funds from these accounts. Wimbledon's investment into SIP was made pursuant to a November 2011 Note Purchase Agreement ("NPA") and accompanying Reference Notes, both of which were executed by Jam on SIP's behalf as its Vice President. Jam's signatures on the SIP NPA and Reference Notes were made at

the instruction of Bergstein. Jam routinely received instructions from Bergstein and/or Bergstein's assistant Frymi Biedak (Biedak). Jam's role as signatory of the NPA and accompanying Reference Notes had no import to Wimbledon. Jam did not read or understand what he was signing but signed based on his reliance and trust in Bergstein, in Bergstein's many attorneys vetting Bergstein's deals, and in the agents of Weston Capital Asset Management, LLC ("Weston"), who also frequently requested Jam's signature. Jam had no ownership or control of SIP whatsoever and pursuant to SIP's corporate and filed records, Jam was never formally identified as Vice President or any other officer of SIP.

In 2013 Wimbledon obtained a default New York state judgment against SIP for the amounts transferred to SIP plus interest. Thereafter Wimbledon commenced a federal diversity action in Texas against Jam, Bergstein and others seeking individual responsibility. In November 2017 Bergstein unilaterally negotiated a settlement with Wimbledon on behalf of SIP, himself and others. The Settlement Agreement provided three installment payments totaling $9 million to Wimbledon, with the last one being a payment of $2 million to Wimbledon by November 16, 2018. If this payment was not made, Wimbledon's remedy would have been a consent judgment against Bergstein created under the Settlement Agreement. SIP and individual defendants, not including Jam, were released after the first two payments were made. The November 16, 2018 date came and went without the third and final payment from SIP.

Instead of seeking to collect on the already provided-for consent judgment against Bergstein, Wimbledon has now pointed its litigation crosshairs at Jam. Wimbledon seeks from Jam all of SIP's alleged remaining obligations owing to Wimbledon, allegedly totaling upward of $23 million with a credit for the approximately $7 million already paid under the Settlement Agreement based on the theory that Jam was the alter-ego of SIP. Whether at ground level or at 30,000 feet this assertion does not pass muster. As discussed in-depth herein, Jam had no ownership or control of SIP, its deals, or bank accounts. And fatal to Wimbledon's claim that Jam is SIP's alter-ego is the undisputable fact that Jam was never a shareholder of SIP – a prerequisite to any finding of him being SIP's alter-

ego under Texas law. Moreover, even assuming, arguendo, that Jam was somehow an alter-ego of SIP, Wimbledon has already settled its claims against Jam by virtue of its settlement and release of SIP, which, under the controlling law of Texas, also releases any alter-ego thereof. Thus, even if Wimbledon wins its alter ego claim, it loses. Summary judgment in favor of Defendant Jam is warranted here.

## II. STATEMENT OF UNDISPUTED FACT

SIP's Certificate of Formation was filed with the Texas Secretary of State's Office on December 2, 2010. Undisputed Fact ("UF") No. 1. While the certificate listed Bergstein's attorney Aaron Grunfeld as SIP's director, filed concurrently with the certificate was SIP's bylaws and "Resolutions Adopted by Sole Director," which listed Bergstein as SIP's sole director and named him President and Secretary of SIP. UF No. 2. SIP's stated address was 10101 Fondren Road, Suite 515, Houston, Texas 77096. UF No. 3. SIP's name was formally changed to "Advisory IP Services, Inc." on June 13, 2012. UF No. 4. SIP had two bank accounts with Deutsche Bank and one account with Wells Fargo Bank, all of which listed Bergstein as the sole signatory. UF No. 5. SIP's responsible party for tax purposes filed with the IRS was Graybox, LLC ("Graybox"), another entity wholly owned and controlled by Bergstein. UF No. 6.

87.5% of SIP's outstanding shares were held by Owari Opus, Inc. ("Owari"). UF No. 7. Owari was 100% owned and controlled by Bergstein. UF No. 8. The remaining 12.5% of SIP shares were intended to be held by Jerome Swartz, an individual. UF No. 9. Jam never owned shares in SIP, and no SIP share certificate bearing Jam's name was ever issued to or received by Jam. UF No. 10.

