# EXHIBIT J

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------x
                                              :

WESTON CAPITAL PARTNERS MASTER    :    Index No. 653309/2012
FUND II, LTD.,                                     :
                  Plaintiff,    :    IAS Part 54
                                       :    (Kornreich, J.)
    -against-                         :
                                     :    Motion Seq. #005
ARIUS LIBRA INC.,                 :
                Defendant,    :
                                     :    **AFFIDAVIT OF**
    -and-                             :    **DAVID BERGSTEIN**
                                     :
OWARI OPUS, INC.,               :
                Proposed Intervenor.   :
---------------------------------------------------------------x

STATE OF CALIFORNIA       )
                                 )    ss.:
COUNTY OF LOS ANGELES   )

        David Bergstein, being duly sworn, deposes and says as follows:

        1.    I am the president and sole owner of Owari Opus, Inc. ("Owari"), the proposed intervenor in this matter. I submit this affidavit in support of Owari's motion to intervene in this action and to set aside the default judgment wrongfully granted in favor of plaintiff Weston Capital Partners Master Fund II, Ltd. ("Partners Fund"), and purportedly assigned to Wimbledon Financing Master Fund, Ltd. ("Master Fund"). Except where indicated, I have personal knowledge of the facts set forth in this Affidavit and if called as a witness could testify competently thereto.

**The Molner Litigation Campaign**

        2.    Beginning in 2009 and 2010, I was the target of a frivolous, scorched-earth litigation campaign (the "Molner Litigation Campaign") orchestrated by David Molner, the

JAM_TT_001149

former principal of Aramid Entertainment Fund, Ltd. ("Aramid"), a Cayman Islands company. Dating back to approximately 2007, some of my film-related entities had engaged in transactions with Aramid for the purpose of financing the development and production of films, commercial exploitation of film libraries, and film "post production" operations.

3. In the course of the Molner Litigation Campaign, Molner orchestrated approximately 200 lawsuits against myself and my family, associates and affiliates, including the commencement of 5 involuntary bankruptcy proceedings against my companies. All of those lawsuits were ultimately dismissed, many at the pleading stage.

4. Molner's agenda was to cover up his systematic looting of more than $50 million from Aramid, wrongdoing which was documented in an independent "Situation Review" commissioned by the board members of Aramid in 2010. A true and correct copy of the Situation Review is attached as Exhibit 1 hereto.

5. Aramid was eventually put under the control of joint voluntary liquidators (the "Aramid JVLs"), who commenced liquidation proceedings in June of 2014. While Molner had represented that the net worth of Aramid was $250 million during the Molner Liquidation Campaign, the Aramid JVLs determined that the actual value of Aramid's assets was less than $10 million, with a negative net value after taking liabilities into account. They determined that Molner had looted all of the company's cash, and that the only avenue to recover value was to prosecute claims on behalf of Aramid.

6. Although the Aramid JVLs were highly incentivized to prosecute any and all valid claims, they declined to prosecute any claims against me, because they concluded that Molner's allegations against me had been wholly unfounded. In fact, they agreed to pay me a settlement of approximately $10 million in cash and assets in compensation for a small fraction

of the damages and legal fees I had been caused by the Molner Litigation Campaign. A true and correct copy of the settlement agreement between myself and the Aramid JVLs is attached as Exhibit 2 hereto.

7. At a hearing before the Bankruptcy Court in Los Angeles, Aramid's counsel stated on the record that Aramid wished to settle with me because "[a]fter four years of fighting to recover against the Bergstein parties . . . [Aramid] determined under its new independent control parties . . . that the Bergstein parties had in meaningful measure been victimized through that process over the past four plus years." A true and correct copy of the relevant portion of the transcript from this bankruptcy hearing is attached as Exhibit 3 hereto.

8. In addition, I had previously obtained a $50 million judgment against one of the lawyers who played a key role in the Molner Litigation Campaign, Susan Tregub, although she soon thereafter was placed into her own bankruptcy. And one of Molner's other law firms which played a key role in the scheme, Stroock Stroock & Lavan LLP, agreed to and paid a settlement of $17.5 million for their part in the Molner Litigation Campaign. A true and correct copy of the Stroock settlement agreement is attached as Exhibit 4 hereto.

9. Ultimately, the Aramid JVLs filed a $200 million lawsuit against Molner in February of 2016, which suit details his looting of Aramid as well as his illegal activities in regards to the Molner Litigation Campaign. A true and correct copy of the Complaint against Molner is attached as Exhibit 5 hereto.

10. Molner's false allegations against me were disseminated so widely, including through media reports and Internet sources, that they continue to unfairly impact my reputation even though those allegations have been repeatedly refuted – by, among others, the independent Aramid JVLs, who are certainly in a position to know the true facts about Aramid.

