# EXHIBIT Q

Kiarash Jam

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

THE WIMBLEDON FUND, SPC (CLASS    )
TT),                              )
                                  )
            PLAINTIFFS,           )
                                  )
      VS.                         ) CASE NO.
                                  ) 2:15-CV-6633-CAS-ASJWx
                                  )
GRAYBOX LLC; INTEGRATED           )
ADMINISTRATION; EUGENE SCHER, AS  )
TRUSTEE OF BERGSTEIN TRUST; AND   )
CASCADE TECHNOLOGIES CORP.,       )
                                  )
            DEFENDANTS.           )
_____)

VIDEOTAPED DEPOSITION OF KIARASH JAM

TAKEN ON

WEDNESDAY, MARCH 27, 2019

Sandra Mitchell
C.S.R. 12553

Kiarash Jam

Page 46

10:29:02  1      A    Yes.

2      Q    Very good.  Now, on the first page of Exhibit 9

3      we see an e-mail there the bottom from David Bergstein

4      to you on November 15, 2011; correct?

10:29:12  5      A    Yes.

6      Q    And he says, "Need you sign this in two places:

7      The note and the SWOP"; correct?

8      A    Yes.

9      Q    What did SWOP stand for?

10:29:21 10      A    I don't know.

11      Q    Was he referencing a swap?

12           MR. WIECHERT:  Calls for speculation.

13           THE WITNESS:  I don't know.

14      BY MR. WALKER:

10:29:27 15      Q    Now, you responded three minutes later saying,

16      "Printing them now.  Can you call me to tell me what

17      they are"; correct?

18      A    Yes.

19      Q    And he said shortly thereafter, "Call you in

10:29:43 20      five"; correct?

21      A    Yes.

22      Q    Now, looking at the documents themselves, the

23      next page, 210, is an e-mail from David Bergstein to you

24      at 4:02 p.m. forwarding what was characterized as a SIP

10:29:57 25      note; correct?

Kiarash Jam

Page 47

| | | | |
|---|---|---|---|
| 10:29:57 | 1 | A | Yes. |

2       Q    And you understood SIP was referring to Swartz

3    IP?

4       A    Sure.

10:30:03  5       Q    The next page we actually see a Swartz IP

6    Services, Inc., reference note; correct?

7       A    Yes.

8       Q    All right.  And looking at the first paragraph,

9    it says that, "The undersigned, Swartz IP Services,

10:30:14 10    Inc., promises to pay Wimbledon Fund (Class TT) the

11    principal sum of $25 million on November 14, 2016;

12    correct?

13       A    Yes.

14       Q    So it was, effectively, a five-year note?

10:30:30 15            MR. WIECHERT:  Calls for a conclusion and a

16    legal conclusion.

17    BY MR. WALKER:

18       Q    You can answer the question, sir.

19       A    So from 2011, five years later is 2016, yes.

10:30:41 20       Q    Okay.  And the date of the note there in the

21    middle right column --

22       A    November 14th.

23       Q    -- was November 14, 2011; correct?

24       A    Yes.

10:30:48 25       Q    And the principal sum would -- was due on

Kiarash Jam

Page 48

10:30:50  1    November 14, 2016; correct?

        2         A    Or 2021.

        3         Q    Or 2021?

        4         A    Yes.

10:30:57  5         Q    So it was either a five-year or a ten-year

        6    note, depending upon whether it was extended?

        7         A    Yes.

        8         Q    If you could look at Page 214, please.

        9              Mr. Bergstein sent you by e-mail another SIP

10:31:19 10    note; correct?

       11         A    Yes.

       12         Q    Okay.  And these were two documents he was

       13    asking you to sign?

       14         A    That's correct.

10:31:30 15         Q    Okay.  Did he call you back in five minutes as

       16    the first page of Exhibit 9 indicates?

       17         A    I don't really remember.

       18         Q    Did he explain the notes to you?

       19         A    I don't really remember.  I'm sure if I asked

10:31:40 20    him, he said, "It's part of business.  It's great."

       21              At the time, things were going quite well.  So

       22    I -- I'm sure he said, "This is great.  It's part of

       23    what we're doing.   It's money we're going to use to

       24    build businesses."  But I don't specifically remember if

10:31:54 25    he called me five minutes after he sent me that e-mail.

Kiarash Jam

Page 49

10:31:57  1        Q     Did you sign those documents?

          2        A     I signed them, I believe so, yes.

          3        Q     At the time that you signed them, did you

          4    understand that you were signing a legal document?

10:32:04  5        A     Yes.

          6        Q     Did you understand that were you signing a

          7    promissory note?

          8        A     I didn't read it when I signed it.  I was

          9    signing for him at the time.  He was going through a

10:32:13 10    pretty public bankruptcy at the time and the press had

         11    really gone after him and painted him in a very negative

         12    light at the time.  And he ended up, obviously, winning

         13    that bankruptcy case, as I'm sure you know.

         14           So he was vilified.  He had said to me,

10:32:29 15    "Because of all the negative press around me, I can't be

         16    the front.  I can't be the guy making some of these

         17    deals.  I'd like you to come in and do that.  We're

         18    building businesses together."

