# EXHIBIT V

Page 2

```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3

 4   THE WIMBLEDON FUND, SPC (CLASS    )
     TT),                             )
 5                                    )
                     PLAINTIFFS,      )
 6                                    )
          VS.                         )  CASE NO.
 7                                    )  2:15-CV-6633-CAS-ASJWx
                                      )
 8   GRAYBOX LLC; INTEGRATED          )
     ADMINISTRATION; EUGENE SCHER, AS )
 9   TRUSTEE OF BERGSTEIN TRUST; AND  )
     CASCADE TECHNOLOGIES CORP.,      )
10                                    )
                     DEFENDANTS.      )
11   _____)

12

13

14

15

16          VIDEOTAPED DEPOSITION OF KIARASH JAM, taken on

17   behalf of the Plaintiff, at 10100 Santa Monica Boulevard,

18   13th Floor, Los Angeles, California, commencing at

19   9:49 a.m., Wednesday, March 27, 2019, before Sandra

20   Mitchell, C.S.R. 12553, pursuant to Notice.

21

22

23

24

25
```

Kiarash Jam

Page 43

10:26:05  1        Q    Did you ever meet him?

        2        A    I don't recall meeting Robert Pressler, no.

        3        Q    Looking to the endorsement where Mr. Pressler

        4    signed, it was for RPP Enterprises.

10:26:13  5             Are you familiar with that company?

        6        A    No.

        7        Q    Going to the next page, we see a check for

        8    $12,000 to Graybox; correct?

        9        A    Yes.

10:26:25 10        Q    Why was this check issued?

       11        A    I don't --

       12             MR. WIECHERT:  Calls for speculation.  No

       13    foundation.

       14             THE WITNESS:  I don't know.  I was not in

10:26:33 15    control of this account.  I had nothing to do with this

       16    account.

       17    BY MR. WALKER:

       18        Q    Going to the next page, we see a check 1052

       19    dated December 18, 2013, in the amount of $10,000 paid

10:26:46 20    to Integrated Administration; correct?

       21        A    Yes, that's what it is.

       22        Q    Why was this check issued?

       23        A    I don't know why it was issued, but David would

       24    arrange funding for IA from multiple sources, and this

10:26:59 25    was a check to Integrated Administration.  I don't why

Kiarash Jam

Page 44

10:27:03  1   he issued it.

2        Q    Was -- did Integrated Administration issue an

3   invoice for -- requiring this payment?

4        A    I would issue to David -- I would let David

10:27:11  5   know on a regular basis what our cash needs were with

6   the breakdown of this much is for payroll; this much is

7   rent; this much is the phone bill; this much is

8   Internet; and this is the money we need.  And he would

9   arrange the funding.

10:27:23 10       Q    So he would fund it on a cost basis?

11       A    I don't know what that means.

12            MR. WIECHERT:  I don't know what that means

13   either.

14   BY MR. WALKER:

10:27:30 15       Q    Turning to the next page, there's another check

16   to Integrated Administration for $12,000; correct?

17       A    Yes.  That's correct.

18       Q    What was the purpose of this check?

19       A    Same as the other check.  I don't know.  As I

10:27:41 20   said, David was -- he would fund Integrated

21   Administration.  And I don't know what this was for at

22   the time, but...

23       Q    Now, once the two checks to Integrated totaling

24   $22,000 had been issued and deposited in the Integrated

10:27:56 25   Administration account, you had access to those funds;

Kiarash Jam

Page 45

10:27:58  1   correct?

2        A    Correct.  I was the signer on the Integrated

3   Administration's account.

4        Q    Now, looking at the last page of this

10:28:07  5   Exhibit 8.  Is that your endorsement, your signature?

6        A    No.

7        Q    Is that, in fact, David Bergstein's signature?

8        A    It looks like it.  It looks like a sloppy

9   version of his signature.

