**DECLARATION OF AARON GRUNFELD**

I, Aaron Grunfeld, declare as follows:

1.     The following facts are personally known to me. If called as a witness, I could and would competently testify to the truth thereof under oath.

2.     Attached hereto as Exhibit A is a true and correct copy of an email message that I received on April 26th, 2012 from Albert Hallac, containing an e-mail cover letter along with a "Commitment Letter" provided by Weston Capital Management, LLC, and apparently signed by Mr. Albert Hallac.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this day of April 22, 2019 in Los Angeles , California.

By: _____

Aaron Grunfeld

# EXHIBIT A



| From: | David Bergstein |
|---|---|
| To: | mahanelt@pacbell.net; Filippone, John L.; Mark Hiraide |
| Cc: | David Zinberg; Aaron Grunfeld; Hallac, Albert; Hallac, Jeffrey; Keith.Wellner@westoncapital.com |
| Subject: | FW: Bidz.com -Commitment letter |
| Date: | Thursday, April 26, 2012 8:18:28 AM |
| Attachments: | Equity Commitment letter BIDZ 04.25.2012.pdf |
| | img-425141430-0001.pdf |

**From:** Hallac, Albert [mailto:Albert.Hallac@westoncapital.com]
**Sent:** Thursday, April 26, 2012 8:02 AM
**To:** Aaron Grunfeld
**Cc:** Wellner, Keith; Hallac, Jeffrey; davidbergstein@abcxyz.cc; Howard Appel; Artem Sagalovich
**Subject:** RE: Bidz.com -Commitment letter

Dear Aaron,

Please find the executed letter attached.

You are already familiar with Weston Capital and more information can be seen on our website at www.westoncapital.com.  We are an alternative investment firm, and among other investments we control several funds.

Attached please find our commitment letter as well as balance sheet dated December 31, 2011 for Weston Capital Partners Fund II.  As we discussed, we control a number of funds and we will be investing capital from one of our funds into this transaction.  The final construct of Glendon Group, Inc. is yet to be determined based on how this agreement gets executed, and we expect that certain investors, such as Swartz IP Services (who I understand has separately provided Bidz with evidence of in excess of $10 million in available funds) will contribute a substantial portion of the proceeds necessary.  We and Swartz have set aside funds for many months now and this process has moved forward with very little progress.  This pace makes our position very tenuous as we cannot plan properly without any timeframes being given to us.  Nonetheless, we are prepared to provide an equity commitment letter, which is attached. We have also attached a financial statement for the fund which is currently intended to be used for this acquisition.

This enclosed letter is provided in confidence and my not be used by you or Bidz as part of any public filing without our prior written consent

I am available to Bidz if they wish to discuss this directly and readily reachable at the numbers below.

Best regards,
Albert

**Albert Hallac**
Chairman
**Weston Capital Management LLC**
222 Lakeview Avenue, Suite 1550
West Palm Beach, FL 33401
Direct (561) 868-6756 Mobile (561) 847-6667 Fax (561) 515-3620

767 Third Avenue, 25th floor
New York, NY 10017
Main (212) 318-3500 Fax (212) 980-4064


DEFENDANT
EXHIBIT
46 SEARS
Z165

Disclaimer: This information should not be construed as a recommendation, investment or tax advice, or an offer or solicitation to buy or sell any security. This message (incl. attachment) is confidential and must be read in conjunction with the following disclosures located http://www.westoncapital.com/424303.htm

Disclaimer: This information should not be construed as a recommendation, investment or tax advice, or an offer or solicitation to buy or sell any security. This message (incl. attachment) is confidential and must be read in conjunction with the following disclosures located http://www.westoncapital.com/424303.htm



W     E         S         T         O       N

C     A     P     I     T     A     L

M a n a g e m e n t   L L C

## EQUITY COMMITMENT LETTER

April 25, 2012

Peter Hanelt, Chairman
Special Committee of the Board of Directors
Bidz.com, Inc.
3562 Eastham Drive
Culver City, California 90232

Glendon Group, Inc.
2425 Colorado Boulevard
Suite B-205
Santa Monica, California 90404

