UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL    'O'

| Case No. | 2:15-cv-6633-CAS (AJWx); C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|---|---|---|---|
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Catherine Jeang | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:

Not Present

Attorneys Present for Defendants:

Not Present

**Proceedings:**    (IN CHAMBERS) - PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. [ 408 ], filed on April 10, 2019)

DEFENDANTS JAM AND INTEGRATED ADMINISTRATION'S MOTION FOR SUMMARY JUDGMENT (Dkt. [ 409 ], filed on April 10, 2019)

## I.    INTRODUCTION

Plaintiff, the Wimbledon Fund, SPC (Class TT) ("Wimbledon"), filed this action on August 28, 2015 against defendants Graybox, LLC. ("Graybox"), Integrated Administration ("IA"), Eugene Scher, as trustee of the Bergstein Trust ("Scher"), Cascade Technologies, Corp. ("Cascade"), and the Law Offices of Henry N. Jannol, P.C. ("Jannol") (collectively, "defendants"). Dkt. 1. The operative amended complaint was filed on January 15, 2016. Dkt. 105 ("Compl."). Wimbledon alleges five claims for fraudulent transfer, pursuant to California Civil Code §§ 3439.04, 3439.05, and 3439.07. See generally id. On May 10, 2016, the Court consolidated this case for all purposes with a related action, originally filed by Wimbledon in the Southern District of Texas on July 30, 2015, against David Bergstein ("Bergstein"), Jerome Swartz ("Swartz"), Aaron Grunfeld ("Grunfeld"), and Kiarash Jam ("Jam"), and subsequently transferred to this Court. Dkt. 134; see The Wimbledon Fund, SPC (Class TT) v. Bergstein, No. 2:16-cv-2287-CAS (AJWx). The operative amended complaint was filed on September 12, 2016. Dkt. 197 ("Tex. Compl."). In that case, Wimbledon sought a declaration that defendants are jointly and severally liable with Swartz IP Services Group's ("SIP") for losses suffered by Wimbledon on its loan for $17.7 million to SIP. See generally id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-6633-CAS (AJWx);<br>C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

On April 10, 2019, defendants Jam and IA and plaintiff Wimbledon filed cross motions for summary judgment on Wimbledon's declaratory relief claim against Jam, and on Wimbledon's fraudulent transfer claim against IA.  Dkts. 408-57 ("P MSJ"), 409 ("D MSJ").  The parties attached statements of undisputed facts, dkts. 408-58 ("PSUF"), 409-33 ("DSUF"), along with supporting exhibits.  On April 22, 2019, Jam and IA filed an opposition to Wimbledon's motion, dkt. 415 ("D Opp'n"), along with a statement of genuine disputed facts, dkt. 415-18 ("DGDF"), 24 objections to Wimbledon's exhibits, dkt 415-19 ("D Obj."), and a supplemental statement of facts, dkt. 415- 20 ("DSSUF").  Wimbledon also filed an opposition to Jam and IA's motion, dkt. 413 ("P Opp'n"), and attached a statement of genuine disputed facts, dkt. 413-3 ("PGDF").  On April 29, 2019, Wimbledon filed a reply brief in support of its motion for summary judgment.  Dkt. 417 ("P Reply").  On the same day, Jam and IA filed a reply in support of their motion, as well, and they attached additional evidentiary exhibits.  Dkt. 420 ("D Reply").

The cross motions for summary judgment are now before the Court.  Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## II.    BACKGROUND

This matter arises out of a loan agreement, entered into by plaintiff Wimbledon and Swartz IP Services Group Incorporated ("SIP") in November 2011.  In brief, Wimbledon claims that, after loaning $17.7 million to SIP, pursuant to a Note Purchase Agreement, SIP fraudulently transferred funds to related parties, and defaulted on the loan.  The following facts, as they pertain to the instant motions for summary judgment, are not meaningfully disputed and are set forth for purposes of background.  Unless otherwise noted, the Court references only facts that are uncontroverted and as to which evidentiary objections have been overruled.

### A.    The Parties

Plaintiff, the Wimbledon Fund, is a Cayman Islands-based pooled investment hedge fund, with five separate classes of investment portfolios.  Compl. ¶¶ 1, 9.  The investment portfolio which is at issue in this case, Wimbledon's "Class TT Fund," was managed by Albert Hallac and Keith Wellner at the times relevant to this case.  PSUF

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-6633-CAS (AJWx); C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|---|---|---|---|
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

No. 26.[1]  Hallac was the Principal of the Weston Capital Management LLC and Weston Capital Asset Management, LLC (collectively, the "Weston Companies") and Wellner served as the companies' General Counsel, Chief Operating Officer, and Chief Compliance Officer.

Bergstein is a California-based movie producer and investor, who has formed and served as an officer and/or director, of numerous business entities, including Graybox. Graybox is wholly owned and controlled by Bergstein.  Jam also worked in the motion picture industry and is the sole owner of KJam Media and IA, a defendant in this case. Between 2010 and 2014, Jam also worked with Bergstein on multiple business deals and investments, and the two shared an office.  D MSJ at 1; PSUF No. 132.  This case specifically pertains to Jam and Bergstein's involvement with SIP, a Texas corporation which Bergstein and Grunfeld, another defendant in this case, formed on December 10, 2010.  PSUF No. 1.[2]  SIP was incorporated for the "purpose of providing advisory services and making investments." Id. No. 2.

### B.   Wimbledon and SIP Enter into a Note Purchase Agreement and Wimbledon Seeks Redemption of its Loan and Sues

In 2011, Bergstein met Hallac and Wellner, Wimbledon's Class TT fund managers, and they negotiated various investments using Wimbledon funds.  DSUF No. 11.  One of these deals resulted in Wimbledon's entering into a Note Purchase Agreement ("NPA") with SIP, whereby Wimbledon could purchase up to $25 million of reference notes (the "SIP Notes").  PSUF No. 30.  The SIP Notes were to increase or decrease in value each year based on the performance of the Tewksbury Investment Fund Ltd, a fund renowned for its positive annual returns and stability.  PSUF Nos. 30–32. Subsequently, in November and December 2011, Wimbledon made payments of $12.5 million and then $5.2 million to SIP to purchase SIP Notes, pursuant to the NPA.  Id. No.

---

[1]     Jam and IA dispute this fact to the extent that "Wimbledon's directors had the final say on whether to enter into" the contracts at issue in this case.  DGDF No. 26.