In and around November 2011, Bergstein negotiated with representatives of Weston Wimbledon's investment of $17.7 million into SIP, on the promise that SIP's management of the money would produce a similar return to what Wimbledon would have experienced if its funds were left in the Tewksbury Fund – a highly regarded investment fund in which Wimbledon's investor clients believed their investments would be held. UF No. 11. Bergstein solely negotiated this deal on SIP's behalf. UF No. 12.

Wimbledon's investment into SIP was memorialized in the NPA and Reference Notes, which Jam executed on behalf of SIP as "Vice President." UF No. 13. Jam also executed a Side Letter on SIP's behalf (but not as Vice President), representing that at least $5 million of Wimbledon's investment would remain in SIP's Deutsche Bank account, however this Side Letter was never fully executed or relied upon by Wimbledon. UF No. 14. Bergstein directed Jam to execute these documents on SIP's behalf, and Jam did so as he was accustomed to signing documents for Bergstein, whom he trusted, and which he understood numerous attorneys had vetted. UF No. 15. Jam did not read the lengthy NPA, Reference Notes, or Side Letter before signing them; he returned executed copies of a revised set eleven minutes after receiving Bergstein's email directing Jam to execute the documents. UF No. 16. Bergstein routinely controlled Jam in transactions in which both were involved. UF No. 17.

Wimbledon did not rely on Jam's signature on the Side Letter, which was never fully executed by Weston's agent Keith Wellner, nor on Jam's signatures on the NPA or the Notes – indeed, Wimbledon has admitted that it had no oral communications with Jam and Jam never made any misrepresentations to Wimbledon. UF No. 18. Wimbledon would have accepted the NPA and Reference Notes regardless of who signed them on behalf of SIP. UF No. 19.

Wimbledon's investment totaling over $17,000,000 was transferred in two tranches into a SIP Deutsche Bank account, which, like all the SIP bank accounts, was opened and singularly controlled by Bergstein. UF No. 20. Bergstein solely determined the trajectory of SIP's funds, with Jam having no control over SIP's use or transferring of its funds. UF No. 21.

On February 8, 2013 Wimbledon filed in New York state court a complaint against SIP for breach of the NPA due to SIP's alleged misuse of Wimbledon's monies. UF No. 22. Bergstein asked Jam to sign an affidavit re service of the complaint as a Vice President of SIP. UF No. 23. On November 24, 2015, the New York court entered judgment in Wimbledon's favor for $23,051,971.31. UF No. 24. On July 30, 2015,

Wimbledon filed the instant alter-ego claims against, *inter alia*, Bergstein and Jam in United States District Court for the Southern District of Texas. UF No. 25. On April 4, 2016 this case was transferred to this Court and it was subsequently consolidated into Case No. 2:15-cv-6633-CAS. UF No. 26.

In 2017, Bergstein and Wimbledon began settlement negotiations. UF No. 27. Bergstein, through his counsel, negotiated on behalf of himself, Graybox (to which he was its sole member), and SIP. UF No. 28. On November 16, 2017, Bergstein, SIP, Graybox, and Wimbledon executed the Settlement Agreement which purported to settle Wimbledon's claims against Bergstein, SIP and Graybox in exchange for $9,412,000. UF No. 29. Bergstein executed the Settlement Agreement on SIP's behalf. UF No. 30.

The $9,412,000 payment to Wimbledon was to be made in three installments: (1) Graybox was to make an initial $2,412,000 payment on the date the Settlement Agreement was executed; (2) SIP was to pay $5 million within 30 days of the Settlement Agreement's execution; and (3) SIP was to pay an additional $2 million within twelve months of the Settlement's execution. UF No. 31. The third installment payment SIP was to make was secured by a consent judgment against Bergstein and in favor of Wimbledon. UF No. 32.

The Settlement Agreement provided that if the first two installments were paid, Wimbledon would release Bergstein, Graybox, and SIP, along with all other parties to the instant lawsuit except for Jam and Integrated Administration. UF No. 33. Jam and Integrated Administration would be released only if the third installment (SIP's additional payment of $2 million) was paid. UF No. 34. Graybox made the first installment payment, and SIP, using Bergstein's personal funds and assets (and assets from entities he controlled), made the second installment payment. UF No. 35. Accordingly, Wimbledon released Bergstein, Graybox, SIP, and all other parties except Jam and Integrated Administration. UF No. 36. SIP's final $2 million installment payment was never made. UF No. 37.