**Gerova's Transactions**

11.     In August 2010, I was approached by a board member of Gerova Financial Products, Ltd. ("Gerova"), which had a significant investment in Aramid (the "Aramid Interest"). I had no involvement with Gerova prior to this time.  I was informed that the Gerova board members had been provided with a copy of the Aramid "Situation Review," and that they had reached out to me because they sought to utilize my experience in turnaround situations, as well as an infusion of capital that could help recover the value of the Aramid Interest and heal some of the damage caused by Molner's wrongdoing.

12.     Through my discussions with Gerova, I came to understand that Gerova's Aramid investment was one of 12 illiquid hedge fund interests that Gerova had acquired from the Master Fund in late 2009 or early 2010 in exchange for Gerova stock.  These 12 hedge fund interests, which would later serve as the collateral for the Arius loan at issue in this proceeding, are referred to herein as the "Securities."  A true and correct copy of the Asset Purchase Agreement ("APA") between the Master Fund and Gerova (then known as Asia Special Situations Group") is attached as Exhibit 6 hereto.

13.     What I was not informed of in my discussions with Gerova was the relationship between the individuals behind Gerova, Gary Hirst and Jason Galanis, and the Weston Principals who controlled the Master Fund and its affiliates through various management companies including Weston Capital Management LLC and Weston Capital Asset Management LLC.  The "Weston Principals" are Albert Hallac ("Hallac"), his son Jeffrey Hallac, and Keith Wellner, together with the aforementioned management companies.

14.     My present understanding is that discussions between Gary Hirst and the Weston Principals first began during 2008.  At that time, Hirst had a more than 10-year relationship with

his partner, Galanis, as well as with Hallac. The Weston Principals, led by Hallac, came to an agreement with Galanis and Hirst in 2009 whereby, through a vehicle under the control of Galanis called Fund.com, Galanis and Hirst gave millions of dollars to the Weston Principals in exchange for majority ownership of Weston Capital Management (the "Fund.com Agreements"). The terms of the investment required that the Weston Principals, and the various funds under their control, engage in certain other transactions with Galanis and Hirst – one of which was the APA between the Master Fund and Gerova. I was unaware of these facts at the time of my discussions with Gerova.

15. As a result of my discussions with Gerova, three of my companies agreed to loan approximately $6.5 million to Gerova in exchange for, among other things, a security interest in certain of the Securities (including the Aramid Interest), with the understanding that a portion of the invested capital would be used to litigate against Molner and rehabilitate the Aramid Interest. At the time I agreed to these transactions, I believed that Gerova owned assets worth in excess of $100 million, including the Securities.

**My Initial Contacts with the Weston Principals**

16. By early 2011, it had become clear that Gerova was actually in distress. In April 2011, I was contacted by the Weston Principals, and a meeting between us was arranged in Florida. At the time, I was aware of the Weston Principals as a result of my dealings with Gerova, but I had never interacted with them or met them. I was also unaware of the long history between Galanis and Hirst and the Weston Principals, as well as the Fund.com Agreements and the control that Hirst and Galanis effectively had over the Weston Principals. Unbeknownst to me at the time, Galanis had urged Hallac to reach out to me in order to convince me not to foreclose on the Securities, as doing so would impair both Gerova and Weston.

JAM_TT_001153

17. At our meeting in Florida, the Weston Principals explained to me that they had created and managed various funds (the "Weston Funds") based in the Cayman Islands, including the Master Fund, which had transferred its Securities to Gerova in late 2009 or early 2010 pursuant to the APA. Capitalizing on Gerova's default on its loan obligations to my affiliated entities, they told me that they had also been duped by Galanis into giving up their valuable assets (the Securities). They asked me to abstain from taking action against the collateral securing my loan agreements with Gerova, in order to find a way that all of the parties could salvage value. They told me that if I would assist them, they could use the resources and capital under their control in order to raise funds for some of the ventures I was involved with. At that time, they represented to me that the Securities had a current value of approximately $20 million.

18. Through these representations, the Weston Principals induced me to enter into a series of transactions designed to help "unwind" the original Master Fund investment in Gerova and transfer those assets into a new entity, Arius. The goal of these transactions was to revive the value in the former Gerova assets.

19. The first key transaction document was an Unwind Agreement dated July 6, 2011, a true and correct copy of which is attached as Exhibit 7 hereto. This agreement essentially sought to unwind the original APA whereby the Master Fund had conveyed the various Securities to Gerova. My companies continued to hold a security interest in the Aramid Interest, and the expectation was that value would ultimately be realized from that investment and the security interest would be successfully retired.