         19           The same thing happened when we bought Miramax

10:32:42 20    right before this.  He couldn't be the front of that

         21    deal and -- and I helped put that deal together and we

         22    ended up closing that transaction.  So we had just

         23    closed a rather large deal and he said this is kind of

         24    the next chapter and I had to reason to believe there

10:32:55 25    was anything wrong or -- or bad going on with any of

Kiarash Jam

Page 50

10:32:59   1   this stuff.  So he sent it to me to sign it and I signed

           2   it.

           3       Q    And you were content to accommodate his

           4   difficult situation by becoming the front man?

10:33:10   5       A    I helped him out, yes.

           6       Q    And in doing that, you were working together?

           7            MR. WIECHERT:  Objection.  Vague and ambiguous.

           8   BY MR. WALKER:

           9       Q    Right?

10:33:18  10            Well, let me ask you this:  I mean, clearly,

          11   you and Mr. Bergstein were working on the transaction --

          12       A    David was the boss.  I worked for David, yes.

          13   David was calling all the shots, unequivocally.

          14       Q    But you're a grown man; right?

10:33:31  15       A    Yes, sir.

          16       Q    And you were a grown man back then?

          17            MR. WIECHERT:  It's argumentative, but we'll

          18   stipulate that he was grown.

          19   BY MR. WALKER:

10:33:36  20       Q    You were capable of exercising free will?

          21       A    Yes, I was.

          22       Q    You were operating other businesses that didn't

          23   involve Mr. Bergstein?

          24       A    That's correct.

10:33:43  25       Q    You had the advice of Majid Zarrinkelk at any

Kiarash Jam

Page 51

10:33:47   1    time that you required it?

2         A    I did.

3         Q    You were able to retain counsel and seek legal

4    advice at any time that you required it; correct?

10:33:54   5    A    I did.  I didn't think I required it at this

6    point.  I didn't have any reason to believe David was

7    doing anything wrong.  He is a very, very smart man.

8    And I was assuming he was getting all the legal advice

9    and doing all that before he would send me something for

10:34:07  10    signature.

11        Q    But there was no barrier to you contacting an

12    attorney and asking him to advise you on the

13    ramifications and the particulars of the documents you

14    were signing?

10:34:16  15    A    There were no barriers, but I didn't feel the

16    need to do that because I trusted Dave at this time.

17        Q    Were you working with anyone else other than

18    Mr. Bergstein in connection with these promissory notes?

19        A    No.

10:34:29  20    Q    Let me hand you what's been marked --

21        A    Call Frymi to fax and stuff.  You know, those

22    kind things, but --

23        Q    Yes, sir.  But in terms of --

24        A    My assistant to make copies, that kind of

10:34:35  25    stuff, but --

Kiarash Jam

Page 52

10:34:36  1        Q    Other that assistants and staff, you and

         2    Mr. Bergstein were the principals; correct?

         3        A    I was not a principal.  David was a principal.

         4    David was the boss.  David called all the shots.  David

10:34:46  5    negotiated every document.  I did not.

         6        Q    But you were the signatory on the documents;

         7    right?

         8        A    I signed document, yes.

         9        Q    And you were the signatory for Swartz IP on a

10:34:53 10    $25 million promissory note; correct?

        11        A    Yes, I signed the document.

        12        Q    And you understood what you were signing?

        13        A    I actually didn't read it when I signed it.  He

        14    sent it to me, said it needed signature.  I had signed

10:35:04 15    hundreds of documents for him before.  When it came

        16    through, he needed signatures, and I signed it.

        17        Q    Let's me hand you what's been marked as

        18    Exhibit 10, sir.

        19              (Exhibit 10 was marked for

10:35:14 20               identification by the Court Reporter

        21               and is attached hereto.)

        22              MR. WALKER:  Wait, hang on, hang on.

        23              THE WITNESS:  Do you need this back?

        24              MR. WALKER:  No, no.  That -- that's yours.

10:35:24 25    Let me make sure I didn't -- well, for reason I don't

Kiarash Jam

Page 53

| | | |
|---|---|---|
| 10:35:28 | 1 | have a courtesy copy, David.  Did I give you two?  I |
| | 2 | might have.  Oh, let me have that one.  That's got my |
| | 3 | notes on it. |
| | 4 | THE WITNESS:  Okay.  I can share with him if |
| 10:35:36 | 5 | that's okay. |
| | 6 | MR. WALKER:  No, no, no.  I've got a copy for |
| | 7 | him.  I'm sorry.  I was just -- I handed it to you. |
| | 8 | I've got the thick thumb going.  Okay. |
| | 9 | MR. WIECHERT:  We didn't have time to read the |
| 10:35:43 | 10 | notes, Counsel. |
| | 11 | MR. WALKER:  It's -- it wouldn't have helped. |
| | 12 | MR. WIECHERT:  It wouldn't have helped anyway? |
| | 13 | MR. WALKER:  No, sir.  They're barely helping |
| | 14 | me. |
| 10:35:50 | 15 | BY MR. WALKER: |
| | 16 | Q    Okay.  If you could look at Exhibit 10, sir. |
| | 17 | A    Yes, sir. |
| | 18 | Q    Let me know when you've completed your review. |
| | 19 | A    I have. |
| 10:35:55 | 20 | Q    All right.  So the first page of Exhibit 10 is |
| | 21 | an e-mail from Mr. Bergstein to you dated November 15, |
| | 22 | 2011; correct? |
| | 23 | A    Yes, that's correct. |
| | 24 | Q    And he says, "The agreements I sent were wrong. |
| 10:36:05 | 25 | Here is the corrected note.  Other agreement to follow |

Kiarash Jam

Page 54

10:36:07  1   in a minute"; correct?