10:28:21 10        Q    And you're certainly familiar with

11   Mr. Bergstein's signature?

12        A    Yes, that is correct.

13        Q    You've seen it many, many times?

14        A    Yes, I have.

10:28:26 15        Q    So Mr. Bergstein also had access to the

16   Integrated Administration bank account?

17        A    No.  The only signers were myself and Majid.

18        Q    Let me hand you what's been marked as

19   Exhibit 9, sir.

10:28:48 20             (Exhibit 9 was marked for

21             identification by the Court Reporter

22             and is attached hereto.)

23             THE WITNESS:  Okay.

24   BY MR. WALKER:

10:28:59 25        Q    Have you had an opportunity to review it?

Kiarash Jam

Page 133

```
11:59:47   1      A    Yes, sir.

           2      Q    And it references "Swartz IP Services Texas

           3    taxes."

           4           Did I read that correctly?

11:59:53   5      A    Yes, sir.

           6      Q    So she's forwarding information to Mr. Woodward

           7    and asking that he file the return ASAP; correct?

           8      A    Yes.

           9      Q    And then there's another e-mail above that from

12:00:05  10    Ms. Biedak to Mr. Woodward that copies you and

          11    Mr. Bergstein and Steve Piscula; correct?

          12      A    Yes, sir.

          13      Q    And this is on January 19, 2012; correct?

          14      A    Yes.

12:00:18  15      Q    And she says, "Hi, Scott.  We are going through

          16    our filings for the new year.  You were able to help us

          17    out with the franchise filing for Swartz IP in Texas

          18    last November.  According to the records, the company is

          19    in good standing through May 15, 2012."

12:00:31  20           Did I read that correctly?

          21      A    That's what it says.

          22      Q    And looking at the last page of Exhibit 17, we

          23    see a printout from a website operated by the Texas

          24    government -- state government that shows that, under

12:00:46  25    status, Swartz IP is in good standing, not for
```

Kiarash Jam

Page 134

12:00:48  1    dissolution or withdrawal through May 15, 2012; correct?

2    A    Yes, sir.

3    Q    And then at the top Mr. Woodward responds to

4    Ms. Biedak with a copy to you, Mr. Bergstein and

12:01:01  5    Mr. Piscula, and says, "Happy New Year.  Please provide

6    me with the 2011 reports."

7         And the first one he requests is the

8    December 31, 2011, balance sheet; correct?

9    A    That's what it says.

12:01:14 10    Q    The next on was the January 1, 2011, to

11   December 31, 2011, general ledger; correct?

12   A    That's what it says.

13   Q    The next one was the January 1, 2011, to

14   December 31, 2011, profit and loss statement; correct?

12:01:28 15    A    Yes, sir.

16   Q    Okay.  Did you ever see the 2000 -- the

17   December 31, 2011, balance sheet?

18   A    No, I don't think so.

19   Q    For Swartz IP?

12:01:38 20    A    No.  I was not in control of the bank accounts.

21   I don't -- I don't know anything about those.

22   Q    Yes, sir.  But regardless of whether you were a

23   signatory on the banks accounts, did you ever actually

24   see a balance sheet prepared for Swartz IP for that

12:01:50 25    particular year?

Kiarash Jam

Page 135

12:01:51  1       A    I don't recall.

2       Q    Did you ever actually see a general ledger for

3    Swartz IP for the 2011 year?

4       A    I don't recall.

12:01:58  5       Q    Did you ever actually see a profit and loss

6    statement for Swartz IP for the 2011 calendar year?

7       A    I don't recall.

8       Q    Did you ever ask to see them?

9       A    No.

12:02:11 10       Q    He goes on to state, "I would need to file the

11    federal corporate income tax return and the related

12    Texas franchise tax return."

13            Did I read that correctly?

14       A    Yes, sir.

12:02:21 15       Q    Did you ever actually see a corporate federal

16    income tax return filed on behalf of Swartz IP?

17       A    I don't recall if I did.

18       Q    Did you ever execute the -- a federal corporate

19    income tax return on behalf of Swartz IP?