      Re:   Equity Financing Commitment

Ladies and Gentlemen:

     This letter agreement sets forth the commitment of **Weston Capital Management LLC on behalf of Weston Capital Partners Fund II** (collectively, the "Investors"), subject to the terms and conditions hereof, to purchase, or cause an assignee permitted by Section 10 of this letter agreement to purchase, directly or indirectly, equity securities of Glendon Group, Inc., a Delaware corporation ("Parent"). It is contemplated that pursuant to the Agreement and Plan of Merger (the "Merger Agreement"), that is being currently being negotiated by and among Bidz.com, Inc., a Delaware corporation (the "Company") and Bidz Acquisition Company, Inc., a Delaware corporation and wholly-owned subsidiary of Parent ("Acquisition Sub"), Parent shall acquire the Company through the merger of Acquisition Sub with and into the Company, with the Company as the surviving corporation (the "Merger").

1.  Closing Commitment.

     (a) Upon the terms and subject to the conditions set forth herein, the Investors hereby collectively commit to purchase for cash, or cause an assignee permitted by Section 10 of this letter agreement to purchase for cash, directly or indirectly, at or immediately prior to the Merger Closing an aggregate of $ 9 million of equity securities of Parent (the "Closing Commitment"), solely for the purpose of allowing Parent and Acquisition Sub (i) to fund a portion of the Merger Consideration (ii) to pay related fees and expenses upon the consummation of the Merger, The total obligation of the Investors to fund in connection with the Merger Closing, (as may be defined in the Merger Agreement) shall in no event



exceed the Closing Commitment. The Investors may effect the purchase of equity securities of Parent directly or indirectly through one or more affiliated entities. The obligation of the Investors to fund any portion of the Closing Commitment may be reduced by the Investors, immediately prior to the Effective Time, to the extent that Parent does not require the full amount of the Closing Commitment  to fund the payment of the obligations referenced in the first sentence of this Section 1(a). Each Investor hereby confirms that no other approval is required for such Investor to fulfill its obligations hereunder.

(b) The Investors' obligations under this letter agreement to fund the Closing Commitment is subject to (i) the satisfaction or waiver by Parent (with the prior written approval of the Investors) of each of the conditions to Parent's and Acquisition Sub's obligations to consummate the Merger and the Offer, in each case, as contemplated by the Merger Agreement other than any conditions that by their nature are to be satisfied at the Merger Closing, but subject to the prior or substantially concurrent satisfaction of such conditions, (ii) the contemporaneous consummation of the Merger, and (iii) the execution and delivery of the Merger Agreement,

(c) The obligation of the Investors to fund, or cause the funding of, the Closing Commitment shall automatically and immediately terminate upon the earliest to occur of (i) the consummation of the Merger Closing (at which time the obligation shall be discharged) or (ii) the valid termination of the Merger Agreement.

2.  Termination Commitment.

(a) Upon the terms and subject to the conditions set forth herein, the Investors hereby collectively commit to purchase for cash, or cause an assignee permitted by Section 10 of this letter agreement to purchase for cash, directly or indirectly, an aggregate amount of equity securities of Parent sufficient to allow Parent to pay any such amounts payable pursuant to the Merger Agreement to the extent any payment obligations are due and payable by Parent pursuant to the terms and conditions of the Merger Agreement, and subject to the limitations set forth therein (but without giving effect to any limitation or restriction imposed by Insolvency Proceedings (as such term is defined below) or related Laws), (ii) all fees and expenses incurred by Parent, Acquisition Sub in connection with the Merger Agreement and (iii) all other liabilities of Parent, Acquisition Sub arising out of or relating to the Merger Agreement (collectively, the "Termination Commitment," and each of Parent's and Acquisition Sub's obligations set forth herein, a "Termination Obligation," and collectively, the "Termination Obligations"); provided, that the Company, Parent and Acquisition Sub hereby agree that the Investors shall in no event collectively be required to purchase, directly or indirectly, (x) more than $3 million of equity securities of Parent (or, in the case of each Investor, its Pro Rata Percentage (as such term is defined below) of such amount) in the event that this amount is required to be paid to the Company under the Merger Agreement and the Company is not legally compelled by a judicial order or