[2]     SIP's name was formally changed to "Advisory IP Services, Inc." on June 13, 2012.  DSUF No. 4.  However, the parties continue to refer to the company as "SIP," and the Court does, as well.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:15-cv-6633-CAS (AJWx); C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|---|---|---|---|
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

52. On behalf of Wimbledon, the Swiss bank Société Générale Private Banking Suisse, SA ("SG Suisse") transferred the funds into SIP bank accounts, which Bergstein opened. Id. No. 53. It is also alleged in this litigation, although not directly relevant to the subject cross-motions for summary judgment, that SG Suisse and Swiss Financial Services (Bahamas), LTD also reviewed the NPA, conducted due diligence, and certified the SIP Note purchases to be "suitable" investments for Wimbledon. See, e.g. Dkt. 375 ("SATPC") ¶¶ 72–73. [3]

The NPA included multiple provisions designed to evidence SIP's status as a legitimate company, including provisions whereby SIP covenanted to follow certain corporate formalities, to maintain a system of accounting in accordance with GAAP, and to make its properties, books, records, and files available for inspection. PSUF Nos. 33–38. The NPA also set forth SIP's obligations to satisfy a redemption request by Wimbledon. Id. No. 40. The NPA did not contain a use of proceeds provision. DGDF No. 54.

In August and October 2012, and again in January 2013, Wimbledon made redemption requests on SIP, pursuant to the NPA. PSUF No. 89. After SIP failed to

---

[3]    In addition to the matter currently before the Court, there have been numerous lawsuits filed pertaining to investment arrangements entered into by Wimbledon, Weston, and Bergstein. Wimbledon has filed multiple lawsuits against Albert Hallac, Wellner, and the Weston companies in New York state court. In 2016, Bergstein, Graybox, Scher, and Grunfeld also filed third-party complaints in this consolidated matter, seeking indemnification or contribution from third-party defendants, Weston, SG Suisse, Swiss Financial Services (Bahamas) LTD, Albert and Jeffrey Hallac, and Wellner. They have also alleged claims for fraud. In 2015 and 2016, Bergstein, Albert Hallac, and Wellner were also indicted in the Southern District of New York for multiple securities-related criminal charges. PSUF No. 97. Albert Hallac pleaded guilty to wire fraud and conspiracy to commit wire fraud. Id. Nos. 98–99. Wellner pleaded guilty to conspiracy to commit investment advisor fraud and securities fraud, two counts of securities fraud, conspiracy to commit wire fraud, and wire fraud. Id. Bergstein's case proceeded to trial, and on March 1, 2018, a jury found him guilty of the same counts as Wellner. Id. No. 129.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-6633-CAS (AJWx);<br>C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET<br>AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID<br>BERGSTEIN; ET AL. | | |

respond to the redemption requests, and failed to respond to an acceleration notice, Wimbledon filed suit against SIP for breach of contract in New York state court. Id. Nos. 91–94. The Supreme Court of New York court granted Wimbledon's motion for a default judgment on April 13, 2015, and on November 24, 2015, a judgment for $18,171,635 was entered against SIP. Id. No. 95. Due to adjustments for interest, costs, and amounts received in settlements, Wimbledon asserts that the current amount due and owing on the SIP judgment is $19,313,377.39. Id. No. 96.

### C.    Wimbledon Reaches Settlement with SIP and Numerous Defendants

On November 16, 2017, Bergstein, SIP, Graybox, and Wimbledon executed a confidential settlement agreement (the "Settlement Agreement"). DSUF 29; P Mot., Ex. X ("SA"). The Settlement Agreement provided that Wimbledon would dismiss its claims against SIP, Bergstein, Graybox, Scher, Cascade, Swartz, Grunfeld, the Law Offices of Henry N. Jannol, Jam, and IA in exchange for $9.412 million. Id. No. 31; SA (A)(1). These funds were to be paid in three installments: an immediate $2.412 million payment from Graybox's frozen funds; a $5 million payment, within thirty days of entering into the Settlement Agreement, by SIP or its designee; and a final $2 million payment by SIP or its designee within twelve months of executing the agreement. Id. No. 31. This third payment was secured by a consent judgment against Bergstein. Id. No. 32. Upon receipt of the $5 million, Wimbledon would dismiss with prejudice its claims against Bergstein, SIP, Graybox, Scher, Cascade, Swartz, Grunfeld, and the Law Offices of Henry N. Jannol. DSUF No. 33; SA (A)(1)(d). However, Wimbledon would only release its claims against Jam and IA upon receipt of the final $2 million within twelve months of executing the Settlement Agreement. Id. No. 34.

While Graybox paid the initial $2.412 million payment, and while SIP paid the second $5 million payment, using Bergstein's personal funds as well as the assets of his entities, the final $2 million payment was never made. Id. Nos. 35, 37. Accordingly, pursuant to the express terms of the Settlement Agreement, Wimbledon released its claims against all parties in the instant consolidated matters except for Jam and IA. Id. No. 36.[4]

---

[4]    Under the Settlement Agreement, $500,000 of the funds received by Wimbledon, were to be held by Wimbledon's counsel as a retainer and were to fund litigation against

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-6633-CAS (AJWx); C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

### D.    Jam's Involvement with SIP

Wimbledon seeks a declaration that Jam is jointly and severally liable for SIP's contractual obligations to Wimbledon, and therefore liable for $19,313,377.39— the balance of the amount due and owing on the breach of contract judgment which Wimbledon obtained against SIP.  P MSJ at 25.  As mentioned, Bergstein and Grunfeld established SIP on December 10, 2010, and SIP was formed for the "purpose of providing advisory services and making investments."  PSUF Nos. 1–2.  Bergstein served as SIP's director, president, and secretary.  Id. No. 5.  Jam signed multiple documents in he which is described as SIP's Vice President, but he denies that he was formally appointed Vice President.  DGDF Nos. 6, 27–28, 42–43.

The ownership structure of SIP is disputed.  Id. Nos. 7–8; PGDF Nos. 8–10. Wimbledon contends that companies named Owari Opus Incorporated ("Owari") and K-Jam Media ("K-Jam") owned SIP, and Wimbledon alleges that Jam is the sole owner of K-Jam Media, and that K-Jam Media is the sole owner of Owari.  PSUF No. 8. Accordingly, Wimbledon claims that Jam had an ownership interest in SIP.  Id. No. 7. However, Wimbledon has produced no admissible evidence on this issue.[5]

----

Weston and others, to recover additional funds paid to SIP.  SA A(1)(d).  On November 29, 2017, Wimbledon filed suit in New York state court against Weston Capital Partners Master Fund II, Ltd., one of Weston's companies, requesting the turnover of funds (the "Turnover Action").  DSSUF No. 13.  The Supreme Court of New York issued a judgment in Wimbledon's favor, awarding Wimbledon $3,525,675, on April 4, 2019.  Id. No. 21.