Even though Wimbledon had an active complaint alleging Jam was the alter ego of

SIP, it did not invite Jam to the negotiations of the Settlement Agreement and indeed Jam was in no way involved in the negotiations which culminated in the Settlement Agreement's execution. UF No. 38. Jam did not learn about the Settlement Agreement's existence or terms until the Settlement Agreement was presented as evidence in Bergstein's criminal trial in February 2018. UF No. 39. Due to his pending appeal in that case, Bergstein is unavailable as a witness here. UF No. 40.

## III. LEGAL ARGUMENT

### A. Motion for Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) permits "[a] party [to] move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." A motion for summary judgment should be granted if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The moving party without the burden of persuasion "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets this initial burden, the nonmoving party must identify "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). However, "the mere existence of a scintilla of evidence supporting the non-moving party's position" will not defeat a motion for summary judgment. *Peliculas Y Videos Internacionales, S.A.*, 302 F. Supp. 2d 1131, 1133-34 (C.D. Cal. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The non-moving party must produce evidence or point to specific facts upon which a jury could reasonably find for them. *Anderson*, 477 U.S. at 252.

Since Wimbledon bears the burden of persuasion of showing that Jam is SIP's alter-ego, all Jam must show to be entitled to summary judgment is that Wimbledon

cannot establish an element of its alter-ego claim, or that its alter-ego claim was extinguished with the full release of SIP pursuant to the Settlement Agreement.

**B. Texas Law Governs Wimbledon's Alter-Ego Claims against Jam**

As a preliminary matter, Wimbledon's claims against Jam present a choice-of-law issue that should be decided in favor of Texas law pursuant to the doctrine set forth in *Van Dusen v. Barrack*, 376 U.S. 612 (1964) and reiterated in *Ferens v. John Deere Co.*, 494 U.S. 516 (1990). Under these cases, the substantive laws of the forum state where a federal diversity suit was originally filed will still govern after the case is transferred under 28 U.S.C § 1404(a) since a § 1404(a) venue transfer results only in "a change of courtrooms," and not a change of law. *Ferens*, 494 U.S. at 531; *Van Dusen*, 376 U.S. at 637; *Ravelo Monegro v. Rosa*, 211 F.3d 509, 513 n. 3 (9th Cir. 2000). Here, Wimbledon first filed its complaint against Jam in United States District Court for the Southern District of Texas on July 30, 2015; the case was transferred, pursuant to 28 U.S.C. § 1404(a), to this Court on April 4, 2016. *See* Case No. 2:16-cv-02287-CAS-SS, Dkt. Nos. 1, 64-65. Because this case was originally filed in a Texas-based district court, Texas substantive law is to govern.

Moreover, even if *Van Dusen* and *Ferens* were inapplicable, Texas law would still govern Wimbledon's alter-ego claims given that SIP is a Texas corporation and the law of the state of incorporation governs alter-ego claims. *See Amoco Chem. Co. v. Tex Tin Corp.*, 925 F. Supp. 1192, 1201 (S.D. Tex. 1996) *citing* Restatement (Second) of Conflict of Laws §§ 307, 309 (1971) ("The Court looks to the law of the State of incorporation for each corporate defendant to determine whether its corporate entity should be disregarded.") (brackets omitted).

Therefore, Texas law governs Wimbledon's claims against Jam.

**C. Wimbledon's Claim that Jam is SIP's Alter-ego Fails as a Matter of Law Because Jam was Never a Shareholder in SIP.**

Under Texas law, a claim of alter-ego requires "[1] a unity between the corporation and the individual to the extent that the corporation's separateness has ceased, and [2]

holding only the corporation liable would be unjust." *Endsley Elec., Inc. v. Altech, Inc.*, 378 S.W.3d 15, 23 (Tex. App. – Texarkana 2012). Critically, Texas law requires the purported alter-ego of a corporation be a shareholder of that corporation. *See Bollore S.A. v. Import Warehouse, Inc.*, 448 F.3d 317, 325 (5th Cir. 2006) ("The great weight of Texas precedent indicates that, for the alter ego doctrine to apply against an individual under this test, the individual must own stock in the corporation."); *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643 (5th Cir. 1991) ("Texas courts will not apply the alter ego doctrine to directly or reversely pierce the corporate veil unless one of the 'alter egos' owns stock in the other."); *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986) (stating that to be considered a corporation's alter-ego, an individual must have "ownership and control" over the corporation).