20. The second key transaction document was a Contribution Agreement dated August 4, 2011, a true and correct copy of which is attached as Exhibit 8 hereto. Arius is a

JAM_TT_001154

Delaware corporation which was established as a mechanism to help revitalize the Securities. It was intended that the Master Fund would contribute the recovered Securities to Arius in exchange for an ownership interest in Arius, and Arius would then use the cash generated from the Securities to invest in and profit from a medical billing and services business. Nearly $15 million was ultimately invested into this medical billing business, which was known as Pineboard.

**The Weston Principals' Control Over Arius**

21. The Weston Principals and the Master Fund had both legal and actual control over Arius. Attached as Exhibit 9 hereto is a true and correct copy of the Minutes of the first Annual Meeting of the stockholders of Arius. The Minutes reflect that the Master Fund owned 59.5% of the shares of Arius, and that an additional 6.38% was controlled by an affiliated fund controlled by the Weston Principals, for a total of 65.88%. The Minutes also reflect that the Weston Principals were elected to hold three of the five Director positions. In contrast, Owari owned only a minority share position (34.12%) and nominated only two of the five Director positions.

22. Wellner, one of the Weston Principals, was the registered contact on each and every one of the Securities (now owned by Arius). Thus, the Weston Principals had full discretion to liquidate, pledge, or otherwise encumber any or all of the Securities in their discretion. I never had any dealings with any of the issuers of the Securities (aside from Aramid, which I was in litigation with and which my companies continued to hold a security interest in). To the best of my knowledge, only Hallac and Wellner had any dealings with the issuers.

23. Although I served as an officer of Arius, my only source of information regarding the status of the Securities or Arius' bank account was from either Hallac or Wellner. Owari's status as minority owner gave it no access to any of this information, other than through the

Weston Principals. Neither Owari nor myself had any access to Arius' bank records, or to its trading records reflecting any liquidation of the Securities, other than such information as the Weston Principals provided.

24. Indeed, the Weston Principals provided me with information regarding their liquidation of the Securities on only two occasions, in December of 2011 and May of 2012. Attached as Exhibit 10 hereto is a true and correct copy of an email and attached ledger sent to me on May 30, 2012 by Albert Hallac. This ledger indicated that between November 2, 2011 and May 24, 2012, 8 payments had been received from one of the 12 Securities – the CAM Opportunity Fund I, LLC – totaling $813,253.99. In addition, the ledger indicated that a payment of $176,856.03 had been made on February 17, 2012 on behalf of another one of the Securities, the Quantek Fund, bringing the total receipts to $990,110.02. Previously, in December of 2011, Keith Wellner had informed me of some of these same transactions. None of the Weston Principals ever informed me of any other liquidation of the Securities aside from those identified in Hallac's ledger, although I consider it highly likely that other funds were received from the Securities.

25. My role in Arius was primarily limited to my involvement with Aramid and the Pineboard investment, where I played an active role. In that regard, I would submit borrowing certificates to Arius requesting funds to be used in regards to the Aramid litigation, Pineboard or related matters. It was up to the Weston Principals – who controlled Arius, the Securities, and Arius' cash – whether to pay what was requested in the borrowing certificates.

**My Contribution of Additional Funds to the Arius Enterprise**

26. Not content to induce me to forego pursuing immediate collection of the loans my companies had made to Gerova, the Weston Principals also induced me to invest further capital

JAM_TT_001156

into Arius. I believed that the Pineboard medical billing and services business presented significant growth potential, and that the Weston Principals would honor their obligations. I agreed to arrange an additional $8 million of funding for Arius in pursuit of this goal.

27. In furtherance to these discussions, a company I owned, Swartz IP Services Inc. ("SIP"), advanced the sum of $3,025,675 to Arius. While it had been originally contemplated that SIP would advance $8 million directly to Arius, it was mutually agreed that instead of advancing additional moneys as loans which Arius would need to repay, SIP instead invested a further $5 million in Pineboard as equity, thus limiting the amount of debt which Arius would need to carry.

**The Partners Fund Loan**

28. Following the execution of the Unwind and Contribution Agreements, Wellner attempted to sell or leverage the Securities through third parties in order to generate cash to repay the loans, but without immediate success. He said that he needed more time and proposed that, as a temporary measure, the Weston Principals would use one of the funds under their control (the Partners Fund) to make a loan to Arius, secured by the Securities, which would be repaid as the Securities were sold.

29. In connection with this proposed transaction, the Weston Principals represented to me that the Partners Fund was completely under their control, with liquid cash that would not be paid out for at least 6 months, and that this transaction would be a means for the Partners Fund to earn interest in the interim. I had no knowledge of the existence of the Partners Fund prior to the Weston Principals introducing it as an option, and no reason to believe any wrongdoing was occurring. I relied on these representations by the Weston Principals in agreeing to the transaction.