2        A     That's correct.

3        Q     Did you ever compare -- I take it that he was

4   asking you to sign this $25 million promissory note as

10:36:17  5   the signatory for Swartz IP?

6        A     He was asking me to sign another version or

7   draft of it, it seems to me.

8        Q     Did you ever compare the one that you signed

9   with this one to determine the differences between the

10:36:28 10   two documents?

11       A     No, sir.

12       Q     But, again, you understood you were going to be

13   the signatory on a $25 million promissory note for

14   Swartz IP?

10:36:37 15       A     No.

16            MR. WIECHERT:  The question's asked and

17   answered.

18            THE WITNESS:  No.

19   BY MR. WALKER:

10:36:42 20       Q     Let me hand you what's been marked as

21   Exhibit 11, sir.

22                 (Exhibit 11 was marked for

23                 identification by the Court Reporter

24                 and is attached hereto.)

25   ///

Kiarash Jam

Page 55

10:36:52   1   BY MR. WALKER:

           2        Q    Let me know when you've completed your review

           3   of the document.

           4        A    I know what this document is.

10:37:05   5        Q    All right, sir.  Exhibit 11 starts with an

           6   e-mail from Mr. Bergstein to you dated November 15,

           7   2011; correct?

           8        A    That is correct, sir.

           9        Q    And the attachment is a clean JSI SWOP 2;

10:37:17  10   correct?

          11        A    Yes, sir.

          12        Q    Was this the other corrected document that

          13   Mr. Bergstein wanted you to sign?

          14        A    I don't know if this was the other one, but

10:37:23  15   this was a document he wanted me to sign.

          16        Q    Okay.  And this was a $25 million note purchase

          17   agreement date November 14, 2011; correct?

          18        A    Yes.

          19        Q    Did you review this document prior to signing

10:37:35  20   it?

          21        A    No.

          22        Q    Did you, in fact, sign it?

          23        A    I believe I did, yes.

          24        Q    Did you seek the advice of legal counsel with

10:37:44  25   respect to the ramifications of your signing this as a

Kiarash Jam

Page 56

10:37:47  1    representative of SIP?

        2        A    No, I did not.

        3        Q    Did you confer with Majid Zarrinkelk, your

        4    longtime friend and advisor, with respect to this

10:37:55  5    particular document and the ramifications of signing it?

        6        A    No, I did not.  I didn't feel like I needed to.

        7    Like I said, I didn't have any reason to think David was

        8    doing anything but things that are up and up at this

        9    time.  And he needed me to sign it and I did.

10:38:09 10        Q    So it's your position that when you engage in

       11    business, if you don't suspect that someone's committing

       12    a crime, you just sign $25 million obligations without

       13    even reading them?

       14            MR. WIECHERT:  The question's argumentative.

10:38:21 15    Incomplete hypothetical.  Calls for speculation.

       16    BY MR. WALKER:

       17        Q    Please answer the question, sir.

       18        A    No.  I -- I did that for David at the time and

       19    it's been the bane of my existence since.

10:38:34 20        Q    Was it your custom not to sign -- not to review

       21    any legal documents, leases, that sort of thing that you

       22    signed?

       23        A    No, I would -- if -- you know, I would, on --

       24    on multiple occasions, get legal advice when I felt like

10:38:47 25    I needed it.  And in this case, like I said, I thought

Kiarash Jam

Page 57

| | | |
|---|---|---|
| 10:38:49 | 1 | this was all part of doing the business that we were |
| | 2 | doing.  And he had brought in new financiers and we were |
| | 3 | going to build wonderful businesses and, you know, be |
| | 4 | successful. |
| 10:38:59 | 5 | Q   Did you consider -- |
| | 6 | A   I thought these were all part of that. |
| | 7 | Q   Excuse me, sir. |
| | 8 | A   I'm sorry.  I interrupted you. |
| | 9 | Q   Did you consider yourself to be a partner with |
| 10:39:05 | 10 | David Bergstein in these enterprises? |
| | 11 | A   No.  It was David Bergstein's -- |
| | 12 | Q   You were working together; correct? |
| | 13 | A   Yes, we worked together. |
| | 14 | Q   And you anticipated that you would profit from |
| 10:39:13 | 15 | these enterprises; correct? |
| | 16 | A   Yes, I did. |
| | 17 | Q   You were doing this for money; correct? |
| | 18 | A   Yes. |
| | 19 | Q   Now, did Mr. Bergstein tell you not to read the |
| 10:39:21 | 20 | document before signing it? |
| | 21 | A   No, sir. |
| | 22 | Q   Did Mr. Bergstein tell you not to get legal |
| | 23 | counsel before signing it? |
| | 24 | A   No, sir. |
| 10:39:29 | 25 | Q   Did Mr. Bergstein instruct you not to consult |

Kiarash Jam

Page 58

10:39:31  1    Mr. Zarrinkelk prior to signing it?