12:02:34 20       A    I don't think so.  I don't recall if I did.

21       Q    Did you ever see a Texas franchise tax return

22    prepared and filed on behalf of Swartz IP?

23       A    I don't think so.  I don't recall if I did.

24       Q    Did you ever ask to see the tax return filed

12:02:45 25    with the federal government or the Texas state

Kiarash Jam

Page 136

```
12:02:48   1   government for Swartz IP at any time?
           2       A    No.
           3       Q    Why don't we take a break for lunch.  Maybe an
           4   hour.
12:02:58   5            MR. WIECHERT:  Sure.
           6            THE VIDEOGRAPHER:  We are going off the record
           7   at 12:00 p.m.
           8            (A recess was taken.)
           9            THE VIDEOGRAPHER:  And we are back on the
13:12:12  10   record at 1:10 p.m.
          11                  (Exhibit 18 was marked for
          12                  identification by the Court Reporter
          13                  and is attached hereto.)
          14   BY MR. WALKER:
13:12:15  15       Q    Mr. Jam, sir, I've handed you Plaintiff's
          16   Exhibit 18.  Have you seen is this document before?
          17       A    Yes, I have.
          18       Q    And what do you understand this document to
          19   represent?
13:12:27  20       A    A letter of intent to buy property.
          21       Q    Was this beachfront property?
          22       A    I don't know.
          23       Q    How are you familiar with it?
          24       A    David sent it to me at some point, and I think
13:12:39  25   I signed it.  I don't recall specifically, but I've seen
```

Kiarash Jam

Page 137

13:12:43  1   this before.

2            MR. WIECHERT:  And I'm sorry, Counsel.  Did you

3     say beachfront --

4            MR. WALKER:  Uh-huh.

13:12:50  5       MR. WIECHERT:  -- earlier?

6            It's -- I don't think Hollywood has any

7     beachfront property.

8     BY MR. WALKER:

9        Q    Where is this property located?

13:12:59 10      A    I don't know.  It says 1377 North Serrano

11    Avenue, L.A., California 90027.  I don't know where that

12    is.  I can look it up.

13       Q    No, it's okay.

14           Why would Swartz IP be making an offer to buy

13:13:16 15   this $13 million piece of property?

16       A    I do not know.

17       Q    What was the business that Swartz IP was in?

18       A    I don't know what David was doing with the

19    company.  I was involved in very little of what it did.

13:13:28 20   But I don't know what David was doing.  He was one who

21    negotiated and dealt with everything that the company

22    was doing.

23       Q    Right.  And, of course, we've seen that you

24    executed legal documents as vice president of the

13:13:39 25   company.

Kiarash Jam

Page 138

13:13:39   1             MR. WIECHERT:  That's asked and answered.

            2   BY MR. WALKER:

            3       Q    My -- my question is, what did you understand

            4   the nature of Swartz IP's business to be?

13:13:47    5       A    At that time, it was just one of the investment

            6   vehicles that, I guess, David was using for a series of

            7   businesses.  I don't know specifically.

            8       Q    In Paragraph 2, escrow and closing, do you know

            9   what the source of the $390,000 escrow deposit was going

13:14:06   10   to be?

           11       A    No, I do not.

           12       Q    After you signed this contract, a letter of

           13   intent on behalf of Swartz IP Services, Inc. --

           14       A    I think I signed it.  I'm not certain, but I

13:14:20   15   think I signed it.

           16       Q    Okay.

           17             MR. WIECHERT:  Assumes facts not in evidence.

           18   BY MR. WALKER:

           19       Q    And we see there on the signature line for

13:14:24   20   Swartz IP, certainly your name is located there;

           21   correct?

           22       A    That is correct.

           23       Q    Okay.  So if this contract was signed, was this

           24   property actually closed on?

13:14:34   25       A    Not to my knowledge.

Kiarash Jam

Page 157

13:32:43  1     Q    Turning to Page 1218.