April 25, 2012

Page 3 of 11

otherwise to return any portion of such amount to Parent, Acquisition Sub or the Investors, provided that no Investor or Investor Affiliate (as such term is defined below), shall have any obligation or liability to any person relating to, arising out of or in connection with, this letter agreement, other than as expressly set forth herein. For the avoidance of doubt, the Investors' commitment to purchase equity securities of Parent pursuant to the first sentence of this Section 2(a) shall occur on such date or dates as the relevant payments to Company are due and payable by Parent or Acquisition Sub pursuant to the terms and conditions of the Merger Agreement and without giving effect to any limitations or restrictions imposed by Insolvency Proceedings or related Laws.

(b) The obligation of the Investors to fund, or cause the funding of, the Termination Commitment shall automatically and immediately terminate upon the earliest to occur of (1) the consummation of the Merger Closing, but only if the Investors shall have funded the Closing Commitment in accordance with Section 1 of this letter agreement, (2) valid termination of the Merger Agreement in accordance with its terms (other than a termination of the Merger Agreement for which a payment or fee under the Merger Agreement, is due and owing by Parent or Acquisition Sub or (3) a written agreement among the Investors, the Company and Parent terminating the obligations and liabilities of the Investors pursuant to Section 2(a) of this letter agreement. In the event that the Company or any of its Affiliates, members, security holders or representatives institutes any suit, action or other proceeding (A) asserting that any provisions of this letter agreement are illegal, invalid or unenforceable in whole or in part or that the Investors are liable in excess of or to a greater extent than the aggregate Termination Commitment (other than in accordance with Section 1 of this letter agreement), (B) arising under, or in connection with, this letter agreement, the Merger Agreement, or the transactions contemplated hereby or thereby, then (x) the obligations of the Investors under this letter agreement shall terminate *ab initio* and be null and void, (y) if any Investor has previously made any payments under this letter agreement to Parent or Acquisition Sub, such Investor shall be entitled to recover such payments and (z) none of the Investors, Parent, Acquisition Sub nor any Investor Affiliate shall have any liability to the Company or any of its Affiliates under this letter agreement or with respect to the Merger Agreement, or the transactions contemplated hereby or thereby.

(c) The obligations of the Investors under this letter agreement to fund, or to cause the funding of, the Termination Commitment in accordance with this Section 2 shall, to the fullest extent permitted by applicable Law, be absolute and unconditional and shall not be released or discharged in whole or in part, or otherwise affected, irrespective of: (i) any change in the corporate existence, structure or ownership of Parent or Acquisition Sub or any other Person interested in the transactions contemplated by the Merger Agreement, or any insolvency, bankruptcy, winding up, receivership, dissolution, assignment, reorganization or other similar proceeding (each, an "Insolvency Proceeding") affecting Parent, Acquisition Sub or any other Person interested in the transactions contemplated by the Merger Agreement or any of their respective assets, (ii) any rescission, waiver,



compromise or other amendment or modification of the Merger Agreement, or any other agreement evidencing, securing, or otherwise executed in connection with, any of the Termination Commitments, or change in the manner, place or terms of payment or performance, or any change or extension of the time, place or manner of payment or performance of, or renewal of, any Termination Commitment, any escrow arrangement or other security therefor, or any amendment or waiver of or any consent to any departure from the terms of the Merger Agreement or the documents entered into in connection therewith, (iii) the addition, substitution or release of any other Person interested in the transactions contemplated by the Merger Agreement, (iv) any lack of validity or enforceability of the Merger Agreement, any other agreement or instrument relating thereto, other than by reason of fraud or intentional misrepresentation by the Company, (v) the existence of any claim, set-off or other right that the Investors may have at any time against Parent, Acquisition Sub or the Company, whether in connection with any Termination Commitment, the Merger Agreement, or otherwise, (vi) the failure of the Company to assert any claim or demand or to enforce any right or remedy against Parent, Acquisition Sub or any other Person interested in the transactions contemplated by the Merger Agreement or (vii) the adequacy of any other means the Company may have of obtaining payment of any Termination Commitment.