[5]     In support of its claim about Jam's ownership interest in SIP, Wimbledon has proffered an email from Frymi Biedak, Bergstein's long-time personal assistant, and a "Summary of Entities" document, allegedly created by Jeffrey Solomon, Bergstein's former attorney.  See Walker Decl., Exs. H, I.  The email from Biedak, dated November 9, 2011, states that SIP is "owned by K-Jam and Owari but K-Jam will be named as responsible party when we file for an EIN #."  Walker Decl., Ex. H.  Jam objected to this email on hearsay grounds, and on the grounds that the email lacks foundation, D Obj. at 3, and the Court finds the evidence inadmissible.  Not only is the email hearsay, but in a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**            **'O'**

| Case No. | 2:15-cv-6633-CAS (AJWx); C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|---|---|---|---|
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

Jam claims that he never owned shares in SIP. DSUF Nos. 7–8, 10. While Jam agrees that Owari owned 87.5% of SIP, Jam claims that Bergstein owned 100% of Owari. Id. Nos. 7–8. In addition, while he acknowledges that he solely owns K-Jam, Jam states that the "remaining 12.5% of shares [of SIP] were intended to be held by Jerome Swartz, an individual." Id. No. 9. In support of his position, Jam has produced a "Resolutions Adopted by Sole Director" of SIP, i.e., Bergstein, dated November 11, 2011, which includes a Banking Resolution and an "Amended Schedule A," which discusses the allocation of SIP shares. Dkt. 409-2, Declaration of David Wiechert ("Wiechert Decl."), Ex. A at 336–38. The Amended Schedule A makes no reference to KJam Media or Jam; rather, it indicates that Swartz received 1,000 shares of SIP and that Owari received 7,000. Id. at 338. With regard to Owari, Jam has produced a "Waiver of Notice of First meeting of Stockholders of Owari Opus Inc," dated November 1, 2010 and signed by Bergstein, in his capacity as "Sole Stockholder." Id. at 339. In addition, the "Minutes of Annual Meeting of Stockholders of Owari Opus Inc.," which is not dated but is signed by Bergstein, identifies Bergstein as the sole stockholder. Id. at 340–41. Wimbledon did not object to these exhibits.

---

deposition, Biedak stated that she had "no idea" where she received information about K-Jam's alleged ownership interest in Owari. Migler Decl., Ex. L 187:03–187:09. She added that she could not testify on this issue. Id. The "Summary of Entities" identifies seven business organizations, including SIP and Owari, ostensibly created by Bergstein and others and includes information like "Type of Entity," "Shares or Membership Interests," "Secretary," and "Next Steps." Id., Ex. I. However, the Summary of Entities is neither dated nor signed. While Wimbledon argues that Jam identified the author as Solomon, Jam's deposition testimony expressly states that he only guessed this fact. Walker Decl., Exhibit J 261:20-262:5. Solomon has not been deposed. Accordingly, these documents constitute inadmissible hearsay, and Wimbledon has not demonstrated that the contents of these documents would be admissible at trial. Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."). Jam's evidentiary objections are **GRANTED** as to these exhibits. See D Obj. at 3.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-6633-CAS (AJWx);<br>C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

Nevertheless, Jam has admitted that on behalf of SIP, Jam executed the NPA and the corresponding SIP Notes, handwriting "VICE PRESIDENT" below his signature. PSUF Nos. 27–28, 42–43. He has also testified that, at the time he signed the SIP Notes, he "understood . . . the significance of indicating that he [was] a vice president of Swartz IP Services Group with [his] signature[.]" Id. Nos. 29, 44. Still, Jam contends that he was not formally the vice president. DSUF No. 14; DGDF No. 28. Jam also executed a side letter (the "Side Letter") on behalf as SIP wherein SIP "represent[ed] and warrant[ed]," *inter alia*, that SIP would maintain at least $5 million of the fund's initial $12.5 million investment in a SIP bank account "until such time as the [SIP] Note matures or redemptions are called for under the NPA[.]" PSUF No. 45.[6]

While Jam admits to signing these documents, he avers that Bergstein "solely negotiated Wimbledon's investment into SIP on SIP's behalf," DSUF no. 12, and that Jam signed the documents at Bergstein's direction—facts which Wimbledon does not dispute, id. nos. 12–13, 15, 17. Jam further states that he did not read the NPA, SIP Notes, or Side Letter before he signed them, and "returned executed copies of a revised set eleven minutes after receiving Bergstein's email directing Jam to execute documents." Id. No. 16. Jam explains that he signed these documents at Bergstein's direction because "he was accustomed to signing documents for Bergstein, whom he trusted, and [who] he understood numerous attorneys had vetted." Id. No. 15. Jam further claims, that "Wimbledon would have accepted the NPA and Reference Notes regardless of who signed them on behalf of SIP," another fact which Wimbledon does not dispute. Id. No. 19.

In addition, Jam notes that Bergstein negotiated and executed the November 2017 Settlement Agreement on SIP's behalf. DSUF Nos. 28–30. Wimbledon did not invite Jam to any negotiations, Jam was not aware of the negotiations as they occurred, and he

---

[6]     Jam objects to the admissibility of the contents of the Side Letter on Federal Rule of Evidence 403 grounds. DGDF No. 45. The Court finds that this evidence is relevant and that it is not unduly prejudicial in light of its probative value. In addition, while Jam contends that the Side Letter was never "provided to Wimbledon," id., the record is clear that Jam sent the letter to Wellner, Wimbledon's investment manager, see Walker Decl., Ex. Q.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:15-cv-6633-CAS (AJWx);<br>C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|----------|--------------------------------------------------------|------|--------------|
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

did not learn about the Settlement Agreement until February 2018, when the Settlement Agreement was presented as evidence in Bergstein's criminal trial. Id. Nos. 38–39.

**E.     SIP Transfers Funds to Related Entities, Including to IA**

Within twelve days of SIP's receipt of the loan from Wimbledon, nearly half of the $17.7 million was transferred to third-parties. PSUF No. 88. Over the following twelve months SIP transferred the funds to numerous entities, including to related parties. Bergstein's entity Graybox received more than $2 million of the NPA funds from SIP; Scher, the trustee of Bergstein's family trust, received $225,000; the Henry N. Jannol Corporation received nearly $1.5 million; and IA received $2.32 million. PSUF Nos. 55–56, 58–59, 63–79. Wimbledon now moves for summary judgment on its fraudulent transfer claim against IA and seeks recovery of the $2.32 million that IA received. P MSJ at 25.

IA is a California corporation, formed by Jam on August 18, 2011. PSUF No. 133; DSSUF No. 1. It was wholly owned by Jam, who also served as the company's Chief Executive Officer, Secretary, Chief Financial Officer, and Director. PSUF No. 133, DSSUF No. 2. In a deposition, Jam described IA as "the company that would pay people. It was – that's the purpose of IA [sic] was set up to pay payroll and pay people and whatnot." PSUF No. 134; DSSUF No. 3. He further stated that IA only offered services to companies affiliated with Jam and Bergstein, id. no. 135, and Jam asserted that Bergstein provided the funding for IA, from sources unknown, id. nos. 137–39. "While Jam owned IA, Bergstein was the primary funding source of IA and would regularly transfer funds into IA, either *sua sponte* or when Jam would advise Bergstein of expenses which needed to be paid." DSSUF No. 4.