Here, Jam was never a shareholder in SIP. At its inception, SIP stock was held, or was intended to be held, by two entities/persons: Owari, which owned 87.5%, and Jerome Swartz, who was to own 12.5%. UF Nos. 7, 8, 9. Bergstein was the sole owner of Owari. UF No. 8. Furthermore, Jam was never issued and never possessed a stock certificate indicating ownership in SIP. UF No. 10. While possession of a stock certificate is not necessarily required in order to be considered a shareholder, see *Krainz v. Kodiak Resources, Inc.*, 436 S.W.3d 325, 331 (Tex. App. – Austin 2013), there is no evidence showing that Jam ever became a shareholder of SIP.

Because he was never a shareholder of SIP, as a matter of Texas law, Jam cannot be SIP's alter-ego. *See Bollore S.A.*, 448 F.3d at 325-26 (vacating order piercing the corporate veil on an alter-ego theory because no evidence was shown that the purported alter-egos owned shares in corporation). Thus, because Wimbledon will be unable to establish the necessary "ownership and control" element of its alter-ego claim against

Jam, Jam is entitled to summary judgment on this claim.[1]

**D. Alternatively, There Is No Genuine Dispute that Jam Did Not Control and Dominate SIP – Rather, all Indications Point to Bergstein Being SIP's Sole Alter-ego.**

Alternatively, Jam is entitled to summary judgment given that there is no genuine dispute as to the material fact that Jam did not sufficiently dominate or control SIP in order to be deemed its alter-ego. Indeed, assuming arguendo that SIP had an alter-ego, all the evidence points to Bergstein being SIP's sole alter-ego.

As noted above, the two elements of an alter-ego claim under Texas law are "[1] a unity between the corporation and the individual to the extent that the corporation's separateness has ceased, and [2] holding only the corporation liable would be unjust." *Endsley Elec., Inc.*, 378 S.W.3d at 23. As to the first element, the factors Texas courts weigh in determining whether there is an inextricable unity between the individual and the corporation are "the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes." *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 229 (Tex. 1990). In other words, Texas courts look to see whether an individual "owns or controls the corporate entity and operates the company in a manner indistinguishable from his personal affairs and in a manner calculated to mislead those dealing with him to their detriment." *Lisanti v. Dixon*, 147 S.W.3d 638, 644 (Tex. App. – Dallas 2004).

---

[1] The same conclusion is reached even if the Court determines that California law governs the alter-ego claim. Like Texas, California law also requires any purported alter-ego of a corporation be a shareholder of that corporation. *See Firstmark Capital Corp. v. Hempel Financial Corp.*, 859 F.2d 92, 94 (9th Cir. 1988) *citing Riddle v. Leuschner*, 51 Cal. 2d 574, 580 (1959) ("Ownership of an interest in the corporation is an essential part of the element of unity of ownership and interest. If an individual's ownership is not established, the corporation's obligations cannot be imposed on him or her."); *Assessment Appeals Services, LLC v. Corolla Centers, Inc.*, No. B169461, 2005 WL 249392, at *5 (Cal. Ct. App. Feb. 3, 2005) ("Lorda was not a shareholder of Corolla, and no evidence was presented on which he could be held responsible under any alter ego theory.").

Bergstein, not Jam, certainly controlled SIP given that he formed SIP, was named its sole director, President, and secretary, and that one of his wholly-owned entities, Owari, was the majority shareholder of SIP. UF Nos. 1, 2, 7, 8. Bergstein's wholly owned entity, Graybox, was also the responsible party for tax purposes for SIP. UF No. 6. Moreover, it is incontrovertible that Bergstein solely negotiated, on SIP's behalf, Wimbledon's investment into SIP and solely controlled SIP's Deutsche Bank and Wells Fargo Bank accounts to which Wimbledon's $17.7 million was transferred. UF Nos. 5, 11, 12, 20, 21. As the unilateral wielder of the deposits in SIP's bank account, Bergstein dictated SIP's transfers of monies received from Wimbledon. UF Nos. 5, 20, 21. Lastly, Bergstein solely negotiated SIP's settlement from the instant lawsuit, and gathered the assets used to make SIP's second installment payment. UF Nos. 27, 28, 29, 30, 35. Moreover, the Settlement Agreement provided Wimbledon a consent judgment against Bergstein personally to secure SIP's last installment payment. UF No. 32.