30. It was originally contemplated that the Partners Fund would loan $3.6 million to Arius. Wellner subsequently advised me that more time would be required to realize value from the Securities, and he increased the amount of the loan to $9 million. This loan is referred to herein as the "Partners Fund Loan."

31. The Partners Fund Loan was effectuated by a set of transaction documents (the "Loan Documents"). The Loan Documents were drafted by the Partners Fund's counsel, provided more than adequate collateral, and at least a market interest rate.

32. Attached as Exhibit 11 hereto is a true and correct copy of a $3.6 million Secured Note issued by Arius Libra Inc. ("Arius") in favor of the Partners Fund, dated August 3, 2011.

33. Attached as Exhibit 12 hereto is a true and correct copy of the Pledge Agreement between Arius and the Partners Fund, dated as of August 3, 2011.

34. Attached as Exhibit 13 hereto is a true and correct copy of the Conditional Assignment and Assumption Agreement between Arius and the Partners Fund, dated as of August 3, 2011.

35. Attached as Exhibit 14 hereto is a true and correct copy of a $9 million Secured Note issued by Arius in favor of the Partners Fund, dated as of August 3, 2011. This document superseded the $3.6 million Secured Note attached as Exhibit 11.

36. By the time the Partners Fund Loan was effectuated, I had come to believe that the market value of the Securities was approximately $10 million – significantly less than the $20 million that was represented to me by the Weston Principals in our initial discussions. Even the value of $10 million, however, was more than sufficient to fully secure the Partners Fund Loan.

**The Present Action**

37. I presently understand that Hallac and the Partners Fund filed this action against Arius in or about September 2012. I have no recollection that anyone made me aware of this action at the time. Neither I nor Owari played any role in causing Arius to allow this action to proceed to judgment unopposed.

38. I have reviewed the affidavit that Albert Hallac submitted in support of the Partners Fund's application for summary judgment. In addition to Hallac's failure to disclose the existence of any of the Loan Documents other than the Secured Note, Hallac failed to inform the Court that $500,000 had been repaid on the Partners Fund Loan in May 2012.

39. Hallac's affidavit acknowledged that the $3,025,675 advanced to Arius by SIP had been used to repay the Partners Fund Loan, through a payment of $1,700,675 on November 30, 2011 and a payment of $1,325,000 on December 9, 2011.

40. However, Hallac did not inform the Court that $500,000 of the funds received from the transactions identified in his May 2012 ledger were also used to repay the Partners Fund loan. Attached as Exhibit 15 hereto are true and correct copies of two wire confirmations documenting this fact; a transfer of $500,000 from Arius to SIP on May 30, 2011, and then a transfer of $500,000 from SIP to Partners Fund on May 31, 2011, clearly marked as "Loan Payment."

41. I believe it is highly likely that other cash flows were received from the Securities, either before or after the filing of this action, aside from the payments disclosed in the ledger that Hallac sent me in May 2012. According to the ledger, there were 8 payments received from the CAM Opportunity Fund between November 2, 2011 and May 24, 2012; it seems likely that these payments continued thereafter. The remaining Securities owned by Arius

had substantial market value as well.  The truth as to any distributions that were received can only be ascertained through discovery from the Weston Principals and/or the Wimbledon Funds.

42.     In addition to these receipts, the Wimbledon Funds recently received the sum of $1.5 million in regards to the Aramid Interest.  Attached as Exhibit 16 hereto is a true and correct copy of the settlement agreement, approved by the Bankruptcy Court, by which the Aramid JVLs agreed to pay $1.5 million to the Master Fund in connection with the Aramid Interest that was owned by Arius pursuant to the Contribution Agreement.

**The Weston Principals' Fraud Unravels**

43.     I later became aware that the SEC had launched an investigation in or about 2012 into the Weston Principals and their affiliates.  I was subpoenaed as a witness in connection with that investigation, provided discovery, and sat for a deposition.  SIP was investigated as well.  The SEC ultimately brought civil claims in June 2014 against Hallac, his son Jeffrey, and Wellner, charging them with fraud. Although Hallac made repeated efforts to implicate me before the SEC, neither myself nor any of my companies were alleged by the SEC to have participated in any of the wrongdoing committed by the Weston Principals.  Hallac was also indicted in July 2015 on five federal fraud charges, and he pled guilty to those charges earlier this year.

44.     Although Hallac again attempted to implicate me during his allocution in the criminal proceedings, I have never been charged either civilly or criminally by the SEC or any other government agency in connection with these events.  None of the allegations made against me by Hallac in his allocution have been substantiated, and many are contradicted by the written record and actual events.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness accuracy, or validity of that document.

_____
David Bergstein

Sworn to before me this
17th day of June, 2016

_____
Notary Public

LESLY A. CHAVEZ
Commission # 2145594
Notary Public - California
Los Angeles County
My Comm. Expires Apr 6, 2020