2        A    No, sir.

3        Q    And by "it," I'm referring to the Swartz IP

4    note purchase agreement.

10:39:39  5    A    This thing.

6        Q    Yes, sir.

7        A    Yes.

8        Q    So Mr. Bergstein never instructed you not to

9    secure legal counsel, or any type of financial advice,

10:39:45 10   or to consult Mr. Zarrinkelk prior signing this

11   document?

12       A    No.  He would send them to me need and need

13   signatures right way.  So he would call and say, "I just

14   sent you something.  I need the signature right away."

10:39:55 15   Q    So in each instance, whether it was the

16   reference note that we've seen earlier for $25 million

17   that you signed on behalf of Swartz IP, or the note

18   purchase agreement for $25 million that you signed on

19   behalf of Swartz IP, it was your affirmative decision

10:40:10 20   not to consult legal counsel; correct?

21       A    My affirmative decision?  I didn't feel like I

22   needed to.  I trusted David that everything was in

23   order.

24       Q    So you didn't consult legal counsel on that

10:40:21 25   occasion, did you?

Kiarash Jam

Page 59

10:40:22  1       A    No, I did not.

       2       Q    And that was your decision to make, was it not?

       3       A    Yes.

       4       Q    Likewise, you didn't consult Mr. Zarrinkelk as

10:40:29  5    your financial advisor with respect to either the

       6    reference note or the note purchase agreement prior to

       7    signing it?

       8       A    That's correct.  I did not consult him.

       9       Q    And that was your decision not to consult him?

10:40:40 10       A    Yes.

      11       Q    And at no time did Mr. Bergstein instruct you

      12    not to consult counsel, legal counsel, or

      13    Mr. Zarrinkelk?

      14       A    That's correct.

10:40:48 15       Q    Let me hand you what's been marked as

      16    Exhibit 12.

      17                (Exhibit 12 was marked for

      18                identification by the Court Reporter

      19                and is attached hereto.)

10:40:56 20    BY MR. WALKER:

      21       Q    Let me know when you've completed your review

      22    of the document, sir.

      23       A    I have.

      24       Q    Exhibit 12 on the first page is an e-mail from

10:41:15 25    you to David Bergstein dated November 15, 2011; correct?

Kiarash Jam

Page 60

10:41:22  1        A    Yes.

          2        Q    And the attachment, you indicated, was a SIP

          3   note PDF and the SIP note purchase agreement PDF;

          4   correct?

10:41:31  5        A    Yes.

          6        Q    And the subject that you typed in was SIP

          7   documents; correct?

          8        A    I didn't type that in.  It's just a forward.

          9        Q    Fair enough.

10:41:37 10             Now, who is Mr. Weinskoski?

         11        A    My assistant at the time.

         12        Q    So what did he do in relation to this

         13   particular e-mail?

         14        A    He probably scanned the documents, named them,

10:41:50 15   and forwarded them to me.

         16        Q    Okay.  And then when he did that, they were

         17   documents you had already signed?

         18        A    Yes.  I would imagine so, yes.

         19        Q    And then you forwarded the e-mail along with

10:42:01 20   the --

         21        A    Attachments.

         22        Q    -- the executed documents to Mr. Bergstein?

         23        A    Correct.

         24        Q    And you state in your e-mail, "As promised, I

10:42:09 25   signed the note and one sig on the NPA (I did not sign

Kiarash Jam

Page 61

10:42:09  1   the note and the NPA as it was an exhibit).  I hope this

2   is correct.  Thanks."

3              Did I read that correctly?

4       A    Yes.

10:42:24  5       Q    And it was your anticipation at the time that

6   you executed these and sent these to Mr. Bergstein that,

7   ultimately, you would benefit financially from these

8   transactions; correct?

9       A    Yes.  Ultimately, we were building businesses

10:42:34 10  that we would all benefit from.

11      Q    And looking to Page 252.

12      A    Yes.

13      Q    You signed this document; correct?

14      A    I did.

10:42:44 15      Q    And you signed it as the signatory, the

16  representative for Swartz IP Services Group, Inc.;

17  correct?

18      A    Yes.

19      Q    And you printed your name, Kia Jam, there;

10:42:54 20  correct?

21      A    Yes.

22      Q    And under title you wrote vice president;

23  correct?

24      A    Yes.

10:43:00 25      Q    And you understood the ramifications of

Kiarash Jam

Page 62

10:43:02  1  signifying that you were a vice president of a

2  corporation at the time that you signed this document;

3  correct?

4          MR. WIECHERT:  The question's vague and

10:43:09  5  ambiguous.

6          THE WITNESS:  I don't know what to do.

7  BY MR. WALKER:

8      Q    Sir, let me explain to you what's going on.  So

9  your counsel has the right to tender an objection,

10:43:16 10  usually to the form of my question.

11      A    Okay.

12      Q    To protect your rights.

13      A    Okay.

14      Q    Which he can then urge that objection to the

10:43:26 15  court later.