2     A    Okay.

3     Q    What is this document?

4     A    This is a bank statement for a Pineboard

13:32:52  5  Holdings account at Wells Fargo dated -- where's the

6  date -- March 1st, 2012.

7     Q    Well, I guess it's the statement for March 1st

8  through March 31, 2012; correct?

9     A    That's correct.  You're correct, yes.

13:33:11  10     Q    Okay.  And it shows that, I guess, this

11  reflects that you had access to the Pineboard Holdings

12  bank account?

13     A    Yes, I did.

14     Q    Okay.  And you were receiving the bank

13:33:21  15  statements at the Irvine, California, address?

16     A    Yes.  They would go to Majid.

17     Q    And this shows that Pineboard, at that time,

18  had a beginning balance of $645?

19     A    As of 3/1, yes.

13:33:36  20     Q    And then Swartz IP money came in totaling

21  $50,000?

22     A    Yes, sir.

23     Q    And then $45,027 went out all in the same month

24  that the 50,000 came in?

13:33:49  25     A    Yes, sir.

Kiarash Jam

Page 158

13:33:49  1      Q     Leaving a balance of $3704.67?

         2      A     Well, the balance was 5618; right?  The average

         3  balance is the one you said.

         4      Q     I'm sorry.  I stand corrected.  Thank you.

13:34:03  5      A     No problem.

         6      Q     Going to the next page.

         7      A     Yes, sir.

         8      Q     We see on March 22nd there was a wire transfer

         9  from Swartz IP's account in the amount of $50,000;

13:34:13 10  correct?

        11      A     Yes, sir.

        12      Q     And then the very next day, check 1001 is

        13  issued for $45,000; correct?

        14      A     Yes, sir.

13:34:29 15      Q     Who did that check go to?

        16      A     I have no idea.

        17      Q     Who wrote the check?

        18      A     I have no idea.  I don't recall that.

        19      Q     Do you recall asking Mr. Bergstein about that?

13:34:45 20      A     I do not recall, no.

        21      Q     Is it possible you didn't ask at all?

        22            MR. WIECHERT:  Objection.  Calls for

        23  speculation.

        24            THE WITNESS:  I would -- as I've said already,

13:34:56 25  he controlled the companies and the money flow.  He

Kiarash Jam

Page 159

13:34:59  1   probably said, Hey, wires coming in for 50,000.  I need

2   you to write a check for this amount to those people and

3   I did.  And I kept -- I would ask for backup so I could

4   have backup for it for the accounting files.

13:35:09  5   BY MR. WALKER:

6       Q    Thank you.  Let me hand you what's been marked

7   a Exhibit 23.

8       A    Thank you.

9            (Exhibit 23 was marked for

13:35:15 10           identification by the Court Reporter

11           and is attached hereto.)

12   BY MR. WALKER:

13       Q    Let me know when you've completed your review

14   of this document.

13:35:27 15       A    One second, please.

16       Q    Of course.  Take your time.

17       A    Okay.

18       Q    All right.  Okay.  I think this e-mail thread

19   actually goes from top to bottom.

13:36:14 20       A    Okay.

21       Q    So we start with an e-mail from Mr. Zarrinkelk

22   to Ms. Biedak, to David Bergstein, and to you on

23   April 19, 2012, at 11:55 a.m.; correct?

24       A    Yes, sir.

13:36:25 25       Q    And a courtesy copy was sent to Steve Piscula?

Page 178

13:54:12  1   $440,000?

2        A     According to this document, yes.

3        Q     Let me hand you, sir, what's been marked as

4   Exhibit 26.

13:54:19  5                (Exhibit 26 was marked for

6                    identification by the Court Reporter

7                    and is attached hereto.)

8   BY MR. WALKER:

9        Q     This is an e-mail from Frymi Biedak to you

13:54:32 10   dated April 27, 2012; correct?