3.  Non – Diclosure.

    Other than as required by Law or the rules of any national securities exchange, each of the parties agree that it will not, nor will it permit its advisors or Affiliates to, disclose to any person or entity the contents of this letter agreement, other than to the Company and its advisors who are instructed to maintain the confidentiality of this letter agreement in accordance herewith.

4.  Remedies to Named Persons.

    Notwithstanding anything that may be expressed or implied in this letter agreement or any document or instrument delivered in connection herewith, each party hereto, by its acceptance of the benefits hereof, covenants, agrees and acknowledges that this letter agreement may only be enforced by either (i) Parent and Acquisition Sub or (ii) the Company, provided, that the Company acknowledges and agrees that any payment of the Closing Commitment or Termination Commitment will be made only to Parent. No Person has any remedy, recourse or right of recovery against, or contribution from any Investor Affiliate, through any of Investor, Parent, Acquisition Sub or otherwise, whether by or through attempted piercing of the corporate veil or similar action, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute, regulation or applicable Law, by or through a claim by or on behalf of any Investor, Parent or Acquisition Sub against any Investor or any Investor Affiliate, or otherwise, except for (x) Parent's and Acquisition Sub's and the Company's rights against the Investors under this letter agreement to fund to Parent, or cause the funding to Parent of, either the Closing Commitment or the



BHLE PAULUS COMMITMENT LETTER

April 25, 2012

Page 5 of 11

Termination Commitment (as applicable), (y) the Company's right to bring claims to enforce this letter agreement and (z) the Company's rights to bring claims against Parent and Acquisition Sub pursuant to the Merger Agreement. For purposes of this letter agreement, the term "Investor Affiliate" means (i) any Investor, (ii) any former, current or future general or limited partners, stockholders, holders of any equity, partnership or limited liability company interest, officer, member, manager, director, employees, agents, controlling persons, assignee or Affiliates of any Investor, (iii) Parent or Acquisition Sub, or (iv) any former, current or future general or limited partners, stockholders, holders of any equity, partnership or limited liability company interest, officer, member, manager, director, employees, agents, attorneys, controlling persons, assignee or Affiliates of any of the foregoing. The Company hereby covenants and agrees that it shall not institute, and shall cause each of its Affiliates and their respective members, security holders and representatives not to institute, directly or indirectly, any action or bring any other claim arising under, or in connection with, this letter agreement, the Merger Agreement or the transactions contemplated thereby, against any Investor or any Investor Affiliate except for (i) claims by the Company (x) to enforce its rights under this letter agreement (provided that the maximum aggregate liability of the Investors under this letter agreement shall in no event exceed an amount equal to the aggregate Termination Commitment and shall in no event be due and payable unless the amount or any other Termination Commitment would otherwise be due and payable in accordance with the terms of the Merger Agreement), (y) to enforce the funding of the Termination Commitment to Parent, or (z) to enforce the funding of the Closing Commitment to Parent only to the extent that the Company is expressly entitled to enforce such funding in accordance with this letter agreement and the Merger Agreement and subject to all of the terms, conditions and limitations herein and therein (clauses (x), (y) and (z), collectively, the "Retained Letter Agreement Claims") or (ii) claims by the Company against Parent or Acquisition Sub under and in accordance with the Merger Agreement (the "Retained Merger Agreement Claims," and together with the Retained Letter Agreement Claims, the "Retained Claims"). Recourse (i) against each Investor, as applicable, solely with respect to the Retained Letter Agreement Claims and (ii) against Parent or Acquisition Sub solely with respect to the Retained Merger Agreement Claims shall be the sole and exclusive remedy of the Company and all of its Affiliates against any Investor or any Investor Affiliate in respect of any liabilities or obligations arising under, or in connection with, the Merger Agreement, or the transactions contemplated thereby, and such recourse shall be subject to the Termination Commitments and the other limitations described herein and therein; provided, that in the event an Investor (i) consolidates with or merges with any other Person and is not the continuing or surviving entity of such consolidation or merger or (ii) transfers or conveys all or a substantial portion of its properties and other assets to any Person such that the Investor's uncalled capital, together with the uncalled capital of any permitted assignee to which the Investor's obligations hereunder are assigned pursuant to Section 10 of this letter agreement, is less than the such Investor's Pro Rata Percentage of the aggregate Termination Commitments then, and in each such case, the Company may seek recourse, whether by the enforcement of any judgment or assessment or by any legal or equitable proceeding or by virtue of any statute, regulation or other applicable Law, against such