Wimbledon claims that SIP did not receive any consideration for the $2.32 million it transferred to IA, and notes that, in depositions, Jam was "unable to identify any specific goods or services that IA provided to SIP in exchange for the millions of dollars IA received." PSUF Nos. 84, 86. Jam's accountant was similarly unaware of any goods or services that IA provided to SIP. Id. No. 85. Wimbledon has also produced numerous emails between Jam and Bergstein, as well as between Jam and his accountants, which specify how some of the SIP funds were to be used. For example, with regard to $150,000 sent from SIP to IA on November 23, 2011, Jam directed his accountant to classify the payment as "income," and to keep $50,000 for "payroll," and to move

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-6633-CAS (AJWx); C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

$100,000 to Jam's entity K-Jam. Id. Nos. 142, 145. In his deposition, Jam testified that Bergstein told Jam to classify the funds in this way. Id. No. 145. With regard to the $100,000 that was sent to K-Jam, Jam directed the funds to be spent as follows: $40,000 for gold and antiques that Bergstein and Jam were purchasing at that time; $10,000 for consulting services; $9,000 to "Jerry Shwarz [sic] for expense reimbursement"; and $41,000 to the Bergstein Trust. Id. Nos. 148–49. After another $250,000 was transferred to IA from SIP, Jam emailed his accountants on December 8, 2011 and directed them to move $84,000 to K-Jam; $40,000 of this was to be used to pay Jam's American Express card. Id. Nos. 150–52, 154 – 55, 157.[7] On March 6, 2012, Bergstein emailed Jam to advise him that SIP had transferred another $300,000 to IA. Id. No. 160. Bergstein directed Jam to use the money to pay a $63,167.36 auction house bill, and to pay Jam's $149,000 American Express statement. Id. No. 161–62. Similarly, in another March 2012 email, Bergstein notified Jam that IA received $50,000 more from SIP, and Bergstein told Jam that he "need[ed] $20k sent to [his family] trust." Id. Nos. 163–64. Other emails similarly reference personal uses of the funds that IA received from SIP. See id. Nos. 165–70, 175.

IA disputes that SIP received no consideration in return for the money that SIP transferred to IA. DGDF No. 84. IA contends that between 2012 and 2014, IA paid $1,442,995.38 in the form of salaries and employment-related expenses for Sovrin Health Systems, Inc. ("Sovrin"), a medical billing company. DSSUF No. 11. IA asserts that it also advanced funds to cover Sovrin's start-up costs, but these amounts are undisclosed. Id. No. 12. IA contends that Wimbledon was on notice that SIP intended to invest a portion of Wimbledon's NPA investment into a medical billing company. Id. Nos. 7–8.

Jam also states that he "lacked awareness of Bergstein's specific purpose in transferring SIP monies into IA," as well as the "source of funds Bergstein infused into

---

[7]     In a deposition, Jam testified that he used his credit card for his "personal and business" expenses. Dkt. 415-1 Declaration of William J. Migler ("Migler Decl."), Ex. C ("Jam Depo.") at Jam Depo. at 51:9. Jam and his longtime accountant and friend also stated that Bergstein also used this American Express credit card for personal expenses. DGDF No. 154; see Jam Depo. at 51:18–51:20; Dkt. 408-4, Declaration of James W. Walker ("Walker Decl."), Ex. C ("Zarrinkelk Depo.") at 44:22 – 45:22.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:15-cv-6633-CAS (AJWx); C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|---|---|---|---|
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

IA or the purpose." DSSUF No. 5–6. In his deposition, Jam testified that he "was not involved in where the money would come from, or how the money would come in" to IA. PSUF No. 144.

## III.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. See Matsushita, 475 U.S. at 587.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-6633-CAS (AJWx);<br>C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|----------|------------------------------------------------------|------|--------------|
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

## IV.    DISCUSSION

### A.    Wimbledon's Declaratory Relief Claim against Jam

Wimbledon moves for summary judgment on its declaratory relief claim against Jam.  It argues that "[t]he overwhelming evidence . . . shows that SIP was utilized solely for the purpose of committing fraud—specifically, to funnel the Fund's investment monies to various entities and individuals related to Bergstein, Jam, and other wrongdoers," and that Jam helped perpetrate that fraud.  PMSJ at 21–23.  Wimbledon emphasizes that SIP rapidly depleted its bank accounts of the funds Wimbledon invested and, amongst other monetary transfers, SIP transferred over $2 million dollars to IA, a company owned by Jam. Id. at 21.  Wimbledon alleges that these funds were then utilized to pay Jam's and Bergstein's personal expenses, id., and Wimbledon calls these transfers "entirely inconsistent" with the NPA and the Side Letter, both of which Jam executed on behalf of SIP, id. at 22.  "Under these circumstances," Wimbledon argues, "piercing the corporate veil is plainly necessary to avoid an inequitable result," and Wimbledon contends that Jam both benefited from the alleged fraudulent activity and perpetrated it. Id. at 22–23.

Jam argues that summary judgment on Wimbledon's alter ego claim should be granted in his favor because he never held an ownership stake in SIP, and to be an alter ego, a defendant must be a shareholder.  Jam further argues that Wimbledon has failed to produce evidence demonstrating Jam's control of SIP, which is necessary even if Wimbledon seeks to pierce SIP's corporate veil on a theory that SIP was created to perpetrate fraud.  D Reply at 5 ("[C]ontrol and ownership are at the heart of Texas piercing law, no matter the theory.").  Jam contends that the evidence demonstrates that Bergstein "singularly controlled SIP," while Jam merely received SIP funds.  D Opp'n at 9.  "[T]hat Wimbledon is unable to say that Jam made those transfers, or caused SIP to make those transfers, is deafening and completely disposes of its alter-ego claim that Jam is SIP and SIP is Jam." Id. (citing Nichols v. Tseng Hsiang Lin, 282 S.W.3d 743, 747 (Tex. App. - Dallas 2009)).  Jam argues that the fact that he executed documents on SIP's behalf, in his stated capacity as SIP's Vice President, does not necessarily establish him as an alter ego of SIP.  D Opp'n at 10.  In light of the representations and arguments made by Wimbledon in the Turnover Action, see supra Section II(iii), wherein Wimbledon primarily mentions Bergstein's involvement with SIP, Jam also argues that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                              **'O'**

| Case No. | 2:15-cv-6633-CAS (AJWx);<br>C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|----------|----------------------------------------------------------|------|--------------|
| Title    | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

Wimbledon is judicially estopped from asserting that anyone but Bergstein controlled SIP.  Id. at 11–15.  Finally, Jam contends that, even if he were SIP's alter-ego, the fact that Wimbledon released its claims against SIP operated to release its claims against any alleged alter-egos; no liability would remain.  Id. at 15.