Bergstein exclusively held SIP in a vise grip and his fingerprints were on every facet of SIP's operation. This stands in stark contrast to Jam's meager involvement with SIP, which was limited to executing the NPA and Reference Notes as SIP's Vice President[2] and the Side Letter addressed to Weston (not as Vice President), which Wimbledon did not rely upon. UF Nos. 13, 14, 16, 18. In fact, Wimbledon did not rely on Jam's role in the execution of the NPA and Reference Notes at all. UF No. 18. If Wimbledon had done any diligence on Jam, they would have learned that he was a movie producer with a string of movies, most of which had lost money, *see*

[2] While Jam signed the NPA and Reference Notes as SIP's Vice President, these are the only documents titling Jam as such. No other official corporate documents list him as Vice President or any other officer position. All other documents indicate that Bergstein was the sole officer of SIP, further indicating that Jam never was truly involved in SIP and was only tangentially related to it at the behest of Bergstein. Furthermore, even if, arguendo, Jam was formally SIP's Vice President, that fact in and of itself is in no way determinative of whether Jam was SIP's alter-ego. *See Nichols v. Tseng Hsiang Lin*, 282 S.W.3d 743, 747 (Tex. App. – Dallas 2009) ("An individual's standing as an officer, director, or majority shareholder of an entity alone is insufficient to support a finding of alter ego.").

https://en.wikipedia.org/wiki/Kia_Jam (last accessed April 10, 2019), hardly the qualifications of a multi-million or billion dollar fund manager who one would transfer all one's assets to from Tewksbury, one of the most successful conservative money managers in the world. Even if Wimbledon had reasonably relied on any action of Jam's, Jam's actions were done at the behest of Bergstein UF No. 15, 17, 23. Moreover, as noted above, Jam was not SIP's shareholder, was not a signatory on SIP's bank accounts, and there is no evidence that Jam ever directed money transfers from SIP's accounts. UF Nos. 5, 10, 20, 21. Jam had no other involvement in the operative facts underlying Wimbledon's claims against SIP. Every other SIP action was done solely by Bergstein. Simply put, Jam was a bit player in a show starring, directed by, and produced by Bergstein.

There is no evidence showing that Jam "dominated and controlled" SIP to the point where there was an inextricable "unity" between Jam and SIP making Jam SIP's alter-ego. Jam is thus entitled to summary judgment on this claim.

**E. Alternatively, Even if, Arguendo, Jam Is SIP's Alter-ego, Wimbledon's Claims against Jam Have Been Settled by Virtue of Wimbledon's Settlement With and Release of SIP via the Settlement Agreement.**

Should the Court find that Jam is SIP's alter-ego (or that there is a dispute of fact on the issue), the Court should nevertheless find that Jam is entitled to summary judgment given that Wimbledon has already settled its claims against SIP via the Settlement Agreement[3] and thus, by extension, settled its claims against Jam.

[3] The Settlement Agreement does contain a choice of law provision providing that California law is to govern "all claims arising out of or related to [the Settlement Agreement], whether sounding in tort, statute, or otherwise . . ." Exhibit X to Wiechert Decl. at p. 12 ¶ (D)(2)(a). This provision does not govern Jam's assertion that Wimbledon's claims against him have been settled via the Settlement Agreement since this assertion does not arise from or relate to the terms of Settlement Agreement itself but rather relates to a collateral issue not addressed by the Settlement Agreement. *See Wehlage v. EmpRes Healthcare Inc.*, 821 F. Supp. 2d 1122, 1127-28 (N.D. Cal. 2011) (holding that alter-ego claims were collateral to a contract and thus not governed by a choice of law provision); *Dassault Falcon Jet Corp. v. Oberflex, Inc.*, 909 F. Supp. 345, 348-49 (M.D.N.C. 1995) (same); *Schlumberger Logelco Inc. v. Morgan Equipment Co.*, No. C-94-1776 MHP, 1996 WL 251951, at *3 (N.D. Cal. May 3, 1996) (same).