16      A    So I answer your question no matter what; I

17  don't have to stop?

18      Q    Unless he instructs you not to answer --

19      A    Okay.  Go ahead.

10:43:30 20      Q    -- he's simply making his objection for the

21  record --

22      A    Okay.

23      Q    -- to be dealt with before the court --

24      A    I understand.

10:43:35 25      Q    -- later as he chooses and you're free to

Kiarash Jam

Page 63

| | | |
|---|---|---|
| 10:43:37 | 1 | answer.  So it -- I know it's difficult to focus while |
| | 2 | someone's speaking to the side of you and someone's |
| | 3 | speaking to the front of you, and it's not a natural |
| | 4 | process.  But allow him to complete his objection and |
| 10:43:47 | 5 | when he's done, unless he specifically instructs you not |
| | 6 | to answer, then you're expected to answer -- |
| | 7 | A    Thank you for explaining it. |
| | 8 | Q    -- consistent with your oath. |
| | 9 | A    Can you repeat the question, please? |
| 10:43:58 | 10 | Q    Yes, sir.  At the time that you signed this |
| | 11 | document that's part of Exhibit 12 entitled the "Swartz |
| | 12 | IP Services Group, Inc., reference note due November 14, |
| | 13 | 2016," that's your signature that appears there as the |
| | 14 | representative of Swartz IP; correct? |
| 10:44:16 | 15 | A    Yes.  Correct. |
| | 16 | Q    And you printed your name there to signify who |
| | 17 | it was? |
| | 18 | A    Yes. |
| | 19 | Q    And you wrote in the title vice president; |
| 10:44:22 | 20 | correct? |
| | 21 | A    Yes. |
| | 22 | Q    And you understood, based upon your prior |
| | 23 | experience with your own companies, the significance of |
| | 24 | indicating that you were a vice president of Swartz IP |
| 10:44:31 | 25 | Services Group with this signature; correct? |

Kiarash Jam

Page 64

| | | | |
|---|---|---|---|
| 10:44:34 | 1 | A | Yes. |
| | 2 | Q | Going to the next, Page 254. |
| | 3 | A | Okay. |
| | 4 | Q | Now, this is the note purchase agreement that |
| 10:44:46 | 5 | | we've referenced earlier; correct? |
| | 6 | A | Yes.  I think so. |
| | 7 | Q | And this is a $25 million note purchase |
| | 8 | | agreement; correct? |
| | 9 | A | Yes. |
| 10:44:55 | 10 | Q | And you understood at the time that you |
| | 11 | | executed this document that it was a material document; |
| | 12 | | correct? |
| | 13 | | MR. WIECHERT:  Calls for speculation. |
| | 14 | | THE WITNESS:  I don't know what that means. |
| 10:45:04 | 15 | | MR. WIECHERT:  Vague and ambiguous. |
| | 16 | | THE WITNESS:  I don't know what that means. |
| | 17 | | BY MR. WALKER: |
| | 18 | Q | Okay.  You understood at the time that you |
| | 19 | | signed the note purchase agreement that it was a legal |
| 10:45:11 | 20 | | document; correct? |
| | 21 | A | Yes. |
| | 22 | Q | Okay.  And you understood that a $25 million |
| | 23 | | potential transaction was a serious transaction? |
| | 24 | | MR. WIECHERT:  The question's vague and |
| 10:45:18 | 25 | | ambiguous. |

eLitigation Services, Inc. - els@els-team.com

Kiarash Jam

Page 65

10:45:20   1            THE WITNESS:  Yes.

           2   BY MR. WALKER:

           3        Q    Do you consider a $25 million transaction to be

           4   serious?

10:45:25   5        A    Yes, sir.

           6        Q    And you understood at the time you were

           7   executing this document that it was purporting to create

           8   a $25 million transaction?

           9        A    Yes.

10:45:37  10        Q    Now, if you could go to Page 274, please.

          11   There we see the signature line for Swartz IP Services

          12   Group, Inc.; correct?

          13        A    Yes.

          14        Q    And we see your signature there; correct?

10:45:54  15        A    Yes.

          16        Q    And you wrote in your name, printed it so

          17   people would -- would be able to discern who signed it;

          18   correct?

          19        A    Yes.  Correct.

10:46:02  20        Q    And you wrote in the title of vice president;

          21   correct?

          22        A    Yes.

          23        Q    And, again, when you signed the note purchase

          24   agreement at the time that you indicated you were an

10:46:12  25   officer, a vice president of Swartz IP, you understood

Kiarash Jam

Page 66

10:46:14  1    the significance of that; correct?

          2         A    Yes.

          3              MR. WIECHERT:   Objection.   Calls for a

          4    conclusion.

10:46:20  5    BY MR. WALKER:

          6         Q    And you understood at the time that you signed

          7    the note purchase agreement in your capacity as vice

          8    president of Swartz IP that you were representing that

          9    you were, in fact, a vice president of that corporation;

10:46:30 10    correct?

         11         A    I asked David what am I signing as and he told

         12    me sign as VP, and I signed as VP.

         13         Q    Yes, sir.   But when you did that, you

         14    understood the significance of denoting that you were a

10:46:41 15    VP; correct?