11        A     Yes, sir.

12        Q     And the subject is wire transfer out of

13   Integrated Administration; correct?

14        A     Yes, sir.

13:54:40 15        Q     And she says, "Per David's request, a wire

16   needs to be sent to Phoenix Life Insurance in the amount

17   of $12,000"; correct?

18        A     Yes, sir.

19        Q     Why was that being done out of Integrated

13:54:51 20   Administration?

21        A     I don't know.

22        Q     Who was the insured life?

23        A     I think what David was -- one of the things

24   David was doing around this time was there was a

13:55:02 25   business they had where they were buying life insurance

Kiarash Jam

Page 179

13:55:05   1    policies at a discount, or something to do with that

2    where they were buying life insurance policies for

3    people that, I guess, weren't paying for them anymore or

4    something like that.  So there were multiple payments

13:55:14   5    that went out to various life insurance policies.

6         Q    Who were the insureds?

7         A    I don't know.  I was not dealing with it.

8         Q    Who were the beneficiaries?

9         A    I don't know.  I wasn't dealing with it.

13:55:25  10         Q    They were just being paid out of your company?

11         A    Yes.  He would fund the company and direct the

12    funds.

13         Q    How do you know that he funded the money

14    necessary to pay that premium?

13:55:33  15         A    He was in full control of what was getting paid

16    and what money was coming in.  He would direct me as to

17    what to do with the money that he was funding.

18         Q    Did you have nothing to say about it?

19         A    I would try.  I would beg and scream.  For me,

13:55:45  20    the top priority was always payroll and, you know, rent,

21    and things of that sort.  But he would ultimately

22    dictate what would get paid.

23         Q    And despite your begging and screaming, he

24    never once put it in a single e-mail?

13:55:55  25         A    Put what in a single e-mail?

Kiarash Jam

Page 281

16:02:34  1    and you're sitting there.

2         Q    You understand that's what's at stake in this

3    lawsuit, though?

4         A    You just articulated it.  Yes, I understand

16:02:41  5    what you just said.

6              MR. WALKER:  Why don't we take a break.

7              MR. WIECHERT:  Okay.

8              THE WITNESS:  Okay.

9              THE VIDEOGRAPHER:  We are going off the record

16:02:45  10   at 4:00 p.m.

11             (A recess was taken.)

12             THE VIDEOGRAPHER:  We are back on the record at

13   4:12 p.m.

14   BY MR. WALKER:

16:14:48  15   Q    Mr. Jam, was there any time after November 2011

16   that you became concerned about the incredible flow of

17   funds in and out of your accounts in the Swartz IP

18   account?

19             MR. WIECHERT:  Vague and ambiguous.

16:15:01  20             THE WITNESS:  I wasn't in charge of the Swartz

21   IP account, so I don't know what was going in and out of

22   the Swartz IP account.  I wasn't a signer.  I didn't

23   open the account.  So I was unaware of the activity in

24   and out of the Swartz IP account that you refer to.

16:15:12  25   BY MR. WALKER:

Kiarash Jam

Page 282

16:15:12  1      Q    Are you aware of the fact that it was roughly

          2   90 days and almost the entirety of the $17.7 million was

          3   gone?

          4      A    No, I'm not.

16:15:22  5      Q    And that all of that was sent to Swartz IP and

          6   then washed through that company?

          7           MR. WIECHERT:  Objection.  No foundation.

          8           THE WITNESS:  I don't know --

          9           MR. WIECHERT:  Argumentative.

16:15:30  10          THE WITNESS:  Sorry.

          11          I don't know that the money had gone in and

          12   out.  I'm not on those accounts.  I don't know what

          13   happened to those accounts.  I don't monitor them.  I

          14   don't get statements.  I'm not a signer.

16:15:40  15   BY MR. WALKER:

          16     Q    Do you agree with me that had you not signed

          17   the note purchase agreement or the reference notes on

          18   behalf of Swartz IP, that that $17.7 million would never

          19   have been transferred by my client to your company?

16:15:58  20          MR. WIECHERT:  Calls for speculation.  No

          21   foundation.  Also calls for a conclusion.