continuing or surviving entity or such transferee Person (in either case, a "Successor Entity"), as the case may be, but only to the extent of the liability of such Investor hereunder and subject to the limitations herein.

### 5. Appreciation of Funds.

The Investors will cause Parent and Acquisition Sub to apply the funds received in accordance with Sections 1 and 2 above in satisfaction of Parent's and Acquisition Sub's obligations under and in accordance with the Merger Agreement. In connection therewith, each Investor hereby represents and warrants to, and with respect to clause (e) agrees with, the Company that:

(a) it has the power and authority required to enter into the obligations set out in this letter agreement and to perform fully such obligations as contemplated by this letter agreement in accordance with its terms;

(b) there is not in existence any document, agreement, arrangement or understanding in relation to any aspect of the Equity Financing or this letter agreement to which any Investor, Parent, Acquisition Sub or any Investor Affiliate is a party which would prejudice the Parent's or Acquisition Sub's ability to pay or procure payment of the amounts payable to the Company pursuant to the Merger Agreement or such Investor's ability to fund the Closing Commitment and Termination Commitment pursuant to this letter agreement;

(c) all consents, approvals, authorizations, permits of, filings with and notifications to, any governmental body necessary for the due execution, delivery of and performance of this letter agreement by such Investor have been obtained or made and all conditions therefor have been duly complied with, and no other action by, and, no notice to or filing with, any governmental body is required in connection with the execution, delivery of and performance of this letter agreement;

(d) the entering into of this letter agreement and/or committing the Closing Commitment and the Termination Commitment to Parent and Acquisition Sub will not result in such Investor being in breach of any investment restriction or other obligation contained in its limited partnership agreements, any side letters related thereto, similar organizational documents or any Law, regulation, rule, order judgment or contractual restriction binding on the Investor or its assets;

(e)(i) such Investor and its Affiliates and representatives will not cause Parent or Acquisition Sub to file for any voluntary Insolvency Proceeding, (ii) such Investor will take necessary actions so that Parent and Acquisition Sub do not file for any voluntary Insolvency Proceeding, and (iii) such Investor will use reasonable efforts to oppose any involuntary Insolvency Proceeding, in each case with respect to Parent or Acquisition Sub (for the avoidance of doubt, in no event shall such efforts include the obligation to provide or expend funds that are not otherwise required to be provided or expended pursuant to this letter agreement);



(f) such Investor has all requisite power and authority to execute and deliver this letter agreement; all action on the part of such Investor necessary for the authorization, execution, delivery and performance of this letter agreement has been taken; and this letter agreement, when executed and delivered by such Investor, constitutes a valid and legally binding obligation of such Investor; and

(g) such Investor has the financial capacity to pay and perform its obligations under this letter agreement, and all funds necessary for such Investor to fulfill its obligations under this letter agreement shall be available to such Investor for so long as this letter agreement shall remain in effect in accordance with Section 2(c) of this letter agreement.

6.  No Agency or Joint Venture.

Each party acknowledges and agrees that (a) this letter agreement is not intended to, and does not, create any agency, partnership, fiduciary or joint venture relationship between or among any of the parties hereto and neither this letter agreement nor any other document or agreement entered into by any party hereto relating to the subject matter hereof shall be construed to suggest otherwise, (b) the obligations of each of the Investors under this letter agreement are solely contractual in nature and (c) the determination of each Investor was independent of each other. Notwithstanding anything to the contrary contained in this letter agreement, the liability of each Investor hereunder shall be several, not joint and several, based upon its respective Pro Rata Percentage, and no Investor shall be liable for any amounts hereunder in excess of its Pro Rata Percentage of the Closing Commitment or the Termination Commitment (as applicable) or such lesser amount as may be required to be paid by the Investors. The "Pro Rata Percentage" of each Investor is as set forth below (subject to adjustment, provided, that in any event the total Pro Rata Percentage of the Investors (including any permitted assignee pursuant to Section 10 of this letter agreement) shall always equal 100%):