> **i.     Jam's Alleged Release from Liability by Virtue of the Settlement Agreement Between Wimbledon and SIP**

Under California law, "[a] judgment obtained against a corporation and its alter ego is enforceable against both separately.  Thus, when the plaintiff settles with only the subsidiary, the parent's liability continues.  To hold otherwise would be to defeat the policy of promoting justice that lies behind the alter ego doctrine." Mesler v. Bragg Mgmt. Co., 39 Cal. 3d 290, 301 (1985).[8]  More to the point, the Ninth Circuit has clearly held that, when interpreting the preclusive effect of a settlement agreement, courts "are not at liberty to give the agreement greater preclusive effect than the parties intended." Wojciechowski v. Kohlberg Ventures, LLC, Case No. 17-15966 (9th Cir., May 8, 2019).  In that case, before suing defendant Kohlberg Ventures, the plaintiff in Wojciechowski had entered into a settlement agreement with ClearEdge Power, LLC and ClearEdge Power, Inc.  That agreement expressly excluded from the release any subsequent claims against Kohlberg.  The Ninth Circuit held that the settlement agreement did not preclude the plaintiff's claims against Kohlberg—and the fact that Kohlberg was excluded from the settlement agreement discussions, and that the plaintiff alleged that Kohlberg was a "single employer" with the ClearEdge companies, did not alter the court's conclusion. Id. at 5.  Rather, the Ninth Circuit explained that it "looks to the intent of the settling parties to determine the preclusive effect of a dismissal with prejudice entered in accordance with a settlement agreement," and the court found that "under the unambiguous terms of the settlement agreement, . . . claims against Kohlberg [were] not precluded." Id. at 7, 8.

---

[8]     While Jam argues that Texas law governs this issue, the Settlement Agreement, to which Jam was admittedly not a party, contains a choice of law provision, and it provides that California law governs.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-6633-CAS (AJWx); C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

In the Settlement Agreement at issue here, Wimbledon, Bergstein, and SIP expressly provided that Jam and IA were not to be released until the payment of the final $2 million, which admittedly has not been paid.  See also SA (A)(5) ("After receipt of the $5 million payment referenced in Section A1(b) above, TT Fund shall dismiss the Consolidated Action, with prejudice, as to all TT Defendants except Jam and IA.").  Accordingly, in light of the unambiguous intent of the parties, claims against Jam and IA have not been released.

**ii.    Joint and Several Liability Under Texas Business Organizations Code 21.223(b)**

"[Wimbledon] seeks a judicial declaration that . . . Jam [is] jointly and severally liable for [SIP]'s liability arising out of or under a contract entered into with [Wimbledon.]"  Tex. Compl. ¶ 7.  Under Texas law, merely establishing that an individual is an alter ego does not render him jointly and severally liable for a corporation's contractual obligations.[9]  By statute,

> [a] holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obligees with respect to . . . any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory.

Tex. Bus. Orgs. Code Ann. § 21.223(a)(2) (West).  Instead, the Texas Legislature established the sole instance in which an individual or entity may be held jointly and severally liable for a corporation's contractual obligations, namely, where "the obligee demonstrates that the holder [of shares], beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial

---

[9]    The parties agree that Texas law governs Wimbledon's declaratory relief claim against Jam, which was originally filed in the Southern District of Texas, because SIP was incorporated in Texas.  P MSJ at 18; D MSJ at 7.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**     **'O'**

| Case No. | 2:15-cv-6633-CAS (AJWx);<br>C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

owner, subscriber, or affiliate." Tex. Bus. Orgs. Code Ann. § 21.223 (b) (West); see Sparks v. Booth, 232 S.W.3d 853, 868 (Tex. App. - Dallas 2007) ("The liability of a shareholder for a contractual corporate obligation limited by section 21.223 'is exclusive and preempts any other liability imposed for that obligation under common law or otherwise.'") (quoting Tex. Bus. Orgs. Code Ann. § 21.224 (West)). In enacting this statute, the Texas legislature overruled and superseded by statute the more "flexible approach to piercing the corporate veil," which was established by the Texas Supreme Court in Castleberry v. Branscum, 721 S.W.2d 270 (Tex. 1986). See Willis v. Donnelly, 199 S.W.3d 262, 271–72 (Tex. 2006) ("The business community was displeased with the flexible approach to piercing the corporate veil embraced in Castleberry, and in response the Legislature in 1989 narrowly prescribed the circumstances under which a shareholder can be held liable for corporate debts.").

Texas courts have now ruled that, by including "affiliates" in Section 21.223(b), "[t]he statute applies not only to shareholders, but also 'encompasses any *individual* who is affiliated with (1) a shareholder of the corporation, (2) a beneficial owner or subscriber of shares of the corporation, or (3) simply the corporation itself in some capacity, which . . . includes officers and directors." Biliouris v. Sundance Res., Inc., No. 3:07-CV-1591-N, 2010 WL 11515566, at *3 (N.D. Tex. Aug. 11, 2010) (quoting Phillips v. United Heritage Corp., 319 S.W.3d 156, 166–67 (Tex. App.–Waco 2010)) (emphasis in the original). Texas courts have "recognized that the actual fraud requirement in the Code involves 'dishonesty of purpose or intent to deceive[.]'" TransPecos Banks v. Strobach, 487 S.W.3d 722, 730 (Tex. App.–El Paso 2016). The Fifth Circuit has also held "that establishing that a transfer is fraudulent under the actual fraud prong of [the Texas Uniform Fraudulent Transfer Act] is sufficient to satisfy the actual fraud requirement of veil-piercing because a transfer that is made 'with the actual intent to hinder, delay, or defraud any creditor,' Tex. Bus. & Com. Code Ann. § 24.005(a)(1), necessarily 'involves "dishonesty of purpose or intent to deceive."'" Matter of Ritz, 832 F.3d 560, 567 (5th Cir. 2016). While Section 21.223 does not define the phrase "primarily for the direct benefit" of the defendant, "courts have concluded that evidence showing that funds derived from the corporation's fraudulent conduct were 'pocketed by or diverted to' the individual defendant is sufficient to demonstrate the requirement of a direct personal benefit." Stover v. ADM Milling Co., No. 05-17-00778-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL                    'O'

| Case No. | 2:15-cv-6633-CAS (AJWx);<br>C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|----------|--------------------------------------------------------|------|--------------|
| Title    | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

CV, 2018 WL 6818561, at *8 (Tex. App.-Dallas Dec. 28, 2018, no pet. his.) (quoting Hong v. Havey, 551 S.W.3d 875, 885 (Tex. App. – Houston [14th Dist.] 2018)). [10]