Texas, like most other jurisdictions, has abrogated the common law rule which precluded a plaintiff from pursuing claims against other joint tortfeasors after settling and releasing another joint tortfeasor. *See McMillen v. Klingensmith*, 467 S.W.2d 193, 196 (Tex. 1971). However, this abrogation of the common law rule as applied to joint tortfeasors does not apply to a corporation/alter-ego situation because Texas law does not consider a corporation and its alter-ego to be akin to joint tortfeasors. *See Lewis v. Exxon Co., USA*, 786 S.W.2d 724, 732 (Tex. App. – El Paso 1989) *abrogated on other grounds by Ruiz v. Conoco, Inc.*, 868 S.W.2d 752 (Tex. 1993) ("Lewis' amended petition merely alleges that the Holts operated H&H Trucking, Inc., as their 'alter-ego' . . . Under these allegations, H&H Trucking, Inc., would be liable if at all, only on a respondeat superior theory, and the Holts would be liable, if at all, following a finding of liability on the part of H&H Trucking only on a theory of alter ego, neither of which is sufficient to characterize them as 'alleged joint tort-feasors' . . .").

Thus, under Texas law, the settlement and release of a corporation equates to the settlement and release of its alter-ego, and vice versa. This notion is consistent with the underlying principles of piercing the corporate veil under an alter-ego theory, which presumes that there is no actual separation between the corporation and the individual owner/shareholder and that the two are actually one and the same. *See Richard Nugent and CAO, Inc. v. Estate of Ellickson*, 543 S.W.3d 243, 264 (Tex. App. – Houston 2018) ("The concept of alter ego, as typically applied in the corporate context, collapses the distinction between a corporation and its shareholder or shareholders by treating them as one and the same for liability purposes."). It logically flows then that to settle with one is to settle with the other given that there actually is no corporation – it is just an individual acting under the guise of a corporate form.

Therefore, assuming, arguendo, Jam is SIP's alter-ego is to assume that Jam and SIP are one and the same. Thus, when Wimbledon released SIP via the Settlement Agreement, it equally settled with Jam, thus meaning Wimbledon's current claim that Jam is liable for SIP's obligations has been settled and released.

## IV. CONCLUSION

Based on the foregoing, the Court should find that Jam is entitled to summary judgment on Wimbledon's alter-ego claim on three separate grounds: (1) Jam was never a shareholder of SIP; (2) there is not a scintilla of evidence showing that Jam dominated or controlled SIP to such an extent evidencing an alter-ego relationship; and (3) even if, arguendo, Jam is SIP's alter-ego, Wimbledon's claims against him have already been settled via Wimbledon's settlement with SIP via the Settlement Agreement. Moreover, the foregoing demonstrates that it was Bergstein who solely controlled nearly every facet of SIP's operation. Jam had only a cameo in a show starring, directed, and produced by Bergstein.

Therefore, Defendant Kiarash Jam respectfully requests the Court enter summary judgment in his favor on Plaintiff The Wimbledon Fund, SPC (Class TT)'s solitary alter-ego claim and dismiss it.

Respectfully submitted,

Dated: April 10, 2019

LAW OFFICE OF DAVID W. WIECHERT

By: *<u>/s/ David W. Wiechert</u>*

David W. Wiechert
Jahnavi Goldstein
William J. Migler
Attorneys for Defendants
Kiarash Jam and Integrated Administration, Inc.

# CERTIFICATE OF SERVICE

I, Danielle Dragotta, an employee of the Law Office of David W. Wiechert, located at 27136 Paseo Espada, Suite B1123, San Juan Capistrano, declare under penalty and perjury that I am over the age of eighteen (18) and not a party to the above-entitled proceeding.

On April 10, 2019, I served the forgoing documents, described as **DEFENDANT KIARASH JAM'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF KIARASH JAM; DECLARATION OF DAVID WIECHERT; EXHIBITS; PROPOSED STATEMENT OF UNCONTROVERTED FACTS AND CONLUSIONS OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT** on all interested parties as follows:

[ ] **BY MAIL:** I caused such envelope(s) to be deposited in the mail at San Clemente, California with postage thereon fully prepaid to the office of the addressee(s) as indicated on the attached service list. I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

[X] **BY E-MAIL:** I caused a copy to be transmitted electronically by filing the foregoing with the clerk of the District Court using its ECF system, which electronically notifies counsel for the parties.

[ ] **BY PERSONAL SERVICE:** I personally delivered the document listed above to the persons at the address set forth below.

[X] **FEDERAL:** I declare that I am employed in the office of a member of the Bar of this court at whose direction the service was made.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 10, 2019, at San Juan Capistrano, California.

/s/*Danielle Dragotta*
Danielle Dragotta