         16              MR. WIECHERT:   Vague and ambiguous.

         17              THE WITNESS:   I just signed it.   He said he

         18    needed it and I signed and I sent it back to him.

         19    BY MR. WALKER:

10:46:48 20         Q    Yes, sir.   But my question is, at the time that

         21    you signed this note purchase agreement for -- as a

         22    signatory for Swartz IP Services, you understood that

         23    you were signifying that were you vice president of that

         24    corporation; correct?

10:46:59 25         A    Yes.   I understood that.

Kiarash Jam

Page 67

| | | | |
|---|---|---|---|
| 10:47:01 | 1 | Q | Did you read this note purchase agreement |

10:47:01    1       Q    Did you read this note purchase agreement

            2    before you signed it?

            3       A    No.

            4       Q    Going to the next page, 275.

10:47:08    5       A    Yes.

            6       Q    Do you see the Schedule A entitled "Information

            7    Relating to Purchaser"?

            8       A    Yes.

            9       Q    Why was the principal amount of notes to be

10:47:18   10    purchased set at 25 million?

           11       A    I have no idea.

           12       Q    And you signed it nonetheless?

           13       A    I didn't sign this document.  Is this part of

           14    the same document?

10:47:26   15       Q    Yes, sir.

           16       A    I don't know.  I did not read this document.

           17       Q    Now, going down to Item 2 on that same page, it

           18    states, "All communications including notice of payments

           19    and written confirmation of such wire transfers would be

10:47:41   20    directed to Keith D. Wellner, the chief operating

           21    officer at Weston Capital Management."

           22            Did I read that correctly?

           23       A    Yes, you did.

           24       Q    Had you met with or talked with Mr. Wellner?

10:47:53   25       A    Yes.  I had met Keith Wellner and talked to him

Kiarash Jam

Page 68

10:47:54  1    on a few occasions, correct.

          2         Q    Prior to signing the note purchase agreement?

          3         A    I believe so, yes.  He actually came to the

          4    office and was in the office on and off.  He and his

10:48:07  5    partners had come to L.A. a number of times to meet with

          6    David and other parties.  I had met them.  We had dinner

          7    on one occasion.  And then he would just come and sit in

          8    the office right outside of David's office in a cubicle

          9    once in a while and be there for a few days and make

10:48:23 10    phone calls and whatnot.

         11         Q    And was Mr. Wellner amenable to answering any

         12    questions you might have about this transaction?

         13         MR. WIECHERT:  Objection.  No foundation.

         14    Calls for speculation.

10:48:35 15         THE WITNESS:  I didn't talk shop with Keith.

         16    Our discussions were, you know, light and fluffy.

         17    Nothing about business, really.  It was more about they

         18    wanted office space; I'd find office space.  What hotel

         19    were they staying at?  I told them I have hotel deals

10:48:48 20    around town if they needed reservations in town.

         21         I was more like a concierge service for him.

         22    We did not talk about business.  All this stuff was done

         23    with David.  David was the one who negotiated all of

         24    these things with all the parties and all the people.

10:48:59 25    BY MR. WALKER:

Kiarash Jam

Page 69

10:48:59  1      Q    And yet you were the party that signed them;

          2  correct?

          3      A    Yes.

          4      Q    And did you ever take occasion to ask

10:49:04  5  Mr. Wellner about the significance of the documents you

          6  were signing?

          7      A    I did not talk to Keith Wellner about this.

          8      Q    Was there any barrier preventing you from doing

          9  that?

10:49:13 10      A    No, sir.

         11      Q    Did Mr. Bergstein ever instruct you that at any

         12  time Mr. Wellner was visiting here in California, that

         13  you were not to talk to him about --

         14      A    No, sir.

10:49:19 15      Q    -- this note purchase agreement?

         16      A    No, sir.

         17      Q    Did Mr. Bergstein instruct you that at any time

         18  that Mr. Wellner was visiting in California, that you

         19  were not to talk to him about the reference note?

10:49:28 20      A    No, sir.

         21      Q    Was there any barrier to you actually just

         22  walking up and initiating a conversation with him at any

         23  time he was visiting here to ask him about those two

         24  transactions?

10:49:39 25      A    No.

Kiarash Jam

Page 70

10:49:39  1      Q    Was there any barrier that prevented you from
        2   picking up the phone and calling him, given the fact you
        3   had already met with him and socialized with him, to ask
        4   him any questions about these two documents?

10:49:50  5      A    No.

        6      Q    Now, did you also ever meet a gentleman named
        7   Hallac?

        8      A    Albert Hallac, yes.

        9      Q    And did he also visit here in California?

10:50:02 10      A    Yeah, he -- I met him in California on probably
       11   two or three occasions.  He was at that same dinner we
       12   talked about.  A big dinner with a whole bunch of
       13   people.  And in the office once or twice I shook his
       14   hand.  And that was about the extent of my dealings with
10:50:16 15   him as well.  There was a couple of e-mails back and
       16   forth.  More about, you know, again, office stuff and
       17   things of that sort.  But I never discussed any shop
       18   talk with Albert Hallac.