          22          THE WITNESS:  I don't know if they would have

          23   transferred it in different ways.  A different type of

          24   document.  But I -- I don't know what your client would

16:16:11  25   or wouldn't have done.

Kiarash Jam

Page 283

16:16:11 1  BY MR. WALKER:

2    Q   Well, the note purchase agreement was the

3  vehicle by which the deposit of the $17.7 million from

4  my client into the Swartz IP account was justified;

16:16:21 5  right?

6        MR. WIECHERT:  "Justified" is vague and

7  ambiguous.

8        THE WITNESS:  As I said, I don't know what your

9  client would have done if that document was not signed.

16:16:30 10  BY MR. WALKER:

11    Q   Well, they certainly wouldn't have transferred

12  almost $18 million to Swartz IP's account; right?

13        MR. WIECHERT:  Motion -- well, strike the

14  motion.  He actually asked the question at the end.  So

16:16:41 15  it will be -- calls for speculation.  No foundation.

16  And it calls for a conclusion.

17        THE WITNESS:  Can you repeat the question,

18  please.

19        MR. WALKER:  Go ahead and read it back.

16:16:49 20         (Whereupon, the record was read back

21         by the Court Reporter as follows:

22         "Q   So isn't it true that it would

23         have -- that what would have been

24         transferred was $18 million to Swartz

16:16:49 25         IP Services account; right?"

Kiarash Jam

Page 284

16:17:09    1            THE WITNESS:  I don't know -- as I said, I

            2    don't control Swartz IP account.  You told me the money

            3    went in and was out in 90 days.  I -- I don't know

            4    anything about that.

16:17:17    5    BY MR. WALKER:

            6        Q    Well, I guess my point is that the transaction

            7    that you signed on behalf of Swartz IP was the vehicle

            8    by which my client was induced to deposit almost

            9    $18 million into Swartz IP's account; right?

16:17:31   10            MR. WIECHERT:  The question is vague and

           11    ambiguous.  Assumes facts not in evidence.

           12            THE WITNESS:  Okay.

           13    BY MR. WALKER:

           14        Q    And your signing of the note purchase agreement

16:17:40   15    facilitated the entire following set of events and

           16    consequences; right?

           17            MR. WIECHERT:  Same objections.

           18            THE WITNESS:  Okay.

           19    BY MR. WALKER:

16:17:50   20        Q    Do you agree with that?

           21        A    I don't know what your client did or didn't do

           22    or how they did it, why they did it.  I can't speak to

           23    what your client did.  But I'm assuming your client did

           24    their own diligence.  They're -- your -- your looked to

16:18:02   25    see who they were or were not getting into business with

eLitigation Services, Inc. - els@els-team.com

Kiarash Jam

Page 285

16:18:04   1    and made a decision based on whatever their internal

           2    criteria was.  I don't know anything about your client.

           3    I've never interacted with your client.

           4         Q    Why would you presume any of that in this

16:18:13   5    instance?

           6         A    Because that's what I would assume they would

           7    have done.  As I said, I don't know any of them.  I have

           8    not interacted with them.  I don't...

           9         Q    And this is in connection with the transaction

16:18:24  10    involving a note purchase agreement that you didn't even

          11    bother to read; correct?

          12              MR. WIECHERT:  The question's argumentative.

          13    Asked and answered.

          14    BY MR. WALKER:

16:18:32  15         Q    Correct?

          16         A    Yes.

          17         Q    Did you ever send an e-mail to Mr. Bergstein

          18    asking him to show some love to your Amex?

          19         A    A lot of times when the bill was late, I'd say,

16:18:41  20    Hey, man, what are we doing about this?  I'd ask for

          21    that.  I'd ask for rent.  I'd ask for payroll.  There

          22    was multiple e-mails to him to pay off his -- to pay off

          23    the obligations.  To pay the accounts payable.

          24    Absolutely.

16:18:56  25         Q    But recently we've heard that Mr. Bergstein