Weston Capital Partners Fund II                     100%

7.  Intended Parties.

This letter agreement is solely for the benefit of Parent, Acquisition Sub and the Company and is not intended to, nor does it, confer any benefits on, or create any rights or remedies in favor of, any Person other than Parent, Acquisition Sub and the Company. This letter agreement may only be enforced (x) subject to the limitations in Section 4 of this letter agreement, by the Company or (y) by Parent at the direction of its equity holders in a manner agreed by its equity holders or as otherwise required pursuant to an order of specific performance obtained pursuant to the terms of the Merger Agreement. In no event shall any of Parent's or Acquisition Sub's creditors (other than the Company) have any right to enforce this letter agreement or to cause Parent or Acquisition Sub to enforce this letter agreement. For the avoidance of doubt, the Closing Commitment and the Termination Commitment will be funded to Parent and under no circumstances will the Company be entitled to or seek that



the Investors fund, or cause the funding, of the Closing Commitment or the Termination Commitment directly to the Company.

8. Amendments in Writing.

This letter agreement may not be amended or otherwise modified without the prior written consent of Parent, Acquisition Sub, the Investors and the Company.

9. Governing Law and Courts.

THIS LETTER AGREEMENT, AND ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS LETTER AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS LETTER AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF DELAWARE. Each party hereto agrees that it shall bring any action or actions in respect of any claim arising out of or related to this letter agreement or the negotiation, execution or performance of this letter agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this letter agreement) and agrees that all claims in respect of any such action or proceeding shall be heard and determined in such Chosen Court, exclusively in the Delaware Court of Chancery (or, if (but only if) the Delaware Court of Chancery shall be unavailable, any other court of the State of Delaware or any Federal court sitting in the State of Delaware; provided, that if (but only if) the Delaware Court of Chancery, any other court in the State of Delaware and any federal court sitting in the State of Delaware shall be unavailable, any other court of competent jurisdiction sitting in the State of New York, and if (and only if) any such court in New York shall be unavailable, then any other court of competent jurisdiction) and any appellate court from any thereof (the "Chosen Courts"), and solely in connection with claims arising under this letter agreement irrevocably and unconditionally (i) submits , for itself and its property, to the exclusive jurisdiction of the Chosen Courts, (ii) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this letter agreement or the negotiation, execution of performance of this letter agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this letter agreement) in the Chosen Courts, (iii) waives, to the fullest extent permitted by Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in such court, (iv) agrees that a final judgment in any such suit on the judgment or in any other manner provided by Law and (v) agrees that service of process upon such party in any such action or actions shall be effective if notice is given in accordance with the provisions of the Merger Agreement (it being understood that any notice to an Investor shall be delivered in the same manner as a notice to Parent or Acquisition Sub as set forth therein). Notwithstanding the foregoing, any action for recognition or enforcement of any judgment of



Case 2:15-cv-06633-CAS-SS  Document 414-2  Filed 04/22/19  Page 13 of 17  Page ID #:11618

a Chosen Court may be brought by any party hereto in any court of competent jurisdiction, not just a Chosen Court. Each party hereto irrevocably waives all right to trial by jury in any action proceeding or counterclaim arising out of or relating to this letter agreement or the action of the Company, the Investors, Parent and Acquisition Sub in the negotiation, execution, performance and enforcement of this letter agreement.