---

[10]    The parties direct their arguments, in part, at the standard for determining whether Jam is an alter-ego of SIP under common law.  However, under Texas Business Organizations Code § 21.223(a)(2), liability for a corporation's contractual obligations is limited to circumstances specified in § 21.223(b).  See Willis, 199 S.W.3d at 271–72; see also Chico Auto Parts & Serv., Inc. v. Crockett, 512 S.W.3d 560, 572 (Tex. App. 2017) (review denied May 5, 2017) ("The Legislature eliminated the 'alter ego' theory as a basis for disregarding the corporate structure when it adopted what is now Section 21.223 of the Texas Business Organizations Code."); Rimade Ltd. v. Hubbard Enterprises, Inc., 388 F.3d 138, 143 (5th Cir. 2004) (explaining that, because plaintiffs sought to hold defendant liable for contractual liability, "the alter ego and illegal purposes considerations are not at issue; as the present case is based on a breach of contract, we focus only on Hubbard's alleged use of HEI to perpetrate fraud.").  Notwithstanding these holdings, the Court notes that some Texas courts have required a plaintiff who wishes to pierce the corporate veil to show both "(1) that the persons or entities on whom he seeks to impose liability are alter egos of the debtor, and (2) that the corporate fiction was used for an illegitimate purpose, in satisfaction of the requirements of article 2.21—now Business Organizations Code section 21.223(a) and (b)."  Tryco Enterprises, Inc. v. Robinson, 390 S.W.3d 497, 508 (Tex. App. – Houston [1st Dist.] 2012).  Because Texas courts have held that an "alter ego" must be a *shareholder* in a corporation, whereas Section 21.223 applies more broadly to affiliates, the Court finds any requirement to show ownership of the corporation as a predicate for liability for corporate debts to be incompatible with Section 21.223.  Compare Permian Petroleum Co. v. Petroleos Mexicanos, 934 F.2d 635, 643 (5th Cir. 1991) ("Texas courts will not apply the alter ego doctrine to directly or reversely pierce the corporate veil unless one of the 'alter egos' owns stock in the other.") with Phillips, 319 S.W.3d at 166–67 ("[t]he statute applies not only to shareholders, but also 'encompasses any individual who is affiliated with (1) a shareholder of the corporation, (2) a beneficial owner or subscriber of shares of the corporation, or (3) simply the corporation itself in some capacity, which . . . includes officers and directors.").  Permian Petroleum was decided in 1991, prior to enactment of Section 21.223, which both expanded the availability of veil piercing to include persons other than the owner of the corporation and contracted the scope of liability to apply only

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-6633-CAS (AJWx);<br>C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

### a.   Whether Jam was an Affiliate of SIP

Jam argues that he cannot be jointly and severally liable for SIP's obligations because he never held shares in SIP.  However, Texas courts have established that, under Texas Business Organizations Code § 21.223(b), "affiliates" need not be shareholders, but broadly includes "any *individual* who is affiliated with (1) a shareholder of the corporation, (2) a beneficial owner or subscriber of shares of the corporation, or (3) simply the corporation itself in some capacity, which . . . includes officers and directors." Phillips, 319 S.W.3d at 166–67.  Wimbeldon has produced evidence that Jam executed numerous documents on behalf of SIP in the stated capacity of "Vice President."  While Jam argues that he was never formally appointed as Vice President, he also testified that, at the time he signed SIP's documents, he "understood . . . the significance of indicating that he [was] a vice president of Swartz IP Services Group with [his] signature[.]"  PSUF Nos. 29, 44.  Thus, not only did Jam hold himself out to Wimbeldon as SIP's Vice President, with knowledge of the significance of doing so, he signed the key contracts at issue in this case in an official capacity on behalf of SIP as SIP's Vice President, thereby binding SIP to the contractual obligations owed to Wimbeldon.  Given this, the Court finds that Jam cannot dispute his status as an officer, and therefore, Jam is an "affiliate," of SIP within the meaning of the statute.  Furthermore, he was, by his own testimony an affiliate of Bergstein, whom, he claims, indirectly owned the majority interest in SIP, and Jam signed the NPA, SIP Notes, and Side Letter at Bergstein's direction.

### b.   Whether Jam Caused SIP to be Used for the Purpose of Perpetrating an Actual Fraud Primarily for his Benefit

"Because of [Jam's] status as [an] affiliate[], in order to pierce the corporate veil of [SIP], [Wimbeldon is] required to establish that [Jam] not only caused [SIP] to be used for the purpose of perpetrating an actual fraud, [but that he] did in fact perpetrate an actual fraud on [Wimbeldon] primarily for [his] own direct personal benefit."  Phillips, 319 S.W.3d at 167; see also Cass v. Stephens, 156 S.W.3d 38, 58–59 (Tex. App.—El Paso 2004).  Contrary to the NPA's provision which indicated that SIP was a legitimate

---

in the circumstances set forth in the statute, at least as to claims based on contractual obligations of the corporation.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-6633-CAS (AJWx); C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|---|---|---|---|
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

business, Wimbledon argues that "SIP . . . did not conduct any legitimate business. Indeed, SIP's Vice President, Jam, could not even identify the company's business purpose, nor could Jam's accountant or business manager." PMSJ at 21. Wimbledon further explains that SIP followed no corporate formalities, never filed taxes, and the Texas Secretary of State forfeited SIP's Certificate of Formation on February 8, 2013. Moreover, Wimbledon contends that SIP acted contrary to the NPA and the Side Letter— both of which Jam signed—by transferring funds to related-entities and to Jam and Bergstein to pay for their personal expenses. Id. at 21–22. The NPA contained express provisions which portrayed SIP as a legitimate business, with considerable capitalization; these representations were false. After signing these key documents, Wimbledon contends that Jam then assisted Bergstein in fraudulently transferring funds, including to Jam's entities, and personally benefitted from the transfers. Wimbledon thus alleges that SIP was a "sham entity which Jam and Bergstein utilized to defraud the Fund of its $17.7 million investment." Id. at 20. Additionally, in light of the Court's finding that defendants engaged in fraudulent transfers, see Section IV(B), Section 21.223's "actual fraud" requirement is met. Ritz, 832 F.3d at 567.

However, Jam resists the conclusion that *he* caused SIP to perpetuate a fraud. He argues that Bergstein solely negotiated the NPA agreement, that Bergstein alone controlled the funds transferred to SIP, and that "any involvement Jam had with SIP was done solely at the behest of Bergstein." D Reply at 1.[11] Indeed, Jam further argues that, in light of representations made by Wimbledon in the Turnover Action, filed against Weston, Wimbledon is judicially estopped from arguing that Jam controlled SIP, D Opp'n at 11–15. Jam asserts that, in the petition for the turnover of funds, Wimbledon

---

[11]     At oral argument, counsel for Jam urged the Court to review the deposition transcript of Majid Zarrinkelk, who was Jam's accountant and family friend. PSUF No. 21. Jam argued that Zarrinkelk's testimony illustrated the degree to which Jam operated at the direction of Bergstein. In his deposition, Zarrinkelk testified that Bergstein made the business decisions and was the "boss" in Bergstein and Jam's business relationship, but he also stated that Jam acted "voluntarily" in their business dealings. See Zarrinkelk Depo. at 27:24–28:03. Zarrinkelk further testified that Jam received a salary for a period of time from IA, id. 148:25–150:02, and that Zarrinkelk was unaware of any services that IA provided to SIP, id. 106:14–106:20; 163:12–163:22. Nothing in this testimony alters the Court's analysis of the cross-motions which are the subject of this order.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL                    'O'

| Case No. | 2:15-cv-6633-CAS (AJWx); C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|----------|------------------------------------------------------|------|--------------|
| Title    | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

alleged Bergstein's sole control in SIP.  Finally, Jam contends that, to demonstrate that Jam caused SIP to engage in actual fraud, Wimbledon must show "that it was Jam's intention to commit such a fraud."  D Reply at 4.