       19      Q    Now, Mr. Hallac was also an officer with Weston
10:50:29 20   Capital Management; correct?

       21      A    I understand that to be case, yes.

       22      Q    And did Mr. Bergstein ever instruct you not to
       23   ask Mr. Hallac about any aspect of either the note
       24   purchase agreement or the reference note that you
10:50:39 25   signed?

Kiarash Jam

Page 71

```
10:50:39   1        A     No, sir.

           2        Q     Was there any barrier preventing you from

           3    contacting Mr. Hallac at any time either over the phone

           4    or when he was here visiting to ask him about either one

10:50:48   5    of those two legal documents?

           6        A     No, sir.

           7        Q     Now, you understand that both Mr. Wellner and

           8    Mr. Hallac have entered guilty pleas in connection with

           9    this fraud --

10:51:04  10            MR. WIECHERT:  Objection.

          11    BY MR. WALKER:

          12        Q     -- involving Swartz IP; correct?

          13            MR. WIECHERT:  Objection.  Relevance.

          14            THE WITNESS:  I know that they've entered

10:51:08  15    guilty pleas.  I don't really know the specifics of what

          16    it was, but I know it had to do with, you know, this

          17    whole world.  But I don't know the specifics of what

          18    they pled to or whatever.  But, yes, I do know that they

          19    have pled guilty.

10:51:21  20    BY MR. WALKER:

          21        Q     So you're aware that Mr. Hallac and Mr. Wellner

          22    pled guilty to various crimes that they were alleged to

          23    have committed relating, at least in part, to the Swartz

          24    IP transactions that you participated in; correct?

10:51:34  25            MR. WIECHERT:  Objection.  Relevance.
```

Kiarash Jam

Page 72

| | | |
|---|---|---|
| 10:51:36 | 1 | THE WITNESS:  No.  I'm aware that they pled |
| | 2 | guilty.  I don't know specifically to what. |
| | 3 | BY MR. WALKER: |
| | 4 | Q    And Mr. Bergstein, I take it you're aware, is |
| 10:51:44 | 5 | serving an eight-year sentence in federal prison for his |
| | 6 | involvement with the Swartz IP transaction that you |
| | 7 | participated in? |
| | 8 | MR. WIECHERT:  Also objecting on the grounds of |
| | 9 | relevance. |
| 10:51:54 | 10 | THE WITNESS:  I know that David Bergstein is |
| | 11 | serving a sentence.  He had a trial and he was |
| | 12 | convicted.  I don't really know the specifics of what |
| | 13 | specifically what he was convicted for.  But, yes, I do |
| | 14 | know that he is serving time in a penitentiary. |
| 10:52:07 | 15 | BY MR. WALKER: |
| | 16 | Q    A federal prison? |
| | 17 | A    I don't know where he -- what -- I mean, he's |
| | 18 | at a place called Taft.  I don't know if it's federal or |
| | 19 | not.  But, yes, he is behind -- he is incarcerated. |
| 10:52:18 | 20 | Q    Have you visited Mr. Bergstein since he's |
| | 21 | arrived in California at the prison here? |
| | 22 | A    No, sir. |
| | 23 | Q    When was the last time you spoke to |
| | 24 | Mr. Bergstein? |
| 10:52:25 | 25 | A    I spoke to David during his trial.  He called |

eLitigation Services, Inc. - els@els-team.com

Kiarash Jam

Page 73

10:52:30  1   me looking for documents that I might have had in my
        2   possession.  He called me about that.  And that was the
        3   last time I spoke to David.
        4       Q    Did you provide him any documents?
10:52:41  5       A    To the extent that I had documents, everything
        6   was provided to him and them.  I had to do huge document
        7   production for -- for the government, which I did.  So
        8   everything I have is out there.
        9       Q    And when you say you had to provide a huge
10:52:55 10   document production for the government, you're
       11   referencing in relation to Mr. Bergstein's federal
       12   trial?
       13           MR. WIECHERT:  Misstates -- assumes facts not
       14   in evidence.
10:53:05 15   BY MR. WALKER:
       16       Q    Let me ask you this:  When you just stated that
       17   you provided a huge document production to the
       18   government, what was that in connection with?
       19       A    The -- the government, I met with them on
10:53:15 20   multiple -- on two occasions.  They asked me all about
       21   everything kind of related to Bergstein and these
       22   things, and I fully cooperated with them.  I went to
       23   New York on two occasions and I sat with a room just
       24   like this with a whole bunch of agency people and I gave
10:53:32 25   them everything, answered all of their questions, and

Kiarash Jam

Page 74

10:53:33  1   that was the end of that.

        2   Q    Okay.  And when you were being interviewed, was

        3   that by the U.S. Attorney's Office in New York?

        4   A    It was by the assistant U.S. attorney in the

10:53:45  5   Western -- Southern District?

        6         MR. WIECHERT:  Southern District.

        7         THE WITNESS:  Southern District of New York.

        8   BY MR. WALKER:

        9   Q    And were they asking you questions about Swartz

10:53:52 10   IP?

       11   A    They asked about everything.  I don't remember

       12   specifically the questions, but I spent two -- on

       13   separate occasions, two days of, you know, five, six,

       14   seven, eight hours with them.  And -- and they asked

10:54:03 15   everything and I had given them everything I had and

       16   answered all of their questions.