10. Miscellaneous.

This letter agreement and any signed agreement or instrument entered into in connection with this letter agreement, and any amendments or waivers hereto or thereto, may be executed in any number of counterparts, each such counterpart being deemed to be an original instrument and all such counterparts together constituting the same agreement and, to the extent signed and delivered by means of a facsimile machine or by e-mail delivery of a ".pdf" format data file, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or e-mail delivery of a ".pdf" format data file to deliver a signature to this letter agreement or any amendment hereto or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or e-mail delivery of a ".pdf" format data file as a defense to the formation of a contract and each party hereto forever waives any such defense. The Investors' obligations under this letter agreement, including the obligation of the Investors to fund, or cause the funding of, the Closing Commitment and/or the Termination Commitment, are subject to the execution and delivery of the Merger Agreement by the Company. The Closing Commitment and the Termination Commitment set forth herein shall not be assignable by Parent or Acquisition Sub without each of the Investors' and the Company's prior written consent, and the granting of such consent in a given instance shall be solely in the discretion of the Investors and the Company, and, if granted, shall not constitute a waiver of this requirement as to any subsequent assignment. All or any portion of the Closing Commitment or the Termination Commitment set forth herein may be assigned by any Investor to any other Investor, any additional equity co-investor and/or their respective affiliates and affiliated funds; provided, however, that, except to the extent otherwise agreed to by Parent, Acquisition Sub and the Company, any such assignment shall not relieve any Investor of its obligations under this letter agreement (including its obligation to fund the Closing Commitment and/or the Termination Commitment); provided, further, however, that each of the Investors shall not assign more than 50% of its Pro Rata Percentage of the Closing Commitment or the Termination Commitment (as applicable) other than to any funds or other entities Affiliated with the Investors. Any transfer in violation of either of the two preceding sentence shall be *null and void*. This letter agreement, the Merger Agreement (including the Exhibits and Schedules thereto), the Support Agreements and the Confidentiality Agreement contain the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior discussions, negotiations, proposals, undertakings, arrangements and understandings, whether written or oral, with respect thereto.



If this letter agreement is agreeable to you, please so indicate by signing in the space indicated below.

(signature page follows)

Case 2:15-cv-06633-CAS-SS   Document 414-2   Filed 04/22/19   Page 15 of 17   Page ID #:11620

**For and on behalf of Weston Capital Partners Funds II**

By: _____

Name:   ALBERT HALLAC
Title: CEO

Accepted and agreed as of April 25, 2012

**GLENDON GROUP, INC.**

By: _____

    Name:
    Title: President

**BIDZ ACQUISITION
COMPANY, INC.**

By: _____

    Name:
    Title: President

Accepted and agreed as of April 25, 2011

**BIDZ.COM, INC.**

By: _____

    Name:
    Title:

*Signature Page to Equity Commitment Letter*

**Weston Capital Partners Master Fund II LTD**
Statement of Assets and Liabilities
31-Dec-11
(Stated in United States dollars)

DRAFT

## ASSETS

| | | |
|---|---|---:|
| Investments in limited partnerships at fair value (cost $30,192,598) | $ | 43,087,799 |
| Cash and cash equivalents | | 10,063,687 |
| Note receivable (cost $5,559,897) | | 5,676,034 |
| Due from corporate | | 569,892 |
| Prepaid expenses | | 8,222 |
| Fee income receivable | | 1,006,650 |
| | | |
| Total assets | | 60,412,284 |

## LIABILITIES AND PARTNERS' CAPITAL

| | | |
|---|---|---:|
| Management/consulting fee payable | | 255,408 |
| Accrued expenses | | 244,997 |
| | | |
| Total liabilities | | 500,406 |
| | | |
| Net Assets | $ | 59,911,878 |

Net asset values per share are disclosed in Note 7.



**Weston Capital Partners Master Fund II LTD**
Schedule of Investments
31-Dec-11
(Stated in United States dollars)



| Investment in limited partnership: | % of net assets | Fair Value |
|---|---|---|
| United States: | | |
| White Oak Opportunity SRV, L.P. | 6.83% $ | 4,094,726.27 |
| White Oak Opportunity Master Fund, LP | 17.07% | 10,224,136 |
| White Oak Strategic Master Fund, L.P. | 42.42% | 25,415,662 |
| White Oak Strategic II SRV, L.P. | 3.18% | 1,907,536 |
| White Oak Strategic SRV, L.P. | 2.41% | 1,445,739 |
| Total investment in limited partnership (cost $40,432,810) | | |
| | 71.92% $ | 43,087,799 |