As a preliminary matter, Wimbledon is not judicially estopped from arguing that Jam controlled SIP.  To determine whether judicial estoppel applies, a court assess whether

> [(1)] a party's later position must be "clearly inconsistent" with its earlier position . . . [; (2)] whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled,' . . . [; (3)] whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

New Hampshire v. Maine, 532 U.S. 742, 750–51 (2001) (internal citations omitted).  The doctrine may be invoked at the court's discretion.  Marsburn v. Unum Life Ins. Co. of Am., 119 F.Supp. 3d 1203, 1212 (C.D. Cal. 2015).  In the Turnover Action, Wimbledon argued that Bergstein "act[ed] in concert with Albert [Hallac], Jeffrey [Hallac], and [Keith] Wellner (among others)" when he used SIP to commit fraud.  Migler Decl., Ex. I ¶ 2.  Wimbledon asserts that those "others" included Jam.  Accordingly, Wimbledon's positions are not "clearly inconsistent" with one another.

The Court also agrees with Wimbledon that, by signing the NPA and the Side Letter, which contained false representations, Jam participated in perpetrating fraud against Wimbledon for his personal benefit.  Jam executed documents which contained false representations, and which caused Wimbledon to invest $17.7 million dollars into SIP.  These funds were subsequently transferred to related parties for no consideration.  While Jam argues that Wimbledon would have relied on anyone's signature on the NPA and the SIP Notes, DGDF No. 131, the undisputed fact remains that Wimbledon relied on Jam's signature—with Jam representing himself to be SIP's Vice President, PSUF No. 28.  Jam also personally benefitted from the transactions, as evidenced by the thousands of dollars transferred to Jam to pay for his personal expenses, without IA or Jam providing any evident consideration to SIP.  See Sections II(A)(v), IV(B); Stover, 2018 WL 6818561, at *8 ("[E]vidence showing that funds derived from the corporation's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-6633-CAS (AJWx);<br>C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

fraudulent conduct were 'pocketed by or diverted to' the individual defendant is sufficient to demonstrate the requirement of a direct personal benefit.").

The record also demonstrates that Jam possessed the requisite level of intent to be declared jointly and severally liable for SIP's contractual obligations under Section 21.223(b). Texas courts have recognized that

> when a corporate obligee seeks to establish that the corporate affiliate engaged in actual fraud through the use of a misrepresentation, the obligee similarly shoulders the burden of establishing the existence of the traditional elements of a misrepresentation claim, including that the affiliate engaged in a representation that was: (1) material; (2) false; (3) knowingly false or made with reckless disregard for its truth or falsity; (4) made with the intention that it be acted upon by the other party; (5) relied upon by the other party; and (6) damaging to the other party.

TransPecos Banks, 487 S.W.3d at 731 (citing Cass, 156 S.W.3d at 59). "[I]ntent at the time the statement was made may be inferred from a party's actions before and after the fraudulent conduct. . . . Although a mere failure to perform is no evidence of fraud, breach of a promise to perform, 'combined with "slight circumstantial evidence" of fraud,' is sufficient evidence of fraudulent intent." Clement v. Blackwood, No. 11-16-00087-CV, 2018 WL 826856, at *4 (Tex. App. – Eastland Feb. 8, 2018), review denied (June 29, 2018) (citing Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 435 (Tex. 1986)).

On the record before it, there is no genuine issue of fact concerning Jam's intent. Jam contends that he had no knowledge of how Bergstein found funding for the entities they formed and operated, and that Jam did not control the bank accounts which held SIP's funds. DSUF No. 5, 21; DSSUF Nos. 4–6. He also states that he executed the NPA, the SIP Notes, and the Side Letter without reading them. DSUF No. 16. However, there is no genuine issue of fact that Jam signed the NPA, the SIP Notes, and the Side Letter, which made false representations about SIP's status as a legitimate business entity and SIP's use of Wimbledon's funds, that Jam knew the funds paid to IA came from SIP, and that Jam received at least some of these funds for his personal benefit. While Jam avers that he never read the documents, even if true, this would not absolve Jam of liability. His actions demonstrate reckless disregard for the truth of the representations made in the documents that he admittedly signed: in executing multi-million-dollar

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:15-cv-6633-CAS (AJWx); C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|----------|------------------------------------------------------|------|--------------|
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

contracts without reading, understanding, and ascertaining the validity of the terms contained therein, Jam made material representations with "reckless disregard for [their] truth or falsity." TransPecos Banks, 487 S.W.3d at 731. He also acted "with the intention that [these representations] be acted upon by the other party." Id. Jam claims that he was never officially appointed as SIP's Vice President. DSUF No. 14; PSUF No. 28. Still, he presented himself to Wimbledon as SIP's Vice President—clearly to signify his authority to bind SIP in contract. Id. Indeed, Jam has testified that he "understood . . . the significance of indicating that he [was] a vice president of Swartz IP Services Group with [his] signature[.]" PSUF Nos. 29, 44.

Accordingly, the record demonstrates that Jam was an affiliate of SIP and Bergstein, and that he used SIP to perpetrate actual fraud, from which he personally benefitted. Pursuant to Section 21.223(b), the Court thus concludes that Jam should be declared jointly and severally liable for SIP's obligations to Wimbledon, which arose out of the NPA. Summary judgment for Wimbledon is **GRANTED** on this claim.

### B. Wimbledon's Fraudulent Transfer Claim against IA

Wimbledon also moves for summary judgment on its fraudulent transfer claim against IA.[12] "There are two theories under which a receiver may proceed under [the UFTA]: actual fraud or constructive fraud." Damian v. A-Mark Precious Metals, Inc., No. CV 16-7198 FMO (SSX), 2017 WL 6940515, at *5 (C.D. Cal. Aug. 28, 2017). Pursuant to California Civil Code § 3439.04(a), "actual fraud" occurs where the transfer was made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Cal. Civ. Code § 3439.04(a) (West). In determining whether the "actual intent" requirement under §3439.04(a) is met, the statute provides that a court may consider, inter alia, "[w]hether the transfer or obligation was to an insider; . . . [w]hether the debtor retained possession or control of the property transferred after the transfer; . . . [w]hether the transfer was of substantially all the debtor's assets; . . . [and w]hether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." Cal. Civ. Code § 3439.04(b). In

---

[12]     With regard to Wimbledon's fraudulent transfer claim, filed against IA, a California corporation, in the Central District of California, the parties agree that California law governs. P MSJ at 23; D Opp'n at 16.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-6633-CAS (AJWx); C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|---|---|---|---|
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

contrast, a plaintiff may avoid a transfer under a theory of constructive fraud where a transfer is made,

> [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

>> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

>> (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Cal. Civ. Code § 3439.04(a) (West).