       17   Q    Did -- did they ask you specifically about

       18   different aspects of the Swartz IP transactions?

       19   A    I believe they did.

10:54:14 20   Q    And did you provide them documents that you had

       21   relating to the Swartz IP transactions in which you

       22   participated?

       23   A    I provided them with all of the documents they

       24   requested and even more.

10:54:31 25   Q    Let me hand you what's been marked as

Kiarash Jam

Page 75

```
10:54:33  1   Exhibit 13, sir.
          2                   (Exhibit 13 was marked for
          3                   identification by the Court Reporter
          4                   and is attached hereto.)
10:54:35  5   BY MR. WALKER:
          6        Q    Let me know when you've completed your review.
          7        A    Okay.
          8        Q    Now, the first page of Exhibit 13 is an e-mail
          9   from you dated December 2, 2011; correct?
10:55:01 10        A    Yes.
         11        Q    And it's directed to David Bergstein, Keith
         12   Wellner, Jeff Solomon, and Kia Jam; correct?
         13        A    Yes, sir.
         14        Q    So you copied yourself?
10:55:11 15        A    Yes, sir.
         16        Q    Was that a standard practice that you
         17   maintained?
         18        A    Sometimes.
         19        Q    Now, when you sent these documents to
10:55:19 20   Mr. Solomon, who did you understand that he was?
         21        A    Jeff Solomon was an attorney.  He's been a
         22   friend of mine for a long time.  I've hired him on
         23   multiple occasions.  He had come in and was working for
         24   us, I think, part-time at the time.  Just, you know,
10:55:33 25   working as a lawyer.
```

Kiarash Jam

Page 76

10:55:36  1       Q    And any time prior to December 2, 2011, did you

2    ever have occasion to ask your good friend and attorney

3    Mr. Solomon about the ramifications of your execution of

4    either the Swartz IP note purchase agreement or the

10:55:47  5    reference note that we've already reviewed?

6       A    No, sir.

7       Q    There's no barrier preventing you from asking

8    your good friend and attorney Jeff Solomon about those

9    two documents prior to signing them, was there?

10:56:01 10       A    No, sir.

11       Q    Did Mr. Bergstein ever instruct you not to

12    consult with Mr. Solomon about either your execution of

13    the note purchase agreement or the reference note that

14    we've already looked at?

10:56:15 15       A    No, sir.

16       Q    And you were providing a copy of this to Keith

17    Wellner?

18       A    Yes.

19       Q    Why was that?

10:56:24 20       A    Because David probably asked me to.

21       Q    Now, you write the e-mail and you say, "Gents,

22    here are the revised docs signed."

23            Did I read that correctly?

24       A    Yes, sir.

10:56:36 25       Q    And then you direct a note to Keith Wellner

Kiarash Jam

Page 77

10:56:37  1    directly.  "Keith, can you please send me a copy once

        2    they are fully executed"; correct?

        3        A    Yes, sir.

        4        Q    Okay.  So when you reference that they were the

10:56:46  5    revised docs, did you participate in the revision?

        6        A    No, sir.

        7        Q    Did you compare the original that you were

        8    provided to the revised version to determine what

        9    changes had been made?

10:56:57 10        A    No, sir.

       11        Q    Did you consult either Mr. Solomon or any other

       12    legal counsel to ascertain the ramifications of the

       13    changes that had been made?

       14        A    No, sir.

10:57:06 15        Q    Was there any barrier to you retaining legal

       16    counsel for that purpose?

       17        A    No, sir.

       18        Q    But you voluntarily did not do so; correct?

       19        A    Like I said, I did not think there was anything

10:57:18 20    nefarious.  I thought this was just part of what we're

       21    doing.  David was doing this as part of our next kind of

       22    chapter.  And I did not have any reason to feel I needed

       23    to get extra protection.  I trusted him.  He was the guy

       24    running the shop.  He was the guy making all these

10:57:32 25    decisions and dealing with all these people.  And I

Kiarash Jam

Page 78

10:57:34  1    mistakenly trusted him.

       2        Q    So I take it it's your testimony that you only

       3    consult attorneys when signing legal documents if you

       4    believe there's something nefarious going on?

10:57:44  5        A    No.  In this particular case -- in this

       6    particular case, I didn't think there was any reason to

       7    consult lawyers.  David would -- had a bunch of lawyers

       8    that he was dealing with that were working on a number

       9    of things with him, and I just assumed that these were

10:57:58 10    all already vetted by -- by legal staff and I didn't

      11    need to do that.

      12        Q    Even though you were the signatory, you saw no

      13    reason to secure independent legal advice to protect

      14    your own individual interest?

10:58:11 15        A    Unfortunately not.

      16            MR. WIECHERT:  Objection.  Asked and answered

      17    now a few times.

      18            THE WITNESS:  Sorry.

      19    BY MR. WALKER:

10:58:16 20        Q    Now, when you say, "Jeff, please make sure this

      21    gets loaded up," what was that instructing Jeff to do?

      22        A    Just to load it up to, like, a, probably, box

      23    or some place where the documents could be find because

      24    there was a -- always a scramble to find documents.  So

10:58:30 25    I was trying to be organized; trying to ask Keith to