Importantly, however, a transfer is not voidable under the statute where a transferee received funds "in good faith and for a reasonably equivalent value." Cal. Civ. Code § 3439.08(a) (West). Still, "a transferee cannot benefit from the good faith defense if that transferee had fraudulent intent, colluded with a person who was engaged in the fraudulent conveyance, actively participated in the fraudulent conveyance, or had actual knowledge of facts showing knowledge of the transferor's fraudulent intent." Nautilus, Inc. v. Yang, 11 Cal. App. 5th 33, 37 (Ct. App. 2017), reh'g denied (May 8, 2017), review denied (Aug. 9, 2017).

Wimbledon argues that the transfers from SIP to IA were "plainly fraudulent" under each of the three provisions of Section 3439.04. PMSJ at 24. With regard to the first provision, Wimbledon asserts that the transfers "were made as part of a wide-ranging fraudulent investment scheme," that the transfers were made to an insider, that Jam retained control of the funds after receiving them, and that SIP received no consideration for the funds transferred. Id. at 24–25. Because SIP received no consideration for the funds transferred to IA, Wimbledon argues that the second and third provisions are also met. Id. at 25.

In defense, IA argues that it is not liable because it received funds from SIP in good faith and because it provided reasonable value in exchange for the transfer. D Opp'n at 16. IA argues that Wimbledon has failed to show that "IA ever had actual

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-6633-CAS (AJWx); C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|----------|-----------------------------------------------------|------|--------------|
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

knowledge of Bergstein's/SIP's intent for making these transfers or the source of the funds. Indeed, in his deposition as the person most qualified to testify on IA's behalf, Jam repeatedly indicated that he, and by extension IA, lacked awareness of the specifics regarding the source of the funds that were transferred into IA and Bergstein's use of SIP monies." D Opp'n at 17 (citing DSUF Nos. 5–6). IA also argues that SIP received reasonable consideration for its payments into IA because IA allegedly paid $1,442,995.48 in payroll expenses for Sovrin Health Systems, a medical billing company. D Opp'n at 17. IA admits that $1,442,995.48 does not account for the total $2.32 million that SIP transferred to IA, but IA argues that "reasonably equivalent value" does not require full consideration. Id. n.8. While IA acknowledges that Jam has testified that he is uncertain whether SIP invested in Sovrin, IA still argues that, "it is evident that SIP's transfers into IA were likely done to cover at least Sovrin's payroll expenses and/or Sovrin's start-up costs, with the expectation that those transfers were an investment into Sovrin which Bergstein/SIP hoped would blossom into future profits." D Opp'n at 18. IA therefore argues that it provided consideration for the payments it received from SIP.

In support of this position, IA has produced spreadsheets listing the names of employees who ostensibly received wages from IA's SIP-funds. See Migler Decl., Ex. F. The spreadsheet also indicates that Bergstein and Jam received 20% of their salaries from these funds. Id. There is no indication of who created the spreadsheet, the spreadsheet is not dated, there are no bank records confirming the payments, and there are no W-2s, or other official documents, evidencing that these individuals were, in fact, employees of Sovrin.

The Court finds that summary judgment should be granted for Wimbledon on this claim. First, the record is clear that Bergstein committed actual fraud on Wimbledon when he negotiated the NPA and made false representations about SIP. However, even if Bergstein did not harbor "actual intent to hinder, delay or defraud" Wimbledon, Wimbledon has established that constructive fraud occurred. Damian, 2017 WL 6940515, at *5. As a preliminary matter, SIP did not receive "reasonably equivalent" value for its transfers to IA, as discussed below. Additionally, when Bergstein negotiated the NPA with Wimbledon, and when SIP later transferred those funds to related parties instead of investing funds in business opportunities, SIP and Bergstein "reasonably should have believed that [SIP] would incur, debts beyond the debtor's ability to pay as

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-6633-CAS (AJWx); C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|---|---|---|---|
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

they became due." Cal. Civ. Code § 3439.04(a)(2)(B) (West). There is no evidence that Wimbledon's funds were ever utilized for any valid investment purposes.

On the record before it, the Court also finds that IA's "good faith" defense fails. Although IA asserts that IA, through Jam, had no "actual knowledge" of Bergstein's fraudulent activities, the Court need not reach this contested factual issue for the purpose of determining the fraudulent transfer claim because IA has not demonstrated that SIP received reasonably equivalent value for its transfers to IA. Cal. Civ. Code § 3439.08(a) (West) (emphasis added) (providing that a transferee may only assert a defense under § 3439.08(a) when it took funds "in good faith *and* for a reasonably equivalent value"). Here, even if IA paid Sovrin $1,442,995.48, as IA claims, IA has not demonstrated that SIP derived any value when IA paid those funds. There is no indication that SIP or IA received equity interests in Sovrin, that Sovrin provided goods or services in return for those funds, nor that IA made payments to Sovrin in the form of a loan that Sovrin would repay. IA has not even produced a certificate of incorporation, or equivalent certificate, to prove Sovrin's status as a legitimate business enterprise. Critically, this case arises out of the clear misuse of the funds that Wimbledon transferred to SIP. SIP transferred those funds to IA for no evident consideration, and there is no basis to assume that because some of those funds were thereafter transferred to yet another related-party—namely, Sovrin—that SIP therefore received any consideration from those transfers. Additionally, while IA argues that $1.44 million is "reasonably equivalent" to the $2.32 million that IA received, the Court disagrees. IA's alleged transfers to Sovrin account for roughly 60 percent of the funds IA received from SIP. IA has offered no explanation for any legitimate use of the remaining 40 percent of the funds received.

In light of the foregoing, the Court finds that Wimbledon has produced uncontroverted evidence which demonstrates that SIP's transfers to IA were fraudulent. IA has failed to raise a genuine disputed fact on the issue and has similarly failed to produce evidence supporting a defense under § 3439.08(a). For these reasons, a rational trier of fact would not be able to find for IA on this issue, and the Court thus **GRANTS** Wimbledon's motion for summary judgment on its fraudulent transfer claim against IA.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**           **'O'**

| Case No. | 2:15-cv-6633-CAS (AJWx); C/W: 2:16-cv-2287-CAS(AJWx) | Date | May 29, 2019 |
|----------|------|------|------|
| Title | THE WIMBELDON FUND, SPC (CLASS TT) v. GRAYBOX, LLC ET AL.; C/W: THE WIMBELDON FUND, SPC (CLASS TT) v. DAVID BERGSTEIN; ET AL. | | |

## V.    CONCLUSION

In accordance with the foregoing, the Court **GRANTS** summary judgment in Wimbledon's favor on Wimbledon's declaratory relief claim against Jam.  The Court **GRANTS** summary judgment on Wimbledon's fraudulent transfer claim against IA.[13]

IT IS SO ORDERED.

00          :   00

Initials of Preparer          CMJ

---

[13]    The Court also **DENIES** as moot all evidentiary objections not discussed in the order because the Court did not rely on those exhibits.